IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| ADELINA GARCIA, et al., individually, and on behalf of a class of others similarly situated, | ) ) ) ) | |
| Plaintiffs, | ) | Case No. 2:06-CV-2198-JWL-DJW |
| v. | ) ) | |
| TYSON FOODS, INC. TYSON FRESH MEATS, INC., | ) ) ) | |
| Defendants. | ) | |

**DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION
TO STRIKE REGARDING DEFENDANTS' EXPERT WITNESSES**

Defendants Tyson Foods, Inc. and Tyson Fresh Meats, Inc. (collectively "Tyson" or "Defendants") oppose Plaintiffs' Motion To Strike Regarding Defendants' Expert Witnesses (Dkt. 877), in which Plaintiffs request that this Court place two narrow limitations on the testimony of Defendant's time-study expert, Dr. Paul Adams, and entirely bar the potential rebuttal testimony of Defendants' damages witness, Peter Nickerson.

## I.   INTRODUCTION AND BACKGROUND

Plaintiffs have moved to exclude the testimony of two of Defendants' witnesses. One of them – Defendants' time-study expert, Dr. Paul Adams – has been designated as an expert witness. The other – Defendants' potential witness who may critique Plaintiffs' damages testimony at trial – was explicitly disclosed *not* as an expert witness, but rather as a fact witness; at most, he could be a Rule 1006 witness.

Importantly, Plaintiffs' motion is *not* a "*Daubert*" motion. Plaintiffs have not invoked Fed. R. Evid. 702 and do not rely upon any case law applying *Daubert* or its principles. Instead,

Plaintiffs rely entirely upon mischaracterizations about the nature of the witnesses' testimony or Defendants' litigation position.

As to Dr. Adams, Plaintiffs make two arguments. First, they contend that Dr. Adams will "tell the jury to ignore the continuous workday rule." Pltfs' Mot. at 3. This is incorrect. Dr. Adams will take no position on the law. Although he did measure various donning and doffing-related activities, his methodology is well supported by industrial engineering principles, including those supported by Plaintiffs' own expert, Dr. Robert G. Radwin, in *Alvarez v. IBP* and later donning and doffing cases. Importantly, post-*Alvarez* decisions have explicitly allowed the same "elemental" time-study methodology employed by Dr. Adams here, and we are not aware of any case authority supporting Plaintiffs' position that such an approach is banned.

Second, Plaintiffs imply that Tyson agreed *not* to challenge the "objectivity/accuracy" of Dr. Radwin's measurements in the locker room using audio narration instead of videotaping. Although Plaintiffs *proposed* such a stipulation, *see* Pltfs' Ex. D, Tyson rejected it. *See* email from E. Paschal to E. Dirks dated May 17, 2010 at 3:42 p.m. EDT, attached hereto as Ex. B. Ultimately, the parties merely agreed that Tyson would not challenge Radwin's use of audio recordings as inferior to video recordings. *See* Pltfs' Ex. C, ¶ 5(3). Dr. Adams' opinion is consistent with the stipulation; he likewise was forced to avoid videotaping in the locker room, and he criticizes Dr. Radwin's locker-room measurements on independent grounds.

As to Nickerson, Defendants did not disclose him as an "expert" witness on damages.[1] Out of an abundance of caution, Defendants disclosed his existence and his qualifications, but

---

[1] *See* Defendants' Disclosure of Peter Nickerson dated Sept. 15, 2010, attached hereto Ex. A, at n.1. We note that Plaintiffs did not attach Defendants' disclosure statement for Nickerson. This was clearly strategic, because on its face the disclosure indicates that Nickerson has *not* been designated as an expert. We discuss below why his testimony would *not* be "expert" testimony.

2

expressly noted that they were not required to do so.  Indeed, in Tyson's other pending donning and doffing cases involving its beef- and pork-processing facilities, no other Plaintiffs' counsel have treated their damages witnesses as "experts," and it is black-letter law that damages testimony may be presented through a fact or Rule 1006 witness.

Furthermore, Defendants are not yet in a position to provide a critique of Plaintiffs' damages calculations.  By agreement of the parties, Defendants will produce updated payroll data in early 2011, Plaintiffs will then decide whether to serve updated damages calculations, and Defendants may then depose Plaintiffs' damages witness for the first time.  *See* section 13 of Pretrial Order, at page 34.

