1

```
 1              IN THE UNITED STATES DISTRICT COURT
                      DISTRICT OF KANSAS
 2

 3

 4    ADELINA GARCIA, et al, Individually
      and on behalf of others similarly
 5    situated,

 6          Plaintiffs,

 7      vs.                              District Court
                                         Case Number
 8                                       06-CV-2198-JTM
      TYSON FOODS, INC., and            Volume 1
 9    TYSON FRESH MEATS, Inc.,

10          Defendants.

11

12          PARTIAL DAILY COPY TRANSCRIPT OF PROCEEDINGS

13

14          On the 1st day of March, 2011 came on to be

15    heard in the JURY TRIAL in the above-entitled and

16    numbered cause before the HONORABLE J. THOMAS MARTEN,

17    Judge of the United States District Court for the

18    District of Kansas, Sitting in Kansas City.

19          Proceedings recorded by mechanical stenography.

20          Transcript produced by computer.

21

22

23

24

25
```

```
 1                    APPEARANCES

 2

 3  The Plaintiffs appeared by and through:
            Mr. George Hanson
 4          Mr. Eric Dirks
            Mr. Lee Anderson
 5          Stueve Siegel Hanson Woody, LLP
            330 West 47th Street, Suite250
 6          Kansas City, MO 64112

 7          Mr. Peter Antosh
            1401 Central Avenue
 8          Garden City, KS 67801

 9

10  The Defendants appeared by and through:
            Mr. Michael Mueller
11          Ms. Evangeline Paschal
            Hunton & Williams, LLP
12          1900 K Street, NW
            Washington, DC 20006
13
            Mr. Craig O'Dear
14          Mr. Robert Hoffman
            Bryan Cave, LLP
15          1200 Main Street, Suite 3500
            Kansas City, MO 64105

16

17

18

19

20

21

22

23

24

25
```

3

1                            INDEX

2
Question to the Prospective Jurors              5
3  Opening Statements by Mr. Hanson             18
   Opening Statements by Mr. O'Dear             64
4  Reporter's Certificate                      111
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Proceedings commence at 9:15 a.m.)

2          THE COURT:  All right.  We all situated, Ms.

3  Holman?

4          MS. HOLMAN:  Yes, Your Honor.

5          THE COURT:  Have a seat, folks.  Good morning.

6  A few of you I can't see because the monitors are in

7  the way, but don't worry, you're probably all better

8  off for that in your cases.

9          This is the United States District Court for

10  the District of Kansas, Case Number 06-2198, Adelina

11  Garcia, et al, Individually and on Behalf of a Class of

12  Others Similarly Situated, Plaintiffs, versus Tyson

13  Foods, Inc. and Tyson Fresh Meats, Inc., Defendants.

14          If you would note your appearances for the

15  record, please.  And announce if you're ready to

16  proceed to trial.

17          MR. HANSON:  Good morning, Your Honor.  For

18  the plaintiffs in this case, George Hanson.

19          MR. DIRKS:  Eric Dirks.

20          MS. MARQUART:  Mary Rose Marquart.

21          MR. ANDERSON:  Lee Anderson.

22          MR. ANTOSH:  I'm Peter Antosh, Your Honor.

23          MR. HANSON:  We're ready to proceed.

24          THE COURT:  Thank you.

25          MR. O'DEAR:  And, Your Honor, for the

1  Defendants, Tyson Foods, Craig O'Dear with Bryan Cave

2  Law Firm.

3          MR. MUELLER:  Michael Mueller with Hutton and

4  Williams.

5          MS. PASCHAL:  Evangeline Paschal from Hutton

6  and Williams.

7          MR. HOFFMAN:  And Brian Hoffman with the Bryan

8  Cave Law Firm.

9          THE COURT:  Thank you very kindly.

10          Are you ready to proceed?

11          MR. O'DEAR:  We're ready to proceed.

12          THE COURT:  Folks, my name is Tom Marten, I'm

13  a U.S. District Judge for the District of Kansas, and

14  these are actually a little bit unfamiliar waters for

15  me.  I -- my duty station is Wichita and this case

16  actually was in the hands of a Kansas City judge until

17  just a few weeks ago, and he has a series of trial

18  conflicts, and so it becomes my happy responsibility to

19  come up and try the case.  And it's a pleasure to be in

20  Kansas City with all of you.

21          Now, the first thing that I have to ask, is

22  how many of you were happy to receive a summons to

23  report for jury duty this morning?

24          Nobody.  Usually we get three or four people

25  who are happy to be here, but it's all right.  I am

6

1  going to ask for your indulgence as we get started

2  here.

3          You know, we talk about jury duty, and it is a

4  duty.  I was over in Ireland for a few weeks about a

5  year ago and people over there actually look forward to

6  it, they see it as just part of their civic

7  responsibility.  We're a little more cavalier over here

8  I think about some of those things, but if you set

9  aside the whole notion of, This is something that I

10  have to do as a right of citizenship, there are so many

11  wonderful things about trials and things that we can

12  all learn from trials.

13          You're going to meet some people that most of

14  you probably have not had an opportunity to meet

15  before.  You're going to be dealing with some issues

16  that you probably have not dealt with before or if you

17  have, it's probably been in a very different kind of

18  context.  You're going to learn about the way that

19  certain types of businesses operate, and it's just an

20  extraordinary opportunity to learn a little more about

21  the world around you.

22          In addition to that, you're going to be asked

23  to make some extremely important decisions.  The

24  parties who are here today, the plaintiffs on one hand,

25  defendants on the other hand, have a dispute with

1  respect to certain matters that they could not resolve

2  themselves and that's why we have courts.  It's why

3  we're here.

4          They are going to place some of these

5  decisions in your hands.  You're going to have an

6  opportunity to take the information that you have

7  learned here over the course of several days, and to

8  make decisions to assist these people in resolving

9  their disputes.

10         And there is much to be learned just from that

11 process, and I think if you will give us some of your

12 time, some of your patience, your common sense, and

13 certainly your good judgment, you're going to find that

14 this is, frankly, an extraordinary experience, and one

15 that you're going to look back on with great pride once

16 you get removed from it just a little bit.

17         There are some people that I want to introduce

18 you to.  Some you've already met some, some you will

19 become better acquainted with as the trial goes on.

20         Seated directly in front of me is Yolanda

21 Holman, and Yolanda is a Deputy Clerk of the U.S.

22 District Court here in Kansas City.  And she's going to

23 be working as my courtroom deputy throughout the course

24 of the trial.  She'll probably be in here most of the

25 time.  And she'll be looking after a number of things

1   that I would not do a good job of looking after.

2          And we are very happy and, Yolanda, glad that

3   you could assist us with this trial.  Thank you so

4   much.

5          Seated out by the gallery is my court

6   reporter, Jana Hoelscher.  Jana has a very important

7   job.  She's taking down every word that's said in here;

8   she'll be able to read it back to you verbatim.

9          And, actually, for the lawyers, for me, and

10  for Ryan Meyer, my law clerk, who is seated over there

11  to my left, to your right -- Ryan is a lawyer,

12  graduated from Washburn Law School almost a year ago,

13  has been clerking with me since last fall, and he'll be

14  assisting me with a number of legal issues as we go

15  through this process.

16          What I was about to tell you about Jana, is

17  that we actually have realtime transcript that's coming

18  up on our screens right now that Jana is putting in.

19  One of the things that is difficult for a court

20  reporter, and the idea of being able to do a verbatim

21  recitation on screen is a little bit beyond me any way,

22  but she's got to be able to hear.  I mean, it's

23  difficult enough to do it accurately when you hear

24  well.  She has to be able to hear.

25          And during the course of questioning today, as

1   we get to that a little bit later, it's going to be

2   important for all of you who are called to the box and

3   questioned to speak up.  Keep your voice up.

4          If there are microphones for you to use, they

5   don't do much good when they're pointed away from you,

6   so get it right up to your mouth and help us, if you

7   would, in that manner.

8          Now, before we get started with opening

9   statements, and that's the first thing we're going to

10  do today, if any of you have served on juries before,

11  you're probably accustomed to being questioned and

12  finding out if you can be fair jurors to carry out your

13  responsibilities before you know anything about the

14  case.  It's always seemed a little backward to me, so

15  you're going to hear about the case from both parties

16  before we begin the questioning this morning.

17         But I do have some questions to put to

18  everybody at this time.  If any of them apply to you,

19  would you please raise your hand, and as I recognize

20  you, I am going to ask you if you would state your name

21  loudly enough that Jana can pick it up, and we'll visit

22  for a moment about the issue.

23         The first question I have for all of you is,

24  is there anybody here who could simply not serve on any

25  jury anywhere as a result of religious beliefs or other

1   ethical or moral concerns about resolving disputes

2   between parties in a courtroom?

3         Is there anybody that that applies to?

4         (No response given.)

5         THE COURT:  Out where I practiced law we had a

6   number of Mennonite communities and they just had

7   problems with the whole notion of courts, so I don't

8   see any hands.

9         Second question:  We expect this trial to last

10  approximately two, to two-and-a-half weeks.  My thought

11  is we're going to -- I just saw a head drop out there.

12  Let me finish before -- before you get too excited

13  about that.

14        Our trial schedule runs from 8:00 to 1:30.

15  8:00 in the morning, 'til 1:30 in the afternoon.  We

16  recess for the day at 1:30.  We get more evidence,

17  testimony into the record during that time than courts

18  do using a 9:00 to 5:00 or 5:30 schedule.  So you all

19  literally are going to have your afternoons off, but

20  you're going to have to be here early.

21        We take two short breaks during the course of

22  that 8:00 to 1:30 time period.

23        Now, we are not going to have trial tomorrow

24  and we are not going to have trial Friday.  I had a

25  commitment on Friday long before I ever took this case

1   on, it's a speech out of state that I could not find a

2   substitute for, so tomorrow we have first witness who's

3   not going to be available until Thursday, and the whole

4   case from the plaintiffs' standpoint doesn't make sense

5   unless this person testifies first.

6           So tomorrow you will have off, Thursday you'll

7   be in trial, Friday you're off.  Starting next Monday,

8   we just go until we're through.

9           I fully anticipate that this case is going to

10  wind up earlier than what counsel's best estimate is.

11  I have always found when I was a lawyer, I tended to

12  overestimate.  I think genetically overkill is bred in

13  to us lawyers and I think we can find we are going to

14  get this done quicker.

15          But I think for you to anticipate wrapping up

16  two weeks from Friday is about right, remembering the

17  9:00 -- or the 8:00 to 1:30 trial schedule.

18          Now, everybody has issues about things they

19  have to do.  The routine ones, you know, whether

20  they're work, or whether it's picking up or delivering

21  kids from school, those are things that typically we

22  are able to get people to cover.  It may be a little

23  uncomfortable but that's not a valid excuse for not

24  being able to serve on a jury.

25          If, however, you have work commitments that

1  are so pressing, and I think in terms of farmers during

2  harvest, work matters that are so pressing that there

3  is no way that you could focus on this trial, or if any

4  of you are likely to lose your job or to be replaced,

5  we're not going to ask anybody to sacrifice a job to

6  serve on a jury, and we know times are tough

7  everywhere.

8         If you have surgery scheduled.  If somebody

9  has passed away, or close family member is on the brink

10 and it's just a matter of days and you know that you're

11 going to need time off for a funeral.  All of -- even

12 if you have prepaid nonrefundable tickets on a

13 vacation, that is legit and we're not going to force

14 anybody to -- to give that kind of thing up.

15        But the day-to-day kinds of things that we all

16 have to make arrangements for are not going to be valid

17 for getting excused from jury service here.

18        With all of that background -- and let's start

19 on -- it's my left, the right side of the room as you

20 look at me, how many of you, because of the timing of

21 the trial, and the length of it, simply could not serve

22 on a jury here?

23        All right.  Ma'am.  Your name, please.

24        JUROR SCHAFER:  Sandra Schafer-Warner.

25        THE COURT:  All right.  And what's the nature

1  of the problem, Ms. Schafer?

2      JUROR SCHAFER:  I have two.  I have been laid

3  off for a year, and just recently --

4      THE COURT:  I'm sorry.

5      JUROR SCHAFER:  That's fine, go into training

6  this next week, plus I also have vacation tickets,

7  Phoenix, for a 80-year-old family member birthday.

8      THE COURT:  All right.

9      JUROR SCHAFER:  Surprise birthday.

10     THE COURT:  I am going to excuse you then.

11  Thank you so much.

12     Would you please report to -- I don't know.

13  Where do they need to go?  Judge Lungstrum?

14     Okay.  You may go home, I guess then.  Thank

15  you so much.

16     JUROR SCHAFER:  Thank you.

17     THE COURT:  And, ma'am, did I see your hand?

18  I guess not.

19     MR. O'DEAR:  There is a gentleman behind the

20  screen.

21     THE COURT:  Okay, sir.  Thank you.  Your name,

22  please.

23     JUROR SUNDSTROM:  My name is Raymond Sundstrom

24  and my mother was just sent home with hospice and maybe

25  a week to ten days.

14

```
 1              THE COURT:  She's terminal, sir?

 2              JUROR SUNDSTROM:  Yes, uh-huh.

 3              THE COURT:  I'm going to make a note of that

 4  and, thank you.  I'm not going to excuse you for the

 5  moment but thank you.

 6              All right.  Anybody else?

 7              Yes, sir.

 8              JUROR LYTLE:  Jared Lytle.  I have -- it's not

 9  next Friday -- well, a week from Friday, tickets to

10  London for a week and a half, nonrefundable, but --

11              THE COURT:  So that would be --

12              JUROR LYTLE:  The 9th.

13              THE COURT:  The 9th?

14              JUROR LYTLE:  Yeah.

15              THE COURT:  All right.  I'm going to excuse

16  you as well.  Thank you so much.

17              JUROR LYTLE:  Okay.

18              THE COURT:  All right.  Anyone else?

19              All right.  Let's go over to the other side.

20  Any folks over there with this kind of a conflict or

21  issue with timing?

22              Yes, sir.

23              JUROR O'CONNOR:  Yeah, Brad O'Connor.  I have

24  got surgery set up for tomorrow afternoon.

25              THE COURT:  Surgery?
```

1          THE JUROR:  Yes.  It's just a small in-and-out

2   type deal, but it -- I don't know if it is going to

3   affect it or not.  I should be able to come back in.

4          THE COURT:  Well, Mr. O'Connor, I sure

5   appreciate knowing that.  I am going to -- I have made

6   a note of it and I am going to keep that in mind.

7   Thank you so much.

8          Anyone else?  I don't see any other hands,

9   unless there is somebody behind the screen that I'm not

10  seeing.  All right.

