1

```
 1              IN THE UNITED STATES DISTRICT COURT
                      DISTRICT OF KANSAS
 2

 3

 4   ADELINA GARCIA, et al, Individually
     and on behalf of others similarly
 5   situated,

 6          Plaintiffs,

 7      vs.                          District Court
                                     Case Number
 8                                   06-CV-2198-JTM
     TYSON FOODS, INC., and          Volume 4
 9   TYSON FRESH MEATS, Inc.,

10          Defendants.

11

12         DAILY COPY TRANSCRIPT OF PROCEEDINGS

13

14      On the 8th day of March, 2011 came on to be

15   heard in the JURY TRIAL in the above-entitled and

16   numbered cause before the HONORABLE J. THOMAS MARTEN,

17   Judge of the United States District Court for the

18   District of Kansas, Sitting in Kansas City.

19         Proceedings recorded by mechanical stenography.

20         Transcript produced by computer.

21

22

23

24

25
```

2

```
 1                     APPEARANCES

 2

 3  The Plaintiffs appeared by and through:
            Mr. George Hanson
 4          Mr. Eric Dirks
            Mr. Lee Anderson
 5          Stueve Siegel Hanson Woody, LLP
            330 West 47th Street, Suite250
 6          Kansas City, MO 64112

 7          Mr. Peter Antosh
            1401 Central Avenue
 8          Garden City, KS 67801

 9
    The Defendants appeared by and through:
10          Mr. Michael Mueller
            Ms. Evangeline Paschal
11          Hunton & Williams, LLP
            1900 K Street, NW
12          Washington, DC 20006

13          Mr. Craig O'Dear
            Mr. Robert Hoffman
14          Bryan Cave, LLP
            1200 Main Street, Suite 3500
15          Kansas City, MO 64105

16

17

18

19

20

21

22

23

24

25
```

3

```
 1                            INDEX

 2
    Reporter's Certificate                      179
 3
    WITNESSES FOR THE PLAINTIFFS:
 4
      ADELINA GARCIA
 5        Direct Examination by Mr. Anderson      4
          Cross Examination by Mr. Hoffman        6
 6        Redirect                               22

 7    ANTONIO GARCIA
          Direct Examination by Mr. Anderson     23
 8        Cross Examination by Mr. Hoffman       39
          Redirect                              52
 9
      JERONIMO VARGAS VERA
10        Direct Examination by Mr. Anderson     55
          Cross Examination by Mr. O'Dear        72
11        Redirect                              90

12
      ROBERT RADWIN
13        Direct Examination by Mr. Anderson     95
          Cross Examination by Mr. Mueller      153
14

15
    EXHIBITS                              ADMITTED
16  239/Page 2277 JSA                        78
    239A JSA                            Stipulated
17  270 Pay Stubs                            91
    337 Mesh Glove                      Stipulated
18  340 JSA                             Stipulated
    346 Apron                           Stipulated
19  348 Steel                           Stipulated
    351 Sleeves                         Stipulated
20  358 Sharpener                       Stipulated
    361 Glasses                         Stipulated
21  366 Shin Guards                     Stipulated
    375 Case                            Stipulated
22  381 Videos                         Not admitted
    381A Videos                             141
23  384A, B, C Tables                   Stipulated

24

25
```

1          (Proceedings commence at 8:00 a.m. outside the

2          presence of the jury.)

3          THE COURT:  Yolanda, let's go ahead and bring

4  the jury in and we'll get this done.

5          MR. MUELLER:  We're ready.  We have a genius

6  with us.

7          THE COURT:  Don't you know it.

8          (The jury enters the courtroom.)

9          THE COURT:  All right.  Everybody can have a

10  seat.

11          And as soon as everybody is situated, we'll

12  pick up with Ms. Garcia.

13          MR. DIRKS:  May it please the Court.

14          THE COURT:  Mr. Dirks.

15                    ADELINA GARCIA,

16  called as a witness on behalf of the Plaintiffs, having

17  been previously and duly sworn, testified further as

18  follows:

19                CONTINUED DIRECT EXAMINATION

20  BY MR. DIRKS:

21  Q.    Good morning, Ms. Garcia.

22          (The interpreter answers for the witness.)

23  A.    Good morning.

24  BY MR. DIRKS:

25  Q.    Just a few more questions.  Yesterday, you

1  testified that it takes approximately four or five

2  minutes in the locker room at the beginning of the

3  shift and approximately three or four minutes in the

4  locker room at the end of the shift.  What I didn't ask

5  you yet is how long does your walk from the locker room

6  to the line take?

7  A.    From two to three minutes.

8  Q.    Okay.  And at the end of your shift, were you

9  required to clean your knives and tools?

10  A.    Yes.

11  Q.    Okay.  What all were you required to clean at

12  the end of the shift?

13  A.    The knives, the hooks, the steels, the mesh

14  gloves, steel mesh glove, and the cup.

15  Q.    Okay.  And approximately how long did it take

16  you to clean all of that?

17  A.    About four to five minutes.

18  Q.    Okay.  And then at the end of your shift, after

19  you've cleaned that gear, how long did it take you to

20  get back to the locker room?

21  A.    About two to three minutes.

22        MR. DIRKS:  And that's all I have with you,

23  Ms. Garcia.

24        Pre-admitted is Exhibit 239A.  This is a JSA

25  for the trim inside skirt position.

1          And then pre-admitted is Exhibit 340, the mesh

2  sleeves on the JSA.  I am handing the equipment.

3          (Exhibits published to the jury.)

4          THE COURT:  All right.  Cross examination.

5          MR. HOFFMAN:  Yes, Your Honor.

6                  CROSS EXAMINATION

7  BY MR. HOFFMAN:

8  Q.    Good morning, Ms. Garcia.

9  A.    Good morning.

10 Q.    We have never met before, have we?

11 A.    I don't think so.

12 Q.    You -- you did give a deposition in this case?

13 A.    Yes.

14 Q.    And that was on December 15th, 2008?

15 A.    Yes.

16 Q.    That was with Mr. Antosh, your Spanish speaking

17 lawyer was present at that deposition?

18 A.    Yes.

19 Q.    And Mr. Dirks, Mr. Dirks was also there?

20 A.    Yes.

21 Q.    And there was also an interpreter there, wasn't

22 there?

23 A.    Yes.

24 Q.    And your testimony that day was complete and

25 truthful?

7

1  A.     Yes.

2  Q.     And you understand, don't you, that we have the

3  right to rely on that testimony as being truthful?

4  A.     Yes.

5  Q.     At -- you know that at your request, Tyson has

6  agreed to pay you your regular, hourly rate for being

7  here in the courtroom attending trial?

8  A.     I don't know.

9  Q.     Have you made such a request?

10 A.     Well, I don't know really because at this time I

11 actually, um, had surgery two weeks ago so I'm actually

12 on leave, um, because the doctor has requested.

13 Q.     Do you know that your lawyers requested that you

14 be paid your regular hourly rate and that Tyson agreed

15 to do that?

16        MR. DIRKS:  Objection, calls for speculation.

17        THE COURT:  He just asked if she knew that.

18 She knows or doesn't know, it's overruled.

19 A.     So do I need to answer then?

20 BY MR. HOFFMAN:

21 Q.     Yes, you do.

22 A.     Well, they haven't told me, um, anything that

23 they're going to be paying me for this time.

24 Q.     Okay.  All of the jobs that you did at the plant

25 were considered trimming jobs, aren't they?

1    A.    Yes.

2    Q.    There were three jobs, the inside skirt, trim

3  the outside skirt, and then trimming flats?

4    A.    Yes.

5    Q.    And you have never worked on any job other than

6  a trimming job.

7    A.    Well, trimming is a job that I've always done.

8    Q.    And you never worked on the slaughter side?

9    A.    No.

10   Q.    So you don't know what goes on really over on

11  the slaughter side of the plant?

12   A.    No.

13   Q.    And it is a different area of the plant

14  altogether, isn't it?

15   A.    Yes.

16   Q.    And you don't know what is required over there

17  in terms of protective equipment or gear?

18   A.    Well, I don't know exactly what equipment they

19  have to have on but what I do know is that I stop

20  working --

21        MR. HOFFMAN:  I'll object as hearsay and

22  nonresponsive.

23        THE COURT:  I'm sorry, I can't even hear

24  because they are talking at the same time.

25        MR. HOFFMAN:  What I heard the interpreter say

1  was, I was told, and that is why I inserted to stop it.

2          THE COURT:  Well, I'll sustain that.

3  BY MR. HOFFMAN:

4  Q.    The reason that you sought employment at the

5  Finney County plant, I believe you testified, is

6  because it seemed like the best job opportunity you

7  could get?

8  A.    Well, I didn't know if it really was the best

9  but what I did know is that simply it was a company

10  that did have a lot of workers.

11  Q.    And it's a job that because you don't have to

12  speak, there is no issue of language and speaking

13  English or not speaking English on the job --

14  A.    Well, that's not a requirement.

15  Q.    Which may -- it makes it a good job for somebody

16  that doesn't have an ease of speaking English.

17  A.    What interests them is that you're able to do a

18  good job, not necessarily that you can talk or speak a

19  specific language, which I guess would be English.

20  Q.    Sure.  I really meant -- we'll move on.

21          What is -- what is your hourly compensation

22  today?

23  A.    I am not sure if it's 12 -- if it's 12.70 or if

24  it's 12.90.

25  Q.    And that's per hour, of course?

```
1    A.    Yes.

2    Q.    And your sister works at the Tyson plant?

3    A.    No, she's been gone there for a long time.

4    Q.    Oh, okay.  She worked there?

5    A.    She worked for about a year more or less.

6    Q.    And your sister-in-law either works or formerly

7    worked there?

8    A.    She works there.

9    Q.    And have you a niece, Marianna Riveras (ph.)

10   that worked or works at the plant?

11   A.    She did work there.  Now she doesn't work there

12   any more but she did work there.

13   Q.    Okay.  The -- I don't know if you'll be able to

14   read through all of those, but do you -- I don't see on

15   there the job on this list that -- of jobs at the

16   processing plant that your counsel has displayed, the

17   job trimming flats.  Do you see it on there?

18   A.    No, I don't see it.

19   Q.    Do you see any of the three jobs, any of the

20   three jobs that you have done at the plant, on that

21   list?

22   A.    No.

23   Q.    You would agree with me, wouldn't you, there are

24   many more jobs, even just on the processing side, than

25   the jobs that are listed on this sheet?
```

1   A.     Yes.

2   Q.     And of course that doesn't include all of the

3   different jobs on the slaughter side?

4   A.     Exactly.

5   Q.     The protective equipment that you've talked

6   about that you wore and the other clothing, you wore

7   that for your benefit, didn't you?

8   A.     It's to my benefit because I am protecting

9   myself but it's also a requirement by the company and

10  that I have to use that equipment.  They're not willing

11  to let me work if I don't use that equipment.

12  Q.     You wouldn't want to work using a knife and in

13  those conditions for your own safety, without that

14  equipment, would you?

15  A.     Well, no, because the knives are very dangerous.

16  Q.     And the hard hat, that, of course, protects your

17  head?

18  A.     Yes.

19  Q.     And the mesh protects you from getting cut or

20  stabbed?

21  A.     Yes.

22  Q.     And the earplugs, they don't have any function

23  for the meat or the product, do they?  They simply

24  protect your ears.

25  A.     There's a lot -- there's a lot of machinery on

1   the floor and there's a lot of noise.

2   Q.    And the earplugs protect your hearing?

3   A.    They help.

4   Q.    Now you recall testifying at your deposition

5   about the amount of time it takes you to put on

6   specific items?

7   A.    I'm not real sure.

8   Q.    Have you read your deposition?

9   A.    I haven't -- I haven't read it well because I

10  don't read English very well and there's a lot of

11  pages.

12  Q.    Sure.

13  A.    Aside from that, two years have gone by.

14  Q.    Sure.  You recall that you testified that when

15  you arrived at the plant, you already had your boots

16  on?

17  A.    I've never -- I've never used boots, I've always

18  used shoes that I wear from home.

19  Q.    Shoes from home is what you come to the plant?

20  A.    Yes.

21  Q.    And you're wearing them, of course when you

22  arrive?

23  A.    Yes.

24  Q.    And the earplugs, those are an item that you put

25  on when you're walking to the floor?

1   A.    You have to have those on before you get on to

2   the floor.

3   Q.    But you testified in your deposition that you

4   put them on when you're walking from the locker room to

5   the floor, while you're walking.

6   A.    Well, sometimes.

7   Q.    And you recall you testified that it takes about

8   two seconds to put on your hair net?

9   A.    Well, when they were asking me those questions

10  the person who was asking me those questions, they

11  wanted me to give them a number.  Exact.  And no one's

12  really ever watching the clock to see exactly how much

13  time it takes to put on each piece of equipment.

14  Q.    But, ma'am, the number that you gave was two

15  seconds for the hair net, wasn't it?

16  A.    It could be.

17  Q.    And the number that you gave when you were asked

18  how long it takes you to put on the frock was five

19  seconds, wasn't it?

20  A.    I guess it could be.

21  Q.    And when you were asked how long it takes you to

22  put on the mesh apron, the number that you gave was

23  five seconds, wasn't it?

24  A.    It's -- it's possible, it's possible that that's

25  what I did say.  Because they're saying give me, I want

1  an amount, I want time.

2  Q.    And the estimate that you gave was five seconds

3  for the mesh apron?

4        THE INTERPRETER:  I'm sorry, the last part of

5  the question?

6  BY MR. HOFFMAN:

7  Q.    The estimate that you gave was five seconds for

8  the mesh apron.

9  A.    Well, it -- that could be true, too.

10  Q.    And when you were asked about the plastic sleeve

11  and how long it takes you to put on the plastic sleeve,

12  you estimated it takes about ten seconds?

13  A.    I've never used a plastic sleeve.

14  Q.    The arm guard.

15  A.    You mean the cup or the polar sleeve?

16  Q.    Well, you testified that the sleeves, and I

17  guess I'm not sure which sleeves you were talking

18  about, but the sleeves take about ten seconds to put

19  on.

20  A.    Well, if it is talking about a sleeve then I

21  guess it could be the polar sleeve.

22  Q.    Okay.  So two seconds for the hair net, five

23  seconds for the frock, five seconds for the mesh apron,

24  and ten seconds for the -- the polar sleeves were your

25  estimate?  Is that right?

1  A.    If that's what's on there then that's what I

2  said.

3  Q.    And the gloves, all of the gloves you're

4  able -- I think you said when Mr. Dirks was asking you

5  the questions, you said that you change your gloves on

6  the line about every hour to hour and a half.

7  A.    Yes.

8  Q.    And so you're able to do that during production

9  time, to change out your gloves, aren't you?

10  A.    Well, I have to take the time to do it because

11  it's needed.

12  Q.    But the line continues to run while you are

13  changing your gloves, doesn't it?

14  A.    Yes, but while I'm changing my gloves out, my

15  co-worker is actually pulling the meat that I need to

16  do to the side to me.

17  Q.    So you can do that quickly?

18  A.    Well, and the job requires it and I can't really

19  take that much time to do it because then the meat will

20  start piling up.

21  Q.    Sure.  And you're able to put on all of the

22  gloves, in fact what you ordinarily do, is you put on

23  all of your gloves after you get to your work area.

24  A.    Yes.

25  Q.    And then, other than the items we've covered,

16

1   the only thing that's left is just the hard hat.

2   A.     Mm-hmm, yes.

3   Q.     And then at the end of your shift, you wear the

4   boots or your shoes home, same ones you came in?

5   A.     I have never changed out shoes at work.

6   Q.     And the frock, when you were asked at your

7   deposition how long it takes to take the frock off,

8   your testimony was about five seconds?

9   A.     It's possible.

10   Q.     And when you were asked about mesh apron, your

11   testimony was that it takes about five seconds to doff

12   the mesh apron?

13   A.     It could be.

14   Q.     And the plastic sleeve or the polar sleeves,

15   must have been the polar sleeves, you said it takes

16   about ten seconds to take those off?

17   A.     It's -- it could be.

18   Q.     If -- if that's what your deposition says,

19   that's what you said?

20   A.     Yes.

21   Q.     And that was truthful at the time, right?

22   A.     Well they're asking me for an exact number more

23   or less, I mean, so...

24   Q.     Sure.

25   A.     Not exactly.

1   Q.    And your estimates are the ones that we're

2   talking about, right?

3   A.    Yes.

4   Q.    And the gloves, you testified that you

5   can -- that you do remove the gloves, all of them as

6   you're walking away from the work area.

7   A.    Are you talking about like at the end of the day

8   or at each break?

9   Q.    At the end -- at the end, when you're done with

10  your working, you walk away from the processing line

11  and you can take your gloves off while you're walking.

12  A.    I can't take them off then because I can't wash

13  down my knives without my protective gloves on.

14  Q.    You wash the knives and then while you're

15  walking back to the locker room, you take the gloves

16  off?

17  A.    I take off the most dirty ones so that way I

18  don't get the knives dirty or like the equipment that

19  I've already washed down.

20  Q.    And you do that while you're making your way

21  back to the locker room?

22  A.    Yes.

23  Q.    And a hard hat, that just takes a second or two

24  to take off, doesn't it?

25  A.    Yeah, it could be.

1    Q.    Same with a hair net, just a moment?

2    A.    Yes.

3          MR. HOFFMAN:  Martin, can you bring up Exhibit

4    258, it's also marked as Defendant's 5072.

5          Yeah, it says no external signal.

6          I've got it.

7    BY MR. HOFFMAN:

8    Q.    Let me show you, ma'am, are you able to see

9    that?

10   A.    Yes.

11   Q.    And you recognize this to be your -- some copies

12   of pay stubs that you provided in the course of this

13   lawsuit?

14   A.    Yes.

15   Q.    And you see on your pay stub, this one at the

16   top is from a pay period in 2006, isn't it?

17   A.    Yes.

18   Q.    See right there.  And you see that there is a

19   line item for clothes changing at your regular rate?

20   A.    Yes.

21   Q.    And this is a weekly pay stub, isn't it?

22   A.    Yes.

23   Q.    And it shows that you were paid .33 hours, a

24   third of an hour for changing clothes?

25   A.    Yes.

1  Q.    And you were paid your full regular hourly rate

2  for doing that?

3        Your rate on that stub was $11.45 an hour, do

4  you see?

5  A.    That is a check stub from 32 hours that were

6  worked.  What I don't see is that if I had worked 32

7  hours, why is it that then I have 31 up here, in

8  minutes and then below I have 33 and I don't know if

9  those are minutes or what those are.

10        So that's the same thing that happens

11 regardless if you work 40, if you work 36, or if we

12 work 32 hours.  It's the same way that they pay us

13 every week and it doesn't matter.

14        Or for example, if we work like in one week 40

15 hours, right up here they'll put like 38 and some odd

16 minutes and then below they'll put like one minute or

17 something.

18        So, of the 40 hours that I worked, that's

19 where they're paying that lower portion.  Well, where's

20 the time that they're supposedly paying me for

21 changing?  I've never seen a different pay check stub.

22 Q.    Do you see that on this pay stub, just the first

23 one, you were paid 36 hours, 36.10 hours it looks like?

24 A.    Five, I think it is fives.  The ones after the

25 three?

Jana L. Hoelscher, CSR, RPR, CRR, RMR
United States Court Reporter

1   Q.    Yeah, I think it is a six.  This is a bad copy.

2   Unfortunately, it is the one you were able to provide

3   us.

4         You see that, the numbers there?

5   A.    Well, I'm not really sure, though, what number

6   it actually is because you can't really even see the

7   number actually very well.

8   Q.    Fair enough.  You understand that the number of

9   hours at the top represents the number of hours you're

10  being paid for your work, production time?

11  A.    Well, well, yes, it's supposedly, yes.

12  Q.    And then there is an allotment additionally for

13  your changing clothes time.

14  A.    Well, at least that's what the check stub says.

15  Q.    And if you worked five shifts during a week,

16  that would be typical for you, wouldn't it?

17  A.    Well, five days a week, yes.

18  Q.    And if you worked five days a week, and you were

19  paid four minutes for each shift you worked, each day

20  in changing clothes time, that would amount to 20

21  minutes a week, wouldn't it?

22  A.    Yes.

23  Q.    And that would be exactly one-third of an hour

24  or .33?

25  A.    Yes.

1  Q.    And in other weeks, you can read this one a

2  little better, a later week here, it looks like

3  you -- you worked fewer shifts that week.

4  A.    It looks like it's a week that I worked three

5  days.

6  Q.    And you were paid a different allotment of

7  clothes changing time?

8  A.    That's what you can see there.

9  Q.    And, for example, on the next page, it looks

10 like you've worked regular hours 40, plus 7 hours of

11 overtime.  Do you see that?

12 A.    Yes.

13 Q.    And that's for the week May 18th of 2006?

14 A.    Exactly.

15 Q.    And you were paid a larger number of clothes

16 changing time for that week, weren't you?

17 A.    That's what the check stub shows.

18 Q.    And you were paid that clothes changing time on

19 that week at time and a half, not your regular hourly

20 rate?

21 A.    That's what the check stub is showing.

22       MR. HOFFMAN:  Ma'am, I have no further

23 questions at this time.

24       THE WITNESS:  Okay.

25       THE COURT:  Thank you.  Redirect.

```
 1                    REDIRECT EXAMINATION
 2  BY MR. DIRKS:
 3   Q.    Just a few questions, Ms. Garcia.  Mr. Hoffman
 4  had the chance to ask you what your current pay rate
 5  is.  Do you remember what pay rate was in 2003?
 6   A.    I'm not really sure.
 7   Q.    Has it changed much?
 8   A.    Well, yes, every year we get another ten cents.
 9   Q.    Mr. Hoffman asked you if -- about slaughter
10  employees and if you had seen them.  Do you know how
11  slaughter employees are paid?
12   A.    No.
13   Q.    Do you know if they're paid on gang-time?
14   A.    Well, they pay all of us employees under the
15  same policy.
16          MR. DIRKS:  Nothing further.  Thank you, Ms.
17  Garcia.
18          THE COURT:  Recross?
19          MR. HOFFMAN:  No -- I have no additional
20  questions.
21          THE COURT:  All right.  Thank you.  You may
22  step down, Ms. Garcia.
23          Your next witness, please.
24          MR. ANDERSON:  Your Honor, plaintiffs call
25  Antonio Garcia.
```

1          THE COURT:   Thank you.

2          (Witness is sworn.)

