1

```
 1              IN THE UNITED STATES DISTRICT COURT
                     DISTRICT OF KANSAS
 2


 3


 4   ADELINA GARCIA, et al, Individually
     and on behalf of others similarly
 5   situated,

 6            Plaintiffs,

 7        vs.                          District Court
                                       Case Number
 8                                     06-CV-2198-JTM
     TYSON FOODS, INC., and            Volume 6
 9   TYSON FRESH MEATS, Inc.,

10            Defendants.

11


12

             DAILY COPY TRANSCRIPT OF PROCEEDINGS
13

14        On the 10th day of March, 2011 came on to be

15   heard in the JURY TRIAL in the above-entitled and

16   numbered cause before the HONORABLE J. THOMAS MARTEN,

17   Judge of the United States District Court for the

18   District of Kansas, Sitting in Kansas City.

19            Proceedings recorded by mechanical stenography.

20            Transcript produced by computer.

21

22

23

24

25
```

2

```
 1                        APPEARANCES

 2

 3   The Plaintiffs appeared by and through:
             Mr. George Hanson
 4           Mr. Eric Dirks
             Mr. Lee Anderson
 5           Stueve Siegel Hanson Woody, LLP
             330 West 47th Street, Suite250
 6           Kansas City, MO 64112

 7           Mr. Peter Antosh
             1401 Central Avenue
 8           Garden City, KS 67801

 9
     The Defendants appeared by and through:
10           Mr. Michael Mueller
             Ms. Evangeline Paschal
11           Hunton & Williams, LLP
             1900 K Street, NW
12           Washington, DC 20006

13           Mr. Craig O'Dear
             Mr. Robert Hoffman
14           Bryan Cave, LLP
             1200 Main Street, Suite 3500
15           Kansas City, MO 64105

16

17

18

19

20

21

22

23

24

25
```

3

```
                              INDEX

Reporter's Certificate                              303


WITNESSES FOR THE PLAINTIFFS
   MONTY HAHN
        Continued Cross by Ms. Paschal               5
        Redirect by Mr. Dirks                       10

   RONDA LITRAS
        Direct Examination by Mr. Hanson            31
        Cross Examination by Ms. Paschal           152
        Redirect                                   182

   SCOTT BAGGETT
        Direct Examination by Mr. Dirks            189
        Cross Examination by Mr. Mueller           224
        Redirect                                   285



PLAINTIFFS' EXHIBITS                           ADMITTED

175 E-mail                                         138
188 E-mail                                          92
190 E-mail                                          57
249                                                 36
394B, C, D Tables                                  296
442-446 Tables                                      71
442A-446A Tables                                    70


DEFENDANTS' EXHIBITS

443
5039 PPE                                           297
5127,5129, 5138                                    297
5430, 5450, 5458, 5462                             297
5469, 5495, 5497, 5510                             297
5689, 5690, 5717, 5718, 5719                       297
5731                                               296
5736                                               264
```

```
 1              (Proceedings commence at 8:00 a.m. outside

 2          the presence of the jury:)

 3              THE COURT:  Mr. Hanson, I understand you want

 4   to talk about a deposition of some kind or another of

 5   an expert, and we'll do that at the break.

 6              MR. HANSON:  That's fine.

 7              THE COURT:  If they're all here, bring them

 8   in.

 9              (The jury enters the courtroom.)

10              THE COURT:  Good morning, folks.

11              JUROR 3:  Good morning.

12              THE COURT:  Go ahead and have a seat.

13   Everyone else can have a seat.

14          And, Mr. Hahn, is he -- once he is seated,

15   we'll get situated.

16          You know, it actually felt a little bit late

17   yesterday afternoon here like it was snowing, I don't

18   think it was but it kind of felt that way, just a

19   little bit.

20          Mr. Hahn, come on back up, take a seat, and

21   quick reminder, you are still under oath, as you know.

22              THE WITNESS:  Yes, sir.

23              THE COURT:  And let's go head and pick up, Ms.

24   Paschal.

25                  MONTY HAHN,
```

1   recalled as a witness on behalf of the Plaintiffs,

2   having been previously and duly sworn, testified

3   further as follows:

4                  CONTINUED CROSS EXAMINATION

5   BY MS. PASCHAL:

6   Q.      Good morning, Mr. Hahn.

7   A.      Good morning.

8   Q.      It's nice to see you again.

9           Mr. Hahn, at the end of yesterday you gave us

10  some reasons why it would not be feasible from an

11  administrative standpoint to move the time clocks right

12  next to the locker rooms and simply tell employees not

13  to clock in or out a certain number of minutes before

14  and after shift.

15          Do you remember that testimony?

16  A.      Yes.

17  Q.      And I believe one of the points that you made in

18  connection to that topic was that it would lead to

19  congestion.  Does having more people in the locker room

20  at any given time increase congestion in the locker

21  room?

22  A.      Yes, I believe it probably would.

23  Q.      And how would plaintiffs' proposal increase

24  congestion in the locker room?

25  A.      Well, I think it would narrow the period of time

1  that our team members had to get prepared for

2  production to start so therefore you're narrowing that

3  window of opportunity and so therefore more people

4  would be there at the same time.

5  Q.    And they would be engaging in donning activities

6  at the same time, is that correct?

7  A.    Certain activities that occur in the locker

8  room, yes.

9  Q.    What about congestion at the time clocks, would

10 that be a factor as well?

11 A.    Well, once again, if -- if we were to manage

12 the -- the window in which our team members

13 could -- could swipe their time cards, then, yes,

14 it -- there would be considerable congestion at the

15 time clock.

16 Q.    And by congestion are you referring to, like,

17 lines to clock in?

18 A.    Well, yes, I mean right now, the plants in the

19 pre-shift is a very social environment.  People kind of

20 funnel in at their leisure, it is not uncommon for

21 people in the cafeteria to be reading newspapers, there

22 is card games so, you know, if we were to manage

23 the -- the -- and people are swiping in, obviously, as

24 they enter the plant, if we were to significantly

25 narrow that window, then I guess I am -- intuitively

1   would think that congestion would occur.

2   Q.    And are you referring in part to congestion at

3   the time clocks?

4   A.    Well, just congestion at the time clock, in the

5   locker room, congestion of people entering the

6   production floor.  Not a whole lot of -- I mean, I am

7   just trying to -- I'm speculating here because we

8   haven't obviously done any -- any significant research.

9   Q.    What about difficulty in managing?  I believe

10  that was another reason you gave why it would not be

11  feasible to do what plaintiffs is proposing.

12        Do you know how many people work in the

13  processing and slaughter areas of the plant at Finney

14  County approximately?

15  A.    Processing I believe is little over a thousand;

16  slaughter, 350 to 400, I'm not quite sure exactly.

17  Q.    How likely do you think it is that a supervisor

18  stationed at a locker room entrance or at the locker

19  room itself would know who everyone walking in to the

20  locker room is?

21        MR. DIRKS:  Objection, calls for speculation.

22        THE COURT:  Overruled.

23  A.    The normal span of control in the plant is

24  somewhere around 30 to 40 team members per supervisor

25  so outside of -- of their -- the individual, the team

1   members that report directly to that supervisor, I

2   would be very surprised if they knew who those other

3   individuals were and what department they worked in.

4   BY MS. PASCHAL:

5   Q.     And how likely do you think it would be that a

6   supervisor would know specific individuals' start time?

7   A.     Outside of their department, it would be very

8   difficult.  Even if they knew the individual and they

9   knew their normal job, on any given day we have people

10  with multiple skills and based off of vacation,

11  attendance and that sort of thing, they may not know

12  exactly what job that individual is doing on that given

13  day.

14  Q.     And do the start times vary in slaughter and

15  processing?

16  A.     Yes, they do.

17  Q.     So, would it be difficult for a supervisor to

18  know if an employee is in the locker room too early or

19  too late?

20  A.     Outside --

21         MR. DIRKS:  Objection, calls for speculation.

22         THE COURT:  Again, overruled.

23  A.     I mean outside of the -- of the individuals in

24  their department, I think that would be very difficult.

25  BY MS. PASCHAL:

1   Q.   Would a male supervisor be able to go into the

2  female locker room to monitor the female employees that

3  he supervises?

4   A.   No.

5   Q.   Would a female supervisor be able to go into a

6  male locker room to look at the male employees that she

7  supervises?

8   A.   No.

9   Q.   Plaintiffs' proposal of moving the time clocks

10  to the locker rooms wouldn't actually help to measure

11  the donning and doffing at meal periods or breaks,

12  would it?

13   A.   No, I don't see how it would.

14   Q.   And, finally, you testified that there was a

15  conceptual, a lack of a conceptual difference with

16  plaintiffs' proposal as opposed to the K-code and

17  specifically you testified that picking a number of

18  minutes by which an employee should clock in or out is

19  no different conceptually than the K-code time.  What

20  did you mean by that testimony?

21   A.   Well, we -- we currently pay a certain number of

22  minutes pre-shift and a certain number of minutes post

23  shift for what we feel is -- is putting us into a

24  compliant situation with respect to the clothes

25  changing.

1        If we were to manage our team members and say

2   you can only punch in a certain number of minutes

3   before the start of your production, and therefore

4   that's the period of time that we're going to pay you

5   for, I guess in my mind that's in essence what we are

6   doing right now.

7   Q.    So either way, you're assigning numbers for

8   donning and doffing time, are you not?

9   A.    That -- that's the way I see it, yes.

10       MS. PASCHAL:  I have no further questions at

11  this time but I would like to reserve an opportunity to

12  summarize Mr. Hahn's testimony after any redirect

13       THE COURT:  Certainly.

14       MS. PASCHAL:  Thank you, Mr. Hahn.

15       THE COURT:  Mr. Dirks.

16       MR. DIRKS:  Yes.  Can everybody hear me okay?

17  I was having some volume issues yesterday.

18       THE COURT:  Thank you.  That's great.

19       MR. DIRKS:  Great.

20            REDIRECT EXAMINATION

21  BY MR. DIRKS:

22  Q.    Mr. Hahn, good morning.

23  A.    Good morning.

24  Q.    We were talking, you were talking a little bit

25  with Ms. Paschal about the congestion issue.  Is there

1 | congestion in the Finney County facility at all today?

2 | A.     Um, at times, yes.  The halls -- halls can get

3 | quite busy.

4 | Q.     That can be congestion at the punch clock, for

5 | example?

6 | A.     I have never -- I -- I have not observed the

7 | time clock, people swiping in and out in Finney County

8 | so I really can't speak to the current situation right

9 | now.

10 | Q.     You don't have an understanding of whether there

11 | is congestion sometimes at the time clocks today at

12 | Finney County?

13 | A.     Today, no, I do not.

14 | Q.     Okay.  What about the locker rooms?  Any

15 | congestion in the locker rooms these days?

16 | A.     I -- I don't know, I've not been in the locker

17 | rooms in Finney County.

18 | Q.     Would you agree that one thing that industrial

19 | engineering could do is purchase additional time

20 | clocks, if there were congestion at the time clocks?

21 | A.     The company could, industrial engineering

22 | doesn't have the authority to purchase time clocks, no.

23 | Q.     Is -- is it industrial engineering purview to

24 | manage how time clocks are used in the facility?

25 | A.     No, no, it's not.

1   Q.    Okay.  So that's just not your job?

2   A.    No, it's not.

3   Q.    But you think that if whoever is responsible for

4   managing time clocks and when people punch in and punch

5   out, they might be able to purchase additional time

6   clocks, right?

7   A.    If that was deemed to be a viable solution to

8   the -- to the issue we're discussing, I think that

9   would be possible, yes.

10   Q.    When Ms. Paschal was asking you about the time

11   clocks, is it your testimony that there is no way to

12   determine who's punching in on time and who's not

13   punching in on time?

14   A.    I'm sorry, I'm not sure I understand your

15   question.

16   Q.    I thought what you were testifying to is is it

17   would -- it would be -- it wouldn't be feasible to

18   understand if people were punching in too early, is

19   that right?

20   A.    I -- I guess what I was trying to explain was

21   if -- if -- if a team member could only punch in X

22   number of minutes prior to shift, and if we were going

23   to ask our supervisors to manage that situation and

24   ensure that team members don't, then there is only a

25   limited number of team members that any given

1 supervisor would know whether in fact that is occurring

2 correctly or not.

3 Q.    And that would be because one person can only

4 visually observe what's going on with a certain amount

5 of people, is that right?

6 A.    They can only visually monitor a certain number

7 of people and they only know whether a certain number

8 of people's actual start time.

9 Q.    You -- you'd agree with me that there are other

10 large employers across the country who are able to pay

11 their employees on a punch to punch basis, wouldn't

12 you?

13         MS. PASCHAL:  Objection.

14         THE COURT:  Basis?

15         MS. PASCHAL:  Speculation.

16         THE COURT:  Well, he asked if he knew.  And I

17 think he can answer that.  That's overruled.

18 A.    IBP/Tyson is the only company that I have worked

19 in a management role in so I really don't have any

20 personal knowledge of other industry pay practices.

21 BY MR. DIRKS:

22 Q.    You don't know if there are other companies that

23 pay on punch to punch?

24 A.    I can't speak directly to that, no, sir.

25 Q.    Yesterday Ms. Paschal was asking you some

1  questions about Doctor Fernandez, do you remember that?

2  A.    Yes, I do.

3  Q.    Did Doctor Fernandez ever perform any time

4  measurements in Finney County?

5  A.    Not that I'm aware of.

6  Q.    Did he visit Finney County?

7  A.    Not that I'm aware of.

8  Q.    Ms. Paschal also asked some questions for you

9  about some -- some lawsuits, do you remember that?

10  A.    Yes.

11  Q.    And do you remember the first one was Reich,

12  some people call it Reich, some people call it Reich.

13  (Pronouncing.)  Do you have a preference?

14  A.    We -- we refer to it as the Department of Labor

15  case, but, yes.

16  Q.    Yeah?

17  A.    Yes.

18  Q.    So there is a third way to say it.  The

19  Department of Labor case, you -- you -- she asked you,

20  Ms. Paschal asked if you had an understanding about

21  that case, do you remember that?

22  A.    Yes.

23  Q.    And do you understand that the case ultimately,

24  after a lengthy litigation, settled with the Department

25  of Labor?

1   A.    I am by no means going to try to say that I

2   understand the -- the details, all I know is the

3   outcome of that case is when we were asked to do

4   the -- the original study.

5   Q.    Okay.  The parts that you do know about the

6   case, where does your understanding come from?

7   A.    Internal Tyson legal's direction to perform the

8   study.  I mean all my information came from internal to

9   the company.

10  Q.    And all your information about the lawsuit, all

11  your understanding about the lawsuit came from what

12  legal told you, is that right?

13  A.    Yes.

14  Q.    And that was in written communications?

15  A.    No, verbally.

16  Q.    Only verbal communications?

17  A.    Yeah, I -- I don't recall any written

18  communication.

19  Q.    And you also testified that you had an

20  understanding about what the company should pay for and

21  what the company shouldn't pay for, that understanding

22  also came from legal, is that right?

23  A.    They gave us the list of the activities that we

24  then studied in 1998, yes.

25  Q.    Okay.  I wouldn't expect you to do this but I

1  want to ask the question.  Did you read any of the

2  opinions from the case?

3  A.    No, I did not.

4  Q.    Now, you testified yesterday that the K-code

5  doesn't represent the actual time that any given

6  employee spends performing a donning and doffing

7  activity, is that right?

8  A.    K-code is a cost code in our time attendance

9  system and so it's -- it's the clothes changing -- did

10 I answer your question?  I'm --

11 Q.    Let me go about it a different way.

12       K-code compensates folks for -- for certain

13 donning and doffing activities, right?

14 A.    Yes.

15 Q.    But K-code doesn't actually -- you're not paid

16 based on following somebody or somebody swiping,

17 it's -- it's an average time that is paid to everyone,

18 is that right?

19 A.    It was -- it was an average time from '98 until

20 the changes that were made in 2006 or 2007 when the

21 additional walk components were made, were added, and

22 at that time, you know, we made two simultaneous

23 changes were made, we added the additional walk and we

24 went away from the averaging, to paying individuals for

25 the -- their specific pieces of equipment.

1    Q.    But that's not based on what the actual

2    individual does in any given day, right?

3    A.    No, it was still based on the 1998 averaged

4    times for each of the activities, true, yes.

5    Q.    Now, you testified about your understanding

6    about the -- the lawsuit or -- and the DOL lawsuit

7    comes from legal.  Did legal tell you about the

8    injunction issued in that case?

9    A.    No, I'm sorry, I don't know what you are

10   referring to.

11          MS. PASCHAL:  Your Honor, although this

12   exhibit has been pre-admitted I don't think -- I think

13   that he needs to establish that the witness recognizes

14   it first before the jury can see it.

15          THE COURT:  Well, he hasn't asked a question

16   yet as far as I know, so let's see where it goes from

17   here.  Thank you.

18          MR. DIRKS:  Would you like me to ask a

19   question before showing it to the jury?

20          THE COURT:  Oh.

21          MR. DIRKS:  I was planning on just showing it.

22          THE COURT:  Well, I think you ought to ask

23   this witness about it.

24          MR. DIRKS:  Okay.

25   BY MR. DIRKS:

1  Q.    So you testified, Mr. Hahn, that you had an

2  understanding about the DOL litigation and you just

3  testified that you -- you had not seen the injunction,

4  is that right?

5  A.    That's correct.

6  Q.    The document I've put in front of you, can you

7  tell me what -- what the caption says?

8  A.    Um, at the very top, is that what you are

9  referring to?

10  Q.    This, Mr. Hahn, this word right here?

11  A.    Injunction.

12        MR. DIRKS:  I would like to go ahead and put

13  it on the ELMO at this point.

14        THE COURT:  Sure, that's fine.

15        MS. PASCHAL:  Your Honor, he hasn't actually

16  said that he recognizes the document.

17        THE COURT:  Well, it's pre-admitted so it can

18  be published and it can be asked about here so that's

19  overruled, Ms. Paschal.

20  BY MR. DIRKS:

21  Q.    And if you take a look, it says -- it's got some

22  legal formalities here, that's called a case caption,

23  and then you see it says "Injunction"?

24        Do you see that, Mr. Hahn?

25  A.    Yes, yes.

1   Q.    And do you recognize the caption at the top of

2   the case being the Department of Labor litigation we

3   were speaking about earlier?

4         If you know?

5   A.    Yes.

6   Q.    Can you read what I just highlighted?

7   A.    "The defendant is permanently enjoined and

8   restrained from violating the provisions of Section

9   1582 and 1585."  (Quoted as read.)

10  Q.    Oh sorry.

11  A.    "Of the Fair Labor Standards Act of 1938."

12  Q.    I'm going to ask you to read what I just

13  highlighted on Page 2, please.

14  A.    "Defendant shall not, contrary to sections 11(c)

15  and 15(a)(5) of the act fail to make, keep, and

16  preserve adequate and accurate records of its

17  employees."  (Quoted as read.)

18  Q.    And then can you read paragraph three for me,

19  please?

20  A.    Can you push it up a little bit, please.

21  Q.    Oh, I'm sorry.

22  A.    "It is further ordered that within ten days of

23  the date of this order, defendant shall implement

24  recordkeeping practices sufficient to record the time

25  spent by each employee performing the pre-shift and

1  post shift activities found to be compensable under the

2  act."  (Quoted as read.)

3  Q.    And can you just read the date here at the

4  bottom?

5  A.    Dated this 30th day of July, 1996.

6  Q.    Now, yesterday I asked you about the continuous

7  workday.  Do you -- do you have an understanding of

8  what the continuous workday is?

9  A.    Not for sure, no, I don't.

10  Q.    Has legal talked to you about the continuous

11  workday?

12  A.    No.

13  Q.    You testified yesterday about the Alvarez case,

14  do you remember that?

15  A.    Yes.

16  Q.    And that was another case involving IBP and then

17  Tyson?

18  A.    Yes.

19  Q.    Did legal tell you what the ruling in Alvarez

20  was?  Did legal tell you that Alvarez -- let me back

21  up.

22       Did legal tell you that Alvarez discussed the

23  continuous workday rule?

24  A.    No, the outcome, what we were directed to do was

25  to study the two walk components that we spoke about

1  yesterday.

2  Q.    What you understand about what's compensable

3  under the FLSA is based on what legal told you, right?

4  A.    Yes, sir.

5  Q.    And when you testified yesterday that it's your

6  belief the company's in compliance, that's based on

7  what the legal department told you, right?

8  A.    Yes.

9         MR. DIRKS:  Your Honor, permission to

10 approach?

11        THE COURT:  You don't have to ask permission

12 to approach.

13        MR. DIRKS:  With you.

14        THE COURT:  Oh.

15        (The following sidebar conference was had

16         outside the presence of the jury:)

17        MR. DIRKS:  Yesterday Mr. Hahn testified about

18 the company's understanding, about his compliance, he

19 talked about his understanding about the Reich lawsuit,

20 he talked about his understanding of the Alvarez

21 lawsuit, he talked about his understanding of the

22 company's understanding of FLSA, he testified this

23 morning, all of that came from his communications with

24 legal.

25        On the privilege logs there are numerous

1  communications between Mr. Hahn and folks in the legal

2  department at Tyson.  We haven't had an opportunity to

3  review those documents, we don't know what they say,

4  but Tyson has opened the door to those documents, and

5  we should have the opportunity to see what they say, in

6  order to effectively cross examine this witness.

7          MS. PASCHAL:  Your Honor, may we respond?

8          THE COURT:  Sure.

9          MS. PASCHAL:  We object to that especially

10 because, in the first place, we believe discovery is

11 already over and the time to challenge that was after

12 Mr. Hahn's deposition.  They certainly had the

13 opportunity to ask him about discovery issues during

14 his deposition if they wanted to, but in addition to

15 that, Mr. Hahn just testified that his understanding of

16 the compliance issues is based on verbal

17 communications.

18          The fact that he may have also had written

19 communications with the legal department doesn't mean

20 that that's the basis for his understanding as to why

21 he was instructed to do certain things, with respect to

22 the walking time measurements in the 1998 time study.

23          MR. DIRKS:  We didn't know that -- we didn't

24 know -- I'm sorry, I didn't mean to cut you off.

25          MS. PASCHAL:  Also, the communication in fact

1 doesn't waive the privilege itself.  The fact that he

2 understood -- he got certain facts from legal or they

3 told him certain things doesn't mean that the

4 communication itself is not still privileged.

5         MR. DIRKS:  As to the discovery issue, we had

6 no idea they were going to put their understanding of

7 the legal issues in through this witness.  And it was

8 never an indication in discovery that he was going to

9 be testifying about what legal told him and that the

10 company's position was based on that, and the company

11 was in compliance is based on that.

12         That's not something that we ever learned

13 until he took the stand yesterday.

14         MS. PASCHAL:  May I respond briefly, Your

15 Honor?

16         THE COURT:  Sure.

17         MS. PASCHAL:  In Mr. Hahn's deposition, Mr.

18 Hahn testified about the same types of things that he

19 is testifying about today, specifically the 1998 time

20 study and the 2006 time study.  We went over the same

21 spreadsheet that he went over yesterday with us, and he

22 explained exactly the same thing he did for the jury

23 and he also explained why he did it and it was in

24 response to legal.

25         He gave the name of the person who told him to

1  visit it at the company, Ms. Sheila Hagen, who was

2  general counsel for IBP at the time.  There was

3  testimony about this during his deposition, that is why

4  he did what he did in 1998 and in 2006, in response to

5  <u>Alvarez</u>.

6          Mr. Dirks had ample opportunity to explore

7  this with him in the deposition, Ms. Hagen's name is in

8  fact mentioned a couple of times in the deposition.

9  Mr. Dirks chose to ask the questions that he asked

10  then.  He certainly had a full opportunity to explore

11  that with Mr. Hahn and Mr. Hahn's testimony here today

12  is basically of the same nature as what he said in his

13  deposition.

14          MR. DIRKS:  You didn't --

15          MS. PASCHAL:  Which isn't different.

16          MR. DIRKS:  You didn't give us documents, you

17  are talking about questions he is asked of an engineer,

18  he is not a lawyer, but now he is testifying about the

19  company's position in the law.

20          Our point is simple:  We need to hear the

21  whole story, not just part of the story.

22          THE COURT:  Well, my first question is, why

23  are you bringing this up now with the jury sitting

24  here, when these same questions came up yesterday?

25          MR. DIRKS:  I didn't --

1            THE COURT:  -- instead of at the end of the

2    day?  And I'm not going to have the jury sitting over

3    here while we're up here chatting about this.  We'll

4    take it up at the break.

5            But, you're absolutely right in terms of what

6    he is testifying about, whether you're entitled to the

7    documents or not is something that I am just not

8    prepared to rule on.

9            MR. DIRKS:  Appreciate that.  I just wanted to

10   lay a foundation, that's all.

11           THE COURT:  Sure.

12           (Side bar concludes and proceedings continue

13           in open court:)

14           MR. DIRKS:  Mr. Hahn, I have nothing further

15   at this time.

16           THE COURT:  And you are subject to recall as

17   well, Mr. Hahn.

18           Ms. Paschal, anything further?

19           MS. PASCHAL:  Not at this time, Your Honor,

20   but may I briefly summarize?

21           THE COURT:  Pardon me?

22           MS. PASCHAL:  May I briefly summarize?

23           THE COURT:  Sure.

24           MS. PASCHAL:  Your Honor, is it okay if I move

25   the lectern slightly to --

1          THE COURT:  Of course.

2          MS. PASCHAL:  -- for purposes of my summary.

3          Ladies and gentlemen, you've heard through Mr.

4  Hahn that the industrial engineering department of IBP,

5  which is now Tyson, conducted a time study at legal

6  department's direction in 1998 at the Finney County

7  plant, as well as at other beef and pork processing

8  facilities owned by IBP.

9          This study was in response to the court's

10  decision in a case called Reich v. IBP that had been

11  brought by the Department of Labor.

12          Mr. Hahn told you that industrial engineering

13  measured the donning and doffing of several unique

14  safety items such as the mesh glove, as well as the

15  time spent washing these items post shift.  And the

16  walk from the walk -- from the work stations to the

17  wash stations, post shift, and that industrial

18  engineering came up with time averages for each of

19  these activities.

20          He explained that the items that are non

21  unique, such as the frock, hard hat, hair net, and

22  earplugs, were not studied, because according to the

23  legal department, they had not been found compensable

24  in the Reich case.

25          He told you that industrial engineering took

1  the averages associated with each activity and

2  determined a time for each job position at the plant.

3  These job position times were then averaged using a

4  weighted average approach to come up with an average

5  for each plant.  And then the numbers for each plant

6  were averaged together resulting in a final four minute

7  number for all plants, which became the four minute

8  K-code in 1998.

9        He also told you that the actual plant average

10  for Finney County was less than four minutes.

11        Mr. Hahn explained to you that the Department

12  of Labor retained an industrial engineer, Doctor Jeff

13  Fernandez, to verify the four minute K-code in 1998.

14  Mr. Hahn attended the time studies that Doctor

15  Fernandez conducted at two of IBP's plants.

16        Doctor Fernandez presented his findings in a

17  written report to the Department of Labor concluding

18  that he had verified the use of the four minute K-code

19  average at all 11 facilities at issue, including the

20  Finney County facility.

21        This verification was done as part of the

22  settlement process of the Reich litigation between the

23  Department of Labor and IBP.

24        Mr. Hahn also explained to you that the legal

25  department asked industrial engineering to measure pre

1   and post shift walking time distances at the plants

2   receiving the K-code in 2006, in response to a court

3   decision known as the <u>Alvarez</u> case, which indicated,

4   according to the legal department, that such time might

5   be compensable.

6           He told you that the industrial engineers

7   developed a protocol for measuring these walking time

8   distances in 2006 and performed the measurements in

9   2006 as well.

10          He explained that industrial engineering then

11  added these walking time measurements to the elemental

12  times for each of the unique items calculated in 1998

13  and they developed a number for each position that

14  became a K-code that was specific to each position

15  within the plant.

16          These became the 2007 K-code times.

17          He explained to you, and we saw an example of

18  how the data is kept in a worksheet, which was admitted

19  as Plaintiffs' Exhibit 24, and he also explained to you

20  that in calculating these K-codes in 2007, they were

21  always rounded up to the nearest minute.

22          He also explained that no additional time

23  studies were performed before the 2010 work day changes

24  and that the new K-codes that were implemented in April

25  of 2010 do not reflect any sort of time measurement.

1          He explained to you that as part of the Reich

2     settlement process Finney County performs quarterly

3     wage and hour audits to ensure that there are no lines

4     in areas such as the wash stations and in distributing

5     knives.

6          He explained that these wage and hour audits

7     are conducted by the plant engineers quarterly and are

8     submitted to corporate IE and he is not aware of any

9     problems that have been escalated from Finney County,

10    from the plant level to the corporate level.

11         Mr. Hahn also explained that moving time

12    clocks to the locker rooms, as plaintiffs have

13    suggested, is not feasible from administrative

14    perspective and he gave us three reasons.  First, that

15    it would increase congestion in the locker rooms and

16    potentially also at the time clocks as employees are

17    waiting to clock in at the appropriate time.

18         He explained that this would not

19    actually -- moving time clocks would not actually

20    measure the time spent donning and doffing at either

21    the meal period or at breaks.

22         He explained some of the management challenges

23    of trying to ensure that employees are clocking in and

24    clocking out at the appropriate time.

25         And, finally, he explained to you that asking

1  employees not to clock in or clock out more than a

2  certain number of minutes before or after shift is

3  conceptually no different than paying K-code time.

4  Thank you.

5         THE COURT:  Mr. Dirks.

6         MR. DIRKS:  Just one moment.

7         You heard that Mr. Hahn is not an expert in

8  time studies.

9         You heard that Mr. Hahn was just doing what

10 legal told him to do and to study what legal told him

11 to study.

12        You heard him testify that everything he knows

13 about compliance comes from what Tyson's lawyers told

14 him.

15        You heard there were numerous items in his

16 studies that were not studied.

17        You heard that K-codes do not pay for actual

18 time worked.

19        And, finally, you heard that Tyson did not

20 study the continuous workday and has never attempted to

21 do so.

22        THE COURT:  Thank you.  All right.  Your next

23 witness?

24        MR. HANSON:  Thank you, Judge.

25        THE COURT:  And you may step down, Mr. Hahn,

1   but you are subject to recall.

2            MR. HANSON:  We would call Tyson's witness,

3   Ronda Litras.

4            THE COURT:  Thank you.

5            (Witness is sworn.)

6            THE COURT:  Mr. Hanson, whenever you're ready.

7            MR. HANSON:  Thank you, Judge.

8                        RONDA LITRAS,

9   called as a witness on behalf of the Plaintiffs, having

10  been first duly sworn, testified as follows:

11                    DIRECT EXAMINATION

12  BY MR. HANSON:

13  Q.    Good morning, Ms. Litras.

14  A.    Good morning.

15  Q.    We haven't had a chance to meet before this

16  morning.  I represent the workers in this case.  You

17  understand that?

18  A.    Yes.

19  Q.    And you haven't given a deposition in this

20  litigation, have you, Ms. Litras?

21  A.    No, I have not.

22  Q.    You understand you were someone identified on

23  Tyson's witness list in this case?

24  A.    Yes.

25  Q.    And on the witness list, Tyson tells us that

1  you're expected to testify regarding how the K-code was

2  added to the payroll system used by defendants and how

3  it has been updated or revised over time.

4          Are you prepared to testify on that?

5  A.    Yes.

6  Q.    You're also expected to testify regarding how to

7  read payroll records and other non production work time

8  paid to hourly production workers at the Finney County

9  plant.  Are you prepared to testify on that?

10  A.    Yes.

11  Q.    Day before yesterday I provided a list of

12  documents or exhibits that I was planning to go over

13  with you.  I provided that to your counsel.

14          Have you had a chance to read through those

15  documents?

16  A.    Yes.

17  Q.    I think that will help things go a little faster

18  I think.

19          All right.  Ms. Litras, are you currently

20  employed with Tyson?

21  A.    Yes, I am.

22  Q.    All right.  Can you tell the jury your current

23  job title?

24  A.    I'm the time and attendance manager.

25  Q.    And how long have you been employed by Tyson?

1    A.    I started with Tyson in the Summer of '89 as

2  a -- as a sales clerk, and I came back December of '90

3  as an internal auditor, and then I moved up to in 1993,

4  benefits accountant, payroll manager in '97 through

5  2006, and then I started in this position July of '07.

6    Q.    All right, Ms. Litras, it sounds like you were

7  initially an employee with Tyson's predecessor, IBP?

8    A.    Yes.

9    Q.    And then you became a Tyson employee in 2001?

10    A.    At the time they acquired us.

11    Q.    I think we're all pretty confident it happened

12  in about 2001, does that sound right?

13    A.    Yes.

14    Q.    And you've been the time and attendance manager

15  since July of --

16    A.    '07.

17    Q.    Thank you.  Now very quickly, what are your job

18  responsibilities as time and attendance manager?

19    A.    I manage the Time and Attendance System, I also

20  have two smaller systems, the bid system and the

21  calendar system.  All three of these systems are used

22  at the plants.  I work with the IT group to ensure that

23  the systems are working as instructed by plant manager

24  and my HRDs and then we train end users.

25    Q.    Thank you.  The Time and Attendance System, I

1  think that's going to be the one we are going to talk

2  about the most.  Is that, though, the centralized time

3  keeping system that Tyson employs?

4  A.    Yes.

5  Q.    Okay.  And it's used at all of its facilities,

6  correct?

7  A.    At all the facilities originated with IBP.

8  Q.    And would those be the facilities that are under

9  what's known as Tyson Fresh Meats?

10  A.    Yes.

11  Q.    And those facilities would include the facility

12  at issue in this case, Finney County?

13  A.    Yes.

14  Q.    All right.  So Finney County is part of the

15  centralized Time and Attendance System?

16  A.    Yes.

17  Q.    Do you know how long the Time and Attendance

18  System that you have just referred to has been in place

19  in Finney County?

20  A.    The system, I believe was created early '90s.

21  So...

22  Q.    I have a --

23  A.    I don't have a specific date on that.

24  Q.    Let me see if we can pin it down in time at

25  least a little bit, Ms. Litras.

1   A.    Okay.

2   Q.    I am going to hand you what I have marked as

3  Exhibit 249.

4   A.    Okay.

5   Q.    Do you recognize this document?

6   A.    Yes, Evangeline showed me this document.

7   Q.    I'm sorry, your counsel showed you this

8  document?

9   A.    Yes.

10   Q.    All right.  And you see that this is a

11  memorandum of December 17th, 2003 titled Time and

12  Attendance Announcement, correct?

13   A.    Yes.

14   Q.    And it's from Ken Kimbro?

15   A.    (Nods head.)

16   Q.    Do you know Mr. --

17   A.    Yes.

18   Q.    Pardon me.  Do you know Mr. Kimbro?

19   A.    Yes, I do.

20   Q.    Do you understand he's the highest ranking human

21  resources manager in the company?

22   A.    Yes.

23   Q.    And that includes Tyson Foods, the parent,

24  right?

25   A.    That's correct.

1    Q.    So he is the top HR manager?

2    A.    Yes.

3            MR. HANSON:  I would move for admission of

4    249.

5            THE COURT:  Any objection?

6            MS. PASCHAL:  Yes, Your Honor, it's hearsay,

7    it's -- Litras is a recipient of this document.

8            THE COURT:  Is Mr. Kimbro coming to testify

9    this next week?  I understand he is?

10           I'll conditionally admit it subject to tieing

11   it up with him.

12           MR. HANSON:  Thank you.

13           THE COURT:  What that means, members of the

14   jury, is I am admitting this, unless Mr. Kimbro cannot

15   tie it up and if that's the case, it will be removed

16   from the evidence.

17   BY MR. HANSON:

18   Q.    And all I really want to accomplish, Ms. Litras,

19   is just confirming what's on the first line of the

20   second paragraph where Mr. Kimbro says:   "The time and

21   attendance project will provide us with the opportunity

22   to replace the 18 existing Time and Attendance Systems

23   at all Tyson locations with one common centralized

24   system."  (Quoted as read.)

25           Do you see that?

1   A.     Yes.

2   Q.     And is it -- is it accurate that the Time and

3   Attendance System that you currently manage was part of

4   this effort to centralize time keeping at Tyson?

5   A.     Yes.

6   Q.     So this is from December of 2003.  There was a

7   Time and Attendance System in place before, correct?

8   A.     Yes.

9   Q.     But at least by around December of 2003, the

10  time systems became centralized across Tyson, is that

11  correct?

12  A.     No.

13  Q.     Okay.  What's not correct about that?

14  A.     This memo is instructing that the objective of

15  this -- of the Project 1 was to create a new

16  centralized system that would replace time and

17  attendance and pers time, you see that in the memo,

18  which is the poultry Time and Attendance System.  They

19  worked on it for two years and they were not able to

20  recreate the complexities of our time systems, it

21  failed, so we continue with our same system.

22  Q.     So you are familiar with the contents of this

23  document, correct?

24  A.     Yeah, I'm familiar with the Project 1 process.

25  Q.     Okay.

1          MR. HANSON:  I guess I would move just for

2   admission.  She's speaking as to the content of the

3   document.

4          THE COURT:  I'm still, I want Mr. Kimbro here

5   to tie it up.