## II. THE COURT SHOULD REJECT PLAINTIFFS' PROPOSED LIMITS ON THE TESTIMONY OF DEFENDANTS' TIME-STUDY EXPERT, DR. PAUL ADAMS

### A. Dr. Adams' "Elemental" Method Is A Sound Scientific Approach And Is Not Inconsistent With The Supreme Court's Decision in *Alvarez*

Plaintiffs are correct that their time-study expert measured different events than Defendants' time-study expert measured.  However, they inaccurately describe *both* Dr. Radwin's methodology *and* Dr. Adams' methodology.

Plaintiffs contend that their expert employed a "'continuous workday' methodology", *viz*., "Plaintiffs' expert measured *all* time that occurs after the first integral and indispensable activity until the last."  Pltfs' Motion at 2.  As demonstrated in Defendants' pending motion to exclude Plaintiffs' expert, Dr. Radwin, this is simply untrue.  Radwin merely broke the work day into four segments, and then further excluded various activities that Plaintiffs' counsel told him to exclude from his measurements.  *See* Def's Mot. to Exclude (Dkt. 875) at section C.1.  Radwin admits that his methodology is not supported by any textbook.  *See id*. at section B.1.  In addition, Radwin's methodology does *not* measure from the "first integral and indispensable

3

activity" until the last "integral and indispensable activity," since his measurements at both ends of the day include activities that are non-compensable as a matter of law. *See id*. at section C.2.

Plaintiffs then misdescribe the methodology of Defendants' expert, Dr. Adams. They assert that he "measure[]d only select portions of the activities that occur within the continuous workday," and they assert that he "only measured what he deems the amount of time 'reasonably required' to perform" those activities.[2] Pltfs' Motion at 2. This is not correct. As an initial matter, Dr. Adams measured 68 different categories of activities at Finney County alone – virtually every type of donning, doffing, rinsing, scrubbing, and waiting to wash. *See* Adams Report at 27-28, attached as Pltfs' Ex. A. He also measured all of the relevant walking. *Id.* at 14 (Table 4) and 18 (Table 9). The only thing that he excluded is "avoidable delays," such as socializing or sitting that occurred in between different donning and doffing activities. *See* Adams Report at 4, ¶ 5; *see also id.* at 20, ¶ 6.1.2. As discussed further below, this is known in

---

[2] Plaintiffs' motion does not ask this Court to decide the proper measure of damages, including whether damages may be based on "reasonable" time. However, we note that, despite the long-time existence of the continuous workday regulation, virtually every court to have addressed the issue has stated that "reasonable" time is either the relevant measure for the *de minimis* defense or for calculating damages. *See, e.g., Alvarez v. IBP, Inc.*, No. CT-98-5005-RHW, 2001 WL 34897841, at *11 (E.D. Wash. Sept. 14, 2001) ("compensable time for each activity is on the basis of reasonable time, rather than the actual time required for each activity"); *Amos v. United States*, 13 Cl. Ct. 442, 443, 448-50 (Cl. Ct. 1987) (compensable time at the start and end of the workday was limited to the amount of time reasonably required); *Reich v. IBP, Inc.*, 820 F. Supp. 1315, 1324 (D. Kan. 1993) (employees entitled to compensation for "reasonable time (rather than actual time) required"), *aff'd and remanded*, 38 F.3d 1123, 1127 (10th Cir. 1994) ("We believe reasonable time is an appropriate measure in this case"); *see also Anderson v. Wackenhut Corp.*, No. 507 CV 137 DCBJMR, 2008 WL 4999160, at *6 (S.D. Miss. Nov. 18, 2008) (rejecting claim that Supreme Court's decision in *IBP, Inc. v. Alvarez* held that all time occurring after the first principal activity is compensable); *Bull v. United States*, 68 Fed. Cl. 212, 227 (Fed. Cl. 2005) (quoting *Amos* with approval); *Albanese v. Bergen County*, 991 F. Supp. 410, 423-24 (D.N.J. 1997) (citing *Amos*, 13 Cl. Ct. at 44) ("employees must show that the overtime hours they worked must be reasonable in order for those hours to be compensable"); *Hellmers v. Town of Vestal*, 969 F. Supp. 837, 844 (N.D.N.Y. 1997) ("the amount of overtime an employee claims to have spent must be reasonable …").

industrial engineering as an "elemental" time-study, that is, a study of each element or segment of activities that is the subject of interest. *See* Adams Report at 4 ("My decision to perform an elemental analysis was based on the following considerations. 1. Elemental analysis is a standard method for conducting time studies and is accepted within Industrial Engineering as a scientific approach.").