11          The final thing is, we typically go in

12  segments of between an hour-and-a-half and two hours

13  between breaks.  For people with back problems, we'll

14  let you stand up if you need to in the jury box while

15  testimony is being presented.  For those of you who are

16  diabetic, we allow you to bring whatever you need in

17  the way of food in, in order to regulate your blood

18  sugar.  If somebody needs a comfort break during that

19  period of time we, of course, will just take a break at

20  that time.

21          Apart from those things, does anybody have a

22  physical or a medical condition that would make it

23  impossible to sit for an hour-and-a-half to two hours

24  at a time during a trial?

25          Yes, your name please.

1          JUROR COMSTOCK:  Sylvia Comstock and I have a

2 medical condition, I have a neural stimulator in my hip

3 for my bladder.

4          THE COURT:  Okay.  And how long would you be

5 able to sit for a period of --

6          JUROR COMSTOCK:  I don't know, when it tells

7 me I need to go, I need to go.

8          THE COURT:  All right.  And when you say you

9 need to go, does that mean like, if your hand went up

10 and we said, Go, would that be quickly enough?

11          JUROR COMSTOCK:  Mm-hmm.

12          THE COURT:  Okay.  Well, I'm going to make a

13 note of that.  And thank you so much.

14          Anyone else?  Yes, sir.

15          JUROR BERNARD:  I am in the same situation.

16 My name is Donald Bernard.

17          THE COURT:  All right.

18          JUROR BERNARD:  And I'm in my early 60s, and

19 things are a little different than when they once was.

20 So, if I could raise my hand and be excused in that

21 manner, I would appreciate it.

22          THE COURT:  Absolutely.  Thank you so much.

23 And I'm getting there, so I understand.

24          Anyone else?

25          Yes, sir.  Mr. O'Connor.

1          JUROR O'CONNOR:  Yeah, I'm on diuretics, so

2  when I have got to go, I've got to go.

3          THE COURT:  Same situation?

4          JUROR O'CONNOR:  Yes, sir.

5          THE COURT:  All right.  Thanks.

6          Anyone else?  Yes, sir.

7          JUROR CUNNINGHAM:  Rodney Cunningham, I got

8  the same situation on bladder.

9          THE COURT:  Mr. Cunningham, I'll make a note

10  of it.  Thank you.

11          JUROR CUNNINGHAM:  And back problems, too.

12          THE COURT:  Your back problem, if you stand

13  up, does that help?

14          JUROR CUNNINGHAM:  It -- it helps, but it

15  don't go away.

16          THE COURT:  I understand.

17          JUROR CUNNINGHAM:  Up and down.

18          THE COURT:  Thank you kindly.

19          Anyone else?  All right.

20          Well, we're going to put some of this to the

21  test right now as we hear opening statements from the

22  parties in this case and this is an opportunity for the

23  parties to tell you what the case is about, by telling

24  you what they anticipate the evidence in the case is

25  going to be during the trial.

1              Now one thing I want to caution you about is

2    statements of counsel, including these opening

3    statements, are not evidence.  And they may use some

4    documents or photographs during the course of their

5    openings.  Those are not evidence yet either.  They're

6    just being used to help explain what they are talking

7    to you about at this point.

8              The evidence that you will consider during the

9    course of the case is what will come in from the

10   witness stand, the exhibits that I admit during the

11   course of the trial.  But plaintiff has at least the

12   initial burden of proof in this case, gets to go first.

13             And who will be opening for the plaintiff?

14             MR. HANSON:  Your Honor, I will.

15             THE COURT:  Mr. Hanson, you may proceed.

16             MR. HANSON:  Thank you.  Can you hear me all

17   right?  Is this on now?

18             THE COURT:  I'm not -- not hearing it.  Is the

19   green light on on your --

20             MR. HANSON:  This one is working, the

21   lavaliere though, I don't think it is.  Is Steve here?

22             Is that working now all right?

23             May it please the Court.

24             THE COURT:  Mr. Hanson.

25             MR. HANSON:  Thank you.  And counsel, and

19

1   members of the prospective jury:

2          We're here today because for many years Tyson

3   has systematically failed to pay its hourly workers for

4   all of their working time.  My name is George Hanson,

5   and I represent the workers in this case.

6          Specifically, at issue in this case is the

7   time it takes to put on and take off equipment, and

8   sanitary outer garments that are required for work.

9          You might have noticed some of the clothing

10  and equipment that we have brought into court today.

11  I'll explain some of that in more detail as we talk

12  about the case, but that gives you an example of what

13  the workers in this case wear every day in order to do

14  their job.

15         Let me introduce you to a phrase which we'll

16  probably hear quite a bit, maybe not a phrase we're all

17  familiar with in our every day lives.  It's donning and

18  doffing.  That is what this is called.  Donning,

19  putting things on; doffing, taking things off.

20         Now, this is a big case.  There are a lot of

21  workers involved.  But the principle at the heart of

22  this case is really pretty simple and that principle

23  is, that an employer like Tyson is obligated to pay its

24  workers for all of their working time.  Not just some

25  of it, not just most of it, but all of it.

1              Now, let's take a minute to dig a little

2     deeper in to what the case is about.  Let me start with

3     the law.  This case involves the law that protects

4     workers in this country.  The first is a federal law

5     called the Fair Labor Standards Act.  The FLSA, it is

6     not a new law, it's been with us for quite some time,

7     since 1938.  And it was passed when this country was

8     coming out of the worst economic crisis in its history.

9              And the law had a number of objectives:  To

10    spread employment; to relieve burdensome working

11    conditions for workers; but at its heart, the FLSA

12    tells us employers have to keep accurate time records

13    and they have to pay for all working time.

14             The other law that's involved in this case is

15    a law from our home state of Kansas.  And it's similar

16    to the Fair Labor Standards Act and it's called the

17    Kansas Wage Payment Act, the K --

18             THE COURT:  Mr. Hanson, excuse me just a

19    moment, but apparently the PowerPoint is not working.

20             Can we get Steve Wallace or somebody back

21    here?  Okay.  Thank you.

22             Mr. Hanson, you might just wait a moment.

23             MR. HANSON:  I'll be happy to.  Apologize for

24    this.

25             THE COURT:  Ah, the joys of technology.

1            Do we have a systems fella?

2            Okay.  So we're good then?  All right.

3            Mr. Hanson, I'm sorry, go right ahead.  You

4    were, I think, at the Kansas Wage.

5            MR. HANSON:  Right, the Kansas Wage Payment

6    Act.  It's the companion to the federal law, and it is

7    a little bit newer in that it was passed in 1973.  Its

8    purpose also is to protect workers who work in this

9    state.

10           When it was passed, the sponsor of the Kansas

11   Wage Payment Act said this:  "The law is intended to

12   protect a class of people who are least able to protect

13   themselves and are wholly dependent on their wages for

14   support."  And that's a pretty good description of the

15   workers in this case.

16           Let's talk a moment about the defendant, Tyson

17   Foods.  It's a name familiar I suppose to all of us.

18   Tyson started in 1935.  It is actually a little bit

19   older than the Fair Labor Standards Act itself.  And

20   over the years it has become one of the world's largest

21   producers of meat products and it employs thousands of

22   workers across the United States that produce chicken,

23   pork, and beef products.

24           This case, however, is not about all of

25   Tyson's facilities and it's not about all of Tyson's

1   workers.  It is about one beef processing plant.  And I

2   want to talk about that facility now.

3          The plant at issue in this case is here in

4   Kansas but it's about as far away as you can get and

5   still be in Kansas.  If we could maybe pull up a map, I

6   hope?  Yes.  Good.

7          Here's our -- here's our home state.  The star

8   up on the northeast corner is where we are today in

9   Wyandotte County.  And the green that I have

10  highlighted represents Finney County down in the

11  southwest part of the state.

12         Now if you were to drive from where we are now

13  to the plant out in Finney County, you would cover

14  about 400 miles, it would take you a little more than

15  seven hours, and you'd drive down through Wichita, down

16  here in Sedgwick County where our judge has his home

17  court.

18         THE COURT:  Thank you.

19         MR. HANSON:  We would travel west, through

20  some historical sites, Dodge City -- Dodge City where

21  Peter Antosh, who fortunately speaks Spanish, is from,

22  and where Tyson has a couple of its competitors.  Excel

23  is there, National Beef is there.

24         And as we approach Finney, you would begin to

25  notice a couple of things.  The landscape continues to

```
 1  change; the trees become fewer; the land becomes
 2  flatter.  And you realize you're in a part of the
 3  country that probably people on the east coast or maybe
 4  the west coast think of when they think of Kansas.
 5            You notice some other things, too.  You'll
 6  notice something in the air.  There is a smell, and for
 7  those of you who may have grown up on a farm or had
 8  experience with agriculture, you'll recognize what that
 9  smell is.  And it's not necessarily a bad smell, at
10  least not to everybody, but it's the smell of
11  livestock.  And you see as you approach Finney County,
12  enormous feed lots, tens and tens of thousands of
13  cattle that are being fattened to go to one of the
14  neighboring processing plants.  Those are called CAFOs;
15  concentrated animal feeding operations.  And we'll
16  figure out pretty soon what -- why there are so many in
17  this part of the state.
18            So, could we have the map back up real quick.
19            As we approach Finney County, you would go
20  through Garden City, and I mention that because Garden
21  City plays a role in the case.  It's the largest town
22  in Finney County, about 28,000 people, and then just a
23  couple miles west is Holcomb.  Holcomb, Kansas.
24            Holcomb has some history you might be familiar
25  with, it's actually the setting for the tragic murders
```

1  in the late '50s that form the basis for the book "In

2  Cold Blood" and the movies that have come since.

3           Right on the outskirts of Holcomb, and rising

4  out of the prairie is the enormous structure that is

5  the Finney County beef processing plant owned and

6  operated by Tyson.

7           Now, I'm hoping that we can show you a quick

8  video clip of the exterior of the facility so you get a

9  chance to see what it looks like.  Let's see if we can

10 roll that.

11          (Tape played.)

12          Here we are approaching from the west.  You'll

13 see a semicircle, which is where the cattle stockyards

14 are before the cows are let into the facility.  And

15 this is a shot of the front entrance, looking from the

16 north and panning from west to east.

17          The Finney County facility is about one

18 million square feet.  You could put three full football

19 fields end to end, to end, and still have some room on

20 each side.

21          I'm going to talk for a minute about some

22 labels that you might hear during the case.  The plant

23 alternatively in some of the documents, and perhaps in

24 some of the testimony that you'll hear, will be called

25 the Holcomb plant, the Garden City plant, or the Finney

1 County plant.  They're all the same thing.  Just over

2 time, different -- different labels have been given to

3 it.

4          I am going to call it -- I am going to attempt

5 to call it the Finney County plant through my opening

6 and through the trial, just so there is no confusion,

7 but you might hear it called by different things.

8          Another clarification.  Tyson Foods acquired a

9 company called IBP in 2001 and IBP, Iowa Beef

10 Processors, is the company that originally built and

11 ran the Finney County facility.  That started in the

12 early 1980's.  So, throughout the case, in some of the

13 documents, and maybe in some of the videos you might

14 see IBP on someone's helmet, maybe on a box of product.

15 That is just a vestige of when the company was owned by

16 Iowa Beef Processors.

17          Iowa Beef is now Tyson, same company.  The

18 transition was seamless.  There was no change in the

19 way the production occurred, no change in the way

20 workers were paid.  So the change really isn't going to

21 matter in the case, but you need to know that it used

22 to be owned and operated by IBP.  For purposes of our

23 case, and the time period we're talking about, it was

24 always Tyson.

25          Okay.  I've hopefully set the scene a little

1  bit, introduced the law and the defendant, and now I

2  want to talk about what is really at the heart of the

3  case and it's -- it's three things:   It's a group of

4  workers; it's the work they do; and it's the time it

5  takes to do it.

6           Let's first talk about the group of workers.

7  This case is brought as a class action and a class

8  action, as I'm sure you're familiar, is where a couple

9  of people, a small number, represent the interests of a

10  large number.  The Court in this case has certified the

11  matter as a class action and has said we can proceed to

12  trial as a class action.

13          It means that the evidence that you will hear

14  is going to be representative of the whole.  The

15  purpose of a class action is for efficiency, and to

16  insure that a case of this size can be resolved in one

17  proceeding rather than in many, many separate

18  proceedings.

19          So, in our class, and there are actually two

20  classes, the first is our state law class, and it

21  numbers 5,130 workers.  5,130.  In our federal law

22  class for the FLSA the number is 1,031.

23          Now the reason there is a difference, is a

24  procedural matter.  For a state law class everybody is

25  in it, unless you opt out.  The reverse is true for a

1  federal law class.  Everyone is out, unless you opt in.

2  You don't need to be worried about that, because we

3  have, through the payroll records and through the

4  process of organizing the case, sorted out those two

5  classes.  The issues and legal principles are really

6  the same for both.  At the end of the case they will be

7  presented to you in a way that's easy to understand.  I

8  just needed to introduce that we have two separate

9  classes.

10        All right.  So let's talk a little bit about

11  the plaintiffs in this case.

12        They are all hourly workers at the Finney

13  County plant.  Many of them were born outside the

14  United States.  Some are from the United States, from

15  Kansas originally, but many are from other places,

16  other countries; from Mexico, from Vietnam, from Sudan,

17  Burma, and other places.  People whose families left to

18  come to the United States for the same reason people

19  have been coming here for hundreds of years, and that's

20  to seek a better opportunity, and a better life.

21        I can't introduce them all to you, there are

22  too many, but let me start with whose in the courtroom

23  with us today.

24        And first I would like to introduce Adelina

25  Garcia.

1          Would you stand for a moment?

2          This is Adelina.  Ms. Garcia is the first

3   named plaintiff in our case.

4          Thank you, Adelina.

5          Ms. Garcia was born in 1968 in El Salvador and

6   when she was 17 years old, she and her sister came to

7   the United States and first went to Los Angeles, then

8   she came to work and she did a number of different jobs

9   in L.A., until in 1998 she heard that there was an

10  opportunity here in Kansas to come and work for a beef

11  processing plant.  And so she picked up from Los

12  Angeles, came out to Kansas, and moved to Garden City.

13         And from 1998 until today she has worked for

14  IBP, now Tyson Foods.  She has worked there for 13

15  years and in that time, she's really had two jobs:  To

16  trim the outside skirt, which is part of the meat; and

17  then later to trim the inside skirt.  So that's really

18  what she has done.  We'll talk a little bit more about

19  the job.  Currently she is paid 12.90 an hour.

20         Jeronimo -- thank you.

21         This is Jeronimo Vargas Vera.  I can say just

22  Vargas though, right?

23         MR. VARGAS:  Yeah.

24         MR. HANSON:  Mr. Vargas was born in Mexico and

25  he came to the United States when he was 20 years old,

1  in 1976.  And Mr. Vargas likes to travel and he has

2  been all over this country and he has had a wide

3  variety of jobs.  Many of them in meat packing plants

4  in different places.