3                      ANTONIO GARCIA,

4  called as a witness on behalf of the Plaintiffs, having

5  been first duly sworn, testified as follows:

6                    DIRECT EXAMINATION

7  BY MR. ANDERSON:

8   Q.    Morning, sir.  Would you please tell the jury

9  your name?

10          (The interpreter answers for the witness.)

11  A.    Good morning, my name is Antonio Garcia.

12  Q.    You may feel free to have a seat.  Thank you.

13          Mr. Garcia, are you related in any way to

14  Adelina Garcia?

15  A.    No.

16  Q.    Is it just coincidence you have the same last

17  name?

18  A.    Yes.

19  Q.    Are you one of the workers who filed this

20  lawsuit in 2006?

21  A.    Yes.

22  Q.    What do you hope will happen from this lawsuit?

23  A.    I'm only claiming for the time that the company,

24  that Tyson hasn't been paying us.

25  Q.    What time has Tyson not paid for?

1    A.    Tyson hasn't paid us all the time that we get

2    there since before our actual shift starts and in my

3    case, I would always get there approximately 20 minutes

4    before my actual shift would start.  After I would get

5    to the entrance of the plant, I would have to walk to

6    the cafeteria.

7            And there at the cafeteria, that's where we

8    have an area that's specifically designed for us to

9    leave our food and I would leave my food there and then

10   I would go and punch.  After that, then I would go

11   walking over to the lockers and then after I would get

12   to the dressing rooms, the first thing I would do would

13   take care of my -- of my bodily needs.

14           And then after that I would open up my locker

15   and I would take out my uniform, I would take off my

16   street clothes --

17           MR. HOFFMAN:  Objection, Your Honor.  The

18   question I think was what does he want to get from this

19   lawsuit and I don't -- I just don't know what he might

20   be talking about and I would like to have questions and

21   answers that make it --

22           THE COURT:  What's your objection?

23           MR. HOFFMAN:  It's nonresponsive.

24           THE COURT:  Well, I'm going to overrule that.

25   But let's try to break this down into bite sized chunks

1  for the witness.

2  BY MR. ANDERSON:

3  Q.    Okay, Mr. Garcia, we'll work through each of

4  those things in a little more detail.

5        Do you have to or did you have to wear

6  equipment and clothing in order to perform your job at

7  Tyson?

8  A.    Well, but there isn't an order specific.

9  Q.    Did someone at Tyson tell you that you had to

10 wear particular clothing and equipment?

11 A.    Oh, yes, well, we have our orientation class.

12 They tell us that for every job there's specific safety

13 equipment involved.

14 Q.    Do you know specifically what every job on the

15 line requires for clothing and equipment?

16 A.    No.

17 Q.    Is there a Tyson policy that you believe is the

18 same for everyone working on the line?

19 A.    That is -- I'm sorry.

20 Q.    Is there a Tyson policy that you believe is the

21 same for everyone working on the line?

22 A.    Yes, there -- there is one, it's the same for

23 everyone.

24 Q.    What is the policy that is the same?

25 A.    The policy is that we have to all use safety

1    equipment and go to our own designated work areas and

2    be there on time before the product gets there.

3            Another one of the policies says that if we

4    don't have the safety equipment on, we can't work.  So,

5    then we would be in -- in trouble.

6    Q.    Are you currently employed by Tyson?

7    A.    No.

8    Q.    Where do you work now?

9    A.    For Cargill.

10   Q.    Is that a meat packing plant?

11   A.    Yes.

12   Q.    At Tyson, when did you start?

13   A.    I started working there in July of 2004.

14   Q.    What was the first job that you had at Tyson?

15   A.    It was pushing cows.

16   Q.    What was the next job after pushing cows that

17   you had at Tyson?

18   A.    I did two different jobs for a little while.

19   Q.    What were those?

20   A.    It was in sanitation.

21   Q.    Both of those two short term jobs were?

22   A.    It was for sanitation.

23   Q.    After those sanitation jobs, what did you do

24   next?  What job for Tyson?

25   A.    I was packing up tripe.

1    Q.    Excuse me, what was the last word?

2    A.    Tripe.

3    Q.    Is there another word for tripe?

4    A.    Menudo.

5    Q.    What is menudo?

6    A.    It's the stomach of the cow.

7    Q.    Would you describe what you did for your job

8  packing menudo or packing tripe?

9          THE INTERPRETER:  Excuse me, Your Honor, if

10 the interpreter may --

11         THE COURT:  I'm sorry.

12         THE INTERPRETER:  If the interpreter may, for

13 a moment.

14         THE COURT:  Sure.

15         THE INTERPRETER:  I believe also another word

16 for tripe is honeycomb.

17         MR. ANDERSON:  Thank you.

18 BY MR. ANDERSON:

19   Q.    So would you please describe what you did in the

20 job packing tripe, or packing menudo, or packing

21 honeycomb?

22   A.    Well, when I would start my shift, I needed to

23 put on all of my safety -- safety gear.  Normally I

24 would do is first by taking off my -- my civilian

25 clothes and then I would take my uniform out of the

1  locker and I would put on my work uniform.  And then I

2  would start with my left hand, by putting on my safety

3  gear.

4  Q.    Did you use a knife in the job packing menudo?

5  A.    Yes.

6  Q.    What did you do with the knife?

7  A.    Well, I would use the knife to help me adjust

8  the weight of the box that I was packing.  And then

9  also to, um, take off or get rid of the contamination.

10 Q.    What contamination?

11 A.    It's, um --

12 Q.    You can say it.

13 A.    It's the cattle's crap.

14 Q.    Were you required to wear sanitary clothing in

15 that job?

16 A.    Yes, always.

17 Q.    So is it correct that even though the cattle's

18 crap was part of what you were working with, you still

19 had to wear sanitary clothing?

20 A.    The -- the clothing, the sanitation clothing is

21 really clothing that we have to wear so we don't

22 contaminate the product.

23 Q.    After the job packing menudo, what job did you

24 do for Tyson next?

25 A.    I was packing hearts.

1  Q.    Did the job packing hearts require you to use a

2  knife at all?

3  A.    Yes.

4  Q.    What did you do with the knife in the job

5  packing hearts?

6  A.    Adjust the weight of the box and then I would

7  also cut a little, um, well, what they call samples

8  just to send it off to the laboratory.

9  Q.    What's the purpose of cutting to adjust the

10  weight of the box?

11  A.    It's the company's policy that we had to weigh

12  the product out exactly.

13  Q.    In each of the jobs that you just described,

14  were you required to wear some protective and sanitary

15  clothing and equipment?

16  A.    Well, safety gear we always have to have on.

17  Q.    And what about sanitary clothing?

18  A.    That's just the uniform.

19  Q.    Did you choose which clothing and equipment to

20  wear or did Tyson order you regarding what

21  clothing -- clothing and equipment to wear?

22  A.    No, well, Tyson always says what type of

23  equipment we're going to wear.

24  Q.    Starting from your head and working down to your

25  feet, please identify the clothing and equipment that

1    Tyson required you to wear.  In the packing hearts job.

2    A.    Okay.  I have to use safety boots, a uniform,

3    two polar gloves, two plastic gloves, one metal mesh

4    glove, a polar sleeve, the hair net, and the safety

5    hat.  Also a frock, and that helps eliminate

6    contamination.  It helps not contaminate.  And I also

7    used a safety belt.

8    Q.    Why did you use a safety belt?

9    A.    Because the boxes that I would pack, well, they

10   are -- well, to me, to me, they were heavy.  To me they

11   were heavy but they were -- they were less than sixty

12   pounds.

13   Q.    Approximately how many boxes a day of hearts

14   would you pack?

15   A.    Approximately I would make one pallet, which is

16   28 boxes every hour.

17   Q.    For eight hours a day?

18   A.    So 28 times eight.

19   Q.    Just asking how many hours a day you did that.

20   A.    Eight hours.

21   Q.    I think you said that you wear the uniform and

22   the frock in the packing hearts job, is that right?

23   A.    I always used the uniform.

24   Q.    Is the uniform the white shirt and white pants?

25   A.    Yes.

31

1    Q.    Please explain to the jury what piece of

2    equipment or clothing you would put on first in the

3    locker room in the morning each day.

4    A.    That would be the safety boots.

5    Q.    And what was the second item, typically?

6    A.    The -- the safety hat, along with the hair net.

7    Q.    Mr. Garcia, do you believe it's very likely that

8    your hair would get caught in the machine at Tyson

9    since it's short?

10   A.    Well, no.

11   Q.    When you worked with packing menudo and there

12   was cattle waste on the product were you nevertheless

13   required to wear the hair net?

14   A.    Yes.

15   Q.    After you would put on the boots and hard hat

16   and hair net, please explain to the jury the rest of

17   your process of putting on the clothing and equipment.

18   A.    Okay.  I would leave my right hand free because

19   with this hand I would put on all of my safety gear on

20   to my left.  First, I would put on my polar glove, then

21   the plastic glove, then the metal mesh glove, then the

22   polar sleeve.  And finally, the cup, the security,

23   safety cup.  And so that I would do and finish off with

24   my right hand still free.

25           Then, I would put on my frock, and my safety

1  belt.  And last, I would put on my other polar glove

2  and the other plastic glove.

3  Q.    And I didn't hear you mention when you put on

4  the white uniform.  When did you put that on?

5  A.    Um, the uniform -- the uniform, the white one I

6  would put on after I had taken off my street clothes.

7  Q.    Did you ever put on the white uniform at home?

8  A.    Never because the company, Tyson, has a policy

9  that we can't take our, um, uniforms or equipment to

10 our homes.

11 Q.    Have you ever seen anyone in the slaughter

12 department violate that policy and wear whites from

13 home?

14 A.    Yes.

15 Q.    Is it your understanding, though, that that's

16 not allowed, it is just a violation?

17 A.    All of our co-workers from work knew that you

18 weren't supposed to be violating that policy but I have

19 seen people that would take their uniform to their

20 house.

21 Q.    What time was the first heart supposed to arrive

22 at your work station in the job packing hearts?

23 A.    It would usually get there about 6:30 in the

24 morning.

25 Q.    Did it vary?

1    A.    Sometimes.

2    Q.    In order to be ready to the line at 6:30 what

3    time would you typically arrive at the locker?

4    A.    Normally I would get there about 6:10, no later.

5    Q.    What would happen to you if you were late to the

6    line regularly?

7    A.    The policy of Tyson is that you are

8    not -- cannot be late to the line.  And they generally

9    give us a verbal warning, the second time it's a

10   written, and the third time you're fired.

11   Q.    Have you ever timed yourself putting on each

12   individual piece of clothing and equipment?

13   A.    Well, no, and I've never used a watch there.

14   Q.    In your observation of the workers at Tyson, do

15   most of them have short hair?

16   A.    A majority.

17   Q.    Can you wear or could you, rather, in each of

18   the jobs that you had at Tyson, wear all of your

19   required clothing and equipment into the bathroom?

20   A.    That's impossible.

21   Q.    What did Tyson tell you had to be removed before

22   you could use the bathroom?

23   A.    They have a policy there that says that we can't

24   take our safety equipment into the restroom.

25   Q.    What things could you leave on when you went

 1  into the bathroom?

 2  A.    Just the uniform.

 3  Q.    Now, I want to ask you about your breaks during

 4  the day at Tyson.  How many breaks did you get?

 5  A.    There was two rest breaks.

 6  Q.    Which one of those was the shorter break?

 7  A.    There was one that was 15 minutes.

 8  Q.    And how long was the other one?

 9  A.    The other was 30 minutes.

10  Q.    Where in the Tyson plant would you go to take

11  your rest break?

12  A.    Normally we go and do it in the cafeteria.

13  Q.    Is that true for both first and second break?

14  A.    Yes.

15  Q.    Is there any place on the production floor where

16  you worked where it would be sort of possible to take a

17  break, are there chairs around?

18  A.    On the production line there's nothing you can

19  do there to rest.

20  Q.    Were you required to take off some or all of

21  your clothing and equipment for the breaks?

22  A.    Yes, Tyson's -- Tyson's policy is that we have

23  to take all of our, um, safety gear off except the hard

24  hat and the boots.

25  Q.    Did Tyson encourage you to use the restroom only

1  during breaks and before your shift rather than during

2  production time?

3  A.    Well, normally, but it's through the

4  supervisors, um, they tell us that we should take

5  advantage to go then.

6  Q.    If you needed to use the restroom during the

7  production time, what was the procedure?

8  A.    Well, the policy that Tyson has is that, first,

9  you need to let the supervisor know that you need to go

10  to the bathroom and if they grant you permission, then

11  the worker can go to the bathroom.

12  Q.    You said if they grant permission.  Would they

13  sometimes not grant permission?

14  A.    Lots of time, a great majority of the time they

15  don't give you permission.

16  Q.    When you would take your breaks to go to the

17  cafeteria, was the cafeteria right next to your work

18  station or did you have to walk some distance?

19  A.    Well, you have to walk to get to the cafeteria.

20  Q.    Where would you put the clothing and equipment

21  that you had to take off during the rest break and the

22  meal break?

23  A.    Um, at my work area.

24  Q.    After you take off your gear and clothing for

25  the rest break, the first break of 15 minutes, and walk

36

1  to the cafeteria, and then taking out the time that it

2  takes to walk back to the work station and put on your

3  clothing and equipment, just for the 15-minute break,

4  approximately how much time would you have left to sit

5  and actually rest?

6  A.    Well, I never really actually, um, took or

7  watched the time but I'd say that it's -- it's five

8  minutes or less than five minutes.

9  Q.    And during the meal break, the same question.

10 After you take off all the gear and walk to the

11 cafeteria, and subtracting the time that you had to

12 walk back to the work station and put the gear back on,

13 how much time, typically, approximately, would you have

14 to sit and enjoy the meal and use the restroom?

15 A.    Well, enjoying my food and actually sitting, um,

16 approximately 15 minutes.

17 Q.    Now I want to ask you about the end of the day.

18 At some time in the packing hearts job, the hearts

19 would stop appearing at your work station?  Is that

20 right?

21 A.    Yes.

22 Q.    After that would you have to take off the

23 clothing and equipment?

24 A.    After washing down the gear, yes.

25 Q.    Where did you wash the gear?

1  A.    There's a section that's specifically made for

2  us to wash down the gear.

3  Q.    So --

4  A.    And it's close to the knife room.

5  Q.    Were you the only one who used that wash station

6  or were there others?

7  A.    Well, it's a policy that Tyson has that all of

8  the workers have to wash their equipment.

9  Q.    And do multiple people use the same wash

10  station?

11  A.    Always, there's always lots of people.

12  Q.    Were there lines?

13  A.    Sometimes there's lines.

14  Q.    When you would get to the locker and take off

15  the gear, what is typically the last piece of clothing

16  or equipment that you would take off?

17  A.    The last?  My uniform.

18  Q.    And what was the item typically that you would

19  take off right before the uniform?

20  A.    Well, I didn't have a specific order.

21  Q.    Are all the items that you took off things that

22  were required by Tyson?

23  A.    Yes, that's the way it is.

24  Q.    Do you think that the safety gear provides some

25  benefit to you by keeping you safe?

1   A.    Of course.

2   Q.    Have you studied United States Department of

3   Agriculture regulations?

4   A.    No.

5   Q.    Have you studied OSHA regulations?

6   A.    No.

7   Q.    Do you know exactly what would happen to Tyson

8   if OSHA or the USDA found violations of the law?

9   A.    No.

10  Q.    Do you know how much Tyson spends on workers'

11  compensation claims?

12  A.    No.

13  Q.    Do you know how much money Tyson pays for

14  disability claims for people who are injured at work?

15  A.    No.

16  Q.    Do you have access to statistics at Tyson about

17  the number of injuries or workers' comp claims?

18  A.    Could you repeat the question, please?

19  Q.    Do you know or do you have access to numbers and

20  figures at Tyson about how many injuries or workers'

21  comp claims there are at Tyson?

22  A.    I don't know.

23        MR. ANDERSON:  Thank you, Mr. Garcia.  I don't

24  have any more questions.  I believe Tyson's lawyer will

25  ask you some questions.

```
 1              THE COURT:  Cross examination.

 2              MR. HOFFMAN:  Yes, Your Honor.  Thank you.

 3              THE COURT:  Whenever you're ready, Mr.

 4  Hoffman.

 5                    CROSS EXAMINATION

 6  BY MR. HOFFMAN:

 7  Q.    Good morning, Mr. Garcia.

 8  A.    Good morning.

 9  Q.    You -- you testified you no longer work at the

10  Tyson plant.  When did your employment end?

11  A.    I did say that I don't work for Tyson any more

12  and I worked for them -- for them until the 10th -- the

13  9th of July, 2000, June -- sorry, June 9th of 2010.

14  Q.    And you were terminated?

15  A.    Yes.

16  Q.    That was because --

17              MR. ANDERSON:  Objection.

18              THE COURT:  Basis?

19              MR. ANDERSON:  Relevance, and there's a

20  discovery issue, Your Honor.  Could we approach

21  briefly?

22              THE COURT:  Sure.

23              (The following sidebar conference was had

24              outside the presence of the jury:)

25              MR. ANDERSON:  Your Honor, we requested
```

1 repeatedly that we get supplemental personnel files for

2 our plaintiffs and we did not receive a supplemental

3 personnel file for any of them.  We asked many times.

4          Mr. Garcia was allegedly terminated for having

5 a fight with a supervisor, but we have none of the

6 documentation from the personnel file, we haven't been

7 able to have, to prepare for this because they simply

8 failed to give us the documents.

9          THE COURT:  Just a second.  Okay.

10          MR. HOFFMAN:  The company has searched for

11 them and doesn't have, I understand, the personnel

12 file.

13          THE COURT:  Then how did you find out about

14 this?

15          MR. HOFFMAN:  Mr. Young, the corporate

16 representative, knows about this, he was the HR

17 manager.

18          THE COURT:  And there's nothing in the file?

19          MR. HOFFMAN:  There --

20          MR. MUELLER:  We can't find the file.  We've

21 asked over and over and over again.

22          MR. HOFFMAN:  We're unable to find the file.

23          THE COURT:  I'm going to let you go ahead and

24 ask him about it but you can bring out the fact that

25 you've made repeated requests and that Tyson can't seem

1  to find a file on a fight that resulted in a

2  termination.

3          MR. ANDERSON:  Thank you, Judge.

4          (Sidebar concludes and proceedings then

5          continue in open court:)

6  BY MR. HOFFMAN:

7  Q.    And, sir, you were terminated for having a

8  physical altercation with your supervisor, weren't you?

9  A.    The -- the company says that I battered Mr. Juan

10 Carrera, but that is not true.

11 Q.    That was the reason you were terminated, though?

12 A.    That's what they said, that that's why they

13 fired me.

14 Q.    And the job of hot beef pusher, that's a job

15 that you did?

16 A.    Um, I had told you that the last job I did was

17 the packing hearts.

18 Q.    I understood that but one of the jobs you did

19 was pushing cows or hot beef pusher?

20 A.    That's right.

21 Q.    And all of these jobs, the packing hearts, the

22 packing tripe, and the beef pusher job, were all in the

23 what's called the offal department?

24 A.    I'm sorry?

25 Q.    Offal, o-f-f-a-l.

1    A.    No, because the pushing -- pushing cows is in

2    the hot box area.

3    Q.    Okay.

4    A.    And the one with the hearts is in the offal

5    area.

6    Q.    And the packing tripe or menudo is in the offal

7    area?

8    A.    No, that one's close -- well, to what they call

9    the head table.

10   Q.    Okay.  I'm going to show you a map of the -- of

11   the facility, of the slaughter portion.

12         Will you go into the back here?

13         Which hot box were you?  Hot box two, hot box

14   one, or which hot box were you in?

15   A.    They call the whole area hot box.

16   Q.    Go back out.

17         So were you at the front end there, near the

18   cafeteria or the back end, further away?

19   A.    I worked in the whole area of the hot box.

20   Q.    Okay.  And the hot box in that area, the cow is

21   coming off of the slaughter line, is that right?

22   A.    Yes.

23   Q.    It's washed in a citrus bath?

24   A.    Before it comes into the hot box area

25   it's -- it's washed.

1    Q.    And then there's a steam bath it goes through?

2          THE INTERPRETER:   I'm sorry, I'm at a loss for

3    the steam bath.

4    BY MR. HOFFMAN:

5    Q.    It -- it goes through an area where it is

6    steamed?

7    A.    Well, it's a combination of both.

8    Q.    It's a cleaning area?

9    A.    It is clean.

10   Q.    And then it goes into the hot box area?

11   A.    That's right.

12   Q.    And the hot box is actually a cooler, isn't it?

13   A.    They call it a hot box but, um, more exactly

14   it's a cooler.

15   Q.    The -- the break period that you were testifying

16   about, that's the old break period, before the changes

17   that Tyson made to the -- to the realignment of its

18   work day, isn't that right?

19   A.    No.

20   Q.    You understand that the break period changed?

21   A.    I know that in the month of April they changed

22   that break and I was still working for Tyson back in

23   that time.

24   Q.    Right.  For about a month, month and a half?

25   A.    Well, I'll repeat once again, that I was

44

1   terminated from Tyson on the 9th of June.

2   Q.    Now, the -- you recall giving a deposition in

3   this case, don't you?

4   A.    Well, I mean, the exact time or the exact month,

5   I mean I can't remember but there was, um, there was

6   something in the deposition.

7   Q.    Right.  It was -- I'll tell you it was December

8   17th of 2008 that you gave that deposition.