6          MR. HANSON:  That's fine.

7          THE COURT:  I have conditionally admitted

8   already.

9   BY MR. HANSON:

10  Q.    Ms. Litras, the Time and Attendance System that

11  is currently in place at Finney County, that Time and

12  Attendance System has been in place since 2003,

13  correct?

14  A.    Yes, and prior.

15  Q.    You said even prior to 2003?

16  A.    Yes.  T and A has been there since until at

17  least early '90s.

18  Q.    So the Time and Attendance System that is

19  currently in place goes back, you know, before 2003,

20  correct?

21  A.    That's correct.

22  Q.    The reason I mentioned 2003 is that's really the

23  time period at question in the case.

24          So, it is true, that during the entire time

25  period that we're talking about here, this same Time

39

1  and Attendance System at Finney County has been in

2  place, is that right?

3  A.    That is correct.

4  Q.    Now the Time and Attendance System that you

5  manage can do a number of things for Tyson, correct?

6  A.    Yes.

7  Q.    It helps you keep attendance, correct?

8  A.    Yes, it identifies who's in the plant.

9  Q.    And it also helps you to keep time punches,

10  correct?

11  A.    That's correct, it accepts the team members'

12  punches when they come in.

13  Q.    Some team members at Finney County are paid off

14  the time clock, correct?

15  A.    If there is people paid off the -- like a manual

16  time clock?

17  Q.    Like off -- like a time swipe?

18  A.    Okay, like a punch?

19  Q.    Right.

20  A.    Yes, that would be, yes.

21  Q.    So I just want to make sure our terminology is

22  consistent.  You call it a punch right?

23  A.    Yes.

24  Q.    So there are some hourly workers who are paid

25  punch to punch, right?

1   A.    That would be punch to punch would be our

2   clerks.

3   Q.    Right.

4   A.    The office clerk.

5   Q.    So you have office workers at Finney County who

6   are paid punch to punch, right?

7   A.    Right.   That would -- that's correct.

8   Q.    And you have the large number of hourly workers,

9   though, the production workers, most of them are paid

10  not punch to punch?

11  A.    No, they're paid gang.

12  Q.    They're paid on a gang-time, correct?

13  A.    Yes.

14  Q.    And the Time and Attendance System, although it

15  doesn't pay gang-time production workers punch to

16  punch, it is still used as part of the gang-time

17  payroll, correct?

18  A.    Yes.

19  Q.    For example, it's used for purposes of adding

20  K-code, right?

21  A.    Yes.

22  Q.    And K-code, as we've learned in this case, are

23  just minutes that Tyson has added on to gang-time over

24  the years, correct?

25  A.    That's correct, it's additional minutes beyond

1  work time.

2  Q.    Well, it's additional minutes beyond gang-time,

3  correct?

4  A.    That's correct.

5  Q.    In terms of the Time and Attendance System, can

6  you use it to set certain rules regarding punching in

7  and punching out?

8  A.    Yeah, my staff and I have the ability -- all the

9  rules are centralized at my office.

10  Q.    Right.

11  A.    The rules.

12  Q.    And you say rules.  Can you essentially program

13  the system to do certain things, like provide an alert

14  if someone is punching in when they shouldn't, correct?

15  A.    We have edits that would identify if someone

16  punches in late.  Everybody has an approximate -- a

17  start time that we want them to be there, so if they

18  punch in one minute after that start time, an edit will

19  be thrown.

20  Q.    Right.  So just by way of example, if someone

21  was supposed to punch in, let's just say 8:00 a.m., but

22  they actually punched in at 8:01 or 8:02, that would

23  create a flag for the supervisor, correct?

24  A.    That is correct.

25  Q.    So the supervisor would see, oh, one of my

1  hourly workers actually punched in late, correct?

2  A.    That is correct.

3  Q.    And if that hourly worker was paid not punch to

4  punch but on some other method like gang-time, the

5  supervisor could make an adjustment to the pay,

6  correct?

7  A.    That's correct.  The supervisor at that point

8  would have to id -- excuse me -- would have to decide

9  that why was this person late, you know.  For our

10  calendar issues, we need to know if that was excused or

11  unexcused or was this person truly late or did he

12  possibly change the start time for that person that

13  day.

14  Q.    But even under gang-time, the punch system, if

15  an hourly gang-time worker came in late, the punch

16  system provides useful information to a supervisor to

17  determine how much that employee should be paid,

18  correct?

19  A.    It determines when the employee should be there.

20  Q.    But it -- but it will tell the supervisor when

21  they're late, correct?

22  A.    Yes, it will tell them when they're late.

23  Q.    Let's just look on the other side of that.  The

24  Time and Attendance System, it can also tell a

25  supervisor when an individual punches in early,

1  correct?

2   A.    That is correct.

3   Q.    You can set up an edit to show if someone

4  punched in earlier than they're supposed to, that would

5  also be made aware to the supervisor, correct?

6   A.    That is correct.  The plant has -- the plant

7  management can give me a tolerance level, for example,

8  if they want to see anybody who punches in 10 minutes

9  early, or 15 minutes earlier, then I'll set the rule

10  and then the edits will -- will be shown accordingly.

11   Q.    Right.  It's actually an adjustable rule,

12  correct?

13   A.    Yes.

14   Q.    Okay.

15   A.    I can change it.

16   Q.    If you -- if you wanted to -- let's just talk

17  about gang-time employees at Finney County.

18         If you wanted to know who was punching in, you

19  know, more than 15 minutes early, you could -- you

20  could set that rule in the Time and Attendance System,

21  correct?

22   A.    Yes, I could reset it and they would run their

23  edits and they would have a list of who is punching in

24  15 minutes early.

25   Q.    So the supervisor would not have to stand

44

1  outside the locker room and watch their employees, they

2  would see an automated report as to who punched in

3  early, correct?

4  A.    Right.  You could create that report.  That

5  report, usually they have a higher tolerance level

6  because that report could be 50 pages long.

7  Q.    But for each supervisor --

8  A.    To 60 page.

9  Q.    I'm sorry.  For each supervisor, the Time and

10 Attendance System could be programed to provide

11 automatic alerts on a daily basis as to who was

12 punching in before they should, that is true, correct?

13 A.    That is true.

14 Q.    All right.  You mentioned gang-time, correct?

15 And that's the basis for how production workers at the

16 Finney County plant are paid, correct?

17 A.    That is correct.

18 Q.    And you know what K-code is, correct?

19 A.    Yes.

20 Q.    You can see K-code in the payroll data, correct?

21 A.    Yes, in the details it appears as a summation at

22 the end of the week on Saturday.

23 Q.    Ms. Litras, it's true that anyone who is given

24 K-code is a gang-time worker, correct?

25 A.    Yes.

1   Q.    You don't give K-code to non-gang time workers?

2   A.    No.

3   Q.    For example, you don't give K-code workers to

4   office workers who are paid punch to punch?

5   A.    No, the office girls do not get K-code.

6   Q.    And you don't get K-code workers to workers who

7   are not on the production line?

8   A.    No.

9   Q.    And I'm going to give an example.

10         Maintenance, the folks who are -- well,

11  maintenance in the facility, they don't get the K-code,

12  correct?

13  A.    That's right.  Typically maintenance doesn't get

14  K-code.  Engineers instruct me or the HRDs instruct me

15  which departments or which job codes get K-code.

16  Q.    Right.

17  A.    And it's not something I decide.

18  Q.    Do you know the ground beef department?

19  A.    That's not something I decide, so I would have

20  to look at my system.

21  Q.    But do you know whether ground beef gets K-code

22  or not?

23  A.    I cannot tell you that offhand.

24  Q.    Or rendering?

25  A.    I cannot tell you that offhand.

1   Q.     But maintenance you know gets K-code?

2   A.     I know maintenance doesn't get it.

3   Q.     I'm going to show you a document that we've

4   agreed by stipulations has already been admitted, it's

5   Exhibit 20.

6          Show you the exhibit sticker here.

7          Ms. Litras, do you recognize this document?

8   A.     Yes.

9   Q.     This appears to be -- well, can you tell us what

10  it is?

11  A.     This is a list of the cost codes that are used

12  in my Time and Attendance System.  It also -- it breaks

13  them out as direct or indirect, then you have your

14  status codes, this is the type of if somebody is

15  working restricted or light duty, that is used for our

16  engineers, then we also have the different types of

17  absences that are identified in our system.

18  Q.     All right.  The code I just want to call your

19  attention to is the third one on the left column.

20  Actually, it's the fourth one on the left column.  K.

21  And it's identified as clothes change, do you see that?

22  A.     Yes.

23  Q.     All right.  This is the K-code we've been

24  talking about, right?

25  A.     That is correct.

47

1   Q.    And it's referred to within the payroll system

2   as clothes change, correct?

3   A.    Yes.

4   Q.    And you understand that it's intended to

5   compensate for what we're calling donning and doffing

6   time?

7   A.    That's correct.

8   Q.    Just a different way of saying clothes change?

9   A.    Yes.

10  Q.    Now, there's not a code here for gang-time,

11  correct?

12  A.    No, I mean that would show under work.

13  Q.    Right.  So let's -- but we know that if someone

14  did have a K-code in their payroll records, as you

15  said, we would know they were paid on gang-time,

16  correct?

17  A.    Yes.

18  Q.    Sometimes K-code workers may not be paid

19  gang-time for a given shift, right?

20  A.    They may be short that day, for example, maybe

21  the team member has to leave early, they would still

22  receive their K-code even though they didn't complete

23  the whole gang.

24  Q.    Right.  So and this is what I want to clarify

25  with you.

48

```
 1          K-code means the worker is eligible for
 2  gang-time, correct?
 3  A.    Yes.
 4  Q.    But on a given shift, just because maybe a
 5  doctor's appointment or a family emergency or maybe an
 6  illness, a worker may leave the gang early, correct?
 7  A.    That is correct.
 8  Q.    Or a worker may arrive to the gang late,
 9  correct?
10  A.    That is correct.
11  Q.    And on that particular shift, they may not be
12  paid along with the rest of the gang, correct?
13  A.    That is correct.
14  Q.    They would be paid a different amount, according
15  to their supervisor, right?
16  A.    That's correct.
17  Q.    So if we wanted to look through all the payroll
18  records and find out which shifts were paid on
19  gang-time, one way to start would be to look at the
20  K-code, correct?
21  A.    Yes, you could do that.
22  Q.    And then you could look to see whether other
23  workers in the facility are being paid the same amount
24  of time as other members in their department, correct?
25  A.    Yes.
```

1  Q.    All right.  That would show the gang, right?

2  A.    Yes.

3  Q.    For example, you might see in a department,

4  let's say there are 20 people?

5  A.    Okay.

6  Q.    Nineteen of them are paid eight hours and five

7  minutes on a given day, you understand that?

8  A.    Yes.

9  Q.    That would show that those 19 are part of the

10 gang, correct?

11 A.    That's correct.

12 Q.    The one that might have been paid 7 hours and 30

13 minutes, although they're eligible for gang-time or are

14 gang-time worker, they were paid a different manner on

15 that shift, correct?

16 A.    That's correct.  And then the system or excuse

17 me, the supervisor would have filled in using one of

18 the absent codes.

19 Q.    Right.  But I'm just trying -- you can, from the

20 payroll records you can determine both what shift works

21 are K-code, correct?

22 A.    Yes.

23 Q.    And which shifts work are gang-time, correct?

24 A.    I didn't quite follow that.

25 Q.    From the payroll records you can tell

1  who's -- who's being paid on gang-time, correct?

2  A.    Right.  You can see the total number of hours

3  they were paid, yes.

4  Q.    You can see the total number of hours they were

5  paid and you can see that they were paid according to a

6  gang, correct?

7  A.    Well, on my initial -- on my initial payroll

8  report, I don't have what the actual that department's

9  gang was.  So that's why I wasn't --

10  Q.    I appreciate that.

11  A.    Okay.

12  Q.    And let's just maybe explore that a little bit.

13        On -- if you just got one person, one person's

14  payroll records for a week, you would not be able to

15  tell which shift was paid a gang-time and which was

16  paid through modifications, would you?

17  A.    Well, the supervisor should complete it with the

18  absent codes, so you're right, so on those days you

19  would see the absent code, you would know they didn't

20  work a full shift.

21  Q.    And so if there is an absence code you should

22  know that that was not a gang-time shift, right?

23  A.    They didn't work the full gang.

24  Q.    If you had the whole department's payroll

25  records, one way to see if people are working the gang,

1  is to kind of compare to see the time that is worked on

2  a given day?

3  A.    Right, you could compare if there is a

4  consistent number of hours worked.

5  Q.    Exactly.  Okay.  Sorry, there is one more page I

6  want to show you.

7  A.    That's all right.

8  Q.    Within Exhibit 20 are portions of a manual, and

9  it's called a Time and Attendance Supervisor Training

10  Manual, do you see that?

11  A.    Yes.

12  Q.    And do you see that this portion of the manual

13  is training supervisors on how the punch to punch

14  system works?

15  A.    Yes.  Pay by punch.

16  Q.    So just as an administrative manner, if Tyson

17  wanted to, it could pay its production workers punch to

18  punch?  Correct?

19  A.    My system could be changed to pay -- to be paid

20  pay -- excuse me, to pay punch to punch.  We are

21  limited to only four punches a day, which is a system

22  issue we have.

23  Q.    Okay.  But within the limitations of punch to

24  punch, just as an administrative matter, you could pay

25  all workers at Finney County punch to punch, the --

1   A.      System wise, yes.

2   Q.      The system's in place to do that, correct?

3   A.      Yes.  If we would be limited to four punches a

4   day.

5   Q.      Four punch in, punch outs?

6   A.      Mm-hmm.

7   Q.      But it's administratively feasible, correct?

8   A.      System wise, yes.

9   Q.      You can probably find a system that could allow

10  you more punch in and punch outs, couldn't you?

11  A.      That would be possible, that is what they tried

12  with Project 1, they just weren't able to recreate our

13  other complexity payroll processes.

14  Q.      I would have to imagine in the year 2011 with

15  our technology capability there are probably some

16  systems somewhere that would allow multiple punches?

17          MS. PASCHAL:  Objection.

18          THE COURT:  Basis?

19          MS. PASCHAL:  Speculation.

20          THE COURT:  Overruled.  You can answer.

21  A.      I'm sure, I mean I'm not a system expert but I'm

22  sure there are systems out there, it is just that they

23  have to accommodate our other payroll processes.

24  BY MR. HANSON:

25  Q.      Even with four punches for a production worker,

1  you could record the time they punched in before they

2  went to change clothes or go to the production floor,

3  correct?

4  A.    Right.  We could do the punch in.

5  Q.    Let me just walk through the four.  And then a

6  punch out you could record when they went on unpaid

7  meal break, correct?

8  A.    Yes.

9  Q.    And then you could punch in again after they

10 went back to work after their unpaid meal break,

11 correct?

12 A.    Yes.

13 Q.    And then they could punch out when they were

14 done for the day, right?

15 A.    It would just always have to be a perfect day.

16 Q.    Well, would you agree most days would have four

17 punch in, punch outs?

18 A.    Right.

19         MR. HANSON:  Ms. Davis, can we pull up a slide

20 I used in my opening and with Mr. Karkiainen.

21         MS. DAVIS:  George, can you push the button,

22 please.

23 BY MR. HANSON:

24 Q.    Ms. Litras, the jury has seen this a couple

25 times, this may be the first time you've seen our

1  timeline in the case, all right?

2  A.    Okay.

3  Q.    Let me just give you some quick orientation to

4  it.

5        We talked about the points in time that Tyson

6  changed its K-code policy, do you remember that?

7  A.    Yes.

8  Q.    All right.  Back in 1998, when the company at

9  that time was IBP, there was a decision to add four

10 minutes to a gang-time workers' pay, do you see that?

11 A.    Yes.

12 Q.    And I apologize -- were you just coming on board

13 at that point for the company?

14 A.    I was a payroll manager at this time.

15 Q.    Do you recall when that change was made?

16 A.    Um, I was not involved with it at all.

17 Q.    Not at that time?

18 A.    Not at that time.

19 Q.    By the time you moved up, the K-code of four

20 minutes was already in place, right?

21 A.    That's correct, four minutes by department.

22 Q.    But you understand now that that four minutes

23 was added on to account for clothes changing time,

24 correct?

25 A.    Yes.

1  Q.    All right.  So the next change in K-code, well,

2  let's just show we have the acquisition by Tyson of IBP

3  in 2001, do you see that?

4  A.    Yes.

5  Q.    All right.  And then in May of 2006, this

6  lawsuit is filed, you see that?

7  A.    Yes.

8  Q.    Then the next change to K-code occurs in January

9  of 2007.  Do you see that?

10  A.    Yes.

11  Q.    And you were part of the company at that point,

12  correct?

13  A.    Actually January of '07 was during my nine month

14  leave from the company.  I returned July of '07.

15  Q.    Okay.  On maternity leave at that point or --

16  A.    No, they had eliminated my department.

17  Q.    Oh.

18  A.    I worked elsewhere for nine months and then

19  returned.

20  Q.    You were out for nine months but then came back,

21  right?

22  A.    Yes.

23  Q.    You were aware that the K-code add on occurred

24  at about this time, though, when the decision was made

25  to go up to seven minutes, right?

1    A.      Yes.

2    Q.      And then, the final adjustment to K-code that's

3    current today, occurred in April of 2010, do you know

4    that?

5    A.      Yes.

6    Q.      And you're aware of that change, correct?

7    A.      Yes.  I was involved with that one.

8    Q.      And under that change, the time was increased to

9    up to 22 minutes, correct?

10   A.      Yes.

11   Q.      I want to first go back to the 2007 time frame.

12   A.      Okay.

13   Q.      Let me hand you a document that we have

14   previously marked and identified to your counsel as

15   Exhibit 190.

16          Ms. Litras, you recognize this document?

17   A.      Yes, I do.

18   Q.      Okay.  This is an e-mail from you, correct?

19   A.      Yes, from me to Mark Hayre, H-a-y-r-e.

20   Q.      And it's from August of 2007, correct?

21   A.      Yes.

22   Q.      And the subject matter is pre and post activity

23   minutes adjustment, correct?

24   A.      Yes.

25   Q.      And you're familiar with what this document is?

1   A.    Yes.

2         MR. HANSON:  I'd move for admission of 190.

3         MS. PASCHAL:  Objection, hearsay.

4         THE COURT:  Overruled.

5   BY MR. HANSON:

6   Q.    All right.  Let's just walk through this

7   document, Ms. Litras.

8         First, just to confirm that it is an e-mail

9   from you, correct?

10  A.    Yes.

11  Q.    And the date is August 14th, 2007, correct?

12  A.    Yes.

13  Q.    Now, the change in the addition to K-code

14  minutes that occurred in 2007, we understood occurred

15  in January, correct?

16  A.    That is when they started bringing the plants on

17  to the new process.

18  Q.    So the policy change you're saying was effective

19  in January, correct?

20  A.    Yes.

21  Q.    But the actual payments for that additional

22  K-code were not made for about another six months, is

23  that correct?

24  A.    Yes.

25  Q.    So, who is Mark Hayre?

1   A.    Mark Hayre is the Tyson payroll director.

2   Q.    Is he your supervisor?

3   A.    Not in this position.

4   Q.    Not when you were in this position?

5   A.    That's right, not as a time and attendance

6   manager.

7   Q.    But he is -- he is a high -- he's a super --

8   A.    He is the highest ranking payroll.

9   Q.    Mr. Hayre is the highest ranking payroll manager

10  in the company?

11  A.    Yes.

12  Q.    And then the other people copied here, that's

13  Mr. -- that's Mr. Hayre.

14        Who is Hector Gonzalez?  Who is Hector

15  Gonzalez?

16  A.    Hector Gonzalez I'm not sure of his position at

17  this point in time but he was in Springdale, he was

18  some type of HR, he might have been a vice president at

19  this time, I'm not for sure.

20  Q.    You think he is in the HR department, though,

21  Mr. Gonzalez?

22  A.    Yes, he is HR.

23  Q.    And then who is Bruce Pautsch?

24  A.    Bruce Pautsch is a HR meats president.

25  Q.    So Mr. Pautsch is the highest ranking HR for

1   Tyson Fresh Meats?

2   A.    Yes?

3   Q.    Who is Vikky Christiansen?

4   A.    Vikky Christensen, Ybarra, she was the HRD for

5   Finney County at this time.

6   Q.    HR, human resources director?

7   A.    Yes.

8   Q.    For Finney County?

9   A.    Yes.

10  Q.    All right.  And who is Paul Kirchner?

11  A.    And Paul Kirchner was legal counsel for the

12  company.

13  Q.    Do you know Mr. Kirchner?

14  A.    Yes.

15  Q.    Do you work with Mr. Kirchner on wage and hour

16  matters?

17  A.    Yes.

18  Q.    Is that why Mr. Kirchner is attached to this

19  document?

20  A.    Yes.

21  Q.    All right.  So your e-mail says, "Mark, attached

22  is the spreadsheet documenting the dollar amount to be

23  paid to the TM in reference to the update of the

24  minutes for the pre and post activity minutes for

25  Finney County from January 21, '07 through August 4th,

1  '07," is that correct?  (Quoted as read.)

2  A.     Yes.

3  Q.     And "TM" means team member, right?

4  A.     That's correct.

5  Q.     And you go on to write, "The data is broke out

6  between slaughter, five min and six min jobs and

7  processing five min, six min, and seven min jobs," is

8  that correct?  (Quoted as read.)

9  A.     Yes.

10  Q.     "I have broke the data down by TH and week ended

11  to aid in the calculation of earnings," is that

12  correct.  (Quoted as read.)

13  A.     Yeah, I should have said interest, but, yes.

14  Q.     You should have said interest where?

15  A.     Well, to aid in the calculation of earnings, I

16  should have said to aid in the calculation of interest,

17  because see, below it says the total wage adjustment

18  before interest.

19  Q.     Right.

20  A.     So I had to break it by week ending dates, Mark

21  was going to calculate the interest of when they should

22  have received it forward.

23  Q.     Oh, I see.  So we -- we -- week ending is

24  the -- is the weekend, the payroll week end?

25  A.     That's correct.

1   Q.    All right.  And then it says, "The total wage

2   adjustment before interest is broke out accordingly."

3   (Quoted as read.)

4         And then you provide the numerical break out,

5   is that right?

6   A.    Yes.

7   Q.    Okay.  And then attached are two Excel

8   spreadsheets, is that right?

9   A.    Yes.

10  Q.    One for processing, correct?

11  A.    Yes.

12  Q.    And one for slaughter?

13  A.    Yes.

14  Q.    So though the policy to add up to additional

15  three minutes for K-code was effective back in January,

16  it wasn't until August that the company was able to

17  make those payments, is that right?

18  A.    That is correct.

19  Q.    So you're making those payments retroactively,

20  correct?

21  A.    That's correct, back to January 21st.

22  Q.    And you're making them as back payments,

23  correct?

24  A.    That's correct, with interest.

25  Q.    Right.  So and the spreadsheets, they don't

1  indicate -- these totals that you gave here, they don't

2  indicate that that's inclusive of interest, right?

3  A.    That's correct, before interest.

4  Q.    So, just mechanically, how are the employees

5  provided their back pay?

6  A.    You know, Mark Hayre took it from this point.  I

7  know that he needed the ability to calculate interest

8  and that's why I broke it by week ending date.  So he

9  actually made the payments from this point.

10  Q.    Do you know if it was time that was just added

11  to an employee's payroll check?

12  A.    I don't know if they added it to the check or

13  made a separate check, I do not know.

14  Q.    Or they may have made separate payments,

15  correct?

16  A.    That's correct, could have been a whole separate

17  check.

18  Q.    The policy that you identified in Exhibit 190,

19  you say was effective January 21st of 2007.  Do you see

20  that?

21  A.    Yes.

22  Q.    We have a stipulation with Tyson in this case

23  that indicates the change in Finney County became

24  effective January 28th, 2007.  Are you aware of that?

25  A.    Um, I -- I wasn't aware of the date difference.

1   Q.    And it's just, there is a one week -- I'll just

2   show you this.  This is a copy of the stipulation we

3   have in this case.  From our pretrial order.

4         And it just talks about from the beginning of

5   the limitations period until January 28th, 2007 at

6   Finney County defendants paid an additional four

7   minutes per day, do you see that?

8   A.    Okay.  And that would make sense because January

9   21st would have been the first day of -- well, I'm

10  assuming January 28th is a Saturday.

11  Q.    There may be just a week off because of a

12  payroll or week end?

13  A.    Right, that's what I am thinking, the 21st was a

14  beginning of a payroll week is what I am thinking but I

15  can't confirm that.

16  Q.    It probably doesn't matter.  Sorry, it probably

17  doesn't matter a whole lot, I just wanted to clear up

18  what looks make a week disconnect between your e-mail

19  and what our stipulation says.

20  A.    Okay.

21  Q.    Well, just help me understand why we had a

22  delay.  The policy to pay workers additional minutes

23  went into effect in January, why is it 'til August that

24  they're getting the payments?

25  A.    You know, I didn't come into my position until

1  July of '07, so I wasn't here in January.  I know they

2  brought on several, you know, quite a few plants, you

3  know, throughout that time period.  Which probably just

4  system wise, but I was not in my position until July.

5  So I was not involved bringing on those other plants.

6  Q.    So you -- you're not able to help us understand

7  why there was a six month delay in making those

8  payments?

9  A.    No.

10  Q.    But whatever the reason for the delay, as this

11  e-mail reflects, Tyson did agree to make back pay,

12  correct?

13  A.    Yes.

14  Q.    It agreed that back pay was appropriate,

15  correct?

16  A.    Yes.

17  Q.    It agreed that these workers were owed this

18  additional money, correct?

19  A.    Yes.

20  Q.    Your e-mail makes clear that the back payments

21  do not extend to any time before January, at least

22  21st, of 2007, correct?

23  A.    That's correct.

24  Q.    So it is true that although Tyson made back

25  payments to January 21st of 2007, it did not make

1    additional back payments prior to that date, correct?

2    A.    Right, I am not aware of any back payments.

3    Q.    The K-code that was added in -- by policy in

4    January of 2007 but not paid until August of 2007, that

5    K-code was either an additional one, two, or three

6    minutes for production workers in Finney, correct?

7    A.    That's correct, according to the job they were

8    working.

9    Q.    And you understand that those additional one,

10   two, or three minutes was in order to account for

11   walking time, is that right?

12   A.    I have heard that, yes.

13   Q.    So prior to the policy coming into effect in

14   January of 2007, you understand K-code did not include

15   walking time, but just clothes changing time, right?

16   A.    Well, K-code was paid four minutes by

17   department.

18   Q.    Four minutes, but you understand that four

19   minutes did not include walking time?

20   A.    Yes.

21   Q.    So, did you -- did you pay the interest on some

22   of these amounts?

23   A.    Mark Hayre took it from here.  So, he was to

24   calculate interest and then pay it out.

25   Q.    Do you know if that happened?

1   A.    I do not have firsthand knowledge of it, I'm

2   sure it did, though.  I do not have firsthand

3   knowledge.

4   Q.    We don't have any document or records showing

5   that any additional interest payments were made.  Do

6   you know if there are?

7   A.    Oh, that would be in my systems, I could

8   validate that in my system.

9   Q.    You think interest was calculated and paid?

10   A.    Yes.

11   Q.    And you think that would be only right because

12   there was delay in getting the money, correct?

13   A.    Correct.

14   Q.    Another question about the back payments you

15   made.

16          You agree that there's turnover at these

17   facilities, correct?

18   A.    Correct.

19   Q.    So you might have hourly production workers who

20   are employed in January, February, March, April and so

21   on, in 2007 who wouldn't be employed when these back

22   payments were made, right?

23   A.    There's a possibility, yes.

24   Q.    So what did Tyson do to make sure that the

25   workers who had left Tyson who are no longer employed

1  got their additional money?

2  A.    You know, I don't recall if I included people

3  that had, you know, unemployed since then, between

4  January and August.  At this point I don't recall if

5  they were included.

6  Q.    You may have just included the current

7  employees, correct?

8  A.    I may have, but I would have to double check

9  that.

10  Q.    So just taking a very quick mathematical look at

11  the numbers, the total of 87,233.51, do you see that?

12  A.    Yes.

13  Q.    You see that's a very exact number?

14  A.    Yes.

15  Q.    And it represents approximately six months,

16  correct?

17  A.    Yes, I went back through this time and what I

18  did is I identified what job the people were working,

19  and then I, you know, looked currently, you know, is

20  that job going to be paid at five, six, or seven

21  minutes and then I would add -- add on the appropriate

22  minutes, and I also, on a week ending -- on a weekly

23  basis I went back and determined if those people were

24  in to overtime or if this would have put them over the

25  overtime, so then overtime was considered in this

68

```
 1  calculation.
 2  Q.    Right.  And then you're actually anticipating
 3  some of my questions which is good because it will go
 4  faster.
 5        But when the additional minutes put the worker
 6  into an overtime environment, you paid that time at
 7  time and a half, correct?
 8  A.    Yes.
 9  Q.    So if we just did very rough math, over six
10  months, there was $87,000 of back pay, which had
11  accrued to these production workers, correct?
12  A.    Yes.
13  Q.    You agree with me that 87,000 divided by six is
14  roughly 14,000, give or take?
15  A.    Okay.
16  Q.    It is a little less, right?
17  A.    Yes.
18  Q.    Can we agree that it is about $14,000 a month
19  that the -- that the company owed, correct?
20  A.    Yes.
21  Q.    So even though we're adding just a minute or two
22  or maybe three, those minutes can add up, correct?
23  A.    Yes.
24  Q.    And you understand that every minute matters in
25  terms of payroll, correct?
```

 1  A.    Yes.  We have to pay to the minute.

 2  Q.    Thank you.  Tyson is obligated to pay for every

 3  minute of working, correct?

 4        MS. PASCHAL:  Objection.  Foundation, calls

 5  for a legal conclusion.

 6        THE COURT:  Overruled.

 7  BY MR. HANSON:

 8  Q.    Tyson's obligation is to pay for every minute of

 9  work, correct?

10  A.    That's correct.

11  Q.    And even one minute is not too small to matter,

12  correct?

13  A.    That's correct.

14  Q.    In fact, in some of these back payments that you

15  made, some of the payments were very, very small,

16  weren't they?

17  A.    Yes.

18        MR. HANSON:  Just worked out a little

19  agreement here on these documents.

20        THE COURT:  Always happy to hear about that.

21  BY MR. HANSON:

22  Q.    I think it would be easiest, if I am just going

23  to approach.  I am going to give you -- let me back up.

24        Yesterday, your counsel provided us hard

25  copies of what is represented in Exhibit 190, the

1  spreadsheets you attached, do you see that?

2  A.     Yes.

3  Q.     And do you remember having those pulled off your

4  system for us?

5  A.     Yes.

6  Q.     And they were delivered here to the court?

7  A.     (Nods head.)

8  Q.     So I am going to show you just excerpts of

9  those, all right?

10  A.     Okay.

11  Q.     I am going to hand you what I have marked as

12  Exhibit 442A, I'm going to hand you what I have marked

13  as 443A, and 444A, 445A, and 446A.  And I'll just

14  represent to you those are excerpts from the

15  spreadsheets that you provided your counsel and then

16  provided them to us.

17          Do you see those?

18  A.     Yes.

19          MR. HANSON:  Move for admission of Exhibits

20  442 through 446A.

21          MS. PASCHAL:  No objection.

22          THE COURT:  Thank you.  Those will be

23  admitted.

24          Those are 442A through 446A?

25          MR. HANSON:  That's correct.

```
 1  BY MR. HANSON:
 2   Q.    We won't spend a ton of time on these.
 3         MS. PASCHAL:  Your Honor, just before Mr.
 4  Hanson begins his questioning, if we could move for the
 5  admission of the entire exhibit for completeness in
 6  addition to the excerpts?
 7         THE COURT:  You have any problem with that?
 8         MR. HANSON:  Not -- just the volume, because
 9  they're large, I was just trying to make this
10  manageable, but sure.
11         THE COURT:  Do you really want all those to go
12  back to the jury room or can you reach an agreement
13  about what they he have to look through back there?
14         MS. PASCHAL:  At this point, Your Honor, just
15  given the time at which we have had to look at these
16  exhibits and to talk about it with plaintiffs, I am not
17  sure if we would want all of them but just to be
18  protective, we would like to at least conditionally
19  move to admit them for completeness sake.
20         THE COURT:  Mr. Hanson, if you don't have a
21  problem we'll just admit 442 through 446.
22         MR. HANSON:  I don't, it's just a lot of
23  material, but that's fine with us.
24         THE COURT:  Sure.  All right.  Those are
25  admitted.  Thank you, Ms. Paschal.
```

1   BY MR. HANSON:

2   Q.    And just for clarification, what I have done is

3   I have just taken, Ms. Litras, the first page of each

4   of the spreadsheets that you provided us and then

5   attached a couple of examples to the -- to the back of

6   the first page, all right?

7   A.    Yes.

8   Q.    Okay.

9   A.    Sorry.

10  Q.    That's fine.  Let's start with 442A.

11  A.    Yes.

12  Q.    Do you have a calculator there, too?

13  A.    Yes, I do.

14  Q.    Okay.  I don't know if we'll need that but it is

15  always good to have one handy.

16        The first column, just has Name, do you see

17  that?

18  A.    Yes.

19  Q.    All right.  Actually, I'm sorry, let me start

20  with what I think identifies the document best, and

21  that's the heading over on the right side, and do you

22  see it says Total Five Min Job Adjust Payout, do you

23  see that?

24  A.    Yes.

25  Q.    All right.  Now, this particular version doesn't

1  tell us what department it is, but can you -- can you

2  tell us just by looking at it?

3          In other words, is it processing or slaughter?

4  A.    I have no idea.

5  Q.    I'll just represent to you that each of the

6  other spreadsheets kind of tells us processing or

7  slaughter, and just by process of elimination, it looks

8  like this one is the five minute adjustment for the

9  processing department, all right?

10  A.    Okay.

11  Q.    And I'll make that clear later, but I'll just

12  preview that that is what it looks like, at least when

13  I look at it.

14  A.    Okay.

15  Q.    Okay.  We'll go back quickly to what it tells

16  us.  It shows us the name of the employee, correct?

17  A.    Yes.

18  Q.    It shows us the, I guess that's the Social

19  Security Number, correct?

20  A.    Yes.

21  Q.    What is the PERNR?

22  A.    That's the personnel number, that is the

23  identifying number for team members in SAP.

24  Q.    That's like employee ID number?

25  A.    Yes.

1   Q.    Then "SC".  What does that mean?

2   A.    Status code.

3   Q.    And that tells us if they are current or former,

4   right?

5   A.    That's correct.

6   Q.    So at least here, all of those are As, correct?

7   A.    Yes.

8   Q.    And I am going to go to the next page.  Do you

9   see some Hs?

10  A.    Yes.

11  Q.    Do you know what that means?

12  A.    Rehires.

13  Q.    Rehires, so they have come back to the company,

14  correct?

15  A.    Mm-hmm.

16  Q.    And that means they're currently employed

17  though, correct?

18  A.    Yes.

19  Q.    See if I can find any other codes.  There's a T?

20  A.    There is a TX.

21  Q.    What is TX?

22  A.    That means that he was let go.

23  Q.    So that's a --

24  A.    So I did pay term people.

25  Q.    That's what I am trying to find out.

1    A.    Okay.

2    Q.    So it looks like -- well, you don't know how

3    these people were paid, right?  You didn't

4    mechanically --

5    A.    I didn't cut the final check.

6    Q.    Right, but on your spreadsheet at least you

7    included terminated people, it looks like, here?

8    A.    It appears so.

9    Q.    What about someone who does not have a code at

10   all, like --

11   A.    That means they are just on their

12   initial -- they're -- their first hire in.  The As

13   means they were reactivated; so an H means they were

14   rehired; a blank just means that they were -- they're

15   employed, there has been no changes in their status.

16   Q.    All right.  Then I have one other code here on

17   the last page, do you see the TT?

18   A.    Yes.

19   Q.    What does that mean?

20   A.    Voluntary termination.

21   Q.    So that is one individual who voluntarily left?

22   A.    Yes.

23   Q.    "TT" means voluntary, "TX" means involuntary?

24   A.    That's correct.

25   Q.    All right.  So then the next column says Total

1  Minutes to Pay, do you see that?

2  A.    Yes.

3  Q.    And then the next column is overtime question

4  mark.   One is a yes, zero is on a no.  Can you explain

5  that to us?

6  A.    When I was going through this I wanted to know

7  if for that week ending, if the employee had worked

8  over 40 or would these number of minutes have put them

9  over 40, so then in my calculation I just put that

10  indicator out there so I could resort the spreadsheet

11  and calculate accordingly.

12  Q.    So if by adding the total minutes to the

13  employee's already recorded time for a given shift put

14  them --

15  A.    For that week ending --

16  Q.    Sorry.

17  A.    For that week ending.

18  Q.    For the week -- and let me back up.

19        Tyson pays by the week, correct?

20  A.    Yes.

21  Q.    It has a weekly payroll?

22  A.    Yes.

23  Q.    So it's not some of us we're paid semi-monthly

24  or biweekly, it is not like that?