Plaintiffs' expert, Dr. Radwin, ratified the importance of the "elemental" approach in his deposition in this case. He admitted that a leading textbook in this area is Benjamin Niebel's. *See* Andrew Frievalds and Benjamin W. Niebel, NIEBEL'S METHODS, STANDARDS, AND WORK DESIGN, Time Study (Chapter 10) (12th ed. McGraw-Hill Higher Education) ("NIEBEL"), attached hereto as Ex. C; Radwin Dep. at 230:13-233:5, 246:22-247:16 (admitting that Niebel's textbook is authoritative, is generally accepted in Radwin's field, and that Radwin has taught from it and cited it in other work), attached hereto as Ex. D; Radwin Report in *Alvarez v. IBP, Inc.* at p.9 (citing then-current 8th edition of Niebel's textbook), attached hereto as Ex. E; Radwin Report in *Spoerle v. Kraft Foods Global, Inc.*, at p.4 (citing then-current 11th edition of Niebel's textbook), attached hereto as Ex. F. Niebel's treatise recommends measuring activities for a time study by breaking them down into clearly defined "elements."[3]

---

[3] According to the Niebel treatise: "For ease of measurement, the operation should be divided into groups of motions known as *elements*. … To identify endpoints completely and develop consistency in reading the watch from one cycle to the next, consider both sound and sight in the elemental breakdown. For example, the *break points* of elements can be associated with such as sounds as [examples listed] …. Each element should be recorded in its proper sequence, including a basic division of work terminated by a distinctive sound or motion." *See* NIEBEL at pp. 415-16 (emphases in original). Radwin described the process the same way in a published article about using videotape to analyze work activities. *See* Robert G. Radwin & Thomas Y. Yen, *Development of an Instrument for Assessing Exposure to Physical Stress in Repetitive Manual Work,* 2 PROCEEDINGS OF THE 1993 NSF DESIGN AND MANUFACTURING SYSTEMS CONFERENCE, 1153 (1993), attached hereto as Ex. G ("While viewing the video tape, an analyst assigns break-points for task *elements*.") (emphasis added).

Indeed, for many years, Plaintiffs' expert Radwin has accepted and used the bedrock principle of measuring "elements." Radwin originally represented IBP (which later became Defendant Tyson Fresh Meats, Inc.) in *Alvarez v. IBP*. In his report in that case, Radwin accepted the "elemental" approach of plaintiffs' expert Dr. Mericle, but criticized it on other grounds. *See* Radwin Report in *Alvarez v. IBP, Inc.*, attached hereto as Ex. E, at 7 ("The activities studied are not repetitive tasks and therefore applying allowances to *individual work elements* is inappropriate.") (emphasis added). The district court adopted the elemental approach based on the plaintiffs' elemental measurements of each clothing item and walking distance. *Alvarez v. IBP, Inc.*, No. CT-98-5005-RHW, 2001 WL 34897841, at **11-12 (E.D. Wash. Sept. 14, 2001) ("the methodology of [plaintiffs' expert] Dr. Mericle was followed by the DOL in its time studies involving IBP, and seems to be accepted in the meat packing industry … and, finally, the testimony presented convinces the Court that these times are the reasonable times required for performance of each activity.") (citation omitted). Although Plaintiffs here cite to the Supreme Court's decision in *Alvarez*, they fail to point out that the district court's "elemental" numbers in *Alvarez* were affirmed by the Ninth Circuit and were left untouched by the Supreme Court. *See* 39 F.3d 894, 907, 914 (9th Cir. 2003), *aff'd on other grounds*, 546 U.S. 21, 29 (2005). There was no remand to recalculate damages using what Plaintiffs are now calling a "'continuous workday' methodology."

In many other donning and doffing cases, both before and after *Alvarez*, Dr. Radwin himself has broken down the workday into "elements." *See* Radwin Report in *Fox v. Tyson Foods, Inc.* dated Sept. 28, 2001, attached hereto as Ex. H, at 7 ("The events observed for donning and doffing equipment were divided into *distinct time segments called elements. This is a frequent approach used for time studies.*") (emphasis added); Radwin's updated Report in *Fox*