5          He came to Kansas in 2001 and started working

6  for IBP right before it was acquired by Tyson and Mr.

7  Vargas worked there for seven years, until 2008.  And

8  during that entire time, Mr. Vargas worked on what's

9  called the kill floor or slaughter floor.  We'll talk

10  about that more in a moment.  And when he left, he was

11  making just a little over $12 an hour.

12          One final thing about the group of workers.

13  They're not represented by a union.  There is no

14  collective bargaining agreement.  There has never been

15  a union at the Finney County plant.

16          All right.  Let's talk a little bit about the

17  work that they do for Tyson.  All tolled in the Finney

18  County facility there are 2600 hourly workers.

19          I want to pull up a schematic of the Finney

20  County plant floor so you can see it.

21          Again, a million square feet all tolled, but

22  this case is focussed on an area called production, and

23  it's where the vast majority of the hourly workers

24  work.

25          The first area of production we're going to

1  talk about is the kill floor, which is on the west side

2  of the facility.  You might see the semicircle of the

3  stockyards and really what is a chute where the cows

4  come to the -- to the plant.  And then on the other

5  side of the facility on the east side, is what's called

6  processing.  And we'll talk about those in a little

7  more detail momentarily.

8         Because of the nature of the work, and because

9  of the conditions in the plant, all the production

10 workers, all of our class members, are required to wear

11 certain personal protective equipment, called PPE, and

12 sanitary outer garments.  It's a requirement.

13        On these boards is an example of the PPE and

14 sanitary outer garments in question.

15        To my left is what Mr. Vargas wore when he

16 worked on the slaughter floor.  To my right is what Ms.

17 Garcia has worn on processing, and still wears to this

18 day.

19        Can we pull up the slide that shows the

20 overview of the equipment?

21        All right.  This is a summary of, first, what

22 all of the production workers are required to wear:

23 Hair nets, earplugs, hard hat, a beard net, if you have

24 a beard, and the sanitary outer garments.  The frock,

25 if you're in processing, and the white uniform,

1  sometimes called whites, if you are in slaughter.

2          But in addition to that, below is a partial

3  list, it is not even a full list of all of the other

4  equipment that production workers wear.  And wear some

5  combination of it.  Belly guards, knocker vests,

6  legging aprons, mesh aprons, mesh gloves, mesh sleeves,

7  plexi glass arm guards, polar sleeves, polar -- polar

8  gloves, polar sleeves, shin guards, steel scabbard

9  knives and double mesh sleeves.

10          One thing we don't -- are not able to show

11  you, and it may be because it is still down in the

12  Marshall's security station, are the knives that

13  the -- the workers carry.  We have been able to show

14  you some of the hooks and the like, but they also are

15  required to carry very sharp knives as part of their

16  job.

17          You might wonder, Well, why is this required?

18  Well, you might not; it might be self-explanatory.  But

19  Tyson requires it by policy.  The United States

20  Department of Agriculture requires this gear and so

21  does OSHA, the Occupational Safe and Health -- Health

22  Administration.  There will not be a dispute that what

23  we see here is required by Tyson.

24          All right.  Let's focus in a little bit more

25  on the production side, first slaughter and then the

1  processing floor.

2          There are 540 hourly employees who work every

3  workday on the slaughter side.  They work in two

4  shifts, an A-Shift and a B-Shift, 270 hourly workers

5  per shift.

6          Let me give you a sense of the scope of the

7  operation out of this single facility.  And it's really

8  measured in terms of the number of cattle that are

9  killed on a daily, weekly, annual basis.

10          Over the course of the year, this single plant

11  processes 1.5 million dollar -- million dollar -- 1.5

12  million cows.  And that equates to 5700 a day; 356 an

13  hour; and 6 cows a minute.  And the math there is

14  pretty straight forward, it's about one every ten

15  seconds.  And if the chain is moving faster, they'll

16  process even more.

17          It's important to understand how many cattle

18  are processed.  It is important to understand how many

19  people are required to do the job within the facility.

20          All right.  Let's take a look at some of the

21  jobs in or on the slaughter side.

22          This is a list that comes from Tyson, what

23  they produced to us.  And if you start in the first

24  column, work your way down, and then move over to the

25  second column, work your way up, over to the third, and

1   go back down, that really tracks the line.  And we'll

2   see this in a minute, but the slaughter operation works

3   as a chain, as a type of production line that actually

4   serpentines its way around the floor.

5         So the first job on the line is a knocker.

6   Then comes next to him the shackler, neck splitter, and

7   so on.  And if you take a minute to look at the jobs,

8   they don't require too much explanation because they

9   are pretty self-explanatory.

10        Now I'm going to take a short peak inside the

11  slaughter facility.  This clip is about 20 some seconds

12  long.  We didn't get a lot of footage of slaughter from

13  Tyson so I can't show you very much, and maybe that's a

14  good thing.  I'm not going to show where the cows are

15  killed themselves but I want to show you a couple of

16  clips from the slaughter line itself.

17        (Tape played.)

18        One thing the videos can't convey because they

19  were not produced to us with any audio, is how loud it

20  is.  It's incredibly loud.  In fact, these two

21  gentlemen, if they were speaking in a normal voice like

22  I am now, could not hear each other speak at all.

23        The other thing the videos don't convey is how

24  hot it is, especially in a Kansas summer.  It's wet.

25  The floors are slippery, they're constantly being

1 sprayed, and washed off.

2          Now, Mr. Vargas, from 2001 to 2008, on his

3 working days, went to the slaughter floor to do his

4 job.  I'm going to -- and he did a number of different

5 jobs on the line but the one he did the longest, for

6 about four years, was a job called clearing neck.

7          Here's a slide that shows the job description

8 and what he had to wear.

9          The job description is pretty straight

10 forward.  Team member rip hide under chip, which is

11 just part of the neck of the cow.

12          And then I'm moving over here because this is

13 Mr. Vargas's equipment that he had to put on every day.

14 The hard hat, the white uniform, safety glasses, hair

15 net.  This is a mesh apron.  I don't know, there is

16 another one over there as well.

17          This is made out of metal.  It's kind of a

18 chain metal, little links of metal.  It's heavy.  Mesh

19 glove, rubber glove, plastic sleeves, steel toed boots,

20 apron, polar sleeves, plastic arm guards, shin guards,

21 steel to keep the knives sharp, scabbard.  And he had

22 to carry two knives as well, knives that we don't have

23 here.

24          Let's go over to processing for a minute and

25 see the other side of the facility.  In processing

1  there are 1800 people working every day.  Again, two

2  shifts, about 900 a shift.  So there are about three

3  times as many workers on the processing side as on the

4  slaughter side.  Although there are more people, there

5  are actually fewer job descriptions and that's because

6  you have more people working each job.

7         In slaughter, basically just one or two people

8  work each spot on the -- on the line.  In processing,

9  and we'll see this a little bit in some video, you have

10  got more people, sometimes five, six, seven, who are

11  working a single job.

12         Can we pull up the processing video?  And then

13  maybe come back to the job slide.

14         Well, actually, tell you what.  We'll just

15  talk about this now since its up.  Here are the

16  processing jobs.  And, again, it follows a chain.  Down

17  the first column, up the next, and so on.  The chain in

18  the processing department serpentines like it does in

19  slaughter and then the meat goes on the conveyor belts

20  where teams of workers do further cutting, trimming,

21  and processing.  But the concept of the chain exists in

22  processing as well.  And the jobs, as you can see, are

23  quite self-explanatory as to what they do.

24         Let's run a clip from the processing side a

25  little bit longer.  Tyson gave us more footage of what

1  the processing side looks like.  Unfortunately, again,

2  no audio here.

3          (Tape played.)

4          If you did have audio, it would be loud, just

5  like the slaughter side.

6          You can see the meat moving on the conveyor

7  belts.

8          You can see how many people are working in a

9  relatively cramped space.

10          Those are workers sharpening the knife.  Those

11  knives are unbelievably sharp.

12          Adelina had a job like this and still does.

13  And this is some stock footage that Tyson gave us.

14  Again, you can see the scale of the operation.

15          This video doesn't convey a couple of things

16  about the processing floor:  The noise; it also is wet;

17  it's also cold.  It's like working in a refrigerator.

18          At this point in the process the meat is kept

19  chilled.  And in both videos in slaughter and

20  processing you saw the chain, the chain move throughout

21  the facility.

22          And it looks a little bit like a factory

23  assembly line.  And, interestingly, Henry Ford, who is

24  the father of automobile manufacturing in this country,

25  got the idea for automobile assembly, at least he

1  purportedly did, in the early 1900's when he visited

2  the Chicago slaughter houses and saw the carcasses

3  moving on a chain with each worker doing an individual

4  job and he had the idea of building cars that way.  So,

5  from a disassembly line comes the concept of an

6  assembly line.

7          But that chain is important, in this case, not

8  just for historical reasons, but it has a lot to do

9  with the issue in this case, because it has to do with

10  how the workers are paid.  And that's what I want to

11  talk about now.

12          Every worker in our class, every production

13  worker on that floor, is paid an hourly wage.  They're

14  hourly employees.  That means they are not paid by

15  salary, they're not paid piece rate or flat rate or

16  paid by commission.

17          What that means is they have a dollar, which

18  is intended to compensate for 60 minutes; an entire

19  hour of work.

20          One thing that won't be in dispute in this

21  case, at least the consent won't be in dispute, is that

22  Tyson must pay its workers for all of their work.  Let

23  me put up for you a guarantee that Tyson gives its

24  workers when they start and come to work for Tyson.

25          So what does Tyson say about compensation for

38

1  work?  This is in what Tyson refers to as the Team

2  Member Bill of Rights.  And it says, under Right Number

3  9, "Right to Compensation For Work Performed," "Every

4  team member has the right to expect payment of wages

5  owed for work performed by the team member.  Tyson Food

6  shall pay all wages due its team members."  "They shall

7  pay all wages due."  So that won't, in principle, be in

8  dispute.  Of course the devil is in the details.

9           So, in explaining how Tyson does pay its

10  workers, I think it's good to start with how they

11  don't.

12           Tyson does not pay its hourly workers through

13  a time clock.  Tyson does not have its hourly workers

14  fill out time sheets of hours worked.  Tyson, other

15  than having a time clock, pays a different way.  It's

16  not because Tyson doesn't have time clocks; they do

17  have they have quite a few of them.  And, actually, let

18  me show you what those time clocks look like.

19           Some of you might be familiar with a process

20  of swiping a card that either has a magnetic strip or

21  some other identification, and this is an example of

22  workers at the Finney plant doing just that.  And every

23  punch is recorded by employee and by time but that's

24  not how Tyson pays.  They don't pay punch to punch.

25           They use that time clock in order to keep

1   attendance.  They use that time clock primarily to find

2   out if someone came to work late or if they're in the

3   facility.

4          Okay.  So here's how Tyson pays its workers.

5   They pay under a system that Tyson refers to as

6   gang-time.  Gang-time.  So that may be a new term or

7   phrase for some of us.  And gang-time is another way of

8   saying production time.

9          I mentioned the movement of the chain.  It's

10  the movement of the chain that measures gang-time.  And

11  it's a way to pay employees for what Tyson calls their

12  productive work.  And the way it works is, when an

13  employee arrives at the line, and the first piece of

14  meat arrives at their work station and they begin to do

15  their job, that's the start.  At the end of the shift,

16  when the last piece of meat leaves their work station,

17  that's the stop of gang-time.

18         Now the start and stop times for different

19  people on the line is going to be different.  So, if

20  I'm on the line and the co-worker is ten minutes up the

21  chain, that co-worker is going to arrive ten minutes

22  early, because their piece of meat is going to get

23  there earlier, it is going to get to me ten minutes

24  later but that co-worker is also going to leave ten

25  minutes earlier, so the shifts are staggered.

1         But the idea is that at the end of the shift,

2   there is a single amount of time that the production

3   line moved that everyone gets paid.  That time might be

4   8 hours and 4 minutes.  That time on a given shift

5   might be 7 hours and 58 minutes.  But, under the

6   gang-time system all those workers are paid for the

7   same amount of time.  They're paid together; they're

8   paid as a gang.

9         And you might be thinking, Well, if they're

10  paid by gang-time from when they're at the line and

11  from that point to when they leave the line, what

12  accounts for the time it takes to put all this stuff

13  on?  The equipment, the sanitary outer garments that

14  Tyson requires them to wear?  And the answer is,

15  gang-time does not account for it.  That's one of the

16  reasons we're here.

17        Let me show you the concept of the difference

18  between paid gang-time and what we're calling the

19  donning and doffing time in question in this case.

20        I pulled up a slide that's called The Anatomy

21  of the Work Day, Pre Shift.  I hope everyone can see

22  that.

23        And for those of you who are having trouble

24  reading the words, see the colors.  The green is the

25  production time which is paid by gang-time, and the red

1  is not paid by gang-time.

2        So, the first thing that happens, of course,

3  is a worker enters the plant.  They then go to the

4  locker room, and they start putting on the gear; the

5  donning process.  And you'll see that little bit of

6  time measured after the workers enter the plant and

7  when they get to the locker room to start their

8  donning.  We're not claiming that that needs to be

9  paid.  Okay?  That is not going to be at issue in this

10  case.

11        But what we do say, is once we're in the red

12  here, once they start donning the required equipment

13  and sanitary outer garments, and then walk to the

14  position on the line -- and remember, the facility is a

15  good size, it's crowded, it takes time to get to the

16  production line -- that time in red is what we're

17  saying needs to be fully paid.  The green then

18  represents the production time.

19        Now, the exact same process happens again at

20  the end of the day, just in reverse.  So let's show the

21  end of the shift.

22        The green, again, represents gang-time; people

23  working away.  And this time I put 2:30, it might be a

24  different time for different workers.  The green

25  production time ends, the worker leaves their work

1  station, walks back to the locker room -- well,

2  actually they clean tools at a work station and then

3  walk back to the locker room, take off the sanitary

4  outer garments and the PPE, that is represented in the

5  red, then they leave the plant.

6          And again, after they leave the locker room,

7  after they stop and finish with their doffing activity,

8  we're not claiming they should be paid for other time

9  we spend in the plant.  So that, conceptually, is what

10 is at issue in this case.  That red time.

11         Now I'll just preview for you that Tyson

12 acknowledges some of the time within the red needs to

13 be paid.  Over time they have started to pay for it.

14 You will see that in a minute.  But let's talk about a

15 couple of things that won't be disputed in the case.

16         If we could pull up the equipment and clothing

17 slide again.

18         Remember, this is just a summary of the stuff

19 represented on these peg boards that Tyson requires to

20 be worn.

21         Now the stuff in the top column, the hair net,

22 the earplugs, the hard hat, beard net, sanitary outer

23 garments, Tyson refers to those as standard outer

24 garments.