9   A.    Well, I mean, I did say that I didn't remember

10  the exact time or the exact date but I do know that it

11  approximately was about two years ago.

12  Q.    Okay.  And in that deposition, you were asked

13  about the amount of time it takes to put on and take

14  off certain items, weren't you?

15  A.    What do you mean?

16  Q.    You were asked in that deposition how long it

17  took you to put on certain items and to take off those

18  items.

19  A.    Well, the attorney, she was asking me these

20  things but I just told her that I really couldn't tell

21  her because I never wore a watch.

22  Q.    But you were able to estimate the time and you

23  did estimate the times in that deposition, didn't you?

24  A.    I -- I -- I couldn't, I really couldn't, not

25  exactly, um, I couldn't.

```
 1   Q.     You did give time estimates, didn't you?
 2   A.     I gave them an estimate of time overall for what
 3   it takes for me to take off -- take off all of my
 4   street clothes and then to put on all -- all of my
 5   uniform clothes.  And the safety and security -- excuse
 6   me, the safety gear and that approximately it was
 7   around anywhere from five to seven minutes.
 8   Q.     And you testified, didn't you, that, for
 9   example, with the safety boots, it takes about 15
10   seconds to put those on?
11   A.     And I'll repeat once again that I didn't use a
12   watch so I can't say that that was exactly the time
13   that I would use.
14   Q.     Sure, I understand that.  And I'm not asking
15   whether you used a watch.
16           What I'm asking you, is at the deposition you
17   were asked to give estimates, weren't you?
18   A.     I never gave an estimate, so we could say but
19   the attorney asked that I give her something and how
20   long it would generally take to put on some of these
21   things.
22   Q.     And you answered those questions, didn't you?
23   A.     I told her, yes, so and so that way I wouldn't
24   commit any mistakes, I -- I gave her the estimate of
25   anywhere from five to seven minutes.
```

1   Q.     And when you were asked about specific items,

2   you estimated those as well, didn't you?

3   A.     She did ask me about certain pieces of gear but

4   I told her that I couldn't give her an exact time

5   specific.  But if she wanted an estimate, I couldn't

6   give her exact but that I could give her at least some

7   estimates.

8   Q.     And you did estimate the times.  You did do that

9   for her?

10  A.     Of some things, yes.

11  Q.     If I were to hand you the transcript of the

12  deposition, would you be able to read it in English?

13  A.     If you give it to me now?

14  Q.     Sure.

15  A.     Sure.

16  Q.     Is that the transcript of the deposition that

17  you gave on December 17th, 2008?

18  A.     Well, I would like to correct an error that's on

19  here.

20  Q.     Okay.

21  A.     On the top part of the page it says Antonia

22  Garcia, and I am Antonio Garcia.

23  Q.     That -- that's the testimony that you gave,

24  though, isn't it?

25  A.     Yes, it is.

1    Q.    And, sir, did you testify on Page 98 -- can you

2    find Page 98 there?

3         Do you see beginning on Line 7, were you asked

4    the following and did you give --

5    A.    Number 7?

6    Q.    Line 7.  Were you asked the following and did

7    you give the following answer:

8         Question.  Approximately how long did it take

9    you to put on your hair net?

10         Answer.  Oh, just a few seconds.

11    A.    Yes.

12    Q.    And you were asked on Line 12:  And how about

13    your hard hat?  And you said, That too.

14         And she asked you, Five seconds?

15         And you said, Uh-Huh.

16    A.    Yes, and that's when the attorney was asking me

17    if I could -- if I could give her an estimate or

18    approximately of how much time I would use.

19    Q.    And -- and you did that?

20    A.    Yes.

21    Q.    And you were asked, How about the steel toed

22    boots?  And you answered, Oh, 15 seconds.

23    A.    Yes.

24    Q.    And that was truthful, wasn't it?

25    A.    That's what the attorney was telling me to -- to

48

1  give her, an estimate.

2   Q.    And the estimate you gave for the safety boots

3  was 15 seconds; for the hard hat was five seconds; for

4  the hair net was five seconds?

5   A.    It's the estimate that I could tell you about, I

6  mean I could never really tell you if it's actually

7  factual because, like I told you, I never used, um, a

8  watch.

9   Q.    And the earmuffs that you wear, you didn't wear

10  earplugs, you wear earmuffs?

11  A.    I like the earmuffs more because they protected

12  more.

13  Q.    And they were attached to your hard hat?

14  A.    Yes, then they were always with the hard hat.

15  Q.    And the gloves you testified take about 15

16  seconds to put on?

17  A.    I'll repeat it once again.  That the attorney,

18  she was telling me to give her an estimate.  But I

19  never told her that that was exact because I'll tell

20  you once again that I never used a watch.

21  Q.    I understand that you didn't use a watch.  I'm

22  simply trying to ask you about the estimates that you

23  gave when you were asked two years ago and the estimate

24  you gave for your gloves was about 15 seconds.

25  A.    And it could actually be that but I never said

1  that it would exactly be --

2  Q.    Sure.

3  A.    -- that exact time.

4  Q.    And for the polar glove you said it was about

5  five seconds.

6  A.    For my right hand, could be and that would be

7  approximate.

8  Q.    Sure.  And for the mesh apron, you said that

9  took about 30 seconds?

10  A.    In my job for packing hearts I didn't use a mesh

11  apron.

12  Q.    In the menudo job, when you did wear a mesh

13  apron, you estimated it would take about 30 seconds to

14  put it on.

15  A.    Well, I did use it there but a little bit ago

16  you had been talking about my job packing hearts.

17  Q.    It took you about 30 seconds to put a mesh apron

18  on, didn't it?  Isn't that what your testimony was?

19  A.    When I was working with the menudo, that would

20  be approximate.

21  Q.    And the polar sleeve, which you used in the

22  menudo job, that took about ten seconds to put on?

23  A.    All of those times are approximate.

24  Q.    I understand that, but that -- that was the

25  approximation that you gave when asked in your

1  deposition, ten seconds.

2  A.     More or less.

3  Q.     And the plastic apron that you wore for the

4  menudo job, you said that took about 30 seconds to put

5  on.

6  A.     Approximately.

7  Q.     And the plastic arm guards that you wore in the

8  menudo job, that took about three seconds to put on.

9  A.     And I'll repeat it once again, this is all

10 approximate because I never actually timed this.

11 Q.     Sure.  I understand that they are approximations

12 but they are the approximations that you gave?

13 A.     Yes, because the attorney, she wanted an

14 estimate.

15 Q.     The break period that you testified about, you

16 of course wear your white uniform during the break

17 period?

18 A.     That's right.

19 Q.     But it just replaces your street clothing, you

20 wear it all day?

21 A.     It is actually Tyson policy that we have to use

22 the uniform that they are providing and use it there.

23 Q.     I understand, but you -- when you put it on, you

24 keep it on all day?

25 A.     That's right.

1   Q.    So you wear the white uniform when you go to the

2   bathroom and when you go to the lunch break and

3   everywhere else?

4   A.    Well, yes, because we have to use it all day.

5   Q.    And the hard hat, you wear that all day?

6   A.    At break I would take it off.

7   Q.    You are certainly allowed to wear your hard hat

8   at the break, aren't you?

9   A.    At the -- if a person wants to use it they can

10  and if they want to take it off we can, because they

11  have given us permission to do so as well.

12  Q.    And the hair net as well, you can leave that on

13  if you want to?

14  A.    You can also take it off.

15  Q.    It's your choice?

16  A.    That's right.

17  Q.    And the boots, you certainly leave those on?

18  A.    Well, the boots we can't leave anywhere else.

19  Q.    Right, you just wear the boots through the

20  breaks, and the restroom breaks and all of those

21  things?

22  A.    Of course.

23          MR. HOFFMAN:  I have no further questions at

24  this time.

25          THE COURT:  Redirect?

```
 1           MR. ANDERSON:  Thank you, Your Honor.
 2                   REDIRECT EXAMINATION
 3  BY MR. ANDERSON:
 4   Q.   Mr. Garcia, I am going to ask you to look at a
 5  portion of your deposition transcript that Mr. Hoffman
 6  did not ask you to read.
 7           Could you start here on Page 97 at Line 23,
 8  and read to Line 6 on that second page, 98.
 9           And go ahead and read it in English to the
10  best of your ability.
11           MR. HOFFMAN:  Your Honor, before he reads it,
12  can I have one minute to look at the page line?
13           THE COURT:  Sure.
14           MR. HOFFMAN:  I'm sorry.
15           MR. ANDERSON:  97, 23 to 98, 6.
16           MR. HOFFMAN:  That's fine.
17           THE INTERPRETER:  Would you repeat the lines,
18  please?
19  BY MR. ANDERSON:
20   Q.   97, 23 to 98, 6.  Go ahead and read it as slowly
21  and plainly in English as you can, please.
22           THE WITNESS:  Question 23:  And when I say
23  each item, I want you to tell me how long it took you
24  to put on you that item.
25           Page 98, Question 6, Seven minutes.
```

1  BY MR. ANDERSON:

2   Q.    When you change in the locker room at Tyson are

3  you the only one in the locker room?

4   A.    No, there was a lot of co-workers, work

5  co-workers around me.

6   Q.    The people around you in the locker room have

7  knives and hooks?

8   A.    Yes.

9   Q.    Did you arrive in the locker room and begin

10 planning or begin putting on the clothing and equipment

11 with enough time to be sure you were not late to the

12 line?

13  A.    Yes.

14          MR. ANDERSON:  No further questions.  Thank

15 you, Mr. Garcia.

16          THE COURT:  Recross?

17          MR. HOFFMAN:  No additional questions, Your

18 Honor.

19          THE COURT:  All right.  Sir, you may step

20 down.

21          May this witness be excused?

22          MR. HOFFMAN:  He may from the defendants'

23 perspective.

24          MR. ANDERSON:  And also ours, thank you, Your

25 Honor.

1           THE COURT:  And you are excused.  Thank you.

2           Folks, this is a good time to take our first

3  recess of the morning.  We will be in recess until

4  9:55, 9:55.

5           I remind you again, as always, you are not to

6  discuss this case or any aspects of it among yourselves

7  or with anyone else.  Thank you so much.  See you back

8  here shortly.

9           Go ahead and have a seat, folks, but who is

10 going to be up next?

11          MR. ANDERSON:  Mr. Jeronimo Vargas Vera.

12          THE COURT:  Very good.  Thank you all so much.

13 See you back here shortly.

14          (Recess taken from 9:35 a.m. until 9:55 a.m.

15          Proceedings are then had outside the presence

16          of the jury:)

17          THE COURT:  Let's bring them all in.

18          (The jury enters the courtroom.)

19          THE COURT:  Mr. Hanson, let's go ahead and

20 bring the next witness on up.

21          Members of the jury have, a seat.  Everyone

22 else can as well.

23          (Witness is sworn.)

24                JERONIMO VARGAS VERA

25 called as a witness on behalf of the Plaintiffs, having

1  been first duly sworn, testified as follows:

2                    DIRECT EXAMINATION

3  BY MR. ANDERSON:

4  Q.    Good morning, sir.  Would you please tell the

5  jury your name?

6           (The interpreter answers for the witness.)

7  A.    Good morning.  My name is Jeronimo Vargas.

8           THE COURT:  Mr. Vargas, you can just stay

9  seated.  Thank you.

10          THE WITNESS:  Thank you very much.

11          THE INTERPRETER:  Thank you very much.

12          THE COURT:  Appreciate it.

13 BY MR. ANDERSON:

14 Q.    Mr. Vargas, are you currently employed by Tyson?

15 A.    No.

16 Q.    Have you worked for them in the past?

17 A.    Yes.

18 Q.    When did you start working for Tyson?

19 A.    The 23rd of January, 2001.

20 Q.    When you started with Tyson in 2001, what was

21 the first job they had you do?

22 A.    I don't remember.

23 Q.    Was it just a short time?

24 A.    Yes.

25 Q.    What's the first job you do remember doing for

1    Tyson?

2    A.    Cutting horns and ears.

3    Q.    Did you have other jobs at Tyson as well?

4    A.    Yes, different.

5    Q.    What did you do after cutting horns?

6    A.    I signed for the job of cleaner neck.

7    Q.    Could you say it again just so we're clear what

8    it is.

9    A.    I signed for the job of clear neck.

10    Q.    Could you explain what the job clear neck

11    required you to do to the cow?

12    A.    The job consists of cutting the hide of the cow,

13    starting from right here all the way to the end of the

14    cow.

15    Q.    Did you use a knife to do that?

16    A.    Well, regularly I used three knives.

17    Q.    Did you use three knives all at once or would

18    you use one and have a couple of spares?

19    A.    I would use one, and then when that one wasn't

20    sharp any more, then I would use another one and then

21    another and that's usually how it went.

22    Q.    Did you wear a hard hat in that job?

23    A.    Yes.

24    Q.    What color was the hard hat?

25    A.    When I started working at that job it was a

1  white hat.

2  Q.    When you started in clear neck it was white?

3  A.    Yes.

4  Q.    Did they change it to a different color at some

5  point?

6  A.    Yes.

7  Q.    What did they change it to?

8  A.    To the color of brown.

9  Q.    What does the brown hat signify?

10  A.    They gave us -- they gave us all of the workers

11  the brown hat for those of us that were there where all

12  of the cattle still have their hides on and it's the

13  area with the most contamination.

14  Q.    Is that all of the slaughter area or just part

15  of it?

16  A.    No, it's only a portion.

17  Q.    Other than the hard hat, what other gear were

18  you required to wear in the job clear neck?

19  A.    Well, in that job I was required and needed to

20  use all of the equipment that's there on that peg

21  board.

22  Q.    Mr. Vargas, I am showing you a demonstrative

23  that has been used previously in the case.  Could you

24  look at that and state whether that accurately states

25  all of the clothing and equipment you were required to

58

1  wear?

2  A.    Yes.

3  Q.    You see in the left-hand column where it says

4  polar sleeve?  How many polar sleeves did you wear?

5  A.    Well I would use two polar sleeves.

6  Q.    And also in the left column it says shin guards.

7  How many shin guards did you wear?

8  A.    Two.

9  Q.    Did you choose the items that appear on this

10 list or did Tyson tell you that you were supposed to

11 wear them?

12 A.    Tyson is the one that said that this is the gear

13 that was required to do my job.

14        MR. ANDERSON:  Your Honor, all of the items

15 here have been stipulated for admission.

16 BY MR. ANDERSON:

17 Q.    Mr. Vargas, I am showing you that item.  What is

18 that item?

19 A.    It's a hair net to put over your hair.

20 Q.    And this one is marked Exhibit 362.  What is

21 that item?

22 A.    This is so we can put it on (demonstrating) like

23 this.

24 Q.    This still has a piece of the peg board attached

25 to it, but this is Exhibit 361.  Can you tell us what

1  that is?

2  A.    These are glasses so that way the blood doesn't

3  splatter up into my eyes.

4  Q.    And what is that?

5  A.    These are polar gloves and I would put one on

6  each hand.

7  Q.    And what is this item?

8  A.    First is this.

9  Q.    And what is it?

10 A.    It's a yellow glove.  I would put two yellow

11 gloves on, one and that was before putting on the polar

12 gloves.

13 Q.    What are these?

14 A.    Boots.  Safety boots that I first had to put on

15 for my job.

16 Q.    Are those like the boots that you wore on the

17 job?

18 A.    Yes, the same.

19 Q.    I'm handing you what's marked Exhibit 375.  What

20 is that item?

21 A.    This is the case to -- to put your knives away

22 into but right here there's actually a chain so then

23 you can, um, tie it off on to yourself.

24 Q.    Where is the chain?

25 A.    I don't know.

```
 1   Q.    No, I mean on that?

 2   A.    Right here.  From this.

 3   Q.    I'm handing you Exhibit 348.  What is that?

 4   A.    This is a scratched steel and so this you use to

 5   smooth out the -- the dings in your knives.

 6   Q.    And I'm handing you Exhibit 358.  What is that

 7   item?

 8   A.    This is to sharpen up your knife, to get the

 9   blade.

10   Q.    Why did you use two sharpeners?

11   A.    Because this one's to get rid of the nicks on

12   the knife and this one is to actually sharpen.

13   Q.    The white one is for sharpening?

14   A.    No, this one is what you use to get rid of the

15   nicks because sometimes you can actually hit it and

16   strike it against the edges.

17   Q.    And, so is the black one for the sharpening?

18   A.    Mm-hmm.

19   Q.    And what is this item?

20   A.    Yeah.  (Demonstrating.)  This one is a cup that

21   I have to put on for safety so that way I don't cut

22   myself.

23   Q.    And for the record, the item is blue.  What did

24   you call this item?

25   A.    A cup.
```

1   Q.      You called it a cup?

2   A.      Yes.

3   Q.      I'm handing you Exhibit 351.  Can you tell us

4   what that is?

5   A.      These are yellow sleeves so that way it covers

6   so that way not as much blood gets in there and it

7   helps to cover the gloves.  So that way blood doesn't

8   get into the gloves.

9   Q.      Is there quite a lot of blood in the job you did

10  clearing neck?

11  A.      Yes, a lot because when I would go ahead and

12  scratch down, my whole arm would become covered with

13  blood.

14  Q.      And what is this item?

15  A.      But of these, I would use two.

16  Q.      Thank you.  What is this item?

17  A.      And these are the plastic gloves that would

18  normally put on top of all of the other gloves.

19  Q.      What is this item?

20  A.      This is the mesh glove that I have to put on and

21  this I generally put on after the yellow glove and

22  after the polar glove.  On my left hand.

23  Q.      What are these items, sir?

24  A.      These I would put on my shins.

25  Q.      And could you step down and just -- go ahead and

1  step down and actually put them on.

2          (Witness complies.)

3  BY MR. ANDERSON:

4  Q.    Actually, Mr. Vargas, I think the jury will be

5  able to see if you just step over here.

6          (Witness complies.)

7  A.    And I had to buckle all three, I only did one

8  just to show you.

9  BY MR. ANDERSON:

10  Q.    So there are more hooks that you would attach?

11  Thank you.  And you can take them back off.

12  A.    Okay.

13  Q.    And thank you.

14          And the shin guards are marked Exhibit 366.

15          I'm handing you Exhibit 346.  What is that

16  item?

17  A.    This, I would put on (demonstrating) I would put

18  it on like this, and that way I would get the

19  rest -- well, so I wouldn't get everything very dirty

20  that I had on.

21  Q.    What is that item called?

22  A.    It's a rubber apron or plastic apron.

23  Q.    And what are these?

24  A.    These are polar sleeves and I need to put one on

25  each arm.  (Demonstrating.)  Like this.

63

1   Q.    Take those back.   Thank you.

2           Where does this item, this is 337, Exhibit

3   337?

4   A.    This is the mesh apron, steel mesh apron and I

5   have to put this on as well and I put it on like this.

6   (Demonstrating.)  And then I also have to fasten down

7   both of the legs down here.

8   Q.    Thank you.

9           Mr. Vargas, did Tyson ever tell you that any

10  one of those pieces of gear was more important than all

11  the rest?

12  A.    No.  No, Tyson's policy was that I had to use

13  this specific type of gear and equipment for the job

14  that I was going to be doing.

15  Q.    What did you understand would happen if a

16  supervisor caught you not wearing any piece of your

17  required gear?

18  A.    My supervisor said that I needed to have all of

19  my equipment on because if I didn't have all of my

20  equipment on I could -- I could suffer an accident, I

21  could cut myself like if I didn't put on my boots, a

22  hook could fall down and it could fall on my feet.

23  Q.    Mr. Vargas, does the rubber apron stop a knife

24  from going through?

25  A.    No, that one would go through really easily.

64

1   Q.    And do the rubber gloves stop a knife from going

2   through?

3   A.    No.

4   Q.    When you were working the clear neck job, what

5   time were you supposed to arrive to be ready for the

6   first cow to pass your work station?

7   A.    I need to be at my work area no later or than

8   7:08 or 7:10 in the morning.

9   Q.    That's the time you got to the line itself?

10  A.    Yes, to my line.

11  Q.    What time would the first cow pass your position

12  on the line?

13  A.    Well, it wasn't always the same time.  Sometimes

14  it would get there earlier, sometimes it would get

15  there later.

16  Q.    What did you do during the minutes that passed

17  from about 7:08 to 7:10 until the first cow appeared at

18  your work station?

19  A.    I would actually put myself to work sharpening

20  my knives.  I actually got a stone that was about this

21  size (indicating) so that way I could sharpen them

22  really well because the hide is really hard.

23  Q.    For your start time a little after 7:00 a.m.

24  each morning, what time would you plan to arrive at the

25  plant?

1   A.    Well, to get to the plant, I -- I almost always,

2   um, wanted to be there early because I wanted to be

3   there on time before the first cow would pass.

4   Q.    Approximately what time would you arrive at the

5   plant?

6   A.    6:25, 6:30.

7   Q.    And if you got to the plant about 6:25 or 6:30,

8   just approximately what time would you enter the locker

9   room?

10  A.    To the locker room?  Probably about 6:35,

11  approximately, and then so I could go ahead and start

12  changing.

13  Q.    And you said you could start changing.  Is this

14  equipment then that you would put on?

15  A.    Well, no, because at first I would only put on

16  my uniform and then the hair net and the hard hat and

17  then I would go to the cafeteria to have some coffee.

18  Q.    Okay.  You put a couple items on and then go to

19  the cafeteria?

20  A.    Yes.

21  Q.    And then would you go back to the locker?

22  A.    Yes.

23  Q.    Okay.  Approximately what time would you go back

24  to the locker?

25  A.    Like at 6:40.

1  Q.    And what did you do at approximately 6:40 in the

2  locker room?

3  A.    I would start putting on my gear, the rest of

4  the gear.

5  Q.    When you would return to the locker after going

6  to the cafeteria for coffee, what is the first item you

7  would typically put on?

8  A.    That would be the -- the steel apron, then the

9  polar sleeves and the -- the -- the shins, the black

10 things.