25  A.    It's weekly.

1  Q.    So if in the week in question, by adding the

2  additional back pay of one or two or three minutes,

3  depending, if that put the overall total into above 40,

4  then that amount that was over would be paid at time

5  and a half, correct?

6  A.    That is correct.

7  Q.    But if that amount that was added on as back pay

8  did not reach 40, you paid it at straight time?

9  A.    That's correct.

10  Q.    You still, even if it wasn't overtime, you

11  acknowledge you had to pay it, correct?

12  A.    Yes, that was the objective here.

13  Q.    Just at a straight time rate, correct?

14  A.    Yes.

15  Q.    So let's just take a look at one -- just go to

16  the last page of 442A and you'll see we have, again,

17  these were picked out of a much larger spreadsheet, do

18  you understand that?

19  A.    Yes.

20  Q.    So when you see the list of names you have a lot

21  of names that are repeating, I take it that that each

22  line entry represents a work week, right?

23  A.    That's correct.

24  Q.    And for many employees, there are a number of

25  work weeks worked in this six-month period, right?

1   A.    That's correct.

2   Q.    Where minutes are added on, correct?

3   A.    Yes.

4   Q.    But a couple had only one entry and I would just

5   point out, Deven Grigsby, do you see that?

6   A.    Yes.

7   Q.    I assume that is a gentleman, so Mr. Grigsby has

8   only one entry, does that mean Mr. Grigsby only worked

9   one shift, is that right?

10  A.    I show he only worked one week ending.  Well,

11  this is processing, maybe he only worked one week

12  ending in processing during this time period.

13  Q.    And that's -- it looks like that is because for

14  whatever reason he was terminated, correct?

15  A.    That's correct.

16  Q.    And this tells us that his master rate, which is

17  another way of saying his regular rate, was $11.40, is

18  that right?

19  A.    Yes.

20  Q.    This tells us that his pay period ended on April

21  7th of 2007, is that right?

22  A.    Yes.

23  Q.    This tells us that according to the K-code

24  policy that is now being followed, one minute was added

25  to his time worked, correct?

1    A.    That's correct.

2    Q.    This zero tells us that that one minute was

3    straight time, not overtime, correct?

4    A.    That's correct.

5    Q.    And then we have another --

6    A.    That's the repeat.

7    Q.    I'm sorry?

8    A.    That's a repeat, that's his master rate again.

9    Q.    Just another -- another example of his master

10   rate.

11        So really the master here is one minute at a

12   pay rate of 11.40 gives us what total?

13   A.    It shows 19 cents there.

14   Q.    So, in this example, Mr. Grigsby would have been

15   paid for one minute of back pay, correct?

16   A.    Yes.

17   Q.    And because he is terminated, that likely would

18   have had to have been paid by mailing him a check,

19   correct?

20   A.    I would assume so.  Comp care would have took

21   care of that.

22   Q.    But as your spreadsheet shows, even though there

23   is just one minute, it's not too small to pay, right?

24   A.    That's correct.

25   Q.    Even though it is 19 cents, it's not too small

1  to pay, right?

2   A.    That's correct.

3   Q.    And Tyson doesn't think it can refuse to pay

4  someone back pay they're owed just because the number

5  is small, do they?

6   A.    No.  I mean, I was told to include everybody.

7   Q.    All right.  I don't think I need to show all the

8  rest of the documents that have been admitted just for

9  expediency but if you just look through, can you tell

10 us that each of the other documents I have handed you,

11 443, 444, 445, and 446A are similar examples of how the

12 company went back and made retroactive back payments to

13 production workers?

14  A.    Yes, they are.

15  Q.    Let me show you, Ms. Litras, a document we've

16 marked as Exhibit 188 that was produced to us by Tyson

17 in this case?

18  A.    Okay.

19       MR. HANSON:  I know I think we're approaching

20 our morning break, let's just get the foundation in and

21 admitted.

22       THE COURT:  Sure.

23       MR. HANSON:  And then we can talk about it

24 when we come back.

25 BY MR. HANSON:

1   Q.    All right.  Ms. Litras, can you see that this

2   is --

3              THE COURT:  We still have 15, 20 minutes.

4              MR. HANSON:  Oh, we do?  Great.  I am jumping

5   the gun then.  I think we can may make it through most

6   of it.

7              THE COURT:  All right.

8   BY MR. HANSON:

9   Q.    Ms. Litras, do you see this is an e-mail from

10  you?

11  A.    Yes.

12  Q.    Do you recognize this document?

13  A.    Yes.

14  Q.    Do you see that it is an e-mail that you sent on

15  June 10th of 2009?

16  A.    Yes.

17  Q.    To a Ms. Linda Wray, correct?

18  A.    That is correct.

19  Q.    And that you are attaching a spreadsheet, is

20  that right?

21  A.    Yes.

22  Q.    All right.

23             MR. HANSON:  We would move for admission of

24  188.

25             THE COURT:  Any objection?

1          MS. PASCHAL:  No objection, Your Honor.

2          THE COURT:  188's admitted.

3    BY MR. HANSON:

4    Q.    All right.  Let me just show this to the jury

5    the attachment, Ms. Litras, is an Excel spreadsheet,

6    right?

7    A.    Yes.

8    Q.    You understand that the .XLS stands for

9    Microsoft Excel?

10   A.    Yes.

11   Q.    And it is titled Monty 61009, do you see that?

12   A.    Yes.

13   Q.    Can I assume that Monty is Monty Hahn?

14   A.    Yes, that is correct.

15   Q.    And you saw Monty Hahn in the courtroom just

16   moments ago?

17   A.    Yes.

18   Q.    He is one of Tyson's industrial engineers,

19   correct?

20   A.    That is correct.

21   Q.    And the 61009 means it's a spreadsheet of June

22   10th, 2009, is that correct?

23   A.    That's correct.

24   Q.    And you write, "Per your request, this is a copy

25   of the final report I sent to the engineers," and then

1  your name, right?  (Quoted as read.)

2  A.    That's correct.

3  Q.    And fair to say this is a report that you had

4  put together, that you had provided to Tyson's

5  engineers, right?

6  A.    That is correct.

7  Q.    And one of those engineers was Mr. Hahn,

8  correct?

9  A.    That is correct.

10  Q.    Now who is Linda Wray?

11  A.    Linda Wray is my boss, she is a VP of HR and

12  Comp.

13  Q.    Ms. Wray is a VP of HR and Comp?

14  A.    For Tyson.

15  Q.    Is she in Dakota Dunes?

16  A.    No, she's in Springdale, Arkansas.

17  Q.    All right.  She's down at the company

18  headquarters for Tyson in Springdale, Arkansas?

19  A.    That's correct.

20  Q.    But you are in Dakota Dunes, is that correct?

21  A.    That's correct.

22  Q.    But your supervisor is down at company

23  headquarters?

24  A.    Yes.

25  Q.    And Ms. Wray, is she the highest ranking payroll

84

1  manager in the company?

2  A.    No, she's not on the payroll side.

3  Q.    I'm sorry?

4  A.    She is just more on HR compensation side.

5  Q.    So she is part of the HR department?

6  A.    Yes.

7  Q.    And does she report to Mr. Kimbro?

8  A.    Yes.

9  Q.    But her area of responsibility includes payroll?

10  A.    It includes all the HR systems, including time

11  and attendance.

12  Q.    Thank you.  All right.  So this -- this is a

13  little tricky to walk through but I think --

14  A.    Okay.

15  Q.    -- if we do it piece by piece we'll get it.

16        This spreadsheet is a number of pages long, do

17  you see that?  It has lots of different --

18  A.    Yes.

19  Q.    Lots of pages?

20  A.    Lots of page.

21  Q.    Now most of them, almost all of them are

22  redacted.  Do you see that?

23  A.    Yes.

24  Q.    Okay.  Do you know -- do you know why you

25  redacted these?  Or did you redact these?

85

1    A.      I did not do that.

2    Q.      Okay.  Your spreadsheet actually has a lot more

3 information on it, correct?

4    A.      Yes.

5    Q.      After you provided these to counsel, they have

6 been redacted, right?

7    A.      Well, I was not involved in that process.  I

8 don't know when counsel received this document, I did

9 not.

10   Q.      So you can't tell us what we're not seeing,

11 right?

12   A.      No, I mean the titles are there.

13   Q.      All right.  Let's go to kind of middle of the

14 document, here we go.  Where the redaction ends

15 briefly.

16           Can you go to -- and I'm going to show you

17 what is called a Bates stamp and it's a stamp your

18 attorneys put on documents when they give them to us

19 and it is down here on the right corner.

20   A.      Okay, I'm with you 1435.

21   Q.      Yeah, 1435 are the last digits.  All right.  So

22 we're on the same page.

23           All right.  Let's just go up to the top left

24 of this page.  Can you read the top left for us?

25   A.      Finney County Processing 0638, which is our

1  system code for Finney County processing.

2  Q.    That's your Time and Attendance System code for

3  that department?

4  A.    Yes.

5  Q.    And this does not include slaughter, right?

6  A.    That is correct, it's just processing.

7  Q.    Slaughter has a different code?

8  A.    That's right, 0628.

9  Q.    And then it says Direct Hours, do you see that?

10  A.    Yes.

11  Q.    And then it says, WE6609, can you tell us what

12  that means?

13  A.    Right, week ending June 6, 2009.

14  Q.    All right.  So week ending June 6, '09.  Tyson

15  is on a weekly payroll system, correct?

16  A.    That is correct.

17  Q.    So the data that we're about to see covers one

18  week, right?

19  A.    That is correct.

20  Q.    The first entry or column is called Department

21  Numbers and then there's a long list of them, do you

22  see that?

23  A.    Yes.

24  Q.    And is this the individual department numbers

25  for the Finney County processing department?

1  A.    Yes.

2  Q.    Okay.  And then I think we are just going to

3  have to go quickly through each of the column headers,

4  so we understand what that -- what they are, okay?

5  A.    Okay.

6  Q.    The first group is under a heading called Gang

7  Hours, correct?

8  A.    That's correct.

9  Q.    And just to kind of preview what we're about to

10 see, let me just move across the spreadsheet and there

11 begins another set of numbers which are called punch to

12 punch, correct?

13 A.    That is correct.

14 Q.    And you've had a chance to look at this before

15 your testimony today, haven't you?

16 A.    Yes.

17 Q.    All right.  Can you just let us know if it's

18 accurate, that this is an analysis or study of

19 gang-time hours in comparison to punch to punch hours?

20 A.    That is correct.

21 Q.    For the Finney County processing department for

22 one week ending in June, on June 6 of 2009, correct?

23 A.    That is correct.

24 Q.    Did you do this on your own initiative or were

25 you asked to do this?

1   A.    I was asked to do this.

2   Q.    Who asked you?

3   A.    Monty.

4   Q.    Mr. Hahn?

5   A.    (Nods head.)  Yes.

6   Q.    Did he tell you who asked him to do it?

7   A.    No.

8   Q.    Did you hear him -- were you in the courtroom

9   when he testified?

10  A.    No.

11  Q.    Did he tell you that his direction came from the

12  legal department?

13  A.    No.  I didn't -- no, he did not tell me anything

14  else.

15  Q.    Mr. Hahn just said, Ms. Litras, could you please

16  evaluate the number of hours worked, captured by

17  gang-time for the Finney County processing department

18  and then compare it to the number of hours identified

19  under their time punches, correct?

20  A.    That's correct.

21  Q.    Did he tell you why he wanted to know that

22  information?

23  A.    He did not.

24  Q.    Did you ask him?

25  A.    No.  He requests information all the time, so it

1  was...

2  Q.    Do you remember him giving you any instructions

3  in writing?

4  A.    No.

5  Q.    Let's go down to the -- the bottom of this

6  document.  And this is a document you created, correct?

7  A.    That's correct.

8  Q.    All right.  You put a -- a footer, do you know

9  what a footer is?

10  A.    Yes.

11  Q.    That's what I call a footer, at least kind of a

12  stamp or a identification at the bottom of the

13  document?

14  A.    Okay.

15  Q.    That's what you put on here?

16  A.    Yes, it appears there.

17  Q.    All right.  So you put FMW Evaluation 2009, do

18  you see that?

19  A.    Yes.

20  Q.    Can you tell was that is?

21  A.    Fresh Meat Work Evaluation 2009.  I -- I don't

22  recall.

23  Q.    Well, that was my guess.  I thought the W might

24  be wage, because I have seen something similar that

25  says WH Wage Hour Evaluation 2009?

1   A.    I do not know.  If it's there, I was instructed

2   to put it there.

3   Q.    Okay.  And that's I guess what I am getting at.

4   Someone told you to stamp it a certain way, correct?

5   A.    Yes.

6   Q.    And that means it is part of an overall company

7   project, correct?

8   A.    Yes.

9   Q.    It has this title or something similar?

10  A.    Yes.

11  Q.    Okay.  It also says Attorney Work Product, do

12  you see that?

13  A.    Yes.

14  Q.    Do you know which attorney was involved in this?

15  A.    No.

16  Q.    Did you talk to Mr. Kirchner about this?

17  A.    No.

18  Q.    Any -- any in-house or legal counsel input on

19  this?

20  A.    No, just Monty.

21  Q.    All right.  Let's continue on and figure out

22  what all these numbers mean.

23        So we have got the first columns are gang-time

24  hours, correct?

25  A.    Yes.

1   Q.    Or, I'm sorry, what they say are gang hours,

2   right?

3   A.    Gang hours, yes.

4   Q.    And this would generally represent those hours

5   that were captured by the gang-time system, right?

6   A.    That is correct.

7   Q.    All right.  So running across the columns, we

8   have regular hours, correct?

9   A.    Yes.

10  Q.    And then these, what these numbers correspond to

11  is the given department.  So just the top one,

12  Department 710 had 255.4 gang-time hours for that one

13  week, correct?

14  A.    Yes.

15  Q.    And that actually is a smaller department, let

16  me look for one that's maybe a little larger.

17        Well, let's just look at 724, do you see that

18  on our list?

19  A.    Yes.

20  Q.    Okay.  That department has 2242 gang-time hours

21  in one week, correct?

22  A.    Yes.

23  Q.    So that would be a large -- larger department in

24  processing?

25  A.    That is correct.

1  Q.    All right.  And then just continuing across the

2  top, Regular Dollars, what does that mean?

3  A.    That's the dollar value, according to the team

4  members' rates for those hours worked.

5  Q.    So if you divided regular dollars by regular

6  hours you should come up with their regular rate,

7  correct?

8  A.    An approximate, yes, people have varying rates,

9  various rates.

10 Q.    Thank you.  You actually get a department

11 average?

12 A.    Yes.

13 Q.    And then OVT Hours, do you see that?

14 A.    Yes.

15 Q.    And this tells us that of the -- of the

16 hours -- well, I'm sorry, you tell me what that is.

17 A.    That's overtime hours, so I broke it out, you

18 have regular hours, overtime, and a potential

19 opportunity for double hours.

20 Q.    And so overtime hours are additional hours under

21 gang-time but in addition to the column of regular

22 hours, correct?

23 A.    That's correct.

24 Q.    The overtime hours are not included in the

25 regular hours?

1   A.    That is correct.

2   Q.    And then you have the -- the dollars associated

3   with the overtime, right?

4   A.    That's correct.

5   Q.    We have a column for double hours, right?

6   A.    Yes.

7   Q.    And double dollars?

8   A.    Yes.

9   Q.    But those aren't populated, right?

10  A.    That's correct.

11  Q.    Okay.  And then I take it when we move over to

12  punch to punch, you're just doing the same analysis,

13  right?

14  A.    Yes.

15  Q.    So, for that first department, you have got the

16  260 hours that were captured from punch to punch,

17  right?

18  A.    Yes.

19  Q.    And if you paid punch to punch, you have got the

20  dollar figure associated with that, right?

21  A.    Yes.

22  Q.    You don't pay punch to punch though, right?

23  A.    No, Finney County is gang.

24  Q.    Finney County is gang.  You've never paid punch

25  to punch?

94

1   A.     Not for the hourlys in Finney County.

2   Q.     Not for the hourly production workers, correct?

3   A.     That's correct in Finney County.

4   Q.     And you still don't pay punch to punch, correct?

5   A.     In Finney County, no, we don't.

6   Q.     But here you are producing a report that tells

7   Tyson what it would like like if you did pay punch to

8   punch, correct?

9   A.     Right.

10  Q.     And then of course the overtime hours under

11  punch to punch is represented here, correct?

12  A.     Yes.

13  Q.     All right.  Now, this is the problem with

14  spreadsheets, they are usually --

15  A.     Too long.

16  Q.     They are spread out, correct?

17  A.     That is correct.

18  Q.     So when you produce and print a spreadsheet on

19  normal paper like this, to get full view of the

20  spreadsheet we actually have to continue moving, what

21  is that, horizontally, on additional pages, okay?

22  A.     That's correct, yes.

23  Q.     All right?

24  A.     I apologize.

25  Q.     No, that's fine, I just wanted to make sure the

1  jury understands how we are doing this.

2         But the good news about Excel is that they at

3  least give us alphabetical headers for each column,

4  right?

5  A.    Yes.

6  Q.    So we know that we have just gone through A

7  through K, and then we can see what the other columns

8  look like if it had been printed out like a landscape,

9  right?

10         So let's turn the page and you see we pick up

11 with L and we're still under the gang -- sorry, punch

12 to punch analysis here, right?

13 A.    Yes.

14 Q.    So OVT dollars is what the punch to punch

15 overtime dollars would be?

16 A.    Yes.

17 Q.    And there's still no double hours under punch to

18 punch, rights?

19 A.    That's correct.

20 Q.    And what are double hours?

21 A.    Finney County hourlys would be paid double time

22 if they worked on Sundays or like Saturday into Sunday

23 or if they worked Sunday or if they work on a holiday.

24 Q.    All right.  And so continuing across, you see

25 column O, now we're getting some totals, right?

1    A.    Yes, I just went back and I have on O it is a

2   summation of the total hours.

3    Q.    So --

4    A.    For gang.

5    Q.    So O is the total hours of that department paid

6   by back time, correct?

7    A.    Yes.

8    Q.    With the dollars, correct?

9    A.    Yes.

10   Q.    And then Q starts the same analysis, just with

11   the punch, right?

12   A.    That is correct.

13   Q.    Sorry.  So, you can tell the difference, for

14   example, the difference between column O and the total

15   hours worked on gang is less than the total hours

16   worked on punch, right?

17   A.    Yes.

18   Q.    I'm sorry, I can hardly see it on my screen.

19   Okay.

20         And, similarly, the dollars paid on punch are

21   more than the dollars paid on gang, right?

22   A.    That is correct.

23   Q.    So then let's get the rest of our columns.  This

24   tells us -- S tells us the total team members worked,

25   do you see that?

1  A.    Yes.

2  Q.    And is that the total number of individuals who

3  worked that week in that department?

4  A.    Yes.

5  Q.    Now, this is one thing I have struggled with as

6  I was trying to figure this out.  Those are -- those

7  are -- you have people repeated in there, correct?

8  A.    That's correct.

9  Q.    And --

10  A.    Because I was after an average daily.

11  Q.    Okay.  Right.  But when you looked down, like

12  32, the top row, that's a very small or relatively

13  small department, correct?

14  A.    Yes.

15  Q.    As we go down, we see departments that are quite

16  a bit larger in size, correct?

17  A.    That's correct but if Joe worked all week, Joe

18  was represented five in that 32.

19  Q.    And that's exactly what I was going to ask,

20  right.

21        Because it's not that there were 249 people

22  working on a given department on one day, you probably

23  take that number, divide it by five and you get roughly

24  50 individuals each working?

25  A.    That's correct.

1  Q.    Five shifts, right?

2  A.    Yes, five days.

3  Q.    Okay.  And T is the gang average daily hours per

4  team member, is that right?

5  A.    Yes.

6  Q.    And that just tells us what the average daily

7  gang -- average daily gang-time is for each of those

8  departments, right?

9  A.    Yes.

10  Q.    And then you total up the punch to punch average

11  daily hours per team member, do you see that?

12  A.    Yes.

13  Q.    And then you have something called the variance

14  hours per team member, do you see that?

15  A.    Yes.

16  Q.    All right.  Just want to focus on this column

17  for a minute, that is column V, all right?

18  A.    Yes.

19  Q.    Okay.  And this tells us -- variance is just

20  another way of saying the difference, right?

21  A.    That's correct.

22  Q.    So when you compare column T, to column U,

23  column V will pick up just the mathematical difference,

24  right?

25  A.    That's correct.

1  Q.    Another way of doing it, you are just

2  subtracting column T from column U, right?

3  A.    Yes.

4  Q.    All right.  So then looking down across the

5  Finney County processing department, you see what the

6  average variances are for each department, correct?

7  A.    Yes.

8  Q.    Now, every one of them shows, save one, shows

9  that people were working more punch to punch than they

10 were working gang-time, correct?

11 A.    That's correct.

12 Q.    And the one that's different is just this second

13 one, and that's one where there were only two -- two

14 shifts working that entire week, right?

15 A.    That's correct.

16 Q.    So would you consider that kind of an outlier?

17 A.    Yes, I would.

18 Q.    And then every other one shows a variance

19 represented as percentages of an hour, right?

20 A.    Yes.

21 Q.    So, let me pick an easy one, if I can find it.

22 That's a half an hour, right, that .50 I just

23 highlighted?

24 A.    Yes.

25 Q.    And then trying to do ones that I can

1  mathematically do in my head.  Let me see.

2          All right.  There is one that is two-thirds of

3  an hour, correct?

4  A.    Yes.

5  Q.    And that would be 40 minute variance?

6  A.    That is correct.

7  Q.    And you get one down at the bottom that is .93,

8  it is close --

9  A.    Close to an hour.

10  Q.    It is 93 percent of an hour, correct?

11  A.    Mm-hmm.

12  Q.    So there is no question that when you measure a

13  time from punch to punch, it is invariably larger than

14  gang-time, correct?

15  A.    Yes.

16  Q.    More time is captured?

17  A.    That's correct.

18  Q.    I'm going to turn the page and we'll see that we

19  are leaving V and moving to W, which is blank, but then

20  we get into some additional headings.

21          And I'm just going to move through the

22  headings and then take our break, if that's okay?

23          THE COURT:  That's fine.

24          MR. HANSON:  All right.

25  BY MR. HANSON:

1    Q.    We see X is the total gang hours, correct?

2    A.    Yes.

3    Q.    And Y is total punch hours, correct?

4    A.    Yes.

5    Q.    And then Z is total variance hours, correct?

6    A.    Yes.

7    Q.    And then AA, that's something new, and it says

8    total donning and doffing hours, can you tell us what

9    that is?

10   A.    That is the donning and doffing is typically

11   K-code.

12   Q.    Isn't that what that is, representing the K-code

13   for these folks?

14   A.    I didn't remember working K-code into this

15   spreadsheet.

16   Q.    Okay.  You know, we're going to take a break

17   here in a minute --

18   A.    Okay.

19   Q.    -- so maybe in the down time?

20   A.    Okay.

21   Q.    Because I do want to know what that is?

22   A.    Okay.

23   Q.    When I looked at that time it looked like it was

24   a way to represent the K-code?

25   A.    Okay.

1  Q.    All right.  And then the column AB says total

2  variance less donning and doffing?

3  A.    That would make sense.

4  Q.    Which suggested that now you were crediting the

5  K-code being paid?

6  A.    Okay.

7  Q.    And now looking at the variance between punch to

8  punch and gang-time, accounting for K-code?

9  A.    Okay, yes.  Yes.  That seemed very reasonable.

10  Q.    When you have a couple moments to reflect, let's

11  see if you can confirm that.

12  A.    Okay.

13  Q.    And I think that's -- tell you what, yeah, that

14  is the end of the horizontal on the spreadsheet and

15  everything else that follows just continues the column?

16  A.    Okay.

17          MR. HANSON:  So I think it is a good time to

18  break.

19          THE COURT:  All right.  We'll do that.

20          Members of the jury, I remind you, you're not

21  to discuss this case among yourselves or with anyone

22  else at this point.

23          We will be in recess until 10:10, that's

24  10:10.  Thank you so much.

25          (The jury leaves the courtroom.)

1              THE COURT:  All right.  Counsel, have a seat.

2         Anything that we can take up now while the

3    jury is out?

4         MR. HANSON:  There are two issues, one at the

5    bench and, again, didn't mean to waste the jury's time

6    with that discussion, Mr. Dirks was trying to get a

7    couple more foundational questions clarified before we

8    discussed it.

9         Our position very briefly is that the

10   defendants chose to ask Mr. Hahn what his -- if he

11   thought the company was in compliance, the basis for

12   his thinking about that, and injecting that squarely at

13   issue to the jury.  He then explained that the sole

14   basis for his knowledge of what he considers to be the

15   company's compliance was from legal department.  He

16   expanded that all things he did related to his time

17   study was at the direction of legal.

18        The problem we have, Judge, is that we don't

19   have the documents that show what the direction was, or

20   what the communications were from legal.  Those are in

21   a privilege log which we now have, have taken the break

22   our log was -- which Ms. Litras looked through, and I

23   am told that there are any number of entries that show

24   Mr. Hahn being communicated with legal.

25        I don't know how we can cross examine him

1  effectively on the truth of what he is saying or what

2  really he was told, or anything about the substance of

3  his testimony without having those documents.

4        It is very similar to what we had with section

5  or Exhibit 203 that we talked about.  Tyson has chosen

6  to present to this jury this face of compliance and

7  they are using legal as the behind the scenes

8  orchestrators of that compliance.  But they won't show

9  us the documents.

10        The glimpse we have seen, that 203 suggests,

11 that may not be the whole story.  We need the whole

12 story.

13             THE COURT:  Mr. Mueller.

14             MR. MUELLER:  May it please the Court.  Your

15 Honor, this case has been pending since 2006.  We have

16 been producing documents since 2006.  We looked at over

17 8 million documents against --

18             THE COURT:  You know, I really don't care how

19 many you have looked at.  Let's talk about these few --

20             MR. MUELLER:  I am.

21             THE COURT:  -- documents we are talking

22 about --

23             MR. MUELLER:  Your Honor --

24             THE COURT:  -- on the privilege log.

25             MR. MUELLER:  Okay.  First of all, the

1  willfulness issue has been in the case all along.

2  Discovery was conducted on the willfulness issue.  In

3  fact, the first phase of discovery before merits and

4  class discovery was limited to the willfulness issue.

5          And there have been multiple opportunities for

6  the plaintiffs to ask our witnesses questions on

7  willfulness.  They even filed a motion to compel some

8  of our privileged documents before Judge Lungstrum and

9  then withdrew it.

10          We have not opened the door to anything.  We

11  have told them we're not relying on advice of counsel

12  defense.  Mr. Hahn didn't say he was relying on advice

13  of counsel.  They asked him his understanding and all

14  he said is facts that were conveyed to him, not legal

15  positions.  And it is black letter law that conveying

16  facts to someone never waives a privilege or opens the

17  door.

18          In fact, the facts themselves aren't

19  privileged.  And so we are entitled to withhold the

20  documents that are attorney/client privilege.  The few

21  things we saw today that bear an attorney/client

22  privilege stamp on them aren't a selective waiver, we

23  have a duty, of course, to review documents when they

24  are produced and the ones we saw that were not truly

25  privileged, 200 -- Exhibit 203 was truly privileged and

1  produced inadvertently but like the one we were just

2  looking at, it isn't privileged so that is why it is

3  turned over.  So there isn't a selective waiver, there

4  is no issue here, there is nothing new, nothing has

5  changed in the whole course of the case or even in Mr.

6  Hahn's testimony here today.

7       We are entitled to retain the privilege, we

8  have protected it, and we're not going to waive it.  We

9  are not going to come in here and say I am relying on

10  the advice of counsel.  We are laying up a historical

11  story of what happened.

12       And, frankly, the historical story of what

13  happened is not in dispute.  I mean they didn't want to

14  reach agreement on the stipulation, but there is no

15  dispute over what happened in Reich, or what happened

16  in the Supreme Court in Alvarez.  And that's all we're

17  talking about here, is so nothing has opened the door

18  and there are no new issues, this should not be coming

19  up on the last day of the plaintiffs' case-in-chief in

20  a five year old case.

21       MR. HANSON:  We don't know how they are going

22  to try their case, Judge.  In terms of the stipulation,

23  we begged for a stipulation.  But they didn't -- they

24  wanted to tell half the story.  They wanted to tell the

25  good side.  You know, a coin has two sides; they want

1  to show one.  They don't want to show the other.

2        We would have been happy not to make any of

3  these things an issue in this case.  We would have been

4  happy to stick to, hey, this is integral and

5  indispensable or is it di minimis and how much time is

6  involved.

7        Instead, they put up a witness, like Mr. Hahn,

8  and propped him up as, We're in compliance; I believe

9  we're in compliance; I've always been told we are in

10  compliance.  The sole source of his knowledge is legal.

11        If that wasn't hammered home to his testimony

12  into the jury, think about what Ms. Paschal said in her

13  summary, she emphasized it at least three times.  She

14  said according to the legal department they have not

15  been -- this gear had not been found compensable in the

16  Reich case.  They're absolutely making it an issue what

17  these witnesses knew, the only source of that knowledge

18  is legal.

19        But, we don't -- I don't want to get

20  distracted or sidetracked because I think we are making

21  progress on the issues in the case.  I wish they

22  wouldn't bring it up but when they do, we have to have

23  the ability to respond fairly.

24        Here is what I suggest, Judge.  Have them

25  produce all of the documents on the privilege log to

1  you in camera, you can take a look at them, if you

2  think they are casting any question or doubt on the

3  what is in front of the jury, I think you can make a

4  judgment as to whether we should see them.

5       I think the whole subject matter has been

6  waived, but let's let you take -- we have some days

7  coming up, we can reconvene, you can talk to us over

8  the weekend about it but I think you should be able to

9  see whether what they are presenting to the jury is

10  only part of the story.

11       THE COURT:  Mr. Mueller, anything further?

12       MR. MUELLER:  They haven't made a showing for

13  in camera review.  The things on the document are fully

14  described on the privilege log, they made one motion

15  and withdrew it.

16       We haven't said anything that raises any

17  question about the documents we withheld based on

18  privilege and there is hundreds or if not more than a

19  thousand among that long and they covered the whole

20  history of our position on various litigations and

21  nothing said with Mr. Hahn opens that, all we do talk

22  about is public record, what the Reich court did, what

23  Alvarez court did.

24       THE COURT:  Well, pull the documents up and

25  get them to me and I'll take a look at them and I'll

1   let you know whether I think there has been a waiver or

2   not.

3            I do find it troubling that Mr. Hahn sits up

4   here and -- by the way, you can step down, you're not

5   stuck in the box at this point.

6            You know, these are the things that we did, we

7   relied on what we were told by legal, that's why we did

8   it.  And that's paraphrasing, but that's essentially

9   what he said.

10            And not to know what exactly that was, just

11  having to take his word for it, that's not the way this

12  is ever worked.  So let me see the documents.

13            MR. MUELLER:  It may take a couple days.  It's

14  a large pile, I think.

15            THE COURT:  Well, shoot them --

16            MR. MUELLER:  We'll start printing them out

17  now.

18            THE COURT:  Okay.  Thank you kindly.  And now

19  I know how I am going to spend my weekend.

20            MR. HANSON:  We wouldn't have wanted it that

21  way, but that's the case that's being presented.

22            The other issue has to do with Doctor

23  Fernandez.  I would just suggest, maybe the next break

24  we take that up.  I for one actually need a quick

25  break, but I am happy to take it up now if you wish.

```
1              THE COURT:  What do you want to do, depose

2   him?

3              MR. HANSON:  Judge, Doctor Jeffrey

4   Hernandez --

5              THE COURT:  Yeah.

6              MR. HANSON:  -- is -- he never visited the

7   Finney plant.  He never took a measurement in Finney.

8              THE COURT:  Mm-hmm.

9              MR. HANSON:  We have already had the testimony

10  that they relied on him for their good faith.  We have

11  got that in.

12             They want to bring him in to testify.  They

13  want to bring him to the jury and have him discuss his

14  methodology.  Here are the two problems with that,

15  there are probably more, actually.

16             We don't have any underlying data.  He said we

17  have videotapes, we don't have them, he was never

18  identified in Rule 26 disclosure, he was never

19  identified as an expert witness but that is exactly

20  what they want, to bring in Doctor Fernandez, someone

21  who hadn't been identified as a witness, not identified

22  as an expert, to talk about a report that he did in

23  another plant.  It is massively prejudicial.

24             Okay, and, look, they can talk about what they

25  relied on but to have him here in person?  Not -- not
```

 1 fair.

 2          THE COURT:  Mr. Mueller.

 3          MR. MUELLER:  We already went through this on

 4 the motions in limine.  He's -- he was identified by

 5 giving his report, in November of '06.  It was filed

 6 with the Court February, '07.  Your Honor pointed out

 7 that they have obviously known about him for four

 8 years.  We're not calling him as an expert.

 9          We found the missing pages.  I called him

10 yesterday and said, Do you have those missing tables?

11 He sent them to me and I sent them to them within ten

12 minutes of that.

13          There are no tapes.  I mean if they exist

14 anywhere in the world, he has no idea where they are,

15 but it doesn't matter.  All the data is now in their

16 hands.

17          I thought Your Honor already ruled he could

18 testify.  We have provided the tables.  He's the guy

19 that can talk about the document.  And it just goes to

20 weight.  I mean, the -- the explanation he'll give is

21 the same one Mr. Hahn gives, except that he knows stuff

22 Mr. Hahn doesn't and that is why Your Honor wouldn't

23 let Mr. Hahn talk about the document.

24          He explained the DOL thought the measurements

25 at Emporia were being done to cover the whole 11 plant

112

1  litigation that had just been resolved and that that

2  was a measurement, company wide if he wanted him to

3  come up with a company wide K-code.  And what they are

4  talking about goes to weight.

5          MR. HANSON:  Your Honor, you gave the

6  defendant a free pass not identifying on Rule 26 early

7  just on the idea that if we get to depose him we can

8  figure out what he is going to say.  We now know what

9  he is going to say, so the issue isn't whether we

10  depose him or not, obviously he is going to come, we

11  will.  The issue is, 402, 403 issue.  What is he being

12  offered for?

13          Obviously, he is being offered to try to tell

14  the jury that four minutes was appropriate as a time

15  study in Finney County.  And he wants to do that -- he

16  is going to say, I thought it was appropriate for all

17  eleven plants.  He never was in the Finney County

18  plant.  It doesn't go just to weight, it goes to

19  threshold admissibility, and prejudice.

20          And when they say that they produced what is

21  the underlying data, not true, they produced to us

22  tables that summarize data.  We don't have the data.

23  Unlike Doctor Radwin, who produced all the videotapes

24  which form the basis of his tables, these are just

25  summaries of data that we don't have.

1          And they say they may not exist in the world.

2   We can't test it and we can't have someone who is not

3   an expert, who is going to be referred to as Doctor

4   Fernandez, this time study guy, come in and tell the

5   jury about a time -- the appropriateness of a four

6   minute conclusion on a plant that he never visited, it

7   would just be prejudicial to us and we don't need it.

8          Mr. Hahn has already told the jury what he

9   did.  And that's what was relied on.

10          MR. MUELLER:  May I add one thing?

11          Your Honor, there is a willfulness issue now,

12   clearly in the case.  It wasn't clear whether it would

13   be in the case when we first talked about this.  We

14   made our decision, I think as Your Honor knows, on a

15   company wide basis, we didn't say, should we do this at

16   Finney and not at the other plants, and that's how the

17   Department of Labor was looking at it when it was

18   resolving the Reich and Herman cases with us so the

19   only document that exists in the world that we relied

20   on as verification for the four minutes is a company

21   wide document.

22          It's true, he looked at Emporia and Storm

23   Lake, but we can't tell our willfulness story without

24   saying, We got this document from the government, and

25   it is verification of our number.  The document is what

1   we have rested the entire history of the K-code on.

2          And if it's excluded because he wasn't in the

3   Finney County plant, the jury doesn't know the most

4   important thing about why we implemented the K-code and

5   I can't help it that the government did -- didn't do a

6   separate study for all 11 plants but this is the

7   willfulness defense right here.  And that just, it all

8   goes to weight.

9          And, by the way, we have the government

10  records exception to the hearsay rule, it's not called

11  the government files exception.  Most private parties

12  only have the government's fact finding report.  They

13  don't have all the files and the EEOC or in some

14  government agency.  It is the fact finding of the

15  government that comes in as evidence and you can cross

16  examine whatever -- by the way, usually don't even have

17  to cross examine the author of the document, the report

18  itself comes in, that's why the exception exists, but

19  here they'll have the ability.

20          THE COURT:  Well, they are self authenticating

21  but that does not eliminate the at least desirability

22  of having that underlying data for cross examination

23  purposes.  And that's the point that I was trying to

24  get to yesterday.

25          I am going to let him testify.  You can depose

1  him but every one of those things that have been

2  pointed out here, I think, too, go to weight.  The fact

3  that he never visited the plant, that he made the

4  assumption that this 11 plant wide thing was equally

5  applicable, and, you know, that's all fair ground for

6  you guys to get into.