6

*v. Tyson Foods, Inc.* dated May 25, 2006, attached hereto as Ex. I, at 9 (post-*Alvarez* report using the same words);[4] Radwin Report in *De Asencio v. Tyson Foods, Inc.* dated Jan. 15, 2002, attached hereto as Ex. J, at 7 (pre-*Alvarez* report using the same words); Radwin's updated Report in *De Asencio v. Tyson Foods, Inc.* dated Apr. 13, 2006, attached hereto as Ex. K, at 1 (post-*Alvarez* report stating: "I conducted my new analysis using refined *elements* for each of the donning, doffing and sanitizing activities … based on recent rulings [*i.e., Alvarez*].") (emphasis added); Radwin Report in *Chao v. Tyson Foods, Inc.* dated Feb. 18, 2004, attached hereto as Ex. L, at 10 ("The events observed for donning and doffing activities were divided into distinct activities or *elements*.") (emphasis added); Radwin's updated Report in *Chao* dated Sept. 18, 2006, attached hereto as Ex. M, at 10 ("Due to a recent US Supreme Court decision, the original analysis and *the elements* of donning and doffing activities have been revised.") (emphasis added); Radwin Report in *Perez v. Mountaire Farms, Inc.* dated July 10, 2008, attached as Ex. N, at 7 ("The events observed for donning and doffing activities were divided into distinct activities *or elements*.") (emphasis added); Radwin Report in *Rios v. Jennie-O Turkey Stores, Inc.* dated Nov. 21, 2008, attached as Ex. O at Tables 4 and 6 (listing "Elements" that Dr. Radwin measured).

Recently, Radwin was retained by a defendant employer, Kraft Foods, in a donning and doffing case. Again, although it was a post-*Alvarez* case, Radwin accepted the "elemental" approach, and he merely criticized the opposing expert for how that methodology was applied:

> It is important that each *elemental* activity is therefore independent and does not overlap. …

---

[4] Radwin differed in his pre-*Alvarez* and post-*Alvarez* reports in *Fox v. Tyson Foods*. The main difference is that Radwin's "new analysis attempts to include as much of that time [in the cafeteria or restroom] as possible …." *See* Radwin's updated Report in *Fox* at 7.

> Since the task of donning, doffing and walking at the start and end of the shift at the Kraft Oscar Mayer plant is not stereotypical and cyclical, and does not contain independent activities that are initiated and terminated by distinct actions or sounds that demark the exact start and end of the *elements*, the methodology Mericle used for estimating these times is inappropriate. …
>
> Further Mericle's video analysis did not use activities that are initiated and terminated by distinct and indisputable actions or sounds that demark the exact start and end of the *elements*.

*See* Radwin Report in *Spoerle v. Kraft Foods Global, Inc.*, attached hereto as Ex. F, at 5 (emphases added).

Since the Supreme Court decided *Alvarez*, many plaintiffs' counsel in donning and doffing cases have sought to exclude the opinions of employers' time-study experts on the ground that an "elemental" study is inconsistent with "the continuous workday rule." To the best of Defendants' knowledge, no court has ever accepted a plaintiff's argument that an "elemental" or "task-based methodology" is invalid in the context of a donning and doffing case. *See, e.g., Anderson v. Sara Lee Corp.,* 508 F.3d 181, 186 (4th Cir. 2007) (referring to the district court's decision to decline to exclude the expert's report, although it measured individual activities, and admitting it for the purpose of estimating the time needed by workers for the isolated acts); *Lewis v. Smithfield Packing Co.,* No. 7:07-CV-166-H, slip op. at 7-9 (E.D.N.C. Aug. 20, 2010) (holding that an expert report employing basically the same methodology as Dr. Adams' "elemental" approach was relevant, *inter alia,* to the amount of time at issue and factors for the *de minimis* defense), attached hereto as Ex. P; *Sandifer v. United States Steel Co.,* No. 2:07-CV-443 RM, 2009 WL 3430222, at *17-18 (N.D. Ind. Oct. 15, 2009) (in denying summary judgment to plaintiffs, court failed to agree with plaintiffs' argument that the measurement of donning and doffing activities must be in the aggregate to be consistent with the continuous workday rule); *Kasten v. Saint-Gobain Performance Plastics Corp.,* 556 F. Supp. 2d 941, 946 (W.D. Wis. 2008) (rejecting plaintiff's argument that expert's utilization of a task-based methodology was legally

improper, and finding the report relevant); *Chao v. Tyson Foods, Inc.,* No. 2:02-cv-1174-VEH, slip op. at 7-8 (N.D. Ala. Sept. 7, 2007) (expert's methodology was relevant, *inter alia,* to factors to be considered on *de minimis* defense), attached hereto as Ex. Q.