25         The stuff down below, the mesh aprons, the

1   sleeves, the scabbards, the arm guards, Tyson refers to

2   that as unique equipment.  And Tyson acknowledges and

3   they stipulate that this unique gear needs to be

4   compensated.  That the time it takes to put that stuff

5   on and take it off needs to be paid.

6           So the issue in this case is whether the

7   amount of time they have attributed to what they agree

8   needs to be paid is enough.

9           But by contrast, this other equipment and gear

10  also required, also for the job, Tyson does not pay

11  for.  And has not paid for for years, and will tell you

12  today, they still don't need to pay for it.

13          So our case is about whether all of the stuff

14  needs to be paid for, and whether the stuff they

15  currently do pay for is paid for fully.

16          All right.  I mentioned that Tyson, over time,

17  has changed its payroll practices.  Let me give you a

18  quick timeline to describe that.  And here we need to

19  go back to 1998.

20          And from 1998 up until April of 2010 there has

21  been a process of Tyson at various junctures beginning

22  to add time to the working day.  Just tack on minutes

23  to gang-time.  They still pay on gang-time.  They pay

24  on gang-time back then, they do today, but they have

25  started to tack on extra minutes designed to compensate

1  for some of the donning and doffing and walking time

2  that we have at issue in this case.

3           So the add on time begins back in 1998.

4           And it was after lengthy litigation that had

5  been brought against Tyson by the Department of Labor

6  that Tyson began to add four minutes.  We'll talk a

7  little bit about that litigation, but it does not have

8  an impact on the issues that you will decide in this

9  case.

10          But I give you that by way of background.

11  Four minutes was added by Tyson back in 1998.  And

12  that's the way it stayed for quite a long time.

13          In 2001 Tyson acquires IBP.  If I said that

14  the Department of Labor and Tyson were in litigation, I

15  need to rephrase.  It was IBP at the time.  Back in

16  1998 it was IBP that added the four minutes.  Tyson

17  acquires IBP in 2001 but the policy stayed exactly the

18  same.  Tyson kept IBP's policy of the four minute add

19  on time to gang-time.

20          In May of 2006, we filed the lawsuit that's

21  being tried today.  That's right, it's almost five

22  years ago.  It's important to note the day we filed the

23  lawsuit, because we, by law, can only go back to

24  recover for a period of three years.  It's called a

25  statute of limitations.  I think you understand what

1  that is.  We can't go back all the way to 1998 or 1988

2  and capture the working time that we believe needs to

3  be paid.  We can only go back at the earliest, three

4  years from May of 2006, to capture time.

5          All right.  So, the lawsuit was filed in May

6  of 2006.  Then in January of 2007, Tyson added a little

7  bit more add on time.  They added up to seven minutes

8  now.  What had been four now comes up to seven and they

9  analyzed different jobs and added one or two or three

10  minutes of add on time.  And it was designed to cover

11  walking time.

12          And I don't know if Tyson is going to get into

13  this in detail, but there was a Supreme Court case that

14  came out in November of 2005 which addressed a

15  requirement to pay for walking time, and Tyson in

16  January of 2007 begins to add more time.

17          And then a little more than three years later,

18  about four years after we filed the case, a little less

19  than a year ago, Tyson made a final change to their add

20  on time and in April of 2010, they bumped it up by an

21  additional 15 minutes, and now add up to 22 minutes of

22  extra pay per worker, per class member.

23          And they did that by, if you had gotten seven

24  minutes before, you now got 15.  If you got six minutes

25  before, you now have 21.  And if you had four or five

1  before, you now have 20.  So Tyson has added between 20

2  and 22 minutes to all the workers working on gang-time,

3  and who are paid under this policy.

4       And let me tell you how Tyson refers to this

5  type of add on time.  I call it add on time because

6  that is the easiest way to explain it.  Tyson in its

7  payroll records refers to it as K-code.  The four

8  minutes is K-code in their payroll records, and they

9  have kept that designation up 'til today.

10      In the payroll records "K-code" means clothes

11 changing time.  The reason it's called "K" is because

12 it means knife.  It's for a worker who works on the

13 production line, has some form of cutting

14 responsibilities.  I guess in short form, Tyson thinks

15 of those folks as knife wielders, so "K" means knife,

16 K-code means the add on time.

17      Not included in the K-code add on time would

18 be people maybe in maintenance, people working in

19 packaging, people who are not working on the line

20 cutting meat.  Those people are not in our class.  Our

21 class are people who work on gang-time, and who

22 received the K-code.

23      Now, while there was litigation way back when

24 that resulted in the four minutes being added, I just

25 want one thing to be really clear so it's not

1  misunderstood or it's not a distraction.  No Court has
2  told Tyson that its current pay policies are in
3  compliance.  The time period that we have in question,
4  which is 2003 up to the present, Tyson has not been
5  informed or told or received a ruling that its time is
6  compliant with the law, that it's K-code time.  That is
7  why we are here.
8          So I want you to understand that, ultimately,
9  it will be your job to determine whether Tyson is fully
10 paying for the working day as required by law.
11         Two other things to note about this timeline.
12 Actually, three.
13         First, is in going from four minutes to seven
14 minutes, to now 22 minutes, there wasn't a change in
15 the job that these workers are doing.  The slaughter
16 jobs, the production jobs remained basically the same.
17 In other words, the 22 minutes wasn't added because
18 they have to put on twice as much equipment.  The 22
19 minutes wasn't added because they have to walk three
20 times as far within the facility.  The facility stayed
21 the same, the jobs changed -- stayed the same.  What
22 changed was Tyson's decision to add more time.
23         The next thing to know is that when Tyson
24 makes its change to 7 minutes and to 22 minutes, they
25 make it only prospectively.  They only make it going

1  forward.  Even though they now pay for this additional

2  time, they never paid back pay to the workers who had

3  been doing the donning and doffing and walking time.

4  They only made the changes prospectively, never went

5  back and made back pay.

6        Finally, the change to 22 minutes, which is a

7  15 minute add on, was the result of a realignment of

8  Tyson's work day.

9        Let me explain it this way.  Before April of

10 2010, Tyson gave its workers a 30-minute unpaid meal

11 break, and that's fine.  A meal break doesn't need to

12 be paid.  But it also gave a rest break.  A rest break

13 of 15 minutes.  And its our view that rest breaks, if

14 they are provided by an employer, need to be paid.  And

15 Tyson did pay 15 minutes for its rest break.

16        But when it increased its add on time from 7

17 to 22 minutes, it took away the paid break.  Their

18 break is now unpaid.

19        So what really happened is Tyson

20 re-characterized the work day, is now adding 22

21 minutes, but took that extra 15 minutes out of the

22 workers' pay break.

23        And failing to pay for the rest break is also

24 one of the claims in our case.

25        All right.  We could put up the clothing slide

1  again.

2         The basic issue in this case that will be

3  decided is whether Tyson is required to pay for all of

4  the items on this slide.

5         Whether they're compensable.  Whether they

6  constitute work.

7         You might hear a phrase called integral and

8  indispensable, and it's one way that the law looks at

9  whether required clothing or gear needs to be paid.

10        When you think about the concept of whether

11  putting this gear on and taking it off needs to be

12  paid, there are a couple of things to keep in mind.

13  One of them is whether it's required by Tyson.  I don't

14  think you'll hear a dispute that this stuff is

15  required.

16        Another issue is whether it's necessary for

17  the job.  And I think the record will be clear the

18  workers couldn't do the job without it; Tyson wouldn't

19  let them.

20        The third issue is what Tyson, I believe, will

21  argue quite strongly, and that is, whose benefit is

22  this for?  Whose -- who benefits from putting the

23  equipment on, wearing it, and the like?  And Tyson will

24  tell you that it solely, or at least primarily,

25  benefits the employee.

1          And this much is true:  Wearing some of this

2   stuff does help keep the employee safe.  There is some

3   truth to that.  Wearing some of this stuff does help

4   keep the employees warm.  There is some benefit as

5   well.

6          But our evidence will be that, overwhelmingly,

7   wearing this required gear and clothing benefits Tyson

8   and it benefits Tyson for a number of reasons.

9          Could we pull up the next slide?

10          Let's think about why Tyson requires all of

11   this.

12          Let's start down here.  Its beef meets

13   sanitation standards.  Remember what's happening in the

14   Tyson plant.  They are processing meat, they're

15   processing beef that goes into our nation's food

16   supply.  It is critical, and Tyson will tell you,

17   nothing is more important than insuring that that

18   product is clean, unadulterated, free from

19   contamination.

20          There is a reason Tyson calls, for example,

21   this uniform a sanitary outer garment.  There is a

22   reason they call the frock that Ms. Garcia wears a

23   sanitary outer garment.

24          The frock isn't to protect the workers from

25   the meat, it is to protect the meat, what we feed our

1  families, our children, it is to protect the meat from

2  any contaminants that the workers might bring into the

3  plant.  That is why they are there.  And that's Tyson's

4  requirement.

5        I already mentioned compliance with

6  governmental regulations, OSHA, and the USDA.  I didn't

7  know this until a couple of weeks ago when I had the

8  chance to be in Tyson's plant in Garden City, there is

9  a United States Department of Agriculture official on

10 site all the time.  I think there is more than one,

11 actually.  Tyson cannot operate if the USDA official

12 isn't on site.  Tyson cannot operate if the USDA

13 standards are not met.  Tyson's business requires

14 compliance with OSHA and USDA and that's what that gear

15 is for.

16       The plant's running continuously and

17 efficiently.  I mentioned, for example, in processing,

18 how cold it is, working in a refrigerated unit.  If a

19 worker is numb from cold, they can't do the work

20 necessary to process the meat.  Yes, putting on a polar

21 glove allows the worker to keep warm, but if you didn't

22 put on the glove, the worker could not do their job.

23       So even a benefit for the employee, by keeping

24 warm, has an ultimate benefit for Tyson.  Similarly,

25 the protection.  Yes, the workers don't want to get

1   hurt, obviously, but think about the ultimate benefit.

2   Tyson needs its workers to stay healthy.  They need

3   them to stay safe.  Injured workers are costly.

4   Injured workers require worker's compensation, they

5   require medical care, they may require replacement and

6   the cost of retraining.

7           So even the protection and safety that helps

8   the worker ultimately goes to Tyson benefit and bottom

9   line.

10          Overall, when you look at the big picture, and

11  you think about who is getting the benefit of this

12  gear, it's Tyson.  They could not run their operation

13  without it.  It's all for the job.  It is for Tyson's

14  ultimate benefit.

15          All right.  I mentioned this case is also

16  about the time it takes -- and this is really the issue

17  we believe will be in dispute -- how long does it take

18  to put this equipment on, take it off, walk within the

19  plant?

20          We have hired an expert witness to help us

21  determine how long the activities in question actually

22  take.  His name is Doctor Robert Radwin.  He's a

23  professor at the University of Wisconsin, he's an

24  industrial engineer.

25          And we asked Doctor Radwin, We need to measure

1  how long it takes for someone to put on equipment and

2  get to the production line and measure again the same

3  process in reverse, coming off the line.

4  　　　　And I should mention, too, this process

5  happens at the beginning of the shift, at the end of

6  the shift, and it also happens over the unpaid breaks,

7  because there is some donning and doffing that occurs

8  when you go to your lunch break.  You have to take some

9  of the equipment off, you have to put it back on when

10  you leave the unpaid meal break.

11  　　　　So we asked Doctor Radwin, How best do we

12  measure how long it takes?  How best could we measure

13  the time?  And he visited the Finney County plant and

14  he brought a team in to help us do some time

15  measurement.

16  　　　　And Tyson allowed Doctor Radwin and his team

17  to be in the plant to take measurements for three days

18  and three days only.  And during that time, Doctor

19  Radwin took a video camera, and he actually followed

20  people that were selected at random, did not know who

21  they were, did not know where they worked, and simply

22  followed them with a video camera and timed when they

23  started to put this stuff on, until when they got to

24  the line.  And then at the end of shift or before they

25  went to break, just timed them and measured them when

1   they left the line and got back to the locker room.

2           So he took those measurements, and here's what

3   he found.  He found that in the processing department,

4   the average amount of total donning and doffing time,

5   if you remember the slide that showed the red, the

6   average amount of red time was 27 minutes a day.  27

7   minutes a shift for folks in processing.  On the

8   slaughter side he found that red time to be 32 minutes.

9   And when you combined our class, slaughter and

10  processing as one, the overall time was 29 minutes.

11          Now, it was Doctor Radwin's intention to give

12  as realistic, as real life a measurement as possible by

13  actually observing people in their everyday work lives.

14  But when he followed with a camera, he did not include

15  all the time.  Sometimes the person who was under

16  observation, after they put their gear on, might go to

17  the nurse's office, or they might go sit with a friend,

18  or they might go smoke a cigarette.  Doctor Radwin

19  excluded that time.  He did not count it.

20          So his intention was to measure the time

21  employees would actually take, excluding some of that

22  personal time, and the measurements, averaging about 29

23  minutes is what he found.

24          It's not going to be a surprise to you that

25  Tyson hired its own expert.  Not a surprise.  Tyson's

1  expert is named Doctor Adams.  And Doctor Adams also

2  has experience in industrial measurements and Doctor

3  Adams did something a little different.  Actually he

4  did something quite a bit different than Doctor Radwin.

5          Rather than measuring actual start times and

6  stop times, showing a continuous process, Doctor Adams

7  did something called an elemental analysis.  So what

8  Doctor Adams did is he observed a worker taking a hard

9  hat and putting it on.  And he identified an amount of

10 time for that.  Three seconds, four seconds.

11         He identified a worker grabbing a mesh vest

12 and putting it on and he scribed an amount of time to

13 it.  And he did that for each activity that a worker

14 does in the day.  So he discreetly measured bits of

15 time for each object, and then what he did is he added

16 it up at the end and said that putting on all that

17 stuff should take "X" amount of time.

18         And the way he goes about it is describing

19 it's reasonable time, it's what minimally -- what it

20 should take minimally.  It should take no more than

21 this reasonably.

22         So what you have is Doctor Radwin who is

23 measuring continuous time; you have Doctor Adams,

24 Tyson's expert, who is measuring elemental time.  And

25 those numbers are different.  Radwin's is higher; you

1  might expect Adam's is lower.  But here's the point:

2  Both Doctor Adams and Doctor Radwin both find it takes

3  time and both find that there is unpaid time due to

4  donning and doffing in the Garden City facility.

5          When we talk about time there are different

6  ways to think about it, different perspectives to

7  bring.  One defense that Tyson may raise in this case

8  is a defense called de minimus.

9          Let me throw that up on the screen as well.

10          And I put it up because this is not a phrase

11  that is commonly used every day.  It's Latin, and it

12  means too small to matter; trivial; insignificant; a

13  trifle; not to be bothered with.

14          If they raise the defense, the judge will give

15  you instructions on how it might apply to this case but

16  a couple of things to keep in mind when you hear about

17  de minimus.