11 Q.    Shin guards?

12 A.    Yes.

13 Q.    Have you ever timed how long it takes to put on

14 each individual piece of clothing and equipment?

15 A.    Well, unfortunately, no, I guess I just was

16 never had that curiosity enough to go ahead and time

17 that.

18 Q.    Would you just make sure that you had enough

19 time to get it on before your shift?

20 A.    Yes.

21 Q.    Mr. Vargas, at the time that you worked at

22 Tyson, did you ever have long hair?

23 A.    No.

24 Q.    If you hadn't worn a hair net do you think your

25 hair would have been likely to get caught in the

67

1  machinery?

2   A.     No, because where I work, um, there wasn't any

3  machinery that would pose that kind of risk.

4   Q.     In the brown hat area where you worked, with cow

5  hides, were you nevertheless required to wear the hair

6  net?

7   A.     Yes.   This is Tyson's policy.

8   Q.     Did Tyson allow you to wear all of that

9  equipment in the restroom?

10  A.     No.

11  Q.     What did Tyson tell you had to be taken off

12  before you could use the restroom?

13  A.     All -- all of the equipment minus the boots, the

14  hard hat, and the uniform.

15  Q.     Now I want to turn to the breaks that you got

16  during the day.

17          How many breaks did you get?

18          MR. O'DEAR:  Your Honor, I object.  Can we get

19  a time frame here?

20          MR. ANDERSON:  Sure.  Oh, sure.

21          THE COURT:  Sure.

22  BY MR. ANDERSON:

23  Q.     During the time that you worked on the clearing

24  neck job.

25          MR. O'DEAR:  Well, Your Honor, the

1  clarification I am looking for is when he last worked

2  at the plant.

3          THE COURT:  Let's just back up for a second

4  and let's talk about a particular time period and what

5  job he was working.  I think that's fair.

6          MR. ANDERSON:  Certainly.

7  BY MR. ANDERSON:

8  Q.    Mr. Vargas, when did you stop working at Tyson?

9  A.    The 25th of January, 2008.

10 Q.    During your work in the clearing neck job prior

11 to leaving Tyson, how many breaks did you get?

12 A.    Two.

13 Q.    Was the first break shorter than the second

14 break?

15 A.    Yes.

16 Q.    How long was the hole in the line for the first

17 break?

18 A.    Approximately two hours.  Or two hours and 15

19 minutes.  For the -- for the first break to roll

20 around.

21 Q.    All right.  So it's two hours or so before the

22 first break started, is that right?

23 A.    Yes.

24 Q.    But how long was the period from when a cow

25 would pass until there was no more cow, and the next

1  cow arrived?

2  A.     I never checked that time either.

3  Q.     During the second break, how long was the period

4  from the last cow at the start of the second break

5  before you had to return to the line?

6  A.     The second break?

7  Q.     Right.  How long was it?

8  A.     Well, I mean, it would maybe be like two hours

9  because they would always give us the -- the second

10 break for lunch break.

11 Q.     I think we're miscommunicating.

12        Rather than how long before the next break

13 came, how long did the second break last?

14 A.     Oh.  30 minutes.

15 Q.     And did Tyson tell you approximately how long

16 the first break lasted?

17 A.     Yes.

18 Q.     About what did Tyson tell you how long the first

19 break lasted?

20 A.     15 minutes.

21 Q.     Did you typically use the restroom during both

22 the first and second break?

23 A.     Yes.

24 Q.     Where in the plant did you take your first and

25 second break?

1    A.      In the cafeteria.

2    Q.      Based on your observation of the workers around

3  you, did most people take their break in the cafeteria?

4    A.      A majority.

5    Q.      Is there any place on the line in your job

6  clearing neck where you could comfortably sit and rest?

7    A.      No.

8    Q.      Any chairs around?

9    A.      No.

10    Q.      Is the floor clean to sit on?

11    A.      No, it's very dirty.

12    Q.      What's it dirty with?

13    A.      With blood, and water.

14    Q.      Is the cafeteria right next to your work station

15  on the line?

16    A.      No, I have to walk.

17    Q.      Is there anything among the clothing and

18  equipment that you had to take off for each of the

19  breaks?

20    A.      Yes, almost all of it.

21    Q.      Is that true for both breaks?

22    A.      Yes.

23    Q.      Now I want to switch to the end of the day.

24  After the last cow would show up at your spot on the

25  line, what did you have to do?

1    A.    Walk to the station, um, well it's an area where

2    we can walk and we can wash and all of the workers are

3    required to wash everything down.

4    Q.    Where did you do the washing?

5    A.    In this area that's specific, where there's some

6    hoses with hot water so that way we can wash down all

7    of the gear.

8    Q.    Was there ever a line at the wash station?

9    A.    On occasion.

10   Q.    What did you do with each item when you would

11   take it off at the end of the day?

12   A.    I would wash it and then I would walk towards my

13   locker so that way I could put it away.

14   Q.    Where did you put the white uniform?

15   A.    We would put it in a white bag where there was

16   some big bins and you put it in there that way it could

17   go into the wash.

18   Q.    Did anything else go in the bag?

19   A.    Polar gloves and yellow gloves and then also,

20   uh, polar sleeves.

21   Q.    Were all of those items dirty at the end of the

22   day?

23   A.    Yes.

24   Q.    What were they dirty with?

25   A.    With blood.

1    Q.    Mr. Vargas, have you studied the safety and

2    sanitary laws that Tyson has to follow?

3    A.    No.

4          MR. ANDERSON:  I have no further questions,

5    Your Honor.

6          THE COURT:  All right.  Cross examination.

7          MR. O'DEAR:  Yes, Your Honor.

8                    CROSS EXAMINATION

9    BY MR. O'DEAR:

10   Q.    Good morning, Mr. Vera.

11   A.    Good morning, lawyer.

12   Q.    You can be seated.

13   A.    Thank you very much.

14   Q.    We have not had an opportunity to speak before

15   today, is that correct?

16   A.    No.

17   Q.    You have -- you did have an opportunity to give

18   a deposition, though, however, in this case back in

19   December of 2008?

20   A.    Yes.

21   Q.    And I'm going to bring this up to lay in front

22   of you just in case you need to refer to it, if I

23   could.  There we go.

24   A.    Thank you very much.

25   Q.    And as I think is true in most of these

1  depositions, your Spanish speaking lawyer, Mr. Antosh,

2  was present at your deposition back in December of

3  2008, is that true?

4  A.    Yes.

5  Q.    And Mr. Dirks was also present?

6  A.    I don't exactly remember.

7  Q.    Okay.  Let's -- it's indicated on the deposition

8  transcript.

9       You do recall that you took an oath before you

10 gave that testimony, correct?

11 A.    Yes.

12 Q.    And you gave truthful testimony on that day,

13 correct?

14 A.    Yes.

15 Q.    As Mr. Anderson clarified on your direct

16 examination, I believe, that you last worked for Tyson

17 Meats back in January of 2008, correct?

18 A.    Yes.

19 Q.    And, so, you have not worked there since April

20 of 2010 when they restructured the work day and changed

21 the morning break, have you, sir?

22 A.    No.

23 Q.    So, the period you worked there you had a

24 15-minute paid morning break and a 30-minute unpaid

25 lunch break, correct?

1  A.     Yes.

2  Q.     Okay.  Now, the reason you're no longer working

3  at Tyson is simply because you decided you didn't want

4  to work any more, is that correct?

5  A.     That's right.

6  Q.     And you decided that you wanted to go back to

7  your hometown in Mexico, correct?

8  A.     Yes.

9  Q.     And you, before you quit, you didn't tell

10 anybody at Tyson that you were going back to Mexico, is

11 that correct?

12 A.     Yes, that's right.

13 Q.     And you just took a vacation and simply didn't

14 return to work, is that correct?

15 A.     That's right.

16        MR. O'DEAR:  Okay.  I would like to pull up

17 Exhibit 270 now, Mr. Whitehead.

18        And let's start with the top pay stub, Martin,

19 pull up the first one and we'll just scroll down

20 through it.

21        That's fine.  There you go.

22 BY MR. O'DEAR:

23 Q.     Okay.  Looking -- I want to make sure we can see

24 this okay.

25        Yeah, looking at the very first pay stub at

1  the top, do you see a payment of clothes changing time

2  at regular pay of two-tenths of an hour?

3  A.    Yes.

4  Q.    And you understand, sir, that two-tenths of an

5  hour translates into 12 minutes of changing time?

6  A.    I'm sorry, how many?

7  Q.    Twelve minutes.

8  A.    They never explained this to us.

9  Q.    Okay.  I just wanted you to know, I mean if we

10 have 60 minutes in an hour, one-tenth of that would be

11 six minutes; two-tenths would be 12 minutes?

12        Do you agree with that?

13 A.    Well, I don't understand everything that's

14 included in the check.

15 Q.    Okay.  The -- we've had testimony in the case,

16 sir, that -- that throughout the period starting in

17 2003 when this litigation period commences, that Tyson

18 has been paying four minutes of day to knife users for

19 clothes changing time.

20        Is it your understanding that from 2003

21 forward you got paid four minutes a day for clothes

22 changing time or do you know?

23 A.    It's possible that that's what it was but they

24 never actually explained to us in detail what it

25 actually was.

1  Q.    Okay.  You have testified to a lot of different

2  items of protective gear and clothing that you put on

3  each day, correct?

4  A.    Yes.

5  Q.    Okay.  The testimony we've had thus far in the

6  case is that each day you did that, you have been paid

7  four minutes a day for the protective items, the

8  protective gear.

9         As you sit here today, do you have any belief

10 as to whether or not that's accurate for you?

11 A.    It's possible.

12 Q.    Okay.  Let's go down and look at then the next

13 stub.

14        The second stub we see, again, clothes

15 changing regular .27 hours, let me just ask you, do you

16 understand that that's time you're being paid for for

17 changing your clothes?

18 A.    Okay, well, that's fine.

19        MR. O'DEAR:  Okay.  Let's move down to the

20 next one.

21 BY MR. O'DEAR

22 Q.    We've also had some testimony in the case with

23 regard to occasions when there are required meetings

24 for workers and the testimony has been that Tyson pays

25 workers for meeting time.

1          Do you see on the third pay stub on the first

2   page of 270 that you were paid 1.08 hours that week for

3   meeting time?

4   A.     Yes.

5   Q.     Okay.  And you do agree, do you not, that when

6   there were required meetings, Tyson paid you for the

7   time to attend those meetings, correct?

8   A.     Correct.

9          MR. O'DEAR:  Mr. Whitehead, let's go to Page

10  26 of that exhibit.

11  A.     It's okay.

12         MR. O'DEAR:  And the middle, let's look at the

13  middle pay stub.

14         Well, let's go up.  It may be a different one.

15         Let's go down.

16         Let me -- all right.

17         Let's go to, Martin, be page -- it's

18  actually -- just page down, it's the fifth page of the

19  exhibit.

20         And the middle, the middle stub.

21  BY MR. O'DEAR:

22  Q.     Now, sir, looking at -- this is a pay stub, I

23  believe, for the period ending April 24 of '04, and can

24  we agree that there your meeting time of an hour -- or

25  1.08 hours was actually paid at time and a half?

1  A.    That's fine.

2        MR. O'DEAR:  And then let's go down three more

3  pages.

4        The middle.

5  BY MR. O'DEAR:

6  Q.    And this is for the pay period ending June 26th

7  of 2004.  And do we see here, you agree, that your

8  clothes changing time for that pay period was 4/10ths

9  of an hour, which is 24 minutes paid at one-and-a-half

10 times your hourly rate?  Is that correct?

11 A.    Correct.

12 Q.    Okay.  Can we agree that the clothes changing

13 time on each of these pay stubs was paid at your hourly

14 rate or on some occasions, the overtime rate?

15 A.    Yes.

16 Q.    Okay.

17       MR. O'DEAR:  Then pull up, Mr. Whitehead,

18 Exhibit 239.  And I don't know if this is in, but if

19 not it is the JSA for clear neck position, I would

20 offer it.

21       MR. ANDERSON:  No objection.

22       THE COURT:  All right.  The exhibit will be

23 admitted.

24       MR. O'DEAR:  And I'm just offering this page,

25 Your Honor.

1          THE COURT:  All right.

2          MR. O'DEAR:  This is Exhibit 239, Page 2277.

3  BY MR. O'DEAR:

4  Q.    And this is the Job Safety Analysis, Mr. Vera,

5  for the clear neck position at Finney County.  This is

6  the position that you testified you worked in, correct?

7  A.    Yes.

8  Q.    And the safety equipment required in this

9  position is mesh apron, shin guard, mesh glove, polar

10  glove, and arm guard and polar sleeve, correct?

11  A.    Well, supposedly that's what this document here

12  is saying.

13  Q.    Okay.

14          MR. O'DEAR:  Can you scroll down just a bit.

15          All right.  That's it.  I just wanted to make

16  sure we had all of the equipment.

17  BY MR. O'DEAR:

18  Q.    There was -- are you familiar with the phrase

19  sunshine time?

20  A.    No.

21  Q.    Do you recall a period of time when you worked

22  at Finney County where if the team was able to

23  slaughter the number of cattle that was scheduled that

24  shift in less than eight hours, you still got paid for

25  a full shift but you got to go home early?

80

```
 1   A.     Yes.

 2   Q.     And can you remember how many years that lasted

 3   while you were working there?

 4   A.     I don't remember.

 5   Q.     Okay.  There were times, were there not, when

 6   you and the others on your team were able to kill the

 7   number of cattle that had been scheduled in an amount

 8   of time less than your normal shift, right?

 9   A.     Correct.

10   Q.     And on those occasions, you got to go home early

11   but you still got paid for the full shift, right?

12   A.     Correct.

13   Q.     Okay.  You -- you testified, sir, on direct,

14   about restroom breaks.

15   A.     Yes.

16   Q.     And my question is, it's true, is it not, that

17   if you needed a restroom break during production time,

18   that what you did is you would ask a supervisor, the

19   supervisor would arrange to have your spot filled, and

20   then you would be given your restroom break, is that

21   correct?

22   A.     Yes.

23   Q.     You were -- the entire time you were at Tyson

24   you were never denied a restroom break, were you, sir?

25   A.     No.
```

1  Q.    You testified about the clear neck position

2  where you worked, I believe, most of your time with

3  Tyson but you do understand, do you not, that different

4  jobs in that same department require different

5  equipment, correct?

6  A.    Yes, sir.

7  Q.    For example, the worker who puts paper on the

8  hide wears a lot less equipment and a lot less

9  protective clothing than you did on the clear neck

10 position, correct?

11         MR. ANDERSON:  Objection, calls for

12 speculation.

13         THE COURT:  Overruled.

14 A.    Yes.

15 BY MR. O'DEAR:

16 Q.    And there were other positions in slaughter that

17 wear less protective gear than you had to in your

18 position with clear neck, right?

19 A.    Yes.

20 Q.    In fact, would it be accurate to say that you

21 probably in that position put on more protective

22 equipment than probably anybody in the plant?

23 A.    Well, possibly, yes.

24 Q.    Okay.  And that protective equipment was worn by

25 you to protect you from injury, wasn't it, sir?

1  A.     Yes.

2  Q.     The primary benefit of all that equipment that

3  we see here in front of you was to protect you from

4  injury so that you got to go home in the same condition

5  that you were in when you went to work, isn't that

6  true?

7  A.     Of course, yes.

8  Q.     The -- all the various jobs in slaughter, we've

9  seen an exhibit that lists all these jobs, you are not

10 familiar with all of the different equipment

11 requirements and personal practices and preferences of

12 all the workers in those other jobs, are you, sir?

13 A.     No.

14 Q.     And you never worked on the processing side of

15 the plant at all, did you?

16 A.     No.

17 Q.     And you don't know what goes on on -- in the

18 processing side in terms of equipment or break periods,

19 do you, sir?

20 A.     No.

21 Q.     Can we agree, sir, that people that are coming

22 to the Finney County plant to go to work, they all

23 choose to arrive at the plant at different times,

24 correct?

25 A.     Yes.

83

1   Q.    Some people, like yourself, like to get there

2   early and get dressed at a relaxed pace and others like

3   to come closer to the shift time and get with it and

4   get dressed fast, correct?

5   A.    Correct.

6   Q.    I believe that you testified here, and also I

7   know in your deposition, that your routine was to come

8   in early, put on your white uniform, your boots, your

9   hair net and your hard hat, and then you liked to go to

10  the cafeteria and have coffee, correct?

11  A.    Correct.

12  Q.    But not everybody did it that way, did they?

13  A.    No.

14  Q.    And then after you had some time to relax and

15  socialize and have your coffee, you would go back to

16  your locker room and put on your unique protective

17  items such as the mesh apron and the mesh glove and the

18  knee guards and the other protective items we've

19  discussed?

20  A.    Yes.

21  Q.    Now, you don't believe it would be fair, do you,

22  sir, for Tyson to pay you for the time that -- that you

23  like to go to the cafeteria and have coffee and spend

24  time with friends?

25  A.    I've asked the company to pay me for my time

1  that I go in early for.

2  Q.    And my question, sir, is you wouldn't expect the

3  company to pay you for the time that you like to go to

4  the cafeteria in the middle of getting dressed and

5  having coffee and relaxing with your friends?  You

6  don't expect to be paid for that time, do you?

7  A.    No.

8  Q.    Okay.  And you don't think it would be fair, do

9  you, sir, to have Tyson pay somebody more if they like

10  to get work -- if they like to get dressed for work at

11  a slow pace than what they would pay somebody who likes

12  to get ready for work at a more brisk pace, shall we

13  say?

14  A.    No.

15  Q.    Okay.  Isn't the same thing true at the end of

16  the shift when people get to go home, some

17  people -- some people do -- well, all people do all of

18  those activities at different speeds at the end of the

19  shift, too?

20  A.    Yes.

21  Q.    Some people like to go slower, socialize?  Other

22  people want to do it fast and get out the door.

23  A.    That's right.

24  Q.    During your deposition back in December of 2008

25  you were asked to estimate how much time it took to don

1  or put on these various items, correct?

2  A.    Yes.

3  Q.    And when you were asked to tell us how much time

4  it takes to -- takes you to put on a mesh apron, you

5  said 15 to 20 seconds, correct?

6  A.    I don't remember exactly.

7  Q.    Okay.  Could you pull up your deposition in

8  front of you there?

9       MR. O'DEAR:  Could you show -- turn him to

10  Page 89?  Or I can do it.

11  A.    It's okay, tell him I'm sorry, lawyer, I

12  understand English but I can't read it.

13  BY MR. O'DEAR:

14  Q.    But I can't what?

15  A.    Read it.

16  Q.    Oh.  Would it be possible then, Ms. Chavez, for

17  you to read it?

18       THE INTERPRETER:  If it pleases the Court.

19       MR. O'DEAR:  Your Honor, is that permissible?

20       THE COURT:  Absolutely.

21       MR. O'DEAR:  Ms. Chavez, I just -- would you

22  please confirm that you were also the translator in the

23  deposition?  Is that correct?

24       THE INTERPRETER:  I was in fact the

25  interpreter.

86

1          MR. O'DEAR:   Okay.

2          THE INTERPRETER:   In the deposition.

3   BY MR. O'DEAR:

4   Q.    Okay.  Page 89, Lines 15 and 16.  When we asked

5   you to say how long it took you to put on a mesh apron,

6   your answer was 15 to 20 seconds, correct?

7   A.    Approximately.

8   Q.    Okay.  And on your knee shields your estimate

9   was 30 seconds.

10  A.    It's possible.

11  Q.    And the mesh glove your estimate was 20 seconds,

12  correct?

13  A.    Okay, and that's fine.

14  Q.    And the polar glove your estimate at Page 90,

15  Lines 5 and 6, was 30 seconds, correct?

16  A.    I'm sorry, 90 seconds?

17  Q.    No, 30 seconds at Page 90.

18  A.    Approximately.

19  Q.    And your estimate on the plastic arm guard that

20  we actually saw you put on in court here today was five

21  seconds.

22  A.    Okay, that's fine.

23  Q.    Okay.  And the polar sleeve, you also showed us

24  how you put that on today.  Took -- took you, what?

25  Approximately five seconds to put that on?

1    A.    I didn't look at my watch.

2    Q.    Okay.  Now those are the items that I just

3 listed are the required, unique items for your

4 position.  I wanted to also cover the standard items.

5         And the first one is at Page 88, Lines 16 to

6 25, and the earplugs you estimated at ten seconds,

7 correct?

8    A.    Yes.

9    Q.    The steel toed boots you estimated at 15

10 seconds, correct?

11   A.    It's approximately.

12   Q.    The hard hat you estimated at five to ten

13 seconds?

14   A.    Okay.

15   Q.    And the hair net you estimated at five seconds,

16 correct?

17   A.    Yeah.

18   Q.    Now, I believe you were also asked about some

19 other optional items for your position.

20         MR. O'DEAR:  And this one, Ms. Chavez, is at

21 Page 90, Lines 9 and 10.

22 BY MR. O'DEAR:

23   Q.    The yellow sleeves you estimated at 20 to 25

24 seconds, correct?

25   A.    Okay.

```
 1   Q.    The plastic apron you estimated at 20 seconds,

 2   correct?

 3   A.    Yes.

 4   Q.    The safety glasses you estimated at five

 5   seconds, correct?

 6   A.    Yes.

 7   Q.    The knife sheath that you explained today, you

 8   estimated at 30 seconds?

 9   A.    It's possibly.

10   Q.    The cloth glove you estimated at ten seconds,

11   correct?

12   A.    Okay.

13   Q.    And the plastic glove, last item, you estimated

14   at ten seconds, correct?

15   A.    That's fine.

16   Q.    Okay.  You were also asked about how long it

17   took to take off these items.  This is at Page 101,

18   Line 12 where we'll start.

19         You estimated it took about a minute to take

20   off your gloves, correct?

21   A.    It's possible, I -- I don't remember very well.

22   Q.    Okay.  But that was your estimate on the day of

23   your deposition, correct?

24   A.    Yes.

25   Q.    And the mesh apron you estimated would take you
```

1  30 seconds to take that off, correct?