7          I still think -- well, I don't even want to

8  get into that.  But you guys get it sorted out now, get

9  the dep set up and I'll see you back here --

10          MS. PASCHAL:  Your Honor --

11          THE COURT:  -- in five minutes.  What?

12          MS. PASCHAL:  I had one quick issue.

13          THE COURT:  Yeah.

14          MS. PASCHAL:  In the interest of trying to

15  move things forward I would like to raise, and at first

16  it may --

17          THE COURT:  Can it wait until the next break

18  or does it need to be taken up right now?

19          MS. PASCHAL:  It relates to Ms. Litras's

20  testimony.

21          THE COURT:  Okay.

22          MS. PASCHAL:  Judge -- are you planning on

23  using Plaintiffs' 175?

24          MR. HANSON:  Yes.  Yes, I told you that two

25  days ago.

```
 1              MS. PASCHAL:  Your Honor, there is an issue
 2   with one of the exhibits that plaintiffs has said --
 3              THE COURT:  Why didn't you all talk about this
 4   yesterday?
 5              Why didn't you talk about it before this
 6   morning  --
 7              MS. PASCHAL:  Your Honor --
 8              THE COURT:  -- before we got started?
 9              Why is this stuff about what exhibits are
10   being used now being brought up at this point?
11              MS. PASCHAL:  Your Honor --
12              THE COURT:  I am going to take it up, but
13   aren't you talking to each other about what documents
14   you're using in examinations?
15              MS. PASCHAL:  Yes, Your Honor, we are.
16              THE COURT:  Then why wasn't this brought up
17   with me at 7:35 or 40 this morning?
18              MS. PASCHAL:  Your Honor, I apologize, Mr.
19   Hanson did identify this document to us and I did state
20   my objection to him in an e-mail, so to that extent, we
21   have communicated what the difference is.
22              I wasn't sure until just this moment that he
23   was still planning on using the document with the
24   witness, given the nature of the objection.
25              THE COURT:  What's the problem?
```

1          MS. PASCHAL:  We believe the document is

2  excluded by Your Honor's ruling on the motion in limine

3  on February 25th, 2010.  It's an e-mail relating to

4  practices at other plants owned by Tyson.

5          THE COURT:  I am not going to exclude that

6  when a person is coming in here testifying about times

7  at 11 plants.  So, don't even bother.

8          MS. PASCHAL:  Okay, Your Honor.

9          THE COURT:  You all want to bring that stuff

10 in, fine.  But that comes in, too.

11         You have got two minutes.

12         (Recess taken from 10:08 a.m. to 10:10 a.m.

13         The jury enters the courtroom.)

14         THE COURT:  And as soon as defense counsel is

15 back, we'll take up again.

16         (Pause.)

17         THE COURT:  I think Mr. Mueller is the only

18 person we're missing.

19         MS. PASCHAL:  We're okay to go ahead.

20         THE COURT:  Are you, Ms. Paschal?  That all

21 right?

22         All right.  Mr. Hanson, you may proceed then.

23         MR. HANSON:  Thank you, Judge.

24         Thank you.

25 BY MR. HANSON:

1   Q.    All right, Ms. Litras, just to follow-up on a

2   question I asked earlier.  I asked whether you paid

3   punch to punch at the Finney County plant, right?

4           Do you remember that?

5   A.    Yes.

6   Q.    Okay.  I think I heard you say you did pay for

7   the office workers, right?

8   A.    That's correct.

9   Q.    But you said at this plant, Finney County, you

10  didn't pay punch to punch for the production workers,

11  correct?

12  A.    That is correct, we pay gang for production.

13  Q.    Are you aware that Tyson does pay punch to punch

14  for production workers at other Tyson plants?

15  A.    There are two small plants that we punch to

16  punch.

17  Q.    Which ones are those?

18  A.    Omaha and Vernon.  Vernon, Texas.

19  Q.    So, at Tyson's facility in Omaha, Nebraska you

20  pay production workers punch to punch?

21  A.    Yes.

22  Q.    Did you used to pay gang-time at Omaha?

23  A.    We, I'm not for sure when we got Omaha, if Omaha

24  came with Tyson or if we purchased Omaha, right around

25  that time.  But Omaha is a finished product plant, we

1  do not have a slaughter there.  It is a small location

2  and in Omaha they make, goodness, what did they make in

3  Omaha?  Ham or bacon.

4  Q.    So they -- but it's a meat processing plant?

5  A.    Yeah, but it's a finishing plant.

6  Q.    And there are production workers there correct?

7  A.    Yes.

8  Q.    And you managed to pay them punch to punch,

9  right?

10  A.    Yes.

11  Q.    Off their time swipes, correct?

12  A.    Yes.

13  Q.    In fact, it is the same time and attendance you

14  use at Finney County, right?

15  A.    Yes.

16  Q.    Vernon, where is that?

17  A.    Vernon, Texas.

18  Q.    Another meat processing plant?

19  A.    They strictly just make bacon, so there is no

20  slaughter at these plants, you don't start with a cow.

21  You are just getting meat in and you're putting it into

22  a, you know, a finished product that you would see on

23  the shelf.

24  Q.    And then Vernon, you're paying production

25  workers punch to punch, correct?

1  A.     Yes.

2  Q.     Using the same Time and Attendance System at

3  place in Finney County, right?

4  A.     Yes.

5  Q.     And then the workers at Vernon, they have to don

6  and doff sanitary garments and equipment, correct?

7  A.     They would have garments they have to put on,

8  I'm not real familiar with their plant.

9  Q.     Well, you know that any time you're dealing with

10 a meat processing environment, making food that goes

11 out in to the nation's food supply, you're going to

12 wear sanitary outer garments, correct?

13 A.     That's correct.

14 Q.     And you're going to have to wear some safety

15 equipment to do your job?

16 A.     Yes.

17 Q.     All right.  And you're using the time clock to

18 capture that donning and doffing time, correct?

19 A.     Yes, we pay punch to punch.

20 Q.     All right.  And that includes the donning and

21 doffing time?

22 A.     I don't know where their clocks are, I mean I

23 know we pay punch to punch and I don't pay them

24 anything in addition to that punch to punch time.

25 Q.     That's where I was going next.  You don't pay

1    punch to punch plus a K-code, right?

2    A.    No.

3    Q.    You pay their actual time at Vernon, Texas,

4    right?

5    A.    That's correct.

6    Q.    And that actual time is measured punch to punch?

7    A.    Yes.

8    Q.    And the same thing is in place at Omaha,

9    correct?

10   A.    Right.

11   Q.    Same actual time, punch to punch?

12   A.    That's correct.

13   Q.    For production workers?

14   A.    Right.

15   Q.    To cover the donning and doffing time?

16   A.    Yes.

17   Q.    Other than Omaha and Vernon, what about other

18   facilities at Tyson that use the time clock?

19   A.    Those are the only facilities again under the

20   Tyson Fresh umbrella.

21   Q.    Let's talk about Tyson -- Tyson Foods generally.

22   You aware that other plants under the Tyson --

23   A.    I know in the poultry world they are putting

24   some plants on to punch to punch.

25   Q.    The poultry world is also a processing type

1  facility, right?

2  A.    Yes.

3  Q.    And they kill chickens there?

4  A.    Yes.

5  Q.    And process them?

6  A.    Yes.

7  Q.    And they are -- implemented a punch to punch

8  system to pay in poultry?

9  A.    Yes, I don't know which plants and what

10  specifically part of the process they do at those

11  plants, I have very little -- very little involvement

12  with that.

13  Q.    But it is the same Time and Attendance System

14  that is used in Finney, correct?

15  A.    No, in the Tyson, the original Tyson umbrella,

16  majority of those plants are paid by PERS time.

17  Q.    Is it -- is it a time system though?

18  A.    Yes, it's a time gathering system.

19  Q.    And is it -- you swipe in or punch in?

20  A.    You swipe.

21  Q.    So it's a time swipe system, correct?

22  A.    Yes.

23  Q.    It just has a different mechanical, um, it's

24  just a different mechanical way of keeping actual time,

25  correct?

```
 1   A.     Yes.

 2   Q.     What did you call it PERS?

 3   A.     PERS, P-E-R-S, percent time is what they call

 4   it.

 5   Q.     P-E-R-S?

 6   A.     And I have no experience with that system.

 7   Q.     I just wanted to make sure here, but under the

 8   PERS system you know they make punch a time --

 9   A.     Yes.

10   Q.     -- that swipes a card?

11   A.     Yes.

12   Q.     And you know in poultry they are moving to a

13   punch to punch pay system, correct?

14   A.     Yes, sir.

15   Q.     And that punch to punch pay system is to cover

16   donning and doffing time, correct?

17   A.     I would -- yes.  It would cover that time.

18   Q.     All right.  Let's go back to our spreadsheet.

19   A.     Okay.

20   Q.     I'll put back up the spreadsheet we were looking

21   at.

22          So, what I'm showing you, Ms. Litras, are the

23   columns that we had previously identified and because

24   the way the -- the way it prints off we can't -- you

25   can't see what the column headers are here.  But I'm
```

Jana L. Hoelscher, CSR, RPR, CRR, RMR
United States Court Reporter

1  going to try to -- I'll just tell you what they are as

2  we go.  Okay?

3  A.    Okay.

4  Q.    And O, do you remember that that was total gang

5  hours?

6         Do you need -- do you need the Bates number to

7  get on the same page with me?

8  A.    Yes.

9  Q.    All right.  It's 891439.

10  A.    Okay.  Well, let me flip back and get a page

11  where I can see the columns and the title.

12  Q.    Yeah, if you go back to 1436 you will see what

13  the columns are.

14  A.    Okay.

15  Q.    If you could just kind of hold that page, too,

16  so we can flip back and forth?

17  A.    I can do that.

18  Q.    Tell me what column O is.

19  A.    Column O is total gang hours.

20  Q.    What is column P?

21  A.    Column P is total gang dollars.

22  Q.    All right.  So that's a dollar, right?

23  A.    That's correct.

24  Q.    All right.  What is Q?

25  A.    Q is total punch hours.

125

1   Q.    What is R?

2   A.    R is total punch dollars.

3   Q.    All right.  Let's just take a look at O and R

4   for a second.  O is total -- I'm sorry, P and R.

5         P was total gang hours, correct?

6   A.    Total gang dollars for P.

7   Q.    Total gang dollars for P.  And R was total punch

8   dollars?

9   A.    Yes.

10  Q.    All right.  Do you have a calculator still?

11  A.    Yes, I do.

12  Q.    Can you subtract the total in P from the total

13  of R?

14  A.    Okay.

15  Q.    What number do you get?

16  A.    I have 83,539.52.  83,539.52.

17  Q.    All right.  83 -- and I apologize for my

18  handwriting, but it's the best I can do.

19        $83,539.52, correct?

20  A.    Yes.

21  Q.    Okay.  And can you confirm that that represents

22  the difference between what paying, for just one week,

23  paying by punch would be as opposed to the system of

24  paying by gang-time, correct?

25  A.    Yes, according to how the -- I set the

1  spreadsheet up, yes.

2  Q.    And that's for one week?

3  A.    Yes.

4  Q.    And in one facility?

5  A.    Yes.

6  Q.    In one processing department?

7  A.    Well, this is one location.

8  Q.    But it's the processing department, correct?

9  A.    That's correct.

10  Q.    We haven't talked about the kill floor yet,

11  correct?

12  A.    Okay.

13  Q.    Am I right?

14  A.    That's correct.  I don't have which one you

15  identified as total processing but this whole document

16  is just processing.

17  Q.    Yeah, every sheet I showed you was under that

18  first header, Ms. Litras?

19  A.    Okay.

20  Q.    Of processing.  And if I have made any mistakes

21  at all on this document, you can tell me or I'm sure

22  your counsel will have a chance to talk to you --

23  A.    Okay.

24  Q.    -- when you are examined by them.

25        I want you to do one other piece of math for

1    me, if you would.

2             If column O is total gang hours, correct?

3    A.    Yes.

4    Q.    And column Q is total punch hours, correct?

5    A.    Uh-huh.

6    Q.    Could you subtract O from Q?

7    A.    I have 4,528.34.

8    Q.    4,000?

9    A.    528.34.

10   Q.    Okay.  And that represents for us the

11   total -- the difference in hours between the workers on

12   a punch to punch and workers on gang-time, correct?

13   A.    Right.  And that would be O and Q.

14   Q.    What did I say?

15   A.    You have Q and P.

16   Q.    It's not -- I'm sorry, it's Q minus O, isn't it?

17   A.    Yes.

18   Q.    I made a mistake.  I made a mistake.  So it's Q

19   minus O.

20             Punch hours minus gang-time hours, correct?

21   A.    That is correct.

22   Q.    So Q minus O equals 4528 and 34.  That's a

23   little over 4500 hours, correct?

24   A.    That's correct.

25   Q.    And that's the difference in the Finney County

1  processing department for one week, punch time compared

2  to gang-time, correct?

3  A.    That's correct.

4  Q.    Calculator again, please.

5        Can you divide 83,539 and 52 by 4,528 and 34?

6  A.    Okay, I take 83 and I divided it by 4500 it

7  would be 18.448.

8  Q.    18.448?

9  A.    Uh-huh.

10  Q.    So 18.45 to round up?

11  A.    Yes.

12  Q.    And do you agree that that represents the

13  average rate of pay for the hours worked, is that

14  correct is it?

15  A.    Yes.

16  Q.    All right.  Now, there's one -- one little bit

17  of math that I just want to do on this document and

18  then we'll be done with it.

19        We looked -- I asked you before, there was

20  that donning and doffing column, do you remember that?

21  A.    Yes.

22  Q.    Did you have a chance to think about that over

23  the break?

24  A.    Yes, I did.

25  Q.    Can you help us clarify that?

1   A.    That donning and doffing, I could have labeled

2   it K-code would have been more familiar to me but I

3   identified the amount of K-code that was actually paid

4   that week and then took that out of the variance that

5   we identified.

6   Q.    Okay.  Now, and that's an important concept

7   because in this -- in this study you're analyzing punch

8   to punch as opposed to gang-time, correct?

9   A.    That's correct.

10  Q.    But you still want to take into account the

11  K-code, right?

12  A.    Right.

13  Q.    In the math I just did we didn't take into

14  account the K-code, correct?

15  A.    No.  Because K-code was not included in the

16  regular hours.

17  Q.    Right.

18  A.    The regular and overtime.

19  Q.    I think there is a way to do that.  So

20  the -- the delta or difference of 83539 does not credit

21  the K-code that Tyson is already paying?

22  A.    That's correct.

23  Q.    Okay.  Let's -- I think there is a way to do

24  that.

25  A.    Okay.

1   Q.     And see what that number should be.

2          All right.  Let's go to just flip the page if

3   you would.

4          And can you tell us what column X represents?

5   And you might have to flip back.

6   A.     Total gang hours.

7   Q.     Okay.  So this number, again, is the total gang

8   hours, right?

9   A.     Uh-huh.

10  Q.     And what is Y?

11  A.     Total punch hours.

12  Q.     All right.  So those are the -- the gang hour

13  and punch hours for that week, correct?

14  A.     Yes.

15  Q.     All right.  And then what's Z?

16  A.     Z is total variance.

17  Q.     So the total variance, the difference between X

18  and Y is Z, which is 4,528 and you'll agree with me

19  that that is actually the number that we came up with

20  ourselves when we did it, right?

21  A.     Yes.

22  Q.     Okay.  And now, what is AA?

23  A.     AA is total donning and doffing hours.

24  Q.     And in other words, AA is?

25  A.     K-code.

1    Q.     K-code hours. Okay. I'm just going to label AA

2 K-code, and then what is AB?

3    A.     Variance less donning and doffing.

4    Q.     So, AB is column Z minus AA, right?

5    A.     Yes.

6    Q.     All right. And so this number, 3887.77 that

7 number represents the difference between punch to punch

8 and gang-time, crediting back in K-code, correct?

9    A.     Correct.

10    Q.     So that really is the true difference, correct?

11    A.     That is correct.

12    Q.     But we don't have dollars on these spreadsheets?

13    A.     Just hours.

14    Q.     We just have hours, but fortunately we just did

15 the math on knowing what the average hourly rate, is

16 correct?

17    A.     Okay.

18    Q.     From that previous page, you remember the 18.45?

19    A.     Yes.

20    Q.     Okay. I want to find out the dollar difference

21 associated with those 3,887 hours.

22    A.     You know, we would have one issue with this

23 calculation. Would you flip back to another page,

24 please?

25    Q.     Please, yes.

1  A.    One moment.  You want to get to a rate but we're

2  working with total hours so if there is an overtime

3  calculation in there, your rate would be -- would be

4  off by that amount.  Do you understand that?

5  Q.    I -- I completely understand that.  And, in

6  fact, that's what this 18.45 is actually what we call a

7  blended rate, that includes overtime rates and straight

8  time rates, right?

9  A.    Right, so you could say that rate is -- could be

10 exaggerated.

11 Q.    Well, it may not be exactly precise, but we have

12 a pretty good sample size of hours here, don't we?

13 A.    Yes.

14 Q.    And we can pick any hourly rate we would want,

15 but let's just use the one that -- that we found --

16 A.    Okay.

17 Q.    -- on this page, 18.45.

18        Can you multiply 3887.77 by $18.40 an hour?

19 A.    Okay 71,729 --

20 Q.    71,000 --

21 A.    729.

22 Q.    729?

23 A.    .36.

24 Q.    And 36 cents.  Okay.  Now that we've accounted

25 for K-code, would you agree with me that the difference

1  in paying punch to punch as opposed to paying

2  gang-time, even crediting K-code for one week for

3  Finney County processing, is $71,729?  Correct?

4  A.    Correct.

5  Q.    All right.  Can you multiply that number by 52?

6  A.    37 million --

7  Q.    Sorry.

8  A.    37 million 299 -- oh, I'm sorry.

9  Q.    I don't think it is 37 million.

10  A.    3,729,926.

11  Q.    Three million?

12  A.    729,926.

13  Q.    3,729,000 --

14  A.    926.

15  Q.    For 52 weeks in a year?

16  A.    Yes.

17  Q.    The annual difference for Finney County in one

18  department, between paying punch to punch?

19  A.    One location.

20  Q.    Well, again, this is in processing, right?

21  A.    Yeah, you just say department, I have, you know,

22  lots of departments within processing.  So I want to

23  make sure that is clear.

24  Q.    That is absolutely fair.  On the processing side

25  of production.  Just for the processing side of

1   production, in Finney County, on an annualized basis

2   the company saves $3.7 million a year by paying

3   gang-time plus K-code instead of punch to punch, is

4   that right?

5   A.    Yes.

6   Q.    I would do this with slaughter if I had the

7   data.  But I don't think I do.

8           Can you just flip through with me the rest of

9   the document?  And tell me if we get -- and as we're

10  flipping through do you know what was redacted?

11  A.    I think.

12  Q.    And I ended up Ms. Litras on 891449.  Which is

13  the next -- and I just show you this page because it is

14  the next one that really has any -- any of the fields

15  populated but I can't make any sense out of it.

16          You know, it doesn't really matter, I have

17  been through this document.  I can't find any other,

18  like we just did with processing in Finney, I could not

19  find any other data that would allow us to do the same

20  analysis.

21          Do you know -- do you know whether the

22  information was in this document at one time?

23          And wouldn't you agree that it would have

24  been?

25  A.    Yes, I did -- I would have done the whole plant.

1    Q.    Well, and do you think this is just for Finney

2  County?

3    A.    Yes, it was just for Finney County.

4    Q.    All right.  Is that -- and how do you know that?

5  Would you go on back to the cover page.

6    A.    I guess there is no title.

7    Q.    Right.  And the document itself goes from -- it

8  goes from 1428 to 1462, that's 40 -- that's 34 pages,

9  is that right?  You have a calculator, but I think

10 that's 34 pages?

11   A.    Yes.

12   Q.    Right?

13   A.    Yes.

14   Q.    And the pages that we looked at for processing

15 took up -- that's one, two, three, four -- that took up

16 five, six pages, correct?

17   A.    Yes.

18   Q.    Do you think that this was a study of some other

19 meat processing plants at Tyson, in addition to Finney?

20   A.    No, I am pretty sure it was one -- just one

21 location just because I had to do a lot of manual

22 intervention in order to make this work, in order to

23 get the details clean for the punch to punch numbers.

24   Q.    All right.  But you don't see in there any of

25 the numbers that we can run for the slaughter

136

1  department, correct?

2   A.    I'm not real familiar with department numbers,

3  someone might be able to tell me if that was --

4   Q.    Well, we'll --

5   A.    But I don't see a title, I don't see a Finney

6  County slaughter title.

7   Q.    And what we see at the top of Page 1435, where

8  it says Finney County Processing, 0638, do you see

9  that?

10  A.    Yes.

11  Q.    I just didn't see that anywhere else in the

12  document?

13  A.    No.

14  Q.    And it may --

15  A.    I don't.

16  Q.    It may have just been one of the other

17  redactions, okay?

18         But you think that you would have done an

19  analysis -- analysis for slaughter like you did for

20  processing, correct?

21  A.    Yes.

22  Q.    But what we do know is for processing, at least

23  when you look at the annualized difference between

24  punch time and gang-time for processing, we're at a

25  range of 3.7 million for one year, correct?

1   A.    Yes.

2   Q.    One more document.

3   A.    Okay.

4   Q.    It's not a spreadsheet.

5   A.    That's good.

6   Q.    I'm going to hand you what I have marked as

7   Exhibit 175.

8         Do you recognize this document, Ms. Litras?

9   A.    Yes, I do.

10  Q.    Is this something that you saw in preparation

11  for your testimony today?

12  A.    Yes.

13  Q.    You see that at the top of -- the top, well,

14  it's an e-mail strip, correct?

15  A.    That's correct.

16  Q.    And you use e-mail as part of your every day

17  business, right?

18  A.    Yes.

19  Q.    And this is an e-mail from a Rosa Cruz, correct?

20  A.    Yes.

21  Q.    To you, correct?

22  A.    Yes.

23  Q.    With some folks carbon copied, right?

24  A.    Yes.

25  Q.    And the title is Pay Practices, do you see that?

1    A.    Yes.

2    Q.    And you see that it is just an e-mail string

3    that, in fact, discusses pay practices within Tyson,

4    correct?

5    A.    Yes.

6            MR. HANSON:  Let me move for admission of 175.

7            THE COURT:  Any objection?

8            MS. PASCHAL:  Your Honor, this is the document

9    that we had objected to during break.

10           THE COURT:  All right.  I'm going to overrule

11   the objection.  175 is admitted.

12           Thank you, Ms. Paschal.

13   BY MR. HANSON:

14   Q.    Let me just show the jury what we're talking

15   about.

16           So this is you, right, Ms. Litras?

17   A.    Yes.

18   Q.    The date is January 30th of 2009, correct?

19   A.    Yes.

20   Q.    Can you tell us who Ms. Rosa Cruz is?

21   A.    She is our HR manager at our Houston, Texas

22   location.

23   Q.    I'm sorry, she is the HR manager from Houston,

24   Texas?

25   A.    Yes.

139

1   Q.    And Tyson has a meat processing facility in

2   Houston?

3   A.    Yes.

4   Q.    Who is Jerry Tilton?

5   A.    Jerry Tilton is their HRD.

6   Q.    HRD means human resources director?

7   A.    Yes.

8   Q.    Who is Mona Mitchell?

9   A.    Mona Mitchell is part of Rosa's staff.

10  Q.    And who is Marciela Hernandez?

11  A.    Also parts of the Houston staff.

12  Q.    I just want to move down the string a little bit

13  to the e-mail that you sent.  Do you see that?

14  A.    Yes.

15  Q.    On January 29th, 2009, correct?

16  A.    Yes.

17  Q.    To Ms. Cruz, right?

18  A.    Yes.

19  Q.    And this is what you write:  "I need to confirm.

20  Did you want the system to deduct a 30 minute lunch

21  automatically.  It can automatically deduct a lunch as

22  long as there is 6-1/2 or more hours between punches."

23  (Quoted as read.)

24        Did I read that correctly?

25  A.    Yes.

1    Q.    And then you write, "The other option is

2    everyone punches out for lunch."  (Quoted as read.)

3    Correct?

4    A.    Yes, that's correct.

5    Q.    Just a moment ago Ms. Paschal was asking Mr.

6    Hahn whether paying punch to punch would be able to

7    capture donning and doffing time over lunch.  Can you

8    confirm for us that in fact you can set the Time and

9    Attendance System to punch in and punch out for lunch,

10   right?

11   A.    Our option is to pay, if we change it to pay

12   punch to punch, then the people can punch in and out

13   for lunch.

14   Q.    Right.  Just like they do in the morning,

15   correct?

16   A.    Yes.

17   Q.    Before their shift, correct?

18   A.    Yes.

19   Q.    And just like they do in the afternoon, after

20   their shift, correct?

21   A.    That's correct.

22   Q.    So you can absolutely set up the system to

23   account for donning and doffing time over lunch with a

24   punch to punch system, can't you?

25   A.    I can set it up to deduct the set amount of

141

```
 1   minutes.

 2   Q.     Did you ever talk to Mr. Hahn about that?

 3   A.     No.

 4   Q.     Do you think he was just unaware that you could

 5   do a punch to punch over lunch as well?

 6   A.     Yes.

 7   Q.     But we know better now, don't we?

 8   A.     In this situation, yes.

 9   Q.     Well, you could -- you could do a punch to punch

10   in Finney County, right?

11   A.     Systematically, yes.

12   Q.     And you could do punch to punch over lunch in

13   Finney County, correct?

14   A.     Yes.

15   Q.     Let me move down a little further and you'll see

16   another e-mail as part of this string from you.

17   Correct?

18   A.     Yes.

19   Q.     And this is Monday, December 29th, 2008, right?

20   A.     Yes.

21   Q.     And you're sending this to Jerry Tilton with a

22   copy to Ms. Cruz?

23   A.     Yes.

24   Q.     And the subject is still pay practices, right?

25   A.     Yes.
```

1  Q.    You said, "I have set the Houston rules to pay

2  punch to punch," correct?   (Quoted as read.)

3  A.    Yes.

4  Q.    And the Houston is the Houston meat processing

5  plant of Tyson's right?

6  A.    It's Houston, Texas it is one of the poultry's

7  original plants.

8  Q.    I'm sorry?

9  A.    It wasn't under the IBP umbrella, it is one of

10  poultry's plants.

11  Q.    It is a chicken processing plant, correct?

12  A.    No, it actually does ham.

13  Q.    I am sorry, I thought you said poultry?

14  A.    It was just originally owned by Tyson, it wasn't

15  originally owned by IBP.

16  Q.    But it is a meat processing plant in Houston,

17  Texas?

18  A.    Yes.

19  Q.    Where people are required to wear sanitary outer

20  garments?

21  A.    There is no slaughter, they are just slicing

22  ham, making sandwich meat.

23  Q.    And in slicing meat, you know you have to comply

24  with USDA regulations, correct?

25  A.    I'm sure that there are some.

1  Q.    And wear sanitary outer garments?

2  A.    Yes.

3  Q.    And if you're slicing meats, you're using a

4  knife, aren't you?

5          MS. PASCHAL:  Objection, foundation.

6  A.    I have not toured the plant.

7          THE COURT:  Overruled.

8  BY MR. HANSON:

9  Q.    Can -- can we fairly assume if you are slicing

10 meat you're using a knife?

11 A.    I am not going to make that assumption, because

12 the ham could be this big (indicating) and a machine

13 could slice it, I don't know that, I just, I cannot

14 make that assumption, I have never toured the plant.

15 Q.    Can we make this fair assumption, though, that

16 people at the Houston plants are also wearing sanitary

17 outer garments and some equipment to do their jobs?

18 A.    Yes.

19 Q.    Okay.  So you set the Houston rules to pay punch

20 to punch, correct?

21 A.    Yes.

22 Q.    And that was for production workers as well,

23 correct?

24 A.    Yes.

25 Q.    And then you write:  "An edit will flag anyone

1  punching in earlier than 15 minutes".  (Quoted as

2  read.)

3  A.    Yes.

4  Q.    "And anyone that is one minute late or more,"

5  correct?  (Quoted as read.)

6  A.    Yes.

7  Q.    So, you, yourself, set the Houston plant to a

8  punch to punch system for production workers, correct?

9  A.    I originally set them up that way.

10 Q.    And you instituted a 15-minute rule that would

11 send an alert if someone was abusing the system by

12 punching in early, correct?

13 A.    Yes.

14 Q.    And, similarly, you indicate that you could set

15 the rules so if someone punches out late, that would be

16 flagged, too, correct?

17 A.    Yes.

18 Q.    And you set those rules to make sure that the

19 company was managing its production workers in terms of

20 when they're punching in and when they're punching out,

21 correct?

22 A.    I was assisting the management.

23 Q.    And in assisting the management, part of your

24 job is to make sure the system wasn't being taken

25 advantage of by the production workers, correct?

1   A.    That's correct.

2   Q.    And setting these rules is one way to do that,

3   right?

4   A.    Yes.

5   Q.    In fact, a little further down, we actually see

6   what the rules kind of look like, right?

7   A.    Yes.

8   Q.    And that an edit will appear if a TM punches in

9   late, right, and you can add a one minute?

10  A.    Yes.

11  Q.    And an edit will appear if a TM punches in early

12  15 minutes, correct?

13  A.    Yes.

14  Q.    And these numbers can be changed, can't they?

15  A.    Yes.

16  Q.    If for management reasons you wanted to set the

17  early punch to ten, you could do that, correct?

18  A.    Yes.

19  Q.    If you wanted to set the late punch to five you

20  could do that, correct?

21  A.    Yes.

22  Q.    You could customize this system to whatever the

23  plant environment required, right?

24  A.    Yes.

25  Q.    In fact, can't you set the Time and Attendance

1  System to prohibit early punch ins entirely?

2  A.    No.

3  Q.    You can't?

4  A.    No.

5  Q.    Just setting up the edits?

6  A.    That's right.

7  Q.    That was discussed, though, whether you could do

8  that, right?

9  A.    Well, I was asked if I had -- if I had that

10 ability and we do not.

11 Q.    But what you can do, is create an edit, flag it

12 so that supervisors can take care of it, correct?

13 A.    That's right.

14 Q.    But one thing is very clear from this, you don't

15 need a supervisor every morning stationed at the time

16 clock to monitor their employees to see if they are

17 punching in or punching out at the right time, do you?

18 A.    The supervisor would want to stand at that time

19 clock because he doesn't want 50 pages waiting for him

20 while he is trying to go out on the line and he's got

21 all these edits to do, so they do their best to try to

22 stand there and control this.

23 Q.    Ms. Litras, at the end of the day a report would

24 be given to a supervisor that says, Of your 20

25 employees, five of them punched in early, correct?

1    A.    That is correct.

2    Q.    And that supervisor could then tell those five,

3    Look, you can only punch in 15 minutes, within 15

4    minutes of your shift, right?

5    A.    That's correct.

6    Q.    They can manage that, correct?

7    A.    Yes.

8    Q.    Yes?

9    A.    Yes.

10   Q.    And they don't have to every morning sit next to

11   the time clock and monitor their employees, do they?

12   That's -- that's automated by the system, right?

13   A.    Can I add something here?

14   Q.    You can add whatever you like.

15        THE COURT:  Sure you can.

16   A.    Houston never went punch to punch.  I set up the

17   rules, the plant was our first day of running the

18   system -- actually it was the second day, so the

19   supervisors received all their paperwork and stuff,

20   plant management came down, I was at -- on the site,

21   they came down and they said, we cannot handle this.

22        And Houston is approximately 150, 175 people

23   per shift.  They said, We cannot handle this much, um,

24   activity and that was the edits.

25   BY MR. HANSON:

1  Q.    Well, I'm sure your lawyer will bring out more

2  of this kind of information.

3  A.    I just wanted -- it looks like I left it there

4  and I didn't.

5  Q.    That's perfectly fair, you're going to have a

6  complete chance to tell --

7  A.    Okay.

8  Q.    -- Tyson's side of the story.

9         What I am really getting at is just the system

10  itself.  You can set up the system so that a supervisor

11  will know every day whether an employee is following

12  the rules, correct?

13  A.    Yes.

14  Q.    And you have a similar system -- well, the same

15  system in Vernon, Texas and in Omaha, Nebraska,

16  correct?

17  A.    That's correct.

18  Q.    And you are paying punch to punch in those

19  locations, correct?

20  A.    Yes, those locations are 300 people or so.

21  Q.    And, again, I -- I am going to ask you my

22  questions, you will have --

23  A.    Okay.

24  Q.    -- ample opportunity, I'm sure.  And Tyson

25  poultry plants are moving to a punch to punch system,

1  correct?

2   A.      I am told that, yes.

3   Q.      And you know that those aren't small plants,

4  right?

5   A.      I have no exposure to their plants.

6   Q.      You don't know that the poultry plants are

7  hundreds and hundreds or thousands of production

8  workers?

9   A.      I have never been to one of their plants.

10   Q.      I am just asking your knowledge.  Are you aware

11  that they are larger plants than the Houston plants we

12  are talking about?

13   A.      I don't know the individual counts.

14   Q.      Let me just show you the final piece of this

15  e-mail string.

16   A.      Okay.

17   Q.      This is what I would like to draw your attention

18  to.

19          Mr. Hilton, you identified him earlier, didn't

20  you?

21   A.      Yes, the HRD.

22   Q.      The human resources director?

23   A.      Yes.

24   Q.      And here's what he writes:  Since we will be

25  going to a new type -- sorry.  "Since we will be going

1  to a new keeping system soon and will need to program

2  it with our pay practices, Hector would like us to

3  consider going punch -- to a punch to punch system.  I

4  believe we can set the system to where no one can clock

5  in more than 10 to 15 before scheduled start."  (Quoted

6  as read.)

7          Do you see that?

8  A.    Yes.

9  Q.    And that was a question I just asked you,

10 whether you could set it to prevent 10 to 15 minute

11 clock ins?

12 A.    That's correct and we cannot do that.

13 Q.    You say you cannot do that with current Time and

14 Attendance System, correct?

15 A.    That's correct.

16 Q.    Do you know whether there are Time and

17 Attendance Systems which would be able to prevent that?

18 A.    I do not know that.

19 Q.    Would you just in your experience, assume that

20 the technology exists to prevent someone from clocking

21 in?

22 A.    I would assume there was --

23        MS. PASCHAL:  Objection.

24        THE COURT:  I'm sorry.

25        MS. PASCHAL:  Calls for speculation.

1            THE COURT:  The question was whether she knew

2  if there was that kind of technology.

3            MR. HANSON:  And I asked given her experience,

4  wouldn't she assume that such technology exists and I

5  believe she is answering.

6            THE COURT:  Well, I'll overrule the objection.

7  You can answer.

8            THE WITNESS:  Okay.

9  A.     The systems I have worked with are all in-house

10  built systems so I do not have any exposure to existing

11  software.

12  BY MR. HANSON:

13  Q.     My question is, wouldn't you assume that that

14  technology exists, didn't you say you would assume

15  that?

16  A.     I would assume that there is something out there

17  but I'm not aware of any specifics.

18  Q.     Mr. Hilton then concludes his e-mail with, "It

19  would be the supervisor's responsibility to monitor

20  this," correct?  (Quoted as read.)

21  A.     Yes.

22  Q.     "Folks who abuse the system will be subject to

23  progressive discipline," correct?  (Quoted as read.)

24  A.     Yes.

25  Q.     And he signs off, that "obviously, this system

1   would be more defensible," correct?  (Quoted as read.)

2   A.    I don't know what that means.

3   Q.    Well, you didn't disagree with it in the e-mail

4   string, did you?

5   A.    No, I just don't know what that specific -- I

6   mean, I agree with all his facts in that I just don't

7   know what that last statement means, the system would

8   be more defensible.

9   Q.    You agree with the, in fact it would be the

10  supervisor's responsibility to monitor this?

11  A.    Yes.

12  Q.    You agree the fact that people who abuse this

13  system would be subject to progressive discipline,

14  correct?

15  A.    Yes.

16  Q.    You just don't necessarily agree with the system

17  that the system would be more defensible?

18  A.    That's correct.

19          MR. HANSON:  Thank you, Ms. Litras, I'm done.

20          THE COURT:  All right.  Cross?

21          MS. PASCHAL:  Yes, Your Honor.

22                    CROSS EXAMINATION

23  BY MS. PASCHAL:

24  Q.    Good morning, Ms. Litras.

25  A.    Good morning.

1  Q.     Ms. Litras, Mr. Hanson just asked you about a

2  Houston ham facility and whether or not they tried to

3  go to a punch to punch system.

4  A.     That's correct.

5  Q.     And is it your testimony that they tried that

6  system and it turned out not to be workable?

7  A.     Yes.

8  Q.     And is it your testimony that in fact after two

9  days it was determined it was not workable?

10  A.     Yes.

11  Q.     And is that because of the number of edits that

12  were being generated from people clocking in too early?

13  A.     That's correct.

14  Q.     Even though they were told not to clock in more

15  than a certain number of minutes before shift?

16  A.     Yes.

17  Q.     And is it your testimony that this is a facility

18  that has about 300 employees?

19  A.     Yes.

20  Q.     Is that on one shift or two shifts?

21  A.     That would be 300, I think that is both shifts.

22  Q.     Okay.  So that's 300 together, about 150 per

23  shift?

24  A.     Yes.

25  Q.     Would you agree that that's significantly

154

1  smaller than the Finney County processing shift, for

2  example?