These rulings are correct as a matter of law. The continuous workday rule, 29 C.F.R. § 790.6(b), has existed since 1947. *See IBP, Inc. v. Alvarez*, 546 U.S. 21, 29 (2005). Nonetheless, the Supreme Court has never suggested that every bit of socializing and other non-productive activities must be included in applying the *de minimis* defense *or* in calculating damages. In the seminal donning and doffing case of *Anderson v. Mt. Clemens Pottery*, 328 U.S. 680 (1946), the Supreme Court held that "compensable working time [is] limited to the minimum time necessarily spent in walking at an ordinary rate along the most direct route," *id.* at 692, and held that "insubstantial and insignificant periods of time spent in preliminary activities need not be included in the statutory workweek." *Id*. at 693 (explaining *de minimis* doctrine). The Supreme Court then remanded for a determination of the amount of time involved, "giving due consideration to the de minimis doctrine and calculating the resulting damages under the Act." *Id*. at 694. *Accord Alvarez*, 546 U.S. at 25-28 (acknowledging that *Anderson* held that time "necessarily" spent walking is to be treated as part of the "workweek"; that the subsequent enactment of the Portal Act *narrowed* the coverage of the FLSA; and that except for the express exceptions for travel and preliminary and postliminary activities, the Portal Act does not purport to change the Court's previous description of the term "workweek"); *Musticchi v. City of Little Rock, Arkansas*, __ F. Supp. 2d __, 2010 WL 3327998 at \*\*9, 11 (W.D. Ark. Aug. 24, 2010) ("when deciding whether an activity should be considered *de minimis* the court must look at the minimum time it takes to complete the task.") (quoting *Anderson v. Mt. Clemens Pottery* to analyze maintaining and assembling/disassembling safety and other gear).

Here, Dr. Adams followed precisely the methodology stated by the Supreme Court in *Anderson v. Mt. Clemens Pottery* and *IBP v. Alvarez*. As Plaintiffs' own expert admits in his rebuttal report to Dr. Adams, the measurements of Dr. Adams "represents **just the bare minimum time needed to do**" the activities. *See* Rebuttal Report of Robert G. Radwin at 4, attached hereto as Ex. R (bold in original). Dr. Radwin's words track virtually word for word the standard imposed by the Supreme Court. Thus, Dr. Adams' methodology is appropriate.

Finally, we note that it is more than a bit ironic that Plaintiffs are seeking to exclude Dr. Adams' report on the ground that it does not apply a "continuous workday methodology." Neither does Dr. Radwin's report. Radwin admits that he "didn't attempt to measure the entire continuous workday" and *excluded* various activities (*e.g.*, going to the restroom, eating or socializing in the cafeteria, smoking, reading, visiting medical office). *See* Radwin Report at 6, attached hereto as Ex. S; Radwin Dep. at 214: 11-12, 15-22, 216:22-217:1, 218:9-219:12, 222:8-10. Nonetheless, Radwin *included* other socializing. Radwin Dep. at 222:17-223:3. Radwin admits he excluded these certain activities, not based on the concept of the "continuous workday," but rather *based on the direction of Plaintiffs' counsel*. *Id.* at 225:6-17, 229:16-230:5, 238:7-240:22. In short, Plaintiffs are attacking Defendant's expert for not following a method that they themselves instructed their expert not to follow.

### B. Tyson Reserved The Right To Challenge The Accuracy Of Dr. Radwin's Measurements Of Donning And Doffing In The Locker Room, And Dr. Adams' Critique Of Radwin's Measurements In The Locker Room Are Consistent With The Parties' Stipulation

Out of respect for its employees' privacy, Tyson generally prohibits videotaping in the locker rooms, and this was memorialized in the parties' stipulation that governed Dr. Radwin's time study. *See* Pltfs' Ex. C at ¶ 5 ("Defendants have prohibited Plaintiffs' team from videotaping in the locker rooms due to concerns for employee privacy."). Plaintiffs were aware

10

of this concern in advance of Dr. Radwin's team's trip and agreed with it. *See* email from Plaintiffs' counsel E. Dirks to Defendants' counsel E. Paschal dated May 16, 2010 at 4:25 p.m., attached as Pltfs' Ex. E ("We understand your privacy concerns ….").

Without disclosing *how* Dr. Radwin's team would actually take measurements in the locker room and later analyze them, Plaintiffs asked that Tyson enter into a blanket agreement to not "attack the objectivity/accuracy of the locker room portion of the time study." *Id.* Tyson refused to relinquish its right to challenge the objectivity of Dr. Radwin or the accuracy of his (not-yet-known) measurements. Instead, it agreed to abide by the same limitations placed on Dr. Radwin, and encouraged Plaintiffs to use any accurate means that they saw fit (other than videotape) to measure the locker-room activities:

> We are prepared to stipulate that our expert witness will not use video in the locker room, that we will not otherwise record video or take pictures in the locker room for use in the litigation, and that we will not challenge Dr. Radwin's report or testimony for failing to have video or photographic analysis/evidence of locker room times or activities. That puts plaintiffs on exactly the same footing as defendant, which we believe is equitable.
>
> We also have no objection to plaintiffs' team bringing in an audio device (but with no camera attached) to assist with their time study. *The same is true for stopwatches or other timing or measuring devices.*

*See* email from E. Paschal to E. Dirks dated May 17, 2010 at 3:42 p.m. EDT, attached hereto as Ex. B (emphasis added). Ultimately, the parties agreed *only* that Defendant would "not challenge Dr. Radwin's use of audio recordings as inferior to video recordings …." *See* May 18, 2010 Stipulation, ¶ 5(3), attached as Pltfs' Ex. C.