18          One of the issues is whether the time in

19  question can be recorded, as a practical matter.  Is it

20  able to be captured?

21          Our evidence will be that Tyson has time

22  clocks.  They have plenty of time clocks and, in fact,

23  they could have more if they wanted to add them.

24          Another issue is, is the time in question

25  regular?  Is it -- is it only occasional or infrequent

1   or does it happen on a regular basis?

2           The donning and doffing and walk activities in

3   this case happen every single day.  And they happen

4   several times within every shift.  And the final

5   consideration as to whether time is de minimus is the

6   amount of time, just how long it takes.

7           And here, perspectives on time can be viewed

8   in an objective way.  So let's think about time for a

9   minute and think what it means in this case.

10          Let's first start with an amount of time and

11  what it means to a Tyson worker.  Twenty minutes per

12  day, that's going to be within the ballpark of the time

13  we're talking about in this case.  Here's what it means

14  to an individual worker.

15          Twenty minutes per day, five days a week, adds

16  up to an hour and 40 minutes for a week.  Five shifts.

17          When you translate that out into 50 shifts --

18  or 50 weeks of work -- weeks a year, the amount is 83

19  hours.  So when you think of de minimus -- too small to

20  matter -- think about what we could do with an extra 20

21  minutes a day, or an extra hour and 40 minutes a week.

22  Or 83 hours a year.

23          Another way to look at time is from Tyson's

24  perspective.  And what time means to Tyson.  If you

25  take that same 20 minutes a day, and you aggregate it

1  over an average number of daily worked shifts, you come

2  to 733 hours of time per day, 3,665 hours per week and

3  190,000 per year.

4        You can keep those concepts in mind as you

5  listen to Tyson talk about what's too small to matter.

6        A final person I want to introduce you to that

7  you'll meet at trial is Scott Baggett.  He is our

8  statistician in this case and he is going to help us

9  work through the mountain of payroll records that Tyson

10  has produced in order to help us calculate the time in

11  question.  Tyson gave us 6.8 million separate payroll

12  records.  And from that mountain of data, and thank

13  goodness for computers, Doctor Baggett was able to

14  analyze the payroll, find who was paid on gang-time; he

15  was able to find who was paid K-code; he was able to

16  calculate average wage rates; and he was able to tell

17  us who was in our class.  And, ultimately, he'll be

18  able to tell us what the damages will be for the class.

19  So he is going to make sense of the data for the entire

20  class using Tyson's payroll records.

21        I can tell you that the unpaid time in

22  question, the evidence will ultimately show, is in the

23  hundreds of thousands of hours.

24        All right, I'm going to wrap up here in just a

25  moment.  Before I do, I want to let you know that

1  probably in the history of jury trials, there probably

2  has never been a perfect case presented by any one side

3  or any one attorney.  I can assure you that this is not

4  going to be the first.  Our case of course is not

5  perfect.  We have some challenges.  I want to identify

6  a couple of those challenges to you.

7       One is a simple language barrier.  Our

8  clients, the vast majority of them, don't speak English

9  or if they do speak English -- and Adelina and Jeronimo

10  speak some, they don't speak it with enough comfort or

11  confidence to stand or sit in a witness box and give

12  testimony through cross examination.

13       So what we are going to do is bring in a

14  translator that has been accepted by the Court and by

15  Tyson, to help in that communication process.  The last

16  thing we want to do is slow the process down, but a

17  translator is going to be necessary for us to convey

18  the story of several of our -- of our clients.

19       Our clients also don't know the big picture of

20  how Tyson pays, how it runs its business, the

21  regulations they're under.  Our workers worked a

22  discreet job on a production line and they

23  don't -- they can't give the whole story, and because

24  of that, as the Court mentioned, we're going to call as

25  our first witness to help give that bigger picture,

1  Tyson's own manager, the manager who ran the Tyson

2  county facility for all of the years in question up

3  until just recently, actually.  So we're going to start

4  our case with Tyson's witness.  It's a little bit of an

5  unusual way to begin.

6          And, finally, I mentioned this earlier, as a

7  class action, we are not going to call certainly all of

8  our witnesses.  The trial would take, literally, years

9  if we were required to, but we're not.  We are going to

10 call a smaller set.  And we're going to do that to try

11 to give you a sense of their work experiences.

12         But, remember this.  When you think about

13 evidence and then when you think about class wide

14 evidence, it isn't limited to just what the initial

15 workers are able to tell you.  Listen to what Tyson

16 tells you.  Listen to what they have done, in terms of

17 setting policies for all of their workers, the

18 gang-time policy, the K-code policy.  It is Tyson's

19 conduct which will show the class wide evidence in this

20 case.

21         All right.  So we have covered who's involved

22 in this dispute:  It is a group of workers in Tyson

23 Foods.

24         And we have covered what the case is about:  A

25 dispute over unpaid time.

1          We've covered the where:  Finney County.

2          And when?  The May, 2003 until the present.

3  So we have one more of the who, what, when, "Ws" to

4  look at, and that's the why.

5          Why would Tyson pay this way?  Why would they

6  not pay punch to punch or a time clock?  Why would they

7  pay gang-time?  And why would they just over time start

8  adding minutes?

9          And to think about the answer to that

10  question, you have to understand a little bit about

11  Tyson's business.  There are a number of costs involved

12  with Tyson's business that are out of its control and

13  among those would be the cost of the cattle it buys to

14  process; the cost of the feed it takes to feed them;

15  the availability of the product, whether because of mad

16  cow disease or some other limited availability.  They

17  don't control the energy costs that it takes to run

18  their plants.  They don't control the fuel costs it

19  takes to transport their product across the country,

20  and across the world.

21          But there is one cost they do control and

22  what's kind of amazing when you think about this

23  operation is even in the age of incredible technology,

24  and jobs and workplaces that are being designed so that

25  fewer workers can do much, much more work, that type of

1 technology really hasn't changed the way Tyson goes

2 about its business of processing cattle.  It is still

3 incredibly labor intensive.  They still have to hire

4 thousands and thousands of people to do that work.  And

5 this is a cost.

6          And we'll see how Tyson views labor.  This is

7 a deposition statement from one of Tyson's industrial

8 engineers and he told us "Labor is our single largest

9 controllable cost."  "Labor is our single largest

10 controllable cost."  Story of this case is the story of

11 Tyson controlling its labor costs.

12          All right.  I appreciate your patience.  We've

13 talked about a number of things:  Workers, the nature

14 of the work.  This case involves some important issues

15 and issues that affect all of us.  What it means to be

16 paid, what time means in our workplace, what the

17 definition of work might mean.

18          I know serving on a jury may not be anyone's

19 first choice of how to spend time but I really do hope

20 that if you are chosen to serve, that you will find the

21 experience worthwhile and that the issues at stake are

22 interesting and important.

23          At the end of the case, after the evidence is

24 in, I am going to have a chance to stand up in front of

25 you one more time and speak to you directly.  By that

1  time, some of you will be over there in the jury box

2  (indicating) and when I get up at the end of the case,

3  I am going to ask that you return a verdict in favor of

4  the workers in this case.  I'm going to ask for that

5  verdict, I'm going to ask for an award of monetary

6  damages.

7          But when I stand up in front of you I'm not

8  going to be talking about punitive damages, I'm not

9  going to be talking about emotional distress, or pain

10 and suffering.  I'm not going to be talking about a

11 bail out, I'm not going to be asking for a handout.  I

12 am going to be talking about unpaid wages.

13         And I'll promise you now, I won't ask for

14 anything more than the fair pay for the work that these

15 folks have done.  By the same token, these workers

16 should not expect anything less than full pay for the

17 work that they have given Tyson these many years.

18         Thanks for your patience.

19         THE COURT:  Thank you, Mr. Hanson.

20         Folks, we're going to take a short break now

21 and when we come back, we'll have the defendants'

22 opening statement.

23         We'll be in recess until 11:10.  11:10.

24         Now let me give you an admonition that those

25 of you who end up on the jury are going to be hearing

1  frequently throughout the case.  But you are not to

2  discuss this case or any aspect of it among yourselves

3  or with anyone else.

4       So that means as you're in the hallway or the

5  restroom, if you want to go outside and have a

6  cigarette, you can visit about anything except what's

7  happening in this courtroom up here and what you have

8  heard about the case so far today.

9       So, with that, if you would be back in your

10  seats at 11:10, I would appreciate it.  And with that,

11  we'll be in recess until 11:10.

12       (Recess taken from 10:50 a.m. until

13       11:10 a.m.)

14       THE COURT:  As soon as everybody is settled in

15  we'll proceed with the defendants' opening statement.

16       MR. O'DEAR:  Thank you, Your Honor.

17       THE COURT:  Certainly.

18       MR. O'DEAR:  May it please the Court.

19       THE COURT:  Thank you.

20       MR. O'DEAR:  Thank you.  Ladies and gentlemen

21  of the jury:

22       My name is Craig O'Dear, I represent Tyson

23  Foods in this litigation, and the evidence in this case

24  is going to show that throughout the period at issue in

25  this trial, we have paid our employees fairly and fully

1  in compliance with the law.

2          And as Mr. Hanson told you, the period at

3  issue in this case starts in 2003 but there's actually

4  a longer period of pay history at this plant that will

5  be part of what I explain to you to explain why IBP

6  originally, and now Tyson, have done what we have done

7  and what our policies have been and how they have

8  changed over the years.

9          The issue of how we pay our people, we have

10  other people, employees, who have to make decisions

11  about how we pay people.  They're not always clear and

12  easy and obvious, and sometimes there are differences

13  of opinion and there have been in this situation.  And

14  as the Court told you, that's why we're here.

15          But there are a lot of things that we

16  consider; people that make these decisions in our

17  company have to consider.  First and foremost, we want

18  to be fair to our employees.  We want our employees to

19  feel appreciated and respected.  And we believe they

20  do.

21          You are going to hear about a lot of employees

22  that we have that have worked 10, 15, 20 years with

23  this company, with this plant.  You'll hear that the

24  turnover over the last three years has been tremendous

25  decrease in turnover and retention.  You've already

1  heard that people travel from all over the world, they

2  come here and want to work at the Tyson facility in

3  Finney County, Kansas because it's a great opportunity

4  for them.

5          You've heard it's a non labor union plant,

6  because the employees voted it down.

7          The implication in some of the remarks you've

8  heard is that our employees at Finney County are not

9  well treated.  The evidence is going to be to the

10  contrary in this case.  The evidence is going to show

11  that Tyson is a good employer providing good jobs at

12  good wages, under good conditions.

13          You saw the last slide.  How do we view labor?

14  How do we view our people?  Made me think of a couple

15  of people that started out in these hourly jobs.

16          One of them here is Mr. Mitch Young, that's

17  our company representative sitting here in front of

18  you.  Mr. Young is now a head of human resources at the

19  Finney County plant.  He has worked at that plant for

20  over 20 years.  He's a formerly hourly production

21  worker, worked his way up as a production supervisor,

22  and now is head of human resources.  That's how we view

23  labor:  It's our most valuable asset.

24          You saw a slide on Mr. Monty Hahn,

25  another -- he's an industrial engineer.  He started

1  this company 18 years ago, worked on a variety of

2  manufacturing hourly positions and then he went back to

3  college at Iowa State and got his engineering degree.

4      That's how we view labor:  Our most important

5  asset.

6      Now, Judge Marten has told you, sometimes

7  there's an honest difference of opinion and we'll have

8  more questions about this during jury selection, but in

9  our view, the way the legal system works in this

10  country is just because somebody sues you, doesn't mean

11  they're right.  Everybody has got -- got an opportunity

12  and a right to defend themselves and that's

13  where -- where we are today.

14      As the judge has told you, you're going to

15  decide, whoever ends up in that jury box, is going to

16  be sworn to decide this case and given the power to

17  decide it, based on the instructions the judge gives

18  you, and the facts presented in this case.

19      Now, we talked about the various things that

20  we want to consider as we make these decisions on

21  employee compensation.  And I talked about being fair

22  to our employees, make sure they're appreciated,

23  motivated, et cetera.

24      We also want to fully comply with the law, and

25  we believe we have.  I am going to talk to you about a

1   23-year history of litigation off and on, and we

2   believe we have every step of the way, fully complied

3   or exceeded our compliance with the law.

4        You've heard about the change we made in

5   April, 2010.  You're going to hear what our position

6   is.  It is a change that exceeded significantly what is

7   required by law.  Hopefully to try to end a 23-year

8   history of not having us back five or ten years down

9   the road.

10        And sometimes when parties disagree, the only

11  way in the end you can sort it out is to have a trial,

12  and to come to people like you who are empowered to

13  make the decision.

14        Let's talk about what's at issue in this case.

15  Mr. Hanson has already explained to you the concept

16  between unique items, as we refer to them.  And these

17  are items that are specific to knife users.  They are

18  the kinds of things you see that protect people from

19  the hazard of knives.

20        And throughout the period at issue in this

21  case, 2003 forward, and even going back beyond that,

22  but 2003 forward is what we are looking at, Tyson Food

23  has been paying employees for the time spent donning

24  and doffing these unique items before the shift, and

25  after the shift.  And I'm going to give you a little

1  bit more of that history but start out at four minutes,

2  moved up to seven minutes.  That's not at issue.

3          Mr. Hanson had pointed out there is an issue

4  of, they believe, more time is required, but we have

5  been paying all this equipment, most of it you see

6  hanging on these racks, we have been paying employees

7  for the time spent donning and doffing this equipment

8  since the beginning of the period of this lawsuit,

9  2003.

10          The standard items, these are the non unique

11  items that basically see workers wearing in a number of

12  industries.  And the plaintiffs' contention in this

13  case, Well, you should pay for this now, as well,

14  because there's some time it takes to put on these

15  items.  And to take them off.  And these are standard

16  things like hard hats, earplugs, safety footwear and

17  eyewear.

18          Now, I got my trusty trial bag here that is

19  about to fall apart but it's been with me many years

20  and I wanted to emphasize to you what's at issue.  This

21  is what we haven't been paying for.  And I'm going to

22  explain to you why.  He talked about why?  We have an

23  answer for why.

24          What we have here is a hard hat, hair net,

25  goggles, and earplugs.  A set of gloves.

1        We have a frock and we have white pants and

2  white shirt.  Okay?

3        The frock is worn by people in processing.

4  The white pants and shirt are worn on the slaughter

5  side.  Okay?

6        So what we have here is frock -- let me start

7  with slaughter.  The pants and shirt, and we have

8  boots.  All right?  So this is onerous equipment that

9  we're talking about here on the slaughter side.  It's

10  that.

11        On the processing side it's this.

12  (Demonstrating throughout.)

13        That's what we haven't -- our position has

14  been putting these items off and on is getting dressed

15  for work.  And people don't get paid for getting

16  dressed for work.  That's been our position and I'm

17  going to tell you how we got to that a little bit more

18  about the history.