2  A.    Okay.

3  Q.    The sleeves you estimated 10 to 15 seconds to

4  take off?

5  A.    Approximately, yes.

6  Q.    And the knee shields you estimate approximately

7  ten seconds to take off during your deposition,

8  correct?

9  A.    Yes.

10  Q.    Now the taking off of your hard hat and hair

11  net, that just takes a few seconds, maybe five seconds

12  or so, right?

13  A.    That's right.

14  Q.    Earplugs, takes just a couple of seconds to pull

15  them out?

16  A.    Yes.

17  Q.    And the boots, taking off boots, would you say

18  it takes 20, 30 seconds?

19  A.    I just -- just never checked my watch, um, when

20  I was putting on or taking off any of these things.

21  Q.    Okay.

22        MR. O'DEAR:  No further questions, Your Honor.

23        THE COURT:  All right.  Thank you.

24        Redirect?

25        MR. ANDERSON:  Thank you, Your Honor.

90

REDIRECT EXAMINATION

BY MR. ANDERSON:

Q.    Mr. Vargas, I've put in front of you what's been marked Exhibit 239, Page 2277, the Job Safety Analysis for clearing neck.

When -- when Tyson told you what equipment to -- that you had to wear for your job, did they give you this document?

A.    No.

Q.    How did you know what clothing and equipment you were supposed to wear?

A.    Because we're -- when they're giving us the training the supervisor or the director who is in charge of the classes, they are the ones that will tell us what type of clothing is going to be required.

Q.    Did Tyson give you an option not to wear any of the clothing or equipment you testified to here in your testimony today?

A.    Never.  Never.  The supervisor said this is the equipment that you are going to be using, and there was never anything else.

Q.    Did Tyson's supervisors go into the locker room to supervise the process of everyone putting on their clothing and equipment?

A.    No.

1   Q.    They just let you do it on your own?

2   A.    Yes.

3   Q.    They left it to your judgment about when and how

4   to do it?

5   A.    Yes.

6   Q.    If Tyson's supervisors had supervised that

7   process or told you a particular time or way to do it,

8   would you have complied with the instructions?

9   A.    Yes.

10  Q.    Did you just do what you were told?

11  A.    Yes.

12        MR. ANDERSON:  Your Honor, I have no further

13  questions, other than if Mr. O'Dear has no other

14  questions, I would request to publish some of these

15  items to the jury while the next witness comes on.

16        THE COURT:  Any objection, Mr. O'Dear?

17        MR. O'DEAR:  Not at all and publishing.

18        I forgot to move admission of Exhibit 270, the

19  pay stubs, but I have no further questions.

20        THE COURT:  Any objection?

21        MR. ANDERSON:  No, sir.

22        THE COURT:  All right.  That will be admitted

23  as well.

24        All right.  You can go ahead and publish

25  those.

1           Any recross, Mr. O'Dear?

2           MR. O'DEAR:  No.

3           THE COURT:  All right.  Sir, you may step

4    down.  Thank you so much.

5           And your next witness?

6           MR. ANDERSON:  Will be Doctor Robert Radwin.

7           THE COURT:  All right.

8           (Exhibits published to the jury.)

9           MR. MUELLER:  Your Honor, may I be excused for

10   one minute?

11          THE COURT:  Sure.  Well, folks, I anticipate

12   this will probably be our last witness of the day.  We

13   are going to take a break just right before noon for 20

14   minutes, then we'll come back and go 'til 1:30 again.

15          How's that schedule working out for you?  Does

16   it give you time in the afternoons to get after some

17   things?

18          JUROR 8:  Great.

19          THE COURT:  You know, of course what you see

20   in the courtroom is about somewhere between one-third

21   and one-half of what's going on in the off hours and

22   back in the days when I was trying cases, I always felt

23   like we lost the jury about 4 o'clock and that that

24   last hour was pretty much useless.  Additionally, there

25   were jurors who were worried about getting to work or

1   being able to take care of other things and as lawyers,

2   our clients were still calling, even when we were in

3   trial so the chance to get back to them and to still

4   have time to adequately prepare for the next day was

5   really important.

6        When I thought about doing this schedule, a

7   lot of people said you've got to be crazy, but you

8   still can do it and it's just worked out pretty well.

9   After people get past getting up that early in the

10  morning and getting around, which for me has been the

11  single, hardest part because I'm not an early morning

12  person, but once we get past that, people kind of get

13  settled in to it and it seems to work out pretty well.

14        So, and it sounds like we might be to really

15  bad rain that's supposed to come in late this afternoon

16  when we recess today, too, and maybe tomorrow we won't

17  all be flooded but I guess we'll see.

18        We all set to go?

19        MR. DIRKS:  We're ready to go, Your Honor.

20        THE COURT:  All right.

21        MR. DIRKS:  Plaintiffs call Doctor Robert

22  Radwin.

23        THE COURT:  Thank you.

24        (Witness is sworn.)

25        MR. DIRKS:  You are going to hear testimony

1  from Robert Radwin here, he is a professor at the

2  University of Wisconsin.  He's has a PhD in industrial

3  engineering and his experience in performing time

4  studies.

5          Doctor Radwin went out to the Finney County

6  plant and has done a study, sent a team of

7  videographers to record and collect data of pre and

8  post shift activities and meal period activities.

9  Which you are going to see a few examples of.  Then

10  they took the videos and they -- they measured the time

11  that these folks are donning and doffing and waiting

12  and you'll be able to see that.  And that's all

13  compiled into some final analysis which we'll also talk

14  about.

15          These videos may be one of your only chances

16  to see, really see inside the facility, see what's

17  going on, see how long it takes folks and one of the

18  things you are going to see is -- is not only inside

19  the facility but and not only just the time it takes to

20  put on an article of clothing but the -- a real world

21  environment and that's what we are going to try to show

22  you with Doctor Radwin.  So, without further adieu...

23                  ROBERT RADWIN,

24  called as a witness on behalf of the Plaintiffs, having

25  been first duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. DIRKS:

Q.   Doctor Radwin, could you please introduce
yourself to the jury.

A.   I'm Robert Radwin.

Q.   And were you hired by plaintiffs in this case?

A.   Yes.

Q.   Okay.  And what were you hired to do?

A.   I was asked to design and conduct a study of the
amount of time that employees at Tyson spend donning
and doffing according to the continuous workday
principle.

Q.   Okay.  And could you tell the jury a little bit
about your background?

A.   I have a PhD in industrial engineering and I'm a
professor at the University of Wisconsin.  I teach
industrial engineering and ergonomics and I do research
at the University.

Q.   And you teach undergraduate level courses?

A.   Undergraduate and graduate.

Q.   Both.  Have you performed other time studies?

A.   Yes, I have.

Q.   Let's talk about that a little bit.  What types
of time studies have you performed?

A.   Well, just various types of time studies that

1   industrial engineers perform.  Some of them are used to

2   set time standards, some of them are used for process

3   improvement to identify ways that you can improve jobs.

4   Some of them, like the study I did, was to just measure

5   how much time people spent doing things for the purpose

6   of quantifying that and hopefully for improving the

7   process.

8   Q.    Have you testified in connection with other

9   lawsuits?

10  A.    Yes, I have.

11  Q.    Have you testified -- or not testified, excuse

12  me.

13        Have you done work with companies?

14  A.    Yes.

15  Q.    Time study work?

16  A.    Yes.

17  Q.    Have you worked with the federal government?

18  A.    Yes, I have.

19  Q.    Okay.  I actually want to take that and go

20  backwards.

21        Tell me about the work you've done with the

22  government.

23  A.    I was hired by the U.S. Department of Labor to

24  do a study at a pork processing plant on the topic

25  that's similar to the topic that we are talking about

1  here today.

2  Q.    And then tell me a little bit about the work you

3  have done for companies.

4  A.    So, um, when -- when I do the study, when I did

5  the study for the Department of Labor, they -- they

6  came to me with a problem they wanted to know how you

7  can measure the amount of time that employees spend

8  donning and doffing in this plant, and this was back in

9  the early -- well, around mid-1990s when we were

10 developing software that we used for our studies.  And

11 an attorney from the Department of Labor saw my website

12 and saw the software and he said I think that maybe

13 this guy can help me measure what I'm trying to

14 measure.  So, he took me to this plant and we did -- we

15 looked at the various processes there and I designed a

16 study.

17       Companies have also asked me to do similar

18 studies and help them measure how much time employees

19 spend donning and doffing and I have done lots of other

20 things with companies besides.

21 Q.    And those -- the ones with the companies would

22 be outside of the context of litigation?

23 A.    I'm not exactly sure if there was litigation

24 that motivated some of the studies but I was hired on

25 behalf of the company as a consultant to make these

1  kind of measurements.

2  Q.    Okay.  And you also mentioned in connection with

3  lawsuit or actual lawsuits, have you worked for both

4  plaintiffs and defendants?

5  A.    Yes.

6  Q.    Have you performed studies in other meat packing

7  plants?

8  A.    Yes, I have.

9  Q.    Other beef plants?

10  A.    Yes, beef plants, I've done studies in poultry

11  plants, turkey plants, pork plants, and many different

12  types of meat processing, food processing facilities

13  and electronics facilities, similar types of studies.

14  Q.    Do you recall, Doctor, when you were retained in

15  this case?

16  A.    Yes, it was around September of 20 -- well,

17  September of 2009.

18  Q.    2009?

19  A.    Um, yes.

20  Q.    And were you retained by the plaintiffs in this

21  case?

22  A.    Yes, I was retained by your law firm.

23  Q.    Are you being compensated for your work?

24  A.    Yes, I am.

25  Q.    Can -- can you tell me how much you have been

1  paid for -- and you've earned, and the team has earned,

2  for this study?

3  A.    Yeah, the -- the total, um, amount includes the

4  costs and compensation for like my students, my

5  videographers, my assistant and myself was over

6  $100,000.

7  Q.    And did you ultimately perform a time study in

8  this case?

9  A.    Yes, I did.

10  Q.    And what did that time study measure?

11  A.    So, I did a study, um, according to the

12  continuous workday to measure a reasonable amount of

13  time that employees spend donning and doffing during

14  the various times of day when employees do those

15  activities.

16  Q.    Is it -- and you testified you're an industrial

17  engineer?

18  A.    Yes.

19  Q.    Is it common for industrial engineers to perform

20  time studies?

21  A.    Yes, industrial engineers have been doing time

22  studies for over a hundred years.  The field of

23  ergonomics that my research is in is based on measuring

24  the amount of time that people spend doing different

25  things.

1  Q.    Can you tell me a little bit about the different

2  types -- types of time studies industrial engineers do?

3  A.    Well, so, we talked about some time studies are

4  used to measure time standards and sometime studies are

5  used for quantifying various amounts of time.

6        The work that I do is in the occupational

7  health and safety area and a lot of my research

8  involves designing ways to measure how much time people

9  are exposed to different hazards in the workplace.  I

10 did a lot of work on vibration and how much time people

11 are exposed in vibration.  Some of the methods that I

12 developed and the software that I developed is based on

13 those kinds of studies.

14 Q.    And is that the kind of study you did here?

15 A.    Basically, the study involved using videos

16 to -- to observe the various activities that we wanted

17 to study and then quantify that time.

18 Q.    I want to talk to you -- and you -- I think you

19 already testified, you did perform a time study in this

20 case?

21 A.    Yes, I did.

22 Q.    I want to talk to you about the process that you

23 went through in -- from beginning to end with the time

24 study.

25        How did -- how did you get started?

1   A.    Well, so the first step is to understand what

2   I'm being asked to measure and so I spoke with Mr.

3   Dirks and he explained to me the legal principle that

4   he was trying to measure and then he took me to the

5   plant and traveled to Tyson beef processing plant,

6   observed different areas where donning and doffing

7   occurs, the locker room, the hallways, went on to the

8   production floor, I observed all the different types of

9   areas that this lawsuit was concerned with and then I

10  designed a study that would allow me to make a

11  reasonable measure of how much time employees spend

12  donning and doffing.

13  Q.    You mentioned you visited the facility with me.

14  When was that?

15  A.    That was in January of 2010.

16  Q.    Was anybody else there?

17  A.    Yes, I took my assistant scientist, Tom Yen,

18  with me.

19  Q.    And who's Tom Yen?

20  A.    He's a former student, has a PhD from my

21  laboratory in industrial engineering and he assists me

22  in research that we do and in some of these time

23  studies.

24  Q.    And what was your purpose of making this trip?

25  A.    So the purpose was to design the study and I

1  wanted to understand where to -- to video because the

2  method that I use is to videotape all or video all of

3  the activities and so in order to do that and to have a

4  study that's accurate and representative, you need to

5  figure out where the videographers are going to be

6  stationed and the flow of people who come in to the

7  plant and go on to the work floor and how they come off

8  the work floor, cafeterias, locker rooms, and so the

9  initial visit was to understand what those activities

10  were and make a time study.

11  Q.    And so after the initial visit, what did you do

12  next?

13  A.    So the next step was to -- to design the study

14  and then I had my videographers, I had six

15  videographers visit the plant and spend several days

16  there making videos of the various activities using a

17  procedure that I had developed for the study.

18  Q.    So the next step, you sent the videographers,

19  tell me a little bit about who they are.

20  A.    So, the videographers have all worked on similar

21  projects with me, some of them are former students,

22  some of them are graduate students, students who are in

23  between undergraduate and graduate school, and I know

24  them all from the university and they were hired to

25  video the employees during donning and doffing, but the

1  major qualification is they have to be agile enough to

2  be able to walk around the plant and follow employees

3  through the various stages of donning and doffing, and

4  go on to the plant floor.  They have to follow the

5  instructions and they have to be respectful of the

6  employees.

7  Q.    Was Tom Yen there as well?

8  A.    Yes, so Tom Yen was the supervisor, the

9  coordinator.  We communicated with Tyson management

10 about when different shifts were going to start and end

11 and so he coordinated when and where the different

12 videographers would go and follow the procedure that I

13 had designed.

14 Q.    When did Mr. Yen and the videographers visit the

15 Finney County plant?

16 A.    That was in May of 2010.

17 Q.    And how long were they there?

18 A.    They were there for three days.

19       MR. DIRKS:  Is it competing with the --

20       MR. HANSON:  It's right, go ahead.

21 BY MR. DIRKS:

22 Q.    I want to talk to you about the points in the

23 day that you followed, that you had your camera people

24 follow.

25       The -- was the first part of the day that you

1  collected data from the beginning of the -- of the day?

2  A.    Yes, so this is a -- a timeline of -- of the

3  work day and what we wanted to do at the beginning of

4  the shift was video employees as they entered the plant

5  and we had a process that randomly selected employees

6  who entered the plant at the start of this timeline, at

7  the gray line, and then we followed them through this

8  timeline from all the donning and putting on the

9  different garments and PPEs and until production

10 starts.

11        And so we covered from the gray line all the

12 way to the point that, well, it shows 6:00 a.m. where

13 production starts.  And we videoed every activity that

14 the employee performed, as much as we could, until they

15 started working with product.

16 Q.    And then at the end of the shift, let me show

17 you, post shift slide, did you video at the end of the

18 shift?

19 A.    Yes, so at the end of the shift, my

20 videographers were stationed at random work stations on

21 the line.  And they waited for the -- the randomly

22 selected employee to finish working with the meat

23 product, so it was the last piece of meat that left and

24 then they videoed the employee leaving the line,

25 cleaning, sanitizing, doffing their equipment and then

1  followed them all the way until they left the plant.

2          MR. DIRKS:   Thanks, Ms. Davis.

3  BY MR. DIRKS:

4  Q.    And then did you have your team follow folks

5  during the lunch period?

6  A.    Yes, so during the lunch period it was kind of

7  similar to what we did at the end of the day, we knew

8  when lines were going on break and so the videographers

9  were assigned to random employees, they waited for the

10  last piece of meat to pass at the break and then

11  videoed them leaving the line and doffing their

12  equipment, until they were ready to go to the -- to the

13  break room or wherever they were going to take their

14  break.

15          Then after the break, the videographer stayed

16  with that person, and the employee was in the cafeteria

17  the videographer waited outside and watched for the

18  person to get up and leave and then they videoed them

19  going back on to the line, donning their equipment and

20  waiting until they arrived again after the break.

21  Q.    Did your team, when they are at the Finney

22  County plant, did they have unlimited access to the

23  plant?

24  A.    No.

25  Q.    Could you tell me a little bit about that?

1   A.      So, we were permitted three days in the plant

2   and they had only been in the plant and on the floor

3   during the times when donning and doffing occurred.

4   Q.      What -- what actual type of information, I think

5   you mentioned video cameras, maybe you already -- maybe

6   you already told us, but from the start of the

7   day -- there we go -- from the start of the day, these

8   video cameras, you testified to that, was there any

9   time that they were not videoing folks?

10  A.      Yeah, there were certain areas that they weren't

11  allowed to video.  One was on the production line,

12  there were areas in the center of the production lines

13  that they weren't allowed to take the cameras and so

14  they had to stand outside and so there were times when

15  you don't see the employee fully donning or doffing and

16  that's cut short the time that we measured.

17          We also weren't allowed into the locker rooms

18  out of respect for the employees.  There were restrooms

19  in the locker rooms and employees changed, and so we

20  developed a procedure to document the donning and

21  doffing activities without having to video in the

22  locker room.

23  Q.      So how did -- how did that work?  I'm a camera

24  man and I'm following somebody with my camera.  What do

25  I do when I get in a locker room?

1  A.    It's -- there was a procedure when an employee

2  walked in to the locker, the camera operators put the

3  lens cap on the camera and then they carried the camera

4  in their hand and but walked inside the locker and then

5  as employees donned or doffed different items they

6  would announce that in the microphone and so we would

7  have a record of the precise time when different items

8  were donned or doffed.

9  Q.    Now was your team able to follow everybody in

10 the plant?

11 A.    Um, no, they didn't follow everyone.  We sampled

12 a number of employees to get a

13 representative -- representative sample of what

14 different employees in different areas of the plant,

15 different shifts, different departments, and that made

16 up our study.

17 Q.    Why not follow everybody?

18 A.    Well, for one thing, it's not possible to follow

19 everybody, there is just too many people to follow.

20 And you don't need to.  You can sample, and if you do

21 it in a proper way, you can get a very good estimate

22 within the boundaries of what we need to estimate to

23 know how much time it takes.

24 Q.    You talked a little bit about individuals who

25 were followed were randomly selected.  Can you give me

1  a little more detail and give the jury a little more

2  detail about how that worked?

3   A.    Yeah, there was a procedure that we used, at

4  different times of day, so in the start of the day, the

5  videographers stood at the entrance and all the

6  employees and there were two departments that we

7  studied, there was a slaughter department and a

8  processing department, and each department had its own

9  entrance.

10       Employees came to those entrances, so each

11  videographer was assigned a random number and we looked

12  up random numbers in a random number table, there is a

13  computer program that does it actually, and they

14  counted the number of people who passed through the

15  door, and when that random number came up that they

16  were assigned, then the videographer would videotape

17  that person.

18       So the videographer didn't know who they were

19  going to video, the person who was walking through the

20  door didn't know they were going to be videoed, and

21  then after that person was selected, then the next

22  videographer would count people coming through.

23       And we set up the random number so we can

24  divide up pretty evenly, about half the number of

25  people we anticipated coming through the door and we

1  did that the early part of the shift, and then later,

2  and then to the later half of people who would arrive

3  because we knew approximately how many people were in

4  the department, and that worked out pretty well, we

5  were able to get good distribution of people.

6          On the line, when people were going to break,

7  that was a lot easier because we can count how many

8  people are working on different production lines and

9  assign a random number to that, and then videographers

10  were assigned randomly to different people on the line

11  and they would follow them and we would do the same

12  thing at the end of the day as well.

13  Q.    So, at the -- at the beginning of the day,

14  you -- you've just got no idea, somebody is going to

15  walk through the door, and your videographers had a

16  number when they were up, that number, and you followed

17  that person?

18          MR. MUELLER:  Objection, leading.

19          MR. DIRKS:  Yeah, I did.

20          THE COURT:  Sustained.

21          MR. DIRKS:  I'll rephrase.

22          THE COURT:  Thank you.

23  BY MR. DIRKS:

24  Q.    So, the -- the videographers, at the beginning

25  of the day, did they know what -- where the person was

Jana L. Hoelscher, CSR, RPR, CRR, RMR
United States Court Reporter

1  coming through the door would end up working on the

2  line?

3  A.    No, they didn't.  We had a -- a person from

4  Tyson stand at the entrance with the videographers and

5  he informed us if somebody was not a production worker.

6  So, for example, if a manager came through the door,

7  then we exclude that person from the count because we

8  know that the person wasn't a production employee.

9         And so that helped us identify a lot of the

10 people and exclude people from the study.

11 Q.    Then the -- the folks at lunch and at the end of

12 the shift, they weren't coming through a door.

13 How -- how were they selected?

14        What -- what pool of people were they selected

15 from?

16 A.    So we knew the departments that -- and the lines

17 that were interested in studying, so they were working

18 on the line and we can count how many people are

19 working on each line and assign a random number to that

20 line, to -- to, you know, to those lines and have

21 videographers video random people and we know exactly

22 where they are coming from, what department they are

23 working in, we can follow them doffing and donning

24 after the break or at the end of the day.

25 Q.    Okay.  Are you aware that some of the folks who

1 were followed may not have worked directly on the line?

2 A.    Yes, some -- sometimes some of the employees

3 that we selected at the start of the day, because they

4 walk in we don't know what department they are going to

5 work in, they don't work on the line but they did a lot

6 of the same things that production employees do, they

7 donned their -- the same types of equipment, and so we

8 videotaped them and that gave us a lot of good

9 information about how much time it takes to don the

10 same equipment, whether they worked on the line or not.

11 Q.    Was your team able to make observations in both

12 processing and slaughter?

13 A.    Yes.

14 Q.    So, your -- your team finishes collecting the

15 data, what do you do next?