3  A.    Yes.

4  Q.    Which has over a thousand employees per shift,

5  does it not?

6  A.    Yes.

7  Q.    Could you explain to me what the problem was at

8  the Houston facility with team members clocking in too

9  early?

10  A.    They had a lot of people that were carpooling,

11  so it was just standard practice for them to come so

12  early so then they were clocking in.

13  Q.    And so they were clocking in before they were

14  told that they should be clocking in, is that correct?

15  A.    Yes.

16  Q.    Because they were actually there in the

17  facility, is that correct?

18  A.    Yes.

19  Q.    Because a lot of them were sharing rides to get

20  to the plant, is that correct?

21  A.    Yes.

22  Q.    And there was no way for the Time and Attendance

23  System to bar them from clocking in too early, is that

24  correct?

25  A.    That's correct.

1   Q.    Now, talking about the management problems with

2   managing the system.  What were the supervisors having

3   to do with all of these edits that were set for people

4   clocking in too early at the Houston plant?

5   A.    They would have to go through, they would have

6   to decide, you know, there are some scenarios where the

7   supervisor would request a team member to come in

8   early, to help with set up, so he would have to make

9   sure, you know, maybe Joe was asked to come in early,

10  and then we change his -- instruct the clerks to change

11  the start time.

12        But they are documented -- documenting it on

13  pieces of paper, going through each person.

14  Q.    So they literally would have to go through each

15  and every edit and investigate why that employee was

16  clocking in too early?

17  A.    Yes.

18  Q.    And for some -- in some instances it may be that

19  that employee was supposed to clock in early because

20  they were performing work, production work, is that

21  correct?

22  A.    Yes.

23  Q.    And so the supervisor would have to investigate

24  to make sure that's the case, that that person was

25  receiving pay for that production work, is that

1  correct?

2  A.     Yes.

3  Q.     And if a team member, which is clocking in early

4  because they had arrived early, then would the

5  supervisor then have to investigate it to tell the

6  person, You need not to clock in -- need to not clock

7  in so early?

8  A.     That's correct.

9  Q.     So they were having to do this for each and

10  every instance when someone was clocking in too early?

11  A.     Yes.

12        MR. HANSON:   Judge, I apologize for the

13  objection.   And maybe I'm not clear about the rules

14  when it's Tyson's witness, but very leading type of

15  examination, the witness is only saying yes to Ms.

16  Paschal's leading questions.   I think some question and

17  answer is appropriate because it is Tyson's witness.

18        THE COURT:   Well, Mr. Hanson, all you have to

19  say is leading.

20        MR. HANSON:   I'm sorry.

21        THE COURT:   I don't need a narrative.

22        MR. HANSON:   Thank you.

23        THE COURT:   But the fact is, it's cross

24  examination, she's going over areas that you went over

25  with this witness, so I am going to overrule the

1   objection until she gets beyond the scope of where your

2   examination was.

3          MR. HANSON:   Thank you, that clarifies.

4          THE COURT:   Thank you.   Go ahead, Ms. Paschal.

5          MS. PASCHAL:   Thank you, Your Honor.

6          THE COURT:   That is overruled, by the way.

7   BY MS. PASCHAL:

8   Q.     Ms. Litras, do you have a sense of how many

9   employees a supervisor at the Houston plant supervised?

10  A.     Um, I would say probably around 20 to 30.

11  Q.     So they were having a hard time -- excuse

12  me -- keeping up with 20 to 30 team members that they

13  supervise each shift in their early punches, is that

14  correct?

15  A.     Yes.

16  Q.     So if a supervisor of a larger facility had a

17  larger number of team members to keep up with, would

18  you agree that that would increase that

19  supervisor -- supervisor's burden?

20  A.     Yes.

21  Q.     Even more than what was experienced in those two

22  days at the Houston facility?

23  A.     Yes.

24  Q.     Is Houston a slaughter facility?

25  A.     No.

1  Q.    Is it a -- is it a facility where large

2  carcasses are carved up for processing?

3  A.    No.

4  Q.    Does the Houston facility receive K-code time?

5  A.    No.

6  Q.    Do you have any reason to believe that the

7  Houston facility was part of the Reich Department of

8  Labor litigation?

9  A.    No.

10 Q.    You also gave some testimony about the Omaha and

11 Vernon facilities paying punch by punch?

12 A.    Yes.

13 Q.    Is it true that these facilities also are not

14 slaughter facilities?

15 A.    That's correct.

16 Q.    Is it true that these facilities make more in

17 the line of processed meat?

18 A.    Yes.

19 Q.    Are they more similar to the Houston plant than,

20 for example, to the Finney County plant?

21 A.    Yes.

22 Q.    Size wise, how would you characterize these two

23 facilities in comparison to Finney County?

24 A.    They're all -- comparable to Houston, I would

25 say around two to 300 people total.

1    Q.    So would you agree that Finney County is

2  significantly bigger than these two facilities?

3    A.    Yes.

4    Q.    Significantly larger number of team members

5  working on each shift?

6    A.    Yes.

7    Q.    Do you have any reason to believe that either

8  the Omaha or Vernon facility are subject to the Reich

9  Department of Labor litigation involving IBP?

10   A.    No.

11   Q.    Do either of those facilities pay K-code time

12  for clothes changing time?

13   A.    No.

14   Q.    You said earlier that from a systematic

15  standpoint it is possible to go punch by punch.  When

16  you say systematic, are you referring to what the

17  technology is capable of?

18   A.    Yes.

19   Q.    Is that different from whether or not the

20  process can be managed from an administrative

21  standpoint?

22   A.    Yes.

23   Q.    And, in fact, would you agree that the situation

24  in Houston is an example of the administrative

25  difficulties with the punch to punch system?

1   A.     Yes.

2   Q.     Mr. Hanson talked with you earlier about setting

3   the system to generate a flag whenever a team member

4   comes early.  And my understanding is this is largely

5   the way the Houston situation was set up, is that

6   correct?

7   A.     That's correct.

8   Q.     And, in fact, do some red meat plants such as

9   the Finney County facility also sometimes set the

10  system up to flag when employees come in too early?

11  A.     Yes.

12  Q.     Or punch in too early?

13  A.     Yes.

14  Q.     Now that's done from a -- a systems standpoint,

15  right?

16          That's something that is in the Time and

17  Attendance System, is that correct?

18  A.     That's correct.  The system is centralized, the

19  rules are centralized, so just myself and I are the

20  only ones that change those rules.

21  Q.     So -- even though an employee, for example, if

22  the rule is, Don't clock in more than five minutes

23  before your shift, even if an employee clocks in 20

24  minutes before their shift, would you agree that their

25  supervisor isn't going to know that during the shift?

1  A.    Right, that's correct.  He wouldn't see that

2  until the next day.

3  Q.    Is that when he receives the daily report on

4  everyone's --

5  A.    Yes.

6  Q.    -- clock in and clock out times and production

7  time?

8  A.    That is correct.

9  Q.    So, the supervisor wouldn't actually know if an

10 employee punched in too early or punched out too late

11 until the next day, is that correct?

12 A.    Right.  That is correct.

13 Q.    And then at that point, would the supervisor

14 have to investigate each and every instance of why an

15 employee clocked in too early or too late?

16 A.    Yes.

17 Q.    And the way that system works, even when it's

18 being used now in the red meat plants, that it is flag

19 that is thrown up doesn't indicate why an employee is

20 clocking in too early, does it?

21 A.    No, it does not.

22 Q.    So in other words, you can't tell just from the

23 fact that an employee clocked in too early if they did

24 so simply because they arrived and went ahead and

25 clocked in, or if they were coming early to do, for

1  example, set up duties on a particular day?

2   A.    That is correct.

3   Q.    Is it the same way on the -- at the end of the

4  day, if an employee clocks out too many minutes after

5  the end of their shift?

6   A.    That is correct.

7   Q.    So, for example, if an employee clocks out 20

8  minutes after the end of his shift, you don't know if

9  that employee simply was just in the plant hanging out,

10  maybe socializing and then clocked out or was actually

11  doing some cleanup work at the end of shift, is that

12  correct?

13  A.    That is correct.  The edit is called punches

14  exceed hours worked.  And that would identify anyone

15  who's punching out a considerable time after the gang.

16  Q.    So all of those flagged punches would have to be

17  investigated by the supervisor, is that correct?

18  A.    That's correct.

19  Q.    And the supervisors would have to do this day

20  after day after day, is that correct?

21  A.    That's correct.  They have to come back and

22  either say that they helped with cleanups so then we

23  add an additional detail, make sure they're paid for

24  those hours to the gang record, or they'll say, if they

25  left before the gang was over then we would be adding

1  absentee codes.

2  Q.    We spoke a little bit earlier about the Project

3  1 project.  Do you remember that?

4  A.    Yes.

5  Q.    From 2003?  And am I correct that that project

6  was to try to integrate all of the various Time and

7  Attendance Systems used throughout the new company

8  after Tyson acquired IBP?

9  A.    That is correct.  And Project 1 was actually

10 looking at all systems across both companies.  And that

11 memo is specifically was talking about time and

12 attendance.

13 Q.    Would it be fair to say that the goal of that

14 project was to try to have one integrated, highly

15 functional system?

16 A.    Yes.

17 Q.    And I believe your testimony was, was that that

18 project was not successful, is that correct?

19 A.    That's correct.

20 Q.    About how many years did Tyson work on this

21 project?

22 A.    I believe approximately two years.

23 Q.    Would you agree that this was a project that the

24 company took very seriously?

25 A.    Yes.

1  Q.    Would you agree that the company expended a fair

2  amount of time and resources towards this project?

3  A.    Yes.

4  Q.    And would you agree that despite the amount of

5  time and resources put into this project, the company

6  concluded that there was no way to integrate all these

7  systems and have all the functionalities that it

8  desired?

9  A.    Yes.

10 Q.    Ms. Litras, would you agree that in your current

11 job, your job responsibilities do not include knowing

12 what the law requires with respect to time clocks or

13 Time and Attendance Systems?

14 A.    That's correct.

15 Q.    And would you agree also that your job does not

16 require you to have a legal understanding of when a

17 company is obligated to pay back pay, for example?

18 A.    That is correct.

19 Q.    So if I were to represent to you that the law

20 does not require a company to use time clocks as a time

21 keeping -- as a basis for a time keeping system, would

22 you have any reason to disagree with me?

23        MR. HANSON:   I am going to object to the form

24 of the question as really stating an improper legal

25 hypothetical for this witness.

1          THE COURT:   Sustained.

2    BY MS. PASCHAL:

3    Q.    Do you have any reason to think that the reason

4    the company uses time clocks is because it is required

5    to do so under the law?

6    A.    We have -- we have to track the amount of time

7    the team members -- the amount of time they're working.

8    Q.    Would you agree with me that you have no basis

9    for thinking that the specific way that it's done is

10   mandated by the law?

11   A.    Yes.

12   Q.    Mr. Hanson asked you some questions about some

13   back pay that was paid to the employees at Finney

14   County in August of '07.   Do you remember your

15   testimony?

16   A.    Yes.

17   Q.    And, in fact, was it your testimony that that

18   was back paid until about January 21st or 28th of '07?

19   A.    Yes.

20   Q.    And just to be clear, when that back pay was

21   paid, was that paid with interest that had accrued from

22   January through August of 2007?

23   A.    Yes.   I set up the spreadsheet so Mark Hayre

24   could calculate the interest.

25   Q.    And I believe that you testified that the

1   increase in K-code started being implemented at the red

2   meat facilities in January of 2007, is that correct?

3   A.    That's correct.

4   Q.    But in Finney County, the process was not able

5   to be done until August of 2007, is that correct?

6   A.    That's correct.

7   Q.    Is it your understanding that the purpose of

8   that back pay was to make those employees sort of

9   comparable to employees at other facilities who had

10  started to get that back pay earlier?

11  A.    Yes.

12  Q.    Do you have any reason to think that Tyson was

13  required to pay that back pay under the law?

14  A.    No.

15  Q.    Would you agree with me that Tyson did that

16  because it thought it was the right thing to do?

17  A.    Yes.

18  Q.    And in going through some of the examples that

19  we looked at for the data underlying that back pay,

20  would you agree that that back pay was paid even to

21  employees who only worked for one week during the

22  January to August '07 time period?

23  A.    Yes.  If we saw terms were included in there.

24  Q.    So in other words, you also paid people who had

25  quit their job between January and August of '07, is

1  that correct?

2  A.    Yes.

3  Q.    And, in fact, did you not pay back pay to people

4  who had been fired by the company between January and

5  August of '07?

6  A.    That's correct, but the TX versus TT status

7  code.

8  Q.    Ms. Litras, are you aware that the K-code at the

9  Finney County facility was increased from four minutes

10 to a range of four to seven minutes in 2007?

11 A.    Yes.

12 Q.    When that change was made, were there any

13 employees at the Finney County facility who lost their

14 K-code time?

15        In other words, were paid K-code before the

16 2007 changes but no longer were paid K-code after the

17 2007 changes?

18 A.    No.   Nobody lost their benefits.

19 Q.    When the K-code was paid from '98 to 2007, the

20 four minute rate, was that paid to employees who -- to

21 some employees who did not necessarily use knives?

22 A.    Yes, because it was paid by department.

23 Q.    So if a department had knives in it, would all

24 employees in that department receive the K-code?

25 A.    Yes.

1    Q.    Would that be true even if a particular employee

2    did not use a knife in that department?

3    A.    That's correct.

4    Q.    And would that be true even if that employee did

5    not wear certain knife protective items?

6    A.    That's correct.  My system was strictly just

7    reading the work department.

8    Q.    And when the K-code was changed in 2007, did the

9    K-code become job specific?

10    A.    In 2007, yes.

11    Q.    And that's in contrast to the department

12    specific before that?

13    A.    That's correct.

14    Q.    Were there some employees who were receiving the

15    four minutes at Finney County up until 2007 who did not

16    use knives?

17    A.    Yes.

18    Q.    And when the change was made to the K-code in

19    2007 did they lose that four minutes of K-code?

20    A.    No.  We grandfathered them in.  What we did is

21    we identified anyone that was working at that time and

22    we flagged their department so as long as they worked

23    in that department -- well, excuse me, let me step

24    back.

25          My testimony would first look at their job

169

1  code and it would say, Are you working a job code that

2  is K-code eligible?  If they were not working a job

3  code that was K-code eligible, it would look at the

4  work department.  And it would say, Was this work

5  department originally a safety indicator?  Was it also

6  K-code eligible?  And if it was, then it would pay that

7  employee four minutes.

8  Q.    And when you say it would pay the employee four

9  minutes, is that going forward in 2007?

10  A.    Yes.

11  Q.    And the current K-code that's being used at the

12  plant in 20 to 22 minutes, is that paid to all

13  production employees?

14  A.    It's by job code but it's everybody who's tied

15  to the production line.

16  Q.    So is that all employees on the slaughter side,

17  for example?

18  A.    Yes, anyone attached to the chain.

19  Q.    Is that employees on the processing side as

20  well?

21  A.    Yes.

22  Q.    And is that K-code dependent any more on whether

23  or not someone is wearing safety and protective items

24  that are unique to knife users?

25  A.    Again, it's the number of minutes they are being

1  paid is by job code but if they're tied to the line

2  then they're getting K-code.

3  Q.    Is that even if they are not using a knife?

4  A.    Yes.  As long as they are part of the chain.

5  Q.    For purposes of calculating weekly pay, when is

6  the K-code time added in to an employee's pay?

7  A.    The system looks at it on a daily basis but when

8  you -- when the supervisor reviews his payroll details

9  he would see it on Saturday as a total amount for the

10  week.

11  Q.    So if production time for the week is 40 hours,

12  at what rate does the K-code rate paid?

13  A.    K-code falls on Saturday so if they've already

14  exceeded their 40 hours for the week, K-code would be

15  paid at overtime.

16  Q.    So would it -- would it be accurate to say that

17  K-code is calculated, for purposes of employee pay, at

18  the end of the week?

19  A.    Yes.

20  Q.    And would it be accurate to say that that's

21  after the -- all the other production time components

22  have been calculated?

23  A.    Yes.

24  Q.    So is it true that the K-code is sometimes paid

25  at the overtime rate?

1   A.    Yes.

2   Q.    If the employee has not worked over 40 hours for

3   the week and the production time plus K-code time is

4   not over 40 hours, at what rate is the K-code paid?

5   A.    Be paid at straight rate.

6   Q.    Is that also known as the master rate?

7   A.    It would be paid at master, yes, straight

8   master.

9   Q.    Would it be fair to say that the master rate is

10  basically the rate in which an employee is paid to do

11  the job she was hired to do?

12  A.    Yes.  You know, I should clarify that.

13         In '98 up through -- up to 2010 K-code was

14  paid at master, currently now in 2010 we looked back at

15  if they worked jobs that had various rates throughout

16  the week we take a weighted average and K-code would be

17  paid the higher of the master rate with that weighted

18  rate, which obviously is the weighted average.

19  Q.    And when you say that, do you mean that an

20  employee may work different jobs throughout the week?

21  A.    Yes.

22  Q.    Are there different pay rates associated with

23  these different jobs?

24  A.    Yes.

25  Q.    When an employee is paid different pay rates

1  associated with the different job, is that rate ever

2  lower than their master rate?

3  A.    No, it is not.

4  Q.    So when you are talking about an average of the

5  rates at which an employee is working various jobs, is

6  it true that it can be greater than the master rate?

7  A.    Yes.

8  Q.    Can it ever be less than the master rate?

9  A.    No.

10  Q.    And is it fair to say that at this point now the

11  K-code, when it's paid as part of straight time, is

12  paid at either the master rate or the average rate,

13  whichever is higher?

14  A.    That's correct.

15  Q.    Since 2003 has Finney County paid slaughter

16  employees something called sunshine time?

17  A.    Yes.

18  Q.    Is sunshine time counted as part of an

19  employee's regular work week?

20  A.    Yes, it's included in the 40-hour overtime

21  calculation.

22  Q.    And when you say it's included in the 40-hour

23  overtime calculation, does that mean that when you're

24  looking to see whether an employee has hit 40 hours you

25  look not only at the time they spent working in their

1  job, but also at things like sunshine time?

2  A.     That's correct.

3  Q.     Is sunshine time paid at the master rate?

4  A.     Yes.

5  Q.     Is sunshine time ever paid at an overtime rate?

6  A.     Yes.

7  Q.     When might that occur?

8  A.     Just depending on when it falls in the week, if

9  they have already hit their 40 hours, then sunshine

10  would go into overtime.

11  Q.     Is sunshine time denoted separately on a

12  employee's pay stub?

13  A.     Yes, it is noted with a G cost code.

14  Q.     But for purposes of calculating wage rates it's

15  included as part of the regular work week, is that

16  correct?

17  A.     Yes.

18  Q.     Does the Finney County plant ever pay a second

19  15 minute break to employees?

20  A.     Yes.

21  Q.     And under what situations does this occur?

22  A.     Um, if they -- if the team member works over

23  eight hours and seven minutes then they're owed an

24  additional break.  Paid break.

25  Q.     And when you say they're owed an additional paid

1  break, do they actually have to take that break?

2  A.     No.

3  Q.     If they don't take that break, what happens?

4  A.     Then the supervisor notes on there -- well,

5  first of all, an edit will identify it for the

6  supervisor saying this team member worked in excess of

7  eight hours and seven minutes, and then the supervisor

8  will have the clerk include the break detail and that

9  would pay in another 15 minutes.

10 Q.     So is it fair to say the second 15-minute break

11 is paid out in those situations?

12 A.     Yes.

13 Q.     Is the employee actually required to do any work

14 during that extra 15 minutes?

15 A.     No.

16 Q.     Is the employee required to stay at the facility

17 during that extra 15 minutes?

18 A.     No.

19 Q.     That second paid break comes on the last day of

20 the week and 40 hours have already accrued, would it be

21 paid at the overtime rate?

22 A.     Yes.

23 Q.     Does the K-code for the day count towards that

24 eight hours and seven minutes?

25 A.     Yes.

1   Q.    So if an employee's K-code is five minutes and

2   production or gang-time ran eight hours and three

3   minutes, for a total of eight hours and eight minutes,

4   would that employee be eligible for the second paid

5   break?

6   A.    Yes, it would.

7   Q.    And that would be paid on top of the K-code

8   time?

9   A.    Yes.

10   Q.    I would like to show you some examples of some

11   pay stubs.

12   A.    Okay.

13   Q.    Plaintiffs' Exhibit 270.

14        MS. PASCHAL:  And I believe this exhibit was

15   previously admitted.

16   BY MS. PASCHAL:

17   Q.    Ms. Litras, these are some pay stubs from

18   Jeronimo Vargas who is one of the named plaintiffs in

19   this case who testified earlier.

20   A.    Okay.

21   Q.    Do you recognize this as a pay stub for a Finney

22   County employee?

23   A.    Yes, I do.

24   Q.    And can you tell us what pay period this is for?

25   A.    January 3rd, 2004.

1   Q.    Can you tell us what this top line indicates?

2   A.    That team member was paid 23.8 regular hours.

3   Q.    Can you tell us what this next line indicates?

4   A.    He received eight hours holiday.

5   Q.    So, is that for a day off, in effect?

6   A.    Yes.

7   Q.    Is that part of his -- is he getting paid for

8   that day off?

9   A.    Yes.  It was a benefit.

10  Q.    What is this next line?

11  A.    This is .20 hours of clothes change paid at the

12  regular rate, so this is our K-code.

13  Q.    So when it says clothes change regular, that

14  means that's the K-code being paid at the -- at this

15  time the master rate?

16  A.    Yes.

17  Q.    Is that correct?

18  A.    That's correct.

19  Q.    And .2 hours is how many minutes?

20  A.    Twelve minutes.

21  Q.    Now, we're in the 2004 time range, so what was

22  the K-code in 2004?

23  A.    That was four minutes by department.

24  Q.    So how many days does that indicate or how many

25  shifts does that indicate at that Mr. Vargas worked

1  that week?

2  A.     Three.

3  Q.     Wanted the holiday pay of eight hours, is that

4  in effect one day?

5  A.     Yes.

6  Q.     Now when we look at his regular pay, I see 23.8

7  hours.  About how many shifts does that indicate that

8  Mr. Vargas worked that week?

9  A.     Three.

10  Q.     So is that the equivalent of just under eight

11  hours each day that he worked?

12  A.     Yes.

13  Q.     Like to show you another example.  Can you tell

14  us what this pay stub right here, what time period are

15  we in?

16  A.     June of '04, June 26th.  Of '04.

17  Q.     And, again, what do we see was his regular

18  hourly pay for that week?

19  A.     He worked 40 hours regular.

20  Q.     Is 40 hours the threshold for overtime?

21  A.     Yes.

22  Q.     So anything above 40 hours has to be paid at

23  overtime?

24  A.     Yes.

25  Q.     This line right here, overtime pay, 1.5, and

1  then a 4.77 hours.  What does that indicate?

2  A.     That indicated that he worked an additional 4.77

3  hours after he completed his 40, so he was paid at time

4  and a half.

5  Q.     So is that part of his production time?

6  A.     Yes.

7  Q.     And the line underneath it, clothes changing,

8  1.5 and then .4, what does that indicate?

9  A.     That indicates that his K-code for the week was

10 all paid at overtime.

11 Q.     And if it's .4, how many minutes does that

12 translate into?

13 A.     Um, 24.

14 Q.     So does that indicate six shifts that week?

15 A.     Yes.  This is four minutes.

16 Q.     And so was each K-code for each shift paid at

17 the overtime rate for Mr. Vargas on this particular

18 week?

19 A.     Yes, it was.

20 Q.     Ms. Litras, I would like to show you a slide

21 that the plaintiffs showed us during their opening

22 statement.

23 A.     Okay.

24 Q.     And before I do so, do you remember the series

25 of questions that Mr. Hanson asked you about some

1  calculations that you did comparing gang-time plus

2  K-code versus just punch to punch for a particular week

3  in 2009?

4  A.    Yes.

5  Q.    And you testified about the differential between

6  those two numbers, is that correct?

7  A.    Yes.

8  Q.    And when you did that analysis, did you just

9  pull the punches off the system for that day or for

10 that week?

11 A.    Yes.

12 Q.    For those departments?

13 A.    That is correct.

14 Q.    Now to briefly explain to you how this slide

15 works, Mr. Hanson has indicated that this period right

16 here, this little gray sliver is the time between when

17 an employee enters the plant and when an employee

18 starts doing some of the pre-shift activities that are

19 at issue in this case.

20       Then this red box is supposed to indicate, and

21 there was no representation this was done to scale, but

22 this was supposed to indicate that the activities at

23 issue in this case, donning and doffing activities.

24       And then this is supposed to indicate when the

25 employees started performing their production work.

1           So do you have a sense of how that works?

2   A.    Yes.

3   Q.    So, for that week in 2009 when you were

4   comparing punch in and punch out times to gang-time

5   plus K-code, would you agree that it could be that some

6   of those punches were occurring right here?

7   (Indicating.)

8   A.    Yes.

9   Q.    So in other words, when the employee entered the

10  plant, but before they started doing any of the

11  activities at issue in this case?

12  A.    That's correct.

13  Q.    In other words, when you were looking at the

14  data you had no way to know if this was happening or

15  not?

16  A.    That's correct.

17  Q.    Well, for example, someone could have been

18  clocking in right here, right here, right here,

19  anywhere in this little window right here.  (Indicating

20  throughout.)

21  A.    That's correct.

22  Q.    Now, Mr. Hanson told us in his opening statement

23  that the plaintiffs are not seeking compensation for

24  that time in that first gray bar.

25           Although I believe it's your testimony, is it

1  not, that when you pulled the punches for that week in

2  2009, it could have included people who were punching

3  in during that window, is that correct?

4  A.    Yes, that's correct.

5  Q.    Now, we also looked during the plaintiffs'

6  opening at the same thing post shift and Mr. Hanson

7  explained this is supposed to represent the end of

8  production time, this red box is supposed to indicate

9  the post shift activities that are at issue in this

10  case, and this gray bar right here is supposed to

11  indicate the time between those post shift activities

12  and when employees actually leave the plant.

13          So, for that week in 2009, when you were

14  looking at the punches, could it be that some people

15  were punching out here?  (Indicating.)

16  A.    Yes.

17  Q.    Or here?  (Indicating.)

18  A.    Yes.

19  Q.    Or here?  Or here?  (Indicating.)

20  A.    Yes.

21  Q.    And, again, Mr. Hanson represented that this

22  time where we have just drawn the Xs is time that

23  plaintiffs are not seeking compensation for, but would

24  you agree that they would have been included in the

25  calculations that you ran in that week of 2009?

1   A.    Yes.  We just worked with the punches.

2   Q.    So given what we have just gone through, would

3  you have any basis for disagreeing with me if I said

4  that your calculations in 2009 comparing the punch to

5  punch times and the pay associated with it, with the

6  gang-time plus K-code times and the pay associated with

7  it, could have included time that the plaintiffs have

8  said they're not seeking compensation for?

9   A.    Yes.

10        MS. PASCHAL:  I have no further questions at

11  this time.  Thank you, Ms. Litras.

12        THE COURT:  Thank you.  Mr. Hanson.

13                REDIRECT EXAMINATION

14  BY MR. HANSON:

15  Q.    Thank you.  Just very, very briefly and just to

16  take up the last line of questioning from your lawyer,

17  Ms. Paschal, okay?

18  A.    Okay.

19  Q.    Let me show you the same slide --

20        MR. HANSON:  Well, do you mind if I use yours?

21  Yours is still up.

22        MS. PASCHAL:  That's fine.

23        MR. HANSON:  Okay.

24  BY MR. HANSON:

25  Q.    You understand, Ms. Litras, that the time from

1  where production starts, this is all covered by

2  gang-time, correct?

3  A.     That's correct.

4  Q.     You understand the red is the donning and

5  doffing and walk time in question, correct?

6  A.     Okay.

7  Q.     Ms. Paschal put some Xs where she suggests that

8  workers might have punched in after they got to the

9  plant, correct?

10  A.     That's correct.

11  Q.     But you understand the worker might have punched

12  in anywhere in this time frame up until 6:00 a.m.,

13  correct?  The start of the production?

14  A.     I don't know where the clocks are, I mean,

15  you're right, it could be any time against production.

16  Q.     Sure.  So the Xs that Ms. Paschal showed you,

17  you don't know if those were when folks were actually

18  punching in, correct?

19  A.     No, I don't know when they actually punched in

20  on this timeline.

21  Q.     As far as you know, they may have been punching

22  in just a moment or two before they went on the

23  production floor, after they had been donning and

24  doffing, correct?  (Indicating.)

25  A.     That could be possible, yeah.

1  Q.    Sure.  It's at least it's as possible as

2  punching in immediately, correct?

3  A.    Yes.

4  Q.    Are you aware that the policy in Finney County

5  is actually to punch in right before you go on to the

6  production floor?

7  A.    I don't know where the clocks are set up.

8  Q.    You don't know one way or the other?

9  A.    No.

10  Q.    But you would agree with me that under your

11  analysis, where we calculated that about $3.7 million

12  is saved annually by paying gang-time instead of punch

13  time that that is not necessarily over inclusive.

14        Too long a question, let me back up.

15  A.    Okay.

16  Q.    When we did that, when we did that analysis and

17  that math, you were just using the punch times,

18  correct?

19  A.    That's correct.

20  Q.    You weren't assuming that the punch times were

21  before donning and doffing, right?

22  A.    That's correct.

23  Q.    And you weren't assuming that they were after

24  donning and doffing before they went to production

25  floor, correct?

1  A.     That's correct.

2  Q.     And you would agree with me that if most of the

3  punches are actually after donning and doffing, a lot

4  of this red time is not paid, correct?

5  A.     That's correct.

6  Q.     And I don't have to go through the whole thing

7  again, but same -- same here, correct?

8          If someone punches out after they leave the

9  production floor, instead of after they leave the

10 locker room, their doffing, their time taking their

11 equipment off would not be captured by the punches,

12 correct?

13 A.     That's correct.

14 Q.     So you can't tell the jury that your gang-time

15 versus punch to punch analysis is, you know, whether it

16 covers donning and doffing time or not.  In some

17 instances it might, in some instances it might not,

18 correct?

19 A.     That's correct.

20 Q.     What you were looking at was just by the punches

21 that actually occurred, there is about a $3.7 million

22 annual difference between the time clocks and the

23 gang-time, even in accounting for K-code, correct?

24 A.     Right, because we did gang code -- excuse me, we

25 did gang plus K-code, we subtract that from the time in

```
 1  between the punches.

 2  Q.    But we -- we credited -- we credited Tyson

 3  K-code, correct?

 4  A.    That's correct.

 5  Q.    And you still got that $3.7 million number?

 6  A.    That's correct.

 7          MR. HANSON:  That's all I have.  Thank you.

 8          THE COURT:  Thank you.  Anything further, Ms.

 9  Paschal?

10          MS. PASCHAL:  No, Your Honor.

11          THE COURT:  All right.  Ma'am, you may step

12  down.

13          May this witness be excused?

14          MR. HANSON:  Yes.

15          MS. PASCHAL:  Yes, Your Honor.

16          THE COURT:  And you are excused.  Thank you.

17          Folks, let's go ahead and take our second

18  break.  It's 11:30.  We'll be in recess until 11:50.

19  11:50.  I remind you, again, you're not to discuss this

20  case or any aspect of it or do any kind of independent

21  research.

22          Thank you so much.

23          (The jury leaves the courtroom.)

24          THE COURT:  All right.  Well, folks, go ahead

25  and have a seat.  I think I am going to take a break
```

1  this time, if that's all right with you all.

2        I'll have a little better frame of mind when I

3  come back.

4        Is there anything I need to be thinking about,

5  however, while I'm on break?

6        MR. MUELLER:  No, we'll have -- go ahead.

7        MR. HANSON:  We have one more witness for

8  today, it's Doctor Scott Baggett, I can't imagine we

9  can't finish him before today's end.  I would just note

10 he had to come in over the weekend to be deposed, flew

11 back, it would be really good if we could finish him

12 today and allow him to get back to Colorado.

13       THE COURT:  You think we may need to go a

14 little long today?

15       MR. MUELLER:  I need two hours, so how long do

16 you need?

17       MR. HANSON:  We don't need that long.  We need

18 probably 45 minutes.

19       MR. DIRKS:  We can move it along.

20       MR. HANSON:  We will move it along as quickly

21 as possible, it would just be great if we could get him

22 done.

23       THE COURT:  Sure.  Well, we'll see what we can

24 do.

25       MR. MUELLER:  We have some objections to their

1  exhibits.  They've altered his tables and are trying to

2  put in new tables and I object to that.  And I don't

3  object to the ones that are the same as his tables but

4  they have changed some of the numbers and changed some

5  other things.  I just got them this morning.

6           THE COURT:  What are the changes?

7           MR. DIRKS:  We took his report, we put it into

8  a spreadsheet.  Here's -- how about this.  We'll enter

9  his report into evidence and we'll use the slides as

10  demonstrative purposes.

11          MR. MUELLER:  That -- I have no objection, if

12  by report he means the tables, and not the narrative.

13  I have no problem with that.

14          MR. DIRKS:  We'll have to redact it if

15  that's --

16          MR. MUELLER:  That's fine, I have no problem

17  with that.

18          THE COURT:  Well, you guys, you know, it

19  sounds fine to me.  If you can't sort it out and there

20  is something we need to take up, we'll do it right

21  before the jury comes in.

22          MR. MUELLER:  That sounds like it solves it.

23          THE COURT:  Okay.  Thank you all so much.

24          MR. MUELLER:  Thank you.

25          THE COURT:  Appreciate it.

```
 1            (Recess was taken from 11:32 a.m. until 11:50

 2            a.m.  The jury enters the courtroom.)

 3            THE COURT:  Go ahead and have a seat, folks.

 4            And everybody else can be seated.

 5            Mr. Dirks, as soon as you're ready.

 6            MR. DIRKS:  Absolutely.

 7            (Witness is sworn.)

 8                      SCOTT BAGGETT,

 9    called as a witness on behalf of the Plaintiffs, having

10    been first duly sworn, testified as follows:

11                      DIRECT EXAMINATION

12    BY MR. DIRKS:

13    Q.    It's still morning.  Good morning, Mr. Baggett?

14    A.    Good morning.

15    Q.    Could you please introduce yourself to the jury?

16    A.    My name is Doctor Scott Baggett.

17            MR. DIRKS:  I was going to give a summary to

18    help the jury understand where I am going.

19            THE COURT:  Sure.

20            MR. DIRKS:  So, let me back up.

21            You're going to hear from and you have already

22    found out, this is Doctor Scott Baggett, he has a PhD

23    in statistics and he is experienced with large sets of

24    payroll data.  What he did is actually pretty amazing.

25    He took the payroll data provided by Tyson and he was
```

1 able to load it into his system, create code, create

2 algorithms to make some sense out of this large set of

3 payroll.

4       What he did is then he calculated plaintiffs'

5 requested damages, and a few different ways of looking

6 at damages in this case.  He calculated damages by

7 taking an assumption of minutes of unpaid time so, for

8 example, one of the ways he looked at it was Doctor

9 Radwin's assumptions, another way he looked at that

10 time was how Tyson's paying now.  And then he accounted

11 for Tyson's K-code already paid and he subtracted that

12 out and he applied it to individual payroll records and

13 was able to then, using his code and algorithms that he

14 wrote, put it back out into a damages calculation.

15       One of the more complex issues in this case,

16 it's not really an issue for you or for the case but

17 it's just sort of a granular detail is the statute of

18 limitations.  You heard Mr. Hanson talk about there are

19 two different separate classes in this case.  There's a

20 Fair Labor Standards Act class and there's a KWPA state

21 law class.

22       Damages -- you'll hear the damages are

23 calculated differently for those classes, FLSA, state

24 law, and Doctor Baggett is going to try to explain how

25 he separated those out in the damages calculation.

1        The other thing that is different about FLSA

2 and state law class is the statute of limitations goes

3 back two or three years for the FLSA class from the

4 date somebody opted in, affirmatively filled out

5 paperwork, and joined the case.

6        The statute of limitations for the Rule 23

7 class goes back, it's the same day for everybody and

8 that's May 15th, 2003.

9        So you're going to hear him talk about how he

10 counted for the statute of limitations in this case.

11        And then, finally, he is going to -- and we'll

12 try to move through this quickly but he is going to

13 show you several different tables that summarize his

14 calculations based on his code and we'll try to talk to

15 you through it and make it as simple as possible.

16                CONTINUED DIRECT EXAMINATION

17 BY MR. DIRKS:

18 Q.    Doctor Baggett, could you please tell the jury a

19 little bit about your background.

20 A.    Yes, I have a PhD in statistics, I'm a

21 professional statistician.  I got my PhD at Rice

22 University in Texas in 2000, and right before I got my

23 PhD, Rice actually hired me on a joint appointment

24 between the business school at Rice University and the

25 Department of Statistics, so while I was with the

1  business school there, I consulted to faculty members,

2  statistical consultation for publications and research

3  projects that they worked on.