Plaintiffs misleadingly imply that Dr. Radwin himself entered the locker rooms and dictated his observations about donning and doffing times into the video camera while the lens cap was covered. *See* Pltfs' Mot. at 4. In fact, Dr. Radwin was not even present in the buildings when the time-studies were conducted at Finney County and Emporia. Instead, he recruited

11

teams of undergraduate students.  *See* Radwin Dep. at 55:1-59:12.  Those students then dictated their observations of donning and doffing while the video camera was running with the lens cap covered.  *See* Adams Report at 21, attached as Pltfs' Ex. A.  They did not use stopwatches or any other timing devices.  *See* Radwin Rebuttal Report at 8 ("stopwatches and timing clipboards, which were not used by us ...."), attached hereto as Ex. R.  Defendants' time-study expert, Dr. Adams, was watching the students while they were doing this.  *See* Adams Dep. at 162:2-4, attached as Pltfs' Ex. B.

Plaintiffs are now concerned that Dr. Adams has criticized the accuracy of Plaintiffs' locker-room measurements.  But they misstate Dr. Adams' opinion in this regard.  First, Dr. Adams criticizes Dr. Radwin for over-stating the supposed accuracy of his students' measurements.  Dr. Radwin's report states that the recordings have a precision of $1/30^{th}$ of a second, or 0.00056 minutes.  *See* Radwin Report at 3, attached hereto as Ex. S.  Dr. Adams merely points out that this is overblown, at least as applied to the locker-room measurements: "Given human limitations and variability in verbal response rate, it is erroneous to assert that Dr. Radwin's methodology yields data with a precision of 1/30 second, or that analyst errors and reaction time are eliminated."  Adams Report at 21-22.  Indeed, Dr. Radwin *admitted* in his deposition that this method of dictating events into a tape was not very precise for the same reasons stated by Dr. Adams.  *See* Radwin Dep. at 215:1-216:15 and 322:22-325:7 (admitting that measurements dictated in locker rooms could not be accurate to $1/30^{th}$ of a second, and that his overall numbers were "good" only within a few minutes one way or the other).

Second, Dr. Adams merely points out that, once the tapes are being analyzed, it is difficult to know from the words heard on the tape precisely what the employees were doing: "Further, deciphering start times from verbal cues can be somewhat ambiguous, leading to even

12

less precision in time measurement." *Id*. at 22. In his deposition, Dr. Adams explained this in transcript pages that the Plaintiffs omitted from their motion. As Dr. Adams explained, Radwin's students *claimed* to have omitted time when the employees traveled to places (such as the restroom) for personal activities, but the students could not *know* the employee's intent until the employee was already near the bathroom. As a result, the dictation on the tape does not leave an accurate record of what the employee was doing, and the analysts are likely to have been over-inclusive in the amount of time that they attributed to the employees' donning and doffing activities, because there is no way to accurately subtract this personal time. *See* Adams Dep. at 161:24-164:24, attached hereto as Ex. T.

The above two criticisms are entirely consistent with the parties' stipulation and, indeed, as noted above, Dr. Radwin even agreed with the first criticism. As to the second criticism, it is an entirely fair point about a methodology that Plaintiffs *chose* to pursue and just happened to botch.

### III. THERE IS NO BASIS TO EXCLUDE THE TESTIMONY OF DEFENDANTS' RULE 1006 DAMAGES WITNESS, PETER NICKERSON

On August 20, 2010, Plaintiffs disclosed the qualifications and report of a damages witness named L. Scott Baggett. The report is 18 pages with nine tables. *See* Report of L. Scott Baggett, attached as Ex. U (filed under seal). The report is based on payroll and "punch-in" data produced by Tyson for the period through May 29, 2010, although he is missing "Kill" side pay data at Finney County after July 25, 2009. In his conclusion, Baggett states: "When I have received a complete dataset from Tyson, I can update this report using the same process as outlined above." *Id*. at 18.