19        They give you just a bit of an overview on the

20  major points I'm going to hit upon.  I am going to give

21  you -- Mr. Hanson talked a lot about why.  I'm not sure

22  why is all that relevant but I'm going to explain to

23  you the history of our policies and our changes and the

24  specific events that brought each of them about.

25        And what you have already heard from Mr.

1   Hanson is that over the years we have changed our

2   policy in -- and how we pay our workers to be fair and

3   to comply with the law.

4        I went -- earlier I said it's not always easy

5   and obvious, these decisions.  The reason is over

6   23-year period the law in this country often changes.

7   It's not static.  And so over time you may have to

8   change your policies to be in compliance.  So I'm going

9   to talk to you about that, the history.

10        The other thing, next thing I am going to talk

11  to you about, and Mr. Hanson touched on this, this core

12  issue in this case, these items that we're talking

13  about, for the plaintiffs to prevail, they have to

14  prove to jurors in this case by a preponderance of the

15  evidence that that equipment is worn primarily for

16  Tyson's benefit, not for the workers' benefit.

17  Primarily for Tyson's benefit.

18        And I'm going to talk to you about that test

19  and what the evidence is going to be on that because we

20  believe this equipment is worn primarily for the

21  workers' benefit, even though there is benefit to

22  Tyson, of course, but prime -- but we believe it is

23  primarily for the workers' benefit and we'll talk about

24  how we think you'll have to address that issue.

25        Mr. Hanson mentioned de minimus defense and

1  what that boils down to is that the amount of time for

2  these items that takes seconds, we'll hear the

3  plaintiffs themselves I believe testify and workers

4  testify, we're talking about seconds.  Not 20 minutes a

5  day that you saw the calculation about what 20 minutes

6  a day adds up to; we're talking seconds.

7         So we believe the evidence is going to show

8  and illustrate that the amount of time required for

9  these activities is overstated.  And Mr. Hanson talked

10  about the administrative difficulties as another factor

11  in the law that we believe you'll be instructed on.

12  When you got literally 7,000 workers that are working

13  in multiple departments and multiple jobs and they have

14  different requirements and different personal

15  preferences, the -- the administrative task of trying

16  to track all of that is exceedingly difficult.

17         Then we're going to talk, he mentioned the

18  meal break and lunch break, rest break and the rest

19  break.  We believe when we talk to you about those

20  claims and what the evidence will be, and what we think

21  the legal framework will be, the judge will explain to

22  you on how to decide it, and what it really comes down

23  to, and it's -- I mean no different than your own

24  experience -- these breaks or lunch break, as long as

25  the lunch break is predominantly for you, the worker,

1  you get to do whatever you want to during your lunch

2  break, it's not paid.

3       And the analysis is very much the same for a

4  rest break, so long as it's of a sufficient period of

5  time that you actually can get away from your work.  So

6  we'll talk about that.

7       And then the last issue we're going to touch

8  upon has to do with the number of workers that they are

9  in this case attempting to prove a case for.  I believe

10 Mr. Hanson made a comment to the effect that the judge

11 had made a ruling about, you know, whether what these

12 plaintiffs will testify to is representative.  We

13 believe that's going to be one of the issues in the

14 case.

15       What we have here is a case that's been

16 permitted to go forward on a class basis, but now what

17 we're left with is the issue of proof.  And for the

18 plaintiffs to prove their -- their case, not just for

19 the limited number of people that will testify, but

20 for -- they are going to be asking you to extrapolate

21 that information across thousands of workers, they have

22 got to give you evidence that gives you some basis to

23 conclude that you actually know what the practices are

24 for these various people.  And we believe that that's a

25 burden that they will be unable to meet in this case.

1          Let's move to the history; the why.  I'm going

2   to try to move through this pretty quickly but it's a

3   history that you all I think need to understand to

4   know -- understand why we made the changes we've made.

5          1988 -- yeah, 1988, this plant was owned by

6   IBP.  And as Mr. Hanson said, we acquired it in

7   September, 2001 and it was renamed, that business was

8   renamed Tyson Fresh Meats.

9          Well, back in 1987, the Department of Labor

10  investigated certain IBP pork and beef plants and they

11  took the position, the Department of Labor, federal

12  government, took the position that certain of these

13  activities that we're talking about, donning and

14  doffing certain items, were compensable.  And IBP

15  disagreed.  Same thing that we are presented with right

16  here.

17          And when -- eventually, because of that

18  disagreement, the Department of Labor filed suit on

19  several plants that included Finney County.  And you'll

20  probably hear reference to the name of the case Reich

21  vs. IBP and this is after the Department of Labor

22  Secretary Robert Reich.  And that case was actually

23  tried in this court, the United States District Court

24  for the District of Kansas by another judge, a Earl

25  O'Connor, who is since deceased.

1        And it wasn't tried to a jury as this case

2   will be.  In that case Judge O'Connor was the,

3   basically the jury; judge and the jury.  And he got to

4   decide.  And what he ruled was, with regard to this

5   dispute that IBP had with the Department of Labor, is

6   the Department of Labor was right in certain respects

7   and IBP was right in certain respects.

8        And IBP took the position that the time spent

9   donning and doffing these items I have just showed you

10  are not compensable and Judge O'Connor said, You're

11  right.  The -- he also ruled that for the knife

12  wielders, reasonable time -- this is what he ruled --

13  the reasonable time required for knife users to don,

14  doff and clean the personal protective equipment, both

15  pre shift and post shift, not the meal period, is

16  compensable.  But, you don't have to pay for the

17  standard safety items and sanitary items.

18       That went up to the United States Court of

19  Appeals for the 10th Circuit, it was appealed.  The

20  United States Court of Appeals affirmed, said, Judge

21  O'Connor is correct .

22       1996, what happened is the case then went back

23  to Judge O'Connor for a trial on damages; how much time

24  is owed.  And in that trial he ruled that IBP has to

25  pay employees for the reasonable time necessary to

1 complete the activity, not the actual time, recognizing

2 that, you know, if somebody wants to, they can take a

3 lot of time to get dressed.

4         So, it's the reasonable -- so he ruled in that

5 case that reasonable time necessary is what IBP had to

6 pay.  And he entered an injunction against IBP saying,

7 Going forward, you got -- you got to pay these knife

8 users for the time it takes to don and doff these

9 unique items pre shift and post shift.

10         We go forward, that issue was taken up to the

11 United States Court of Appeals, again affirmed.  1998,

12 IBP did some time studies to look at, well,

13 what's -- what is this reasonable time that's required

14 for donning and doffing this unique equipment for knife

15 users?  And the time studies determined four minutes

16 was appropriate.  The Department of Labor hired their

17 own expert, did their own time study, and verified four

18 minutes.

19         And so IBP began paying at that time the four

20 minutes, not just -- this is a example of going a

21 little bit beyond, not just the knife users that IBP

22 paid those four minutes extra but to anybody that

23 worked in a department where there was anybody using a

24 knife.

25         And then in 2001 Tyson acquired IBP and we

1  continued that practice, paying the four minutes.  And

2  then, what happens?  I said then some times the law

3  changes.  Okay?

4       Now, the issue was another issue was raised in

5  November, 2005.  The United States Supreme Court ruled

6  that certain pre and post shift walking time is

7  compensable and so that applied to Tyson and other

8  employers that, you know, are similarly situated, and

9  Tyson then had to conduct walking time studies and then

10  beginning January, 2007 we -- we basically added one,

11  two, or three minutes to the four minutes that had been

12  paid previously to the knife users.

13       And then we move up to April of 2010 and in

14  April of 2010, Tyson looked at this issue and decided

15  to try to solve the problem.  And by that I mean the

16  problem of continuing litigation and -- and continuing

17  claims that it's not enough, it's not enough.

18       Prior to April of 2010, there was a 15-minute

19  break that was given, that was paid.  And what Tyson

20  did -- and a 30-minute lunch break.  That was unpaid.

21  Tyson restructured that work day and what they did is

22  they increased, first of all, the rest break to 25

23  minutes, give a longer rest break so that it could be

24  uncompensated if you give a sufficiently long rest

25  break, went ahead and paid five minutes of that rest

1  break, and also extended lunch break to 35 minutes and

2  paid five minutes of the 35 minute lunch break.

3          And so, basically, added or restructured the

4  work day, gave a longer rest break, five minutes of

5  which is unpaid, and took 15 minutes and added it to

6  what had been the previous K-code time.

7          And the belief, our belief, is that this would

8  move us to a place where no one could reasonably

9  suggest that the activities -- I'm going to show you

10 some videotape about these activities and how long it

11 takes somebody to come off the floor and hang up their

12 gear and be in the lunch room, and our belief is, when

13 you look at this activity, that nobody could suggest

14 going forward down the road, five, ten years, like I

15 said, down the road, that 20 minutes isn't sufficient

16 time to cover these activities.  And so, we made that

17 change in the hopes that this jury will be the last

18 jury impaneled on this issue.

19          I want to show you -- this goes back, this is

20 a pay stub from Ms. Garcia back in 2006.  And I simply

21 want to emphasize here, that -- and I believe it was

22 clear, in fairness, from Mr. Hanson in his opening,

23 that there has never been a question that for the

24 productive time the workers are on the line, they have

25 always been paid, by IBP and Tyson.  No question about

1  that.

2       The question has been, how has the time pre

3  shift/post shift been spent for putting on clothes and

4  taking them off?  And what this shows is, this

5  particular slide -- this is a pay stub, a couple of pay

6  stubs, and what it shows in -- in the top one here,

7  this pay stub on 8-17 of 2006, that week there was a

8  clothes changing payment of .25 minutes, and another

9  one down here, I think this is .08 but this K-code time

10  was included and part of it Tyson Fresh is paid at time

11  and a half, so it wasn't just paid, it was paid at

12  overtime rate.

13       And same -- down here on the 5-18-2006 date,

14  down here on the bottom, that week, because of extra

15  time, there was -- I'm sorry, it is four tenths of an

16  hour is what that is, these are fractions of an hour,

17  not a minute.

18       That clothes changing time was paid all at 24

19  minutes at time and a half.  So, this -- the practices,

20  what I want to really emphasize is, the practices that

21  we have implemented have always been very transparent,

22  they're communicated and itemized on pay stubs and, you

23  know, there has never been any question in terms of

24  what's -- what's being paid and how much for the

25  clothes changing.

1           This is -- I just want to again show you, kind

2    of track through our pay practices.  I have given you a

3    little history on why, but this first one is the

4    period, deals with the period from 2003 to 2007.  Okay?

5           And what we had during that period was four

6    minutes of clothes changing time being paid and it

7    shows here a 15-minute break that was paid and a

8    30-minute lunch break unpaid.

9           Okay.  Then we move into the next period,

10   which starts January, 2007, as I told you.  Still a

11   15-minute pay break, a shorter break, but paid, and up

12   to seven minutes now, because of the case on the -- the

13   walking time and that was continued, that policy was

14   continued up until April of 2010.

15          And this slide depicts the restructuring of

16   the work day that Tyson did in April, 2010, to

17   hopefully resolve this issue for a long time.

18          And this is a longer break, longer rest break,

19   five minutes of which is paid, and a longer lunch

20   break, five minutes of which is paid, and now, 15

21   minutes is added to the prior K-code time of 7, to get

22   to 22 minutes.

23          So, that's the history of the pay practices at

24   the Finney County plant.  A 23-year history that

25   involves litigation up to the United States Court of

1   Appeals twice, and explains why we paid for what we

2   paid for, and why we have not paid for what we disagree

3   about.

4          And this case now, again, is going to be

5   submitted to you, once again, to decide this issue

6   based on the instructions the judge is going to give

7   you at the end of this trial and based on the evidence

8   you hear during this trial.  It will now be your

9   decision.

10          All right.  Let's talk about the -- one of the

11  main elements of what the plaintiffs has -- have to

12  prove in order to prevail in the case.  And Mr. Hanson

13  touched on this, but it is the bottom line, the Court

14  will instruct you that which the plaintiffs seeks

15  payment is it must be integral and indispensable to

16  their principal work activity.

17          And there are three factors the plaintiffs

18  must prove to you beyond a preponderance of the

19  evidence.  All three of them have to be proven.  If

20  they don't meet one, they haven't made the case.

21          Items of clothing/equipment must be required

22  by Tyson; items of clothing/equipment must be necessary

23  for the employee to perform their duties; and the third

24  one, which is the one Mr. Hanson discussed, employees

25  must show that they wear this clothing and equipment

1  primarily to benefit Tyson, rather than themselves.

2          And you're going to hear a good bit of

3  evidence on this issue and I want to give you a little

4  overview of it.  But one of the things I want to point

5  out here, this is kind of one of those deals that is it

6  primarily for Tyson?  Primarily for the employees?

7  This is an important issue that we'll talk about more

8  in closing on burden of proof.

9          But if it's 50-50, if plaintiffs' burden is

10  showing it's primarily for Tyson's benefit and you

11  conclude, Hey, there is benefit on both sides, I think

12  it is pretty 50-50, then they haven't made the case.

13  Tyson wins the tie on this claim.

14          So let's talk -- and we don't think it's a

15  tie, to be clear.

16          So I want to tell you about what some of the

17  evidence will be on this issue of why these garments

18  are worn and equipment and who it benefits.

19          This is our safety policy, Tyson's Safety

20  Policy.  And it says right up front that "Tyson Fresh

21  Meats dedicates itself to the principle of providing

22  the safest and most helpful work environment for all

23  employees.  The prevention of accidents and the

24  elimination of personal injuries and illness to you is

25  one of our primary goals.  Safety operating procedures

1  have been established by Tyson Fresh Meats for both

2  management and hourly personnel to eliminate work

3  related accidents and thus personal injuries and

4  illness to you.  It is the responsibility of all Tyson

5  Fresh Meats personnel to adhere to the safety

6  procedures in order to protect themselves, fellow

7  employees, and visitors from harm."

8          So, when we talk about Tyson requires certain

9  things or OSHA, why?  These things are required to

10  protect the employee from injury and, frankly, all you

11  have to do is look at a lot of this equipment and you

12  can see that upfront.

13          The OSHA law, Occupational Safety and Health

14  Law.  The purpose of that law is to assure as far as

15  possible every working man and woman in the nation is

16  safe and healthful working conditions.

17          So there are two issues and they are separate.

18  The fact that Tyson provides certain equipment to be

19  worn and requires it to be worn doesn't mean that there

20  is not huge benefit to the employees.  And the evidence

21  is going to be that even though we provide it and

22  require it, the predominant beneficiary are the people

23  wearing it; the workers that go back to what Mr. Hanson

24  said about the original FLSA law, is to improve

25  conditions.  It's all about safety for the worker, and

1  having better and safer working conditions.