16 A.    So we've made videos, we have a hundred videos

17 in the Finney plant and we take them back to the

18 laboratory and we play the videos using the software

19 that I talked about a little earlier and the software

20 allows us to identify the activities that signify the

21 start of the donning or the end of doffing, and we can

22 mark that on the computer program and then measure the

23 amount of time that it takes between those points.  It

24 kind of works like a timeline.

25 Q.    Let me show you what's been marked as Exhibit

1  384A.

2          MR. MUELLER:  Eric, are you going to use the

3  same one that we did?

4          MR. DIRKS:  I've got it on paper, trusty

5  back-up.

6          Oh, okay.

7  BY MR. DIRKS:

8  Q.    Are -- are these the times that you were talking

9  about?

10  A.    Yes, so this is a table from the report that I

11  submitted and it describes the four activities that I

12  studied and it describes the event that started the

13  timing and then the event that ends the timing.

14          So, for example, at the start of the shift I

15  wanted to start timing when employees first acquired an

16  item for work, like a helmet or hair net or one of the

17  other items that were involved in the continuous work

18  day, and so when an employee acquired that item, that

19  started the time.  And the time kept running until the

20  employee starts production work.

21          And that was an estimate of their donning time

22  before production work, the time that they're spending

23  before they're compensated.

24  Q.    So that's the number one, if you read it across?

25  A.    That's correct.

1  Q.    Um, so -- go ahead.  Or if you would talk about

2  number two?

3  A.    Sure.  So the second one is doffing at the start

4  of a meal break and we identified the point where an

5  employee stops production work and then they go about

6  doffing and sanitizing, cleaning, and then when they

7  completed all of the doffing, then that is the end of

8  doffing at the start of the meal.

9        The same employee is -- is observed donning at

10 the end of a meal break and so we videoed them

11 acquiring the -- the first item for work, so if it's a

12 frock or a hair net or whatever the item is, the point

13 where the employee is observed on the video acquiring

14 that item starts the timing, and then we followed them

15 on to the production line, when we hit the line we

16 actually start working with the meat product, then that

17 stops the timing.

18        And then at the end of the shift, it's kind of

19 like the start of a break, when the employee stops

20 their production work, we start the time and then end

21 the time when they have completed donning all of their

22 items for work and usually that's about the time they

23 walk out the door.

24 Q.    Let's take for -- just for example, activity

25 one, the donning and start of shift.

1           Was all of the time from the first acquisition

2  of an item for work to start production work, was that

3  all included in your study?

4  A.    Actually, it wasn't.  In order to be

5  conservative and have a reasonable estimate of

6  activities that might have occurred during that time

7  that were personal were subtracted out.

8           So, for example, if an employee used the

9  restroom, for example, we would identify that they went

10 in to the restroom and when they came out, we would

11 measure that time as well and subtract that restroom

12 time out of the total time.

13 Q.    Was there some waiting time that was subtracted

14 out?

15 A.    Sometimes employees would sit and wait and when

16 that occurred, we also measured that time and

17 subtracted that time out of the total time.

18 Q.    What I would like to do now is -- and hopefully

19 this goes smoothly, is show the jury some examples of

20 the videos and the MVTA software, so I want to try to

21 pull it up and then hopefully we can -- we can talk a

22 little bit while we're watching it.

23          So what I have here is a laptop that has your

24 files.  When the -- when the -- when the videographer's

25 taking film, is that then turned in to some sort of a

1  file?

2   A.    Yeah, the video cameras that we use actually

3  have a hard drive built into the camera, so all of the

4  videos are digital files and we can download those

5  right on to a computer and then play them in our

6  software.

7   Q.    I've got a box up.  Does this look like

8  the -- the types of video files that you just talked

9  about?

10  A.    Yeah, these are the -- the video files that were

11  extracted from the camcorders.

12  Q.    And these are .AVI files?

13  A.    Right.  The camcorder produces files in one

14  format and we convert them into a .AVI file which is a

15  certain kind of file you can play on a computer.

16  Q.    And going to select this one, it says "FC Cam

17  A".  What does that mean?

18  A.    So Finney County is what "FC" stands for.  "Cam

19  A" is Camcorder A.  You can see there's files that are

20  named all the way from Camera A to Camera F.  There is

21  six videographers, each one gets a letter.

22        And then there is a code after that that tells

23  you the date and the actual time when the video file

24  was made.

25  Q.    So, this -- what does this 0521 mean?

1  A.    It was made the Fifth -- May 21st, rather, was

2  the date, and you can see 2000 -- 2010 is the number

3  before that, and so that represents the date, May 21st

4  of 2010.

5  Q.    And then what's the time after the "T"?

6  A.    So, "T" represents time; and then 14 is the time

7  of day, at 2:00 in the afternoon; and then there's a

8  35, so it is 2:35.  And I'm trying to see it here.  52,

9  the 52 seconds.

10         And that tells you the time that the file was

11  created.

12  Q.    Okay.  I'm going to open -- and you see, we have

13  separated your files out into different categories, I'm

14  going to Don Start of Shift Start.  I am going to go

15  ahead and open this one.

16         And what are we looking at here?

17  A.    Sure.  So, this is the software that we have

18  designed in our laboratory and so at first you can see

19  a video window and that's just like any DVD window that

20  you would play on your computer.

21         And you can see there are various buttons that

22  allow you to start playing or to fast forward or rewind

23  the video, just like you would on a DVD player.

24         And then there's a second window and that

25  window is above that, it's called Task Analysis and in

1   that window, you can see three bars and each of those

2   bars are different timelines that were created.  We can

3   make any timelines you want in this software, so the

4   top bar is labeled record one, don/doff and that's the

5   donning and doffing times that we mark on the software.

6           And if you look to the right, there's a list

7   of events and in this particular video, it's donning at

8   the start of the shift, and so that's the black box and

9   so all the bars that you will see that are starter

10  shifts have black lines.

11          If we were looking at doffing at the start of

12  the break, then it would be red and each one is

13  color-coded.

14          Null, that means that that time isn't counted,

15  so that's kind of the clear part on the -- on the

16  timeline.

17          And there are several other timelines I'll

18  tell you about in a little while.

19  Q.    So, there's a blue line right here.

20  (Indicating.)  What does that represent?

21  A.    That's -- so that cursor tells you that that's

22  the precise time that the video screen you're looking

23  at corresponds to.  So you can look at that cursor line

24  and it's going to move across and as it moves across,

25  the video frames will come up and you'll be able to

1  correspond that video frame to where it occurs on the

2  timeline.

3         That's how we actually mark the video is by

4  using that cursor.

5         By the way, each video frame has a unique

6  number and so this big number in yellow LLLL1,

7  represents frame number one, and you can see there is a

8  frame number box up in the top of that text analysis

9  window and that corresponds to the same frame number.

10 And that's how we measure time.

11        In video, each frame is 1/30th of a second.

12 Q.   Okay.  I'm going to press play and hopefully the

13 audio is going to work.

14        And we'll -- we'll walk you through and if

15 there is something that you need to point out, I'll ask

16 that you do that and then ask me to pause if you want

17 to stop and explain something?

18 A.   Okay.

19        (Tape is played.)

20 A.   Can you pause it for a second.

21        So this was an employee who was randomly

22 selected.  The videographer for Camera A had a random

23 number and they didn't run the camera until that number

24 came up, and so the person who they are videoing is

25 just walked through the door and now we're seeing them

1   follow it.

2         If you will look at the cursor, that time

3   hasn't been marked yet as the start of shift time,

4   because the activity, the first acquisition of an item

5   hasn't occurred.

6         Okay.  Start.

7         (Tape is played.)

8   A.    You can see it is very crowded in there, that is

9   why you have to be very agile if you're a videographer,

10  to follow people through there.

11        Now, stop.

12        So, the picture went blank and that's because

13  the lens cap was put on.  This employee was walking in

14  to the locker room and so the procedure for the locker

15  room was put the lens cap on, and keep the camera

16  running so that we can count the amount of time that

17  occurred, but we don't see what is going on in the

18  locker room out of respect for the employees.

19        (Tape is played.)

20  BY MR. DIRKS:

21  Q.    So at this point the camera is still running,

22  it's just --

23  A.    And you can hear.

24        So --

25  Q.    Talking over the -- the videographer, let me

1  back up.

2  A.     So if we go back here, the videographer

3  announced some of the things that are happening but as

4  he announces it, you'll notice that we didn't start

5  timing yet because the acquisition of an item for work

6  hasn't occurred.

7          (Tape is played.)

8  BY MR. DIRKS:

9  Q.     So had this individual acquired an item of

10  clothing or gear, what would have happened right there?

11  A.     Then we would mark that the employee was in the

12  restroom and subtract that time out but we didn't have

13  to do that.

14  Q.     What I want to do is, um, forward to closer to

15  when some action starts happening on your timelines.

16          (Tape is played.)

17  A.     And pause.

18          So, if you listen to the videographer, the

19  videographer is going to announce when the employee has

20  acquired an item and you'll see that it's marked,

21  you'll see how the blue cursor line comes up to the

22  black bar, and that's where it is already marked by the

23  analyst that that had occurred.

24          (Tape is played.)

25  A.     Pause.

1      So, the mesh apron is one of the items that we

2  count as the start of donning and so that starts the

3  time.  So the black bar beyond that is time that's

4  included.

5  BY MR. DIRKS:

6  Q.    How did you determine which time to include and

7  which time not to include?

8  A.    We had a list of items that were -- we were

9  asked to -- to include in the study and that was how we

10 did it.

11 Q.    So, if you had been asked to include the times

12 from someone -- from the time somebody walks in the

13 doors, you could have done that?

14 A.    We could have done that but the idea was to

15 represent the continuous workday, according to

16 acquiring the first item used for work.

17 Q.    Okay.  I'll continue.

18      (Tape is played.)

19 BY MR. DIRKS:

20 Q.    I see there is a white bar approaching.

21      (Tape is played.)

22 A.    Yes, so that white bar will represent another

23 item.

24      So the smock was grasped and that was marked

25 with that white bar.

1          And so on this locker room record, which is

2    record number three, all the items that were acquired

3    and the different activities that occurred in the

4    locker room, which we can't see, is documented by

5    voice.

6              (Tape is played.)

7    BY MR. DIRKS:

8    Q.    So there is a little bit of space until the next

9    black bar and then I'll ask you a couple of questions.

10            How -- how were these --

11   A.    Pause.

12   Q.    How were these black bars inserted into the

13   screen?

14   A.    Yeah, so, um, you -- the analyst can play the

15   video and they have a mouse cursor and there -- the

16   video, if you move this video to the left a little bit,

17   just move --

18   Q.    Right here?

19   A.    Just take the whole -- the video.

20   Q.    Oh, the whole window?

21   A.    Yeah, move it to the left.  You'll see there is

22   some buttons in the lower right-hand side and you can

23   press those buttons to insert different events, which

24   is how it's done.

25            But you don't have to do it in realtime, you

1  can pause the video, and actually you can slow it down,

2  make it go in either direction and identify the exact

3  point where you want to insert that, and then press a

4  button.

5         I'll show you an example of that when the

6  video is outside of the locker room.

7  Q.    And I'm going to go ahead --

8  A.    Can you advance it?

9  Q.    -- just forward here.

10        (Tape is played.)

11  A.    So now we're out of the locker room and we're

12  following the -- the employee.

13        Can you pause for a second?

14        So the employee is the person in the white

15  helmet and if you just roll on the -- on the mouse

16  well, you can kind of see how -- if you roll it forward

17  and backward, roll it just -- no, no, yeah, there you

18  go, just that wheel on top of the mouse.

19        There you go.

20        You can see how we can kind of move the video

21  frame by frame and that's what the analyst does, is

22  they find the precise point where the event occurs and

23  that's how they mark it on the software.

24  BY MR. DIRKS:

25  Q.    Does that -- does that apply in the locker room

1  as well?

2   A.    Well, in the locker room, we -- we do a

3  procedure that's kind of like that.  You can't see the

4  activity occur when this occurs, so you have to listen

5  first, stop the video, and then back it up, to the

6  point where the sound just begins.  And that's when you

7  mark it.

8           (Tape is played.)

9   A.    You can see the employees putting on hearing

10 protection.

11          (Tape is played.)

12 BY MR. DIRKS:

13  Q.    Now he's not moving, is this time excluded?

14  A.    No, he's still working with his gloves and

15 you'll see that he is still donning equipment.

16          (Tape is played.)

17  A.    He was putting on a plastic guard.

18          (Tape is played.)

19  A.    Now the employee is on the production line.

20          He's walking to his work station.

21          (Tape is played.)

22  A.    Can you pause?

23          So, what you are seeing is a zoom lens on the

24 employee, we couldn't -- we weren't allowed to go to

25 the work station because it was an interior part of the

1  production line, so the -- we couldn't see the actual

2  time here when meat arrived and I don't think that you

3  can see the meat from on the line yet, but if you look

4  at the timeline, we marked it at the point where he

5  arrived at the line and it -- it's less time than

6  actually until you worked with -- with meat but it was

7  the best view that we could get and that's when we

8  marked it as the end of doffing -- donning.

9  BY MR. DIRKS:

10  Q.    And so this blue line, now that -- it is in the

11  white, what does that indicate?

12  A.    That means that the time in the white area

13  doesn't count as part of the donning time, so the

14  donning time is the time between the start of the black

15  bar and the end of the black bar, it is a timeline

16  that's created.

17  Q.    I just want to be clear, this is --

18         THE COURT:  Let's go ahead and take our first

19  -- or our last break, actually, of the morning.

20         We'll be in recess, folks, until 12:25, 12:25.

21         I remind you, again, you're not to discuss

22  this case or any aspect of it among yourselves or with

23  anyone else.

24         Thank you so much.

25         (The jury leaves the courtroom.)

1          THE COURT:  Sir, you can go ahead and step

2  down.

3          (Recess taken from 12:03 p.m. until 12:30

4          p.m.  Proceedings commence outside the

5          presence of the jury.)

6          THE COURT:  Bring them in.

7          (The jury enters the courtroom.)

8          THE COURT:  Go ahead and have a seat, folks.

9          Mr. Dirks, would you look and make sure your

10  microphone is on?

11          MR. DIRKS:  Testing.

12          THE COURT:  Okay.  We're just not picking you

13  up quite as well.

14          MR. DIRKS:  It seemed like it came up and then

15  went down.

16          THE COURT:  All right.  Thank you.

17          Well, you may proceed, thank you.

18  BY MR. DIRKS:

19  Q.    Doctor Radwin, before the break we had just

20  finished up this video and I just had a couple final

21  questions for you.

22          The time here and the time here,

23  is -- that's -- is that -- is that minutes and seconds

24  or is that something different?

25  A.    No, that's -- that's the frame number.  Each

1  video frame has a unique number and that's displayed

2  there and so the next frame would be 1/30th of a second

3  after the previous one.

4  Q.    So I want to make sure I'm understanding this.

5        How many frames in a second?

6  A.    There is 30 frames in one second.

7  Q.    Okay.  That was a pre-shift.

8        What I would like to do now, is pull up a post

9  shift.

10       I went back one to many.  Okay.

11       And I want to show you a break.

12       (Tape is played.)

13  BY MR. DIRKS:

14  Q.    Now you see the camera is pointed down.  Can you

15  explain why?

16  A.    Yes, can you pause, please.

17       So, now we're on the production floor and the

18  videographers aren't permitted to video the actual

19  production work, so we want to keep the camera running

20  because we want to catch the exact time when we need

21  the last piece of meat passes.  The camera is pointed

22  down and you'll see the camera go up just before the

23  meat leaves the work station.

24       (Tape is played.)

25  BY MR. DIRKS:

1  Q.    I'm going to go ahead and forward through.  This

2  was the -- we just watched that.

3          (Tape is played.)

4  A.    So you saw one of the employees leave that line

5  but the employee that was selected isn't leaving yet.

6          And now -- pause.

7          And now, the employee who was randomly

8  selected is the person whose head is being chopped off

9  by that piece of equipment but you saw that he just

10  started to remove a glove and so if you look at the

11  don/doff timeline, the red bar has already started

12  timing because that's when the glove was start -- when

13  they started to doff the glove.

14          (Tape is played.)

15  A.    Pause.

16          So, he's now completed doffing and you can see

17  he is walking away from the area where he hung up his

18  equipment and the red line is at the end now,

19  the -- the red bar, rather, is at the end because that

20  is the end of doffing at the start of the break.

21          (Tape is played.)

22  BY MR. DIRKS:

23  Q.    Now I'm going to try to pull up this same

24  individual on his way back.

25  A.    You need to go to a different --

```
 1   Q.     That's right.

 2   A.     -- directory.

 3   Q.     We are now at Don Break End.

 4          (Tape is played.)

 5  BY MR. DIRKS:

 6   Q.     I'll forward it a little closer.

 7          Is this the same individual?

 8   A.     Uh, pause.

 9          So we can't see the employee that we are

10  studying, who is behind this other person, but he is

11  wearing a dark shirt and you'll see the camera, see him

12  in a moment, and watch the cursor on top, and when

13  the -- the gold bar is crossed, that's when the analyst

14  marked the start of donning at the end of the break.

15          (Tape is played.)

16   A.     So you can see now he is starting to don and

17  that time is marked.

18          (Tape is played.)

19   A.     There he is, you can see him putting on some

20  gloves.

21          (Tape is played.)

22   A.     That's the meat and here comes the meat.

23          (Tape is played.)

24   A.     And now he is starting to work with the meat and

25  that's the end of donning at the end of the break.
```

1  BY MR. DIRKS:

2  Q.    Let's take a look at a shift end clip.

3         (Tape is played.)

4  A.    So this is very similar to what you saw the

5  break beginning.

6         The camera is pointing down, production work

7  is going on, on the line, and the videographer is

8  waiting for the random employee who is assigned to that

9  videographer to -- to stop working with product.

10        (Tape is played.)

11 BY MR. DIRKS:

12 Q.    I'll go ahead and forward it.

13        (Tape is played.)

14 A.    There he is and you can see him starting to doff

15 gloves and the time has been marked as doffing at the

16 end of the shift.

17        (Tape is played.)

18 A.    He is doing some cleaning.

19        (Tape is played.)

20 BY MR. DIRKS:

21 Q.    While we're watching, all of your videos, were

22 they obtained the same way?

23 A.    Yes, the -- the procedure that I described

24 earlier is what you are seeing here.

25        (Tape is played.)

BY MR. DIRKS:

Q.    And did the videos make their way into a data summary or a report?

A.    Yes, so once the analysis is completed, then the computer generate the times that we mark and we can use that information to do an analysis.

Q.    Now, is everybody moving at the same speed in all of the videos?

A.    You can see that the person who's being videoed is doing certain activities and other people who are not being videoed, they can watch in the video field are doing similar things the same way.

Q.    Are some videos longer than others?

A.    Some videos take longer, some videos take shorter.

     We sampled a representative sample and we averaged all of those times to come up with an average amount of time for donning and doffing.

     (Tape is played.)

A.    Then you can see the employee departing.  And he's in an area where there's hoses and --

     MR. MUELLER:  Your Honor, there is no question pending, and I think it would be helpful to the record if we do question/answer.

     THE COURT:  I think he is talking about what's

132

1  happening in the video now, so that's overruled.

2          (Tape is played.)

3  BY MR. DIRKS:

4   Q.    Now we're getting ready to approach some red

5  bars?

6   A.    The employees are going to walk into the locker

7  room and the lens cap goes on and so the procedure that

8  we saw before in the locker room is going to continue.

9   Q.    I want to turn the volume back up and forward

10  it.

11          (Tape is played.)

12   A.    Pause for a second.

13          So I want you to notice that if you look at

14  the don/doff bar, the top bar, the green line, the

15  cursor is right between that, there is still time where

16  the employee is doffing.

17          Right now what we're looking for is the last

18  item that's doffed and so as the videographer announces

19  the various items, which are marked on the red bar, and

20  which is listed as locker room on the bottom, we're

21  looking for the last item.

22          (Tape is played.)

23  BY MR. DIRKS:

24   Q.    I'll fast forward.

25          (Tape is played.)

1  BY MR. DIRKS:

2   Q.    I'll go ahead and forward to the end here of the

3  locker room.

4          (Tape is played.)

5  BY MR. DIRKS:

6   Q.    I turned the volume down on that.  Do that one

7  more time.

8          (Tape is played.)

9   A.    So the pants were the last -- so the pants were

10  the last item and so it's marked as the last item and

11  even though we're still in the locker room, we can see

12  that the doffing time has ended.

13          (Tape is played.)

14  A.    By the way, what you just saw was an index card

15  with the name of the employee.  After we videoed each

16  employee, the supervisor assigned to the videographers

17  asked the employee for their name and their employee

18  number, we put it on an index card and videoed it so we

19  had a record of who we studied.

20  BY MR. DIRKS:

21  Q.    I just want to show you one more.  This is one

22  you weren't here but this is one that Mr. O'Dear showed

23  in his opening statement and we won't go through the

24  entire thing, but --

25          (Tape is played.)

BY MR. DIRKS:

Q.    I'll go ahead and forward it to the locker.

          (Tape is played.)

A.    So, at this point, the employee took shirts,
pants, and gloves out of his locker and that was marked
as the start of time.

BY MR. DIRKS:

Q.    So I fast forwarded through the locker room
time.

A.    So now we're outside of the locker and the
employee is proceeding to the -- to the floor.

Q.    What I want to do is fast forward some more.

          (Tape is played.)

BY MR. DIRKS:

Q.    And this is what I want to show you.

          There is now -- we see a third bar in the
middle, the second bar down.  Can you explain what that
is?

A.    Yes, so that's the timeline for exclusions and
so if an activity occurs that is -- doesn't include
donning and doffing, here you can see this employee sat
down but he is still donning gloves.  When the employee
is resting or doing personal activities, then we mark
those activities on the exclusion line and then we
subtract that time out of the total donning time.