4          My duties with the statistics department

5  involved teaching courses, statistics courses, both

6  undergraduate and graduate levels statistics courses at

7  Rice University.

8          And I worked this up until about this time

9  last year, when I accepted a position in Colorado with

10  the United States Forest Service and what I do now with

11  the Forest Service is I work with about a hundred

12  research grade scientists throughout the Rocky Mountain

13  region and I do everything from the planning stage, all

14  the way to the analysis stage of data that pertains to

15  the management of natural resources, wildlife, and

16  forests, for example, throughout the Rocky Mountain

17  region.

18  Q.    Now, is that your full-time job?

19  A.    That's my -- my full-time job right now is with

20  the Rocky Research Station in the United States Forest

21  Service.

22  Q.    Were you hired in this case to -- to make sense

23  of Tyson's payroll data?

24  A.    I -- yes, ever since about 2000 I have worked on

25  several projects regarding payroll data, large -- large

1  payroll data.  And I was asked to help out on this

2  matter.

3  Q.    Those projects have been in connection with

4  other litigation?

5  A.    Yes.

6  Q.    And who hired you?

7  A.    For this -- for this litigation, you did, Mr.

8  Dirks.

9  Q.    And are you being paid for your work?

10  A.    Yes, I am.

11  Q.    And what's your hourly rate?

12  A.    $300 an hour.

13  Q.    Now, what data has been provided to you in this

14  case?

15  A.    I was provided a payroll data from Tyson and

16  these are very large text files and typically you can

17  call these things up on your computer and open them up

18  and look at them but they're so large you might need

19  something, you know, special text edit or something to

20  actually pull them open and look at them.

21       I'm ringing.

22  Q.    Let's see.  I will try and move it a little bit

23  closer.

24  A.    It's an unintentional feedback.

25  Q.    So we were talking about the payroll data.  Did

1  you have access to Tyson's Time and Attendance System?

2  A.    No, I didn't.

3  Q.    How many payroll, just approximately, how many

4  payroll records did you receive?

5  A.    There's about 6.7 million records in the data

6  that I worked with.

7  Q.    Let's talk a little bit about the actual

8  records, the text files.  What could you see in the

9  records?

10  A.    Well, there's -- there's numerous things, in the

11  records.  If you open up the text file it has actually

12  got commas in it for each item that's in the data, and

13  it starts off by providing a Social Security Number or

14  some identifier -- every time I turn my head this

15  way --

16  Q.    We'll keep experimenting.

17  A.    Maybe it is the screen.

18       But the data contains -- so there is

19  information about an individual and the day they

20  worked, so there is a date, the individual's name and

21  some identifier, like a Social Security Number, and

22  then a -- a payroll week ending date is included in

23  there.  There's a pay rate that's included, and there's

24  also, for one day there might be more than one entry,

25  so those entries will involve a variety of what Tyson

1  calls cost codes and those cost codes might include

2  paid break time, K-code time, regular pay for hours

3  worked, meeting time, training time, there's about 25

4  different cost codes that can be applied.

5       So like I say, there may be several records

6  for each day, for each individual.

7  Q.    You mentioned K-code was one of the cost codes

8  you could see.  Did the K-code -- could you see in the

9  payroll data the K-code has changed over time?

10  A.    Yes, I could.  Around -- well, before January of

11  2007 it was -- it was about four minutes and then after

12  January, 2007 it -- it went up to somewhere four, six,

13  seven minutes, and then beginning May, 2010, it jumped

14  up to somewhere around 20 to 22 minutes.

15  Q.    Were there any periods -- well, what is the time

16  period of the class records or the payroll records that

17  you received?

18  A.    The -- the records that I received start May

19  15th, 2003 and then go all the way up to January 1st,

20  2011.

21  Q.    Was there anything missing in the payroll

22  records?

23  A.    Yeah, there's about -- there's a one or two week

24  period that's missing in April of 2010.

25       So, I mentioned the increase that I see, the

1  first increase or the first indication of that increase

2  in 2010, I see is May.  I understand it could have

3  happened somewhere during the latter two weeks of April

4  but there is a hole in the data that I can't tell for

5  sure.

6  Q.    Now, you understand the plaintiffs are asserting

7  damages for back pay in this case, don't you?

8  A.    Yes.

9  Q.    And in order to run those calculations, did you

10  need to understand the class?

11  A.    Yes, I did.

12  Q.    And do you understand that the class includes

13  folks who are paid on gang-time?

14  A.    Yes, that's my understanding.

15  Q.    And you understand that K-code is a critical

16  component to the case?

17  A.    Yes.

18  Q.    How -- the records you received, did they

19  include only K-code folks or gang-time folks?

20  A.    No, the records included both folks that worked

21  or work shifts that were not gang-time and work shifts

22  that were gang-time.  Some of them were not paid K-code

23  at the end of the week and some were.

24  Q.    So, did you have to focus in on the gang-time

25  and K-code shifts?

1    A.    Yes.

2    Q.    And how did you do that?

3    A.    I wrote -- I wrote a program, actually it's a

4    series of computer programs, that in each -- each

5    program does certain things, but overall, what I did is

6    I identified shifts using an algorithm in a computer

7    program that identifies shifts that were worked on

8    gang-time.

9    Q.    Let's dig into a little more.  How did you

10   identify those shifts?

11   A.    Well, I could give you -- it would be best to

12   give you an example.

13          So within a particular day, and a particular

14   department, there might be 50 total shifts worked.  And

15   for each of those 50 shifts, there's a time worked in

16   the payroll record.

17          For example, 30 of those shifts might have

18   worked exactly eight hours and five minutes, exactly.

19   So for those 35 shifts, I classified them as having

20   worked in that gang.

21          There is 15 other shifts that might have

22   different times, you know, ranging from maybe 7-1/2

23   hours all the way up to 8-1/2 hours, for example, but

24   they weren't exactly eight hours and five minutes, so

25   they weren't included in that gang.

1    Q.    So did you include only people who had the

2    identical amount of hours for that shift within the

3    department?

4    A.    Yes, exactly.

5    Q.    Let's first talk about the Fair Labor Standards

6    Act class.  And do you understand that these are

7    workers who opted in to the case?

8    A.    Yes.

9    Q.    And do you understand that there is a, either a

10   two or a three year statute of limitations?

11   A.    Yes.

12   Q.    And is that something that you calculated?

13   A.    Yes.

14   Q.    And how did you do that?

15   A.    Well, what I did is for each -- well, I have a

16   list of class members that was provided to me and

17   within that list are the FLSA class members and for

18   each of the FLSA class members they have an opt in

19   date, so I looked at each class member, looked at their

20   opt in date and went back either two years or three

21   years from their reported opt in date.

22   Q.    Now, did you actually manually do that or did

23   you write code to do that?

24   A.    No, this was all on the computer.  To manually

25   do this would probably take years, I'm guessing, given

1   the total amount of data so it was all done -- it was

2   all done by computer programs that I assembled.

3   Q.    And you've got a code but does it do a

4   calculation for each individual?

5   A.    Yes, it -- it looks at each individual, each

6   individual's daily records and then aggregates

7   information over those daily records for the work week

8   and then totals all of that up to come up with total

9   numbers for -- for damages.

10  Q.    Did you have to do the same sort of statute of

11  limitations code for state law class?

12  A.    No state law class, it's my understanding that

13  it goes back to or it begins May 15th, 2003.

14  Q.    So did you have to individualize the beginning

15  of the statute of limitations for state law class

16  members?

17  A.    No, I didn't individualize those but -- but each

18  record is worked with individually, so each -- each

19  employee's records were dealt with the same as with the

20  FLSA class.

21  Q.    Do you understand that the FLSA class members

22  are eligible for overtime pay?

23  A.    Yes.

24  Q.    Do you understand that state law class members

25  are not eligible for overtime pay?

1  A.    That's my understanding, yes.

2  Q.    And did you break out your calculations for the

3  two different classes?

4  A.    Yes, those calculations are done separately so I

5  have tables for the FLSA class and tables for state law

6  class.

7  Q.    Okay.  So we have talked about, you know, what

8  the data is, who's in the data and the time period for

9  the data.  But, obviously, you're going to talk about

10  damages calculations.

11        How did you calculate damages?

12  A.    The way I calculated damages, in general for

13  both classes was, first of all, I determined

14  the -- that the number of gang-time shifts that an

15  individual worked on during a particular week and then

16  I further filtered it by -- by only including in the

17  damages weeks where K-code was paid, so

18  that's -- that's -- that's two sort of filters, if you

19  will, that the data have to go through before they can

20  be included in the damage tables.

21        Or calculated specific -- according to

22  specific methods in the damage tables, but that's

23  indicated on the damage tables, so what I did in

24  general, after -- after it went -- after the data went

25  through that filter, was I looked at the K-code time

1  that Tyson paid already, compared that with the -- with

2  a assumed K-code time, for example, Doctor Radwin's

3  numbers or Tyson's numbers, and credited Tyson in all

4  of the damage calculations for the K-code time that

5  they pay.  And then the remainder of that time was used

6  to assess the damages.

7  Q.   Now, did you make that calculation on a class

8  wide basis?

9  A.   It was done for each individual.  Each

10  individual -- it came from each individual's pay, their

11  work activity during that week, and the total hours

12  during that week.

13  Q.   So I just want to maybe do an example.  If -- if

14  I'm a gang-time K-code worker and I worked five shifts,

15  would I be eligible for damages in that week?

16  A.   Well, you might be.  It just depends on how much

17  K-code time you were paid and the way it worked out in

18  the calculations.

19  Q.   Okay.  If I was a gang-time worker, I worked in

20  a gang-time department but I showed up late on Tuesday

21  and so my time isn't identical to the other folks in

22  the gang that Tuesday, would I be eligible for damages

23  that day?

24  A.   Well, even though you might have worked in the

25  gang, I didn't identify you as having worked in the

1 gang so you were not included in the gang-time

2 calculations.

3 Q.     Did you do non-gang time calculations as well?

4 A.     Yes, I did those separately.

5 Q.     Okay.  And did you produce a report of your

6 calculations?

7 A.     Yes.

8 Q.     I set in front of you Exhibit 391, can you tell

9 me what that is?

10 A.     This is my supplemental report dated February

11 27th, 2011.

12 Q.     Is that a supplemental reports -- have you done

13 more than one?

14 A.     Yes, I did another report back in August of

15 2010.

16 Q.     What was the purpose of the supplemental report?

17 A.     It was primarily there were changes in rulings

18 that I implemented.  There was also a tolling, which is

19 what I understand to be a change in the statute of

20 limitations or alterations in the statute of

21 limitations.  And also I received new data from Tyson

22 so that's what's -- the purpose behind the supplemental

23 report.

24 Q.     Okay.  If you would, please, turn to Page 5 of

25 your report.  Do you recognize that table?

```
 1   A.     Yes.

 2   Q.     And what is that?

 3   A.     This is FLSA damages with the three year statute

 4   of limitations.

 5   Q.     And is this one of the calculations you did for

 6   the FLSA class?

 7   A.     Yes.

 8   Q.     Okay.

 9          MR. DIRKS:  Mike, I understand -- just the

10   tables.

11          MR. MUELLER:  No objection.

12   BY MR. DIRKS:

13   Q.     What I want to do is show you first your Page 5

14   and it's table 5-1A of your report.  Is that what you

15   are looking at?

16   A.     Yes.

17   Q.     Okay.  Now, what I first want to do is look at

18   the top row.

19          So, it -- I may have already asked you, is

20   this the FLSA class damages?

21   A.     Yes, for the three year statute of limitations.

22   Q.     How did you calculate these damages?

23   A.     Well, again, for each individual I

24   calculated -- there -- there was a -- an assumed

25   required K-code time which is Doctor Radwin's --
```

1  actually it is Doctor Radwin's average K-code time that

2  was applied to this, and there is two different

3  averages, there is one for kill and one for Finney

4  processing and so what it is, again, I credited K-code

5  time that Tyson paid and then whatever was the

6  remainder of that K-code time was -- was used in

7  calculation of the damages.

8  Q.     Let me just make sure I've got that straight.

9          The amount of assumed back pay time that

10 you're using is the averages that Doctor Radwin came up

11 with for kill and then the averages that he came

12 calculated for processing?

13 A.     That's correct.

14 Q.     And then did you subtract out the K-code already

15 paid?

16 A.     Yes, the K-code that Tyson already paid I

17 credited Tyson for.

18 Q.     And did that leave you with a certain amount

19 of -- of alleged unpaid minutes?

20 A.     Yes.  For -- for -- now that's for each -- every

21 work week for every individual.

22          There was no average used, it was calculated

23 down to the detail of each individual, each

24 individual's work history.

25 Q.     And you'll see here, you use -- did you use the

1  Radwin average for kill here, and then you separated

2  out the Radwin average for processing?

3  A.     Yes.

4  Q.     All right.  Let's look at this -- this column.

5  Hours under 40.

6           Tell me what -- what the 10,529 and 7,270

7  mean?

8  A.     Well, that's the total across all weeks, all

9  individuals that worked on gang-time and were paid

10  K-code time during that week for any owed hours less

11  than or equal to 40.

12  Q.     And then moving over, hours over 40, what does

13  that represent?

14  A.     Well, that's for the same thing, it's the

15  corresponding hours over 40 of -- of owed K-code time.

16  Q.     Now, this says FLSA gang-time only.  What does

17  that mean?

18  A.     Well, that's only for -- only for work shifts

19  that were identified by my code that I described

20  earlier as being on gang-time.

21           For example, an individual may have worked

22  five days during one week, three of those days I

23  identified as being on gang-time, two days not.  So,

24  this part of the table only addresses those three days

25  that were worked on gang-time.

1    Q.    And is this the total amount that you found for

2    that FLSA class, applying the three year statute of

3    limitations?

4    A.    Yes.

5    Q.    Okay.  Let's move down one.  And this one is

6    called FLSA non-gang time only.  What does that mean?

7    A.    Well, that's -- that's, again, back to my

8    example, if you worked or somebody worked five days,

9    three of those days were on gang-time, two of those

10   days were not.  This part of the table assesses damages

11   for those two days that were not on gang-time.

12   Q.    And when -- when you say gang-time, are you

13   referring to the gang-time shifts where they -- they

14   matched exactly to the -- to the other folks in the

15   gang?

16   A.    Yes, they had to match the time exactly to the

17   minute.

18   Q.    So the example I gave you, if I -- if I showed

19   up, I worked a shift, I worked on the line, and my

20   department is paid on gang-time, but I showed up a

21   couple minutes late, was docked those couple minutes,

22   my time is different from gang code time, is that what

23   I -- would I appear in this column then?

24   A.    Yes, you would appear there.

25   Q.    And then finally, what is the last --

1   A.     Well, that's --

2   Q.     -- row?

3   A.     Again, using my example of an individual who

4   worked five days during one week, three of those days

5   being on gang-time, two not, this is the total of the

6   whole -- of the entire five days.

7   Q.     Okay.  And these are assuming, if -- and are

8   these assuming if the individuals had been paid based

9   on Doctor Radwin's averages?

10  A.     Yes, this -- these -- these three tables are all

11  based on Doctor Radwin's averages.

12  Q.     And so this would be your total for the

13  FLSA -- would this be your total for the FLSA class for

14  a three year statute of limitations?

15  A.     Yes.

16  Q.     Did you run these calculations -- this

17  calculation, assuming a two year statute of

18  limitations?

19  A.     Yes, I did the same thing, just looking back two

20  years from each individual's opt in date.

21  Q.     Is this your two year calculation?  Oh, I'm

22  sorry, I apologize, Page 8.

23  A.     Okay.  Yes, it is, it is the two year

24  calculation.

25  Q.     Okay.  And is -- are these calculations the

1   same, other than the assumed statute of limitations?

2   A.    Yes, I used the same method, same exact method

3   for this table, only looking back two years from their

4   opt in date.

5   Q.    And under the two year limitations period, is

6   this your total?

7   A.    Yes.

8        MR. MUELLER:  Your Honor, objection.  Can we

9   just have a standing objection to showing the jury

10  non-gang time numbers?

11       THE COURT:  Sure you can.

12       MR. MUELLER:  So I don't have to object.  I

13  just want to preserve my record.

14       THE COURT:  Absolutely, Mr. Mueller, that is

15  fine.  Sorry I didn't see you behind the screen here.

16  BY MR. DIRKS:

17  Q.    And Doctor Baggett, did you calculate these

18  numbers on upper bound and a lower bound as well?

19  A.    Yes.

20  Q.    And can you explain what that means?

21  A.    Well, there's -- with -- whenever an average

22  is -- is collected, along with that average it's good

23  to report a confidence interval around that average

24  which is a measure of uncertainty so the larger -- in

25  general, the larger a sample gets, the -- the tighter

1    that -- that bound around that average gets.  The

2    smaller the sample, is the -- of course the wider it

3    is.

4            So those -- those confidence bounds are

5    associated with the averages that Doctor Radwin

6    reported and I also -- so I included damage

7    calculations based upon the -- the lower bound and the

8    upper confidence bound.

9    Q.    So we had looked at the three year statute of

10   limitations total, which was 4,196,000 do you remember

11   that?

12   A.    Yes.

13   Q.    And then did you calculate a upper and a lower

14   bound?  For that number?

15   A.    Yes.

16   Q.    And is this the upper bound calculation?

17   A.    Yes.

18   Q.    And so that changes the total to 4.8 million?

19   A.    Yes.

20   Q.    And did you calculate the lower bound?

21   A.    Yes, I did.

22   Q.    And is that total 3.6 million?

23   A.    Yes.

24   Q.    Now, did you calculate damages using any other

25   assumptions, other than Doctor Radwin's times?

1  A.    Yes, I also calculated tables that used the

2  amount of K-code time that Tyson currently pays and has

3  paid since, according to the payroll data that I have,

4  since May 1st of 2010.

5  Q.    And do you have to write a different code when

6  you write in a different -- assume a different amount

7  of code?

8  A.    No, the way I wrote the code is you can take any

9  assumed amount of time and you can plug that into the

10 code and it will calculate a damage report for you.

11 Q.    Now you just mentioned you did one, you did a

12 calculation based on what Tyson currently pays in

13 K-code.  Could you turn to Page 11, please.

14       Is that the calculation?

15 A.    Yes.

16 Q.    So, again, we see FLSA damages with three year

17 statute of limitations, but this time we see based on

18 K-code currently paid by Tyson.

19       Let's -- let's -- so, the first -- the one I

20 showed you before would have -- would it have been

21 Doctor Radwin's numbers, minus K-code paid on -- on

22 that given -- for that given time?

23 A.    Yes.

24 Q.    Okay.  And this one, tell me what averages you

25 used.

1    A.    Well, these are the averages -- I actually went

2    into the payroll data that I have and from -- from May

3    1st, 2010 up through January 1st, 2011 I calculated an

4    average amount of K-code, that was actually paid by

5    Tyson through all the employees in all the shift during

6    that period, I calculated one mean for Finney kill and

7    another for -- and another average for Finney

8    processing.  And then used those numbers the same way

9    that I used Doctor Radwin's numbers but used those for

10   the sample.

11   Q.    Do these averages fall somewhere between 20 and

12   22 minutes?

13   A.    Yes.

14   Q.    Are they the same for kill and processing?

15   A.    They're not the same.

16   Q.    Okay.

17   A.    They're close, but they're not the same.

18   Q.    Okay.  And this table here, Table 5-3,

19   everything else, other than the assumed time that you

20   plugged in to your calculations, is everything else

21   calculated the same way?

22   A.    Yes, it's calculated the same way as for the

23   Doctor Radwin's -- the tables that I used Doctor

24   Radwin's numbers.

25   Q.    And so the gang-time only total is 2.1 million?

1   A.      Yes.

2   Q.      And then the -- those -- those non-gang time

3   shifts are 648,000?

4   A.      Yes.

5   Q.      And then when you add those two up, what's the

6   number?

7   A.      It's 2,754,746.

8   Q.      And did you do those calculations based on a two

9   year statute of limitations?

10  A.      Yes.

11  Q.      And I'm showing you table 5-4.  Are these those

12  calculations based on a two year limitation period?

13  A.      Yes.  Yes.

14  Q.      And this is based on the amount of K-code that

15  Tyson currently pays?

16  A.      Yes.

17  Q.      Going back.  Let -- let me ask -- let me ask you

18  a question about that.

19          Does that mean that -- that damages cut off in

20  May of 2010?

21  A.      Yes.  Yeah, because it's -- it's the amount that

22  they -- the same amount that they pay after -- after

23  May 1st, 2010, so these damages just go up to May 1st,

24  2010.

25  Q.      Now, we were talking about the FLSA class, but

1  did you also calculate damages for state law class?

2  A.    Yes.

3  Q.    And do those damages include hours over 40?

4  A.    No.

5  Q.    Okay.  If you could turn to Page 13.  Is this

6  one of your tables for the Kansas state law class

7  damages?

8  A.    Yes.

9  Q.    And is this -- is this applying Doctor Radwin's

10  numbers?

11  A.    Yes.

12  Q.    And if you -- if you look, there's only an over

13  or under 40 hour column.

14  A.    That's correct.

15  Q.    My question is, what happened to the -- to the

16  over -- did these class members ever work over 40

17  hours?

18  A.    They did but it's my understanding that they are

19  not eligible for any time over 40 hours.

20  Q.    Okay.  So this is only hours worked or your

21  calculations are only hours worked under 40 hours?

22  A.    Less than or equal to 40 hours.

23  Q.    Okay.  And other than changing it to only under

24  40 hours and applying it to the Kansas state law class

25  members, are your calculations different in any way?

1   And that's a bad question.

2           Is the methodology different?

3   A.    The general methodology is the same.  So, and

4   the general methodology being that whatever K-code time

5   credited Tyson for that and then the difference between

6   whatever assumed time I used, whether it's Tyson's time

7   or Doctor Radwin's time, that difference is applied to

8   the damage calculations.

9   Q.    And did you identify gang-time shifts the same

10  way for state law class?

11  A.    Yes, same method.

12  Q.    And -- and it would -- you would identify -- did

13  you identify a gang-time shift by folks who had the

14  exact same amount of time that shift?

15  A.    Yes.

16  Q.    And then you also, did you calculate a non-gang

17  time amount?

18  A.    Yes.

19  Q.    Okay.

20  A.    Same -- same method as used in the previous

21  table.

22  Q.    What was the gang-time only total?

23  A.    4,936,343.

24  Q.    And is the Kansas state law class bigger than

25  the FLSA opt in class?

1  A.     Yes, it is, it is about 5,000 people.

2  Q.     And then if you add up the damage time only, the

3  non-gang time, is this your total?

4  A.     Yes.

5  Q.     What is that number?

6  A.     7,265,473.

7  Q.     Did -- do these numbers include calculations for

8  interest?

9  A.     No.

10  Q.     Did you do an upper and lower bound for state

11  law class damages as well?

12  A.     Yes.

13  Q.     Let me just quickly show this to you.

14         Is this your lower bound number for the Kansas

15  state law class?

16  A.     Yes.

17  Q.     Is this your upper bound number?

18  A.     Yes.

19  Q.     Now, did you only run calculations based on

20  Doctor Radwin's times for the Kansas state law class?

21  A.     No, I also used the same -- the time that Tyson

22  currently pays.

23  Q.     And on Page 16, does that represent calculations

24  going back from May 1st, based on what Tyson currently

25  pays?

1  A.     Yes.

2  Q.     And, so the number for state law class, if you

3  assume going back the amount Tyson currently pays,

4  the -- what was the gang-time only total?

5  A.     4,211,687.

6  Q.     And the non-gang time total?

7  A.     985,609.

8  Q.     And then the -- the total using Tyson's numbers

9  that it currently pays on?

10  A.     5,197,295.

11  Q.     Now, do you understand that plaintiffs are

12  alleging that they should be paid for their unpaid rest

13  breaks after may of 2010?

14  A.     That's my understanding.

15  Q.     Did you run calculations on -- based on that?

16  A.     Yes.

17  Q.     If you'll turn to page -- well, let me back up

18  for a second.  If you'll turn to Page 17.

19        Did you separate those calculations based on

20  the FLSA class and the Kansas state law class?

21  A.     Yes, I generated these calculations.  These are

22  on top of -- of the damage calculations based on Doctor

23  Radwin's tables in the previous statements that we

24  talked about.

25  Q.     And I think that's an interesting point.

1          You -- in order to know if it's an FLSA

2   overtime damage or a state law damage, did you have to

3   know if the time added brought you over 40 hours?

4   A.    Yes.

5   Q.    And so in order to do that, you -- did you apply

6   the Doctor Radwin numbers first?

7   A.    Yes.

8   Q.    And then?

9   A.    Yes, before calculating these tables, Doctor

10  Radwin's numbers were applied.

11  Q.    Okay.  Are these your rest break calculations?

12  A.    Yes.

13  Q.    And did you do the same thing?  Did you go into

14  individual payroll records?

15  A.    Yes, the same -- I used the same method, so for

16  each individual, each individual, their date, their

17  work day, and this was applied to their hourly rate on

18  that day.

19  Q.    And what's the time period for these

20  calculations?

21  A.    These are beginning May 1st, 2010 and ending at

22  the end of the data that I have, which is January 1st,

23  2011.

24  Q.    And did you do -- and did you break it out by

25  gang-time and non-gang time only again?

1    A.    Yes, the same way that I did the previous table.

2    Q.    And if you total that up, what is the total?

3    A.    342,106.

4    Q.    And then did you do that same calculation for

5    state law class?

6    A.    Yes.

7    Q.    Is this that table?

8    A.    Yes.

9    Q.    And your total?

10   A.    368,944.

11   Q.    Okay.  If you'll turn with me to Page 22 of your

12   report.  Can you -- sorry, I'll wait a minute.

13         Can you tell me what that is?

14   A.    Yes.  So previously, you know, we talked about

15   tables that I used Doctor Radwin's numbers and also

16   tables that I used the K-code time that Tyson currently

17   pays.  What this table does is just run through from

18   five minutes of K-code time all the way to 30 and it

19   includes FLSA class and Kansas state law class damages

20   for gang-time shifts only.

21   Q.    So if you -- so if -- you don't do a non-gang

22   time shift calculation for this, for this table?

23   A.    No, this is -- this is for gang-time shifts

24   only.

25   Q.    Okay.  Now, this -- is this number if you would

1  add up a finding for FLSA class damages with a finding

2  for state law damages?

3  A.     Yes, that third column is the total of the FLSA

4  class and Kansas state law class for each of those time

5  increments and again, it's for gang-time only.

6  Q.     And what statute of limitations period does this

7  assume?

8  A.     This is a three year statute of limitations.

9  Q.     And I just want to make sure, these numbers down

10  the left-hand column, time, what do these numbers

11  represent?

12  A.     That's -- that's time in minutes of daily

13  K-code.

14  Q.     Are these -- are these if you assume a certain

15  amount of unpaid K-code?

16  A.     Yes, if -- well, it's -- there are certain

17  amount of required K-code time.

18        So for all of these calculations, as with the

19  other calculations, Tyson is credited for the K-code

20  time that they paid.

21  Q.     Let me -- let me try to see if I can get some

22  clarification on that.

23        If the jury were to assume, for example, 25

24  minutes, and I was already paid four minutes of K-code

25  time, is that four minutes of K-code time already being

1  backed out?

2   A.    Yes, it's backed out of that 25 minutes.   But

3  you're kind of speaking in terms of averages, I

4  actually did it for each program actually did it for

5  each individual and each individual's daily work

6  record.

7   Q.    One more question about this table.   Does it

8  include the -- the rest break damages?

9   A.    No.

10  Q.    And did you run the same calculation for a two

11  year statute of limitations?

12  A.    Yes.

13  Q.    Is this that table?

14  A.    Yes.

15  Q.    Page 23 of your report?

16  A.    Yes.

17  Q.    I want to go back one page to Page 22.

18  Actually, one moment.

19         So if you're in the range of K-code already

20  paid today by Tyson and Radwin's numbers, would

21  you -- let me just explain what this is.

22         I've taken the last table that I just showed

23  you, and just made a demonstrative out of it.   Do you

24  recognize that?

25  A.    Yes.

1  Q.    And is this based on table 8d?

2  A.    8d, yes.

3  Q.    And if -- if you were to -- and does this

4  include non-gang time damages that you calculated in

5  your tables?

6  A.    No, this only includes K -- or gang-time

7  damages.

8  Q.    So, if one were to assume that 30 minutes of

9  unpaid gang-time, what would be the total damages?

10  A.    9,635,391.

11  Q.    And if one were to assume 25 minutes of unpaid

12  or of K-code time?

13  A.    It would be 7,714,461.

14  Q.    And am I correct that these numbers already

15  account for the K-code already paid by Tyson?

16  A.    Yes, all of the damage calculations that we have

17  talked about, all of them that I did account for K-code

18  time paid by Tyson.

19  Q.    Did Tyson ask you to run any calculations for

20  them?

21  A.    Yes, they did.

22  Q.    And what were those calculations?

23  A.    The calculations that I was asked to run was to

24  include credit for a G code, in addition to the K-code.

25        MR. DIRKS:  Thank you, nothing further.

1          THE COURT:  Cross?

2          You need something?

3          Ryan?  We all set now?  Okay.

4          MR. MUELLER:  May it please the Court.  Good

5    afternoon, Doctor Baggett.

6          THE WITNESS:  Good afternoon.

7          MR. MUELLER:  Your Honor, if I may first do my

8    two minutes summary.

9          THE COURT:  Sure.

10         MR. MUELLER:  Ladies and gentlemen, Doctor

11   Baggett is not a tenured professor.  He has mainly

12   worked in the bio science, such as biology, weather

13   predictions, and forestry work.  He does his

14   statistical consulting on the side.

15         Doctor Baggett has worked with Mr. Hanson's

16   firm in four cases, all of them class actions by

17   employees seeking back wages for damages.  He expects

18   to be paid 55 to $60,000 for this case alone.

19         He has only represented a defendant one time

20   or served as an expert for defendant.  All of his other

21   cases have been on behalf of plaintiffs suing usually

22   their employers and mainly against Walmart.

23         His opinion in another case was partly

24   excluded because the Court determined that he had made

25   improper assumptions.

1           He is not an industrial engineer.

2           He is not qualified to render an opinion on

3    whether anything Doctor Radwin did, all of which he is

4    relying on for his numbers, are valid, other than the

5    statistics.

6           He did not consult with Doctor Radwin about

7    Doctor Radwin's sample sizes, and he has done no

8    testing of whether Doctor Radwin's sample sizes were

9    sufficient.

10          He does agree that outliers should be

11   excluded, that is not counted, if the employees at

12   issue altered their behavior for Doctor Radwin's study.

13          He admits that he incorrectly calculated the

14   average gang-time for slaughter and processing in his

15   report.  And when we look at the correct numbers, he'll

16   admit that it would be difficult for most employees to

17   get to overtime if you were just adding in donning and

18   doffing.

19          His review of our pay records confirms that we

20   have in fact been paying the K-codes that we have been

21   telling you we've been paying.

22          Even when he took all of Doctor Radwin's

23   numbers, he found nearly 2100 employees who will be

24   entitled to zero damages in this case, even if you

25   accept everything the plaintiffs have been saying in

1  this case.

2       He found another 185 people who would be owed

3  less than an hour for their whole careers, not in any

4  one day or week, including many who were supposedly

5  shortchanged by one or two minutes over their entire

6  tenure working for our company.  Not on one day, over

7  the entire period, one or two minutes in total.

8       He did not give us credit in his report for

9  sunshine time, as you just heard at the very end, which

10  is the incentive pay you've heard we pay for slaughter

11  employees.

12       He admits that if he had given us credit for

13  that sunshine time, just like he did give us credit for

14  the K-code, it would reduce his own damage calculations

15  by over a half million dollars.

16       And, finally, he tried to confirm Doctor

17  Radwin's statistics but he only confirmed two lines.

18  He never looked at Doctor Radwin's report, and he is

19  unable when asked to do the math, to confirm any number

20  of the other statistics in Doctor Radwin's report.

21                    CROSS EXAMINATION

22  BY MR. MUELLER:

23  Q.    Good afternoon, Doctor Baggett.

24  A.    Good afternoon.

25  Q.    We just met for the first time on Sunday, right?

1    A.    Yes.

2    Q.    And that was the first time I got to ask you

3  questions, right?

4    A.    That's correct.

5    Q.    And in a deposition?

6    A.    Yes.

7    Q.    Now, I understand you did two things in this

8  case.  First, you say in your report you confirmed

9  Doctor Radwin's statistics on which you relied to

10  calculate these damages, right?

11    A.    That's correct.

12    Q.    Okay.  When I say damages, I'm talking about the

13  back wage numbers that Mr. Dirks just showed you.

14          And then, except for the rest break damages,

15  and except for the one page you showed us, assuming

16  calculating your damages based on your current 20 to 22

17  minute K-code all the other damage calculations that

18  you just talked about are based on Doctor Radwin's

19  assumed times or calculated times for donning and

20  doffing and slaughter and processing, correct?

21    A.    That's not correct.

22    Q.    All right.  What's not correct about that?

23    A.    Well, there is another table that had times

24  ranging from five minutes to 30 minutes.

25    Q.    Okay.  Fair enough.  So the 30 was really the

1  top end, it was an average of close to an average of

2  Doctor Radwin's slaughter and processing numbers,

3  right?

4   A.    That's correct.

5   Q.    And then on that one chart you just took it

6  down, in one minute increments down to five minutes,

7  correct?

8   A.    Correct.

9   Q.    Okay.  The rest all do come from assumptions

10 that Doctor Radwin's estimates are correct, isn't that

11 right?

12  A.    That -- well, it -- they're based on Doctor

13 Radwin's numbers.

14  Q.    Yes.  Okay.  Let me just ask you a few questions

15 about your background.  Your bachelor's degree is in

16 zoology, correct?

17  A.    Yes.

18  Q.    You currently work for the forestry service or

19 U.S. Forest Service?

20  A.    Yes.

21  Q.    That's your day job?

22  A.    Yes.

23  Q.    And you do this consulting on the side, right?

24  A.    Yes.

25  Q.    Okay.  And previously you were at Rice

1  University, I think I heard you say that, right?

2  A.    That's correct.

3  Q.    You were not a tenured professor, were you?

4  A.    No, I wasn't.

5  Q.    You lectured but you did not teach any classes,

6  is that right?

7  A.    I was -- that was actually my position, is in

8  the statistics department was a lecturer.

9  Q.    Okay.  And you have done some statistical work

10 for a weather group called Reliant Resources?

11 A.    Yes.

12 Q.    And there you assisted meteorologists, weather

13 predictors?

14 A.    Yes, basically.

15 Q.    Okay.  And you were not an industrial engineer,

16 correct?

17 A.    No, I am not.

18 Q.    Okay.  In fact, generally, you don't do

19 fieldwork?  That is, you're not generally the person

20 who gathers data, you take information other people

21 gather and you analyze it, correct?

22 A.    Yes, that's my specialty, that's -- that's what

23 statisticians normally do.

24 Q.    Okay.  Now, with one exception where you worked

25 for a defendant, you have otherwise always done your

1  litigation work for the plaintiff's side of these

2  cases, correct?

3  A.     Yes.

4  Q.     And you have been an expert in, for the

5  plaintiffs, in about 12 to 15 cases, right?

6  A.     Uh, I think about that.  That sounds about

7  right.

8  Q.     Okay.  And only one of those cases, other than

9  this one, involved donning and doffing, correct?

10  A.     Correct.

11  Q.     Okay.  And then most of those cases have

12  involved claims that people weren't paid for their meal

13  and rest breaks?

14  A.     Most of the work that I did was -- was -- it was

15  Walmart litigation and that's what it revolved around,

16  yes.

17  Q.     Okay.  And was I correct when I said that you

18  have worked with Mr. Hanson's firm on two prior cases

19  and you're currently working on two cases for them?

20  A.     That is correct.

21  Q.     Okay.  And on all of those cases, that's on the

22  plaintiffs' side where they are suing employers,

23  correct?

24  A.     Uh, yeah, they're the only ones that call me,

25  so...

1   Q.     Okay.

2   A.     Not that I have any bias against, you know,

3   working for defendants, they just don't call me very

4   often.

5   Q.     And do you expect them to pay, and as you put

6   it, you earn, or expect to earn 55,000 to $60,000 for

7   your work in this case, correct?

8   A.     That's correct.

9   Q.     Okay.  Now you've given reports and testified in

10  a number of cases, correct?

11  A.     Yes.

12  Q.     And one of those was Brown versus Walmart?

13  A.     That's correct.

14  Q.     And in that case, Walmart asked the court to

15  throw out your opinion and the court granted that

16  request in part, correct?

17  A.     Well, that's -- that's not correct.  They didn't

18  ask me to throw out my opinion.

19         What they asked me to do was -- was instead of

20  calling missed swipes missed rest breaks, I could only

21  call them missed swipes.  It had nothing to do with my

22  damage calculations.

23  Q.     My question wasn't about damage calculations,

24  they asked to exclude your report, correct?

25  A.     Uh, my report wasn't excluded.

1   Q.    My first question is whether Walmart asked to

2   exclude your report?

3   A.    To my knowledge, my report was not excluded.

4   Q.    Do you remember you got the opinion in that

5   case, right?  You remember you told me Sunday you had

6   read the opinion --

7   A.    Yes.

8   Q.    -- of the court?  Okay.

9         Let me -- do you see here where it says, "The

10  defendants' motion to exclude Doctor Baggett's report

11  and testimony is granted in part"?  (Quoted as read.)