By agreement of the parties, Defendants will produce updated payroll and "punch-in" data in early 2011. *See* section 13 of Pretrial Order, at page 34. As Plaintiffs note in their

motion, they "intend[] to file a supplemental report (as agreed by the parties) …." *See* Pltfs' Motion at 6. Defendants may then depose Plaintiffs' damages witness for the first time. *See* section 13 of pretrial order. The parties had these understandings by mid-September of 2010.[5]

On September 15, 2010, Defendants disclosed the identity and qualifications of a rebuttal witness, Peter Nickerson, who may critique the facts or conclusions of Plaintiffs' damages witness. *See* attached Ex. A. As noted above, Defendants did *not* disclose him as an "expert."[6] As Defendants expressly stated:

> By making this disclosure, Defendants do not concede that expert testimony is required to critique Plaintiffs' damages methodology or to present competing damages calculations, in which case the present disclosure of Dr. Nickerson as a potential witness is not required by the Court's scheduling order or Fed. R. Civ. P. 26(a)(2). However, out of an abundance of caution, Defendants hereby disclose Dr. Nickerson to Plaintiffs as a potential witness.

*See* Ex. A at n.1.

As Defendants further stated, they are not able to critique Baggett's work yet, and it would be premature to do so given that he intends to re-do his work next year:

> By agreement with Plaintiffs, Defendants have not yet deposed Mr. Baggett, because he has likely not yet completed his damages calculations. Specifically, Defendants have agreed with Plaintiffs to defer deposing Dr. Baggett until after Plaintiffs have submitted a supplemental damages report by Dr. Baggett, which Plaintiffs have indicated they intend to do in January 2011. Until Defendants have reviewed the supplemental report *and* deposed Dr. Baggett regarding his methodology and calculations, they are unable to conduct a critique of his

---

[5] Plaintiffs' counsel Eric Dirks stated to Defendants' counsel Evangeline Paschal on August 27, 2010, that Plaintiffs *were* likely to supplement Baggett's report after Plaintiffs receive the updated data in 2011. In addition, by September 14, 2010, the parties had agreed that Defendants need not depose Baggett until Plaintiffs had made that decision as to whether they will supplement his report.

[6] Nickerson is described in the Pretrial Order as an expert witness. However, this appears in *Plaintiffs'* paragraph preserving their right to file the motion presently before the Court. The immediately following section 14.a of the Pretrial Order (at page 35) notes that the deadline for the parties to actually designate witnesses as "experts" is not until 21 days before trial.

methodology, which would be the basis for Dr. Nickerson's report. Defendants hereby reserve the right to submit a rebuttal report by Dr. Nickerson after receiving the supplemental report and deposing Mr. Baggett.

*See* Ex. A.

Importantly, these Plaintiffs are unique among the red-meat cases in believing that they needed an "expert" to present damages calculations based on payroll and "punch" data. In the seminal modern "donning and doffing" case, *Alvarez v. IBP, Inc.*, the plaintiffs sought and were allowed to establish their damages through a Dr. Abbott, whom they proffered *not* as an "expert" witness, but instead as a "human calculator" under Rule 1006. *See Alvarez* trial transcript dated Oct. 13, 2000 at 4:7-8:23, 71:5-73:22, attached hereto as Ex. V. In Tyson's other donning and doffing cases involving its beef- and pork-processing facilities, no Plaintiffs' counsel have disclosed "experts" on the issue of damages; indeed, counsel in various cases have even listed paralegals of their law firms to provide the requisite calculations. *See* Declaration of Michael J. Mueller, attached hereto as Ex. W.

It is black-letter law that damages testimony may be presented through a fact or Rule 1006 witness.[7] For example, in *U.S. v. Caballero,* 277 F.3d 1235 (10th Cir. 2002), the court permitted the government's financial analyst to "summarize" the defendants' financial records without being qualified as experts. The case involved a similar argument under Rule of Criminal Procedure Rule 16(a)(1)(E), which mandates that the government provide a written summary of any expert witness testimony, including: (1) the witness's opinions; (2) the bases and reasons for

---

[7] Fed. R. Evid. 1006 provides: "[t]he contents of voluminous writings, recordings, or photographs which cannot conveniently be examined in court may be presented in the form of a chart, summary, or calculation. The originals, or duplicates, shall be made available for examination or copying, or both, by other parties at reasonable time and place. The court may order that they be produced in court."

the opinions; and (3) the qualifications of the experts. The government argued that the Rule 16 disclosure requirements did not apply because the witness was not an expert giving expert opinion testimony. The court agreed that the witness was not an expert under Rule 702 and further found that "this testimony was not a surprise to defendants who had been notified of the witnesses and the substance of their testimony during the pretrial phase. As the challenged testimony proffered no opinion, lay or expert, but simply the witnesses' personal experience relating to a subject bearing directly upon the appropriateness of a jury inference, we reject the claim that the Caballeros were entitled to Rule 16 discovery." *Id.* at 1246-47.