2          As we look at some of the benefit, this is

3  just common sense here now, white shirt or white pants

4  and shirt keeps their street clothing clean.

5          You saw on there and you heard Mr. Hanson talk

6  about in the slaughter facility there is water, there's

7  blood, there's different things.  Okay, the uniform

8  keeps people's clothing clean.

9          Hard hat, pretty obvious.  It protects their

10  head.

11          Earplugs, protects hearing.

12          Boots, help avoid slips, also protects feet

13  from a lot of different hazards.

14          Hair net, long hair, any of you have worked in

15  a plant, slips down, can grab in equipment.  And that's

16  another safety item that protects employees.  That's in

17  the slaughter area.

18          On the processing side, the frock, once again,

19  you put it over your clothes to keep the clothes clean

20  and also you heard it's cold.  A lot of this is worn,

21  again, just for personal comfort.  These -- this frock

22  is basically a jacket that is warmer.  And sometimes

23  people wear other things, too.

24          Processing area, people again wearing a hard

25  hat, earplugs, hair net.  Notice that in processing the

1  boots are not required.  Okay?  So, people -- you'll

2  see people wearing their own shoes from home.  They

3  don't have to come and spend time putting on boots and

4  taking them off, they can wear their own shoes.

5         Some positions require safety glasses but

6  actually not that many.  But a lot of people choose to

7  wear them any way.  It's an optional item and some

8  people wear them.

9         And there is going to be testimony, in

10  addition to what I just showed you here on the slide,

11  that I just wanted to give you a full -- a few bullet

12  points of what some people have testified to.  Workers

13  on their view, their view of, Why do I wear this

14  equipment and who benefits?

15         Various people have testified, one optional

16  item, earmuffs.  Primarily protects employees from the

17  cold.

18         Gloves, it's optional for some positions but

19  they benefit employees from the cold, to keep them dry,

20  and they allow a better grip on the knife or the

21  product or the tools they're using.

22         Protective eyewear.  It keeps foreign objects

23  out of the eye.

24         Talked about whites and frocks.

25         Earplugs, very important for ear protection

1  because it is loud in the plant.

2          We got rubber aprons, rubber gloves, plastic

3  sleeves are required for some positions, optional in

4  others but they keep employees dry; they keep employees

5  warm.  They improve comfort for the worker while

6  they're working.

7          So, this issue of these items at issue is

8  going to come down to primary benefit and we believe

9  there is very compelling evidence that the primary

10 beneficiary of all this clothing and equipment are the

11 workers themselves.

12         You heard Mr. Hanson talk about the di minimus

13 defense and what this really comes down to, effectively

14 is in the law, not a requirement to pay for

15 insubstantial or insignificant amounts of time.

16         Now, you know, again, you are going to have to

17 decide that.  The judge is going to give you a set of

18 instructions to give you the framework within which you

19 must decide it and then you'll hear evidence and I am

20 going to try to give you a little bit of that evidence

21 and give you a little outline of what I think the legal

22 framework might look like , which the judge ultimately

23 gives you.

24         The first thing, first and foremost and namely

25 that you will be looking at is how much time is

1  involved?  And keep in mind here now, we're talking in

2  this case the amount of daily uncompensated time

3  because throughout the period at issue in this lawsuit

4  from 2003 forward, these plaintiffs are already getting

5  compensated for putting those clothes on and taking

6  them off pre shift and post shift.  They're already

7  being paid to do it.

8          The question is, on this de minimus defense,

9  how much in addition, if any, do you think these

10  activities require that's not compensated?  That's what

11  you'll be looking at.

12          And then there is three other factors that we

13  look at here, and this is different.

14          The first test I told you about on whose

15  benefit the clothes, plaintiffs have to prove all three

16  factors, this is a little different.

17          No -- none of these factors is dispositive in

18  this analysis, there's just three things that you look

19  at in addition to the over all amount of daily

20  uncompensated time, if you think there is some.

21          The practical administrative difficulty of

22  reporting the additional time; the size of the claim;

23  and the aggregate; and whether the activities were

24  regular.

25          Now I'm going to talk, first of all, the size

1  of the claim and the aggregate.  You know, very simply,

2  we believe, again, you want to talk to you about these

3  time elements, we're talking seconds.  If you add up a

4  few seconds here and there, you still get the aggregate

5  is a very small amount of time.  On a daily basis.

6         Regularity.  Mr. Hanson mentioned, well, you

7  know, they do this every day.  Just because they do

8  something every day, in our view, the evidence is going

9  to cause you to believe that that's not enough to

10  establish that factor, because every day while somebody

11  might be doing it, they're doing it in a different

12  order.  They're getting -- they're using different

13  equipment, they're doing it in different places.

14  They're doing it at different speeds.

15         So this is not something that is just roguely

16  done by 2200 people every shift and everybody does it

17  the same.  Nobody does it the same.  People are

18  different.  So, we believe the evidence is going to

19  show you that this is not regular activity.

20         I'm going to talk to you first about -- or

21  next, about the amount of time.  I'm going to give you,

22  actually a few snippets of testimony and then I want to

23  just give you my view of what probably some common

24  sense times because you'll be told you don't have to

25  have an expert that's been paid a lot of money and a

89

1  stop watch.  You know, you guys have put on gloves and

2  taken them off.  You have put on pants and shirts and

3  taken them off.  You have put on gloves and taken them

4  off.  You know how long it takes.

5          Jeronimo Vargas Vera.  He testified that he

6  can don various items such as earplugs, steel toed

7  boots, hard hat, hair net, mesh apron, plastic apron,

8  knee shields, cloth gloves, mesh gloves, plastic

9  gloves, polar gloves, plastic arm guards, yellow

10 sleeves, and protective glasses in seconds.  In a -- in

11 a -- in an amount of time, each one of those can be

12 done in mere seconds.

13         Antonio Garcia says he can don his items in

14 mere seconds.  Ranging from -- he gave an estimate

15 ranging from three to 30 seconds per item for his hair

16 net, hard hat, boots, frock, plastic gloves, cloth

17 gloves, weight belt, earmuffs, metal apron, plastic

18 apron, mesh gloves, polar gloves, polar sleeves,

19 plastic arm guard.  And you'll see on some of this

20 videos, these people can do this really fast and

21 efficient.

22         Adelina Garcia estimates it takes her maybe

23 two seconds to don a hair net; ten seconds to don polar

24 sleeves; five seconds to don an apron; five seconds to

25 don on a frock.

1       And Mr. Vera said that doffing items such as

2   the apron sleeves, knee sheilds, taking his knife and

3   sheath off at the break, all that takes him an amount

4   of time measured in seconds.

5       And, keep in mind here, too, this is a thing

6   we've discussed about how to illustrate this and when

7   you go back in deliberations eventually can

8   you -- everybody has a watch.  You know, 45 seconds, if

9   you just sit there, a lot of people underestimate time.

10      When somebody says, I can do it in a matter of

11  seconds, well, you know, that's under a minute.  If

12  you -- if you sit there for 55 seconds, or you -- or

13  you think about how many -- how many -- how many of

14  your clothes you can take off or put back on in 55

15  seconds, it's -- it's -- it's a long amount of time.

16      Looking through next to same issue, how long

17  does it take employees to perform these activities?  We

18  believe reasonable times for these items at issue.

19  Okay?  Are in the range, these are just common sense

20  now, again, we don't think you need an expert to come

21  up with this.  To put on a frock, 20 seconds; take it

22  off, 11.  That's what the processing employees do.

23      White pants, that's for slaughter, about 25

24  seconds to put it on; 16 minutes or 16 seconds to take

25  them off.

1          White shirt, little longer, 32 seconds to put

2    it on; 11 seconds to take it off.  Those are both

3    slaughter.

4          Hair net, maybe nine seconds to put it on.

5    You are going to see some workers, I think, in videos,

6    take forever to -- while they're being videoed, and of

7    course they are aware they are being videoed to put on

8    a hair net or a beard net; two seconds to take it off.

9          Cotton gloves, maybe 20 seconds to put them

10   on; six seconds to take them off.

11         Rubber gloves, 25 seconds to put them on; five

12   seconds to pull them off.

13         Rubber boots, these are slaughter again, maybe

14   24 seconds to put them on; 13 to take them off.

15         Earplugs, 11 seconds to put them in; two

16   minutes -- two seconds to pull them out.

17         Hard hat, five seconds to put on your head;

18   three seconds to take it off.

19         And keep in mind, now, you don't add up all

20   these for any one person.  Because on the slaughter

21   slide, they're the only ones that have white pants,

22   white shirt, rubber boots.  If they're in processing

23   they don't wear any of those.  And they just have a

24   frock.

25         In processing by far is the greatest number of

1  employees.  The slaughter side of the business has

2  a -- a much smaller percent of the employees.

3        Now you heard Mr. Hanson talk about -- well,

4  actually, one thing I want to talk about it goes back

5  to the -- the various factors on -- on de minimus.  You

6  remember I talked about administrative difficulty and

7  we'll see this in the slide coming up, the number of

8  people involved, but you have already seen on the

9  slides that Mr. Hanson showed you all of the different

10 jobs and the different departments.

11        And different people -- what you are going to

12 hear in the testimony is these differences, they're

13 differences by job, differences by department,

14 difference in personal preference, and difference in

15 the speed that people do these things, which is why in

16 our view, the proper approach, and the one we have

17 taken, is you look at the activities that are

18 compensable, and you come up with an amount of time

19 that fairly compensates people for the reasonable time

20 that should take.

21        And one of the things that we'll get into with

22 a clip here where we see some people, we show you a guy

23 that swipes in and then takes a lot of time before he

24 gets ready for work.

25        There are competing philosophies here that you

1  are going to hear evidence about on how this should be

2  approached.  One approach is, you know, you put these

3  time clocks in certain areas and you don't let people

4  clock in until it's -- you think it's time that they

5  should be allowed into the plant to get ready for work

6  and that they don't come in and loiter and get paid for

7  time where they're not working.

8          You know, that, in our view, is -- doesn't

9  really give people the freedom and the flexibility and

10  the respect that they want.  Some people like to come

11  in, have a cup of coffee, sit in the cafeteria, talk

12  with their friends, read the newspaper.

13          And so if you approach it instead, as we have,

14  looking at, what are the compensable activities and

15  what's a reasonable amount of time to compensate people

16  for that?  Then that is -- that is a better way, a,

17  frankly, more respectful way for employees and a more

18  fair way for all employees and the company to -- to get

19  paid for the time they are owed.

20          We have this Doctor Radwin expert that they

21  have hired to do their study for the red -- the red

22  period on the slide, pre shift, post shift and he is

23  measuring from the first time somebody walks in the

24  locker room and does this (indicating) and now he has

25  touched his hard hat so now he's getting ready for

1    work, until he shows up on his production station.

2    They're saying all that time he should get paid.

3          Now, except in fairness, again, Mr. Hanson

4    said, they -- they -- they cut out a few things for

5    people, they observed that you just couldn't, you know,

6    with straight face say they should get paid for it but

7    for the most part, it's from the first touch until

8    they're in their position.  And the same thing when

9    they leave.

10         Our criticism to that approach that you'll

11   hear is that effectively what Doctor Radwin is doing is

12   he's counting activities other than the compensable

13   activities.  The donning and doffing of the actual

14   equipment, and that's what we have been paying for, the

15   knife users, the unique equipment, he is paying -- he's

16   collecting amount of time -- we'll give you, I will

17   show you just one clip, I can't do too many of them in

18   the opening -- he's picking up a lot of time that's not

19   spent being getting read for work.

20         And -- and that's -- that's why we are here.

21   We don't think that is fair.  And we don't think under

22   the law that is compensable time and that's what the

23   issue you all will be charged to decide.

24         He also did his work -- by the way, these

25   videos I am going to show you are pictures or videos

1 taken by Doctor Radwin's team.  And Mr. Hanson I think
2 misspoke, said that Mr. Hanson or that Mr. -- Doctor
3 Radwin had come in and taken this video.  He wasn't
4 there when the video was taken.  He sent some people
5 in, some students I think, of his, to take video but he
6 wasn't there.
7        He visited the plant I think two weeks or
8 months earlier, but this notion that Doctor Radwin was
9 there videoing and picking people and observing them,
10 et cetera, he just -- he was not there.
11        And sample sizes that he uses in the study are
12 too small to be statistically valid.  105 workers out
13 of 1,962 working that day and 5,130 in the state law
14 class, okay?  And, frankly, just to look at it here,
15 his own report, his own analysis says that he himself
16 believes he needed at least 24 as a sample size.  This
17 is Finney County slaughter.  Donning to start the
18 shift, he says, Well, I need 24, but they only observed
19 13.
20        And of course you get that sample size down
21 small enough, and you catch a number of people that are
22 slow, that's how you get the 30 minutes a day putting
23 on a frock and a hard hat and taking it off.
24        Finney County slaughter doff at the end of the
25 shift.  Okay?  He sampled 11 out of 474 employees.  And

1  keep in mind, this is just the slaughter side, as I

2  said was a lot smaller, there was only 474 employees on

3  the slaughter side, even though there are close to 2000

4  in the plant as a whole.  Okay.  So he got 11.

5          On the -- on the slaughter side to start the

6  meal break he got 11 there.  Again, he himself admits

7  it takes 24 to get a valid sample.

8          And on the donning at the end of the meal

9  break he got 12, when he said he needed 24.

10          Another thing, and you may wonder about this

11  when I show you this clip coming up, you know, when you

12  are following people with the video cameras, you know,

13  these are -- these are very smart people, they are

14  highly skilled workers, they know what's going on.  It

15  changes their behavior when they know they are being

16  watched.

17          And -- and this is one of the points of this

18  clip I am getting ready to show you, we believe that

19  scientifically, if you really are trying to get at a

20  reasonable average or a reasonable measure of what

21  should be fairly compensated, you should be looking at

22  people that are diligently pursuing the business of

23  getting dressed.  And if somebody is obviously just not

24  diligently pursuing the business of getting dressed or

25  the business of getting -- taking your stuff off to go

1  home, then that's an outlier that needs to be

2  eliminated, otherwise you're unfairly skewing your

3  scientific study.  And Doctor Radwin didn't do that.

4        So, bottom line is, we think these numbers

5  that this gentleman came up with are highly inflated.

6  And really have -- should play no part in a final

7  determination of what, if any, we believe there is

8  none -- amount of time that is fairly taken for these

9  activities that we haven't been paying for from day

10 one, 2003 forward.

11        Let me play this clip.

12        (Tape played.)

13        This is -- I'll tell you, I want to emphasize

14 again this is not video footage that we took, this is

15 video footage that Doctor Radwin's students took and so

16 this is -- this is their video.  This is a very long

17 clip and I'm not going to torture you for 40 minutes

18 with it, I promise.  I am going to try to fast-forward

19 through this to show you some points.