1  BY MR. DIRKS:

2   Q.    I'll forward to the end there.

3   A.    So you can see now that even though the donning

4  bar is still filled in, the exclusion bar is filled in,

5  which tells the computer that we're going to subtract

6  that time from the total time, so the time that you are

7  watching now on the video is not included in the

8  donning time because the employee is just sitting,

9  resting.

10          (Tape is played.)

11  BY MR. DIRKS:

12   Q.    And, so is all of this time in black bar an

13  exclusion?

14   A.    That's correct.

15   Q.    And then the -- when the black bar ends, does

16  that mean that it is not an exclusion?

17   A.    That's right.

18          (Tape is played.)

19   A.    So now you can see that this employee is working

20  with safety glasses, and gets up to do some additional

21  donning activities and so we stopped the exclusion

22  clock.

23  BY MR. DIRKS:

24   Q.    I'll just represent to you that he comes back.

25          Well, let's watch a little of this.

1            (Tape is played.)

2   BY MR. DIRKS:

3    Q.    Now we're beginning to approach another black

4   bar.   What does that mean?

5    A.    So the employee was back on the work station, it

6   looked like he wasn't -- they weren't ready for him

7   yet, he did some things and now he's back in the

8   hallway, doing some additional donning, and then he's

9   going to rest some more and wait, and so that waiting

10  time that's going to commence now was excluded.

11           (Tape is played.)

12   A.    And now he starts the donning and proceeding to

13  the work station and so the donning time continues.

14           (Tape is played.)

15  BY MR. DIRKS:

16   Q.    And I'll just go ahead and forward it to the end

17  here.

18           (Tape is played.)

19   A.    Now the meat's arriving and that's when donning

20  ended.   The camera was pointed down, by the way,

21  because the videographers were instructed by Tyson not

22  to video when production was going on and in the field

23  of view, it was production going on elsewhere, so the

24  camera was pointing down.

25  BY MR. DIRKS:

1  Q.    Doctor Radwin, I'm showing you Exhibit 381A.  Do

2  you recognize this document?

3  A.    Yes, that's one of the appendices from the

4  report that I produced.

5  Q.    And what -- what is this document?

6  A.    This contains each observation and the time that

7  was measured for donning and doffing for various

8  activities that we talked about earlier.

9  Q.    So if I look at the left-hand column, it says

10 Activity.  What are these activities?

11 A.    So for each video that we saw, there was a

12 similar analysis and these activities are all Don Start

13 of Shift on this page of appendix for, so that's the

14 activity that is listed in the first column.

15        In the second column shows the Duration, the

16 amount of time that was measured for each employee who

17 was studied.  And in that column, the computer file

18 name is in the next column.

19        And then we list the date, and the time of day

20 when the event began and then the time of day and the

21 date that the event ended in the next column.

22        The last three columns identify a particular

23 employee.

24 Q.    Are -- are the event times, are -- where did you

25 get those times?

1   A.    So I told you earlier we calibrated our video

2   cameras to the time clocks, and so this is the plant

3   time when that mark at the start of donning in this

4   case began.

5   Q.    I just want to turn --

6   A.    And we get that from the computer program.

7   Q.    If you look at the second row down, it appears

8   that the -- the first column changes.  Can you explain

9   that?

10  A.    So, then those are all the Don Start of Shift

11  and then the doff start a break or Doff Break Start, as

12  it's listed here, continues.

13        And the -- similarly, the Don Break End starts

14  up on Page 20, and continues, and keeps going until the

15  end of the shift data shows up on Page 22.

16  Q.    And the videos that are loaded on this computer,

17  I brought a hard drive, too, with the video.  Is this a

18  hard drive that contains all of the videos used in your

19  analysis?

20  A.    Yes.

21        MR. DIRKS:  At this point, I move to admit

22  Exhibit 386.

23        MR. MUELLER:  Objection.

24        THE COURT:  Basis?

25        MR. MUELLER:  We discussed this in the motions

1  in limine.

2       Would you like me to approach?

3       THE COURT:  You may.

4       (The following sidebar conference was had

5       outside the presence of the jury:)

6       MR. MUELLER:  As you may recall, we moved for

7  disclosure of the clips they would actually play at

8  trial.  They only listed 86 clips.

9       Mr. Dirks tells me this has 171 clips on it so

10 first of all, you already sustained that objection.

11      Second, I don't think it is proper to send it

12 to the jury room hundreds of clips that they haven't

13 seen any explanation about in open court.  I object on

14 that ground as well.

15      MR. DIRKS:  What -- what Mr. Mueller had asked

16 for was that we provide him the clips that we were

17 going to use and play at trial.  We tried to narrow it

18 down, we narrowed it down further last night to

19 something smaller than that, but that is different from

20 what is admissible evidence and what is contained.

21      THE COURT:  I am not going to send anything to

22 the jury that they haven't had a chance to see and hear

23 testified.

24      MR. DIRKS:  Would like to keep it for the

25 record.

1          THE COURT:  Oh, sure you can keep it.

2          MR. MUELLER:  But I would want to cross

3   examine, and that is the whole point.

4          MR. DIRKS:  He is able to cross examine, he

5   has all of the statements.

6          And I would like the record to show that he

7   did more than three videos but we would be here for

8   weeks showing video.

9          THE COURT:  Well, I am not going to send

10  anything to the jury room that they have not seen in

11  here in court.  So, it's just that simple.

12          (Sidebar concludes and proceedings then

13          continue in open court:)

14  BY MR. DIRKS:

15   Q.   Exhibit 381 that you just looked at, each of

16  these -- each of these files contains a video that

17  was -- that was shot by your videographers.  Or excuse

18  me.

19          Does each of these videos contain -- each of

20  these files contain video that was shot using the same

21  methodology?

22   A.   Yes, these are the same videos that we saw in

23  the computer screen in the computer files.

24          THE COURT:  Counsel come on back up here for

25  just a second.

1           (The following sidebar conference was had

2           outside the presence of the jury:)

3           THE COURT:  I want to be clear about this.  I

4  don't have a problem with 381A going back there because

5  he's laid, I think, sufficient foundation for that.

6           What I have got a problem with is sending

7  videos back for the jury to look at.

8           MR. DIRKS:  I understand.

9           MR. MUELLER:  I agree.  I have no objection to

10 381A.

11          THE COURT:  Okay.  I just wanted to be sure

12 you understood that.

13          (Sidebar concludes, and proceedings then

14          continue in open court:)

15          THE COURT:  I'm sorry, go ahead, Mr. Dirks.

16          MR. DIRKS:  Thank you.

17 BY MR. DIRKS:

18 Q.   Doctor Radwin, did you summarize and analyze the

19 data that's contained in the videos and in Exhibit

20 381A?

21 A.   Yes, once we had all those times extracted from

22 the videos, then I averaged the various times and

23 produced the table with -- as part of my report.

24 Q.   I'm showing you what has been marked as Exhibit

25 384B.  Can you explain what that is?

1    A.    Yes, this is a table out of my report that

2    summarizes the average times for each of the activities

3    that we talked about earlier.

4            MR. DIRKS:  I move to admit Exhibit 384B.

5            MR. MUELLER:  I don't know what it is.  I

6    haven't seen it.

7            MR. DIRKS:  This is what I shared with you.

8            MR. MUELLER:  I object.

9            THE COURT:  Basis?

10           MR. MUELLER:  Haven't seen it until out in the

11   hallway, I haven't checked the numbers.  It's a

12   demonstrative and it was shown to me as a

13   demonstrative.

14           THE COURT:  Well, I think the foundation has

15   been laid but it's a summary of everything that is set

16   out in 381A, so I am going to overrule the objection.

17           MR. MUELLER:  I just need a copy.

18           THE COURT:  Sure.

19           MR. DIRKS:  Okay.

20           MS. DAVIS:  Need signal three, please.

21   BY MR. DIRKS:

22   Q.    Now, Exhibit 384B, can you explain what this is?

23   A.    Yes, this is the table we were just talking

24   about and has several columns.  It's titled Lapsed Time

25   For Donning and Doffing Activities At the Tyson Finney

1  County Beef Processing Plant.  And before activities;

2  don the start shift; don and doff at the end; and then

3  start of meal break; and don at the end of the shift,

4  it is all listed in these rows.  And those times that

5  represent the average time for each of those activities

6  for all the employees who we observed is displayed as

7  an average time for the different departments, the

8  further processing department, and the kill department,

9  or the slaughter department.

10         And the -- the third row all is a grand

11  average of all of those departments averaged together.

12  Q.    So if you look at the -- the first row, you have

13  a number for further processing, don start of shift,

14  the first, and then if you move over to "mean", what

15  does that mean?

16  A.    So, mean is a statistical term for average.

17  It's calculated just like you would any other average,

18  you take all the numbers, add them up and then divide

19  by the number of numbers and you get the mean or the

20  average.

21  Q.    And then "SD".  What does that mean?

22  A.    "SD" stands for standard deviation and it's a

23  measure of the -- the spread of the numbers, and it's a

24  statistical measure that is used for describing how

25  much variation there is in the data.

1  Q.    Then "N", what is that?

2  A.    "N" is the number of observations, so for

3  example, in further processing, at the start of shift

4  there is 26 numbers that go into the average, for kill

5  it's 13 and a total of 39, and that goes similar for

6  all the other activities.

7  Q.    And then "Min"?

8  A.    "Min" stands for minimum, so that's the smallest

9  number that we observed.

10  Q.    "Max?"

11  A.    "Max" stands for maximum, that is the largest

12  number.  And so, for example, further processing the

13  smallest observation was 3.326 minutes -- and these

14  times are all in minutes -- the maximum time was 21.634

15  minutes.

16  Q.    And then 95 percent CI?

17  A.    "CI" stands for confidence interval.  It's a

18  margin of error and that's the 95 percent confidence

19  interval or the margin of error through the average

20  that was calculated for each of the averages that are

21  shown.

22  Q.    Can you explain that a little more?

23        How does it work as a margin of error?

24  A.    So confidence interval is calculated for a given

25  level of probability, so this is a 95 percent

1  probability.  95 out of a hundred times is what that

2  represents.

3        Confidence interval is the range in which if I

4  did this study over and over again, 95 out of a hundred

5  times I would expect to get an average between that

6  interval.

7        So it's a level of confidence; the smaller the

8  number, the -- the -- the better the confidence

9  interval.

10  Q.    So, let's just keep going, with the don start of

11  shift further processing, it has a 95 percent

12  confidence interval of 1.581.  And the number or the

13  mean is 11.7.

14        So, what -- what does that mean with regard to

15  the further processing mean number for don start of

16  shift?

17  A.    So that would mean that the margin of error for

18  further processing is 11.702 plus or minus 1.581, so it

19  is within one and a half minutes of 11.702.

20  Q.    So, the 1.581 represents a number of minutes?

21  A.    That's correct.

22  Q.    And if you add 1.581, that would be the -- the

23  high bound for the confidence interval?

24  A.    Yes.

25  Q.    And then if -- and then what is the low bound of

1  the confidence interval?

2  A.    So you would take 11.702 and subtract 1.581, and

3  those two numbers represent the upper and lower

4  confidence intervals, the boundaries that I would

5  expect the average to fall in between 95 out of a

6  hundred times.

7  Q.    Doctor Radwin, I am showing you Exhibit 384C.

8  Can you tell me what that is?

9  A.    Yes, that's another table from my report.

10  Q.    And does -- does the -- does the exhibit that

11  I've shown you match identically to the table in your

12  report?

13  A.    No, it -- there's a typo in my report and the

14  table has that correction.

15  Q.    Okay.  Can you explain what the typo was?

16  A.    Yeah, it is simply a typo, all the numbers that

17  I calculated were calculated in an Excel spreadsheet

18  and those are the numbers that I used and one of the

19  numbers was miss -- mistyped and so, that number is

20  correct here but all the numbers that I used for my

21  analysis were in the spreadsheet, they weren't from the

22  report.

23  Q.    Did the typo in your report impact the -- the

24  confidence interval?

25  A.    No, it didn't change any of the other numbers

1 and, in fact, the numbers calculated correctly in the

2 spreadsheet, it just wasn't typed correctly in the

3 report.

4 Q.    But other than that, this represents what was

5 found in Table 3 of the report?

6 A.    Yes, exactly.

7          MR. DIRKS:  Move to admit.

8          MR. MUELLER:  Are you going to -- is there a

9 clean copy?

10          MR. DIRKS:  The copy is clean.

11          MR. MUELLER:  Okay.  No objection to a clean

12 copy going to the jury.

13          THE COURT:  Thank you.  And that's exhibit

14 what?

15          MR. DIRKS:  It's 384C, Your Honor.

16          THE COURT:  384C is admitted.

17          MR. DIRKS:  And just to -- just to make sure,

18 move to admit 384A, stipulated, B, and C.

19          THE COURT:  384A, B, and C are all admitted.

20 BY MR. DIRKS:

21 Q.    Is this 384C, Doctor?  That's shown on the

22 screen?

23 A.    Yes.

24 Q.    And explain to me what we see in 384C.

25 A.    So, each of these rows represent the total

1  amount of times that are listed in the activities.  So,

2  in the first row, that's donning and doffing with meal

3  break.  I took all of the times that I measured for

4  donning, at the start of the shift, and doffing at the

5  end of the shift, and the donning and doffing time that

6  was measured during the meal break, and it's all added

7  together and that's the times that you are seeing in

8  that first row.

9  Q.    And have you broken it out for process -- and

10  you have kill here.  Did -- is kill the same as

11  slaughter to you?

12  A.    Yes.

13  Q.    And you have broken out further processing,

14  kill, and all.  Can you explain that?

15  A.    Yes.  So similar to what we talked about

16  earlier, in further processing I took just the

17  employees who worked in further processing, and took

18  their donning and doffing and meal break times, added

19  those all together, to get a total average time of

20  27.54 minutes.

21        And did the same thing for kill, or for

22  slaughter.  And then "all" represents the -- all of

23  those -- all together average, and that's 29.332.

24  Q.    Then the next row, what does that explain?

25  A.    The next row is similar but I left out the

1  donning and doffing time for meal break, so in further

2  processing you can see that it is only 18.627 minutes

3  compared to the time in the row above, which is 27.54,

4  because meal break isn't included in that row.

5          And I did the same thing for kill and for all.

6  Q.    And then the third row?

7  A.    In the third row, that's the time for donning

8  and doffing for meal breaks and it's listed for further

9  processing and for kill, and this is just the time that

10  employees spend donning and doffing during the break.

11          MR. DIRKS:  Just for the record, 381A, the

12  tables that we showed earlier, have been pre-admitted.

13  BY MR. DIRKS:

14  Q.    The numbers we see in 384C and that we saw in

15  384B, are those numbers representative of the group of

16  workers you studied?

17  A.    Yes, they are.

18  Q.    Do they represent a reasonable estimate of the

19  average time spent in pre-shift, post shift, and lunch

20  activities?

21  A.    Yes.

22          MR. DIRKS:  Your Honor, if I could have just

23  one moment.

24          THE COURT:  Sure you may.

25          (Pause.)

1          MR. DIRKS:  Nothing further.

2          THE COURT:  All right.  Thank you.

3          Mr. Mueller.

4          MR. MUELLER:  Ladies and gentlemen, good

5  afternoon, I am going to make a number of points with

6  Doctor Radwin and I beg your indulgence, it will take

7  awhile.

8          I am going to show the following things, I

9  believe:  First, Doctor Radwin originally used to work

10  for my client, IBP, who is sitting over here, in a

11  donning and doffing case, but since then he has

12  switched sides and he mainly works for the employees

13  who sue their employers.

14          He is a full-time scholar, not a practicing

15  industrial engineer.

16          He's been an expert against us almost

17  full-time since 1999, and he's been paid over $315,000

18  to work on cases against us.

19          The type of time study he did here is called a

20  Type 1 Time Study.  A leading text book that Doctor

21  Radwin himself likes to cite says that those kinds of

22  studies are quick and dirty and mainly subjective, not

23  objective.

24          He can not identify a single text book or

25  scholar that supports the approach he took in this

1    matter.

2          He spent only 3-1/2 hours in our plant.

3          The students he sent to this plant later were

4    all undergraduates, except for one who had graduated.

5          They did the videotaping, he wasn't there.

6    And he has watched less than half of the tapes they

7    took.

8          Even he thinks that we cooperated fully in his

9    study.  He got all the time and information he asked

10   for.

11         His sample sizes are small.  He generally

12   wanted to get 24 examples of each thing he measured but

13   he often got far less than that.

14         There is a high relationship between when an

15   employee arrives at the plant and how long it takes to

16   dress for work.  Those who arrive the earliest take,

17   under Doctor Radwin's approach, the longest time to get

18   ready.

19         He admits or he admitted in his deposition, he

20   did not measure the continuous work day that he now

21   says he is measuring.

22         He included a lot of time employees talk to

23   friends or do other non work activities and in the

24   clips that I will show you, you will see from his own

25   videotape that employees can wear their frock in the

1 cafeteria, and in some instances you will see many or

2 most of them are wearing it in the cafeteria.

3       You will see the employees who were filmed

4 knew they were being filmed and they altered their

5 behavior as a result.  Which resulted in much longer

6 times.

7       Doctor Radwin did not throw out any of those

8 high numbers.  He counted everything, which raised his

9 averages.

10      He claims his measurements are accurate to

11 within 1/30th of a second, which is the number of

12 frames in the videotape and he reports his numbers in

13 the table Mr. Dirks just showed you to one-thousandths

14 of a minute, but Doctor Radwin will admit his numbers

15 are not good any more than within a couple minutes.

16      He started measuring from the time the

17 employee first touched a clothing item, even if it took

18 several more minutes before they even started dressing.

19      He admits that workers wear many different

20 combinations of clothing equipment, they do things

21 differently to each other, and they even do things

22 differently from one day to the next.

23      And finally, when he worked for us, he used

24 the exact same method that our time study expert used,

25 that's called an elemental method, where you actually

1   measure each piece of clothing, and then add them up.

2                    CROSS EXAMINATION

3   BY MR. MUELLER:

4   Q.    Good afternoon, Doctor Radwin.

5   A.    Good afternoon.

6   Q.    When you are retained in these cases, or at

7   least since 1998, you usually work for the plaintiffs,

8   that is the employees who are suing their employers,

9   right?

10  A.    No.

11  Q.    Well, there is on two exceptions for that, in

12  litigation, since you last worked for us, the only two

13  times you have worked for employers are Kraft Foods and

14  Omaha Beef, correct?

15  A.    No.

16  Q.    Okay.  And you worked for the Department of

17  Labor in one of those cases also, right?

18  A.    I worked for the Department of Labor but I've

19  worked for a number of other companies in litigation

20  and not in litigation, doing similar studies.

21  Q.    In donning and doffing litigation where you were

22  hired as a private expert, other than Omaha Beef and

23  Kraft Foods, and then us in 1998, you have always

24  worked on the employee side, correct?

25  A.    No.

154

1    Q.    Name the employers who has hired you in donning

2    and doffing litigation.

3    A.    I did a rather large study in donning and

4    doffing litigation for Texas Instruments, several years

5    ago.

6    Q.    Okay.  Who else?

7    A.    I also did a study for Harris Ranch, the beef

8    processor in California.

9    Q.    When was that?

10   A.    Several years ago.

11   Q.    Okay.  Was that in your expert report?

12   A.    It wasn't litigated, so --

13   Q.    So you didn't disclose it to us, did you?

14   A.    You didn't ask for it.

15   Q.    Okay.  What else?

16   A.    Those are the few that I can think of right now.

17   Q.    Okay.  And Texas Instruments doesn't make food

18   products, does it?

19   A.    No, they don't make food products but it

20   involved donning and doffing.

21   Q.    Okay.  So, most of the cases in which you have

22   been involved in litigation have been measuring donning

23   and doffing in food processing settings, correct?

24   A.    Most of them, yes.

25   Q.    Okay.  Now, back in 1998, you worked for what

1   was called IBP, right?

2   A.     Yes.

3   Q.     Okay.  And you were an expert for that company,

4   which is now known as Tyson Fresh Meats, correct?

5   A.     Yes.

6   Q.     Okay.  And that was a lawsuit brought by the

7   beef packing -- packing employees at our plant in

8   Pasco, Washington, correct?

9   A.     Yes, that's correct.

10  Q.     Okay.  Since that time, you've been involved in

11  a number of cases against Tyson Foods, correct?

12  A.     Yes.

13  Q.     At least three that you can think of, right?

14  A.     Yes.

15  Q.     Okay.  And even now you're currently working

16  with other plaintiffs' lawyers, not Mr. Hanson and Mr.

17  Dirks, but other lawyers who are suing Tyson Foods in

18  other cases, correct?

19  A.     Yes.

20  Q.     Okay.  Throughout your career, you've been a

21  professor, correct?

22  A.     That's right.

23  Q.     In fact, you describe yourself, when I took your

24  deposition, you described yourself as a full-time

25  scholar, correct?

1  A.     Yes, I'm a tenured professor and former

2  department chair at the University of Wisconsin.

3  Q.     And am I correct that you do not consider

4  yourself to be an expert in statistics?

5  A.     No, I'm not an expert in statistics.

6  Q.     Okay.  You've never been a president of any

7  professional organization that you belong to, am I

8  right about that?

9  A.     No, not the president.

10  Q.     Okay.

11  A.     I've had leadership roles.

12  Q.     Has any judge ever issued a court ruling that

13  excluded your expert opinion in any case in which you

14  offered an opinion?

15  A.     One of the cases that I participated in was

16  excluded for relevance.

17  Q.     Okay.  And, in fact, in that case, the Court

18  found that you had made assumptions that proved to be

19  false, correct?

20  A.     No.

21  Q.     Could you -- excuse me a moment.

22         There is a box of exhibits with you.  Would

23  you prefer that I hand them up to you?