12  A.    Yes.

13  Q.    And do you remember that later in the opinion it

14  said the court found that you had incorrectly assumed

15  that if somebody had missed a punch it meant they had

16  also missed their break?

17  A.    Yes, that's correct.

18  Q.    Now, I want to first start with the damage

19  calculations that Mr. Dirks asked you about.

20        But since you said a number of times that they

21  depended upon Doctor Radwin's work, I am going to come

22  back to that as a separate line of questioning, but let

23  me first talk about the exhibits we just looked at.

24        Will you agree that we received your current

25  report right around the beginning of the Academy Award

1  ceremony, what?  Two Sundays ago?

2  A.    That's correct.

3  Q.    Okay.  So that's how long we've had it, correct?

4  A.    Yes, that's correct.

5  Q.    Okay.  Now, as I understand it, you examined

6  people who were paid both on gang-time and then you had

7  a separate calculation on most of those charts for

8  people who were not paid on gang-time, correct?

9  A.    Yes, the charts are broken up into gang-time

10 only, non-gang time only and then total.

11 Q.    Okay.  And why did you calculate any damages for

12 the non-gang time people?

13 A.    I was asked to do that.

14 Q.    You mean Mr. Dirks asked you to do it, right?

15 A.    That's correct.

16 Q.    Did he tell you why he was asking you to do

17 that?

18 A.    No.

19 Q.    Did he tell you that non-gang time people aren't

20 even part of this case?

21 A.    No.

22 Q.    Would you agree with me by adding those numbers

23 in to everyone of your charts, you're inflating the

24 damages in this case?

25 A.    Well, it does add to the damages, but I -- I

1  don't know the law, I just -- I did what I was asked to

2  do for the damage calculation.

3  Q.    So just assume for me, just assume with me that

4  this case is about gang-time only.  Would you agree

5  with me that when you take the gang-time damages you

6  calculated and the non-gang time damages you

7  calculated, you remember, you always have a total at

8  the bottom?

9  A.    Yes.

10  Q.    If I am right that this case is just about

11  gang-time, your totals are always more than the amount

12  you calculated for the people who work on gang-time,

13  right?

14  A.    Well, if you look at that total, they're going

15  to be more but if -- if I assume that the case just

16  involves gang-time only, then the Court should only be

17  looking at those gang-time tables.

18  Q.    Okay.  Now, your report is based on a review of

19  what?  6.8 million records we gave you?

20  A.    About that, yes.

21  Q.    And so Tyson does have, I think you said with

22  the exception of one week, the pay records for the

23  employees in this case, right?

24  A.    To -- well, it's, you know, it's hard to tell

25  what's not there.  But to -- to the best of -- of what

1    I can tell from the data, there is one or two weeks

2    missing, at the end of April, 2010.

3    Q.    Okay.  And you have worked with data a lot.  Do

4    you understand that data sometimes become corrupted?

5    A.    Sure.

6    Q.    Can you just tell the jury what that means?

7    A.    Well, there's, for example, a disk might go bad.

8    I'm sure that's probably happened to everybody, you

9    know.

10   Q.    So you're not suggesting we withheld that week

11   from you?

12   A.    I don't know at all, I'm not -- I'm not

13   indicating anything --

14   Q.    Okay.

15   A.    -- as far as the reason for that.

16   Q.    Okay.

17          MR.  MUELLER:  Let me first pull up 5729,

18   Martin.

19          This is part of your report, I think it's

20   Table 4.  Oh, I'm sorry.

21          Go to Page 4, Martin.  And zoom in on Table 4.

22          No, the whole table.

23   BY MR. MUELLER:

24   Q.    This is part of your report, correct?

25   A.    Yes.

1  Q.    And one of the things you did was you looked at

2  how many of the records we gave you, out of the 6.8

3  million records, you looked at how many of them involve

4  work shifts where people were paid on gang-time, right?

5  A.    That's correct.

6  Q.    And that was far less than the 6.8 million

7  records we gave you, right?

8  A.    Well, it's -- I think you're talking about

9  apples and oranges here because records, the table that

10 you have got here shifts and in the raw data, the 6.7

11 million, or 6.8 million, that's raw records.

12 Q.    Okay.  A record -- let me put it this way.

13 Employees, I think we agreed on Sunday, could have

14 three or four records on a day, correct?

15 A.    That's right.

16 Q.    So just because it is a record doesn't mean that

17 is how many people days were worked in this period,

18 right?

19 A.    That's correct.

20 Q.    Okay.  So, you found something like, if you look

21 at that column, it says total work shifts on gang-time?

22 A.    Yes.

23 Q.    And payroll data.  You had about 730,000

24 under -- on the kill side, right?

25 A.    Yes.

1  Q.    And about 2,045,000 on the processing side,

2  right?

3  A.    That's correct.

4  Q.    So you had something like 2.7 or 2.8 million

5  daily work shifts where people worked on gang-time,

6  correct?

7  A.    That's right.

8  Q.    Okay.  And so when Mr. Dirks was showing you

9  gang-time only damages, it came from these 2.8 million

10 shifts, correct?

11 A.    Well, it's actually -- it's actually less than

12 that, because the only shifts that I included in those

13 tables were shifts where K-code was paid during the

14 week.

15 Q.    Okay.  Now I want to ask you about the

16 right-hand column.

17        MR. MUELLER:  Martin, can you get rid of the

18 highlighting there and let's focus on just the right

19 column, average gang-time duration.

20        Just enlarge that last column.

21 BY MR. MUELLER:

22 Q.    This is a number you calculated from our data,

23 correct?

24 A.    That's correct.

25 Q.    And so what you calculated originally

1  was -- well, what you were trying to calculate was when

2  people work on chain time or gang-time, you were trying

3  to look at how long on average the chain ran and they

4  were paid that day, based on chain time, correct?

5  A.    Are you saying chain?

6  Q.    Yeah, I'm saying sometimes chain, sometimes

7  gang, do you understand --

8  A.    Okay.

9  Q.    -- they're interchangeable?

10  A.    I'm used to gang-time.

11  Q.    Even though I've used gang-time but what you are

12  trying to figure out is how long an average that line

13  that wound through the plant would meet, correct?

14  A.    That's correct.

15  Q.    And in your report you stated that it was eight

16  hours on average on the kill side, correct?

17  A.    In the report it states that, yes.

18  Q.    And in processing, you said it took 7.93 hours

19  on average, correct?

20  A.    That's correct.

21  Q.    And do you remember on Sunday, I brought your

22  attention to these numbers were entirely wrong?

23  A.    Yeah.  They're wrong, yes.

24  Q.    Okay.

25  A.    And I -- I agree with that.

1  Q.    All right.  And would you agree that I am the

2  one that brought that to your attention?

3  A.    I -- I would.

4  Q.    Okay.  Now, the correct numbers, I noticed Mr.

5  Dirks didn't get into this, but the correct numbers are

6  7.58 hours on the kill side, right?

7  A.    Yes.

8  Q.    And so what that means is that on average, the

9  chain ran for 7 hours and 35 minutes each day in

10 slaughter, correct?

11 A.    Correct.

12 Q.    So not eight hours but seven hours, 35 minutes?

13 A.    Yeah, you're correct.

14 Q.    That is before adding any K-code time or your

15 lunch period, correct?

16 A.    That's correct.

17 Q.    Okay.  And then the correct number for

18 processing is 7.67 hours, correct?

19 A.    That's correct.

20 Q.    And what that means is that's approximately 7

21 hours and 40 minutes a day, correct?

22 A.    That's correct.

23 Q.    And so what that means is on average, on the

24 processing side, the people in their departments are

25 working when they are working on the chain,

1  approximately 7 hours and 40 minutes, and that's before

2  K-code and meal period, correct?

3  A.    That's correct.

4  Q.    Okay.  Now, what that means is on a normal day

5  the chain speed is at least, on average, 20 to 25

6  minutes, depending on the department, less than eight

7  hours, correct?

8  A.    Yes.

9  Q.    Okay.  And what that also means, that for those

10 people on average to hit eight hours, and assuming a

11 five hour week to get overtime, they would need to work

12 an extra 20 minutes a day on the -- processing side to

13 get eight hours, right?

14 A.    Yes.

15 Q.    And to get overtime, right?

16 A.    Yes.

17 Q.    And then on the kill side, they'd have to work

18 an extra 25 minutes a day on average to hit eight hours

19 and therefor overtime on a five-day week, right?

20 A.    Well, have that -- have that time included, yes.

21 Q.    But my point is, they're so well below eight

22 hours that to get to overtime it's going to take a

23 finding that people worked another 20 minutes on the

24 kill side and 25 minutes on -- I'm sorry, 20 minutes on

25 the processing side and 25 minutes on the kill side,

1  correct?

2  A.    Well, you say work, but there is also paid

3  breaks in there and there is meeting time and training

4  time --

5  Q.    So let's treat --

6  A.    -- and you --

7       THE COURT:  And, Mr. Mueller, again, you're

8  talking over, let's wait.

9       All right.  Let's start again with the

10 question and the answer.

11 BY MR. MUELLER:

12 Q.    I didn't mean to cut you off, I'm sorry.

13 A.    No.

14 Q.    My question he assumed all that.

15 A.    Sure.

16 Q.    Anything we treat as work and pay is -- is you

17 would need to have that plus the dressing time be at

18 least 20 or 25 minutes to get to overtime, correct?

19 A.    Yes, sir.

20 Q.    Okay.  Now, what that means is, we heard a

21 witness earlier today, and just assume with me it was a

22 witness named Ronda Litras that Mr. Hanson was

23 examining this morning, and he was asking if adding

24 four to seven minutes would push most workers in to

25 overtime when the 2007 new K-codes were paid.

1          Based on the average chain time that we just
2    looked at, adding four to seven minutes probably
3    wouldn't have pushed most people in to overtime,
4    correct?
5    A.     If you're just looking at those numbers, but you
6    sort of got to drill down to a specific -- and to a
7    specific example of these meanings and I calculated for
8    each individual and those times vary.
9    Q.     Right.  But and the reason we know it wouldn't
10   have pushed that many people over is your damages, for
11   example, you remember that page that went from five to
12   30 minutes?
13   A.     Yes.
14   Q.     The damages for seven minutes were much lower
15   than 30, right?
16   A.     These correct.
17   Q.     And there is two reasons for that.  One, is the
18   time difference, right?
19   A.     Yes.
20   Q.     But the other is that at seven minutes, a lot of
21   people just won't get to 40 hours, right?
22   A.     That's correct.
23   Q.     Okay.  That's my point.
24          Now, the way you got to the numbers you did,
25   was in most of your tables you're adding Doctor

1  Radwin's 32 minutes for slaughter, correct?  32.264

2  minutes, correct?

3  A.    That's correct.

4  Q.    And in most of your tables for processing you're

5  adding in Doctor Radwin's 27.54 minutes for processing,

6  correct?

7  A.    That's correct.

8  Q.    Okay.  And we heard a lot of discussion, I know

9  you weren't here, by a witness this morning about

10  whether we could go to a punch to punch system and, you

11  know, and so on.

12        You know from the records we gave you when the

13  employees punched in and punched out, correct?

14  A.    Well, I -- I don't -- I don't know about

15  punching in or punching out.  I know -- I know the

16  duration of their -- of their work time.

17  Q.    Okay.

18  A.    From the payroll records.

19  Q.    You did not calculate damages on a punch to

20  punch method, correct?

21        That is, you did not calculate damages from

22  when people arrived to when they swiped out at the end

23  of the day?

24  A.    I'm -- I couldn't answer that.

25  Q.    That was not what you set out to do?

1  A.    Well, I received the payroll data from Tyson and

2  it has a number of hours worked and I just calculated

3  the damages based upon those number of hours worked, so

4  I -- I don't know anything about so called punch to

5  punch.

6  Q.    Let me put it this way.  This is a chart the

7  jury has seen throughout this trial.  It's something

8  that Mr. Hanson and Mr. Dirks created.

9        Essentially what you did was you took the

10 chain time that started here (indicating) and ran to

11 the end of the day, right?  And you added to it assumed

12 minutes that were supplied to you by Doctor Radwin,

13 correct?

14 A.    Well, I -- I took this -- these are the hours

15 worked but I also included meeting time, training time,

16 and paid break time.

17 Q.    Okay.  So let's -- let's just assume a day that

18 doesn't have a meeting and it doesn't get an extra

19 second break, just to make it simple.

20 A.    Okay.

21 Q.    The basic premise is you first started with the

22 chain time, right?  You added to it an assumed number

23 of minutes that came from Doctor Radwin, right?

24 A.    Yes, they're --

25 Q.    And --

1 A.     The number of hours that they were paid, and

2 then I incorporated Doctor Radwin's number.

3 Q.     Okay.  And just assume with me this red box is

4 the period the plaintiffs are suing us for and Doctor

5 Radwin has a measure for that at the beginning of the

6 day, he has one at both ends of the meal period, and

7 one at the end of the day, correct?

8 A.     Yeah.  I mean, that -- that red box should be

9 part of it, should be at the beginning, part in the

10 middle, and part at the end.

11 Q.     That's correct.

12 A.     That's kind of throwing me off a little bit.

13 Q.     So at the end of the day, Doctor Radwin's

14 numbers that you used also include this portion of the

15 red box in addition to ones at the meal period and

16 pre-shift, correct?

17 A.     You could say that.

18 Q.     Just assume with me this red box represents

19 donning and doffing that the plaintiffs are suing us

20 for.

21 A.     Okay.

22 Q.     What you did was you took Doctor Radwin's number

23 for this red box pre-shift, Doctor Radwin's number for

24 this box at the end of the shift, and Doctor Radwin's

25 numbers for red boxes at either end of the meal period

1  and that's what you added to the gray chain time in

2  between, correct?

3          MR. DIRKS:  Are you still with a hypothetical?

4          MR. MUELLER:  No, I'm asking what he did.

5          MR. DIRKS:  Okay.

6  A.    I don't think I understand your question.

7  BY MR. MUELLER:

8  Q.    Okay.

9  A.    I can tell you what I did, if that will help.

10 Q.    Well, I was trying to relate it to this chart.

11 My question is you took chain time and you are adding

12 Doctor Radwin's numbers for before shift, after shift,

13 and meal period, donning, doffing and walking, correct?

14 A.    Yes, I am adding Doctor Radwin's number after

15 crediting the K-code that Tyson paid.

16 Q.    And what you did not do, is you did not take

17 into account time before donning and doffing?  That is,

18 let's say somebody walks in, swipes and spends two

19 minutes before they start donning, you didn't work that

20 into your damage calculations?

21 A.    The damage calculations that incorporated Doctor

22 Radwin's numbers were incorporated the way Doctor

23 Radwin calculated them.

24 Q.    Okay.  So if I tell you that Doctor Radwin is

25 not -- does not have in his number time from when

1  people first swipe in, would you first agree with me

2  that the time from punch to punch is not what you are

3  basing your damages on?

4  A.    Well, I don't know what -- I don't know how

5  Doctor Radwin calculated that.

6  Q.    Okay.

7  A.    So I can't really answer that question.

8  Q.    All right.  I want to talk about how the K-code

9  factored in to your numbers.

10        You told Mr. Dirks that in all of your

11  calculations you did give credit to Tyson for the

12  K-code, correct?

13  A.    I did.

14  Q.    And you were able to easily confirm in the

15  payroll records whether we had given people K-code in

16  any particular week, correct?

17  A.    Absolutely.

18  Q.    Okay.  Let's look at what you found in that

19  regard.

20        MR. MUELLER:  Let's pull up 5729.  This is

21  your report again at Page 3.

22        Whoops, sorry.

23        And let's go to Table 3 at the bottom of the

24  page there, Martin.

25  BY MR. MUELLER:

1   Q.    So am I correct that this also comes from your

2   report?

3   A.    That's correct.

4   Q.    Okay.  And then what you did was at various

5   points in history, you looked at how much K-code time

6   on average week we gave to the workers, right?

7   A.    Yeah, that's correct.

8   Q.    So in the left column it says, May 15th, '03 to

9   January 27, '07, is that your understanding that's the

10  period when the K-code was flat four minutes to anybody

11  who worked in a department where there was knife users?

12  A.    That's my understanding.

13  Q.    Okay.  And you came up with numbers just shy of

14  four minutes, right?

15  A.    Yes.

16  Q.    But the reason that happened is you've included

17  some people here who didn't get the K-code, right?

18  A.    Well, there -- no, there -- there were days

19  where -- in other words they might have worked for five

20  days --

21  Q.    Mm-hmm?

22  A.    -- but been paid K-code for four days during

23  that week.

24  Q.    Why do you understand that?

25  A.    Because I see it in the data.

247

1   Q.    Well, do you -- do you understand that some of

2   the days that were paid were for paid days off?

3   A.    I didn't include paid days off.

4   Q.    Okay.  All right.  So you don't know why they

5   may not have gotten the K-code on a particular day?

6   A.    Well, again, the K-code is paid for the week, so

7   I can't associate K-code for a particular day.

8   Q.    Okay.  By and large, would you agree this

9   generally suggests a K-code of four minutes from 2003

10  to early '07?

11  A.    Yes.

12  Q.    Okay.  Now, the next period you looked at

13  started in February '07 until the change is made in

14  April of 2010.  There you found on the kill side an

15  average K-code of 4.32 minutes, right?

16  A.    Yes.

17  Q.    And on the processing side, 5.05 minutes, right?

18  A.    Yes.

19  Q.    And what you found in the data was K-codes

20  ranging from four to seven minutes in that period of

21  time, right?

22  A.    Yes, generally.

23  Q.    And did you notice that a lot of people who had

24  received the K-code before January, '07 were

25  grandfathered and continued to get the four minutes

1  after January, '07?

2   A.    I -- I didn't look for something like that.

3   Q.    Okay.  But this generally suggests to you a

4  K-code in the range of four to seven minutes in this

5  time period, correct?

6   A.    It's consistent with that, yes.

7   Q.    Okay.  And then if you look at the next column,

8  starting May 1st, so after the changes in April of

9  2010, you found an average K-code of 20.59 minutes in

10  kill, right?

11   A.    That's correct.

12   Q.    And 21.89 minutes in processing, correct?

13   A.    Correct.

14   Q.    So, again, that's consistent with a statement

15  that the K-code went up to about 20 to 22 minutes after

16  April of 2010, correct?

17   A.    Yes, I agree with that.

18   Q.    Okay.  And then if we could take a look at your

19  chart again, one of the things Mr. Dirks showed you,

20  the one that went from like five to 30 minutes --

21       MR. MUELLER:  Let's bring up 5729 at Page 19,

22  Martin.  So, this same document, just further on.

23  BY MR. MUELLER:

24   Q.    So, do you remember looking at this when Mr.

25  Dirks was asking you questions?

249

1   A.    Yes.

2   Q.    So you have various versions of this, this just

3   happens to be 8a, and there is different versions of

4   this for federal, and state, and different time

5   periods, correct?

6   A.    Correct.

7   Q.    Okay.  So, the reason there is no damages for

8   anything under five minutes is because you found that,

9   in general, people got at least four minutes of K-code

10  time, right?  Or just marginally under it on average?

11  A.    Yes, that's right theoretically, those damages

12  should be zero.

13  Q.    So if you took four minutes of donning and

14  doffing a day, there is nothing they're owed, it just

15  zeros out, right?

16  A.    Correct.

17  Q.    Okay.  And if we looked at other time periods,

18  for example, I think you told Mr. Dirks this, after

19  April, 2010, it pretty much zeros out under 20 minutes,

20  right?

21  A.    Under 20 minutes.

22  Q.    Under 20 minutes, after April of 2010, except

23  for the rest break issue, damages zero out, right?

24  A.    Yes.

25  Q.    That is because people are paid in 20 to 22

1  minutes?

2  A.    Right.

3  Q.    Of K-code time?

4  A.    Correct.

5  Q.    Okay.  Now let's talk about the class sizes in

6  this case, because you gave Mr. Dirks a number that's

7  different than my understanding.

8        Did you tell him something like there was

9  something like 5,000 people in this case?

10 A.    For the -- for state law class, that's my

11 recollection.

12 Q.    Okay.

13       MR. MUELLER:  Let's pull up 5731.

14 BY MR. MUELLER:

15 Q.    Do you remember you created a spreadsheet you

16 sent us that listed the damages owed to every single

17 person who is suing us?

18 A.    Yes.

19 Q.    Do you remember doing that?

20       MR. MUELLER:  Let's go to the next page,

21 Martin.

22 BY MR. MUELLER:

23 Q.    This is just an e-mail I sent to your lawyers to

24 show you this.

25       And do you remember, I took your spreadsheet

1  and I just sorted it so that everybody at Finney County

2  came at the top of the list and then went from lowest

3  damages you calculated to highest damages you

4  calculated, correct?

5  A.    Yes.

6  Q.    And you agree that I did that list correctly,

7  right?

8  A.    Yes, I believe you did.

9  Q.    Okay.  So, these are still your numbers, I just

10 put them in order, so instead of alphabetic order we

11 are looking at them by size of damages from lowest to

12 highest, correct?

13 A.    Yes.

14 Q.    Okay.  And if we go to -- well, maybe you'll

15 remember this from your deposition.  Do you remember we

16 looked at this and you calculated damages for 7,187

17 people at Finney County?

18 A.    Um, I don't remember that number but

19 that's -- that sounds about right.

20 Q.    Since I would like to get the number correct,

21 why don't you just go to the spreadsheet to Line 1,788

22 and I think you'll see the answer.

23 A.    Yes, you're correct.

24 Q.    Okay.  And like I said, 7,188.  The reason I

25 said that is because the first row, instead of a name

1  being there, it's the headings for each of the columns,

2  right?

3  A.    Well, actually it's marked at 7,188, so do you

4  mean --

5  Q.    That's the first person?

6  A.    7,187.

7  Q.    Is that the last person on that list?

8  A.    The last person on the list is 7188.

9  Q.    So that's what I am saying, so that means there

10 is 7187 people on the list, correct?

11 A.    Correct.

12 Q.    Okay.  So, that's how many people you looked at

13 to see whether they would be owed any damages, right?

14 A.    Yes.

15 Q.    Okay.  And you understand that to be the state

16 class, the people in Kansas, all the people who work

17 for us in Kansas?

18 A.    Yes, and this is based off the class list that I

19 received from Mr. Dirks. .

20 Q.    Right?

21 A.    So I calculated it for everybody on that list.

22 Q.    Right.  And then you told Mr. Dirks and the jury

23 this morning, you did separate calculations for the

24 federal plaintiffs, correct?

25 A.    Correct.

1   Q.     And we have an agreement that there is 1,031 of

2   those people.  Does that sound about right to you?

3   A.     Yes.

4   Q.     Now, I want to take a look at how this plays out

5   when you looked at the number from lowest to highest,

6   even using Doctor Radwin's numbers of over 25 minutes a

7   day in processing and 32 minutes a day in slaughter,

8   you found that the first 2,057 people on that list are

9   owed nothing, correct?

10  A.     That's correct.

11  Q.     Okay.  That's giving the plaintiffs credit for

12  everything they are claiming on donning and doffing,

13  almost 2100 people would still get nothing, right?

14  A.     That's the way I calculated it, yes.

15  Q.     Now the first person that you found, even using

16  Doctor Radwin's numbers, and I'll get to his numbers,

17  but even using Doctor Radwin's numbers, first person

18  who's owed anything is on Line 2059 on that list,

19  correct?

20  A.     20 -- did you say 2000 --

21  Q.     2059?

22  A.     And 59?  Yes, that's correct.

23          MR. MUELLER:  Pull up Exhibit 5731 and let's

24  go to 2059 and zoom in on it.

25  BY MR. MUELLER:

254

1  Q.    So you have this list in front of you but I
2  would like the jury to see it.
3           MR. MUELLER:  Martin, you have to go --
4           MR. HOFFMAN:  2059.
5           MR. MUELLER:  Line 2059.
6           I'm sorry, there is no page numbers.
7  BY MR. MUELELER:
8  Q.    Okay.  So if we look at Line 2059, that is
9  really the person numbered 2058 on the list, correct?
10 A.    Yes.
11 Q.    So that person is Kevin Sanchez, right?
12 A.    Yes.
13 Q.    And you found that under -- even if you accept
14 the 25 to 30 minutes that Doctor Radwin says we owe for
15 donning and doffing on average, that Mr. Sanchez got
16 shortchanged 18 cents, correct?
17 A.    That's the way that I calculated it, yes.
18 Q.    Okay.  So it's not like we knew that you thought
19 or the plaintiffs thought we owed this guy 18 cents and
20 we've been stalling this for years, we just learned
21 this two Sundays ago, right?
22 A.    Yes, that's when I sent you this, yes.
23 Q.    Okay.  And then the next four people on your
24 damage calculations, you calculate that even giving
25 full credit to Doctor Radwin's numbers, we owe them 21

1  cents, right?

2   A.    That's the way that I calculated it.

3   Q.    Okay.  And then as we go down the list we see 22

4  cents, and 23 cents, and 40 cents, and so on, right?

5   A.    Correct.

6   Q.    Okay.  And, in fact, we have to go for 185

7  people, set aside the first 2057 who are owed zero we

8  have to go 185 people until we find anyone who you say

9  was shortchanged even an hour over their career, right?

10  A.    That's correct.

11  Q.    And that's not an hour and one day, that is an

12 hour in total over the whole number of amount of time

13 they worked for us, right?

14  A.    That's -- that's correct.  I didn't make any

15 judgment calls on who to kick out of this list.

16  Q.    I'm not either.

17  A.    I agree with you.

18  Q.    And I'm not either, I am just trying to get the

19 facts in.

20        The first 15 people you have in that list, the

21 ones we were just looking at a moment ago with Mr.

22 Sanchez --

23        MR. MUELLER:  Is that still up there, Martin?

24 BY MR. MUELLER:

25  Q.    If you look at Mr. Sanchez and the people under

1  him -- and you can confirm this on your copy -- the

2  first 15 people who are owed anything, your column that

3  says hours owed is 0.02, right?

4  A.    Correct.

5  Q.    And so that's the column that is second from the

6  right?

7  A.    Yes.

8  Q.    And -- and .02 hours is the same as one minute

9  and 12 seconds, correct?

10 A.    Yeah, there may be some extra digits in there

11 but -- but .02 is what I said.

12 Q.    So the concept is for those first 15 people, if

13 you accept everything Doctor Radwin says about 25 or 30

14 minutes, your calculations show these people got

15 shortchanged a minute and 12 seconds over their entire

16 career with us, right?

17 A.    Yes.

18 Q.    Okay.  And so the theory would be we should have

19 figured out how to track that minutes and 12 seconds,

20 not just on one day but the whole time they worked for

21 us, and added it up somehow, right?

22 A.    That's not my theory.

23 Q.    Did you understand that is what this calculation

24 is trying to show?

25 A.    All I did was calculate the damages.

1   Q.    All right.

2   A.    I have no theory.

3   Q.    All right.  But that -- that total would be in

4   total how much the plaintiffs would say that person was

5   owed using Doctor Radwin's numbers, right?

6   A.    That's correct.

7   Q.    Okay.  And then the people after that, there's a

8   bunch of people you can see starting with Carlos

9   Jurado, who were owed .04 hours, correct?

10  A.    That's correct.

11  Q.    And that's 2.4 minutes, right?

12  A.    Correct.

13  Q.    And, again, for those people, even accepting all

14  of Doctor Radwin's number, that would say we somehow

15  failed to capture 2.4 minutes of their time over the

16  entire career they worked for us, right?

17  A.    Um --

18  Q.    Assuming it was after May of '03?

19  A.    Right, you say career, I -- I -- some of these

20  folks didn't work for very long, maybe a few days.

21  Q.    Okay.

22  A.    So...

23  Q.    Now, we have to go all the way to line 2243

24  before we get to the first person who you calculate is

25  owed an hour, correct?

1   A.    What line?

2   Q.    2243.  So you see Richard Suarez?

3   A.    Yes.

4   Q.    And even after -- and even after Mr. Suarez,

5   there is some other people, actually a number of people

6   who you found are owed less than an hour, correct?

7   A.    That's correct.

8   Q.    Okay.  Now, I'm not belittling the amount of

9   money or time, my point is you get to these small

10  numbers even using Doctor Radwin's 25 to 30 minutes a

11  day, correct?

12  A.    That's correct.  That's the way I calculated it.

13  Q.    Okay.

14         MR. MUELLER:  You can take this one down.

15  BY MR. MUELLER:

16  Q.    I want to ask you some separate questions about

17  rest break damages.  You had a separate chart on that,

18  right?

19  A.    Yes.

20  Q.    And what that is about, is you made some

21  calculation that said, starting on, what, May 1st of

22  2010, is that when you ran it from?

23  A.    Yes, sir, that's correct.

24  Q.    You just said what would it be like if everybody

25  got an extra 20 minutes a day, right?

1  A.     That's correct.

2  Q.     All right.  And that is not a separate

3  calculation from the donning and doffing damages,

4  right, there is some relationship?

5  A.     Well, it -- it is -- it is separate but it's on

6  top of the donning and doffing.

7  Q.     Okay.  It's piling on top of the donning and

8  doffing calculations, right?

9  A.     Yes, it is adding to it, yes.

10  Q.     Okay.  And that means that if the jury rejects

11  the donning and doffing claim, you can't just use your

12  rest break damages, right, because some of those people

13  wouldn't hit those numbers unless you first -- they

14  first recovered for donning and doffing?

15  A.     That's right.  They shouldn't use that.  I could

16  go back and recalculate that but, again, that number is

17  on top of the K-code time.

18  Q.     Okay.  And, in fact, you agreed in your

19  deposition, did you not, that probably quite a lot of

20  people would never get to overtime if you just added 20

21  minutes a day?

22  A.     Well, I -- I can't say for sure but I can say

23  that with certainty, there are people who would get to

24  overtime.

25  Q.     What you said in your deposition that probably

1  quite a lot of people would not get to overtime if you

2  added 20 minutes a day, right?

3  A.    I guess it would be a lot, I mean, I

4  haven't -- I haven't actually gone and determined that

5  number, but in general, I -- yes.

6  Q.    Okay.  Now, let me ask you about sunshine time

7  because the last couple of sentences of Mr. Dirks's

8  questions to you.

9          Do you understand that Tyson paid its

10 slaughter employees an incentive pay that would give

11 them eight hours even if they worked less than that?

12 A.    Yes, I -- I just explain -- I just understand it

13 to the extent that you explained it to me during the

14 deposition.

15 Q.    Okay.  And do you remember, I think Mr. Dirks

16 showed the jury the chart of all the codes, did that

17 come up?

18 A.    Yes.

19 Q.    Okay.

20 A.    Well, I don't know if -- I don't think Mr. Dirks

21 showed that.

22 Q.    But you have it?

23 A.    I know what you are talking about.

24 Q.    You have a chart.

25          MR. MUELLER:  Let's just pull it up, it is

1 50 -- Exhibit -- your report, so that's 5729.  And

2 probably pages, what?  Three or four?  It's early on.

3          Right there.  Let's go the top chart there.

4 BY MR. MUELLER:

5 Q.    So this is all the codes you found in our

6 payroll data, right?

7 A.    That's correct.

8 Q.    And the G code, you listed as being sunshine

9 time, correct?

10 A.    Yes.

11 Q.    So, you gave us a credit for the K-code, right?

12 A.    Yes.

13 Q.    But you did not give us a credit for the G code,

14 the sunshine time, correct?

15 A.    That's correct, not in my report.

16 Q.    Okay.  Why?

17 A.    I was not asked to do that.

18 Q.    Were you told not to do it or you just weren't

19 asked to do it?

20 A.    I was not asked to do that.

21 Q.    Okay.  Now you remember I raised this in your

22 deposition on Sunday?

23 A.    Yes.

24 Q.    And I asked you to rerun the numbers giving us

25 credit for the sunshine time we'd actually paid people,

1  right?

2  A.    Yes, sir, and I did that for you.

3  Q.    And you reran those numbers, right?

4  A.    Yes.

5  Q.    And I got them -- well, you did do them about

6  Tuesday of this week?

7  A.    Sounds about right.

8  Q.    And you did some of that work in the deposition

9  or at least on the plane coming to your deposition,

10  right?

11  A.    Yes, I had one of the tables completed by the

12  time I got to the deposition, but it was my

13  understanding that -- that, you know, I would have

14  them, I think you said within one or two days.

15  Q.    Okay.  And one of the things you knew even on

16  Sunday was that if you gave Tyson credit for sunshine

17  time, that it already paid people, at 30 minutes a day

18  it would reduce the damages by nearly a half million

19  dollars, correct?

20  A.    Yes, sir, we calculated that.

21  Q.    In fact, what you calculated specifically was

22  the sunshine time at 30 minutes a day, would reduce the

23  damages by 4 -- $476,570, correct?

24  A.    Yes.

25  Q.    Okay.  And the way that works is really for all

1  your calculations for slaughter employees, whether it's

2  five or 30 minutes, if you give us credit for the

3  sunshine time, it's going to reduce the damages by

4  $476,570, correct?

5   A.    For the 30 minutes, yes.

6   Q.    Well, no, even for the five minutes, because it

7  would reduce it by that, it just might take it negative

8  at that point, right?

9   A.    Well, I -- I don't follow you with that.

10   Q.    If you assume five minutes a day of donning and

11  doffing time, but give us credit for 476,570 paid, no

12  matter what number of minutes you apply it to, that is

13  what you subtract from it, nearly a half million

14  dollars, right?

15   A.    Well, I calculated it in those tables to give it

16  to you, I can't remember exactly what was in the

17  tables, but if that's what was in the tables, then I

18  agree.

19   Q.    Okay.  And I'm going to move those in as tables

20  5736.  You can give us four worksheets, right?

21   A.    Um, yes, I think it's -- I think it was maybe

22  two spreadsheets or one spreadsheet but four

23  worksheets.

24        MR. MUELLER:  Any objection to 5730?

25        MR. DIRKS:  I just want to make a record this

1   was done by agreement and the agreement is that Doctor

2   Nickerson won't be testifying about damages, if Doctor

3   Baggett ran the calculations, so with that on the

4   record, we agree.

5            THE COURT:  All right.

6            MR. MUELLER:  I will go back and move some of

7   these later but I move in 5736 which is your

8   calculations that give us credit for sunshine time.

9            Your Honor, moving in 5736.

10           THE COURT:  Yeah, I thought you were just

11  noting that, that's fine.

12  BY MR. MUELLER:

13  Q.    Now I want to move on to some general statistics

14  questions before I address whether it is fair for you

15  to accept Doctor Radwin's numbers.

16           I want to start with sampling.  Do you agree

17  that, if you're taking a sample to make a prediction of

18  a broader population, on group of people in this case,

19  the sample has to be representative of that population?

20  A.    Well, yeah, that's -- that's a Statistics 101

21  fundamental.

22  Q.    So, for example, if we are trying to figure out

23  the average income of the person in Kansas, you would

24  want to limit your sample to people from Kansas and not

25  include people from Wisconsin, right?

1   A.    If you're target population is in Kansas you

2   would not want people from other states in there, you

3   would want to randomly sample from Kansas.

4   Q.    Okay.  And as another sample, if we are trying

5   to figure out how long it takes people on average to

6   drive from New York to Chicago, you would want to take

7   your sample from the people who drive from New York to

8   Chicago, not New York to St. Louis, right?

9   A.    I think New York to St. Louis is further, so,

10  no.

11  Q.    Right?

12  A.    So you wouldn't want to do that.

13  Q.    The concept is, you want to draw from the group

14  of people you're studying because things outside that

15  group might skew the answer, correct?

16  A.    They might.

17  Q.    Okay.

18  A.    It -- it's -- it's ideal to sample from that

19  target population, in some cases, there could be a

20  justification made to use a proxy, as we discussed

21  during my deposition.

22  Q.    Okay.  And then I asked you specifically if

23  we're studying people at a beef packing plant that has

24  a processing and slaughter department, you agreed that

25  we should draw a sample from processing and slaughter

1  if possible, correct?

2  A.    If possible, yes.

3  Q.    Okay.  And would you accept the premise that if

4  somebody works a lot farther away than the processing

5  or slaughter areas, that there is probably more walking

6  time to get there?

7  A.    Well, if it's further away, and they have to

8  walk to get to that point, then I would agree --

9  Q.    Okay.

10  A.    -- that it would take longer.

11  Q.    Now, I'm sorry.  You done?

12  A.    Oh, yes.

13  Q.    Okay.  You didn't consult Doctor Radwin about

14  his sample sizes, did you?

15  A.    No.

16  Q.    And you haven't done any analysis, whether

17  formal or informal, of whether his sample sizes are big

18  enough to make reliable predictions about the

19  population at issue here, correct?

20  A.    That's correct, and I didn't need to.

21  Q.    And that's true even though there are formulas

22  that let people determine how big a sample you need to

23  determine estimates for a population with a certain

24  degree of confidence, right?

25  A.    Well, there -- there are -- there are formulas

1  that based upon the sample size they provide measures

2  of uncertainty and those are actually incorporated in

3  Doctor Radwin's report.

4  Q.    Okay.  But you didn't do those tests, correct?

5  A.    Well, they aren't tests.

6  Q.    Okay.  Well, did you tell me they're tests in

7  your deposition?