Cases in civil litigation are in accord. In *Nationwide Transport Sys. v. Case Information Systems*, 2006 WL 5242377 (D. Nev. March 6, 2006), the court refused to find that a damages witness was an expert, and nonetheless ruled that he could testify as to damages under Rule 1006 if he met certain evidentiary requirements. In *AMPAT/Midwest, Inc., v. Illinois Tool Works Inc.*, 896 F.2d 1035 (7th Cir. 1990), the Seventh Circuit ruled as follows on a damages witness offered by a plaintiff: "although not designated as an expert witness he would easily have qualified under the liberal standard of Fed. R. Evid. 702. … The admission of the summaries he prepared was within the spirit if not the letter of Rule 703 as well as within the spirit and the letter of Rule 1006." *Id.* at 1045 (citation omitted). And in *More, J.B., Inc. v. Nutone, Inc.*, 2007 WL 4754173 (W.D. Tex. March 21, 2007), the defendants objected to plaintiff's lay witness "rendering any expert opinions or, opinions disguised as summaries under Federal Rule of Civil Evidence 1006, on the real property loss, personal property loss, and extra expense elements of damage." The plaintiff stated that it was not offering the witness's *expert* opinion on damages. The court found that "this issue is not a *Daubert* issue; rather, it is an issue regarding interpretation and application of Rule 1006," thus denying the motion to exclude the witness testimony without

16

prejudice so that it could be refiled at trial. *Id*. at *13. *See generally Von der Ruhr v. Immtech Intern., Inc*., 570 F.3d 858, 865 (7th Cir. 2009) ("We do not suggest, nor did the district court find, that experts are required to prove lost profits damages …."); *Watson v. Borough of Darby*, 1998 WL 962004, at *3 (E.D. Pa. Dec. 29, 1998) ("I do not suggest that every case, every sort of damages, needs an expert to spell those damages out. Some damages experts, in truth, are little more than high-priced window dressing. Others can be essential."); *Video Service of America, Inc. v. Maxell Corp. of America*, 2007 WL 2156359, at * 6 (D.N.J. July 26, 2007) ("However, nowhere in the opinion does the Supreme Court indicate that expert testimony is required to establish damages flowing from competitive injury in [antitrust cases]. In fact, the Supreme Court hinted that experts are not required.").

Finally, Defendants have already disclosed that they contend the Plaintiffs' damages are "zero," *see* Ex. A, and Defendants are not yet in a position to provide a critique of Plaintiffs' damages calculations.[8] Under these circumstances, Defendants have nothing else to disclose at this time.

## IV.   CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court deny Plaintiffs' Motion.

---

[8] If Nickerson ultimately has a written critique of Baggett's final work, then Defendants have no objection to Plaintiffs' deposing him.

Respectfully submitted,

*/s/ Michael J. Mueller*
Michael J. Mueller (admitted *pro hac vice*)
E-mail: mmueller@hunton.com
HUNTON & WILLIAMS LLP-DC
1900 K Street, NW
Washington, DC 20006
(202) 419-2116
(202) 778-7433 (facsimile)

*/s/ Brian N. Woolley*
Robert W. McKinley (KS Bar # 13516)
E-mail: rmckinley@lathropgage.com
Brian N. Woolley (KS Bar # 70007)
E-mail: bwoolley@lathropgage.com
LATHROP & GAGE LLP
2345 Grand Boulevard, Suite 2200
Kansas City, MO  64108
(816) 292-2000
(816) 292-2001 (facsimile)

Attorneys for Defendants,
TYSON FOODS, INC.
TYSON FRESH MEATS, INC.

November 12, 2010

**CERTIFICATE OF SERVICE**

I hereby certify that on November 12, 2010, I electronically filed the foregoing DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION TO STRIKE REGARDING DEFENDANT'S EXPERT WITNESSES with the Clerk of the Court using the CM/ECF system which sent notification of such filing to the following:

Eric L. Dirks
George A. Hanson
STUEVE SIEGEL HANSON WOODY LLP
330 West 47th Street, Suite 250
Kansas City, MO  64112

Adam T. Klein
Justin M. Swartz
OUTTEN & GOLDEN LLP
3 Park Avenue, 29th Floor
New York, NY  10016

/s/ Brian N. Woolley
Brian N. Woolley
An Attorney for Defendants