20        So, the gentleman that we are watching here,

21 Adrian Hernandez, all right -- wait a minute.  Okay.

22 It's already -- I'm going to back it up.  I knew that

23 wasn't the beginning of it.  Okay.

24        This is the start.  He walks in and you'll see

25 here, very shortly, he's going to swipe in.

1           Has he already swiped in on this?

2           MR. MUELLER:  Yeah, he swiped in right before

3  that.

4           MR. O'DEAR:  Yeah.  Okay.  He's already swiped

5  in.  He swiped in right as he came in the door.  I am

6  not going to back up to show you that but just a few

7  seconds when he walked in the door.

8           He is in the locker room, can't film in the

9  locker room, so it goes dark.

10           All right.  And I'm going to again fast

11  forward through this, but you'll see more of this, when

12  he is in the locker room, we have a student who is in

13  there observing him and he talks into the mike.  And

14  basically at 2:25 on the clip -- we're not there yet,

15  we are at a minute 27, 28 -- there is a student that

16  says, Adrian is pulling out his shirt and his pants and

17  his gloves, so he reached in and got something out of

18  the locker.  And that's when Doctor Radwin starts the

19  clock.  Okay?

20           Even though, according to his own student, he

21  doesn't actually start putting anything on until 4:24

22  into the frame.  Two minutes later.  Okay?

23           And then we continue on, 11:03, and I'm going

24  to see if I can fast forward here, where he comes out

25  of the locker room and he's out of the locker room at

1    11:03.  I'm a little bit past that.

2           I'm fast forwarding here.

3           Okay.  Now he's out of the locker room.  Keep

4    in mind, according to Doctor Radwin, all this is

5    required time for him to get ready for work.  This is

6    Mr. Hernandez.

7           What he does here is he walks at -- at 12:06

8    he goes to his department door, and the department is

9    not even open yet, the USDA has to clear its

10   department, so he is there, there is nobody else there.

11   No other employee is there and he is standing outside

12   his department door for no good reason and stands there

13   for a little bit and then he's going -- you're going to

14   see him at 12:15 -- here we go.  Now he is starting to

15   don his hair net.

16          I'm sure throughout this trial you are going

17   to see some other people put on a hair net a little

18   faster than that, throw a hat on and be gone.

19          Okay.  So, now -- now he's seeing he's no

20   reason to stand there by his department , so he goes

21   back to the cafeteria, he stands at the cafeteria door,

22   starting at 12:57 on the clip.

23          Now, you'll see that starting this period, he

24   starts fiddling with his gloves and Doctor Radwin, I'm

25   sure will say, Well, now he's in the process of putting

1  on his gloves and, again, this is common sense.  How

2  long does it take you to put on the gloves?  And watch

3  and see how long it takes him to put on gloves.  And

4  see if you think it's reasonable measurement, fair

5  amount of time.  Very delicately.

6           I'm going to fast forward now.

7           This is actually -- what he just pulled out,

8  this is the beard net.  Once again, most people will

9  tell you they can do that in four seconds.

10           Watch how long it takes him to play with his

11  beard net before he just puts it on over his hat.

12           Still working on his beard net.  All right.

13  There he put his beard net over his hat.  And this

14  continues on.  Now he is waving at a friend.  He is

15  smiling and, again, you know, you'll be asked to

16  evaluate this.

17           But you think he knows he is being filmed?  Do

18  you think it's having an impact on his behavior?

19           THE COURT:  Those are not questions that are

20  appropriate at this point, Mr. O'Dear, so let's layoff

21  the commentary and just talk about what the evidence is

22  going to show, shall we?

23           MR. O'DEAR:  Yes, Your Honor.

24           Then we'll continue to come in, at 17:15 he's

25  seated here, and you'll see him seated on the bench and

1  at 17:15 Doctor Radwin in his study decides to

2  discontinue the time.  He does not include the time

3  from 17:15 through 36:52 in his estimate of how much

4  time should be included for the work study.  That

5  is -- what is that?  That is just under 20 minutes.

6         And I won't take you through what he is doing

7  during that period because Doctor Radwin has extracted

8  it.

9         And then we go 36:52 I believe is when Doctor

10 Radwin determines it's compensated time again.

11        36:52.  He is standing by the cafeteria door

12 here, is the location.

13        Okay.  -- okay, now 36:52, this is the

14 beginning, again, where Doctor Radwin is measuring this

15 forward.  I am going to fast forward.  He goes on to

16 the production floor, adjusting his beard net.  And I'm

17 not going to fast forward the rest of it, but it is 40

18 minutes -- 40 minutes and 40 seconds, which is another

19 couple minutes here is when Mr. Hernandez actually

20 starts working on his first piece of meat.

21        So, and I've got two more clips I'll show you,

22 but the -- this just illustrates the -- the issues that

23 we'll be raising with Doctor Radwin in his analysis.

24        Let's see.  The next clip is clip four.  I'll

25 set that up, we'll get to that in a minute.  All right.

1   So that concludes our comments on Doctor Radwin and his

2   work.

3         Next, we go to the issue of the class wide

4   evidence and what I want to illustrate to you, I want

5   to show you a couple charts, and give you a little

6   information about who's in the class and what it means.

7         This 5,130 workers that are depicted on this

8   slide, those are basically all of the little squares

9   combined, blue and red together.  That's in state law

10  class and it's actually, that's calculated by Mr.

11  Hanson's expert witness who on damages.

12        These are not the total number of people in

13  the class because there is something like 7,000 people

14  in the class who are actually suing us but these 5,130

15  people are the people that their expert witness claim

16  we owe them something.  The other people are in the

17  class but they admit we don't owe these people

18  anything.  And there is roughly 2000 people that fall

19  in that category.  There is another 186 workers that

20  are on this slide, of the 5,130 that are suing us for

21  something or they claim they're owed something less

22  than $10.  One guy is suing us for 18 cents; four

23  people for 21 cents.

24        And these are numbers we're still working

25  through.  We got this information Sunday night so we're

1 still analyzing but these -- this is the number of

2 people right now that have claims that calendar -- that

3 amount to some amount of money.

4      The red depicted on the chart are the 1,031

5 people who have actually opted in on the federal claim

6 and, again, there is more people than that but these

7 are the people that claim that there is some positive

8 number that they're owed in terms of compensation.

9      The next slide, the little yellow part up at

10 the top, that's -- that's -- we've colored in nine

11 squares, and as we understand it, the plaintiffs have

12 at most they're going to put nine witnesses on the

13 stand to testify about their claims in the case.  And,

14 again, this gets to the point of this issue, burden

15 they have, is that for each of the elements that the

16 Court is going to instruct you on these claims, you're

17 going to have to ask yourself, have you -- has the

18 evidence you heard persuaded you that you not only

19 understand the circumstances of the nine people in

20 yellow but that you understand the -- all these

21 individual differences and requirements and preferences

22 of everybody else on that slide.

23      And if they don't present evidence to you that

24 gives you a level of comfort that you have heard enough

25 evidence that you understand the circumstances as they

1  apply to each of those people, then we'll be contending

2  that at the end of the trial, that they haven't met

3  their burden and that's -- that's going to be another

4  issue you'll hear a lot of evidence about with each

5  witness at trial.

6          Want to talk to you briefly, and show you two

7  more clips, about the meal break.  And rest break.

8          The meal break, the real question there is

9  whether, and we think this is one of these, you know,

10  issues the evidence is going to be very clear on,

11  whether considered as a whole these employees are able

12  to predominantly spend the time for their own benefit

13  rather than for Tyson's.

14          And, you know, the analysis really comes down

15  to, are they able to get away from their work stations,

16  get off the production floor, move into the cafeteria

17  or wherever they want to go, and use the time for their

18  own purposes.  And in our view, our expectation is that

19  the instructions you'll get will give you a legal

20  framework that says, if -- if the employees are able to

21  do that, then they're not entitled to compensation for

22  breaks, rest break, or meal break.

23          These -- these next two clips are very short

24  and they are meal break.  I got a gentleman, Mr.

25  Paragon I believe is his name, Mr. Paragon.  And I'll

1  pull up the --

2       What did I do?  Okay.  All right.

3       (Tape played.)

4       Now, we'll stop this.

5       This gentleman that you just saw at the

6  beginning of the clip, he just came off his work

7  station, right here.  He is right in the center.  Okay?

8       Now, he's leaving the line for lunch.  He

9  takes off his gloves.  You see he's wearing mesh over

10  his shoulders, that's a -- that's part of the mesh

11  required, and there is mesh underneath his coat.  You

12  are going to see all this -- actually you don't see it

13  come off in this picture but he is taking it all off.

14       So he is back there, we're about 20 seconds on

15  the clip and he's hanging up his mesh items.  You will

16  see when he gets into the lunch room, you'll see a lot

17  of workers who still have their mesh on.  It is not

18  required that you take it off.  It's not required that

19  you wash.  But this gentleman chooses to do so, he's

20  entitled to do that.

21       We're now at one minute.  One minute since he

22  left his station.  This is the gentleman, now he is

23  taking his stuff off.  And at 1:06, he is in the lunch

24  room and, again, the issue becomes on a 30-minute lunch

25  break whether, you know, what you have seen here and

1  what you will see at the end of the break, whether

2  that's such an encroachment on the lunch break that

3  this gentleman is not able to effectively take a lunch

4  break and enjoy the break for his own predominant

5  benefit.

6          You'll see what he does here is he goes and

7  grabs his lunch bucket.  One of the issues you heard

8  testimony about is, Well, does everybody have to take

9  everything off for the lunch?  And you'll see here,

10 look at all these people in the video, everybody's got

11 their --

12         THE COURT:  Mr. O'Dear, you are giving

13 commentary again on the video instead of talking about

14 what the evidence is going to show.  So, we don't need

15 a narrative of what is happening here, from you.

16         MR. O'DEAR:  Okay.

17         THE COURT:  Thank you.  Your witnesses can

18 testify to that when the appropriate foundation has

19 been laid.

20         MR. O'DEAR:  All right.

21         THE COURT:  You can show the video, you just

22 can't talk constantly about, Notice this, notice that.

23 This is what's going on now.  This is how much time has

24 elapsed.

25         MR. O'DEAR:  All right.

 1          THE COURT:  Those are all matters that jury is

 2  going to be able to figure out.

 3          MR. O'DEAR:  All right.

 4          THE COURT:  So let's stick to what the

 5  evidence is going to show and not do a narrative of the

 6  video.

 7          MR. O'DEAR:  All right.  One more video, Your

 8  Honor.

 9          THE COURT:  All right.  See if you can do

10  better with this one.

11          MR. O'DEAR:  Same gentleman coming back from

12  the lunch break is what this shows.

13          (Tape played.)

14          All right.  So, the -- and, you know, you'll

15  see and hear other evidence concerning workers going to

16  and from lunch break and what they do during the lunch

17  break and same thing with meal break or the -- I'm

18  sorry, the rest break.  The rest break -- and keep in

19  mind this:  The rest break issue, there is no issue

20  about the rest break prior to April, 2010 because it

21  was only 15 minutes and we paid them.

22          The claim the plaintiff is making now with

23  regard to the rest break are having expanded the rest

24  break to 25 minutes, five minutes of which is paid, the

25  question they are raising, Well, is that really -- is

1 that length of break, which is 20 minutes unpaid, 25

2 total, is it really a length of time that allows the

3 worker to get away and to use that idle time of that

4 rest break predominantly for the workers' benefit as

5 opposed to Tyson's benefit?

6          And whether that's a long enough time that

7 people can go to the lunch room or go outside or do

8 whatever they want to do and actually use that break

9 for their own purposes?

10          The evidence is going to be that people,

11 they're free to leave the work station, they do.  They

12 leave the production floor.  Some go to the locker

13 room, hang out, some go to the cafeteria to eat, some

14 there is an outside area if it is a nice day and the

15 evidence is going to be that both for the rest break

16 and the lunch break, people are free to do all of that

17 and they get to use those breaks for their own benefit

18 period.

19          So, that is the outline of what we believe the

20 evidence is going to be and certain of the major

21 issues.  And to sum it up, I want to reemphasize that

22 we believe Tyson is a good employer that provides good

23 jobs and the history here, as I've showed you, is that

24 the evidence shows that we started paying extra time

25 long ago for knife users and others working in the same

1 department with them when the Department of Labor

2 challenged that, IBP, at IBP and the court ordered it,

3 IBP started paying it.

4      The Department of Labor has never come back to

5 this plant, either for IBP or Tyson, and raised an

6 issue.  This litigation, the Government's not involved

7 in it.  And we have continued to pay that for minutes

8 and then we increased it for walking time when the

9 Supreme Court came down with that case in '06, and then

10 in April, 2010 we took the acts and we did the

11 restructure the work day and to give people a longer

12 break but to give them more time, more K-code time, 15

13 minutes more.  So, we believe that beyond any point

14 that anybody could say would be reasonably required to

15 compensate them for the activities at issue in this

16 case.

17      We believe we complied with the law every step

18 of the way, now, in this situation that issue is in

19 your hands.  And based on the instructions you're given

20 and the evidence you hear, you'll decide.  And we are

21 very comfortable with that.

22      And at the end of the evidence, and the end of

23 the trial, we're going to ask whoever is in that box

24 over there, and sworn in as a jury, to render your

25 verdict in favor of Tyson and ap proving our practices

1  at Finney County today.  Thank you very much.

2         THE COURT:  Thank you, Mr. O'Dear.

3         Well, folks, we're going to go ahead and break

4  for lunch.  We're going to break until 1:45.  1:45,

5  which is about an hour and 15 minutes.  If you would be

6  back here at that time, we'll proceed with jury

7  selection.

8         I remind you, again, you're not to discuss

9  this case or any aspect of it among yourselves or with

10 any other person at this point.

11        With that, have a good lunch, we'll see you

12 back here in an hour and 15 minutes.  And thank you so

13 much.

14        MS. HOLMAN:   All rise.

15        (The prospective jurors leave the courtroom.)

16        THE COURT:  Go ahead and take off.  We'll plan

17 to see you.

18        And, Jana, I am having a real time issue up

19 here, mine froze.  Okay.

20        (Proceedings recess at 12:30.  Voir Dire then

21        was had, but not requested transcribed.)

22

23

24

25

C E R T I F I C A T E

1          I, Jana L. Hoelscher, United States Court
Reporter in and for the District of Kansas, do hereby
certify:

          That the above and foregoing proceedings were
taken by me at said time and place in stenotype.

          That thereafter said proceedings were
transcribed under my discretion and supervision by
means of computer-aided transcription, and that the
above and foregoing constitutes a full, true and
correct transcript of requested proceedings;

          That I am a disinterested person to the said
action.

          IN WITNESS WHEREOF, I hereto set my hand on
this, the 2nd day of March, 2011.


                         s/ Jana L. Hoelscher
                         Jana L. Hoelscher, RPR, CRR, RMR
                         United States Court Reporter