24  A.     Yes.

25  Q.     Okay.

```
 1              THE COURT:  Members of the jury, it's getting
 2   close to 1:30.  Do you mind going another 15 minutes or
 3   so?
 4              All right.  Thank you.
 5              Mr. Mueller, go right ahead.
 6   BY MR. MUELLER:
 7   Q.     Doctor Radwin --
 8              MR. MUELLER:  If you would bring this up,
 9   first, on Doctor Radwin's screen, not the jury screen.
10              MR. DIRKS:  Exhibit number?
11              MR. MUELLER:  I'm sorry?
12              MR. DIRKS:  What exhibit number?
13              MR. MUELLER:  It is Exhibit 50 in his
14   deposition, but it is trial Exhibit 5142.
15   BY MR. MUELLER:
16   Q.    And, Doctor Radwin, I am going to pull up for
17   you only, Page 16 of Exhibit 5142.
18              MR. MUELLER:  Oh, you can't -- can the Court
19   set it up so that only Doctor Radwin sees it?
20              THE COURT:  I don't have that ability here.
21   It may be available somewhere down the line.
22   BY MR. MUELLER:
23   Q.    Can you take a lot at Exhibit 50 in the binder
24   before you?
25   A.    I am not sure which binder you are talking
```

1  about.

2  Q.    The top one.

3  A.    This one?

4        (Witness complies.)

5  Q.    Could you turn to the Court's conclusion at Page

6  16.  Are you with me?

7  A.    I'm looking at Page 16.

8  Q.    Okay.  Did the Court make the following

9  statement about your finding in that case:

10        "The Court takes note that the expert opinions

11  offered by the named plaintiffs are premised upon the

12  false assumptions that the same equipment is used by

13  the employees at each individual plant.  There is

14  evidence before the Court which proves each of these

15  assumptions false and causes the named plaintiffs'

16  expert reports to be unreliable on their face."

17        And then it goes on to say, "The defendants'

18  motion to exclude is due to be granted, and that Doctor

19  Radwin's and Doctor Snyder's reports are based on

20  premises which have been determined to be erroneous."

21  (Quoted as read.)

22        Is that what the Court said about you?

23  A.    That's what the Court said but that's not what I

24  said in my report.

25  Q.    Okay.  Thank you.  Mr. Dirks can ask you about

1    that.

2            You're not a lawyer, by the way, are you?

3    A.    No.

4    Q.    Okay.  And you're not an expert in the law, I

5    take it?

6    A.    No, I'm not.

7    Q.    Okay.  I take it you do not have any opinion on

8    whether the activities here constitute work?

9    A.    Not from a legal standpoint.

10   Q.    Okay.  And do you have an opinion on what is the

11   first principal act of the day or the last principal

12   act of the day?

13   A.    Only from the -- the standpoint that as I

14   discussed in my previous testimony.

15   Q.    Meaning you don't have a legal opinion on it,

16   correct?

17   A.    That's correct.

18   Q.    Okay.  And you're aware that employees at our

19   Finney County plant are paid a various number of extra

20   minutes, known as a K-code, for certain of their

21   dressing and walking activities?

22   A.    Yes.

23   Q.    And you didn't take that into account in your

24   study, did you?

25   A.    No, that wasn't the objective of my study.

1   Q.    Okay.  And, in fact, you don't know when

2   compensation began on any particular day for any

3   particular employee, is that right?

4   A.    I only know when production work began and

5   that's what I used in my study.

6   Q.    Right.  So some of the footage that we just saw,

7   for all you know, the employees may already have been

8   paid some number of minutes for what you were just

9   showing us with Mr. Dirks, right?

10  A.    I just don't know.

11  Q.    Okay.  But you can't exclude that possibility,

12  is that right?

13  A.    I can't exclude that possibility.

14  Q.    Okay.  In this plant there, you know there are

15  two major production areas, slaughter and processing,

16  right?

17  A.    Yes.

18  Q.    Okay.  And in your report you used the term

19  "further processing" but that's a term you came up with

20  on your own, right?

21  A.    It's a term that some plants use and that's what

22  I used.

23  Q.    But it's not a term used at this plant, is it?

24  A.    Um, not that I'm aware of.

25  Q.    Okay.  Now, when Tyson sent you information

1  about the plant, our information actually showed that

2  there are many departments within those two production

3  areas, is that right?

4  A.    Departments from the standpoint of employee

5  classifications, but I observed those different areas

6  and used them as I described.

7  Q.    And you admit in your deposition, it was many

8  departments, is that right?

9  A.    Well, there's two main departments, the

10 processing department and the slaughter department, and

11 then within those departments there are lines, as I

12 describe them.

13 Q.    Okay.

14 A.    And those lines are what I studied in my study.

15 Q.    My question is a little bit different.

16         Do you understand the slaughter and processing

17 are areas and there are departments within them?

18 A.    Yes.

19 Q.    Okay.  And you admit in your deposition there

20 were many departments within them, correct?

21 A.    Well, there's many lines or departments, as you

22 call them, yeah.

23 Q.    Okay.  And you did not want to make a separate

24 study of each of those departments, correct?

25 A.    That wasn't the objective, I wasn't asked to do

1  that.

2  Q.     Is the answer no?

3  A.     The answer is no.

4  Q.     Okay.  And you did not perform any test to

5  determine if your observations were representative of

6  each of the departments, did you?

7  A.     Um, no specific tests, no.

8  Q.     Okay.  Would you agree that one of the leading

9  textbooks in this field is a text book called Work

10  Design Occupational Ergonomics by Professors Konz and

11  Johnson?

12  A.     Yes.

13  Q.     In fact, you attached a copy of this -- one of

14  the chapters of this book to your rebuttal report in

15  this case, correct?

16  A.     That's right.

17  Q.     Okay.  Do you consider these professors to be

18  recognized authorities in their field?

19  A.     Yes.

20  Q.     Okay.

21        MR. MUELLER:  Your Honor, permission to treat

22  this as a learned treatise?

23        THE COURT:  Any objection?

24        MR. DIRKS:  No objection.

25        THE COURT:  Permission is granted.

1  BY MR. MUELLER:

2  Q.     In this book it tells us there is two types of

3  time studies, right?  A Type 1 time study and a Type 2

4  time study?

5  A.     Yes, that's right.

6  Q.     Okay.  And a Type 1 study is a should-take time

7  study, is that correct?

8  A.     That's right, it measures how much time it

9  should take but not how much time it actually takes.

10  Q.     Okay.  And then Type 2, is that the other type

11  of study?

12  A.     Type 2 study measures the time that it actually

13  takes, not a theoretical time.

14  Q.     Okay.  And you believe that you did a -- which

15  kind?

16  A.     Well, a Type 2 study, the kind of study that

17  measures how much time should -- how much time it

18  actually takes.

19  Q.     Now, that's interesting because when you were

20  testifying I wrote down that you were trying to measure

21  the reasonable amount of time, do you remember saying

22  that?

23  A.     Yes, well I measured both; the time that it

24  actually takes and then I estimated the reasonable

25  amount of time using the exclusions that we talked

 1  about.

 2  Q.    Okay.  So you agree that we're all trying to get

 3  to the same thing, what's reasonable?

 4  A.    We're trying to measure reasonable amount of

 5  time.

 6  Q.    Okay.  But you measured it a different way than

 7  Tyson's expert, is that correct?

 8  A.    Yes.

 9  Q.    Okay.  But you still think you did a Type 2 time

10  study, correct?

11  A.    A sort of Type 2 time study, yes.

12        MR. MUELLER:  Your Honor, at this point I am

13  going to publish from a learned treatise.

14        Can we get -- get this?

15        MR. HOFFMAN:  Push the bottom button.

16        MR. O'DEAR:  The very bottom one, yeah.

17        MR. MUELLER:  Your Honor, I -- my practice

18  with learned treatises is now that it's been

19  recognized, I can just read from it.

20        THE COURT:  You may.

21        MR. MUELLER:  Okay.  Ladies and gentlemen,

22  this is Chapter 27, from the book Doctor Radwin

23  recognized.

24        In the overview it says:   "After a good

25  method is determined, determine" -- I'm sorry.  By the

1  way, this is a chapter called Determining Time/Job.

2           It says, "After a good method is determined,

3  determine how long the job takes.  The measurements can

4  be quick and dirty, Type 2, nonengineered standards, or

5  more precise, Type 1 engineered standards."  (Quoted as

6  read.)

7           And that was at Page 523.

8           And on Page 526 it says, under Section 2.1,

9  "Nonengineered Type 2 estimates, quick and dirty,

10  information can be obtained with low cost.  Sometimes

11  it is useful.  Nonengineered standards are not preceded

12  by methods or quality analysis; they are did-take

13  standards, not should-take standards."  (Quoted as

14  read.)

15  BY MR. MUELLER:

16  Q.    Now, I thought it was interesting a moment ago,

17  something you said about that book.  The reality is

18  that when you -- what you did in this case is not a

19  text book time study, is that right?

20  A.    It's not the type of time study that they're

21  talking about specifically in this book either.

22  Q.    Well, actually, you can't identify any book that

23  talks about the kind of time study you did, isn't that

24  right?

25  A.    No, this is a process that I designed

166

1  specifically for this purpose.

2  Q.    Okay.  And you can't identify a single scholar

3  in your field that describes the kind of method you

4  used in this case, is that right?

5  A.    Well, as you said so yourself, I'm often called

6  to do this kind of study, there aren't too many other

7  people who do them.

8  Q.    Right.  So the few exceptions, you stand alone

9  in what you are doing here, right?

10  A.    Well, at the moment, yes.

11  Q.    Okay.  Now, another leading professor in your

12  area is Professor Benjamin Niebel.  Well, he passed

13  away now, but Professor Niebel was very well recognized

14  in your field, correct?

15  A.    Um, he was an industrial engineer.

16  Q.    And he was at Penn State?

17  A.    That's right.

18  Q.    And did he write one of the leading text books

19  that went through many editions on Work Standards

20  Analysis and Time Studies?

21  A.    He wrote a textbook on certain kind of time

22  study, yes.

23  Q.    I wasn't sure which edition you wanted to refer

24  to, so I just grabbed a bunch of them, different

25  editions.

1            Is the most recent edition co-authored by

2    someone who is living called Andrew Freivalds?

3    A.    Yes.

4    Q.    Okay.  Is that the 12th Edition?

5    A.    I think it's the 12th Edition, yes.

6    Q.    And you've cited to Professor Niebel's work in

7    some of your own papers and reports, right?

8    A.    I have, I used to teach from that text book.

9    Q.    And would you consider the various editions of

10   this text book to be recognized authorities in the

11   field of time studies?

12   A.    For the kind of time studies that they teach,

13   they're recognized as authorities.

14   Q.    Okay.

15        MR. MUELLER:  Your Honor, permission to

16   recognize Niebels' Motion and Time Study, its various

17   iterations, as learned treatises.

18        MR. DIRKS:  No objection.

19        THE COURT:  All right.  Each of the editions,

20   Mr. Mueller?

21        MR. MUELLER:  Well, I'll be very specific.

22   BY MR. MUELLER:

23   Q.    The editions that I have here is 8th Edition,

24   which you have cited from before, correct, Doctor

25   Radwin?

168

1  A.     That was the current edition when I cited it,

2  yes.

3  Q.     The 10th Edition, which you testified about in

4  one prior trial, correct?

5  A.     I don't recall, but I --

6  Q.     The trial in Philadelphia, do you remember?  You

7  don't remember?

8  A.     I don't recall which edition was read to me.

9  Q.     But at one time, this was the current edition,

10  correct?

11  A.     At one time, all of those were the current

12  edition.

13  Q.     And the 11th Edition which you, yourself, have

14  cited from, correct?

15  A.     I have cited that several times, yes.

16  Q.     Okay.  And the 12th Edition, which is the

17  current one, correct?

18  A.     Yes.

19  Q.     All right.

20         MR. MUELLER:  Your Honor, permission to

21  recognize all four of those editions as learned

22  treatises?

23         THE COURT:  Any objection?

24         MR. DIRKS:  No objection, only thing I would

25  ask is if there is a question, I would --

1          THE COURT:   Let him know where you are going

2     to be reading, if you would, from the -- from the

3     various editions, we'll recognize those.

4     BY MR. MUELLER:

5      Q.     Now, Doctor Radwin, although you have cited some

6     of these editions, you didn't rely on any of these

7     books I just held up as authority for what you are

8     doing in this case, correct?

9      A.     I wouldn't say that, that's not correct, I know

10    a lot of the material in those books and I considered

11    them in the design of this study that I did.

12     Q.     Okay.  Every time I showed you something from

13    Professor Niebel's and Freivalds' book in your

14    deposition, you said that didn't apply to what you did.

15    Am I right about that?

16     A.     The way that you are asking the question, that

17    was correct.

18     Q.     Okay.  Let's talk about the cost of this case.

19          Mr. Dirks established that you've charged over

20    $100,000 for your work in this case, is that right?

21     A.     Yes.

22     Q.     And the way you got there is you charged how

23    much per hour?

24     A.     My hourly rate is currently at $440 an hour.

25     Q.     But at the time you did this work it was, was it

```
 1  425?

 2  A.     I think.

 3  Q.     And how much you being paid per hour right now?

 4  A.     Right now, I'm paying -- $440 rate times two,

 5  when I testify.

 6  Q.     So you're being paid $880 an hour to sit there?

 7  A.     Yes, that's correct.

 8  Q.     Okay.  Now, how much do you think you charged

 9  over the course of the last 10 or 11 years for your

10  work against Tyson Foods?

11  A.     I couldn't guess.

12  Q.     Do you remember telling me in your deposition it

13  was over $315,000?

14  A.     I think you read to me some invoices and we

15  discussed that number.

16  Q.     And it's probably gone up now over 350,000 since

17  the deposition, right?

18  A.     I don't have any basis to answer that

19  accurately.

20  Q.     Well, you had only charged 70,000 in this case

21  when I took your deposition, right?

22  A.     That's correct.

23  Q.     So we know it has gone up another 30,000, right?

24  A.     Um, it will by the time this trial is over, I

25  suspect.
```

1  Q.    And you charged other lawyers in other cases who

2  are currently suing Tyson also, correct?

3  A.    Can you repeat the question?

4  Q.    You have also been charging other lawyers for

5  the work you're doing on other lawsuits against us,

6  correct?

7  A.    Well, I charge for the work that I do as an

8  expert, yes.

9  Q.    All right.  So it is probably well over 350,000

10 at this point, correct?

11 A.    I -- I guess so.

12 Q.    Okay.  Am I correct that you only visited our

13 plant on one day?

14 A.    Yes.

15 Q.    In Finney County you were there on January 26th,

16 last year, right?

17 A.    Yes, that's correct.

18 Q.    And your assistant, Thomas Yen, was with you?

19 A.    That's correct.

20 Q.    By the way, I think when Mr. Dirks asked you who

21 he was, you called him an assistant scientist?

22 A.    Yes, that's his title.

23 Q.    Well, no, actually, his title is instrument

24 innovator two, isn't it?

25 A.    Currently, that's his title as he is classified

1    but he's an assistant scientist and that has been his

2    title in the past.

3    Q.    And do you remember telling me that you call him

4    an assistant scientist as a convenient term?

5    A.    He was called an assistant scientist in the

6    past; when his classification changed, I continued to

7    call him assistance scientist.

8    Q.    But he is really an instrument innovator, is

9    that right, that's his current title?

10   A.    It is hard to say instrument innovator, so I

11   called him assistant scientist.

12   Q.    You just said it, right?

13   A.    I can say it.

14          THE COURT:  Okay.  Mr. Mueller, I think we are

15   going to call it a day now.  Thank you so much.

16          Sir, you can step down from the stand.

17          Members of the jury, we'll start again at 8:00

18   tomorrow morning.  I remind you, again, you're not to

19   discuss this case or any aspect of it among yourselves

20   or with anyone else at this point.  No independent

21   investigation.

22          See you all in the morning.  Be careful on the

23   road.

24          (The jury leaves the courtroom.)

25          THE COURT:  All right.  Have a seat, folks.

1        Mr. Mueller, how long you think you're going

2  to be on cross here?

3        And I'm not holding you to anything, I'm just

4  looking for a ballpark.

5        MR. MUELLER:  I told Mr. Hanson I thought

6  three to four hours and I haven't timed it, part of it

7  is I saw how difficult it was for them to work with the

8  clips and that is where things will slow down so I'll

9  try to speed through them like he did as well.

10        THE COURT:  Okay.  Very good.

11        And who do we have additionally on the

12  plaintiffs' list for tomorrow?

13        MR. HANSON:  Judge, when Doctor Radwin is

14  finished we plan on calling Monty Hahn.  And that's the

15  Tyson witness, Ronda Litras, Lee --

16        MS. PASCHAL:  Litras.

17        MR. HANSON:  Thank you, Litras, also a Tyson

18  witness.  And if time permits, Kenneth Kimbro.

19        THE COURT:  Okay.

20        MR. HANSON:  Also a Tyson witness.

21        THE COURT:  And how much more evidence do you

22  have to present here in your case.

23        MR. HANSON:  Not much, those three.  We're

24  still considering Lonnie Jepsen.  If we do call him, he

25  will be short.  And Doctor Scott Baggett, our

1  statistician on the damages expert.

2          THE COURT:  All right.

3          MR. MUELLER:  Your Honor, I don't think we'll

4  have to take this up with the Court but Mr. Jepsen -- I

5  mean, Mr. Kimbro, and I apologize if I get this wrong,

6  George, we got an e-mail last night about 10 o'clock

7  that said they wanted him tomorrow, I'm not sure I can

8  get him here by tomorrow, but there is so much else

9  going on, I don't think that will become an issue.

10          THE COURT:  Well, if you are going three to

11  four hours, it is pretty unlikely that we're going to

12  get there.

13          MR. HANSON:  Except the other witnesses are

14  short.

15          THE COURT:  Okay.  Well, find a way, if there

16  is any dep testimony that's coming in, maybe we can

17  read that.

18          MR. HANSON:  We have a very little potential

19  deposition testimony.  We have the pretrial order

20  stipulations.

21          THE COURT:  Right.

22          MR. HANSON:  And is that something you prefer

23  read into the record?

24          THE COURT:  Yes.

25          MR. HANSON:  So we have to find our -- our

1  golden voiced staff to do that.

2          THE COURT:  All right.  If you want to, you

3  can alternate those so that nobody wears out during the

4  course of reading them.

5          So you are likely, it sounds like, to wrap up

6  your case maybe Thursday?

7          MR. HANSON:  We think we should be done

8  Thursday.

9          THE COURT:  Okay.  And how long is it going to

10  take to present the defendants' case?

11          MR. MUELLER:  I -- I'm sorry, Your Honor, I do

12  mean to answer your question but did you say you are

13  going to call Doctor Baggett?

14          MR. HANSON:  Yes.

15          MR. MUELLER:  Okay, well, the cross -- he's

16  their damages expert and the cross on that might take

17  an hour, hour and a half, two hours, something like

18  that.  So, fortunately, we did depose him this weekend

19  so it will go much faster.

20          And I'm sorry, your question was how long will

21  our case take?

22          THE COURT:  How long is it going to take for

23  you to put your case on?

24          MR. MUELLER:  Your Honor, I hate to say it

25  depends, but we're trying to make a decision whether

1  when some of these out-of-state witnesses are here,

2  whether to just accommodate them and ask our questions

3  while they're here, or do it in our case-in-chief.

4        I can't imagine a situation which our case

5  would take more than three days, don't you think?

6        MR. O'DEAR:  I agree.

7        Judge, we wondered, too, if -- if we were to

8  decide to try to accelerate and ask all of our

9  questions when they're on the stand in their case --

10        THE COURT:  Mm-hmm.

11        MR. O'DEAR:  -- would it be permissible in one

12  of these summary things we do, to advise the jury that

13  we're doing that to accelerate and that that doesn't

14  mean that if we come at the end and all of our

15  witnesses has testified --

16        THE COURT:  Oh, I'll tell them that, that's

17  not a problem at all.

18        MR. O'DEAR:  Yeah, we just want to explain

19  that it's not because we're not putting on a case.

20        THE COURT:  Sure.

21        MR. O'DEAR:  It is because we are putting a

22  case with their case.

23        THE COURT:  No, that's -- that's not going to

24  be a problem.

25        MR. O'DEAR:  Okay.

1          THE COURT:  At all.  So, well if it is going

2  to take three days, then let's go ahead and go Friday

3  and that way we may be able to get to the jury either

4  Tuesday or no later than Wednesday next week, I would

5  think.

6          So, we'll go ahead and have court on Friday

7  this week.  That's what I was looking to try to figure.

8          All right.  Well, you guys look at your

9  stipulations, and see how you want to carve them up.

10         And if you all want to read them half and

11  half, if you want me to read them, I'll do the best I

12  can.  You guys can save your voices, whatever you want

13  to do is fine with me.

14         MR. MUELLER:  Will the Court still be issuing

15  any guidance on the willfulness?

16         THE COURT:  Yes, I will.  And I'll actually

17  get that to you tomorrow.

18         MR. MUELLER:  Okay.

19         THE COURT:  So, all right.  Well, thank you

20  all so much.  Hope you beat the rain back to your

21  hotels.

22         MR. MUELLER:  Thank you, Your Honor.

23         THE COURT:  You bet.  Thank you.

24         (Proceedings recess for the day at 1:40 p.m.

25         and commence the following day, March 9,

1        2011.)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

179

1              C E R T I F I C A T E

2          I, Jana L. Hoelscher, United States Court

3   Reporter in and for the District of Kansas, do hereby

4   certify:

5          That the above and foregoing proceedings were

6   taken by me at said time and place in stenotype;

7          That thereafter said proceedings were

8   transcribed under my discretion and supervision by

9   means of computer-aided transcription, and that the

10  above and foregoing constitutes a full, true and

11  correct transcript of requested proceedings;

12         That I am a disinterested person to the said

13  action.

14         IN WITNESS WHEREOF, I hereto set my hand on

15  this, the 8th day of March, 2011.

16

17                    s/ Jana L. Hoelscher
                      Jana L. Hoelscher, RPR, CRR, RMR
18                    United States Court Reporter

19

20

21

22

23

24

25