8  A.    I might have -- I might have mentioned -- if

9  we're talking about confidence limits --

10  Q.    No, no, we're not.

11  A.    -- those aren't specifically tests.

12  Q.    Okay.  I asked you if there were tests to

13  determine how big a sample you need to make a reliable

14  prediction of a population, do you remember saying

15  there are --

16  A.    Well, I don't know if I used the word tests or

17  not but there are -- there are metrics that, like I

18  say, that you can given a certain sample size, it will

19  provide you with the uncertainty around that sample

20  size, it is similar to like taking political polls, so

21  they poll a thousand people and take plus or minus

22  three percentage points and it's the same sort of

23  thing.

24  Q.    I won't quibble about formula versus tests

25  versus methods.

1           The reason we're concerned about sample sizes

2    is because if you take a sample, it could have a

3    perfect bell curve, which you call a norm distribution,

4    right?

5    A.     Well, a normal distribution is defined by a

6    little bit more -- a lot more than a bell curve, I can

7    show you other distributions that have bell curves that

8    aren't normal.

9    Q.     Okay.  The general concept, though, is that when

10   we make predictions about the big population, we assume

11   the sample is distributed normally, right?

12   A.     Not necessarily.

13   Q.     No?  Don't you usually test for normality?

14   A.     No, well, it depends upon the statistical

15   procedure that you are using.  You might have a

16   statistical procedure that requires normality, and even

17   at that, that procedure may be best for deviations from

18   normality.

19   Q.     So let me put it this way.  If we're trying to

20   predict the average income in the United States and I

21   go out to the street and I say I randomly picked five

22   people, would you want to test that data set to see if

23   it is normally distributed?

24   A.     No.

25   Q.     You wouldn't?

1    A.    Hmm-mm.

2    Q.    You would just accept the data?

3    A.    It is what it is, there is other distributions

4  besides normal and those are acceptable.

5    Q.    Okay.

6    A.    But the first thing that I do is, is not

7  generally test for normality unless, like I say, I'm

8  running a test that requires those data to be normally

9  distributed.

10   Q.    And you did agree with me in your deposition

11 that if the sample is small, then it might not be

12 distributed normally?  Correct?

13   A.    It might not be.

14   Q.    And in here --

15   A.    It might be, it might not be.

16   Q.    In here, do you remember I showed you on Sunday

17 that Doctor Radwin had samples of 11, 12, or 13 on the

18 slaughter side?

19   A.    Yes.

20   Q.    And you didn't test those for normality,

21 correct?

22   A.    No.

23   Q.    Okay.

24   A.    There is no need to.

25   Q.    Let me ask you a quick question about outliers.

```
 1              MR. MUELLER:  Your Honor, I've got quite a bit
 2   more still.  How do you want to proceed?
 3              THE COURT:  Why don't you go a few more
 4   minutes.
 5              Members of the jury, mind hanging around
 6   another 15, 20 minutes?
 7              MR. MUELLER:  That would be helpful.
 8              THE COURT:  We're still going to have to come
 9   back, of course, but -- thank you.
10              MR. MUELLER:  You want to do redirect?
11              MR. DIRKS:  This -- this witness has flown
12   into town twice now, and I understand it's our witness,
13   I will keep my redirect to two minutes if we can get
14   him home tonight.
15              MR. MUELLER:  Well, if the jury is
16   comfortable, I'll move it along.
17              MR. DIRKS:  It's up to the judge and jury,
18   obviously.
19              THE COURT:  Well, I am here so, you know,
20   I -- I really do not care.  But how many of you are in
21   a situation where if we were another hour, that it
22   would create a problem for you?
23              JUROR 7:  I just need to go to the restroom.
24              THE COURT:  I'm sorry.
25              JUROR 7:  I just need to go to the restroom.
```

```
 1              THE COURT:  Well, we can sure arrange for
 2    that.
 3              Anybody else, if we stayed here, say, until 3
 4    o'clock today, does that create a problem for anybody?
 5              JUROR 8:  I have a three o'clock meeting.
 6              MR. MUELLER:  It won't be that long.
 7              THE COURT:  Well, with redirect?  All right.
 8    If you could get to your meeting by 3:00, are you
 9    good --
10              JUROR 8:  Yes.
11              THE COURT:  -- Mr. Trueblood?
12              All right.  Why don't we go ahead and just
13    take ten minutes quickly, you can use the restroom, I
14    remind you, you're not to discuss this case or any
15    aspect of it among yourselves.  No independent
16    investigation.  We'll start back up at 1:40.  1:40.
17              (The jury leaves the courtroom.)
18              THE COURT:  Go ahead and have a seat, folks.
19    Take off and we'll see you back here in ten minutes.
20              You don't have to take off if you don't want
21    to.
22              MR. MUELLER:  I thought we had to sit.
23              THE COURT:  You're welcome to do whatever you
24    would like to until 1:40.
25              (Recess taken from 1:31 p.m. until 1:40 p.m.
```

```
 1           The jury enters the courtroom.)
 2           THE COURT:  Go ahead and have a seat, folks.
 3           All right.  As soon as everybody is seated,
 4  Mr. Mueller, you may proceed.
 5           MR. MUELLER:  Thank you, Your Honor.  The
 6  break was helpful.  I'm going to shorten this up a bit.
 7  BY MR. MUELLER:
 8  Q.    Doctor Baggett, as I said, I wanted to ask you
 9  some questions about outliers.  How would you define an
10  outlier?
11  A.    I would describe an outlier -- well, I can
12  preface that by saying statisticians have differing
13  opinions about how they define outliers.  In my opinion
14  of an outlier is -- it's a mistake, a typo, or an error
15  of some sort.
16  Q.    And I think you agreed with me in this in your
17  deposition, if the jury concludes that some of the data
18  points in Doctor Radwin's studies are not normal
19  behavior, then they are candidates for treating them as
20  outliers?
21  A.    Well, if they're -- if the jury determines that
22  they're errors then they should not be included in the
23  data.
24  Q.    Well, not just statistical errors, you agreed
25  with me that if the data are bias, they're candidates
```

1  for exclusion, correct?

2  A.    Well, there shouldn't -- yes, there shouldn't be

3  any data that biases conclusions.

4  Q.    Okay.  And I think you agreed with me that if

5  someone on Doctor Radwin's videotapes intentionally

6  altered their behavior some -- such as someone who

7  intentionally biases the results by walking differently

8  than they normally do, that that would be data you

9  would not want to include, right?

10  A.    Well, again, I think that we discussed during my

11  deposition, I haven't seen those videotapes, so I

12  really can't -- I really don't know what you are

13  referring to.

14  Q.    Well, conceptually you agreed with me that if

15  someone altered their behavior, that is data you would

16  not want to include, right?

17  A.    That's correct.

18  Q.    Okay.  And we'll just leave that topic at that.

19       Now, you did rely on two lines of numbers in

20  Doctor Radwin's report to calculate your damages,

21  correct?

22  A.    That's correct.  But I want to make it clear

23  that Doctor Radwin's numbers are only part of the

24  damage calculations that I used.  I also used Tyson's

25  own damage or Tyson's own K-code time that they

1  currently pay and I also ran the numbers from five

2  minutes all the way to 30 minutes.

3        So Doctor Radwin's numbers are -- are just one

4  part of -- of my damage calculation.

5  Q.   Okay.  The first several -- really most of the

6  tables Mr. Dirks showed you, the premise was, Doctor

7  Radwin's numbers, and you said that, correct?

8  A.   That's correct, there are tables in there based

9  on Doctor Radwin's numbers.

10  Q.   Okay.  From now until I sit down that is all I

11  am going to ask you about, your calculations of damages

12  that come from an assumption that Doctor Radwin's

13  numbers are correct?

14  A.   So we won't be talking about any of the other

15  damage calculation --

16  Q.   Yes, I'm done with those.

17  A.   -- assumptions?

18  Q.   That's right.

19  A.   So just based on Doctor Radwin's numbers?

20  Q.   That's right.

21        So, you took certain of Doctor's

22  number -- Doctor Radwin's numbers as a given, right?

23  A.   No.

24  Q.   Well, let me put it this way.  You didn't go

25  back and look at his videotapes, right?

1  A.    No, I didn't look at the videotapes.

2  Q.    You didn't?

3  A.    I don't consider myself qualified to do that.

4  Q.    You didn't talk to Doctor Radwin, right?

5  A.    No, I -- I didn't.

6  Q.    You did not e-mail or communicate with him in

7  writing, correct?

8  A.    At the time of my deposition, no.

9  Q.    You didn't review or give an opinion on his

10  sample design, correct?

11  A.    That's correct.

12  Q.    Okay.  So you took his data points as a given,

13  maybe that's a better way to put it, correct?

14  A.    The confirmation that I did on his calculations

15  were based on the data that I received, I think

16  indirectly from him.

17  Q.    Okay.  And you agreed with me on Sunday that if

18  there are flaws in Doctor Radwin's data points then you

19  did an analysis of flawed data, correct?

20  A.    Well, I think that would be a true with any.

21  Q.    Right.  We call it garbage in, garbage out,

22  right?

23  A.    That's a good term for it.

24  Q.    Okay.  Now, you -- you used those numbers, 25

25  minutes in processing, roughly, and 32 minutes in kill,

1   but you didn't get them from Doctor Radwin's actual

2   report, correct?

3   A.    Those numbers are in Doctor Radwin's report but

4   I calculated those numbers on my own from Doctor

5   Radwin's raw data.

6   Q.    Okay.  So, Mr. Dirks sent you Doctor Radwin's

7   draft report on August 18th, last year, right?

8   A.    Correct.

9   Q.    And he sent -- and you read it, right?

10  A.    I reviewed it, yes.

11  Q.    And you saved it on your computer, right?

12  A.    Yes.

13  Q.    And he sent you Doctor Radwin's final report the

14  next day, August 19th, right?

15  A.    Yes.

16  Q.    And you read that, right?

17  A.    Yes.

18  Q.    And you did your first report in this case the

19  next day, August 20th, correct?

20  A.    Yes, that's the day I turned in my report.

21  Q.    Okay.  And do you know in your report you said

22  that you analyzed the underlying data of the Radwin

23  study and have confirmed his statistical conclusions,

24  do you remember saying that?

25  A.    Yes, I do.  And I did that.  And that was for

1  the numbers that I used in the Radwin damage

2  calculation tables in my report, so I -- in short, I

3  reviewed and confirmed the numbers that I used in my

4  damage calculations based on Doctor Radwin's averages.

5  Q.    Great.  Do you remember saying on Sunday that

6  you had intended for that to mean that you had looked

7  at Doctor Radwin's report and that we could rely on

8  that?

9  A.    No, it was intended to mean that I looked at the

10  averages and confirmed the averages that I used for

11  Doctor Radwin's damage calculations in my report.

12  Q.    I'll catch up with you.  I crossed out parts of

13  this but I'll get back to that point I believe.

14         Okay.  So, whatever numbers are in Doctor

15  Radwin's report, you have not verified those, correct?

16  A.    No.  The numbers the total averages, the total

17  daily donning and doffing activity, I confirmed using

18  Doctor Radwin's raw data, and those are the numbers,

19  those are the only numbers out of his report that I

20  used for my damage calculations.

21  Q.    Let me just pull up, for example, Doctor

22  Radwin's Table 2.  And just for simplicity sake I'll

23  use the one Mr. Dirks put in, it's not the actual piece

24  of interview but --

25         MR. MUELLER:  Martin, it is the one you had

1  told me about.  This is 384B.  Oh, okay, we can -- this

2  is Doctor Radwin's actual one, this is good?

3  BY MR. MUELLER:

4  Q.    So this is in the report that you got from

5  Doctor Radwin last August, right?

6  A.    Yes, that looks familiar.

7  Q.    Do you remember telling me that you did not

8  confirm any of the numbers on this page?

9  A.    No -- that's -- you're correct.

10  Q.    That's correct.  Now let's bring up the version

11  Mr. Dirks put in, that is Exhibit 384B.

12        So what the jury has been given here in this

13  trial I'll represent to you, sir, now, 384B.  384B.

14        MR. MUELLER:  Plaintiffs'.  Do you not have --

15  is it not a trial exhibit?

16        MR. HOFFMAN:  That is 384B.

17        MR. MUELLER:  It is?

18        MR. HOFFMAN:  Yeah.

19        MR. MUELLER:  Do you have the trial directory

20  that refers to the plaintiffs?  No.

21        Eric, have you put that on the exhibit table

22  yet?

23        MR. DIRKS:  I don't know.

24        Keep going.

25        MR. MUELLER:  I've got one.

BY MR. MUELLER:

Q.    Doctor Baggett, I'll represent to you that the
jury has seen this and it's been admitted in evidence,
too.   These are the same numbers from Table 2 of Doctor
Radwin's report, he'll represent that to you.

          So, essentially what you have just said in the
last answer was you cannot confirm any of the numbers
in this exhibit as given to the jury, correct?

A.    I didn't confirm these numbers.

Q.    Okay.  Now, there was a second table.

          MR. MUELLER:  Let's go now to Table 3 in
Doctor Radwin's report, Martin.  I think you did have
that one up a moment ago.  That's Exhibit 384C.

          Oh, sorry.

BY MR. MUELLER:

Q.    Now this was another document we saw and I'll
get to the version the jury has in a moment, but on
this page you only confirmed the numbers on two of the
lines, correct?

A.    That's correct.

Q.    And that would be the top two lines?

A.    No, oh, yes.  Yeah, you're right, top two lines.

Q.    So we're further processing where it says
mean -- where it says mean 27.54 and all the way to the
end of that line, you confirmed those three numbers and

1  on the next line you confirmed those three numbers,

2  correct?

3  A.    Yes, sir.

4  Q.    And so the jury saw a version of this that

5  looked like this, so I'll represent to you that except

6  for the error at the bottom -- you see where I circled

7  3.467?

8  A.    I see that, yes.

9  Q.    Do you remember I pointed out to you on Sunday

10 that you had missed this error and the reason you said

11 is because you never looked at the numbers in Doctor

12 Radwin's report?

13 A.    I -- well, that's not true.  Again, the numbers

14 that I looked at in his report are the numbers that you

15 just asked me about, that I confirmed and that's

16 further processing and kill, the top two lines in this

17 statement.

18 Q.    But do you remember this number originally was

19 0.585 and I pointed out to you it needed to be 3.467?

20 A.    Yes, I remember.

21 Q.    And since then Mr. Dirks has fixed that so I

22 circled that here because he fixed it here, but other

23 than those top two lines in this exhibit, you have not

24 confirmed the rest of these numbers, correct?

25 A.    Again, I just confirmed the numbers that I used

1 for the Radwin damage calculations in my report, and

2 these, the top two lines in this table.

3 Q.    Okay.

4 A.    There was no need to confirm the other.  As far

5 as my report goes.

6 Q.    Now, you do realize now, you remember we did

7 some math exercises or statistics exercises on Sunday,

8 and we concluded that Doctor Radwin got to these

9 numbers on this exhibit by taking some of his numbers

10 from the last exhibit, so Table 3 comes from his Table

11 2, right?

12 A.    I don't think I agreed with that.

13 Q.    Well, do you remember, we did some math and we

14 looked at a couple numbers?

15 A.    Yes, we did.

16 Q.    And we looked at -- do you remember we looked at

17 the 4.13 number that Doctor Radwin said was the

18 standard deviation for don start of shift in

19 processing?

20 A.    Yes.

21 Q.    And we took his standard deviation for doffing

22 at the end of the shift, do you remember that?

23 A.    I -- I remember us doing some things with some

24 numbers, yes.

25 Q.    And do you remember then we looked at a third

1  number which was Doctor Radwin's standard deviation for

2  donning and doffing at the meal breaks, right?

3  A.    Yes.

4  Q.    And when you add up the standard deviations for

5  different kinds of things you're sampling from, you

6  can't just add them together, right?

7  A.    No.

8  Q.    Right.  It's not like adding two plus two plus

9  two, you have to do a certain formula to figure out

10 what the standard deviation is of all those activities

11 combined, right?

12 A.    Yes, I -- including distance.

13 Q.    And do you see here where it says 1.182?

14 A.    Yes.

15 Q.    Do you remember we did the math using a correct

16 formula for coming up with the pool standard deviation

17 and you came up with a number that was higher than 5,

18 it was like 5.85?

19 A.    I don't remember specifically, I don't recall

20 that we used the correct number because I think we

21 assumed the sample sizes were equal.

22 Q.    No, that's a different issue which I'm going to

23 get to.

24 A.    Okay.

25 Q.    Do you want to look at your deposition at Page

1  188, you may refresh your memory.

2      Do you remember, I had you take the correct

3  formula and you took those three numbers and I had you

4  do the calculation?

5  A.    Yes, I remember that.

6  Q.    And do you remember coming up with the number

7  5. -- it was 5.615 is the number you came up, if you

8  look at Page 188 in your deposition?

9  A.    I don't have my deposition.

10 Q.    I'm sorry.  I do.

11 A.    Thank you.

12 Q.    So I'm on Page 188, Line 13 has the number

13 5.615.  That was you calculated the polled standard

14 deviation for those three activities combined, right?

15 A.    That's right.

16 Q.    And then I showed you Doctor Radwin's number,

17 1.182 and you cannot explain how he came up with 1.182

18 and you came up with 5.615 from the same numbers,

19 right?

20 A.    Well --

21 Q.    Using what you said was the correct formula?

22 A.    I calculated these numbers and they were at your

23 direction.  I don't know how Doctor Radwin came up with

24 certain numbers that I did not use from my damage

25 calculations.  The only numbers that I know about for

1  sure are the numbers that I confirmed, which are just

2  the top two lines in that table.  And those are the

3  numbers I had used for my damage -- or for the Radwin

4  damage calculations in my report.

5  Q.    I understand.  So the answer to my question is

6  yes?  Right?

7  A.    Well, what was your question again?

8  Q.    You cannot explain how you came up with the

9  different number on that top line than he did when you

10  used the correct formula?

11  A.    All I know is I came up with a different number

12  and I -- I don't know why.  I'm not exactly sure what

13  you are leading me through adding but it is a different

14  number, yes.

15  Q.    And do you remember saying there may be more

16  errors in his report?

17  A.    Well, that's possible.

18  Q.    That's what you said, right?

19  A.    I don't remember the context that I said that

20  in, but I -- I'm sure I -- I'm sure its in there.

21  Q.    I can refresh your memory if you like?

22  A.    No, that's okay.

23  Q.    It's important.  There may be more errors in his

24  report, correct?

25  A.    I don't know that.

1   Q.    Take a look at --

2   A.    There could be but I don't know that for sure.

3   Q.    Okay.

4   A.    And I don't know that this is an error.

5         MR. MUELLER:  No more questions.

6         THE COURT:  All right.  Redirect?

7         MR. DIRKS:  Yes, Your Honor.

8         Mr. Trueblood, we'll get you to your meeting,

9   I assure you.

10        JUROR 8:   I look forward to it.

11                   REDIRECT EXAMINATION

12  BY MR. DIRKS:

13  Q.    Mr. Mueller had mentioned that you provided a

14  report a couple of weeks ago, do you remember that?

15  A.    Yes.

16  Q.    When did you provide your initial report in this

17  case?

18  A.    It was August -- August 20th of last year.

19  Q.    And why did you issue a supplemental report?

20  A.    The primary reason was that I got new data.  I

21  got more data, it was updated, the data that I received

22  back in -- for the August, 2010 report had a lot of

23  gaps in it.  In other words, it wasn't complete so I

24  received a -- a more complete set of data that I needed

25  to generate a supplement for.

1   Q.    And when did you receive the more complete set

2   of data?

3   A.    I believe it was -- it was around the first of

4   February this year.

5   Q.    Mr. Mueller asked you about the non-gang time

6   damages and maybe I should put that up.

7           About the non-gang time damages, do you

8   remember in some of the calculations there was a

9   gang-time only, non-gang time only, and then a total?

10  A.    Yes.

11  Q.    And he was asking you about why -- why in the

12  world you would calculate non-gang time damages.

13  Thanks.

14          Are these people -- let me just show you one

15  of the examples.

16          That we're talking about this -- this row

17  here, the non-gang time only?

18  A.    Yes.

19  Q.    Are these people who, for example, work in the

20  office?

21  A.    No.

22  Q.    Are these people --

23  A.    Well, if they got paid K-code for working in the

24  office, then they would include that but I don't think

25  they would have gotten paid K-code for working in the

1  office, so...

2  Q.     You anticipated my next question.  Are these

3  people only people -- are these people -- did they all

4  receive K-code?

5  A.     Yes, before any -- any shifts appeared in the

6  damage tables, they had to have gotten K-code for that

7  week.

8  Q.     So, the FLSA non-gang time only, still talking

9  about them, they -- did they all receive K-code?

10 A.     Yes.

11 Q.     And did they all receive some time for donning

12 and doffing?

13 A.     Yes.

14 Q.     And they had to be a K-code individual before

15 they appeared in this column of your report?

16 A.     It had to have been a shift that got paid K-code

17 during the week for all of the damage calculations.

18 Q.     Mr. -- do you remember Mr. Mueller showed you

19 Table 4 of your report?

20 A.     Yes.

21 Q.     And that had reported a -- an average gang-time

22 hours?

23 A.     Yes.

24 Q.     I want to focus on the average gang-time hours

25 for a minute.

1       When you made your calculations, were you

2 looking at average gang-time hours?

3 A.    No, I -- I -- I never looked at average

4 anything.  It was based upon a specific -- each

5 specific employee and their specific time series

6 of -- of daily work and calculated for each employee

7 each day, each week.

8 Q.    Did you see in the data that some times

9 gang-time went more than eight hours in a day?

10 A.    Yes.

11 Q.    Did you see in the data that sometimes gang-time

12 went less than eight hours in a day?

13 A.    Yes.

14 Q.    Did you see in the data that sometimes people

15 came in under 40 hours in a week?

16 A.    Yes, absolutely.

17 Q.    And did you see in the data that sometimes

18 people were paid more than 40 hours in a week?

19 A.    They had over time, yes, for the FLSA class

20 members.

21 Q.    Well, let me even ask about the non FLSA class.

22       I understand you couldn't record damages for

23 folks in the -- in the Kansas state law class for hours

24 over 40 but did those people have hours over 40?

25 A.    Yes, they did, I was -- yes.

1   Q.    So to -- what was the purpose of your table that

2   reported the average amount of gang-time hours?

3   A.    All that table was, was -- was just a, um, it

4   was a summary table of what was in the data.  That

5   table is in no way connected to my damage calculations,

6   and while I appreciate Mr. Mueller having found that,

7   it -- it has no affect on my damage calculations at

8   all, was not used.

9        I didn't -- like I say, I did not use any

10  averages, it was just that table was just there

11  for -- for descriptive purposes.

12  Q.    There was a lot of talk of you applying Doctor

13  Radwin's numbers and some tables.  And I -- I showed

14  you a lot of tables, didn't I?

15  A.    Yes.

16  Q.    All right.  I want to just flip through them or

17  at least some of them.

18        Showing you table 5-3.  Did this table rely at

19  all on Doctor Radwin's numbers?

20  A.    No.  Doctor Radwin's numbers have nothing to do

21  with this table.

22  Q.    And 5-4, same question.

23  A.    The same answer.

24  Q.    5 -- or excuse me, 6-2, did that rely at all on

25  Doctor Radwin's numbers?

1   A.     No, not at all.

2   Q.     7a -- well, these are the rest break.  The rest

3   break damages didn't rely on Doctor Radwin's numbers,

4   other than being stacked on top of them, did they?

5   A.     That's correct.

6   Q.     Table -- we looked at Table 8d, did those rely

7   at all on Doctor Radwin's numbers?

8   A.     No.

9   Q.     When we looked at table 8e, did those rely on

10  Doctor Radwin's numbers?

11  A.     No.

12  Q.     I'm going to leave table 8d up there for just a

13  second, because Mr. Mueller had some questions about,

14  do you remember G code or sunshine time?

15  A.     Yes.

16  Q.     And did Mr. Mueller ask you to run some -- some

17  calculations for him?

18  A.     Yes, he did.

19  Q.     Okay.  And that was to compare table 8d, not

20  accounting for sunshine time with table 8d, in

21  accounting for sunshine time, is that your

22  understanding?

23  A.     That's -- that's my understanding.

24  Q.     Why don't you take a look at, for example, the

25  30 minute total.  This is the non G code table.  Now I

1  want to show you Tyson's G code table and I think this

2  is the difference that Mr. Mueller was talking about.

3  There is some difference when you account for G code?

4  A.    Yes, about half a million.

5  Q.    If you reduce the assumed time, for example, if

6  you were to select 15 minutes, the number is 3,966,000

7  and now let me show you the table you ran for Tyson,

8  does that change the number?

9  A.    Yes.

10  Q.    Does that change the -- and then still saying

11  what the G code, the lowest number that we have on our

12  table 301,000, and G code would -- would change the

13  amount?

14  A.    Yes.

15  Q.    Okay.  Do you -- do you have a calculator up

16  there?  I know Ms. Litras did.

17         Can you tell me the difference in percentage,

18  and I am going to use the 30 minute number, the largest

19  difference, between 9,635,391, and 9,152,821.  I'll

20  bring them up for you.

21  A.    Okay.

22  Q.    Could you just calculate what the difference is?

23  And express them as a percentage?

24  A.    Sure.  Um, the G code time is 95 percent of what

25  the G code number for 30 minutes is 95 percent of

1  the -- the K-code only.

2  Q.     I'm not a statistician but can you look at it

3  the other way, can you -- as well?

4          Does that mean that there is a five percent

5  difference in the numbers?

6  A.     Well, yeah.  It reduces it by -- yeah, by 4.946

7  percent.

8  Q.     Now, do you understand that Tyson provided

9  plaintiffs with a class list or a list of potential

10 class members in this case?

11 A.     It's my understanding.

12 Q.     And do you -- and did I give you a -- a class

13 list in this case with some -- with some numbers on it?

14 A.     Yes.

15 Q.     And was that list something that identified who

16 had opted into the Fair Labor Standards Act case and

17 who had opted out of the state law class?

18 A.     Yes, it had codes in it to that respect.

19 Q.     And is that the class list that you used -- Mr.

20 Mueller showed you a spreadsheet a few minutes ago.

21 Were those the class members that were provided on the

22 list?

23 A.     Yes.

24 Q.     Now, is there a reason -- could there -- I want

25 to talk about whether there could be some explanations

1  why there are 2,000 people that just didn't have

2  damages.

3          Could one reason be that -- that that person

4  wasn't working a K-code job?

5  A.     Of course.

6  Q.     Could another reason be that that person wasn't

7  working a gang-time job?

8  A.     Yes, they wouldn't have appeared in that -- in

9  that -- in those top tables.

10 Q.     Now, let me just have you assume with me for a

11 second, if Tyson provided folks on the class list who

12 were not K-code and who were not gang-time, then they

13 wouldn't have received damages based on your

14 methodology?

15 A.     Right.  Right, well, if they didn't have any

16 K-code they wouldn't have received any damages.

17 Q.     And, also, if -- if -- was he showing you the

18 spreadsheet from the Kansas state law class?  The

19 spreadsheet had the Kansas -- you had done a

20 spreadsheet?

21 A.     Oh, yeah.

22 Q.     For the Fair Labor Standards Act class and also

23 for the -- for state law class?

24 A.     Yes, I understand.

25 Q.     Do you recall when one it was?

1    A.    I actually have a printout.

2    Q.    Do you remember which class it was for?

3    A.    No.

4           MR. MUELLER:  It's the State.

5    A.    It was state law class, yes, it was state.

6  BY MR. DIRKS:

7    Q.    That makes sense, because it was a larger

8  number?

9    A.    Yes.

10   Q.    Were state law class members who are not members

11 of the Fair Labor Standards Act class, were they

12 eligible for overtime damages under your calculations?

13   A.    No.

14   Q.    Is it possible that if someone was working in a

15 week over 40 hours and you assigned them damages, that

16 that would give them overtime amounts but that that

17 would not be eligible under your methodology?

18   A.    No, they would be zero damage in that case.

19   Q.    Even if they did have additional damages, it's

20 just that they would not be eligible under the state

21 law methodology?

22   A.    Yes, even if they qualified as working on a gang

23 and had K-code, if they worked over 40 hours a week,

24 they would have zero damages.

25           MR. DIRKS:  Nothing further.  Thank you.

1        THE COURT:  Any recross.

2        MR. MUELLER:  Nothing, Your Honor.  After the

3   jury has left I would like to move in my exhibits but

4   not -- not take up their time.

5        THE COURT:  All right.  Thank you.

6        You may step down.  Thank you so much.

7        Members of the jury, we're going to call it a

8   week.  We'll see you at 8 o'clock on Monday.  8 o'clock

9   Monday morning and we should be in the last two days of

10  evidence Monday and Tuesday.

11       So, with that, have a great weekend.  I remind

12  you, again, you're not to discuss this case or any

13  aspect of it among yourselves or with anyone else yet

14  and no independent investigation again.

15       Have a good weekend, we'll see you Monday.

16  Thank you so much.

17        No speeding, Mr. Trueblood.

18        (The jury leaves the courtroom.)

19       THE COURT:  I guess you can step down.

20       Okay.  Your exhibits, Mr. Mueller?

21       MR. MUELLER:  Yes, Your Honor.

22       Eric, since you already marked these I thought

23  I would just use your three rather than cutting and

24  pasting.

25       MR. DIRKS:  That's fine.

1          MR. MUELLER:  So I am going to move in three

2   tables that I showed the jury from his report, but Mr.

3   Dirks is actually turned them into an exhibit so I'll

4   use his, that is Exhibits 394B, 394C, 394D, and then

5   5731, which is on the witness stand.

6          It's the resorted list of individual damages

7   and I think 5736 was already admitted, I'll put that up

8   on the jury exhibit table.  And then if it is

9   convenient for the Court, I would like to move in the

10  other exhibits from Radwin, I said I would do it this

11  morning but we ran out of time.

12         THE COURT:  Sure, go right ahead.

13         MR. DIRKS:  And we're still working on putting

14  a DVD together for the Court for the exhibits or the

15  video that is we did use with Doctor Radwin but I

16  understand those will be admitted.

17         THE COURT:  Right.

18         MR. MUELLER:  And I have ours on -- on disk

19  and I'll leave them up on the exhibit stand so let me

20  go through because I think I called out two of the

21  exhibits wrong when I used them in examination.

22         And if anybody disagrees with it later, we can

23  correct the record.

24         So I'm moving in Plaintiffs' Exhibit 111, but

25  only Tables 2 and 3 and appendices 1 and 2 and I have

1  those here to put up there.

2      I incorrectly identified an exhibit called

3  Defendants' 5115 at one point, it was just part of

4  Plaintiffs' Exhibit 111, so we can ignore that in the

5  record.

6      Moving in 5039, which was a chart of PPE worn

7  by the employees in a spreadsheet format, I have that

8  here on CD.

9      I am moving in 5127, 5129, 5138, 5717 and

10  5718, those were all hard cope exhibits.

11      And then I am moving in the following video

12  clips, turned out they were all on our exhibit list, I

13  played a couple off the software but they were all

14  given numbers, that is clips 5430, 5443, 5450, 5458,

15  5462, 5469, 5495, 5497, 5510, 5689, 5690, 5719.

16      And I'll just note, I incorrectly identified

17  an exhibit called 4489 and it was just completely

18  wrong, it was 5689, so I move all those in.

19      THE COURT:  All right.

20      MR. MUELLER:  There is no objection.

21      MR. DIRKS:  No objection based on what we

22  discussed.

23      THE COURT:  All right.  Just to make sure have

24  I this right, those are Exhibits 394B, 394C, 394D,

25  5731, 5736, Exhibit 111, tables 2 and 3, and appendices

1 and 2.  5515 is actually to be corrected because it's

part of 111.  Then 5039, 5127, 5129, 5138, 5717, 5718,

5430, 5443, 5450, 5458, 5462, 5469, 5495, 5499, 5510,

569, 5690, and 5719.  Is that correct?

MR. MUELLER:  Yes, Your Honor.

THE COURT:  Okay.

MR. DIRKS:  And then 391 came in today but there was an agreement that we would redact the pros in the document.

THE COURT:  All right.  Thank you very much.

MR. MUELLER:  That's all I have.

THE COURT:  All right.  Anything else now?

MR. MUELLER:  No.

MR. HANSON:  Your Honor, just now that I know the Court's going to be reviewing documents on defendants' privilege log want to get just a sense of the mechanics.

We are going to be starting on Monday morning, first thing with Kenneth Kimbro of Tyson who is Tyson's ranking human resources manager for -- for the whole company.

To the extent that the Court deems doors would have been opened and issues to have been put in front of the jury that may require production of some of those documents, I am just trying to think about how

1  best to handle getting those and then that would be the

2  witness I would obviously use them from, unless we were

3  going to recall Mr. Hahn.

4          And I would also just note this:   That during

5  Ms. Paschal's examination of Ms. Litras, the following

6  exchange occurred about adding the additional minutes

7  after the IBP or after the Alvarez decision came out in

8  2005.  Ms. Paschal asked, Do you have any reason to

9  think that Tyson was required to pay that back pay

10  under the law?  The answer was no.

11         The question was, Would you agree with me that

12  Tyson did that because they thought it was the right

13  thing to do ?

14         The problem with questions and answers like

15  that, is we're dealing with a post-Supreme Court

16  environment that specifically found walking time

17  required by law.  And I am afraid that Tyson's lawyers

18  are eliciting testimony, the witnesses probably don't

19  know any better any way, on the concept that it wasn't

20  required by law, it was just the right thing to do.

21         We all know better.  The Supreme Court ruled,

22  in November of '05, that that walking time is

23  compensable.  Tyson responded to that, in January of

24  '07, by adding, we now have testimony to this jury,

25  nothing legal about it, just the right thing to do.

1        I think that has got to be informative of Your

2   Honor's review of some of that privileged material.

3        I can't cross examine without knowing what

4   Tyson really knew and when they knew it.

5            THE COURT:  Okay.

6            MR. MUELLER:  Your Honor --

7            THE COURT:  Mr. Mueller.

8            MR. MUELLER:  We are going to prepare a bench

9   memo or pocket brief for you, you won't be able to

10  understand the privilege claims without some basis for

11  the documents and, you know, supporting affidavits,

12  whatever you think would be helpful, but on your face

13  you won't know in some of them who they are from, who

14  they're too, why they are at the direction of legal and

15  so on and they're quite voluminous so we are going to

16  work our hardest to get you something to help you

17  review them.

18       I think you'll see that they don't -- well,

19  I'll leave it at that.

20           THE COURT:  All right.  Anything else?

21           MR. HANSON:  Not from us, Your Honor, thank

22  you.

23           THE COURT:  You know, I actually have tried

24  two cases as a lawyer and two as a judge where there

25  hasn't been a single objection because nobody has

1  pushed and pushed and pushed.

2          And, you know, I think when we talked about

3  early on willfulness and that kind -- and when I talked

4  about Tyson telling the story, I thought you were going

5  to talk about the way things were at the plant and

6  being able to tell your story, not this whole business

7  about the -- the history of why K-code and that kind of

8  thing.

9          And we have gone into areas that I had not

10 anticipated and if I had lived with this case, as you

11 guys have, and as Judge Lungstrum had for some period

12 of time, I certainly would have had a far better handle

13 on that.  And I also would have pushed you all much

14 harder with respect to the jury question.  But you

15 know, we are where we are.

16          I think the door has been opened and so, and,

17 you know, frankly, it is frustrating to hear elicited

18 as -- and it was a leading question, too, about out of

19 the goodness of Tyson's heart, that was not a question

20 of saying, why did Tyson do this, and her saying,

21 because we thought it was the right thing to do, the

22 question was, so Tyson did this because it felt it was

23 the right thing to do.

24          And, you know, that plays right into this

25 issue, and, you know, even though I don't know who some

1  of these documents are going to be from, and who

2  they're going to, I assume if they were on the

3  privilege log, that it's there because they were

4  claimed to have been either work product or privileged

5  communications and that's just the way I am going to

6  look at them.

7        And any help you can give me, I'd sure

8  appreciate but it's been a, frankly, a little

9  difficult, as I say, coming into this late, to stay

10 ahead of all of it.

11       And any way, I hope you all get ready for

12 Monday, and -- and I certainly will.  And I'll let you

13 know before we get started Monday.

14       I'm not going to let you get into 2,000

15 documents, I can tell you that, and I would imagine

16 that there may be a dozen out of the 2,000 where there

17 is a privilege claimed, if that many, that really get

18 down to the nub of what you're interested in.  But I'll

19 look through them and tell you what they are and we'll

20 figure out what to do with them on Monday.

21       You all have a good weekend.  Thank you so

22 much.

23       (Proceedings recess for the day at 2:22 p.m.

24        and commence the following Monday, March 14,

25        2011.)

C E R T I F I C A T E

I, Jana L. Hoelscher, United States Court Reporter in and for the District of Kansas, do hereby certify:

That the above and foregoing proceedings were taken by me at said time and place in stenotype;

That thereafter said proceedings were transcribed under my discretion and supervision by means of computer-aided transcription, and that the above and foregoing constitutes a full, true and correct transcript of requested proceedings;

That I am a disinterested person to the said action.

IN WITNESS WHEREOF, I hereto set my hand on this, the 11th day of March, 2011.

s/ Jana L. Hoelscher
Jana L. Hoelscher, RPR, CRR, RMR
United States Court Reporter