1

```
 1              IN THE UNITED STATES DISTRICT COURT
                    DISTRICT OF KANSAS
 2


 3

 4   ADELINA GARCIA, et al, Individually
     and on behalf of others similarly
 5   situated,

 6          Plaintiffs,

 7      vs.                          District Court
                                     Case Number
 8                                   06-CV-2198-JTM
     TYSON FOODS, INC., and          Volume 7
 9   TYSON FRESH MEATS, Inc.,

10          Defendants.

11


12

           DAILY COPY TRANSCRIPT OF PROCEEDINGS
13

14      On the 14th day of March, 2011 came on to be

15   heard in the JURY TRIAL in the above-entitled and

16   numbered cause before the HONORABLE J. THOMAS MARTEN,

17   Judge of the United States District Court for the

18   District of Kansas, Sitting in Kansas City.

19          Proceedings recorded by mechanical stenography.

20          Transcript produced by computer.

21

22

23

24

25
```

```
 1                  APPEARANCES

 2

 3  The Plaintiffs appeared by and through:
            Mr. George Hanson
 4          Mr. Eric Dirks
            Mr. Lee Anderson
 5          Stueve Siegel Hanson Woody, LLP
            330 West 47th Street, Suite250
 6          Kansas City, MO 64112

 7          Mr. Peter Antosh
            1401 Central Avenue
 8          Garden City, KS 67801

 9
    The Defendants appeared by and through:
10          Mr. Michael Mueller
            Ms. Evangeline Paschal
11          Hunton & Williams, LLP
            1900 K Street, NW
12          Washington, DC 20006

13          Mr. Craig O'Dear
            Mr. Robert Hoffman
14          Bryan Cave, LLP
            1200 Main Street, Suite 3500
15          Kansas City, MO 64105

16

17

18

19

20

21

22

23

24

25
```

3

```
1                            INDEX

2
     Deposition Designations of Mr. Lonnie Jepsen      261
3    Stipulations                                      261
     Plaintiffs Rest                                   268
4    Motion for Direct Verdict                         270
     Reporter's Certficate                             271

5

6    WITNESSES FOR THE PLAINTIFF:
        KENNETH KIMBRO
7           Direct Examination by Mr. Hanson            20
            Cross Examination by Mr. Mueller           131
8           Redirect                                   220
            Recross                                    249

9

10

11   PLAINTIFF'S EXHIBITS                         ADMITTED

12   Exhibit 6 Opinion Letter                        222
     Exhibit 449 AMI Letter                          241
13

14

15

16

17

18

19

20

21

22

23

24

25
```

4

1          (Proceedings commence at 7:55 a.m. outside the
2          presence of the jury.)
3          THE COURT:  A couple of things.  I actually
4    went through all of the documents in the privilege log
5    through the website.  It worked out well, one of the
6    systems fellas actually downloaded them for me, so I
7    was able to just go through them one by one yesterday.
8    And I have to confess, even to my surprise, given the
9    number of documents, Mr. Hanson, there just wasn't
10   anything in those documents.
11          A lot of them had to do with the union
12   situation and the fight that went on about whether the
13   steel workers would be able to get certified, there
14   were some things that probably did not belong in the
15   privilege long, like bulletin from the USDA with
16   respect to some things, but there really was nothing in
17   there that even hinted at issues that I think you were
18   concerned about.
19          I will tell you that I did not go through the
20   1050-page spreadsheet, and there were two or three
21   lengthy spreadsheets that I assume were just
22   accumulated data put together to -- but those were
23   basically numbers, and if those were used in the
24   preparation of the report, then I'm going to require
25   that those be turned over, but I couldn't make any

1    sense of the spreadsheets myself, and they were so

2    small on the screen any way, that I am not sure that

3    even if I could have read it, that it would have

4    provided any helpful information.

5            But in terms of the e-mails, the memoranda,

6    the surveys that were done, as I say, I just did not

7    find anything.  And I appreciate Tyson's efforts in

8    putting all of that together in a manner that I could

9    access it and go through it.

10           With respect to the admissibility of

11   Defendants' Trial Exhibit 5012, and it was filed I

12   think last evening, I saw it this morning, and the

13   request to take judicial notice of 29 C.F.R., Section

14   985.2 and 29 U.S.C., Section 651(b), Mr. Hanson, you

15   haven't had an opportunity to respond to those, so I'll

16   give you the opportunity to do that.

17           Are we going to be dealing with those issues

18   with our first witness this morning?

19           MR. HANSON:  My understanding is that we are

20   through defendants' examination.

21           MR. MUELLER:  Judge, just one of them is on

22   the first witness on my cross and that's the DOL

23   regulation that says they don't have binding rulemaking

24   power, that is why they look to the courts themselves.

25           The other one is for a witness called Orlando

1  Kenny who is in charge of implementing the OSHA

2  regulations at our plant.

3            THE COURT:  And he used the Fernandez report

4  to --

5            MR. MUELLER:  No, no, both of those I was

6  talking about things I asked to take judicial notice

7  of, the Fernandez report will come up on my cross,

8  maybe direct of Mr. Kimbro, the first witness.

9            And our basic point is, you know, this is what

10 we relied on as part of our willfulness defense.

11            THE COURT:  Go ahead, Mr. Hanson.

12            MR. HANSON:  I don't think we have an

13 objection to the Court taking judicial notice of what's

14 in a regulation, it's admissibility though, I think is

15 a separate issue and I think it depends on what purpose

16 they're trying to enter it for.

17            THE COURT:  I'm sorry, is that mike turned on?

18            MR. HANSON:  No.  It's not.

19            THE COURT:  Thank you.  Much better.

20            MR. HANSON:  Did you catch what I said,

21 though?

22            THE COURT:  I did.

23            MR. HANSON:  And, again, we -- no -- no

24 objection to taking judicial notice, but entering, you

25 know, legal rules, regulations, cases, we think is

1   probably not an appropriate province of the jury.  In

2   fact, Mr. Mueller and I have had discussions over the

3   weekend, the next witness is going to be testifying

4   about litigation history.  We have at least an informal

5   agreement at this point that we'll be talking about

6   cases, we might be showing some language from cases to

7   show state of mind, what was known, when it was known.

8   We're not going to be entering case law as exhibits in

9   to evidence.  I think that probably maybe even intrudes

10  under your instruction not to do independent research

11  and those kind of things, so I will put that in the

12  same category.

13          MR. MUELLER:  I can clear that up.

14          THE COURT:  Before you do, Mr. Mueller, let me

15  ask, can the jury just be told, and the parties agree

16  that the regulation provides that they cannot bind the

17  parties, all they can do is provide guidance and that

18  it's the courts that actually -- I mean that's the gist

19  of what I think you are arguing?

20          MR. MUELLER:  The reason we're asking for it

21  during this witness's testimony is --

22          THE COURT:  Oh, you can bring that out during

23  the testimony.

24          MR. MUELLER:  Is that -- and we're not asking

25  it to go in as an exhibit, I agree with Mr. Hanson.

1          THE COURT:   Yeah.

2          MR. MUELLER:  Just like a learned treatise, as

3 long as that can come out and be heard, we're not going

4 to ask it go into the jury room.  That's all.

5          THE COURT:  Then I think --

6          MR. HANSON:  And I don't have a problem with

7 that.  Again, we're going to try to not publish a lot

8 of the legal stuff right to the jury but if it needs to

9 be brought out as a concept, we're not going to object.

10          THE COURT:  Okay.  Then I think we're okay on

11 that.

12          With respect to Exhibit 5512, which is the

13 Fernandez report.

14          MR. HANSON:  Right, Mr. Anderson has looked at

15 their brief and will give a very short response.

16          THE COURT:  Thank you.  Go ahead, Mr.

17 Anderson.

18          MR. ANDERSON:  Thank you, Your Honor.  The

19 Fernandez report has the same problem with Mr. Kimbro

20 today that it had with Mr. Hahn last week.  If they are

21 offering it simply for their reliance on what it says,

22 that doesn't admit the report itself.

23          And Mr. Kimbro wasn't, in fact I think he was

24 even less directly connected to the Fernandez report

25 than Mr. Hahn was because Mr. Hahn was an engineer and

1  done himself a similar sort of study.

2         The report itself does not say that it applies

3  anyplace outside of Emporia or Storm Lake, where the

4  test was conducted.  So, we would request that we wait

5  until Mr. Fernandez is here to have an opportunity to

6  talk about what's in the report before the report

7  itself might be considered for admission.

8         THE COURT:  Mr. Mueller.

9         MR. MUELLER:  We're offering it for two

10 purposes:   One, is to show that we received the number

11 and then relied on it; and it doesn't say the exact

12 words or minutes, we want the jury to know what we're

13 relying on.  And second, it answers the argument.  It

14 says it's true and representative of all 11 plants in

15 the Reich litigation and, again, I don't want the jury

16 to think he is making it up, they gave us this, they

17 said, here you, here's the report.

18        And we also think it meets the Government

19 records exception to the hearsay rule, not just an

20 authenticity issue, but it was in our files, it is

21 something we relied on, it is also probative therefore

22 just of our state of mind but of the number of minutes.

23        MR. HANSON:  And this is where we do have a

24 concern.

25        The impact on Tyson, did they rely on it for

Jana L. Hoelscher, CSR, RPR, CRR, RMR
United States Court Reporter

1  their good faith defense, for their lack of

2  willfulness, they can talk about it, they can explain

3  who this person is, what they did.

4       The report itself is -- has all the

5  appearances of an expert report.  And the problem is,

6  this gentleman is not an expert in this case, never

7  been identified on Rule 26 as an expert, never been

8  subject to the expert, you know, <u>Daubert</u> challenges and

9  the like.  We do not have his underlying data, the raw

10  data used to produce the report.  He may be able to lay

11  some foundation for the report when he comes to

12  testify, he may not, but we need to wait and see what

13  this witness says before the report itself is

14  admissible.

15       We hear now they want to use the report not

16  only for state of mind but to actually substantively

17  show that it took only four minutes to do these things.

18  Well, that's just not proper substantive evidence for

19  this witness to testify to.

20       I think that the report should come -- I mean

21  the report itself should not be admitted, the fact of

22  the report, reliance can be discussed, but until we see

23  from the witness what he did, how he did it, it

24  shouldn't come in.

25       THE COURT:  Well, Mr. Mueller, I am going to

11

1  allow you to ask Mr. Kimbro about the fact that they
2  received the report, I am going to actually allow you
3  to testify as to what his understanding of what the
4  report's recommendations were, but I'm not going to
5  admit the report at this point.  That's going to have
6  to wait for Fernandez.
7      But I think you can get what you need with
8  this witness using the report in that way.
9      MR. MUELLER:  May I ask the witness, there is
10 two sentences in the executive summary that are what we
11 are relying on.  Can I have him read those without the
12 jury seeing the rest of the report?  Because that is
13 what he is basing his reliance on.  If the jury doesn't
14 know what is he relying on, I can't prove my point.
15     THE COURT:  I'll let you do two sentences from
16 the executive report but I'm going to give the jury a
17 limiting instruction about that.
18     All right.  Let's -- Mr. Hanson.
19     MR. HANSON:  Just one final, just kind of
20 housekeeping matter.
21     THE COURT:  Sure.
22     MR. HANSON:  And I apologize for not picking
23 up on this earlier, I have made a couple of leading
24 objections, I am calling a Tyson witness again today,
25 and this is the highest ranking HR person in the

1    company, he has been proffered by Tyson to speak on the

2    issue of Tyson's state of mind.

3            THE COURT:  You can lead him.

4            MR. HANSON:  What's that?  They can lead him

5    or --

6            THE COURT:  As long as they are within the

7    scope of what you have examined him about, they can

8    lead him.

9            If they get beyond that, they have got to go

10   back to non leading questions.

11           MR. HANSON:  I was just going to ask for

12   perhaps a restriction on that rule, given what he is

13   going to testify to is his own state of mind over the

14   time, and I just think for a lawyer to ask -- and very

15   effective at asking leading questions, and those are

16   something appropriate in some circumstances but

17   questions that would suggest, you know, Mr. Kimbro, in

18   1998, isn't it true that you were thinking that this

19   meant X?  Yes.

20           That I think is not proper.

21           THE COURT:  In terms of what he was thinking,

22   I -- I think direct or non leading questions are

23   appropriate.

24           MR. HANSON:  Okay.  Thank you.

25           THE COURT:  But you'll have to make your

13

1   objection, obviously, at the time.

2           MR. HANSON:  And I'll be judicious about it

3   but I appreciate the guidance.

4           THE COURT:  Thank you.

5           MR.  MUELLER:  Can I just make one point?  And

6   I appreciate Your Honor's ruling.

7           I will be honest, I'm largely going to do my

8   cross in a chronological order, no matter what he does,

9   because I'm trying to put the history together.  I may

10  go in and out of leading.  I think most of it is within

11  the scope, frankly, but I would rather tell my story, I

12  don't want to do first all the responsive stuff and

13  then all my own stuff.

14          THE COURT:  You don't have to do that, you can

15  drift in and out however you wish to.

16          MR. HANSON:  And the final, final thing.

17          THE COURT:  Go ahead and get the jury, Ryan.

18          MR. HANSON:  We're going to now talk about an

19  issue, which has not been introduced to the jury, the

20  issue of willfulness.  We sent to Mr. Mueller last

21  night a proposed kind of orientation instruction that

22  maybe you could give.  They have declined.

23          Your Honor, we would either request that you

24  explain to -- because we didn't know whether

25  willfulness was going to be in the case when we first

1  sat the jury, either a short explanation that this

2  witness we're now going to be talking about things that

3  aren't in your preliminary instructions.

4      THE COURT:  Why don't each of you just give a

5  short two, three minute opening.

6      MR. HANSON:  Okay, we'll be like 20 seconds,

7  but --

8      MR. MUELLER:  He certainly is entitled to do

9  that and Your Honor has just said he could.

10     I will just point out, two witnesses on

11  Thursday were also willfulness witnesses and he didn't

12  ask for it then and I don't want the jury to think this

13  is our only wilfulness witness and it's a substantive

14  point, not just willfulness.

15     THE COURT:  I will point that out to the jury,

16  as I allow each of you to make your statements.

17     Any of you have any trouble getting here this

18  morning?

19     (The jury enters the courtroom.)

20     THE COURT:  I was a little surprised when the

21  snow started last evening.

22     Good morning, folks.

23     JUROR 3:  Good morning.

24     THE COURT:  A beautiful March morning.

25     Have a seat, have a seat.  Sorry we're a

1   little late getting going this morning.

2           Have a seat, folks.

3           We had some issues that came up over the

4   weekend that we had to deal with here.  I want to tell

5   you that starting last week there were some witnesses,

6   a couple of witnesses that touched on the issue of

7   willfulness, and that is what some of the focus is

8   going to be on today.

9           At the time we started this case, when the

10  parties made their opening statements to the entire

11  venire panel before you were selected, willfulness was

12  not going to be a jury issue.  It's one that I was

13  going to decide after you had reached a verdict on

14  other issues.  It now has kind of worked its way into

15  the case, and is an issue that you are going to be

16  deciding, and given the fact that the parties didn't

17  talk about willfulness in their openings, we thought it

18  would be a good idea to give them an opportunity to

19  talk about it with you very, very briefly here this

20  morning.

21          And, again, I want to make it clear that there

22  have already been a couple of witnesses last week that

23  testified to some extent about willfulness, so I don't

24  want to give you the idea that pushing forward, this is

25  the only evidence you're going to hear about

1  willfulness.

2          Additionally, the parties intend to introduce

3  evidence about issues other than willfulness as well.

4  And so, with that in mind, I am going to ask the

5  parties to give you just a few of their thoughts with

6  respect to the evidence on willfulness, and what you

7  might be listening for.

8          Mr. Hanson.

9          MR. HANSON:  Thank you, Your Honor.  Good

10  morning.

11          THE COURT:  And you can turn that if you want

12  to.

13          MR. HANSON:  Sure.  Can you hear me okay?

14          Thank you.

15          As the judge pointed out, the question of

16  willfulness at the end of this case will now be

17  submitted for your determination.  The issue of

18  willfulness is separate from the issue of liability,

19  whether the law has been violated, and it's separate

20  from the issue of damages.

21          Your determination on willfulness will go to

22  two things:  First, for the Fair Labor Standards Act,

23  whether the limitations period is extended to a third

24  year, whether it's a two year limitations period as it

25  is in all cases, or whether, if it is a willful

1  violation, the back is three years.

2           Under the Kansas law the concept of

3  willfulness goes to the scope of damages.  Willfulness

4  basically means, and the judge will give you specific

5  instructions about that, but whether there was a

6  knowing violation of the law, or a reckless disregard

7  of the law.  It basically goes to what did Tyson know

8  and when did it know it.

9           We're going to call a witness first this

10 morning to address some of those issues, the highest

11 ranking human resources manager in the company and

12 we're going to talk a little bit about what Tyson knew

13 and when they knew it.

14          THE COURT:  Thank you, Mr. Hanson.

15          Mr. Mueller.

16          MR. MUELLER:  Thank you, Your Honor.  And good

17 morning, ladies and gentlemen.

18          As Mr. Hanson said, there is this issue that

19 we lawyers call willfulness and he has accurately said

20 that there is one issue under federal law and one issue

21 under the Kansas claims here.  Under federal law, of

22 course, what I say is not the law, the judge will

23 instruct you on the law, but this is what we believe

24 the instruction will be.

25          That you will be asked whether Tyson knew it

```
 1  was violating the federal law or acted in reckless
 2  disregard of that federal law, the Fair Labor Standards
 3  Act.  It is a different test we believe His Honor will
 4  tell you under state law.  There -- we believe the
 5  instruction will be that we had to have actually
 6  intended to harm the employees.  We believe that is a
 7  higher standard, much higher standard than the federal
 8  standard and that if there is an honest dispute, we
 9  cannot be -- honest dispute as to whether we owed money
10  for these things beyond what we have already paid,
11  that we cannot be said to have acted willfully.
12          Mr. Hanson is correct this is one of the
13  higher ranking people in Tyson Foods, and he was also
14  one of the higher ranking people at IBP.  He was in
15  charge of HR, human resources and, therefore, charged
16  on the pay practices and he will be talking both to Mr.
17  Hanson and to me, about why Tyson felt it was complying
18  with all the Court decisions you have been hearing
19  about, such as the Reich vs. IBP case decided by this
20  Court and the Supreme Court's decision in a case called
21  Alvarez versus IBP.
22          MR. O'DEAR:  Just a minute.
23          MR. MUELLER:  As Mr. Hanson said, if you
24  determine that we're not liable, this is not an issue
25  you'll even be asked to address, it's only if you
```

```
 1  decide we are liable.
 2          THE COURT:  All right.  Thank you.
 3          Mr. Hanson, you can go ahead and call your
 4  witness.
 5          MR. HANSON:  Thank you, Your Honor.
 6  Plaintiffs call Kenneth Kimbro.
 7          THE COURT:  Any of you have any problems
 8  getting here in morning?
 9          JUROR 3:  Not bad.
10          JUROR 1:  I came out of Lawrence, yeah, it
11  wasn't bad.
12          THE COURT:  You know, the roads coming over
13  from the hotel, everything but the overpasses were
14  pretty good, and there was actually snow on the
15  overpasses.
16          Morning.  You have any objection to taking an
17  oath?
18          THE WITNESS:  No, sir.
19          THE COURT:  And if you'll give Ms. Hoelscher
20  your name and spell it out, please.
21          THE WITNESS:  My name is Kenneth,
22  K-e-n-n-e-t-h, J. Kimbro, K-i-m-b-r-o.
23          (Witness is sworn.)
24              KENNETH J. KIMBRO,
25  called as a witness on behalf of the Plaintiffs, having
```

```
 1  been first duly sworn, testified as follows:
 2                    DIRECT EXAMINATION
 3  BY MR. HANSON:
 4  Q.    Good morning, Mr. Kimbro.
 5  A.    Good morning.
 6  Q.    I'm not sure if you remember me.  We met in late
 7  2006 during a brief deposition that you gave in this
 8  case.  Do you recall that?
 9  A.    I do.
10  Q.    And you recall that my partner, Eric Dirks,
11  asked you some questions at the time, do you remember
12  that?
13  A.    I believe so, yes.
14  Q.    Okay.  Well, matter of record, Mr. Dirks took a
15  brief deposition in December of 2006.
16          We have not had a chance to talk since that
17  time, is that correct?
18  A.    That's correct.
19  Q.    Let's just get some orientation for the jury.
20          Could you state your current job title with
21  Tyson?
22  A.    Yes, I'm the Senior Vice President and HR
23  Officer for Tyson Foods.
24  Q.    And when you're the Senior Vice President and Hr
25  Officer for Tyson Foods, that's the parent company,
```

21

```
1  correct?
2   A.    Yes, as it pertains to Tyson Fresh Meats, is
3  that your reference?
4   Q.    Right, we have two defendants in this case,
5  Tyson Fresh Meats and then Tyson Foods?
6   A.    Okay.
7   Q.    But you have responsibility for all of Tyson?
8   A.    All.
9   Q.    Correct?
10  A.    Yes.
11  Q.    So you have responsibility for human resources
12 for the entire company, correct?
13  A.    Correct.
14  Q.    And that includes responsibility for compliance
15 with wage and hour laws, correct?
16  A.    Yes.
17  Q.    Includes responsibility for compliance with the
18 Fair Labor Standards Act, right?
19  A.    Yes, sir.
20  Q.    And you understand that the Fair Labor Standards
21 Act applies to Tyson Foods, right?
22  A.    Yes, sir.
23  Q.    And to Tyson Fresh Meats, correct?
24  A.    Yes.
25  Q.    And that it applies in all of the facilities
```

1  under Tyson Foods, correct?

2  A.    Yes, sir.

3  Q.    When it comes to making decisions about how

4  Tyson is going to comply with the wage and hour laws,

5  that's your responsibility, correct?

6  A.    Yes, sir.

7  Q.    So, there's a phrase from one of our local

8  Presidents, Harry Truman, about passing the buck.  You

9  are familiar with that?

10  A.    I am.

11  Q.    Okay.  So, the buck can't be passed any further

12  than you, correct?

13  A.    That's correct, sir.

14  Q.    So you are a final decision maker when it comes

15  to wage and hour compliance?

16  A.    My only caveat to that is I -- we do a lot of

17  things through consensus building and collaboration

18  but, yes, sir, ultimately, it ends at my desk.

19  Q.    And I didn't mean to suggest you had to go it

20  alone.

21  A.    Thank you.

22  Q.    You have others giving support, correct?

23  A.    That's correct.

24  Q.    But if the jury wants to know what Tyson did,

25  regarding wage and hour issues, you would be the person

1 | to ask?

2 | A.     I believe so, yes, sir.

3 | Q.     If the jury wanted to know, What did Tyson know

4 | about compliance, you would be the person to ask,

5 | correct?

6 | A.     Yes, sir, I'd say that's fair.

7 | Q.     In the witness list that was provided by your

8 | counsel in this case, you were identified as someone

9 | expected to testify regarding defendants' defense to

10 | allegations of willfulness, including steps taken to

11 | comply with the Reich injunction, and Supreme Court's

12 | Alvarez decision and implementation and evolution of

13 | the K-code at the Finney County plant.

14 |        Are you prepared to testify regarding those

15 | things?

16 | A.     I am.

17 | Q.     You've testified before in wage and hour cases

18 | like this, correct?

19 | A.     I have.

20 | Q.     You've testified before in donning and doffing

21 | cases like this, right?

22 | A.     I have.

23 | Q.     Can you identify for the jury just your

24 | experience in testifying in similar cases in the past?

25 | A.     In similar cases I've given testimony on our pay

1  practices and our compliance with the Fair Labor

2  Standards Act.

3  Q.    Can you name those cases --

4  A.    That what you want?

5  Q.    No, I'm actually looking for the cases

6  themselves.

7  A.    In court, <u>Alvarez</u>.

8  Q.    That's <u>Alvarez versus IBP</u>?

9  A.    Yes, sir.

10  Q.    And that was a donning and doffing case out of

11  Tyson's Pasco, Washington plant?

12  A.    Washington state, yes, sir.

13  Q.    And just, I do not mean to interrupt you, but if

14  we talk over each other, it is going to be a little

15  tough for our court reporter, so we'll try to finish

16  answers and questions, is that okay?

17  A.    That's fine.

18  Q.    So, <u>Alvarez versus IBP</u> out of Pasco, Washington,

19  you testified in that case, correct?

20  A.    Yes.

21  Q.    Any others that you recall?

22  A.    Right now that's -- that's what I recall.  Were

23  you talking about depositions, possibly?

24  Q.    Well, I'm going to get to that in a second, but

25  let me just have a couple cases that are in my notes at

1  least and see if you recall those.

2  A.     Okay.

3  Q.     There was another case that came out of Pasco,

4  Washington in addition to Alvarez called Chavez, do you

5  recall that case?

6  A.     I do.

7  Q.     Do you remember giving testimony in that case?

8  A.     As I sit here I honestly don't remember if I

9  did.

10 Q.     Do you recall that Chavez came out of the Pasco,

11 Washington plant as well?

12 A.     I do.

13 Q.     And as you sit here you don't recall whether you

14 testified at trial in that case?

15 A.     I don't.

16 Q.     Do you remember a case called Jordan?

17 A.     I do.

18 Q.     Do you recall giving testimony in that case?

19 A.     A deposition, I believe.

20 Q.     Okay.  And Jordan was a case involving a beef

21 and pork plant out of Goodlettsville, Tennessee?

22 A.     Yes.

23 Q.     All right.  Other than Alvarez and Jordan and

24 perhaps Chavez, do you recall testifying in any other

25 donning and doffing cases for Tyson?

1    A.    As I sit here, no, I -- that's what I'm

2  remembering right now.

3    Q.    Did you testify in the <u>Reich</u> litigation?

4    A.    No, sir.

5    Q.    Did you testify in any of the cases involving

6  Tyson's poultry plants?

7    A.    No, sir.

8    Q.    We talked about your responsibility for

9  compliance with wage and hour, do you recall that?

10   A.    Yes, sir.

11   Q.    And you're specifically familiar with the law

12  that governs federal compliance with wage and hour,

13  called the Fair Labor Standards Act?

14   A.    Yes, sir.

15   Q.    Do you call it the FLSA as well?

16   A.    Yes, sir.

17   Q.    And you're aware that the FLSA requires

18  employers to keep accurate records of time worked,

19  correct?

20   A.    Yes, sir.

21   Q.    And you're aware that the FLSA requires

22  employers like Tyson to pay its workers for all the

23  hours they work, correct?

24   A.    Yes, sir.

25   Q.    You're also aware that the FLSA has what's

1  called a limitations period, basically a period that

2  workers can receive back wages under.  Are you aware of

3  that?

4  A.     Yes, sir.

5  Q.     Do you know how long that look back is?

6  A.     I believe it's two years.

7  Q.     And if the violation is found to be willful, do

8  you understand that it's three years?

9  A.     I do.

10  Q.     Do you understand that the FLSA permits workers

11  to recover back pay?

12  A.     Yes, sir.

13  Q.     You understand that the FLSA does not permit

14  workers to seek punitive damages against an employer

15  like Tyson?

16  A.     Yes, sir.

17  Q.     We discussed the two or three year limitations

18  period for willfulness, right?

19  A.     Yes, sir.

20  Q.     You understand that even if Tyson is not

21  willful, meaning they didn't recklessly or

22  intentionally violate the law, they could still be

23  liable, do you understand that?

24  A.     Yes, sir.

25  Q.     So you understand that even if Tyson was acting

1  in good faith, if it was found to violate the law, it

2  would still owe back pay, correct?

3  A.    Yes, sir.

4  Q.    So in that sense, you understand the FLSA to be

5  a strict liability statute?

6  A.    Yes, sir.

7  Q.    Just from the description in the witness list

8  that I read you, I just want to be clear that you're

9  prepared to testify today as to Tyson's state of mind,

10  is that right?

11  A.    Yes, sir.

12  Q.    And what that means for us, is what Tyson knew

13  about the law and when it knew it.  You're prepared to

14  testify on that, correct?

15  A.    Yes, sir.

16        MR. HANSON:  Can we pull up, Ms. Davis, the

17  timeline slide that I've used a couple times in the

18  case.

19        MS. DAVIS:  Mr. Hanson, the button, please.

20  BY MR. HANSON:

21  Q.    Mr. Kimbro, can you see that on your screen?

22  A.    I can.

23  Q.    All right.  This is just a demonstrative that

24  we've referred to a couple times in the case to set our

25  timeline, if you will.

1              So, can you just work with me from kind of the

2   beginning, and this timeline goes back to 1998, do you

3   see that?

4   A.     I do.

5   Q.     And in 1998, the company that is now Tyson was

6   called IBP, right?

7   A.     Yes, sir.

8   Q.     Iowa Beef Processors?

9   A.     Yes, sir.

10  Q.     Is that the right name?

11  A.     No, but --

12  Q.     Okay.

13  A.     Many people do it so it's okay.

14  Q.     Well, let's clear it up.  What's it called?

15  What's it supposed to be called?

16  A.     At one time it was Iowa Beef Packers, Iowa Beef

17  Processors and then it just became the acronym, IBP.

18  Q.     So we should just say IBP?

19  A.     IBP.

20  Q.     And not worry what the "P" stands for?

21  A.     That's correct.

22  Q.     That's fine with me.  And you were employed by

23  IBP back in 1998, correct?

24  A.     I was, yes.

25  Q.     And you were at that point Senior Vice President

1   of Human Resources for IBP?

2   A.    I believe in '98 I was probably the Vice

3   President of Human Resources, different title, same

4   job.  In '98.

5   Q.    Okay.  Thank you.  But am I right that you were

6   the highest ranking HR manager for IBP in 1998?

7   A.    Yes, sir, you are.

8   Q.    So you had -- well, you didn't have the senior

9   in your title, what you're doing today for Tyson back

10  in 1998, you were doing for IBP?

11  A.    Yes, sir, that's correct.

12  Q.    The next line on our timeline is in 2001 and

13  that's where Tyson acquires IBP, correct?

14  A.    Yes, sir.

15  Q.    And that essentially was Tyson acquiring what we

16  call the assets and liabilities of the company,

17  correct?

18  A.    That is correct.

19  Q.    So any -- any assets that IBP had became Tyson's

20  assets, right?

21  A.    Yes, sir.

22  Q.    And any liabilities IBP had became Tyson's

23  liabilities, correct?

24  A.    Yes.

25  Q.    That would include legal liabilities as well?

1   A.     That's my understanding.

2   Q.     And that transition was fairly seamless, wasn't

3   it?

4   A.     It seems so now.

5   Q.     Maybe not so much at the time?

6   A.     Not so much at the time.

7   Q.     In terms, though, of the wage and hour policies

8   that were in effect at IBP, those continued when the

9   acquisition with Tyson occurred, correct?

10  A.     Yes, sir.

11  Q.     The next moment on our timeline is 2006, which

12  is May, when this lawsuit was filed.  Do you see that?

13  A.     I do.

14  Q.     Okay.  And do you recall when that -- when this

15  lawsuit was filed?

16  A.     I believe that's correct, 2006.

17  Q.     Okay.

18  A.     Yes.

19  Q.     As a matter of record, you understand that under

20  the FLSA, that the furthest we can go back in time is

21  May of 2003, do you understand that?

22  A.     I do.

23  Q.     To recover backpay for our -- our workers in

24  this case?

25  A.     Yes, sir.

1  Q.    In 2007, in January, Tyson changed its pay

2  policies to start adding additional minutes, do you see

3  that?

4  A.    I do.

5  Q.    And if we just go back to 1998 for a second.

6  You understand that it was in 1998 that IBP first

7  introduced the practice of paying an additional four

8  minutes for donning and doffing time, correct?

9  A.    Yes, sir.

10 Q.    Sometimes we call it clothes changing time?

11 A.    It does get called that sometimes, yes, sir.

12 Q.    It's also called K-code?

13 A.    Yes, sir.

14 Q.    K-code, meaning knife wielders get this

15 additional time?

16 A.    Yes, sir.

17 Q.    So, I think just for convenience we'll call the

18 add on time, K-code time.  But the K-code was changed

19 in January of 2007 to add up to seven minutes, correct?

20 A.    Yes, sir.

21 Q.    And the change that occurred in January, 2007

22 was motivated by some litigation that Tyson had been

23 involved in, correct?

24 A.    Yes, sir.

25 Q.    And the case itself is called Alvarez, correct?

1    A.    That's my -- yes, sir, I believe so.

2    Q.    And that's a case that you testified in,

3 correct?

4    A.    Yes, sir.

5    Q.    And when, back in 19 -- pardon me.  Back in 1998

6 when IBP added four minutes, that was also motivated by

7 litigation, correct?

8    A.    Yes, sir.

9    Q.    It was the outcome of what we're calling the

10 Reich litigation, is that right?

11   A.    Yes, sir.

12   Q.    When IBP added the four minutes in 1998 as

13 K-code, it also at the end of the Reich litigation made

14 back -- backpay payments to workers, didn't it?

15   A.    Yes, sir.

16   Q.    In January of 2007 at the outcome of the Alvarez

17 litigation, IBP -- well, now Tyson, made back payments

18 to workers in that Washington plant, correct?

19   A.    Could you ask that again, I'm sorry?  I'm

20 distracted looking at the dates, I apologize.

21   Q.    That's no problem.  You told me that the

22 January, 2007 change in K-code was motivated by the

23 Alvarez litigation, correct?

24   A.    Yes.

25   Q.    So I'm looking now and that litigation came out

1   of Pasco, Washington, correct?

2   A.      Yes.

3   Q.      That was a beef processing facility like Finney

4   County, correct?

5   A.      Yes, sir.

6   Q.      Slaughters and processes cattle, correct?

7   A.      Yes, sir.

8   Q.      After the Alvarez litigation concluded, did

9   Tyson go and make back payments to workers in Pasco,

10  Washington?

11  A.      Yes, I believe that's correct, yes.

12  Q.      Same question for the workers in Finney County.

13  After the outcome of the Alvarez litigation, did Tyson

14  ever go and make back payments to the workers at the

15  Finney County facility?

16  A.      No, sir.

17  Q.      So you made back payments in Pasco, Washington

18  but not Finney County, correct?

19  A.      I believe that's correct, yes.

20  Q.      But you added additional K-code minutes as a

21  result of Alvarez, correct?

22  A.      Yes, sir, I believe so.

23  Q.      And those additional minutes, up to seven, were

24  to account for walking time that the Supreme Court in

25  Alvarez found to be compensable, correct?

1   A.     Yes, sir.

2   Q.     And you'll agree with me that prior to January

3   of 2007, Tyson in its Finney County facility was not

4   paying for that walking time that Alvarez found to be

5   compensable, correct?

6   A.     Yes, sir.

7   Q.     We have one more change to K-code, do you see

8   that, in April of 2010?

9   A.     I do.

10  Q.     And there, the company went from paying up to

11  seven minutes to paying up to 22 minutes, correct?

12  A.     Yes, sir.

13  Q.     That's a 15-minute increase, right?

14  A.     Yes, sir.

15  Q.     Did Tyson ever go back and make backpay to any

16  of the workers in Finney County to account for the

17  additional 15 minutes of K-code?

18  A.     No, sir, I don't believe so.

19  Q.     So that change in policy was going forward, it

20  never went backwards, correct?

21  A.     Yes, sir.

22  Q.     You understand that if the company is required

23  to pay for time worked under the Fair Labor Standards

24  Act it's required to make back payments?

25  A.     I believe that's -- yes, I'd agree with that.

36

1   Q.     And if you --

2   A.     That could be the case.

3   Q.     And I'm just going to give you an example with

4   another provision of the Fair Labor Standards Act, just

5   the min -- you understand that the FLSA also addresses

6   minimum wage?

7   A.     Yes, sir.

8   Q.     You understand that if minimum wage increased,

9   for example, and I'm just going to kind of give you

10  hypotheticals here, but if as of January 1st, 2011

11  minimum wage went up from let's say $6 an hour to $7 an

12  hour, okay, and Tyson was not quite ready because of

13  payroll issues or problems to implement that change, do

14  you understand my hypothetical?

15          THE WITNESS:  I do.

16          MR. MUELLER:  Objection, there is no minimum

17  wage claim in the case and it is a hypothetical with a

18  fact witness.

19          THE COURT:  Overruled.

20  BY MR. HANSON:

21  Q.     So if Tyson under the FLSA was required to

22  increase pay to the workers because of an increase in

23  minimum wage but it just wasn't able to get its systems

24  ready to make that change, let's say for a year, so

25  January 1st, 2012 they were ready to start paying

1  minimum wage, you understand that the company would be

2  obligated to go back and pay what was due for the prior

3  year, correct?

4  A.    Yes, I understand.  Yes, I'd agree with that.

5  Q.    In other words, you understand that the Fair

6  Labor Standards Act doesn't only require a company like

7  Tyson to pay in compliance going forward, correct?

8  A.    Yes, sir.

9  Q.    It can require retroactive or back payments,

10 correct?

11 A.    Yes, sir.

12 Q.    Do you remember submitting a declaration in this

13 case, Mr. Kimbro?

14 A.    Yes, sir.

15 Q.    And do you remember the declaration was provided

16 fairly early in this litigation, right?

17 A.    I believe so, yes.

18 Q.    You remember giving the declaration as part of

19 Tyson's argument that it should not be liable in this

20 case?

21 A.    Yes, sir.

22 Q.    And the argument was that Tyson had been

23 attempting to comply with the law in good faith?

24 A.    Yes, sir.

25 Q.    Do you remember that was kind of the point of

1  your declaration?

2  A.    Yes, sir.

3  Q.    And in that declaration, you listed a number of

4  facts that support your position that Tyson was acting

5  in good faith, right?

6  A.    Yes, sir.

7  Q.    And did you review that declaration in

8  preparation to testify today?

9  A.    I did.

10  Q.    All right.  And you remember the facts that were

11  laid out in that declaration?

12  A.    I believe so, yes, sir.

13  Q.    And those were true and accurate, correct?

14  A.    I believe that to be the case, yes, sir.

15  Q.    And here's my question:   You put in your

16  declaration all the facts that you rely on for

17  the -- for the position that Tyson was complying in

18  good faith with the law, correct?

19  A.    Yes, I believe that.

20  Q.    In other words, there aren't additional facts

21  that were not in that declaration?

22  A.    I don't believe so.

23  Q.    And in that declaration you identified court

24  proceedings or litigation proceedings as forming the

25  basis for your position that Tyson has always been in

1  good faith compliance, correct?

2  A.    Yes, sir.

3  Q.    So one of the things that you, Mr. Kimbro, rely

4  on to support the position that Tyson's been acting in

5  good faith, is Tyson's litigation history, correct?

6  A.    Yes, sir.

7         MR. HANSON:  Can you pull up Exhibit 231,

8  which I believe has been admitted.

9  BY MR. HANSON:

10  Q.    Can you see that okay, Mr. Kimbro?

11  A.    I think I'll be able to here in a minute.

12  Q.    Can I also give you a hard copy if it is easier?

13  A.    I believe I can read this.

14         MR. HANSON:  Can we, April, maybe zoom in a

15  little bit on that first section.

16         Just the top half if we can.

17  BY MR. HANSON:

18  Q.    If we can't zoom, we'll go old school back to

19  the ELMO.

20  A.    Oh, much better.  Thank you.

21  Q.    Yeah.  Everyone see that okay?

22         Do you recognize Exhibit 231 as a memo from

23  you, Mr. Kimbro?

24  A.    Yes, sir, I do.

25  Q.    And you see the date of April of 1998, is that

1  correct?

2  A.     I do.

3  Q.     It's to, what is just referred to as

4  distribution?

5  A.     Yes.

6  Q.     I assume that is a rather large recipient list?

7  A.     That would be general distribution.

8  Q.     And that would be members of HR, is that right?

9  A.     Well, it would be members of HR, in this case it

10  went out to operating facilities also.

11  Q.     Okay.  So it went out to folks in operations as

12  well?

13  A.     Yes.

14  Q.     And what you're doing in this memo, is

15  announcing a -- a new wage and hour policy, is that

16  correct?

17  A.     Yes, sir.

18  Q.     And you write in this memo, "Effective

19  immediately, IBP is voluntarily implementing a

20  procedure to compensate employees for the reasonable

21  time associated with certain pre and post shift

22  activities."  (Quoted as read.)

23        Do you see that?

24  A.     I do.

25  Q.     And I just want to point out the word

1  "voluntarily."  You wrote that, is that correct?

2  A.    Yes, sir.

3  Q.    Do you think that's an accurate characterization

4  of what motivated the change in policy?

5  A.    I believe so, yes.

6  Q.    Now the change in policy, that's what we saw in

7  the timeline as the additional four minutes, correct?

8  A.    Yes.

9  Q.    Adding four minutes to K-code, correct?

10  A.    That's correct, or the creation of K-code.

11  Q.    Thank you.  Before this time frame, in 1998, IBP

12  did not pay for clothes changing time, correct?

13  A.    No, sir, that's our understanding, yes.

14  Q.    So, this is the first time that the company

15  began adding minutes to account for what we're calling

16  donning and doffing, right?

17  A.    That's correct.

18  Q.    And what it decided to add four minutes of

19  K-code, it added that time for almost all production

20  workers, correct?

21  A.    Yes, sir, there was a bit of an evolutionary

22  step in there but, yes, as a general statement, that's

23  accurate.

24  Q.    And when we talk about K-code it was a way to

25  identify the folks who were in knife-wielding

1  positions, correct?

2  A.     Yes.

3  Q.     And the four minutes was added to that group of

4  knife wielders, correct?

5  A.     Yes.

6  Q.     And that four minutes was added, you know, to

7  the group as a whole.  It didn't -- you didn't go and

8  say some people should get three minutes, some people

9  should get six minutes, some people should get five

10 minutes, you treated everyone the same for purpose of

11 adding that four minutes, correct?

12 A.     Yes, sir.

13 Q.     All right.  I'm now going to kind of walk

14 through a chronology regarding the Reich litigation.

15 You're familiar with that, correct?

16 A.     Yes.

17 Q.     And you'll agree with me that in this time frame

18 of 1998 you are kind of at the tail end of the Reich

19 case, correct?

20 A.     Yes.

21 Q.     And you'll agree with me that at least in your

22 memo that's been marked as Exhibit 231, you don't

23 reference the litigation, correct?

24 A.     Is that my declaration that you are referring to

25 as the exhibit?

43

1   Q.    No.

2   A.    I'm sorry, this.

3   Q.    Yes, what's on the screen?

4   A.    I'm sorry, what we're looking at on the screen.

5   I hadn't read it all, but I don't believe we referenced

6   the Reich litigation in this.

7   Q.    Would you just take a minute to scan it just to

8   make sure that we're sure?

9   A.    Thank you.  Okay.  I don't believe I can see it

10  all pre-shift and post shift -- no, I don't see a

11  reference to that litigation.

12  Q.    And just so we know what -- why we call it the

13  Reich litigation or Reich litigation, you understand

14  that lawsuits have to have a name, right?

15  A.    I've learned that over the years, yes.

16  Q.    And for example, in this case, it's called

17  Garcia, because Ms. Adelina Garcia is the first named

18  plaintiff, you understand that?

19  A.    Yes, sir.

20  Q.    Do you know Ms. Garcia?

21  A.    I do not.

22  Q.    In the Reich litigation, the plaintiff was

23  actually the United States, correct?

24  A.    Yes, sir.

25  Q.    The United States Department of Labor?  Correct?

1    A.    Named after the Secretary of Labor, yes.

2    Q.    The secretary at the time.  And the reason I

3  introduce that is the litigation changes names over

4  time as new Secretaries of Labor come and go?

5    A.    It did.

6    Q.    Okay.  And so you'll be -- you're aware that at

7  various times it might be called McLaughlin?

8  McLaughlin is actually how it started out technically,

9  right?

10    A.    Yes.

11    Q.    And then became Reich?

12    A.    I think it became Martin, then Martin, then

13  Reich, then Chao, Alexis Herman.

14    Q.    Well, I think we're going to be hearing --

15    A.    I may have the wrong order.

16    Q.    Metzler, Herman, Reich, McLaughlin, but I just

17  want to be clear, we're talking about the Reich

18  litigation, right?

19    A.    Yes, sir.

20    Q.    In the District of Kansas, correct?

21    A.    Yes, sir.

22    Q.    All right.  Let's just kind of run through a

23  couple of moments in the chronology.

24         You understand that that litigation began back

25  in 19 -- actually '87, correct?

1  A.     '87 or '88, yes, sir.  Was it '87?

2  Q.     Well, the Department of Labor began

3  investigating IBP --

4  A.     Yes, the investigation started in '87.

5  Q.     And then the actual lawsuit was filed in 1988,

6  correct?

7  A.     That's my memory, yes, sir.

8  Q.     And back in 1987, 1988, IBP was paying its

9  production workers on gang-time, correct?

10  A.     Yes, sir.

11  Q.     All right.  And we've talked quite a bit in this

12  case about what gang-time is.  We don't need any more

13  definitions, but you'd agree with me that gang-time is

14  a way of paying everyone kind of the same amount of

15  time, correct?

16  A.     Yes, sir.

17  Q.     And that it did not pay for donning and doffing

18  time, correct?

19  A.     Yes, sir.

20  Q.     You agree with me that's kind of a way to pay an

21  average time, correct?

22  A.     Yes.

23  Q.     You understood that the Department of Labor took

24  the position that gang-time did not capture all working

25  time?

46

1   A.     Yes, sir.

2   Q.     And you understand that the Department of Labor

3   took the position that gang-time records were not fully

4   accurate?

5   A.     Yes, sir.

6   Q.     And the Department of Labor specifically was

7   saying time spent donning protective gear and clothing,

8   walking to your work station, is compensable, correct?

9   A.     Yes, sir.

10  Q.     And you understood that they took that position

11  that doffing certain clothing and protective gear and

12  walking back to the locker room at the end of the

13  shift, that was compensable as well, correct?

14  A.     Yes, sir.

15  Q.     I think you glanced over at our boards.  This,

16  again has been largely discussed and introduced into

17  evidence, but you see at least some of the items that

18  the Department of Labor was claiming was compensable,

19  do you see that?

20  A.     Yes, sir.

21  Q.     So the lawsuit was filed in 1988, correct?

22  A.     That's my memory, yes.

23  Q.     And there actually was a trial in the Reich case

24  in the District of Kansas, correct?

25  A.     I believe this Court.

1    Q.    Yeah.   The District of Kansas, not -- not this
2    courtroom probably?
3    A.    Yes, sir.
4    Q.    And it was tried to the judge, is that right?
5    A.    Yes, sir.
6    Q.    And the judge at that point was the Earl
7    O'Connor, do you recall that?
8    A.    That's my memory, yes.
9    Q.    And the Court issued findings in April of 1993,
10   is that right?
11   A.    Yes, sir, that's my memory.
12   Q.    And the Court found that some of these items to
13   be compensable, correct?
14   A.    Yes, some are.
15   Q.    And at that time found some of them not to be,
16   correct?
17   A.    That's correct.
18   Q.    And the Court also found that it was appropriate
19   to enter an order that would enjoin IBP from future
20   violations?
21   A.    Yes, that came later, is my memory.
22   Q.    It was entered later but it was part of an
23   initial ruling?
24   A.    Yes, sir.
25   Q.    Okay.   And just so the jury understands what

1  that means or what you understood that to mean, can you

2  explain that?

3          What it means to be enjoined from future

4  violations?

5  A.    I would say forbidden, not to repeat.

6  Q.    It's a way of ensuring future compliance, is

7  that right?

8  A.    Yes, sir.

9  Q.    After the trial court issued its findings in

10 1993, IBP didn't accept those findings, it didn't just

11 say, Okay, we'll pay, right?

12 A.    That's correct.

13 Q.    It exercised its right to appeal, correct?

14 A.    Yes, sir.

15 Q.    And actually the Department of Labor appealed as

16 well, correct?

17 A.    Both parties as I recall, yes.

18 Q.    And so it went up to the appellate court?

19 A.    Yes.

20 Q.    In October of 1994, correct?

21 A.    Yes, sir.

22 Q.    And the appellate court affirmed what the trial

23 court did and the case came back down, right?

24 A.    Yes, sir.

25 Q.    All right.  And so now that we've got some of

49

1  these issues appealed and back down, you had a second

2  phase of the trial on damages, is that right?

3  A.     Correct.

4  Q.     And that was tried in July of 1995, is that

5  right?

6  A.     Yes, sir.

7  Q.     And the court issued a ruling on damages,

8  correct?

9  A.     Yes, sir.

10  Q.     And the court -- well, I'm not going to get into

11  a lot of the details, but IBP said damages should be

12  one thing, the Department of Labor said they should be

13  another, correct?

14  A.     That's correct.

15  Q.     And then the court came in and kind of split the

16  difference, if you will, is that right?

17  A.     It's a -- yeah, that's a good generalization,

18  yes, sir.

19  Q.     And you remember that the court -- you remember

20  that one of the issues that IBP was presenting to the

21  court was an issue of di minimis, correct?

22  A.     Yes, sir.

23  Q.     And do you know what di minimis means or

24  what -- can you give us your understanding of what that

25  means?

1    A.    Yes, sir.  That if -- if it is time or it is

2  work, it is so small or so little that it's considered

3  to be di minimis or not payable.

4    Q.    Too small to matter?

5    A.    Too small to matter.

6    Q.    Trivial?

7    A.    I guess.

8    Q.    And you'll recall that one of the issues

9  regarding di minimis is whether a company like IBP is

10  capable of recording that time?

11    A.    Yes, sir.

12    Q.    And you remember what the court said about

13  whether IBP is capable of recording the working time?

14    A.    I'm sorry, I don't remember what the court said.

15    Q.    Okay.  Let me see if I can just refresh your

16  recollection.

17    A.    Thank you.

18    Q.    And I am just reading from the court opinion,

19  from Judge O'Connor.

20         He said, "We are not convinced that in this

21  day of modern technology IBP cannot record the

22  compensable work performed by its employees."  (Quoted

23  as read.)

24         Do you recall that?

25    A.    Yes.

1    Q.    And he was saying that back in 1995, right?

2    A.    Yes.

3    Q.    Sixteen years ago, correct?

4    A.    Yes.  Yes.

5    Q.    And it's true that even today, in Finney County,

6  Tyson is not using modern technology to record all

7  working time, correct?

8    A.    I'm not sure what you mean by that.  Help me

9  with that.

10   Q.    Well, Judge O'Connor in 1995 is saying, we're

11 not convinced that IBP is incapable of recording the

12 time, given the technology that we have today, right?

13   A.    Yes, that's what it said.

14   Q.    And back at this point, IBP was paying on

15 gang-time, correct?

16   A.    Yes.

17   Q.    And it wasn't recording working time through

18 technology, is that correct?

19   A.    No.  No.

20   Q.    And I guess my point is today, Tyson's still

21 pays on gang-time in Finney County, correct?

22   A.    Yes.

23   Q.    It just adds some additional minutes, correct?

24   A.    Yes.

25   Q.    And those minutes are an estimation, correct?

1    A.    That's correct.

2    Q.    They are not actual minutes, correct?

3    A.    That's correct.

4    Q.    So it is true even today, IBP is not paying in a

5    way that captures all actual working time?

6    A.    Yes, sir.

7    Q.    You'll recall that Judge O'Connor also indicated

8    that he was going to issue an injunction to require

9    that IBP keep accurate time records, correct?

10   A.    Yes, sir.

11   Q.    And let me just indicate what he said.  He said,

12   "Defendant must implement sufficient recordkeeping

13   practices to record the time spent by each particular

14   employee in the pre-shift and post shift activities

15   deemed compensable in this case."  (Quoted as read.)

16        Do you see that?

17   A.    Yes, I don't see it but I heard you.

18   Q.    Right.  And if you want I'm always -- I can hand

19   you the opinions and we can look at them together as

20   well.  I am just using this --

21   A.    I can listen well, I'm fine.

22   Q.    I appreciate that.

23        But you heard the court's order to record the

24   time spent by each particular employee, correct?

25   A.    Yes, sir.

1   Q.    And you understand that when the judge said keep

2   time for each particular employee, he's not talking

3   about gang-time, is he?

4   A.    I'm not sure.  I can't interpret that that well.

5   Q.    You think gang-time and keeps time for each

6   particular employee, individually?

7   A.    Well, I think it could, if you kept track of the

8   gang and then you did an edit if someone worked longer

9   or something like that.

10  Q.    Well, it could if you would make revisions for

11  an individual, correct?

12  A.    Yes.

13  Q.    But by definition, gang-time is paying a group,

14  correct?

15  A.    Yes.

16  Q.    By definition it's not paying each particular

17  employee an individual amount?

18  A.    That's true.

19  Q.    And then --

20        MR. HANSON:  If we could pull up Exhibit 331.

21  Will you be able to zoom?

22        MS. DAVIS:  Yes.

23        MR. HANSON:  Okay.

24  BY MR. HANSON:

25  Q.    Tell you what, I'm just going to use the ELMO, I

1  think that will be just as quick.

2          Let me show you what has already been admitted

3  in evidence to, Mr. Kimbro, which is Exhibit 331, and

4  it's the actual injunction that was ultimately entered

5  in this case.

6          You familiar with this document?

7  A.    Yes, sir.  I believe so.

8  Q.    And here the court is entering what it refers to

9  as a permanent injunction, correct?

10 A.    Yes, sir.

11 Q.    Where the company is permanently enjoined and

12 restrained from violating the provisions of the Fair

13 Labor Standards Act?

14 A.    Yes, sir.

15 Q.    Going to show you the paragraph three.  And here

16 the judge is stating, "It is further ordered that

17 within ten days of the date of this order defendant

18 shall implement recordkeeping practices sufficient to

19 record the time spent by each employee in performing

20 the pre-shift and post shift activities found to be

21 compensable under the act."  (Quoted as read.)

22          Do you see that?

23 A.    Yes, sir.

24 Q.    Do you see that the judge is again using the

25 language "each employee," is that right?

1    A.    I see that, yes, sir.

2    Q.    But you'll agree that Tyson did not change its

3  gang-time policies, correct?

4    A.    Yes, sir.

5    Q.    It was still paying employees by a group, even

6  more than ten days after this order?

7    A.    Yes, sir.

8    Q.    You'll agree it was still paying employees as a

9  group even ten years after this order?

10   A.    Yes, sir.

11   Q.    And you'll agree that it is still paying

12 employees as a group to this day, correct?

13   A.    Yes, sir.

14   Q.    You understand that that injunction is still in

15 place?

16   A.    Yes, sir.

17   Q.    It still binds Tyson's conduct?

18   A.    Yes.

19   Q.    It was entered against IBP but Tyson inherited

20 it in 2001 when Tyson acquired IBP, correct?

21   A.    Yes.

22   Q.    All right.  We just talked about the second

23 phase of the Reich trial where the Court identified the

24 amount of time that IBP owed.  Do you recall that?

25   A.    Yes, sir.

56

1  Q.    And we just saw that the injunction that the

2  Court entered in July of 1996, correct?

3  A.    Yes, sir.

4  Q.    But Tyson did not accept the -- the damage award

5  made by the Court, did it?

6  A.    Meaning the amount we were still in discussions?

7  Q.    Well, I mean the case wasn't over.

8  A.    Oh, okay, yes, sir, yes.

9  Q.    And, in fact, IBP decided to appeal again, the

10 trial court's ruling, correct?

11 A.    Yes, sir.

12 Q.    And that appeal went up to the appellate court

13 after 1996, correct?

14 A.    Yes.

15 Q.    In October of 1997, the Court of Appeals issued

16 a second ruling, is that right?

17 A.    Yes, sir.

18 Q.    And do you remember what the court said in its

19 first sentence in that opinion?

20 A.    I'm sorry, I don't.

21 Q.    Okay, I'll just read it.

22       The court stated, "This appeal obliges us to

23 revisit IBP's violation of the overtime and

24 recordkeeping provisions of the Fair Labor Standards

25 Act."  (Quoted as read.)

1          Do you recall that?

2    A.    Yes, sir.

3    Q.    So the Tenth Circuit is once again taking up the

4    issues from Reich, okay, you understand?

5    A.    Yes, sir.

6    Q.    And you understand that in that appeal, IBP was

7    not only contesting the -- the amount that the trial

8    court found IBP should pay, but also the permanent

9    injunction that we just looked at, correct?

10   A.    Yes, sir.

11   Q.    IBP didn't want to be under that injunction,

12   right?

13   A.    No, sir.

14   Q.    And you remember that the court rejected IBP's

15   position and held that the permanent injunction should

16   stay in place?

17   A.    Yes, sir.

18   Q.    And do you remember what the court said when it

19   kept that injunction in place?

20   A.    No, sir.

21   Q.    Let me just remind you:   The court said, "It is

22   an understatement to state that IBP has not made

23   extraordinary efforts to prevent recurrence of such

24   violations in the future."  (Quoted as read.)

25          Do you recall that?

58

1  A.     Yes, sir.

2  Q.     And that would have had an effect on your

3  thinking about the case, correct?

4  A.     Yes.

5  Q.     You're hearing a Court of Appeals tell you that

6  in kind of muted language, that IBP hasn't taken strong

7  efforts to comply with the FLSA.  That was the court's

8  position at that point, correct?

9  A.     It appears so, yes, sir.

10  Q.     And I take it you agree or disagreed with that

11  statement?

12  A.     I believe we would probably disagree with it.

13  Q.     Well, you did disagree, right?

14  A.     Yes.

15  Q.     So the appellate court issued its affirmance of

16  the trial court's damage ruling and entering of the

17  injunction in 1997.  The case went back down but you

18  understand that there was still a dispute over how much

19  IBP would pay, correct?

20  A.     Yes, sir.

21  Q.     And you understand that in April of 1999, the

22  Department of Labor felt it had to start a new piece of

23  litigation to -- to require IBP to make the back

24  payments from Reich, are you aware of that?

25  A.     Is that the Herman --

Jana L. Hoelscher, CSR, RPR, CRR, RMR
United States Court Reporter

59

```
 1   Q.     Yes.
 2   A.     -- that you're referring to.
 3   Q.     Yes, it is.
 4   A.     Yes, I am.
 5   Q.     So in April of 1999, in an action called Herman,
 6   you understood the Department of Labor was stating, IBP
 7   was unlawfully withholding compensation from workers,
 8   correct?
 9   A.     Yes, sir.
10   Q.     Compensation that the DOL said had been decided
11   in Reich, correct?
12   A.     Yes.
13   Q.     Now by April of 1999, if we just use our memo on
14   the ELMO as a --
15   A.     You said April of '99, did you mean April of
16   '98?
17   Q.     Actually the Herman --
18   A.     Oh, I'm sorry, I thought you were referencing
19   here.
20   Q.     I am going back to this now.
21   A.     Okay.
22   Q.     Just to kind of help put this in time now.
23          You understand that this memo is about ten
24   years into the Reich litigation, correct?
25   A.     Yes.
```

1    Q.    And this is where IBP started using the four

2    minutes, correct?

3    A.    Yes.

4    Q.    But it didn't do that initially, you know, with

5    agreement by the Department of Labor, correct?

6    A.    No.

7    Q.    It's your position that the Department of Labor

8    acquiesced to that later, correct?

9    A.    Yes.

10   Q.    But even a year after IBP instituted the four

11   minute K-code, the Department of Labor instituted the

12   Herman case to require back payments, correct?

13   A.    Yes.

14   Q.    Now, Mr. Kimbro, you said in your earlier

15   testimony that something has worked -- or your position

16   is that something was worked out with the Department of

17   Labor, correct, to resolve the Reich case?

18   A.    Yes.

19   Q.    And that something is the four minute K-code

20   policy, is that correct?

21   A.    That's part of it, yes.

22   Q.    Okay.  And you referred to that as a negotiated

23   settlement with the Department of Labor, do you recall

24   that?

25   A.    Yes, sir.

1   Q.    So it's your position that you reached a

2   settlement with the DOL to resolve the Reich case,

3   correct?

4   A.    Yes, sir.

5   Q.    Are you able to show the jury a document that

6   describes the settlement you say you reached with the

7   Department of Labor?

8   A.    I don't believe we have a formal settlement

9   agreement if that's what you are asking me.

10  Q.    Well, I'm asking for kind of any document that

11  would describe the terms and conditions of what you're

12  describing or saying is a settlement with the

13  Department of Labor.

14  A.    My reference would be a statement or letter that

15  said that the four minutes was acceptable.

16  Q.    Right.  And I'll -- you're relying on some

17  communications that went back and forth with the

18  Department of Labor, correct?

19  A.    Yes, sir.

20  Q.    But in terms of what I would call a settlement

21  document, something that says, we reached a settlement,

22  here are the settlement terms, you don't have that, do

23  you?

24  A.    No, sir.

25  Q.    When IBP and now Tyson does settle wage and hour

1   cases, it does reach agreements, correct?

2   A.    Yes, I believe so, yes.

3   Q.    I mean, you're familiar with other settlements

4   that Tyson has reached to resolve donning and doffing

5   cases?

6   A.    After this, yes.

7   Q.    Yes?

8   A.    Mm-hmm.

9   Q.    And when Tyson settles donning and doffing

10  cases, it does so in a document called a settlement

11  agreement, correct?

12  A.    I don't know that I have seen those, so I -- but

13  I would believe so, yes.

14  Q.    And you've seen it also referred to as a consent

15  judgment?

16  A.    I have.

17  Q.    And that, you would agree with would be --

18  A.    Yes.

19  Q.    -- a formal document, correct?

20  A.    Yes, sir.

21  Q.    And if it's not a consent judgment, you would

22  see it in terms of a settlement agreement?

23  A.    Yes, sir.

24  Q.    But here, in the <u>Reich</u> case, you don't have a

25  consent judgment, do you?

1   A.    No, sir.

2   Q.    And you don't have a written settlement

3   agreement, correct?

4   A.    No, sir.

5   Q.    So earlier, you explained that you relied on

6   some communications with the Department of Labor

7   correct?

8   A.    Yes.

9   Q.    And one of those was from April of 1999,

10  correct?

11  A.    I'd have to see it but I believe that sounds

12  right, yes.

13  Q.    Okay.  Let me -- might go ahead and show you

14  this one just because we are going to talk a little bit

15  about it.

16  A.    Very good.

17  Q.    Actually, sir, I am going to hand you a stack of

18  kind of all the documents we have gone through.

19  Actually, it's too many papers.

20        Let me hand you the letters.

21  A.    Thank you.

22  Q.    All right.  You see what I handed you is a

23  letter from the Department of Labor to IBP from April

24  of 1999?

25  A.    Yes, sir.

1   Q.    And this is one of the communications that you

2   relied on to -- to testify that you reached a

3   negotiated settlement, is that correct?

4   A.    Yes, sir.

5   Q.    In the top of the second paragraph, the DOL

6   indicates this, "First, with regard to the payment of

7   back wages, the Department agrees that four minutes per

8   day is sufficient to pay employees for the period

9   October, 1994 to the present."  (Quoted as read.)

10         Do you see that?

11  A.    Yes, sir.

12  Q.    Okay.  And that, you understood, was in

13  reference to backpay, correct?

14  A.    Yes, sir.

15  Q.    Which would have covered the time period '94 to

16  1999, correct?

17  A.    Yes.

18  Q.    And just so we understand, the four minutes that

19  had been implemented to start paying for clothes

20  changing time, if you look up at the board, that four

21  minutes was not intended to cover all of this equipment

22  or clothing, was it?

23  A.    No, sir.

24  Q.    It was intended just to cover a portion of it,

25  correct?

1   A.      Yes, sir.

2   Q.      And that would be considered the knife wielders'

3   personal protective equipment, correct?

4   A.      And unique items, yes, sir.

5   Q.      But it did not cover such things as the sanitary

6   outer garments?

7   A.      Ask me that again, I'm sorry, I'm confused.

8   Q.      It was not intended and it did not cover the

9   sanitary outer garments?

10  A.      That's correct, it doesn't.

11  Q.      Doesn't cover the frocks or the uniform,

12  correct?

13  A.      No.

14  Q.      Didn't cover the hard hat, hair net, earplug or

15  boots, correct?

16  A.      Correct.

17  Q.      Or any safety goggles, correct?

18  A.      Correct.

19  Q.      And some of the polar sleeves and cotton glove,

20  it didn't cover that either, correct?

21  A.      Correct.

22  Q.      Basically the mesh items we show there it did

23  cover?

24  A.      That is a good generalization, yes, sir.

25  Q.      And you'll also agree that the four minutes did

```
 1  not cover pre-shift and post shift walking time, right?

 2  A.     From the locker room or off the line to the wash

 3  station?  Which -- when you say walking time --

 4  Q.     I'll clarify.  It did not cover walking time

 5  pre-shift from the locker room to the production line,

 6  correct?

 7  A.     Yes -- yes.

 8  Q.     And it did not cover walking time from cleaning

 9  stations to the locker room at the end of the shift?

10  A.     Yes.

11  Q.     So if you understood that, the Department of

12  Labor is indicating it would accept four minutes of

13  time for back pay in 1999.  I want you to turn the page

14  with me because there is a reference of what it

15  expected going forward.  Do you see that?

16  A.     Yes.

17  Q.     And here, the Department of Labor states,

18  "Finally, with regard to future compliance, the

19  Department expects IBP to comply with the District

20  Court's orders of March 21st, 1996 and May 16th, 1996,

21  which requires IBP to record and pay for the time spent

22  by each employee performing the identified compensable

23  activities."  (Quoted as read.)  Correct?

24  A.     Correct.

25  Q.     And that comment factored in to your thinking
```

67

```
 1  about whether or not you had been reaching an agreement

 2  with the Department of Labor, correct?

 3  A.    Yes, sir.

 4  Q.    And you understand the Department of Labor was

 5  basically telling you, you have to comply with the

 6  injunction, correct?

 7  A.    Yes, sir.

 8  Q.    And you have to comply with the injunction that

 9  says you have to keep actual time for each employee,

10  correct?

11  A.    I don't think it said actual time.

12  Q.    It says you have to keep time for each employee,

13  correct?

14  A.    Yes, yes.

15  Q.    And earlier, the judge said each particular

16  employee, correct?

17  A.    Yes, sir.

18  Q.    And but you'll agree with me that gang-time and

19  K-code doesn't do that, right?

20  A.    Well, I don't know that I -- I probably do with

21  gang-time, I'm not sure K-code doesn't do that by

22  paying the time for those activities.

23  Q.    All right.  Well, you'll agree with me that

24  gang-time doesn't pay for each particular employee?

25  A.    Yes.
```

1   Q.    And even after this letter, IBP continued its

2   gang-time policy, correct?

3   A.    Yes, sir.

4   Q.    Next in your stack, do you see a July 16th

5   letter?  It's a couple months after the one we just

6   looked at.

7   A.    Yes, sir.

8   Q.    Is this another letter that you relied on in

9   terms of reaching what you call a settlement with the

10  Department of Labor?

11  A.    Yes, sir.

12  Q.    So this is a letter from July of 1999 from

13  someone in the Department of Labor's Solicitor's

14  Office, correct?

15  A.    Yes, sir.

16  Q.    And just to call your attention to the middle of

17  the last paragraph on the first page.

18  A.    Middle last paragraph?  Yes, sir.

19  Q.    Middle of the last paragraph on the first page

20  where it says, "As we discussed previously"?

21  A.    Yes, sir.

22  Q.    And here the Department of Labor is saying, "IBP

23  may continue its current practice with respect to

24  recording and compensating pre and post shift

25  compensable activities until such time as the

1  Department announces its position with respect to

2  recordkeeping in the industry."  (Quoted as read.)

3         Do you see that?

4  A.    I do.

5  Q.    And you understood that the Department of Labor

6  was telling you, you can keep paying K-code for now but

7  only until the Department of Labor announces its

8  position regarding how the meat processing industry can

9  pay, do you understand that?

10  A.    Yes, sir.

11  Q.    Do you also understand that the Department of

12  Labor wasn't changing or modifying the injunction that

13  had been entered by the court?

14  A.    Could they do that?  I mean --

15  Q.    Well, I guess that is my question.  Could they

16  do that, do you think?

17  A.    I don't think the Department of Labor could do

18  that.

19  Q.    Right.  The Department of Labor can't just

20  unilaterally change a court order telling you to keep

21  time, correct?

22  A.    Correct.

23  Q.    So you understood that you were still under the

24  court's injunction, no matter what the Department of

25  Labor said?

1   A.      Yes, sir.

2   Q.      Understanding that, you understand the

3   Department of Labor is saying you can do what you're

4   doing, but once the Department of Labor announces its

5   position regarding recordkeeping in the industry?

6   A.      Yes.

7   Q.      All right.  And didn't -- within a year and a

8   half or so of this, the Department of Labor announced

9   its position regarding recordkeeping in the industry?

10  A.      I think that is going to be our point of

11  contention.

12  Q.      Are we going to have a point of contention?

13  A.      I think so.

14  Q.      Okay.  Well, might as well get to it.

15  A.      There you go.

16  Q.      You are going to tell me that you don't think

17  the Department of Labor announced its position

18  regarding recordkeeping in the industry?

19  A.      I am probably going to tell you I heard about it

20  later but I never got it, is probably what I'm going to

21  tell you.

22  Q.      Well, let's just lay it out.

23  A.      Okay.

24  Q.      Let me hand you an opinion letter from the

25  Department of Labor dated January 15th of 2001.  Do you

71

1  see this?

2  A.     I do.

3  Q.     All right.  And you were aware of this document,

4  correct?

5  A.     I am now.  When you say I was aware of it, I'm

6  not sure what -- what you mean.

7  Q.     Well, okay.  You say you are aware of it now?

8  A.     Yes.

9  Q.     Tell the jury when you first became aware of it.

10  A.     Prior to a deposition in 2005, 2006, somewhere

11  in that time frame I think it was.

12  Q.     Okay.  It's your testimony that you first became

13  aware of the Department of Labor's position identified

14  in this opinion letter in 2005, 2006, is that right?

15  A.     I believe so, yes.

16  Q.     All right.  Well, let's just read for the jury

17  what the Department of Labor said in January of 2001.

18          Can you go to the second page, and read the

19  paragraph that starts, "Also a number."  Can you read

20  that?

21  A.     Yes, "Also a number of meat packing companies

22  have asked the Department if it would be permissible to

23  pay employees' wages based on an average amount of time

24  that all employees work.  I would like to reiterate

25  that in order to comply with the FLSA and its

 1 | implementing regulation" -- do I need to read what's in

 2 | paren?

 3 | Q.     No.

 4 | A.     Parenthesis?  "A company must record and pay for

 5 | each employee's actual hours of work.  Including

 6 | compensable time spent putting on, taking off, cleaning

 7 | his or her protective equipment, clothing or gear."

 8 | Q.     So you understood this letter to be identifying

 9 | the Department of Labor's position regarding

10 | recordkeeping, correct?

11 | A.     Yes, sir.

12 | Q.     Is that correct?

13 | A.     Yes, sir.

14 | Q.     And the Department of Labor says the companies

15 | have asked whether it is okay to pay an average amount

16 | of time, correct?

17 | A.     Yes.

18 | Q.     Which is what gang-time and K-code is, right?

19 | A.     Yes, sir.

20 | Q.     And the Department responds and reiterates that

21 | in order to comply with the FLSA and its implementing

22 | regulations, a company must record and pay for each

23 | employee's actual hours of work.  Did I read that

24 | right?

25 | A.     Yes, sir, I believe so.

1  Q.    And the Department of Labor is telling the meat

2  industry, actual hours must be kept and recorded,

3  correct?

4  A.    Yes.  That's what it says.

5  Q.    And it goes on to say, "Including compensable

6  time putting on, taking off, and cleaning his or her

7  protective equipment, clothing and gear," correct?

8  A.    Yes.

9  Q.    Now you'd agree with me that the Department of

10  Labor is announcing its position with regard to

11  recordkeeping, correct?

12  A.    Yes.

13  Q.    But are you saying although the Department

14  announced this position, it just went by you?  You

15  didn't pick it up?

16  A.    Well, I'm saying, first, I never got the

17  position letter.  No one from the Department of Labor

18  informed us or sent us this information.  That's the

19  first part.

20  Q.    Well, are you sure about that?

21  A.    Well, I'm -- yes, I'm pretty sure.

22  Q.    Wasn't the subject of this January 15th, 2001

23  opinion letter important to you?

24  A.    Well, we would be interested in knowing what the

25  DOL's position is, sure.

74

```
1   Q.    But more than that, didn't you, Mr. Kimbro,

2   personally lobby the Department of Labor for the

3   January, 2001 opinion letter?

4   A.    No, sir.

5   Q.    You don't recall in the Chavez case that this

6   issue came up?

7   A.    As I sit here, no, sir, I don't remember.

8   Q.    Let's see if we can refresh your recollection,

9   okay?

10        MR. MUELLER:  George, which page?

11        MR. HANSON:   It is going to be Footnote 50 of

12  the Chavez District Court opinion.

13  BY MR. HANSON:

14  Q.    Mr. Kimbro, I lost my page.

15  A.    Oh.  Thank you.

16  Q.    I'll just represent to you, Mr. Kimbro, that in

17  several places in the Chavez opinion letter -- I'm

18  sorry, let me back up.

19        In several places in the Chavez's trial

20  court's ruling your testimony is referred to, okay?

21  A.    Okay.

22  Q.    So, does that refresh your recollection that

23  you, in fact, did testify in the Chavez case?

24  A.    Let me read that and see if it does.  Right now

25  it still hasn't yet, but may be hope.
```

1        Where do I need to read from the bottom here,

2   January 15th.

3   Q.    I will read to you Footnote 50.

4   A.    Okay.

5   Q.    But we'll -- I just let you know there are a

6   couple of places in the trial court's opinion where it

7   references the testimony that you gave.

8   A.    Okay.

9   Q.    But, specifically, the court, you'll see,

10  starting in the paragraph on the bottom of Page 28

11  discusses the January 15th, 2001 opinion letter.

12  A.    January 15th, 2001 to Michael Kerr, is that what

13  you are referring to?

14  Q.    Yes.

15  A.    Okay.

16  Q.    It says, "T. Michael Kerr, the Administrator of

17  the Wage and Hour Division of the Department of Labor

18  issued a letter," do you see that?

19  A.    I do.

20  Q.    All right.  And can you just look at the

21  document I gave you, the opinion letter itself?

22  A.    Yes, sir.

23  Q.    And do you see that that also is from -- that is

24  from T. Michael Kerr?

25  A.    Yes, sir.

1   Q.    And you see it is also January 15th, 2001?

2   A.    I do.

3   Q.    Okay.  And here is what the court said in a

4   footnote regarding this January 15th, 2001 letter,

5   okay?

6   A.    Okay.

7   Q.    "Kenneth Kimbro, Tyson Food, Inc., Senior Vice

8   President of Human Resources who was employed by IBP as

9   the Human Resources Vice President in February of 2000,

10  personally lobbied the Department of Labor for the

11  January 15th, 2001 letter.  The letter, however, did

12  not change the Department's earlier position."

13          Do you see that?

14  A.    I do.

15  Q.    Mr. Kimbro, is that true?  Did you lobby the

16  Department of Labor for the January 15th, 2001 opinion

17  letter?

18  A.    Well, see, that's what is confusing.  We were

19  looking for an opinion on 3(o).

20  Q.    Right.  And a lot of what is in January 15th,

21  2001 letter deals with 3(o).

22  A.    Okay, okay.

23  Q.    And just so the jury knows 3(o) is a exception

24  or a part of the FLSA which allows collective

25  bargaining agreements to govern certain clothes

1  changing time, correct?

2  A.    Correct.

3  Q.    So 3(o) is a defense that companies like Tyson

4  might have if they have a union or a collective

5  bargaining agreement?

6  A.    Yes, sir.

7  Q.    There has never been a union at the Finney

8  County plant, correct?

9  A.    No, sir.

10  Q.    So 3(o) defense would never be applicable to

11  Finney County, correct?

12  A.    No, sir.

13  Q.    It might be applicable to some of Tyson's other

14  plants, correct?

15  A.    Yes, sir.

16  Q.    All right.  So that's correct, January 15th,

17  2001 does address 3(o) issues.  But it also addresses

18  the request for clarification regarding timekeeping

19  practices in the meat industry, doesn't it?

20  A.    The letter?  Yes, sir.

21  Q.    Right?

22  A.    Yes.

23  Q.    So it has a couple of subject matters it's

24  addressing, correct?

25  A.    Yes.

1   Q.    All right.  But here's my question.  Now that we

2   have clarified that the opinion letter addresses 3(o),

3   right?

4   A.    Mm-hmm.  Yes, sir.

5   Q.    And it addresses the Department's position

6   regarding recordkeeping, correct?

7   A.    Yes, sir.

8   Q.    This is my question:   Is it true as reflected

9   in the Chavez trial court's findings, that you

10  personally lobbied the Department of Labor for this

11  letter?

12  A.    Yes, sir.

13  Q.    Okay.  All right.  So you personally lobbied for

14  the letter, right?

15  A.    Or lobbied for guidance on 3(o) and, obviously,

16  I haven't read the entire letter but if it addresses

17  the 3(o) piece, then, yes.

18  Q.    Well, you can see in the first paragraph it

19  references in the first sentence it references 3(o)?

20  A.    I do.  I see that, yep.

21  Q.    And I'm not sure if you're disagreeing whether

22  you personally lobbied for the letter?

23  A.    No, no, I'm -- I am agreeing I did lobby for

24  guidance on 3(o).

25  Q.    So if the -- if the letter was important enough

1  to you to have personally lobbied for it --

2  A.    Mm-hmm.

3  Q.    -- do you think it's even plausible that you

4  would not have been aware of it for four or five years

5  after it was issued?

6  A.    I'm going to say I wasn't aware of it for three

7  or four years after it was issued.

8  Q.    For -- a letter that you personally lobbied for?

9  A.    Once again, I was lobbying for guidance on 3(o).

10 Q.    And it gave you guidance on 3(o), correct?

11 A.    Well, it appears to, yes.

12 Q.    All right.  And so you acknowledge that you got

13 that guidance on 3(o) when the letter came out,

14 correct?

15 A.    As I said, I didn't get the letter until three

16 or four years later.  I didn't see the letter until

17 three or four years later.

18 Q.    Mr. Kimbro, is it possible that you did get the

19 letter that you personally lobbied for and maybe just

20 can't remember it as you sit here today?

21 A.    Well, I think anything's possible but I don't

22 think that is probable.  I'm thinking if I got it I

23 would at least remember that.

24 Q.    You have agreed with me that it's quite helpful

25 to Tyson's defense in this case to testify that you

1  never got this letter until 2005 or 2006, right?

2   A.    Yes, I would agree with you.

3   Q.    And you would agree that would be quite helpful

4  to my clients if you acknowledge that you got this

5  letter back in 2001, correct?

6   A.    Yes, I would agree with that.

7   Q.    And you acknowledge that in Chavez, you

8  testified and the court found that you personally

9  lobbied for the letter?

10  A.    Yes, sir.

11  Q.    And do you really think it's plausible that you

12 weren't aware of the letter when it came out?

13  A.    Well, I'm telling you I wasn't.  I didn't know

14 about it.  I'm not trying to be argumentative, I just,

15 no, sir, I don't remember this letter.

16          THE COURT:  Mr. Hanson, what was the date of

17 the letter?

18          MR. HANSON:  January 15th, 2001.

19          THE COURT:  Thank you.

20 BY MR. HANSON:

21  Q.    Well, leaving aside whether as you sit here

22 today you can say that you received the letter or not

23 or when you did, you would agree that as of January

24 15th of 2001 the Department of Labor announced its

25 position with regard to recordkeeping practices?

1   A.     Yes.

2   Q.     And that position was average time is not

3   permissible, correct?

4   A.     Yes.

5   Q.     Actual time is required, correct?

6   A.     Yes.

7   Q.     And you'll acknowledge that Tyson did not change

8   from average time to actual time in 2001, correct?

9   A.     Correct.

10   Q.     And it didn't change from average time to actual

11   time in 2005, correct?

12   A.     Correct.

13   Q.     In fact, it didn't change once you became aware,

14   as you say, of the 2001 opinion letter, correct?

15   A.     Yes.

16   Q.     Can we assume that if Tyson did not change its

17   position when you say you became aware of the 2001

18   opinion letter in 2005, you wouldn't have changed in

19   2001 either, would you?

20   A.     No, sir.

21   Q.     The Reich litigation ended after more than ten

22   years of litigation with the Department of Labor in the

23   late '90s, early 2000s, correct?

24   A.     Yes, sir.

25   Q.     That Reich litigation ultimately resulted in IBP

1  paying backpay to its workers, correct?

2  A.    Yes, sir.

3  Q.    But Reich isn't the only litigation involving

4  donning and doffing and beef processing facilities,

5  correct?

6  A.    No, sir.

7  Q.    Okay.  We talked about Alvarez and Chavez,

8  correct?

9  A.    Yes, sir.

10        MR. HANSON:  And, Your Honor, probably a good

11 place to take a short break, about to switch into a --

12        THE COURT:  All right.  Members of the jury,

13 we'll be in recess until 9:50.  9:50.

14        I remind you, you're not to discuss this case

15 or any aspect of it among yourselves or with anyone

16 else.  No independent investigation.  See you back here

17 in a bit.

18        Mr. Kimbro, you can step down.

19        THE WITNESS:  Thank you.

20        THE COURT:  Certainly.

21        (The jury leaves the courtroom.)

22        THE COURT:  All right.  Counsel, I'll see you

23 back here in 20 minutes.

24        (Recess taken from 9:30 a.m. until 9:50 a.m.

25        proceedings then continue in open court.)

```
 1            THE COURT:  Members of the jury, just go ahead
 2  and have a seat.
 3            Folks, you can all have a seat as well.
 4            Mr. Hanson, you may proceed.
 5            MR. HANSON:  Thank you, Judge.
 6  BY MR. HANSON:
 7  Q.    Mr. Kimbro, do you still -- sorry, do you still
 8  have the January 15th, 2001 opinion letter in front of
 9  you?
10  A.    I do.
11  Q.    The paragraph that immediately precedes the one
12  that talks about the Department's position on
13  recordkeeping practices in the industry, I just want to
14  call your attention to that, if I might.
15  A.    Page 2?
16  Q.    It is actually it's on the bottom of Page 1,
17  continuing to Page 2?
18  A.    Okay.
19  Q.    And this is in the same opinion letter that we
20  discussed, correct?
21  A.    Yes, sir.
22  Q.    The one that you lobbied for, correct?
23  A.    Yes, sir.
24  Q.    And in the paragraph begins at the bottom of
25  page one the Department says, "In addition, I would
```

1   like to take this opportunity to reiterate, as we

2   discussed in our earlier meetings, that under the FLSA

3   and the Portal to Portal Act it is the Department's

4   longstanding position that as a general matter,

5   compensable hours worked include all time from the

6   moment each employee performs the first principle

7   activity of the employee's work day until the last

8   principle activity is concluded, less any bona fide

9   meal periods or bona fide off-duty time.  An employer

10  must compensate its employees for any activity that is

11  integral and indispensable" -- sorry -- "that is an

12  integral and indispensable part of the employee's

13  principle activities, including the putting on, taking

14  off, and cleaning of personal protective equipment,

15  clothing, or gear that is required by law, by rules of

16  the employer, or by the nature of the work.  It should

17  also be noted that the meal period may not include any

18  time performing work and that time spent donning and

19  doffing of personal protective equipment, clothing or

20  gear, before or after the meal period, is compensable".

21  (Quoted as read.)

22          Did I read that correctly?

23  A.    Yes, sir.

24  Q.    Did Tyson make any changes to its pay practices

25  or policies in Finney County after it received this

1  January, 2001 letter?

2  A.    No, sir.

3  Q.    Or after it became aware of this January, 2001

4  letter?

5  A.    No, sir.

6  Q.    All right, I'm just going to just discuss with

7  you a couple of other cases that were introduced before

8  we took our break.

9        You remember that we talked about <u>Chavez</u>

10 <u>versus IBP</u>, correct?

11 A.    Yes, sir.

12 Q.    And that was a donning and doffing case that

13 arose out of Tyson's Washington beef processing

14 facility, correct?

15 A.    Yes, sir.

16 Q.    And it's called the Pasco, Washington facility,

17 correct?

18 A.    Yes, sir.

19 Q.    And you understand that the issues were donning

20 and doffing activities, same as in this case?

21 A.    Yes, sir.

22 Q.    And that in Pasco, the workers were paid on

23 gang-time, correct?

24 A.    Yes, sir.

25 Q.    And they were also paid an additional four

1  minutes of K-code, correct?

2  A.    Yes, sir.

3  Q.    And you do recall now that you testified in

4  Chavez?

5  A.    Yes, sir.

6  Q.    And just like in this case, you were asked by

7  Tyson to testify on the issue of willfulness, right?

8  A.    Well, um, what I remember is it's obvious that I

9  testified, and I honestly can't remember what that was,

10 so if you could refresh my memory, I'd appreciate it.

11 Q.    Well, I'd be happy to.

12 A.    Thank you.

13 Q.    One of the things that you testified about was

14 your belief that the uncompensated work in question was

15 di minimis as a matter of law, do you remember that?

16 A.    Yes, sir.

17 Q.    And that is a defense -- that is a defense that

18 Tyson has raised in this case, correct?

19 A.    Yes, sir.

20 Q.    That the uncompensated work is too small to

21 matter, correct?

22 A.    Yes, sir.

23 Q.    Can you turn to Page 27 of the Chavez opinion?

24 A.    Yes, sir.

25 Q.    So this is from the trial court's ruling in

Jana L. Hoelscher, CSR, RPR, CRR, RMR
United States Court Reporter

1   Chavez from May of 2005, correct?

2   A.     Yes, sir.

3   Q.     Okay.  Do you see the section that starts Roman

4   Numeral IV on the statute of limitations which

5   discusses willful violations?

6   A.     I do.

7   Q.     And do you see in the second paragraph the

8   statement, "The court finds that Tyson's violation of

9   the FLSA were willful."  (Quoted as read.)

10          Do you see that?

11  A.     The second paragraph, you said?

12  Q.     Second paragraph, under Roman Numeral IV?

13  A.     Okay.  Yes.

14  Q.     So the -- the Chavez court found Tyson's

15  violation of the FLSA to be willful, correct?

16  A.     Correct.

17  Q.     And do you see in the next paragraph your name?

18  A.     I do.

19  Q.     And some testimony that was part of the court's

20  finding regarding willfulness?

21  A.     Yes, sir.

22  Q.     Can you just read the first sentence --

23  actually, the first two sentences for us, please?

24  A.     Where it starts with "Kenneth Kimbro"?

25  Q.     Right.

1   A.    Yes, sir.  "Kenneth Kimbro, Tyson's Senior Vice

2  President of Human Resources testified that he believed

3  that a combination of policy changes had reduced

4  uncompensated work time to a di minimis amount."

5  (Quoted as read.)

6   Q.    Next sentence, please.

7   A.    "The Court finds that this belief was reckless,

8  moreover, the Court finds that Tyson's belief that the

9  gap time" --

10   Q.    I'm sorry, I just wanted those first two

11  sentences.

12   A.    Oh, I apologize.

13   Q.    That's fine.

14        So do you recall, Mr. Kimbro, that when you

15  testified in Chavez, that you testified that you

16  believed the amount of time in question was di minimis,

17  correct?

18   A.    Yes.

19   Q.    And you recall that the Court found your

20  testimony in that regard to be reckless?

21   A.    Yes, sir.

22   Q.    Agree or disagree?

23   A.    No, I agree.  Yes, sir, I remember this now.

24   Q.    At the end of that paragraph, I'll just read

25  this last sentence "In all, Tyson's actions may be more

1  properly characterized as attempts -- as attempts to

2  evade compliance or to minimize the actions necessary

3  to achieve compliance.  For that reason the court finds

4  that Tyson's violations of the FLSA were willful."

5  (Quoted as read.)

6          Do you see that?

7  A.    Yes, sir.

8  Q.    So you understand that the court in Chavez,

9  relying on your testimony, found Tyson to have --

10 Tyson's conduct to have been willful, right?

11 A.    Yes, sir.

12 Q.    And that made an impression on you, didn't it?

13 A.    Yes, sir.

14 Q.    And did Tyson, in Finney County now, change any

15 of its policies or practices after the Chavez court

16 found Tyson's conduct to be willful in that donning and

17 doffing case?

18 A.    No, sir, I don't believe so.

19 Q.    And the Chavez case ultimately resulted in Tyson

20 making back payments for unpaid wages to its production

21 workers?  Correct?

22 A.    Yes, sir.

23 Q.    We mentioned the case Alvarez, do you recall

24 that?

25 A.    Yes, sir.

1  Q.    All right.   Alvarez also was a donning and

2  doffing case out of the beef processing plant that

3  Tyson operated in Pasco, Washington, correct?

4  A.    Yes, sir.

5  Q.    Sir, I'm going to go ahead and hand you -- I'm

6  going to hand you the three cases that came out of the

7  Alvarez litigation, okay?

8  A.    Okay.

9  Q.    There you go.

10 A.    Thank you.

11 Q.    Sir, you recall that Alvarez actually began

12 before the Chavez case, correct?

13 A.    Yes, sir.

14 Q.    But it concluded later, because there were a

15 series of appeals, correct?

16 A.    Yes, sir.

17 Q.    And in fact, Alvarez was a case that Tyson took

18 all the way up to the United States Supreme Court,

19 correct?

20 A.    Yes, sir.

21 Q.    And you recall that you did testify in Alvarez,

22 correct?

23 A.    Yes, sir.

24 Q.    And on subject matter very similar to the

25 subject matter in Chavez, correct?

1   A.   Yes, sir.

2   Q.   Would you turn to Page 7 of the trial court's

3   initial Findings of Fact and Conclusions of Law.

4   A.   Yes, sir.

5   Q.   Okay.  And this was, if you look at the front

6   page you can see that this court finding was issued in

7   September of 2001, correct?

8   A.   Yes, sir.

9   Q.   And here, Tyson also had a trial in front of the

10  judge, correct?

11  A.   Yes, sir.

12  Q.   And you testified at that trial, correct?

13  A.   Yes, sir.

14  Q.   All right.  If you look on Page 7, again under

15  the heading Statute of Limitations, correct?

16  A.   Yes, I see it.

17  Q.   All right.  And it says, "Under the FLSA, the

18  statute of limitations for willful violations is three

19  years?"

20  A.   Yes.

21  Q.   "A violation is willful if the employer knew or

22  showed reckless disregard for the matter of whether his

23  conduct was prohibited by the FLSA."  Do you see that?

24  A.   I do.

25  Q.   Okay.  And that's what you were called to

1  testify about in <u>Alvarez</u>?

2   A.    Yes, sir.

3   Q.    And you'll see in the next sentence the court

4  found IBP's violations herein were willful?  Do you see

5  that?

6   A.    I do.

7   Q.    All right.  And then the second sentence

8  down -- actually, let me go to the third sentence down.

9          Do you see your name is referenced again?

10  A.    I do.

11  Q.    Okay.  Can you just read that single

12 sentence -- well, I'll just read it and you tell me if

13 I'm right.

14  A.    Okay.

15  Q.    "Kimbro recklessly assumed that employees spent

16 only one or two minutes in meal break donning and

17 doffing."  (Quoted as read.)

18          Do you see that?

19  A.    I do.

20  Q.    And do you see that the court's findings

21 regarding a reckless assumption that you made were part

22 of the court's overall conclusion of willfulness?

23  A.    I do.

24  Q.    And that was back in 2001, correct?

25  A.    Yes, sir.

1  Q.    And you were aware of this opinion when it came

2  out, correct?

3  A.    Yes, sir.

4  Q.    And it went in to your thinking about whether

5  Tyson should be changing its policies, correct?

6  A.    Yes, sir.

7  Q.    But you didn't change any policies or practices

8  at Finney County, did you?

9  A.    No, sir.

10 Q.    If you could turn to the next document there,

11 you'll see it's the appeal.  And, Mr. Kimbro, after the

12 bench trial, IBP, Tyson -- and this is right when Tyson

13 acquired IBP, correct?

14 A.    Yes.

15 Q.    But you were -- you were there through all of

16 this litigation, right?

17 A.    Yes.

18 Q.    IBP Tyson didn't resolve the Alvarez case after

19 the trial court's finding, correct?  It took an appeal?

20 A.    Yes, sir.

21 Q.    Let's just take a quick look at what the appeal

22 court told us.

23        Can you turn to Page 15.

24        If you go to the -- under Roman Numeral VI on

25 the second half of the page on the right, the first

1  full paragraph which begins "to prove a particular FLSA

2  violation"?

3  A.    I see that.

4  Q.    And again, you understand that the appellate

5  court is now reviewing the district court's finding of

6  willfulness, correct?

7  A.    Yes, sir.

8  Q.    And just the last sentence states -- and this is

9  the court's, appellate court's ruling "We agree with

10 the District Court and concluded that the proof

11 demonstrates that IBP recklessly disregarded the

12 possibility that it was violating the FLSA."  (Quoted

13 as read.)

14        Did I read that correctly?

15 A.    You did.

16 Q.    And then in the next paragraph, starting with

17 the second sentence, "IBP was on notice of its FLSA

18 requirements, yet took no affirmative action to assure

19 compliance with them.  To the contrary, IBP's actions

20 may more properly be characterized as attempts to evade

21 compliance or to minimize the actions necessary to

22 achieve compliance."  (Quoted as read.)

23        Do you see that?

24 A.    I do.

25 Q.    And those comments from a Federal Appellate

1  Court had to have an impact on your thinking about

2  compliance, right?

3  A.    Yes.

4  Q.    And this ruling was issued in August of 2003,

5  correct?

6  A.    Yes.

7  Q.    If you look at the first page.

8        You understand in August of 2003, is just a

9  little bit after the limitations period at issue in

10 this case.  We go back to May of 2003, correct?

11 A.    Yes, I know that, yes.

12 Q.    But no changes were made at Finney County?

13 A.    No, sir.

14 Q.    All right.  And then the final document in front

15 of you?

16 A.    Yes.

17 Q.    This is the final appeal in the Alvarez case,

18 correct?

19 A.    Yes.

20 Q.    Tyson did not accept the appellate court's

21 ruling, correct?

22 A.    Correct.

23 Q.    It took an appeal to the United States Supreme

24 Court?

25 A.    Yes, sir.

96

1   Q.    And you understand that the United States

2   Supreme Court affirmed the Appellate Court?

3   A.    Yes, sir.

4   Q.    Do you know what the -- what the voting was in

5   the Alvarez IBP Tyson case by the judges?

6   A.    In the Supreme Court?

7   Q.    Yeah.

8   A.    I'd be -- I'd be guessing.  No, I don't

9   remember.

10  Q.    Do you know whether there was a single descent?

11  A.    I think it was unanimous, but I'm not sure.

12  Q.    Can I confirm you, it was unanimous?

13  A.    Okay.

14  Q.    Nine zero, to uphold the lower court against

15  Tyson, do you understand that?

16  A.    Yes.

17  Q.    Okay.  Do you have an idea of how many times our

18  Supreme Court can get together nine zero?

19          MR. MUELLER:  Objection.

20          MR. HANSON:  I'll withdraw.

21          MR. MUELLER:  It's argumentative.

22          MR. HANSON:  I'll withdraw it.

23          THE COURT:  Sustained.

24  BY MR. HANSON:

25  Q.    But you did understand that the Supreme Court

Jana L. Hoelscher, CSR, RPR, CRR, RMR
United States Court Reporter

1  unanimously affirmed the appellate court?

2   A.     That's what I believe, yes.

3   Q.     Okay.  And you understand that in the Supreme

4  Court opinion, the judge -- the justices reaffirmed the

5  continuous workday rule, you aware of that?

6   A.     Yes, sir.

7   Q.     So the decision by the United States Supreme

8  Court -- and let's just get the date set.  It was

9  November 8 of 2005, is that correct?

10  A.     Yes.

11  Q.     The unanimous opinion of the United States

12 Supreme Court that reaffirmed the continuous workday

13 rule, did that have an impact on your thinking about

14 compliance?

15  A.     Yes.

16  Q.     But it's true that this ruling did not, at least

17 immediately, change your policies or practices at

18 Finney County, correct?

19  A.     No, not immediately, yes.

20  Q.     You did not start keeping actual time, correct?

21  A.     No.

22  Q.     You were still paying on a gang-time or an

23 average time, correct?

24  A.     Yes.

25  Q.     Now, after all the appeals were exhausted in

1  Alvarez, that litigation resulted in backpay being made

2  to the workers covered by Alvarez, correct?

3  A.    Yes.

4  Q.    The workers in --

5  A.    Pasco.

6  Q.    In Pasco, Washington?

7  A.    Yes, sir.

8  Q.    But you did not pay any of the Finney County

9  workers as a result of the outcome in Alvarez?

10        Let me clarify that question.

11  A.    Okay.

12  Q.    You didn't pay them backpay, correct?

13  A.    Well, I -- we did pay backpay at Finney County.

14  Q.    Can you explain that to us?

15  A.    Well, yeah, I thought when -- after the Supreme

16  Court case we did our time studies and we came up with

17  an average on walk time and we were delayed in

18  implementing it in Finney County until August and then

19  we did go back to January, I -- is my memory --

20  Q.    Okay.  Now I understand.

21  A.    Is that -- yes.

22  Q.    Ms. Litras was here just a couple days ago and

23  testified that although the policy to start counting

24  for the up to seven minutes occurred --

25  A.    Yes.

1   Q.     -- in January of 2008, the payments themselves

2   were not made until August, correct?

3   A.     That's correct.

4   Q.     And I appreciate that.  So there was some

5   retroactive pay?

6   A.     Yes, sir.

7   Q.     But in January of 2008, that's when the policy

8   change was effective, correct?

9   A.     Yes.

10          MR. MUELLER:  Objection.

11          MR. HANSON:  You did not --

12          MR. MUELLER:  Objection.  I think he misspoke.

13   You said '08.

14          MR. HANSON:  I meant -- sorry, I did misspeak.

15          THE COURT:  You want to rephrase that then?

16          MR. HANSON:  Yeah.

17          THE COURT:  Sustained.

18          MR. HANSON:  Thanks.

19   BY MR. HANSON:

20   Q.     The policy to add up to seven minutes became

21   effective in January of 2007, correct?

22   A.     Yes.

23   Q.     But Tyson did not make back payments to account

24   for any walking time prior to January of 2007, correct?

25   A.     Correct.

1  Q.    And you understand that the Supreme Court in

2  this _Alvarez_ opinion was telling Tyson, you have to pay

3  for walk time, correct?

4  A.    Yes.

5  Q.    And you agree that up 'til January of 2007, the

6  four minute K-code was not paying for that walk time,

7  correct?

8  A.    Correct.

9  Q.    Do you remember the example I gave earlier about

10 if -- if you know that minimum wage requires you to pay

11 as of a certain date but just because you don't have

12 the mechanisms in place to start paying, maybe there's

13 a payroll issue, and you're delayed in getting the

14 compliance implemented, you agreed with me that you

15 have to go back and make backpay, correct?

16 A.    Yes, sir.

17 Q.    Can you explain to us how this situation is any

18 different?

19 A.    You are talking about with in regards to Finney

20 County?

21 Q.    Yes.

22 A.    And the official minutes for walking time.

23 Q.    Yeah, I'm talking about the United States

24 Supreme Court in November of 2005 telling Tyson it's

25 got to pay for walking time and admits it hasn't paid

1  for.  What's the rationale for not making back payments

2  when you know what the law is?

3  A.    Mm-hmm.  Well, I think at that time in Finney

4  County we were focussed on finding out how much the

5  walk time was so we did our studies and then when we

6  made our implementation, we were focussing on a go

7  forward basis.  All the focus was on around

8  implementing the time and paying the people for the

9  time on a go forward basis.

10  Q.    But none of the focus was on going back and

11  making sure that any payments for walk time that was

12  missed was made up for in backpay?

13  A.    That's correct.

14  Q.    And who -- who's responsible for that lack of

15  focus on going back and making sure the law, as you

16  know it, is complied with in terms of back payments?

17  Who's kind of decision was that?

18  A.    I don't know there was a conscious decision one

19  way or the other, we were just focussed on

20  implementing.

21  Q.    So is it true you didn't give any thoughts to

22  making back payments?

23  A.    No, sir, we didn't.

24  Q.    You acknowledge you could have, correct?

25  A.    Could have thought about it?  Or did it?  Yes.

1   Q.    Well, you certainly could have thought about it?

2   A.    Yes.

3   Q.    You didn't?

4   A.    Didn't.

5   Q.    Right?  And you certainly could have done it,

6   meaning actually made back payments?

7   A.    Yes.

8   Q.    And in fact, you added one, two, or three

9   minutes to the K-code folks, kind of depending on how

10  far they walked within the facility, correct?

11  A.    Yes, sir.

12  Q.    And you could have easily, after determining how

13  many minutes should be attributed to each worker, you

14  could have easily made those calculations and made back

15  payments, couldn't you?

16  A.    Yes, sir.

17  Q.    You just didn't do it?

18  A.    That's right.

19  Q.    I just want to get the time frames clear here.

20        In November, the Supreme Court tells you you

21  have to be paying for walk time, correct?

22  A.    Correct.

23  Q.    And you understand that the Supreme Court is

24  ruling on a requirement of the FLSA, correct?

25  A.    Yes.

1   Q.    You understand that the Supreme Court isn't

2   announcing like a new law; the FLSA has been in place

3   since 1938, correct?

4   A.    Yes, sir.

5   Q.    They're just interpreting the law to require

6   certain things, correct?

7   A.    Yes, sir.

8   Q.    The company spends the entire year of 2006

9   evaluating how far people walk in facilities, is that

10  your testimony?

11  A.    Yes, sir.

12  Q.    And although the policy becomes effective

13  January of 2007, actual back payments are not made

14  until -- and the back payments that are made, go back

15  to the date of the policy was effective, in January,

16  correct?

17  A.    Yes.

18  Q.    So actual payments are not made until about

19  August of 2007, correct?

20  A.    Yes.

21  Q.    Would you agree that 21 months elapsed between

22  when you became aware of the Supreme Court's ruling in

23  Alvarez and when the company started paying for walking

24  time under the Alvarez opinion?

25        Would you agree that 21 months elapsed?

1  A.     In Finney County, yes.

2  Q.     That's all this case is about, you understand?

3  A.     Okay, I'm sorry.

4  Q.     No, that's fine.  You recall that in November of

5  2002 another donning and doffing case was filed against

6  Tyson coming out of a beef and pork facility in

7  Goodlettsville, Tennessee?

8  A.     Yes.

9  Q.     You recall that that case was called Jordan?

10 A.     Yes.

11 Q.     And I think you told us earlier you do recall

12 testifying in Jordan?

13 A.     Yes.

14 Q.     And you understand that same basic facts as

15 involved in this case, correct?

16 A.     Yes.

17 Q.     A donning and doffing case?

18 A.     Yes.

19 Q.     Sir, I am just going to hand you the opinion the

20 Court issued in Jordan, all right?

21        Do you see that the court issued a ruling in

22 Jordan in March of 2008, correct?

23 A.     Yes.

24 Q.     And you were aware of this opinion when it came

25 out, correct?

1   A.     Yes.

2   Q.     Do you recall in this opinion the court found as

3   a matter of law that the donning and doffing of the

4   frock started and ended the continuous workday?

5   A.     Yes.

6   Q.     That ruling didn't cause you to change your

7   practice in his Finney County, did it?

8   A.     No, sir.

9   Q.     Do you recall also how the court characterized

10  Tyson's conduct in that case?

11  A.     No, sir.

12  Q.     Let's refresh.  If we could go to Page 7.

13         You see under the heading "Background"?

14  A.     Yes, sir.

15  Q.     This is an opinion that you were aware of,

16  right?

17  A.     Yes, sir.

18  Q.     Okay.  Here's what the court says, "This case

19  represents yet another chapter in a long history of

20  litigations that span multiple floor remarks all of

21  which involve one or both of the defendants here, and

22  the question of whether their compensation practice

23  practices violate the Fair Labor Standards Act.  These

24  defendants individually or collectively have now been

25  litigating this same issue for decades reflecting what

1    can only be described as a deeply entrenched resistance

2    to changing their compensation practice toss comply

3    with the requirements of the FLSA."  (Quoted as read.)

4    Did I read that correctly?

5    A.    Yes, sir.

6    Q.    So when a federal court characterized Tyson's

7    conduct as "deeply entrenched resistance to

8    compliance," is that a statement that you agree with or

9    disagreed with?

10   A.    I believe I would disagree with it.

11   Q.    Well, and you understand that this court is

12   basically characterizing conduct that is ultimately

13   your responsibility for the company, correct?

14   A.    Yes, sir.

15   Q.    Just as the Alvarez courts characterized Tyson's

16   conduct, correct?

17   A.    Yes.

18   Q.    And the Chavez courts?

19   A.    Yes.

20   Q.    But you didn't recommend changes at this time,

21   did you?

22   A.    No, sir.

23   Q.    And, Mr. Kimbro, you're aware that at the

24   conclusion of the Jordan case, Tyson paid backpay to

25   production workers, correct?

1    A.    Yes, sir.

2    Q.    Sir, I am going to put up a slide that Tyson's

3    counsel showed the prospective jurors during opening.

4          And just the second bullet point.

5          Says, "Tyson Foods started paying for extra

6    time for knife users when the Department of Labor sued

7    and the Court ordered it."  (Quoted as read.)

8          Do you see that?

9    A.    Yes.

10   Q.    Do you see the next bullet point, "The DOL has

11   never had an issue since?"   (Quoted as read.)

12         Do you see that?

13   A.    Yes, sir.

14   Q.    Isn't it true, Mr. Kimbro, that the Department

15   of Labor continued to have issues with Tyson Foods,

16   correct?

17   A.    How so?

18   Q.    Well, didn't the Department of Labor sue Tyson

19   in 2002 over donning and doffing practices?

20   A.    Are you referencing the Jordan case?

21   Q.    No, the case I'm referring is the Chao case?

22   A.    Oh, yes, sir.

23   Q.    So --

24   A.    Yes, sir.

25   Q.    So the Department of Labor didn't go away, did

1   it?

2   A.      No, sir.

3   Q.      In fact, the Department of Labor kind of

4   switched its focus from Tyson's beef plants and started

5   focussing on its poultry plants, correct?

6   A.      Yes, sir.

7   Q.      You told us earlier that the same law under the

8   Fair Labor Standards Act applies equally to Tyson's

9   poultry plants, as it does to its beef plants, correct?

10  A.      Yes, sir.

11  Q.      So, you're aware that in 2002 the Department of

12  Labor filed a case against Tyson in its poultry plants

13  that was almost identical to the litigation it had

14  filed more than a decade earlier in the <u>Reich</u> case,

15  correct?

16  A.      Yes.

17  Q.      And that the case involved, the new case,

18  involved donning and doffing of hard hats, earplugs,

19  hair nets, sanitary outer garments, correct?

20  A.      I don't think there was hard hats but, yes, I

21  agree with what you characterize.

22  Q.      You don't think there were hard hats in the

23  poultry facilities?

24  A.      No, sir, I don't believe so.

25  Q.      Are you sure about that?

1   A.      Relatively confident.  I'm not sure of a lot of

2   things but I'm relatively confident of it.

3   Q.      Okay.  I understand that in terms of the frocks,

4   hair nets, earplugs, those kinds of things were the

5   subject of the --

6   A.      Yes.

7   Q.      -- the poultry litigation, correct?

8   A.      Yes, sir.

9   Q.      You do recognize that in the poultry facilities,

10  the production workers wear quite a bit less gear than

11  they do in the beef facilities, correct?

12  A.      Yes, sir.

13  Q.      As a result of the Chao litigation, has Tyson

14  changed its pay practices in its chicken facilities?

15  A.      Yes, sir.

16  Q.      And, in fact, as a result of that litigation,

17  the company is in the process of starting to pay for

18  actual time worked, correct?

19  A.      Yes, sir.

20  Q.      In fact, the company is moving towards paying

21  punch to punch on a time clock, correct?

22  A.      Swipe to swipe, and, yes, sir.

23  Q.      Swipe to swipe and punch to punch are the same

24  things?

25  A.      Yes, sir.

1   Q.    So the company is moving towards that

2   compliance, correct?

3   A.    Yes, sir.

4   Q.    But even though in the chicken facilities you're

5   moving towards paying swipe to swipe or punch to punch,

6   you're not doing that in Finney County, are you?

7   A.    No, sir.

8   Q.    You're continuing to pay gang-time, correct?

9   A.    Yes, sir.

10  Q.    Continuing to pay gang-time plus K-code,

11  correct?

12  A.    Yes, sir.

13  Q.    Continuing to pay average time instead of actual

14  time?

15  A.    Yes, sir.

16  Q.    There are more lawsuits pending against Tyson,

17  aren't there?

18  A.    Yes, sir.

19  Q.    Do you know how many?

20  A.    I would be guessing.

21  Q.    Too many to count?

22  A.    No, I don't think there's too many to count, I'm

23  just not sure of the number.

24  Q.    Just, let's just talk about the cases against

25  Tyson out of its beef facilities.

1          Have you a ballpark idea of how many are

2   currently pending?

3   A.     Once again, I'd be guessing.

4   Q.     Do you think it's about ten?

5   A.     The beef facilities?

6   Q.     Yeah.

7   A.     That seems high, but I don't know.

8   Q.     Okay.  Can you give me -- can you give me your

9   best understanding of how many pieces of current

10  litigation are pending against Tyson for donning and

11  doffing out of its beef facilities?

12  A.     Once again, I'd be guess -- I'm not sure.

13         MR. HANSON:  Can we pull up the chronology

14  slide just one more time?

15  BY MR. HANSON:

16  Q.     Mr. Kimbro, we're just back to our timeline.

17  You see that?

18  A.     Yes.

19  Q.     And I just want to talk to you a little bit

20  about the 2010 change in adding additional minutes,

21  okay?

22  A.     Yes, sir.

23  Q.     And this is the final change that Tyson has made

24  to K-code, correct?

25  A.     Yes, sir.

1  Q.    And you were a decision maker in making this

2  change, correct?

3  A.    Yes, sir.

4  Q.    Do you think that change, adding up to 22

5  minutes, is fully compliant with the FLSA?

6  A.    Yes, sir.

7  Q.    Do you have any doubt about that?

8  A.    No, sir.

9  Q.    Do you have any concern about whether it is in

10  compliance?

11  A.    I have a lot of concerns about a lot of things,

12  but I mean, no, I --

13  Q.    I don't mean about anything and everything?

14  A.    Okay.

15  Q.    We all have concerns.  But I'm just talking

16  about compliance with the Fair Labor Standards Act?

17  A.    No, I believe it's compliant in Finney County.

18  Q.    In order to go to 22 minutes of K-code time,

19  Tyson realigned the work day, you're familiar with

20  phrase?

21  A.    Yes, sir.

22  Q.    And you're aware that in realigning the work

23  day, Tyson added an additional 15 minutes of K-code

24  time, correct?

25  A.    Yes, sir.

1    Q.    So the total is now 22, correct?

2    A.    Yes, sir.

3    Q.    So there's 15 more minutes of clothes changing

4  and walk time, correct?

5    A.    Yes, sir.

6    Q.    And that's paid time, right?

7    A.    Yes, sir.

8    Q.    In realigning the work day, you understand that

9  Tyson made the decision to take what had previously

10 been a paid break and made 15 minutes of it unpaid,

11 correct?

12   A.    Yes, sir.

13   Q.    So you would agree with me that Tyson, in

14 realigning the work day, basically offset minutes it

15 was paying for as part of a break, against 15 minutes

16 of now paid clothes changing and walking time, correct?

17   A.    Yes, sir.

18   Q.    Basically a one for one offset, correct?

19   A.    Yes, sir.

20   Q.    Did you have any concerns about realigning the

21 work day to make what had previously been a paid

22 15-minute break, unpaid?

23   A.    Concerns meaning?

24   Q.    Did you have doubts about that?

25   A.    Can you give me a point of reference?  I mean

1  doubts about it?

2  Q.    Well, you're here to testify about Tyson's state

3  of mind?

4  A.    Mm-hmm.

5  Q.    And so far, you have been saying you don't have

6  concerns, you've always believed Tyson's been fully

7  compliant, correct?

8  A.    Yes.

9  Q.    And that's what I am trying to test now is your

10  state of mind regarding the realignment of the work

11  day.  Okay?

12  A.    Okay.

13  Q.    Would you agree with me that you were taking

14  some chances by taking what had previously been a paid

15  break and making it unpaid?

16  A.    As it pertains to the FLSA?

17  Q.    Yes?

18  A.    Or -- no, I didn't -- no, I was concerned how

19  the employees may feel about it.

20  Q.    Well, sure.  You might have been concerned that

21  the employees may not respond well to having a paid

22  break taken away, correct?

23  A.    Yes.

24  Q.    And, in fact, Tyson expanded the length of the

25  work day, correct?

```
 1   A.     Yes, sir.

 2   Q.     As part of its realignment, correct?

 3   A.     Yes.

 4   Q.     But at least for many, many employees, their pay

 5   didn't change at all, correct?

 6   A.     That's correct.

 7   Q.     Just regarding the last break and the

 8   realignment, do you know how long the chain stops for

 9   the rest break now?

10   A.     It's 25 minutes, isn't it?

11   Q.     Okay.

12   A.     I believe that's right.

13   Q.     When I say the chain stops --

14   A.     Production ceases.

15   Q.     Right.  There is a gap in the production line?

16   A.     Yes.

17   Q.     And you agree with me that 20 minutes of that

18   rest break is uncompensated, correct?

19   A.     Yes.

20   Q.     And there is five minutes attributed to donning

21   and doffing, correct?

22   A.     Five minute -- yeah, five minutes at break is

23   paid to cover any of those activities.

24   Q.     Five minutes of the rest break is paid to cover

25   donning and doffing, walking?
```

1   A.     Yes, sir.

2   Q.     We'll go back to Exhibit 231 for a moment.

3          There is some language in here that kind of

4   repeats itself when Tyson makes its changes in 2010.

5          So when Tyson, then IBP went to the four

6   minute rule, it characterized those changes as

7   conservative, is that right?

8   A.     This approach -- are you referring to in order

9   to -- in order to approach this issue in a conservative

10  manner?

11  Q.     Yeah, let me just go ahead and identify the

12  sentence.  This is in your memo, you write, "While IBP

13  believes time associated with these activities may be

14  di minimis and thus not compensable, IBP has decided in

15  order to approach this issue in a conservative manner,

16  IBP will compensate for this time."  (Quoted as read.)

17         Do you see that?

18  A.     Yes.

19  Q.     And you believe that was a accurate statement of

20  Tyson's state of mind at the time that it is

21  approaching these issues in a conservative manner?

22  A.     Yes, sir.

23  Q.     And that, to me, means you're erring on the side

24  of compliance, correct?

25  A.     Yes, sir.

1  Q.    You're trying to leave no doubt or no concern

2  that you're in compliance, correct?

3  A.    Yes, sir.

4  Q.    Similarly, let me show you what's previously

5  been admitted as Exhibit 251.

6        This is a memorandum from Paul Karkiainen.  Do

7  you know who Mr. Karkiainen is?

8  A.    I do.

9  Q.    For a long time he was the plant manager for

10 Finney?

11 A.    Yes, he was.

12 Q.    So he writes a memo March, 2010 regarding

13 changes in the work day, do you see that?

14 A.    I do.

15 Q.    Let me just call your attention to this

16 language.  "While the company believes time associated

17 with these activities is paid appropriately or may be

18 di minimis, and therefore compensable, the company has

19 decided to approach this issue in a conservative

20 manner."  Do you see that?

21 A.    Yes, sir.

22 Q.    Sounds quite a bit familiar from the other?

23 A.    It does.

24 Q.    From the earlier memo, right?

25 A.    Yes.

1    Q.    Did you -- did you actually write Mr.

2  Karkiainen's memo?

3    A.    Probably had part in writing the draft that was

4  ultimately converted in to Mr. Karkiainen's memo, yes.

5    Q.    So you had a hand in how the changes in 2010

6  were being characterized, correct?

7    A.    Yes.

8    Q.    And this memo went to all team members, correct?

9    A.    Yes.

10   Q.    And in this memo Tyson is telling its hourly

11  team members that we don't have to pay for this time,

12  but we want to be conservative, right?

13   A.    Yes.

14   Q.    We want to err on the side of caution, right?

15   A.    Yes.

16   Q.    We don't want to take any chances, correct?

17   A.    Yes.

18   Q.    We want to eliminate any concerns, correct?

19   A.    Yes.

20   Q.    And that's what you wanted team members to

21  believe, correct?

22   A.    Yes.

23   Q.    But in fact, Mr. Kimbro, Tyson's decision makers

24  did have concerns about these changes in 2010, didn't

25  they?

1    A.    Could you put that in context for me?

2    Q.    Yes.  I'm going to hand you a document, Exhibit

3    203, that the Court has previously identified as

4    admissible in this case.

5           MR. HANSON:  And just for clarification for

6    the record, it is document 203A.

7           THE COURT:  Thank you.

8    A.    Okay.

9    BY MR. HANSON:

10   Q.    Sir, I will just let you know that the parties

11   have made some minor redactions to certain pieces of

12   this document, okay?

13   A.    Okay.

14   Q.    You know what a redaction is?

15   A.    Yes, sir.

16   Q.    Just removing or deleting some of the verbiage.

17   But what you see here --

18   A.    Yes.

19   Q.    Can you -- can you -- do you recognize that?

20   A.    Yes, sir.

21   Q.    Okay.  And this is something you reviewed in

22   preparation for your testimony, correct?

23   A.    Yes, sir.

24   Q.    I'll just put it up on the ELMO.  You see it's

25   essentially two e-mails, correct?

1    A.    Yes.

2    Q.    The first one is from Bruce Pautsch?

3    A.    Pautsch, yes.

4    Q.    And can you tell us who Mr. Pautsch is?

5    A.    He's the Vice President of Hr Operations in the

6    Fresh Meat facilities.

7    Q.    Is he one of your direct reports?

8    A.    Indirectly.  He reports to a direct report of

9    mine.

10   Q.    Okay.  He's two steps down?

11   A.    Yes, sir.

12   Q.    And then he is sending this go James Lochner, do

13   you see that?

14   A.    I do.

15   Q.    Can you identify who Mr. Lochner is?

16   A.    He's currently the Chief Operating Officer of

17   Tyson Foods.

18   Q.    So, while you are the highest ranking executive

19   at Tyson responsible for human resource issues?

20   A.    Correct.

21   Q.    Is it correct that Mr. Lochner is the highest

22   ranking executive responsible for operations issues?

23   A.    Yes, sir.

24   Q.    Then you see the subject is Revised and then

25   there's a kind of a tag line, FM W&H Evaluation Memo

1  and PowerPoint.

2        Do you see that?

3  A.    I do.

4  Q.    All right.  And we've seen FM W&H evaluation on

5  some other documents or very similar verbiage, can you

6  identified for us what that means?

7  A.    Yes.  That would be Fresh Meats Wage and Hour

8  Evaluation Memo and PowerPoint.

9  Q.    All right.  And then the -- just that

10 description, FM W&H Evaluation, Fresh Meat Wage and

11 Hour Evaluation, that's been a way that Tyson has

12 described its internal review of the changes to the pay

13 practices that occurred in April of 2010, correct?

14 A.    Yes.

15 Q.    There was a number of evaluations about moving

16 to realigning the work day, correct?

17 A.    Yes, sir.

18 Q.    Adding additional K-code minutes, correct?

19 A.    Yes, sir.

20 Q.    Restructuring the rest and meal breaks, correct?

21 A.    Yes, sir.

22 Q.    Moving a previously paid rest break to an unpaid

23 rest break, correct?

24 A.    Yes, sir.

25 Q.    So that's part of this evaluation, right?

1  A.    Yes, sir.

2  Q.    Okay.  And this e-mail from Mr. Pautsch is

3 actually forwarding an earlier e-mail, you see, from

4 Paul Kirchner, do you see that?

5  A.    Kirchner, yes, sir.

6  Q.    Kirchner?

7  A.    Mm-hmm, yes, sir.

8  Q.    And can you identify who Mr. Kirchner is?

9  A.    He's an attorney, in-house, our corporate

10 attorney.

11 Q.    Okay.  Is he one of Tyson's in-house lawyers,

12 correct?

13 A.    Yes, sir.

14 Q.    And is it Mr. Kirchner's responsibility to work

15 with you on wage and hour issues?

16 A.    Actually, it's broader than that.  He works on a

17 myriad of HR issues.

18 Q.    But including wage and hour?

19 A.    Yes, sir.

20 Q.    And you see that you were copied on Mr.

21 Kirchner's e-mail, correct?

22 A.    I do.

23 Q.    You remember receiving this?

24 A.    Yes, sir.

25 Q.    And you see that the subject here is the Revised

1  FM W&H Evaluation Memo and PowerPoint?

2  A.     Yes, sir.

3  Q.     You see that the importance is high?

4  A.     Yes.

5  Q.     And this is the e-mail.  I'll just represent

6  that the name here has been removed, but you see that

7  Mr. Kirchner is writing that, again, "This person and I

8  had a long discussion regarding how to improve the

9  defense of these changes."  (Quoted as read.)

10          Do you see that?

11  A.     Yes, sir.

12  Q.     Do you know what changes are being referenced

13  here?

14  A.     I believe it's about restructuring the day.

15  Q.     Okay.  And you understand that there were a

16  variety of different options being considered?

17  A.     Yes.

18  Q.     When you were realigning the day, correct?

19  A.     Yes, sir.

20  Q.     And, in fact, if you just turn the memo to its

21  attached page for a second.  Do you see what's

22  referenced here?

23  A.     I do.

24  Q.     Do you see that it's a script for wage and hour

25  meetings?

1   A.     Yes.

2   Q.     And you understand that you and the other folks

3   identified in this e-mail were in discussions about how

4   to script and explain to team members the changes that

5   were coming in April of 2010, correct?

6   A.     Yes, sir.

7   Q.     And if you will look at this script, and you'll

8   see that it's actually redlined, do you see that?

9   A.     Yes.

10  Q.     Do you know who is doing the redline?

11  A.     No, sir, I don't.

12  Q.     But you see that there are changes being made to

13  a draft script?

14  A.     I do.

15  Q.     If I just kind of put this next to what

16  ultimately becomes Mr. Karkiainen's memo of March 29th,

17  2010 you'll see it's the same document, correct?

18  A.     It appears to be, yes.

19  Q.     Okay.  Well, it's -- as you know, there have

20  been a number of wage and hour lawsuits, do you see

21  that?

22  A.     I do.

23  Q.     Actually, I just noticed this.  Do you see

24  between hour and lawsuits, there is a little bit of

25  a -- looks like a redline?

1   A.    Yes.

2   Q.    So, if we go back to Exhibit 203, it looks like

3   just a vestige of the redline made it on to the final,

4   right?

5   A.    Show me that, I'm not sure I'm following you.

6   Q.    It is right here.

7   A.    Oh, okay.  Oh, yes, okay.

8   Q.    And I just really am trying to confirm that this

9   is a draft script of what ultimately is announced to

10  the work force?

11  A.    Yes, it appears so, yes.

12  Q.    Okay.  And Mr. Kirchner goes on to write, "These

13  are very good documents but we revised them for

14  strategic reasons and consistency with our legal theory

15  while trying to maintain the themes I believe will

16  persuade team members that this change is in part

17  motivated by the litigation, and is a good thing for

18  them."  (Quoted as read.)

19          Do you see that?

20  A.    I do.

21  Q.    Do you understand that part of the goal here was

22  to try to persuade team members that the change would

23  be a good thing for them?

24  A.    Yes, sir.

25  Q.    And then in the second paragraph, Mr. Kirchner

1  says, "We remain concerned about the unpaid break of 20

2  minutes and whether the four minutes is sufficient to

3  cover don, doff, and walk during the break and

4  therefore, would not encroach on the 20-minute period

5  and violate federal law."  (Quoted as read.)

6          Do you see that?

7  A.    I do.

8  Q.    So you understand that one of your advisors is

9  communicating a remaining concern about the unpaid

10 break, do you see that?

11 A.    Yes.

12 Q.    And you understand that the concern is if the

13 unpaid break is encroached upon, meaning you don't have

14 a full 20 minutes, that potentially the whole thing

15 might have to be paid, correct?

16 A.    Yes, sir.

17 Q.    And that was a concern expressed to you, right?

18 A.    Yes.

19 Q.    And that had to have an impact on your thinking

20 about whether to go and realign the work day in this

21 manner, correct?

22 A.    Yes, sir.

23 Q.    Mr. Kirchner goes on to say, "As we -- as we

24 have discussed, there may be a claim that this period

25 should be paid rather than unpaid."  (Quoted as read.)

```
 1          Do you see that?

 2   A.     I do.

 3   Q.     And you understand that you were being told that

 4   realigning the work day in the way you were considering

 5   leaves open the possibilities that a claim would be

 6   made that it needs to be paid, right?

 7   A.     Yes.

 8   Q.     And so you understand that Tyson was leaving

 9   itself open to legal claims, right?

10   A.     I understood that that possibility could happen,

11   yes, sir.

12   Q.     But keeping those concerns in mind, and

13   evaluating them, you still made the decision to go

14   ahead and realign the work day by taking away what had

15   previously been a paid break and making it unpaid,

16   correct?

17   A.     Correct.

18   Q.     Knowing full well that you were running some

19   risks, correct?

20   A.     Well, this was a earlier memo, we actually

21   modified our position since it says four, and you're

22   aware we went to five so, this is early in the

23   discussion.

24   Q.     So is it your testimony that going from four to

25   five eliminated any possible concerns?
```

1  A.    I've never found anything that eliminated any

2  possible concern but --

3  Q.    Right, I mean the truth is, you knew you were

4  taking some chances by taking away a paid rest break,

5  correct?

6  A.    We knew that there could -- there could be

7  someone that could take objection to it, yes.

8          MR. HANSON:  That's all I have.  Thanks.

9          THE COURT:  Mr. Mueller.

10         MR. MUELLER:  May it please the Court.  Good

11  morning, ladies and gentlemen.  Good morning, Mr.

12  Kimbro.

13         THE WITNESS:  Good morning.

14         MR. MUELLER:  Ladies and gentlemen, in my

15  two-minute -- I get to give you a two-minute summary.

16  Mr. Hanson didn't, but let me tell what you points I

17  believe we will establish through this witness.

18          As you've heard, Mr. Kimbro is essentially the

19  client, for purposes of making decisions about how to

20  comply with the wage and hour laws, both at IBP and

21  Tyson Foods.  I'm going to go into more detail

22  chronologically and cover some of the same things that

23  Mr. Hanson did, only ask the witness to fill in some

24  gaps in the story that you did not hear about in the

25  examination you just heard.

1        We're going to hear that Mr. Kimbro, when he

2    worked at a union, he was trying to organize, IBP was

3    actually the one who instigated the Department of Labor

4    to bring the litigation against IBP and that started

5    this 23-year battle, so he will talk about it both from

6    the front end of the litigation, when the union started

7    it, and then when he joined IBP, you'll hear that he

8    read the case file and became fully conversant in the

9    case and its litigation history.

10        In the course of that litigation history, he

11   will explain to you, I believe, that the litigation

12   that relates to this plant was favorable to IBP and now

13   Tyson and the only issues we actually care about here

14   and that is whether we now have to pay for the things

15   that the Court, this Court, already ruled we won on,

16   and that is just the whites, the frock, the hard hat,

17   earplugs, hair net, safety glasses, and any safety

18   boots.

19        And so he will explain that they actually won

20   on those issues and that's what you are being asked to

21   decide today.

22        He will explain that a number of the things

23   you heard Mr. Hanson ask about went to willfulness went

24   to issues that we are not contesting in this case,

25   which is the mesh, which we already lost on and are

1   already paying for.

2          You will hear that the injunction does not

3   require Tyson Foods from previously IBP, now Tyson

4   Foods, to record and pay for the actual time and those

5   words appear nowhere in the injunction.

6          You will hear that the Department of Labor did

7   exchange correspondence, and we'll talk about some of

8   that correspondence, saying it was permissible for IBP

9   to go forward with a four minute K-code in satisfaction

10  of the injunction.

11         You will hear that Tyson did not receive the

12  letter when it first went out.  And you'll hear why

13  Tyson did not get the letter when it first went out.

14  You'll find out that it did not go to Tyson and in fact

15  you will know and we cannot tell you today, who the

16  letter was sent to.  Because Mr. Hanson didn't show it

17  to you, but the name has been withheld by the

18  Government, so we don't know who it was sent to.

19         You'll see the copy Mr. Hanson showed the

20  witness, he just printed off of his computer last night

21  and that it did not come from our files.

22         You will hear, and I believe the judge will

23  let us take judicial notice, the Department of Labor

24  does not have binding rulemaking authority by Congress

25  to have say in how to interpret the laws and, in fact,

1    one of the very first regulations in the Department of

2    Labor's own regulations is that the courts have the

3    final say.  And you will hear Mr. Kimbro explain that's

4    why we follow what this Court did in the <u>Reich</u> case.

5           You will hear some further details about the

6    <u>Alvarez</u> case, including the importance of that case we

7    won, and which are favorable to us and why, and for

8    example, you'll hear that the lower courts found that

9    most of the items we're talking about, the standard

10   items, were considered di minimis as a matter of law

11   and need not be paid for.

12          You will hear a number of Court decisions

13   saying that Tyson did not act willfully and that Mr.

14   Kimbro took those into account in making decisions.

15          And then you'll here that the 2010 changes in

16   the K-code were motivated from Tyson's concern that it

17   was getting tired of 23 years of litigation and was

18   concerned in the last memo you saw that these very same

19   plaintiffs' lawyers sitting here would come up with any

20   argument, no matter what they changed in the company,

21   to still figure out a way to sue for it.

22                    CROSS EXAMINATION

23   BY MR. MUELLER:

24   Q.    Good morning, Mr. Kimbro.

25   A.    Good morning.

1   Q.     Could you please tell us a little bit about

2   yourself, such as where you and your family are from?

3   A.     Yes, my mother is from Paducah, Kentucky, my

4   father is from Cape Girardeau, Missouri, and I was born

5   in Southern Illinois.

6   Q.     And where do you reside today?

7   A.     I live in Fayetteville, Arkansas.

8   Q.     And when did you begin your employment with IBP?

9   A.     December 1995.

10  Q.     And what title did you hold when you were first

11  hired into IBP?

12  A.     Vice President of Human Resources.

13  Q.     And what were your job duties in that position?

14  A.     A comprehensive HR, I was responsible for labor

15  relations, industrial relations, employee relations,

16  policy, compliance, training, security, general HR.

17  Q.     And I think you said to Mr. Hanson, did you

18  later become Senior Vice President of HR?

19  A.     I did, in late '99 or 2000.

20  Q.     Was that a promotion?

21  A.     Yes.

22  Q.     Were there any change in job duties?

23  A.     No, sir.

24  Q.     Okay.  When Tyson acquired IBP, I think you told

25  Mr. Hanson, was that around September or October of

133

1  2001?

2  A.    Yes, sir.

3  Q.    Okay.  Did you become a Tyson employee at that

4  time?

5  A.    Yes, sir.

6  Q.    And what position did you hire into, and in fact

7  did you have to apply for the job?

8  A.    Uh, yeah, I interviewed for the job.  I was

9  selected to -- to head up the HR function for what we

10  referred to as the new company or the acquisition of

11  IBP.

12  Q.    Okay.  And what was your title?

13  A.    Senior Vice President of Human Resources.

14  Q.    Now let's step back in time.  How long have you

15  been involved in the meat processing industry?

16  A.    Since 1972.

17  Q.    And what was your first real job?

18  A.    My first real job was working in the Joslin

19  facility in Illinois as a electrician.

20  Q.    Okay.  And was that a meat packing plant?

21  A.    Yes, sir, it's a beef packing plant.

22  Q.    And over the course of your career, have you

23  remained involved in the meat packing or meat

24  processing industry?

25  A.    Yes, sir.

1  Q.    Over the course of your career, have you been

2  involved in issues regarding pay practices?

3  A.    Yes, sir.

4  Q.    Before you worked for IBP, let's go through your

5  prior employers.  Who did you work for immediately

6  before IBP?

7  A.    Dubuque Packing Company or FDL Foods in Dubuque,

8  Iowa.

9  Q.    And is that a packing house?

10 A.    Yes, sir, it's a pork slaughter and processing

11 facility.

12 Q.    What years did you work there?

13 A.    From 1987 to 1995.

14 Q.    Okay.  And then before that, who did you work

15 for?

16 A.    I worked for the United Food and Commercial

17 International Union.

18 Q.    And that's a labor union?

19 A.    Yes, sir.

20 Q.    And what years did you work there?

21 A.    From 1977 to 1987.

22 Q.    So, how many years was that?

23 A.    Approximately ten years.

24 Q.    And tell me, what were your jobs at the United

25 Food and Commercial Workers Union?

1  A.    I was a -- it's called a field organizer, I was

2  an international representative, I was a president of a

3  local union, I was a secretary/treasurer of a local

4  union, and prior to my leaving I was one of the

5  executive assistants to the president, William H.

6  Nguyen.

7  Q.    And then after that you went to FDL, which was

8  Dubuque Packing?

9  A.    Yes, sir.

10  Q.    And then did you join IBP?

11  A.    In '95, yes, sir.

12  Q.    Okay.  And then later that merged in to Tyson,

13  is that right?

14  A.    Yes.

15  Q.    Now, in the course of your career at IBP and

16  Tyson, have you been the client, so to speak, in charge

17  of the pay practices at those companies?

18  A.    Yes, sir.

19  Q.    And have you been involved as the client, so to

20  speak, in the lawsuits that we have been talking about

21  and Mr. Hanson asked you about?

22  A.    Yes, sir.

23  Q.    Okay.  Are you generally familiar with the

24  history of the litigation against IBP and Tyson on

25  these donning and doffing issues?

1    A.    Generally.

2    Q.    Okay.  And I apologize, I'm going to cover some

3    of the same thing Mr. Hanson did but I would like to

4    give you a chance to tell your story and I'm going to

5    try and do this chronologically mainly?

6            MR. MUELLER:  Can we pull up, Martin, the

7    slide the jury saw in opening statements, about history

8    of the litigation.

9            MR. WHITEHEAD:  You need to push the button.

10           MR. MUELLER:  Oh.

11   BY MR. MUELLER:

12   Q.    Mr. Kimbro, this is a slide that Mr. O'Dear here

13   showed to the jury in opening statements and so I'm

14   going to use it as a reference point to ask you some

15   questions.

16           Have you seen this before?

17   A.    Yes.

18   Q.    Okay.  Now, based on your personal knowledge

19   from the positions you've told us you held, are you

20   able to give us some detail on the history of the

21   lawsuits that are shown on this chart?

22   A.    Yes, sir, I believe so.

23   Q.    And are you also able to give us detail on the

24   changes in pay practices shown on this chart?

25   A.    Yes, sir.

1  Q.    Okay.  We'll leave it up for right now.  And I

2  may take it down later as I show you some particular

3  exhibits.

4          Mr. Hanson said at one point that all this

5  case is about is Finney County, but he asked you about

6  a lot of cases.  Did all those cases involve Finney

7  County?

8  A.    No, sir.

9  Q.    Okay.  Did the cases on this chart relate to

10 Finney County?

11 A.    Yes, sir.

12 Q.    Ultimately, if you take Alvarez's ending up in a

13 Supreme Court decision?

14 A.    Yes, sir.

15 Q.    Okay.  Now, I'm going to mainly ask you about

16 Finney County litigation and then I'll try and give you

17 a chance to talk about some of the unrelated stuff Mr.

18 Hanson asked you about.

19          All right.  You're familiar with the case,

20 Reich vs. IBP, I take it?

21 A.    Yes, sir.

22 Q.    And were you involved in Reich vs. IBP at the

23 front end of that case, that is, even before it was

24 filed?

25 A.    Yes, sir.

1    Q.    Okay.  How were you involved?

2    A.    Um, in 198 -- '85, '86 I was working for the

3    United Food and Commercial Workers Union.  I was at

4    that point in time the deputy trustee in seizing or

5    trusteeing local P9 in Austin, Minnesota in a strike

6    with Hormel Foods.

7          The local union president, Jim Guyette, hired

8    a corporate campaign specialist by the name of Ray

9    Rogers and a lot of the strategies that they were

10   applying appeared to be effective.

11         During the course of that time I had several

12   meetings with Louie Anderson, who was the Vice

13   President of the packing division, Joe Hanson who was

14   at that time Executive Assistant of the VP for the UFCW

15   in that region and we -- we saw some opportunity to

16   utilize some of those corporate campaigns, and

17   particularly, using the Department of Labor, OSHA, some

18   of those aspects, to position ourselves to organize the

19   nonunion facilities at IBP.

20   Q.    Okay.  And was the commencing of litigation part

21   of that strategy?

22   A.    Yes, sir.

23   Q.    Okay.  And what do you mean by that?  Whose

24   litigation?  Who would be bringing it against whom?

25   A.    Meaning that we, the UFCW, would go to the

1  Department of Labor and ask them to look at some of the

2  practices that were in effect at the nonunion

3  facilities.

4  Q.    Okay.  Did that include targeting IBP?

5  A.    Yes, sir.

6  Q.    Okay.  So, following those communications

7  between the Union and the Department of Labor, what did

8  the Department of Labor do?

9  A.    Subsequently they filed suit at the nonunion

10 facilities of IBP.

11 Q.    Was there an investigation that preceded that?

12 A.    Yes.

13 Q.    And were -- was the union apprised of the fact

14 that the Department of Labor was doing that

15 investigation?

16 A.    Yes.

17 Q.    Now I think you told Mr. Hanson this, but was

18 the lawsuit filed in 1988?

19 A.    Yes, sir.

20 Q.    Okay.  So if we look at the very first box on

21 this chart, is that the suit that was instigated, that

22 was filed at the instigation of the United Food and

23 Commercial Workers Union?

24 A.    Yes, sir.

25 Q.    Okay.  It was filed against IBP?

1    A.    Yes.

2    Q.    Now, when you joined IBP that was in 1995, you

3    said, right?

4    A.    Yes, sir.

5    Q.    And at that point, had the litigation been going

6    on for about I guess seven years?

7    A.    Yes, sir.

8    Q.    Okay.  What was one of the first things you had

9    to do in your job when you got to IBP?

10   A.    Read all the documentation that we had on the

11   litigation.

12   Q.    How long did that take you?

13   A.    A long time.

14   Q.    Was it more --

15   A.    Approximately I have said three months, 90 days,

16   probably.

17   Q.    Okay.  Now, in what court was that lawsuit

18   filed, Reich vs. IBP?

19   A.    This Court, Kansas.

20   Q.    Okay.  So as Mr. Hanson said maybe not this same

21   room, but essentially this Court, is that right?

22   A.    Yes, sir, that's my understanding.

23   Q.    Was that a civil case or a criminal?

24   A.    Civil.

25   Q.    Okay.  And what law did the Department of Labor

1  say IBP was violating?

2  A.    FLSA.

3  Q.    Okay.  And is that a federal agency, the

4  Department of Labor?

5  A.    Yes, sir.

6  Q.    Okay.  Did they make any claims under Kansas

7  law?

8  A.    No, sir.

9  Q.    Okay.  Now, which IBP plant did the Department

10 of Labor sue IBP over?  You don't have to name them.

11 A.    It -- the nonunion facilities.

12 Q.    And approximately how many nonunion facilities

13 were there?

14 A.    I think originally it was left.

15 Q.    And one of the things Mr. Hanson asked you about

16 and I'll get to it later, do you remember him asking

17 you about a part of the law called 3(o), Section 3(o)?

18 A.    Yes.

19 Q.    Is there a special part of the Fair Labor

20 Standards Act that essentially assumes that unions can

21 deal on their own bargaining with the employers over

22 clothes changing?

23 A.    Yes, sir, that would be my understanding of

24 3(o).

25 Q.    Is it your understanding that that is why the

1  Department of Labor was suing just the nonunion plants?

2  A.    Yes, sir.

3  Q.    Okay.  Now, did the 11 -- well, I'm sorry, did

4  you say how many there were?

5  A.    Eleven of them.

6  Q.    Okay.  Did the eleven plants include Finney

7  County?

8  A.    Yes, sir.

9  Q.    Did they include the Emporia beef processing

10  plant over in Emporia, Kansas?

11  A.    Yes, sir.

12  Q.    Did they include the Storm Lake, Iowa pork

13  processing plant?

14  A.    Yes, sir.

15  Q.    I'm not going to ask you more about those two

16  plants but we have a witness tomorrow who will tie that

17  together.

18        And then what activities generally was the

19  Government suing over?

20  A.    Pre and post shift activities.

21  Q.    Okay.  Did they sue IBP for anything at the meal

22  periods or the breaks?

23  A.    No, sir.

24  Q.    Okay.  And what kind of pre and post shift

25  activities, just generally, were they suing over?

143

1    A.    Donning and doffing.

2    Q.    Okay.  Was there eventually a trial in that

3 case?

4    A.    Yes, sir.

5    Q.    And I think you said, was that in front of Judge

6 O'Connor?

7    A.    Yes, sir.

8    Q.    And do you remember when that trial was?

9    A.    Trial would have been in '92.

10   Q.    And I think you said a decision in what year?

11   A.    '93.

12   Q.    Okay.  So is that the second event that you had

13 on this chart here?

14   A.    Yes, sir.

15   Q.    Okay.  And to your recollection, what things did

16 Judge O'Connor say IBP had to pay for?

17   A.    It was personal unique personal protective

18 equipment, primarily the -- the mesh that you see over

19 there.  (Indicating.)

20   Q.    Okay.  And you're pointing over at the peg board

21 with the items hanging on it?

22   A.    Yes, sir.

23   Q.    And what activities related to that mesh did

24 Judge O'Connor say you had to pay for before and after

25 shift?

1    A.    Putting it on, taking it off, cleaning.

2    Q.    Is that cleaning at the end of shift?

3    A.    Yes, sir.

4    Q.    And I think you mentioned this to Mr. Hanson.

5    Is there a little bit of walk time he said you had to

6    pay for?

7    A.    Yes, sir, that would be the walk time from the

8    production line back to the cleaning area or waiting to

9    clean also.

10   Q.    Okay.  And so the walk to the cleaning area and

11   you said waiting and how about the wash itself?

12   A.    Yes.

13   Q.    And did you say you have to pay for

14   sterilization?

15   A.    The dipping or, yes, sterilizing.

16   Q.    What's a dip?  Just tell us what the dip is.

17   A.    It means walking past a vat or a tub that would

18   have a chemical solution and dipping your equipment in

19   it as you walk by.

20   Q.    And roughly speaking how long does is that take?

21   A.    Seconds.  (Demonstrating.)  Seconds.

22   Q.    Now I'm not sure Mr. Hanson asked you about

23   this.

24         Did Judge O'Connor rule in the company's

25   favor, on some other items?

1    A.    Yes.

2    Q.    With which items did he rule in IBP's favor on?

3    A.    Hard hat, safety glasses, earplugs, um, frock,

4  sanitary clothing, whites, I think somebody said, and

5  safety boots.

6    Q.    Okay.

7    A.    Or boots.

8    Q.    So can I call those the standard safety items

9  and the sanitary outer garments?

10   A.    That's what we refer to them as.

11   Q.    Okay.  Now, what did he say about walking time?

12  Let's break this down.

13         Do you remember, just generally speaking, what

14  walking time had to be paid for?  I think you mentioned

15  the walk at the end of the shift.

16   A.    Yeah.  The walking time was the walk to and from

17  the knife room or waiting for the knife room or walking

18  from the knife room to the production area.

19   Q.    Okay.  And then you mentioned the walk from the

20  work station to washing?

21   A.    Yeah, at the end of the day, you would step back

22  from the line and either a sink or over to a wash area

23  in the department to wash --

24   Q.    Okay.

25   A.    -- the equipment.

1  Q.    So, by this point had IBP, that is by the time

2  Judge O'Connor decided that what you had to pay for,

3  what did IBP done with the knife rooms?

4  A.    We had closed them before and after shift.

5  Q.    And why would you close them before and after

6  shift?

7  A.    We did it so we changed the distribution of

8  knives.  We started distributing the knives on the

9  production floor when people are being paid so we

10 eliminated the -- that walk, that wait, that get the

11 knives, that was done away with and then after we close

12 it, so you wouldn't have any of that either, that

13 people could either leave their knives on the floor,

14 the team members could leave them there, or the team

15 members could take them with them to the locker.

16 Q.    So is that the practice even today, that the

17 employees have to get their knives on paid time?

18 A.    Yes, sir.

19 Q.    Okay.  So, in your view, essentially, did that

20 change, make that issue go away?

21 A.    Yes.

22 Q.    Okay.  Now, did you do anything with the wash

23 basins?

24 A.    Yes, we made physical changes to the facilities

25 and added more sinks or wash basins and more wash

1    areas.  And we actively managed that process to

2    facilitate the flow of team members in it.

3    Q.    What's the goal of adding more wash stations?

4    A.    Reduce the time it takes.

5    Q.    Okay.  And had you done that even before Judge

6    O'Connor issued his opinion?

7    A.    Yes.

8    Q.    Now, did Judge O'Connor say whether IBP had to

9    pay for reasonable time it takes to do these activities

10   or the actual time?

11   A.    Reasonable time.

12   Q.    And were -- is it fair to say both sides were

13   unhappy with his ruling?

14   A.    Yes.

15   Q.    Did the Department of Labor take an appeal?

16   A.    Yes.

17   Q.    And did IBP also take an appeal?

18   A.    Yes.

19   Q.    Okay.  So now you all found yourselves in the

20   Tenth Circuit.  Without any detail what happened?

21   A.    They affirmed Judge O'Connor's decision.

22   Q.    Okay.  So now have we explained the second

23   column on this chart?  The second set of events?

24   A.    Yes, sir, I believe so.

25   Q.    Okay.  Now, let's go to the next box.  And Mr.

1  Hanson asked you a little bit about this.

2         As Mr. Hanson got you to talk, about did the

3  case go back down to the district court?

4  A.    Yes.

5  Q.    And did Judge O'Connor deal with it again?

6  A.    Yes.

7  Q.    Was there another trial?

8  A.    Yes.

9  Q.    And was that trial about back wages and the

10  injunction Mr. Hanson asked you about?

11  A.    Yes.

12  Q.    Do you remember when the trial was?

13  A.    That would have been '95, I believe.

14  Q.    Okay.  And then I said it says '96.  Did he

15  issue his ruling in '96?

16  A.    Yes.

17  Q.    And what did he say was the measure of

18  appropriate time?  Was it reasonable time or actual

19  time?

20  A.    Reasonable time.

21  Q.    Okay.  And do you remember how many minutes he

22  found looking backwards from the period of 1988 to his

23  ruling?

24  A.    I think it was 14.

25  Q.    Okay.

1    A.    That's my recollection.

2    Q.    Did that include some of this knife walking time

3    and waiting at wash basins that had been eliminated by

4    that time?

5    A.    Yes.

6    Q.    Okay.  So as of today, do we have all this

7    waiting at the knife room or at the wash stations that

8    he was ruling on?

9    A.    No, sir.

10   Q.    Okay.  Now, did, in fact, Judge O'Connor issue

11   an injunction?

12   A.    Yes, sir.

13        MR. MUELLER:  Martin, could we please pull up

14   Plaintiffs' Exhibit 331.  Mr. Hanson showed you this.

15        Why don't we zoom in, go to the next page,

16   Martin.

17        And let's go to the bottom of that paragraph,

18   just paragraph three.

19   BY MR. MUELLER:

20   Q.    Could you please, Mr. Kimbro, please read for

21   the jury paragraph three?  And it carries over to the

22   next page so when you get done we'll jump to the next

23   page.

24   A.    Yes.  "It is further ordered that within ten

25   days of the date of this order, defendant shall

1  implement recordkeeping practices sufficient to record

2  the time spent by each employee in performing the

3  pre-shift and post shift activities found to be

4  compensable under the act."  (Quoted as read.)

5  Q.    Okay.  So let me ask you about those words,

6  "found to be compensable."

7        Which particular clothing items did you

8  understand Judge O'Connor was saying here you had to

9  pay for?

10  A.    The unique, personal protective equipment.

11  Q.    Okay.  Did that include the standard and

12  sanitary outer garments?

13  A.    Yes.

14  Q.    Did you see the word actual?  Did he say

15  anything about paying actual time?

16  A.    No, sir.

17  Q.    Okay.  Now did IBP appeal that entry of that

18  injunction?

19  A.    Yes, sir.

20  Q.    Okay.  And then so it goes back up to the Tenth

21  Circuit again?

22  A.    Yes, sir.

23  Q.    And just without any detail, what did they do?

24  A.    They affirmed Judge O'Connor's decision.

25  Q.    Okay.  So, have we now explained the third

1  column on this chart?

2  A.     I believe so.

3  Q.     Okay.  Now, you then told Mr. Hanson that there

4  were some time studies done in -- in -- well, I'm not

5  sure he asked you this.

6         He asked you about the time studies in 2006.

7  What happened in 1998, just generally speaking?  What

8  did the company do first?

9  A.     In 1998 we started a time study of the pre and

10 post shift activities as they pertain to the unique,

11 personal protective equipment.

12 Q.     Okay.

13 A.     At all of our facilities.

14 Q.     And who did those studies?

15 A.     Our industrial engineer.

16 Q.     Do you know a gentleman named Monty Hahn?

17 A.     I do.

18 Q.     Okay.  The jury has heard from Mr. Hahn.  Was he

19 responsible for leading up that effort?

20 A.     Yes, he was.

21 Q.     Okay.

22         MR. MUELLER:  And can we pull up Plaintiffs'

23 Exhibit 24.

24 BY MR. MUELLER:

25 Q.     I'll tell you, Mr. Kimbro --

1            MR. MUELLER:  Why don't you rotate that,

2   Martin.  A big spreadsheet Mr. Hahn testified about.

3   BY MR. MUELLER:

4    Q.    Do you know whether this spreadsheet lists all

5   of the activities that the industrial

6   engineers -- well, let's set aside the walking which he

7   said he added in 2006, look at other things on this

8   spreadsheet.  Was Mr. Hahn's industrial engineer's

9   measuring the things that Judge O'Connor said had to be

10  paid for?

11   A.    Yeah, yes.

12   Q.    So if we were to look -- so if the jury were to

13  look at this exhibit, setting aside the walk time which

14  came in 2006, would this jury essentially -- I'm sorry,

15  would this spreadsheet tell the jury which activity

16  Judge O'Connor said had to be paid for?

17   A.    Yes.

18   Q.    Is that true both pre-shift and after shift?

19   A.    Yes.

20   Q.    Okay.  That's -- I don't get into the details,

21  because Mr. Hahn already explained it.  And just

22  generally speaking, what was the number that the

23  company's industrial engineers came up with on average,

24  across the 11 plants?

25   A.    Four minutes.

153

1   Q.    Okay.  Now, in the same time period -- well, let

2   me first talk about something Mr. Hanson asked you.

3         So you decided to do something with those four

4   minutes, am I right about that?

5   A.    Yes, sir.

6   Q.    Okay.  And Mr. Hanson showed you that.

7         MR. MUELLER:  Let's pull up Plaintiffs'

8   Exhibit 231.

9   BY MR. MUELLER:

10  Q.    And why don't you just read the body of this to

11  us, because I have some questions.  But I would like

12  you to read through it because I think Mr. Hanson only

13  asked but a few parts, so just read the paragraph.

14  A.    All right.  "This is pre and post shift

15  activities and nonunion facilities, effective

16  immediately IBP has voluntarily implementing a

17  procedure to compensate employees for the reasonable

18  time associated with certain pre and post shift

19  activities.  Based upon calculations performed by IBP

20  and verified by a consultant with the expertise in wage

21  and hour calculations, IBP has determined four minutes

22  is more than appropriate estimate of the reasonable

23  time associated with these tasks performed by knife

24  carrying workers.  While IBP believes time associated

25  with these activities may be di minimis and thus not

1  compensable, IBP has decided in order to approach this

2  issue in a conservative manner, IBP will compensate for

3  this time.   IBP will do so by including four minutes in

4  the work day for performing these pre and post shift

5  tasks.   For all employees on gang-time or otherwise

6  with positions tied to the chain, thus where these

7  employees work their regular scheduled hours, four

8  minutes of these scheduled hours will be set aside for

9  the compensable pre and post shift activities.

10         To be clear, this time will be allowed not

11 only to knife carriers but also to all other employees

12 on gang-time or otherwise with positions tied to the

13 chain.   IBP will review these pre and post shift

14 activities on a periodic basis to ensure that its

15 policy accurately qualifies and compensates for the

16 reasonable time associated with these tasks."   (Quoted

17 as read.)

18 Q.    Okay.   So I have three questions about this.

19 Mechanically, how is the four minutes added to the day?

20         Does it make the work day longer or did you do

21 something different?

22 A.    No, we actually reduced the work day or reduced

23 their production time in the work day.

24 Q.    So did the chain that is the chain time or

25 gang-time, did that used to be eight hours?

1   A.    Yes, sir.

2   Q.    And what did you reduce the length of the chain

3   moving to?

4   A.    Seven hours and 156 minutes.

5   Q.    But do the employees continue to receive eight

6   hours of pay?

7   A.    Yes.

8   Q.    Is that how you pay for the clothes changing

9   time that Mr. Hahn's industrial engineer's calculating?

10  A.    Yes.

11  Q.    Okay.  Was that the company's way of complying

12  with Judge O'Connor's rulings as to the mesh items?

13  A.    Yes.

14  Q.    Okay.  Now the second question I have is who got

15  those minutes?

16        Did you give those four minutes even to people

17  that Judge O'Connor said you didn't have to give them

18  to?

19  A.    Yes.

20  Q.    And who was that -- who got the time that wasn't

21  even entitled to it under the court order?

22  A.    It would be those team members that are in the

23  department.

24  Q.    So if you're wearing just sanitary garments and

25  standard items like a hard hat and earplugs, so you

1  don't wear any of that mesh stuff, did they also get

2  the four minutes?

3  A.    Yes, sir.

4  Q.    Okay.  Did anybody make you do that?

5  A.    No, sir.

6  Q.    Okay.  And then at the end here it says you're

7  going to, in the last sentence, IBP will review these

8  pre and post shift activities on a periodic basis.

9  What is that referring to?

10  A.    I believe it is that document you showed us

11  earlier, that is Monty Hahn and his industrial

12  engineers auditing the -- the time that it takes to don

13  and doff that equipment.

14  Q.    So the jury saw I think one of these -- the jury

15  saw a quarterly wage and hour audit.  Is that something

16  you had the company do four times a year just to make

17  sure the number wasn't different from four minutes?

18  A.    Yes, sir.

19  Q.    And Mr. Hahn explained that so I won't go in to

20  the details of it.

21        Now let me show you --

22        MR. MUELLER:  Let's bring up, Martin,

23  Defendants' 5013.

24  BY MR. MUELLER:

25  Q.    I would like to show you another memo issued

1  this same day.  And this is this a memo that you

2  issued?

3  A.     Yes.

4  Q.     Okay.  And it says -- who's this memo go to?

5  A.     This one to the plant manager.

6  Q.     If you look in the second paragraph it says,

7  "These departments were selected based on their

8  dependents to the chain," do you see that?

9  A.     No, I'm sorry, I don't.

10  Q.     Second paragraph?

11  A.     Enclosed -- oh, I'm sorry, I was looking at the

12  first sentence.

13  Q.     Yeah.

14  A.     Okay, yes, I see it.

15  Q.     And if you were to look at the original, was

16  there a bunch -- and it's on there but I'm not going to

17  pull it up, were there a bunch of departments attached

18  to this?

19  A.     Yes.

20  Q.     Okay.  And so what is that all about?

21  A.     I was identifying those departments that had

22  been selected to pay for the pre and post shift time.

23  Q.     So did that include people that didn't wear the

24  mesh items Judge O'Connor said you had to pay for?

25  A.     Yes, sir.

1  Q.    Okay.  So now if you go down later -- and let's

2  look at the next -- the paragraph after.

3          MR. MUELLER:  Let's highlight that, Martin.

4  BY MR. MUELLER:

5  Q.    "IBP has implemented."  Could you read that for

6  the jury?

7  A.    "IBP has implemented the payment of four minutes

8  of safety equipment changing time.  This changing

9  allowance is allocated to all employees on gang-time or

10 otherwise with positions tied to the chain."  (Quoted

11 as read.)

12 Q.    Let me first ask you, at any time in Judge

13 O'Connor's decisions or the Tenth Circuit's decisions,

14 did the courts bar IBP from using gang-time?

15 A.    No, sir.

16 Q.    Okay.

17         MR. MUELLER:  So, and then let's go on to the

18 next paragraph, start with number one.

19 BY MR. MUELLER:

20 Q.    Why don't we read that into the record.

21 A.    "IBP will allocate the four minutes changing

22 allowance to any employee who works any part of the day

23 in a department tied to the chain."  (Quoted as read.)

24 Q.    Okay.  So I have two questions about this.  So

25 does this explain what you said earlier about how

1  people got the four minutes even if Judge O'Connor said

2  they weren't entitled to it?

3  A.    Yes, sir.

4  Q.    Okay.  Then it says, "any part of the day."

5  What does that mean?

6  A.    Because products change and you have to realign

7  or restaff lines or chains, someone may work one or two

8  or three hours with a knife or without a knife, so

9  regardless of how long you did it, we will pay you the

10 pre and post shift time.

11 Q.    Okay.  And in the next paragraph, could you read

12 the first sentence?

13 A.    Next paragraph or number two?

14 Q.    Yeah, number two, just the first sentence of it.

15 A.    Okay.  "The change allowance is automatically

16 allocated at the end of the work week."  (Quoted as

17 read.)

18 Q.    Okay.  And so does it physically show up on the

19 employee's paychecks as a separate line item at the end

20 of the week?

21 A.    Yes.

22 Q.    So if you work five days, how many minutes of

23 K-code did you get back then?

24 A.    Well, four times five should be 20 minutes.

25 Q.    Okay.  If you worked three days, how many would

1  you get?

2  A.     That should be 15 minutes.

3  Q.     Three times four?

4  A.     Oh, my mistake, I got a calculator right here,

5  sorry.  Twelve minutes.

6  Q.     Okay.  And then take a look at number three.

7  A.     Sunshine time.

8  Q.     Yeah.

9  A.     "Sunshine time calculations will remain the

10  same.  Gang-time, chain time equals sunshine time."

11  (Quoted as read.)

12  Q.     Okay.  So, what is sunshine time?  We've heard

13  something about it, but what is it?

14  A.     It's -- it's an old manufacturing phrase that if

15  we have a -- a task to perform or work to be done in

16  a -- theoretically if it took me eight hours to move

17  this cup back and forth, if I could move this cup back

18  and forth a number of times it is needed and I can do

19  it in 7 and a half hours, I would be paid the eight

20  hours.

21        The idea is I would get to leave early and

22  enjoy the sunshine, hence the name.

23  Q.     Okay.  So here's my question.  Even though you

24  started paying this extra four minutes of K-code time,

25  did you also keep that extra sunshine time?

1   A.     Yes.

2   Q.     And is sunshine time, I'm paraphrasing what you

3   just said, is it paid for time you're not working?

4   A.     Yes, sir.

5   Q.     Okay.

6   A.     It's an efficiency reward, is that a better way

7   to say it.

8   Q.     A form of incentive pay?

9   A.     Yes.

10  Q.     Okay.  Now, let me take our -- let's go back to

11  the chart that we're looking at.

12         Because I want to relate this back now to your

13  discussions with the Department of Labor.

14         All right.  So, have we now explained the

15  fourth column on the top row of the -- well, the first

16  event, I haven't got to the verified by Department of

17  Labor yet.

18         The first event says 1998 time studies

19  determines four minutes is reasonable time.  Have we

20  explained that?

21  A.     Yes.

22  Q.     Now what I am going to get into now is the green

23  circle.  So in this period of 1998, 1999 that Mr.

24  Hanson was asking you about, was there back and forth

25  discussions between IBP and the Department of Labor?

1    A.    Yes, sir.

2    Q.    Were you involved in any of those?

3    A.    Yes.

4    Q.    And roughly speaking, who was involved in those

5    discussions on your side and the Government's side?

6    A.    Primarily Mr. Stabler with the solicitor's

7    office.

8    Q.    Is that the solicitor office in Kansas City?

9    A.    With the DOL, solicitor's office in Kansas City.

10   Q.    Okay.

11   A.    And he had some other people with him, but

12   truly, I can't remember their names.

13   Q.    Okay.

14   A.    There was a --

15   Q.    On your side.

16   A.    Sheila Hagen, general counsel for IBP; myself as

17   the head of HR; and Bruce Smith, corporate attorney, at

18   least one or two of the meetings he was in; and then

19   there was some conversations that involved Nate Hotney,

20   also another corporate attorney.

21   Q.    And I think most people know this, but what is a

22   general counsel, you tell them?

23   A.    I would -- she is the -- she's an attorney and

24   she is the counsel to the corporation.  She is our

25   in-house resident lawyer.

1  Q.    Okay.  Is that essentially the top attorney in a

2  company?

3  A.    Yes, sir.

4  Q.    Okay.  Now, and were you personally

5  apprised -- first of all, did you attend some of those

6  meetings?

7  A.    Yes.

8  Q.    Were you personally apprised of the

9  communications that went on between IBP and the

10  Department of Labor?

11  A.    Yes.

12  Q.    Did you see copies of the correspondence between

13  IBP and the Department of Labor on this issue in this

14  time period?

15  A.    Yes.

16  Q.    Okay.  By 1998, what were the two main bones of

17  contention between IBP and DOL on how to implement the

18  Reich vs. IBP rulings?

19  A.    Well, there -- we were still discussing or

20  negotiating or having interaction over -- over the four

21  minutes, whether it was applicable or sufficient and we

22  were at odds on backpay in a particular -- the groups

23  of people.  We ended up with two separate groups

24  involving backpay.

25  Q.    Okay.  Mr. Hanson asked you about that but he

1  didn't ask you why there was a dispute.  What do you

2  mean by two groups of people?

3   A.    Well, we had the group of people from '88 to

4  '94, which was what we refer to as the original class

5  or group.  And then there was another group that was

6  '94 to '98 that the DOL wanted to add to the discussion

7  or negotiations.

8   Q.    So was the Department of Labor trying to get

9  money for people that hadn't been part of the

10  litigation?

11  A.    Of the original litigation, yes, sir.

12  Q.    Was that the bone of contention you were telling

13  Mr. Hanson about?

14  A.    Yes, sir.

15  Q.    Okay.  And so there was some discussions about

16  figuring out what to do with those people?

17  A.    Yes, sir.

18  Q.    Okay.  Let me just set that aside.

19        You said there was also discussion about the

20  four minutes?

21  A.    Yes.

22  Q.    Is it fair to say there was a discussion about

23  how to treat the amount of time going forward?

24  A.    Yes.

25  Q.    Okay.  That's what I want to focus on.

1           Now, we've already seen you implemented the

2    K-code around April 22 of 1998 but I guess that had

3    an -- well, it was right around then, was it not?

4    A.    Yes.

5    Q.    Okay.  I'm not going to worry about the exact

6    day.  That is the date of the memo, was it not?

7    A.    Yes.

8    Q.    Okay.  Shortly before that, did IBP tell the

9    Department of Labor it was going to do that?

10   A.    Yes.

11   Q.    Okay.

12         MR. MUELLER:  And I would like to bring up

13   Defendants' 5200, so it's D5200.

14         And let's just focus in on the first, through

15   the Dear Mike.

16   A.    Could you make it bigger.

17         MR. MUELLER:  Read the first line, too,

18   Martin.  Just go down a little bit further, too.

19   BY MR. MUELLER:

20   Q.    So this was a letter, I'm sorry --

21         MR. MUELLER:  Show the logo and the author at

22   the top.

23   BY MR. MUELLER:

24   Q.    Okay.  So is this a letter that came out of IBP?

25   A.    Yes, Sheila Hagen.

1   Q.    And she was -- was she the top lawyer?

2   A.    Yes.

3   Q.    And you mentioned a Mr. Stabler before, was he

4   the guy representing the Department of Labor here in

5   Kansas City?

6   A.    Yes.

7   Q.    Is this a letter from IBP essentially to the

8   DOL's point person on the Reich litigation?

9   A.    Yes.

10   Q.    Okay.  And I see here on the realign it says

11   "Regarding Herman versus IBP"?

12   A.    Yes.

13   Q.    Mr. Hanson was asking you about changes.  At

14   this point was it Alexis Herman who was the Secretary

15   of Labor?

16   A.    Yes.

17   Q.    But essentially are we still talking about the

18   same case?

19   A.    Yes.

20   Q.    All right.  So, was -- what was Ms. -- without

21   going into all the details, what was Ms. Hagen doing by

22   writing such a letter to Mr. Stabler?

23   A.    She was telling him about we were -- we -- we

24   had done our -- our studies, we had concluded that four

25   minutes was sufficient time to pay on a go forward

1  basis and we were trying to reach settlement.

2  Q.    Okay.

3        MR. MUELLER:  So let's go to the bottom of the

4  second page, Martin.  Starting with paragraph two.

5  BY MR. MUELLER:

6  Q.    And could you read this paragraph into the

7  record, Mr. Kimbro, starting with this language, and

8  then I'll jump to the next page.

9  A.    "IBP has put in place, to be fully implemented

10  effective April 13th, and on a ongoing forward basis a

11  program to implement a reduction in the work day of

12  four minutes.  IBP believes that this time

13  is -- excessive -- excessive especially in light of the

14  duplicative benefits that employees will receive in the

15  form of payment for other non work time, such as

16  sunshine time, and in light of the actual time

17  calculations, as confirmed by Lamar Johnson indicating

18  that less time is appropriate and sustainable.

19        Since DOL has tried to -- tied together

20  settlement on several monetary penalties with backpay

21  and future compliance, IBP has no means by which to

22  explore and agree upon a reasonable amount of time and

23  thus it is taking an inordinately conservative position

24  which upon further investigation, we may decide to

25  change."  (Quoted as read.)

1  Q.    Okay.  So a couple questions about that.  Was

2  Lamar Johnson an expert who had done some work for IBP?

3  A.    Yes, sir.

4  Q.    Okay.  And I won't go into any details about

5  that.  But does that relate to the time measurements?

6  A.    Yes.

7  Q.    Okay.  And then it says that you were trying to

8  score and agree upon a reasonable amount of time, do

9  you see that?

10  A.    Yes, sir.

11  Q.    Was that the crux of a lot of discussions in the

12  time period we're talking about?

13  A.    Yes.

14  Q.    Okay.  Then it goes on to say you were taking or

15  the company was taking an inordinately conservative

16  position.  What does it mean by conservative?

17  A.    Once again, we were not assuming greater risk,

18  we were taking what we believed the lowest risk and

19  offering the reduction in the work day.

20  Q.    Okay.  And in the next paragraph, paragraph

21  three, let's start with the phrase "further" and read

22  from "further" to the end of that paragraph.

23  A.    "Further, these timings will be audited on a

24  quarterly basis, along with independent contractor who

25  will be brought in periodically to monitor compliance.

1          IBP thus will take the position that this is

2    in full compliance with the judge's order on this

3    issue."  (Quoted as read.)

4    Q.    Okay.  And that if we go to the last paragraph

5    that starts, "In short."

6          Could you just read the first sentence?

7    A.    I can.

8          "In short, while IBP desires to resolve this

9    matter with the DOL, IBP is prepared to take all

10   appropriate steps to ensure that absent a settlement

11   IBP has no problem with arguing that it has fully acted

12   in good faith on the basis of the decision rendered

13   finally in October, 1997."  (Quoted as read.)

14   Q.    Okay.  That's good enough.

15         So, is it fair to say that -- well, first of

16   all, this letter was sent to the Department of Labor,

17   correct?

18   A.    Yes, sir.

19   Q.    And was IBP indicating it wanted to reach an

20   amicable resolution to this matter?

21   A.    Yes, sir.

22   Q.    Okay.  Now, shortly after Ms. Hagen sent this

23   letter, did the Department of Labor file a lawsuit Mr.

24   Hanson referred to called Herman versus IBP?

25   A.    Yes, sir.

1  Q.    And for lack of a better word, was that an

2  enforcement action to try to force further dialogue?

3  A.    Yes, sir.

4  Q.    Okay.  Now, while that new lawsuit was pending,

5  did the Department of Labor do anything to try and

6  verify IBP's four minute number?

7  A.    Yes, sir.

8  Q.    What did they do?

9  A.    They hired their own subject matter expert.

10 Q.    Do you know that was?

11 A.    Doctor Jeffrey Fernandez.

12 Q.    Do you know where he was from?

13 A.    Wichita, Kansas.

14 Q.    Okay.

15 A.    Wichita.

16 Q.    Wichita State?

17 A.    Yeah, Wichita State, I believe it was.

18 Q.    And what did he do, generally speaking?

19 A.    He -- he brought in a team and the Department of

20 Labor selected two facilities --

21 Q.    When you say two, is that two out of the eleven

22 that were at issue in the case?

23 A.    Yes.

24 Q.    Okay.  Which two did they select?

25 A.    Emporia, Kansas, and Storm Lake, Iowa.

1   Q.    Did you pick those plants?

2   A.    No, sir.

3   Q.    I mean did IBP pick those plants?

4   A.    No, sir.

5   Q.    So they picked those two plants, what did they

6 do?

7   A.    They did -- Fernandez and his team went in and

8 conducted a comprehensive study of the pre and post

9 shift activities.

10   Q.    The ones that judge said you had to pay for?

11   A.    Yes.

12   Q.    And do you know the outcome of that time study?

13   A.    Yes.

14   Q.    How do you know the outcome of the Government's

15 time study?

16   A.    I looked at it, reviewed it.

17   Q.    I'm not going to show this to the jury today,

18 but let me show you what will be marked as Defendants'

19 Exhibit 5012.

20   A.    Thank you.

21   Q.    Can you tell me if that is Doctor Fernandez's

22 report for the Department of Labor?

23   A.    Yes, it appears to be.

24   Q.    Who was the one that showed you or gave you that

25 report?

1    A.    Sheila Hagen.

2    Q.    The top lawyer for the company?

3    A.    Yes.

4    Q.    Okay.  And what's the date of Doctor Fernandez's

5    report?

6    A.    December 14th, 1998.

7    Q.    Okay.  Could you turn to the, I don't know, the

8    executive summary page, the first page that has actual

9    facts?

10   A.    Yes.

11   Q.    And I highlighted two sentences for you.  We're

12   going to ask another witness about this tomorrow, but

13   why don't you read to the jury what it says.

14   A.    "Results indicate that the total time at Emporia

15   was 4.1420 minutes, IBP 5.2207 minutes, that's in

16   parenthesis, and at Storm Lake, was 3.6362 minutes, IBP

17   3.3568 minutes."  (Quoted as read.)

18   Q.    And could you read the next sentence?

19   A.    "Based on these results, it can be concluded

20   that IBP data, (supplied to the U.S. Department of

21   Labor on October 2nd, 1998) has been verified and can

22   be accepted as true and responsive."  (Quoted as read.)

23   Q.    Read that last word again?

24   A.    Oh, representative, I'm sorry.

25   Q.    Okay.  So Doctor Fernandez said IBP's numbers

1  were true and representative?

2   A.    Representative.

3   Q.    Okay.  And was it IBP's understanding that DOL

4  did this measurement to verify the four minutes at all

5  eleven plants, including Finney County?

6   A.    Yes, sir.

7   Q.    Okay.  Did you rely on that report in forming

8  your thinking on continuing to use the K-code?

9   A.    Yes, sir.

10  Q.    Okay.  So now, let's go back to our chart.  You

11 can set that down.

12        Have we now explained the fourth column on the

13 chart about the history of this litigation?

14  A.    I believe so.

15  Q.    So you have now explained the Department of

16 Labor verified your four minute number?

17  A.    Yes.

18  Q.    Okay.  And so actually by that point you had

19 already been paying it for something like eight months,

20 right?

21  A.    Yes.

22  Q.    Okay.  Now, did the DOL send any correspondence

23 to IBP?  In fact, I think Mr. Hanson showed this to

24 you, indicating it's acceptance with the four minute

25 number?

1    A.    Yes.

2         MR. MUELLER:  Let's bring up Exhibit Defendant

3    5201.

4    BY MR. MUELLER:

5    Q.    And who's this a letter from?

6         MR. MUELLER:  If you need to, we can look at

7    the second page, Martin, just show him the signature.

8    A.    Michael A. Stabler with the Regional Solicitor's

9    office.

10   BY MR. MUELLER:

11   Q.    And again, that is here in Kansas City?

12   A.    YES.

13   Q.    And so who did he send this letter to?

14   A.    He sent it to Sheila Hagen, the general counsel

15   for IBP.

16   Q.    And when did he send this letter?

17   A.    Um --

18   Q.    If you look up.

19   A.    Oh, April 30th, 1999.

20   Q.    And if we go down to the paragraph that starts

21   out "first".  Could you just read that first sentence?

22         I think Mr. Hanson may have asked you about

23   this.

24   A.    Mm-hmm.  "First, with regard to the payment of

25   back wages, the Department agrees that four minutes per

1  day is sufficient to pay employees for the period

2  October, 1994 to present."  (Quoted as read.)

3  Q.    Okay.  And then let's go to the next page, with

4  which Mr. Hanson also asked you about.

5        So, by the way, is this -- you said Judge

6  O'Connor said it was 14 minutes, was this a resolution

7  of the backpay issue we were talking about?

8  A.    Yes, sir.

9  Q.    Okay.  And so the resolution was at four

10 minutes, is that right?

11 A.    Yes, sir.

12 Q.    Okay.  Now, let's talk about the other bone of

13 contention of going forward, compliance.  Could you

14 read that paragraph?

15 A.    "Finally, with regard to future compliance, the

16 Department expects IBP to comply with the district

17 court's order of March 21, 1996 and May 16th, 1996

18 which requires IBP to record and pay for the time spent

19 by each employee performing the identified

20 comp -- compensable activities."  (Quoted as read.)

21 Q.    Okay.  So do you remember the injunction I

22 showed you before, paragraph three?

23 A.    Yes, sir.

24 Q.    Is Mr. Stabler largely tracking the language of

25 the injunction?

1  A.    Yes, sir, it appears to.

2  Q.    Remember the injunction doesn't have the word

3  actual time in it?

4  A.    Yes, sir.

5  Q.    Does Mr. Stabler use the word actual time?

6  A.    No, sir.

7  Q.    And he says only the identified compensable

8  activities.  Did you understand that to refer to just

9  the mesh items?

10  A.    Yes.

11  Q.    Okay.  Now, soon after this, were the parties,

12  that is IBP and the Department of Labor, finally able

13  to resolve their differences on the red meat side?

14  A.    Yes, sir.

15  Q.    And by red meat, I mean all the pork and beef

16  plants, is that how you guys describe them?

17  A.    Yes, sir.

18  Q.    Earlier Mr. Hanson showed you FM and you said it

19  was Fresh Meats.  Is that the beef and pork plants?

20  A.    Yes.

21  Q.    Okay.  Now, at some point then, shortly after

22  this, did the parties enter a stipulation to dismiss

23  the Herman versus IBP case?

24  A.    Yes, sir.

25  Q.    Okay.  I want to pull that up.  This is Exhibit

1  1 -- Plaintiffs' Trial Exhibit 1, Eighth attachment,

2  8th Exhibit.

3         So I am just going to put it on the ELMO, the

4  projector.

5         Now, is this the joint stipulation of

6  dismissal between IBP and DOL finally

7  resolving -- well, I'll get to a little of a dispute,

8  but finally resolving the claims that the Department of

9  Labor had brought against IBP on the Fresh Meats side?

10  A.    Yes, sir.

11  Q.    Okay.  And was it filed with the court on July

12  16th, 1999?

13  A.    It was.

14  Q.    Okay.  Now, remember Mr. Hanson asked you, he

15  said, There's no consent judgment, there's no

16  settlement agreement?

17  A.    Yes.

18  Q.    Okay.  Was this a joint stipulation between the

19  Government and IBP?

20  A.    Yes.

21  Q.    And is this the document that resolved the

22  litigation?

23  A.    Yes, sir.

24  Q.    Okay.  What does that first paragraph say?  Why

25  don't you read that to the jury?

1   A.     "The independent actions taken by the -- by

2   defendant, IBP, Inc. at its facilities has satisfied

3   the relief requested in plaintiffs' amended complaint

4   and therefore has mooted the above referenced lawsuit."

5   (Quoted as read.)

6   Q.     Okay.  And what do you -- what do you understand

7   the word mooted means?

8   A.     Silenced or finished.

9   Q.     Okay.  And what was the independent actions

10  taken by IBP at its facilities?

11  A.     The modifications that we had made in the work

12  day by reducing the work shift by four minutes and

13  paying the K-code for pre and post shift activities.

14  Q.     Okay.  Thank you.

15         So a year later, in 2000, I think Mr. Hanson

16  asked you this, did IBP make an effort to get the

17  Court, this courthouse, to dissolve the injunction?

18  A.     I'm sorry, can you say that again?

19  Q.     Did -- did IBP ask the court to dissolve the

20  injunction the next year?

21  A.     Yes.

22  Q.     And why would it ask to dissolve the injunction?

23  A.     We didn't think it was needed any longer.  We

24  were compliant.  We wanted it to go away.

25  Q.     Were you still paying the four minutes then?

```
 1    A.      Yes.

 2    Q.      Were you intending to continue paying the four

 3  minutes?

 4    A.      Yes.

 5    Q.      Okay.  What was the DOL's position on that?

 6    A.      They were not agreeable to it.

 7    Q.      Okay.  Was there some briefing in the court over

 8  that?

 9    A.      Yes, sir.

10    Q.      And I'm going to show you a portion of the

11  Department of Labor's brief.

12          MR. MUELLER:  Can we bring up Defendants'

13  5202.  Oh, sorry.

14          THE COURT:  You know, I think before we do

15  that, we'll take our second break of the day.  It's a

16  quarter of 12:00.  We'll be in recess until 12:05, it's

17  12:05.

18          I remind you, again, you're not to discuss

19  this case or any aspect of it among yourselves or with

20  anyone else.  No independent research.

21          Enjoy your break and we'll see you back in

22  here in 20 minutes.  Thank you.

23          (The jury leaves the courtroom.)

24          THE COURT:  Mr. Kimbro, you can step down.

25          THE WITNESS:  Thank you.
```

1          THE COURT:  It may not seem so to you, Mr.

2     Kimbro, but this morning is just clipping right along,

3     as far as I can tell.

4          Yeah, Mr. O'Dear.

5          MR. O'DEAR:  I had something that I've just

6     been watching, it's probably nothing but the juror on

7     the back row, to the left, she's either crying or

8     there's something wrong with her eye.  I think there's

9     something wrong with her eye, but --

10          THE COURT:  Ryan, will you ask her?  If she

11     needs some --

12          MR. O'DEAR:  She was trying to shield light.

13          MR. MEYER:  Which one now?

14          MR. O'DEAR:  On the back row, far left.

15          THE COURT:  Can you check on that?

16          Thanks so much, Mr. O'Dear.

17          Okay, Mr. Hanson.

18          MR. HANSON:  I -- rather than interrupt the

19     testimony of the witness, there may be an evidentiary

20     matter that is coming up that Mr. Mueller and I

21     discussed this morning.

22          And I think now I understand what the issue

23     is.  It has to do with a suggestion that union

24     organizing is an instigation for a wage and hour

25     complaint.  You may recall that during Mr. Karkiainen,

1  Ms. Paschal tried to introduce an exhibit which talked

2  about union organizing in this facility.  I think

3  that's where they may be going now.  There was --

4           THE COURT:  If you are, Mr. Mueller, I am

5  going to give them every document that relates to that

6  that Tyson generated.

7           MR. MUELLER:  May I respond to it?

8           THE COURT:  Sure.

9           MR. MUELLER:  Mr. Hanson asked our witness on

10 Thursday, Ronda Litras, why they waited until August,

11 2007.  He elicited the same testimony from Mr. Kimbro

12 but he didn't ask him why, he just left it hanging out

13 there.

14          THE COURT:  Well, you can ask him if it was

15 done in response to an attempt for the union to

16 organize the plant but no further than that.

17          MR. MUELLER:  Well, the critical component is,

18 the three names on the letter are the named plaintiffs,

19 and that's what drove the decision.  It's not a general

20 aversion to unions, it's that the plaintiffs were

21 trying to take credit for it instead of the company and

22 that goes to our motivation for the delay.

23          THE COURT:  That doesn't have anything to do

24 with the merits of this lawsuit and it doesn't have

25 anything -- these three named plaintiffs, I don't think

1  have anything to do any of the issues that we are

2  talking about here, beyond being named plaintiffs.  And

3  so, if you go beyond the fact that there was an attempt

4  to organize in the plant, you are opening the flood

5  gates to all of the stuff that the company sent around

6  with respect to here's how we are going to respond to

7  all this union stuff, we're concerned about these

8  issues, and them talking about this plant up here and

9  bringing some of that stuff and here's how we're going

10  to respond to all the stuff about what the union's

11  promising and I don't think you really want to think

12  you want to get into that, Mr. Mueller.

13        So you can bring out with Mr. Kimbro that

14  there was an effort to organize the plant.  I don't

15  even care if you bring out the fact that the plaintiffs

16  may have been involved in that, but --

17        MR. MUELLER:  That's all I want to do.

18        THE COURT:  -- but if it goes beyond that,

19  then the door is open.

20        MR. MUELLER:  I will -- and I tell you what, I

21  will just show him to confirm that their names on it

22  and not publish it and won't seek to admit it.

23        MR. HANSON:  I'm not even sure there is any

24  foundation for what the union may have done with our

25  named plaintiffs.  That's the problem.

1        I -- the union has its own issues, its own

2   objectives but to try to pull our named plaintiffs into

3   a union organizing attempt, I think it is clearly an

4   attempt to tie, now that we have heard Mr. Kimbro say,

5   The unions instigates these things, it is just going to

6   cause prejudice.  There is no evidence that our

7   individuals were at all involved or interested in union

8   organizing.  Unions do things on their own, there is

9   just no foundation to prop up our plaintiffs and make

10  them or potentially taint them with what I think is an

11  attempt through union organizing.

12       MR. MUELLER:  It explains our state of mind.

13  He suggested we didn't back pay so we are trying to

14  violate the law or get away with whatever we could.  He

15  has asked two witnesses this question, it is completely

16  unanswered.

17       THE COURT:  The thing I am still struggling

18  with, though, Mr. Mueller, is what does bringing the

19  named plaintiffs into this case have to do with the

20  issues that we're dealing with here in terms of whether

21  the -- the -- these people are being paid for all the

22  time they're supposed to?

23       MR. MUELLER:  Can I make a proffer?

24       THE COURT:  Sure.

25       MR. MUELLER:  This is what the witness will

1 say, the witness will say essentially, the company got

2 this flier, the three named plaintiffs, Ms. Garcia, Mr.

3 Jeronimo Vargas Vera and Antonio Garcia who testified,

4 their names are on that and the document says the union

5 is going to take credit for the new seven minute K-code

6 and the company didn't want that, they wanted the

7 election to be over so that it could claim credit

8 because it was the one implementing it and that is all

9 he wants to say.

10        MR. HANSON:  I don't have an objection, if

11 they want to explain just that, that they wanted to

12 avoid the union taking credit is fine, just don't drag

13 my three named plaintiffs into it.

14        They can -- they can communicate the exact

15 same thing, they can explain why there was a delay in

16 payment without identifying the three named plaintiffs

17 as part of that flier.  There is no foundation

18 for -- for that, on for attaching their names to it, to

19 the union.

20        MR. MUELLER:  Their names are on it, I mean we

21 got this flier from the union, it was being handed out,

22 we didn't put their names on it.

23        THE COURT:  Well, but so what, Mr. Mueller?  I

24 mean so what?

25        What does that have to do in terms of

```
 1  advancing the merits of your defense versus the -- the
 2  plaintiffs' claims here?  You're trying to single out
 3  these three plaintiffs in an effort to attribute
 4  something to them that really doesn't have anything to
 5  do with the merits of the case.
 6          MR. MUELLER:  Well --
 7          THE COURT:  So you can -- you can go as far as
 8  you just indicated, which is you can say that the
 9  company wanted to take credit for the additional time,
10  didn't want the union to get credit, but I don't want
11  the plaintiffs' names associated with that.
12          MR. MUELLER:  Okay.
13          THE COURT:  And I think that you achieve what
14  the company wants, in terms of its motive, without
15  injecting what I think is something that's unduly
16  prejudicial.
17          MR. MUELLER:  Okay, Your Honor.  We just note
18  an objection for the record.
19          THE COURT:  Sure.  Absolutely.
20          MR. MUELLER:  Thank you.
21          THE COURT:  See you all back here.
22          (Recess taken from 11:51 a.m. until 12:10
23          p.m.  Proceedings continue outside the
24          presence of the jury.)
25          THE COURT:  Go ahead and have a seat, Mr.
```

1  Kimbro.

2          And go ahead and bring them all in.

3          Sorry for running a few minutes late; visiting

4  with our chief.

5          (The jury enters the courtroom.)

6          THE COURT:  Go ahead and have a seat, folks.

7          Be seated, everybody.

8          And, Mr. Mueller, as soon as you're ready.

9          MR. MUELLER:  I am.

10         THE COURT:  Go right ahead.

11         MR. MUELLER:  I am ready, Your Honor.

12         THE COURT:  All right.

13 BY MR. MUELLER:

14  Q.    Mr. Kimbro, before I get to the Department of

15 Labor's brief relating to IBP's motion to dissolve the

16 injunction, I want to step back.  I forgot to ask you

17 one question.

18         I remember Mr. Hanson was reading some

19 language from the Reich vs. IBP decisions, and I think

20 he may have read from a Tenth Circuit decision but I

21 want to show you the Tenth Circuit decision and ask you

22 to read into the record and ask you how that affected

23 your thinking.

24  A.    Thank you.

25  Q.    So I've handed you the Tenth Circuit's decision

1  on what items you have to pay for and their reasoning.

2  Could you please read the jury the Court of Appeals'

3  reasoning?

4  A.     The highlighted?

5  Q.     Yes.  Yes.

6  A.     "The placement of a pair of safety glasses, a

7  pair of earplugs, and a hard hat into or on to the

8  appropriate location on the head takes all of a few

9  seconds and requires little or no concentration.  Such

10  items can easily be carried or worn to and from work

11  and can be placed, removed, or replaced while on the

12  move or while one's attention is focussed on other

13  things.

14         Similarly, safety shoes can be worn to and

15  from work, and require little or no additional effort

16  to put on as compared to most other shoes."  (Quoted as

17  read.)

18  Q.     And take --

19  A.     "Thus" --

20  Q.     Sorry, go ahead.

21  A.     "Thus, although essential to the job and

22  required by the employer, any time spent on these items

23  is not work."  (Quoted as read.)

24  Q.     Okay.  Then what does it say in the footnote to

25  that?

1  A.    Footnote says:   "It could also be said that the

2  time spent putting on and taking off these items is di

3  minimis as a matter of law, although it is more

4  properly considered not work at all.  Requiring

5  employees to show up at their work station with such

6  standard equipment is no different from having a

7  baseball player show up in uniform, or a business

8  person with a suit and tie, or a judge with a robe.  It

9  is simply a prerequisite for the job.  It is purely

10 primarily in nature -- preliminary in nature."  Excuse

11 me.  (Quoted as read.)

12 Q.    Okay.  Thank you.  Now, did that factor into

13 your thinking over the years?

14 A.    Yes, sir.

15 Q.    Now, let's go back to the issue I said I wanted

16 to cover next, which is IBP's motion to dissolve the

17 injunction.

18        Do you remember, I asked you whether the

19 Department of Labor filed a brief on that issue?

20 A.    Yes, sir.

21 Q.    Okay.  And I have a document here, I'll

22 represent to you was filed sometime in February of

23 2000.

24        MR. MUELLER:  Counsel, it's Defendants' 5202.

25        Let's bring that up.  And see what the

1    Department of Labor said when IBP tried to dissolve the

2    injunction.

3    BY MR. MUELLER:

4    Q.    Can you read this language, Mr. Kimbro?  Read it

5    in to the record.

6    A.    Starting with "first"?

7    Q.    Yes.

8    A.    "First, the chain circumstances in this matter

9    do not make compliance with the injunction onerous,

10   instead the changes made it easier" -- (Quoted as

11   read.)

12   Q.    Before you go on, are the changes the

13   implementation of the four minute K-code?

14   A.    Yes, sir.

15   Q.    Okay.  Go ahead, keep reading.

16   A.    "Easier.  Defendant essentially eliminated what

17   the Court found to be the start of the work day (the

18   knife room) and began to pay employees for the current

19   average time employees spent performing and the

20   remaining pre and post shift activities.

21        It has presented the Court with a letter

22   (Defendant's Motion Exhibit 1) from the plaintiff

23   stating that its system can be used until sometime in

24   the future when the administrator of the wage and hour

25   division decides what, if any, recordkeeping

1  accommodations it will make for the meat packing

2  industry in general.

3           By defendants own admission, compliance with

4  the decree has not become substantially more onerous.

5  If anything, IBP has demonstrated that compliance with

6  the injunction is relatively simple."  (Quoted as

7  read.)

8  Q.    And did you understand the "relatively simple"

9  to mean the four minute K-code?

10 A.    Yes, sir.

11 Q.    Okay.  So, what did the Court do with the

12 injunction?  Did it leave it in place?

13 A.    They left it in place.

14 Q.    Now, after that briefing and since that time,

15 has the Department of Labor ever come back to IBP until

16 October of 2001 or Tyson since then, with regard to

17 donning and doffing practices at the fresh meat or red

18 meat plants?

19 A.    No, sir.

20 Q.    Okay.  Now, and did Tyson continue the K-code

21 over that period of time?

22 A.    Yes, sir.

23 Q.    Okay.  So now, have we explained the -- on the

24 bottom row of our chart the event in 2001?

25 A.    Yes, sir.

1  Q.    Okay.

2        MR. MUELLER:  So now, let me bring up the

3  other slide, Martin, about what's at issue.

4  BY MR. MUELLER:

5  Q.    So I want to make sure I understand this right.

6  The jury saw this in opening statement.

7        On the top half of this chart, it talks about

8  the unique items and it says the protective clothing

9  and gear specific to knife users.  Is Tyson paying for

10  those things pre and post shift?

11  A.    Yes, sir.

12  Q.    Okay.  And then I'll get later to the changes in

13  April of 2010 and then as to the standard items below

14  that, are those the items Judge O'Connor said that the

15  company need not pay for?

16  A.    Yes, sir.

17  Q.    Okay.  Are those the items the jury is going to

18  decide here?

19  A.    Yes, sir.

20  Q.    Okay.  Now, by the way, we have been talking a

21  lot about federal law and Mr. Hanson asked you a lot

22  about federal law but he never asked you about Kansas

23  law.

24        Has any court, I mean any where, ever said

25  that IBP or Tyson has to pay for these activities under

```
 1  Kansas state law?

 2   A.    No, sir.

 3   Q.    In fact, before this lawsuit was filed by Mr.

 4  Hanson, had anyone even tried to sue the company under

 5  state law for these activities?

 6   A.    Not that I'm aware of, sir.

 7   Q.    So as you understand it, is this a test case or

 8  a novel case?

 9   A.    Yes.

10   Q.    Are you aware of any precedent under Kansas law

11  for suing for these activities?

12         MR. HANSON:  Judge, we would just object,

13  calls for a legal conclusion on this issue.

14         THE COURT:  That's sustained.

15         MR. MUELLER:  Okay.

16  BY MR. MUELLER:

17   Q.    Let me now talk about the opinion letter that

18  Mr. Hanson showed you.  Do you have that up there?

19  It's somewhere up there.

20   A.    Okay.

21   Q.    It's two pages.  Does it have a paper clip on it

22  maybe?

23   A.    It was early on, I believe.  I have it.

24   Q.    May I put that on the projector?

25   A.    Mr. Hanson's.
```

1    Q.    Now, is this the opinion letter that he was

2    showing you on the witness stand?

3    A.    Yes, sir.

4    Q.    We have an agreement that Mr. Hanson printed

5    this out last night.

6          This didn't come from Tyson's files, did it?

7    A.    No, sir.

8    Q.    Okay.  And do you see where you would normally

9    have on the line who it is sent, to there is three

10   asterix?

11   A.    I see that.

12   Q.    And so when Mr. Hanson was showing this to you,

13   was it a document that came out of your files?

14   A.    No, sir.

15   Q.    And can you tell who it was even sent to?

16   A.    No, sir.

17   Q.    Based on everything you know, was this sent to

18   Tyson Foods?

19   A.    No, sir.

20   Q.    Okay.  And as you sit here, we can't see who it

21   was sent to, is that right?

22   A.    That's correct.

23   Q.    Okay.  Now, was there -- is there an industry

24   group that Tyson may belong to now?

25   A.    The AMI.

194

1    Q.    Okay, what does that stand for?

2    A.    American Meat Institute -- institute I believe

3  it is, yeah.

4    Q.    Okay.  Back in 2001, January of 2001, was the

5  company a member of AMI?

6    A.    No, sir.

7    Q.    Okay.  So and we're making assumptions here

8  because he hasn't established, and I guess you don't

9  know who this was sent to, but if it was sent to AMI,

10 were you a member of that trade association at that

11 time?

12   A.    No, sir, not at that time.

13   Q.    Okay.  Now, Mr. Hanson asked whether you had

14 lobbied for the Department of Labor to issue an opinion

15 on 3(o) and, again, is that the section of the statute

16 that deals with unionized plants?

17   A.    Yes, sir.

18   Q.    And does that -- I take it Finney County is

19 nonunionized, did you say?

20   A.    That that's correct.

21   Q.    And has it always been nonunionized?

22   A.    Yes, sir.

23   Q.    Okay.  So does that section of the statute have

24 anything to do with Finney County?

25   A.    No, sir.

1  Q.    So to the extent you were lobbying, did they

2  have anything to do with the Finney County plant?

3  A.    No, sir.

4  Q.    And when you look at the letter, when you look

5  at the letter, am I correct that most of the letter

6  deals with unionized plants that 3(o) issued?

7  A.    Yes.  Yes.

8  Q.    And then around the same time that Mr. Hanson

9  was asking you about that relates to unionized plants,

10  do you remember he asked you, he showed you a footnote

11  from a court case called Chavez where you testified?

12  A.    Yes.

13  Q.    And that Chavez case, what plant did that

14  involve?

15  A.    Pasco, Washington, I believe.

16  Q.    And was that a unionized plant?

17  A.    Yes.

18  Q.    Was your interest in lobbying the DOL to get a

19  letter like this related to the unionized plants?

20  A.    Yes.

21  Q.    Now, you said you saw this some years later, am

22  I right about that?

23  A.    Yes.

24  Q.    And in the intervening period, actually, from

25  January of 2001 to -- go ahead.

1    A.    Can I make a correction?

2    Q.    Sure.

3    A.    I -- actually what I recall seeing was a

4  it -- it appears to be the same letter but it was like

5  a, it said to the staff or to something like that.  It

6  wasn't exactly this letter.

7    Q.    Okay.

8    A.    I think the content was probably the same but I

9  don't think it -- I don't remember it looking like

10  this.

11    Q.    Okay.  Well, that's fine.

12    A.    Okay.

13    Q.    And Mr. Hanson said he printed this out last

14  night?

15    A.    Okay.

16    Q.    So that's fine.

17          In the intervening years from January of 2001

18  to the present, has the Department of Labor ever

19  reached out to you to raise issues about donning and

20  doffing at the Finney County plant?

21    A.    No, sir.

22    Q.    Have they picked up the phone and called you?

23    A.    No, sir.

24    Q.    Have they sent you a letter?

25    A.    No, sir.

1   Q.    Have they asked to meet with you with regard to

2   the beef or pork plants?

3   A.    No, sir.

4   Q.    Do you think as head of HR, if the Department of

5   Labor reached out to your company about those things,

6   you would know about it?

7   A.    Yes, sir, I do.

8   Q.    Okay.  Now --

9        MR. MUELLER:  Your Honor, at this point I

10  would like to take judicial notice of the thing you

11  said we could do.

12       THE COURT:  That's fine.

13       MR. MUELLER:  If you could bring up, Martin,

14  Defendants' Exhibit 5203.

15       MR. HANSON:  Judge, pardon me, I thought we

16  had an understanding about publishing certain legal

17  material to the jury.  I mean, again, it's okay to talk

18  about it but I think if we start to --

19       THE COURT:  I agree.  I did not think this was

20  going to be shown to the jury, I thought you were

21  simply going to read it.

22       MR. MUELLER:  Okay.  I can do that.  Your

23  Honor, do you want to explain what a judicial notice is

24  or do you want me to just tell them?

25       THE COURT:  Folks, there are certain things

1   that the Court is allowed to accept as true.  They can

2   be a geographic facts, they certainly can be legal

3   matters.  And, among the things that we can accept as

4   true or recognize without any further proof, are

5   federal regulations and federal statutes.

6           And what Mr. Mueller is about to share with

7   you is a provision of the code of federal regulations

8   and a federal statute that relates to the ability of

9   the Department of Labor and their ability to bind

10  plants with respect to certain wage and hour provisions

11  and their lack of ability to bind them as well.

12          So, with that, Mr. Mueller.

13          MR. MUELLER:  Yes.  This is from 29 Code of

14  Federal Regulations, Section 785.2.

15          The Department of Labor's regulations under

16  the Fair Labor Standards Act.  "Fair Labor Standards

17  Act.  Quote, the ultimate decisions on interpretations

18  of the act are made by the courts.  The administrator

19  must determine in the first instance the positions he

20  will take in the enforcement of the act the regulations

21  in this part seek to inform the public of such

22  positions.  It should thus provide a practical guide

23  for employers and employees as to how the office

24  representing the public interests in its enforcement

25  will seek to apply it."  (Quoted as read.)

1  BY MR. MUELLER:

2   Q.    So, Mr. Kimbro, let me ask you some questions

3  now that the jury knows the -- the Department of Labor

4  defers to the courts on how to interpret the act.

5        Even -- you said even years later when you

6  finally got a copy of this opinion letter that you

7  didn't change anything.  Why is that?

8   A.    Because we had litigated this case, we went to

9  court on this case and we had Judge O'Connor's decision

10  and we were implementing that decision.

11   Q.    And on the last page of the opinion letter, Mr.

12  Hanson showed it to you or had you read from it

13  earlier, he, Michael Kerr, the acting administrator

14  said, I would like to reiterate that in order to comply

15  with the FLSA and its implementing regulations, a

16  company must record and pay for each employee's actual

17  hours of work, do you remember that?

18   A.    Yes.

19   Q.    And do you see the word "actual" suddenly showed

20  up in Mr. Kerr's letter?

21   A.    I do.

22   Q.    Hadn't you -- had you already litigated that

23  issue with the Department of Labor?

24   A.    Absolutely.

25   Q.    And which way had the courts ruled when

1  Department of Labor was in court and the court made

2  decision on his whether it's actual versus reasonable

3  time?

4  A.    The Court said reasonable.

5  Q.    And in light of what we heard the law is, did

6  you feel that Mr. Kerr's opinion letter, which was

7  contrary to the rulings in Reich, was something you had

8  to follow?

9  A.    No, sir.

10 Q.    Okay.  Now I want to move on.

11        MR. MUELLER:  Let's bring up that chart again,

12 Martin, the history of the litigation.

13 BY MR. MUELLER:

14 Q.    I thought I asked you everything I want to ask

15 you about the Reich case.

16        Mr. Hanson just asked you questions this

17 morning about Alvarez versus IBP, so I have a few

18 questions about that.  It won't be too long.

19        And so I'm not going to talk about the box

20 that says November of 2005.

21        And you said that some employees at your plant

22 in Pasco, Washington brought a donning and doffing

23 lawsuit like this one?

24 A.    Yes, sir.

25 Q.    And I think you said they were suing for

1  basically the same activities?

2  A.    Yes, sir.

3  Q.    Is that right?  And you said they were also

4  getting the K -- paid four minute K-code, is that

5  correct?

6  A.    Yes, sir.

7  Q.    Did they want to be paid more than that?

8  A.    Yes, sir.

9  Q.    Okay.  Were there also some claims that were

10 unique to Washington state law in that case?

11 A.    Yes.

12 Q.    Okay.  And do those Washington state laws, to

13 your knowledge, apply here in Kansas?

14 A.    Not to my knowledge, no, sir.

15 Q.    Okay.  Now, was that Pasco plant -- that Pasco

16 plant was, did you say unionized?

17 A.    Yes.

18 Q.    Did the Reich injunction, the one that we

19 litigated involving the 11 plants in this Court, did it

20 apply to the Pasco plant?

21 A.    No, sir.

22 Q.    So did the Court there have authority to relook

23 at the law fresh and decide the issues there anew?

24 A.    Yes, sir.

25 Q.    Okay.  Now, once the Court ruled in that

1    case -- oh, by the way, what did the judge say in that

2    case about whether to follow actual or reasonable time

3    it takes the employees?

4    A.    Judge Wheeler said reasonable time.

5    Q.    And what did he say about whether or not the

6    standard items that are hanging on that board are di

7    minimis?

8    A.    He said they were di minimis.

9    Q.    Okay.  Was that the same as what the 10th

10   Circuit Court of Appeals said in the Reich case?

11   A.    Yes, sir.

12   Q.    Okay.  And after the Court ruled, why didn't you

13   change your practices at Finney County, Kansas?

14   A.    Because we had Judge O'Connor's decision and the

15   injunction and we were following what we believed to be

16   the law.

17   Q.    Okay.  And I think Mr. Hanson asked you this.

18   You appealed to the Ninth Circuit Court of Appeals?

19   A.    Going back to the Pasco case?

20   Q.    Yes, the Pasco case, not this case?

21   A.    Yes, we did.

22   Q.    And went up -- went up to Ninth Circuit.

23   Without details, did they affirm or what did they do?

24   A.    They affirmed.

25   Q.    Okay.  And what did they say about the standard

1   items and whether they were de minimus?

2   A.      They affirmed.

3   Q.      Okay.  And by that point did Tyson own the plant

4   in Pasco, Washington?

5   A.      Yes.

6   Q.      By the time it got to the Ninth Circuit?

7   A.      Yes.

8   Q.      Okay.  And then did the case go to the United

9   States Supreme Court?

10  A.      It did.

11  Q.      And to your understanding, did the Supreme Court

12  decide anything about whether you have to pay for

13  donning and doffing itself or were there some other

14  issues?

15  A.      There was some other -- no, they -- they

16  focussed on the walk time from the locker room.

17  Q.      Okay.  And to your knowledge, were there any

18  issues in that case about the meal period?

19  A.      Um --

20  Q.      Once it was in the Supreme Court?

21  A.      In the Supreme Court?

22  Q.      Yes.

23  A.      No.  No.

24  Q.      Okay.  So and when did the Supreme Court decide

25  that case?

1    A.    November, around Thanksgiving, '05 I think.

2    Q.    And Mr. Hanson pointed out it was a 9-0

3  decision.  Do you remember there was an issue in that

4  case about whether the employees got to be paid for all

5  their pre-shift waiting time?

6    A.    Yes.

7    Q.    And did the Supreme Court rule in favor of

8  employers on that issue?

9    A.    Yes.

10   Q.    So they also ruled 9-0 on one side and 9-0 on

11 the other side?

12   A.    That's correct.

13   Q.    Okay.  Now, did Tyson accept the ruling of the

14 Supreme Court?

15   A.    We did.

16   Q.    Okay.  And starting in 2006 or maybe late '05,

17 what did Tyson do to try and come into compliance?

18   A.    We started conducting time studies on walk time.

19   Q.    And who was in charge of that?

20   A.    Once again, that would be Monty Hahn.

21   Q.    Is he the industrial engineer?

22   A.    Yes, sir.

23   Q.    Okay.  And we heard from him last week.

24        What determinations were made at Finney County

25 to add minutes to walking time?

1   A.    Based on the study there was identified that

2   there was three zones or areas that would either be

3   applicable to one minute additionals, two minutes

4   additional or three minutes additional.

5   Q.    Okay.  And was that added to the K-code at most

6   plants starting around January or February of 2007?

7   A.    Yes, it was.

8   Q.    Okay.  Now we've heard some questions to Mr.

9   Hanson.  He asked you, and I'll represent he asked

10  Ronda Litras last Thursday, why Tyson did not add the

11  new K-code minutes in January like it did at the other

12  plants.

13        What's the reason why there was some delay?

14  A.    At that time, in January of 2007 there was an

15  organizing campaign going on there by the United Steel

16  Workers of America and we identified two issues.  One,

17  we didn't want to have it appear that the steel workers

18  had somehow garnered or gotten this additional time for

19  their organizing efforts and then, second, we were

20  concerned about making unilateral changes during active

21  organizing drive.

22  Q.    Okay.  And what was the outcome of the

23  organizing drive?

24  A.    The union was soundly defeated.

25  Q.    When you say soundly, who votes on that?

1    A.    The team members.

2    Q.    Does --

3    A.    That work in the facility.

4    Q.    Does the company --

5    A.    No

6    Q.    Does the company vote on that?

7    A.    No.

8    Q.    And after -- after the labor process ran out,

9 was there then backpay at Finney County for those one

10 to three minutes?

11   A.    Yes, there was.

12   Q.    Okay.  And was it back paid back to January of

13 '07?

14   A.    Yes, sir.

15   Q.    And by '07 now, are the K-code minutes jobs

16 specific?

17   A.    Yes, they are.

18   Q.    Okay.  And who got the minutes, in terms of

19 whether you hold a knife or don't hold a knife?

20   A.    Knife wielders and those that use knives.

21   Q.    And was that what Judge O'Connor said was a

22 group of people who had to be paid?

23   A.    Yes.

24   Q.    And you told me earlier you also gave a four

25 minute K-code to people that Judge O'Connor said did

1   not need to be paid?

2   A.      That's correct.

3   Q.      Were they grandfathered in?

4   A.      Yes, they were.

5   Q.      So from, effectively January '07, if we count

6   the back pay that was made, from that point 'til 2010,

7   are most of the people in the plant getting four to

8   seven minutes of K-code time?

9   A.      Yes.

10  Q.      Okay.  Now, I'm going to digress a bit.  I

11  wasn't going to ask you about these but Mr. Hanson

12  asked you about two cases.  He asked you about the

13  Chavez case.  Was that around -- did that go to trial

14  around 2004?

15  A.      Yes.

16  Q.      Do you remember he -- he read some language to

17  you from that decision suggesting you acted recklessly?

18  A.      Yes.

19  Q.      Had there been other more recent cases that have

20  also looked at whether the company was acting in good

21  faith or willfully?

22  A.      Yes, sir.

23  Q.      And I'd like to show you one of those.  This is

24  5212.

25  A.      Thank you.

1    Q.    Do you remember Mr. Hanson asking you if the

2    Department of Labor had also sued Tyson's poultry

3    plants?

4    A.    Yes, sir.

5    Q.    And was the Secretary of Labor at that time

6    Elaine Chao?

7    A.    Yes, sir.

8    Q.    And is that case therefore known as Chao versus

9    Tyson Foods?

10   A.    It is.

11   Q.    Okay.  I have handed you a decision the Court

12   issued.  I realize it's not the trial version, but the

13   judge wrote an opinion.  Could you please read into the

14   record what the judge wrote in that case?  On the issue

15   of Tyson's good faith.

16   A.    Starting with "Plaintiff"?

17   Q.    Yeah, I have highlighted it so that we don't

18   waste our time here.

19   A.    "Plaintiffs burs that defendant could not have

20   reasonably believed it acted in conformity with the

21   FLSA.  Plaintiff argues that for at least two years

22   prior to this action, the Department of Labor more than

23   adequately informed the defendant that the activities

24   at issue are compensable; however, given the vast

25   amount of litigation similar to this action which has

1    either recently been or is currently pending in

2    district and circuit courts nationwide, and which

3    offers varying conclusions under different legal

4    theories it is responsible to conclude that the

5    compensability of the activities presently at issue

6    remain unsettled."  (Quoted as read.)

7    Q.    Okay.  So did you take that to mean that the

8    judge was saying that even though the Department of

9    Labor had its use, that Tyson was entitled to look at

10   the version of Court decisions?

11   A.    Yes, sir.

12   Q.    And let me see that.  There was something at the

13   end.

14          Oh, yes.  Did she point out that the courts

15   had come to varying conclusions?

16   A.    Yes, she did.

17   Q.    But do we already have a decision involving the

18   Finney County plant?

19   A.    Yes, we do.

20   Q.    Is that the Reich vs. IBP case?

21   A.    Yes, sir.

22   Q.    And did that inform your views of what to do at

23   Finney County?

24   A.    Yes, sir.

25   Q.    Now, has there been a more recent decision

1  involving Tyson's willfulness as to the Finney County

2  plant?

3  A.     Could you be more specific?

4  Q.     Yes.   An earlier decision in this case.

5            MR. HANSON:   Judge, we need to approach on

6  this.

7            THE COURT:   Yes.

8            (The following sidebar conference was had

9            outside the presence of the jury:)

10           MR. HANSON:   You want to hand him --

11           MR. MUELLER:   I'm not going to publish and I'm

12  happy not to say Judge Lungstrum's name or anything,

13  but he has just read every opinion in the country that

14  doesn't involve this plant.   I mean this is why we are

15  still litigating, because we have been told it's a fair

16  issue.

17           MR. HANSON:   Judge, this is January 31st,

18  2011, it's after the time which they are seeking

19  damages which is ended.

20           THE COURT:   It's irrelevant.

21           MR. MUELLER:   Okay.

22           THE COURT:   You can't use it.

23           (The sidebar concludes and proceedings

24           continue in open court.)

25  BY MR. MUELLER:

1   Q.    Okay.  Lets -- have we now covered the period

2   January, 2007 on the chart?

3   A.    Yes.

4   Q.    Okay.  Now, I want to talk about the last box on

5   the bottom row of our chart.  Talk about April, 2010.

6         I think Mr. Hanson established that since the

7   Supreme Court decided Alvarez there have been new

8   lawsuits filed against the company, did you say that?

9   A.    I believe so.

10  Q.    And Mr. Hanson was suggesting there were about

11  ten other than this one.  Do you have any basis to

12  disagree with that?

13  A.    No.

14  Q.    And I mean on the red meat side, the beef and

15  pork plants.

16        Do those cases involve plants in other states

17  or other circuits, federal circuits?

18  A.    Yes, on both.

19  Q.    And -- do you have an understanding that

20  different circuits of the federal courts follow their

21  own interpretations of the law?

22  A.    Yes.

23  Q.    Just generally speaking, as an employer who has

24  followed labor law issue for his many years, is it

25  generally true that each state has its own laws on wage

1  and hour issues?

2  A.    It surely appears that way, yes, sir.

3  Q.    And by late 2009, which is Exhibit 203A, or

4  early 2010, was the company considering making further

5  changes to the K-code?

6  A.    Yes.

7  Q.    And what motivated that?  Why were you thinking

8  about making further changes, if as you told Mr.

9  Hanson, you thought you were already in compliance?

10  A.    Because we were trying to stem some of the

11  plaintiffs' intervention in litigation.  We were trying

12  to disincentivize (sic) more lawsuits.

13  Q.    And how would adding extra minutes

14  disincentivize (sic) plaintiffs' lawyers from bringing

15  new lawsuits?  What do you mean by that?

16  A.    We believe that if we had a increased the time

17  for the K-code, that it would help do that.

18  Q.    And why?  What would -- how would that, in your

19  view, disincentivize (sic) people from suing?

20  A.    We felt that there would be a sufficient greater

21  amount of paid time for pre and post shift activities

22  that there would be no incentive for anyone to bring

23  suit.

24  Q.    Okay.  But did the 2010 changes also start

25  paying for donning and doffing at the breaks as well?

1    A.    Yes, it did.

2    Q.    Now, in making those changes, did Tyson think it

3  was violating the law?

4    A.    No, sir.

5    Q.    Now, just generally speaking, what was the

6  change that was made at the various plants in terms of

7  how the work day was restructured?

8    A.    We had a 15-minute paid break in the morning and

9  there is no legal requirement from federal or state

10  law, so we felt we weren't getting any credit for that

11  15 minutes of paid time, so we looked at what could we

12  do to better use that 15 minutes of paid time to

13  address the issue of pre and post shift activity and

14  pre and post shift break time.

15    Q.    And so how did you reallocate the number of

16  minutes?

17    A.    Five at the beginning, paid five of the first

18  break, 20 minutes unpaid; five minutes paid on the

19  lunch period five there, went to 35 minutes, with 30

20  unpaid, five paid; and at the end of the day, five

21  minutes of paid time.

22    Q.    And did some employees pick up any extra minutes

23  by making that change?

24    A.    Yes, sir.

25    Q.    Now, Mr. Hanson at one point said this expanded

1  the work day but their pay didn't change.  Do you

2  remember him asking you about that?

3  A.    Yes.

4  Q.    Okay.  I'm sure he didn't mean this, but did the

5  amount of work that the employees had to do from the

6  time they got there to the time they left, did that

7  change?

8  A.    No.

9  Q.    When you made these changes?

10  A.    No.

11  Q.    So they were in the plant longer?

12  A.    Yes, that's the way I understood his question.

13  Q.    Were they in the plant longer on their own break

14  time?

15  A.    Yes.

16  Q.    Okay.  And even though they had more break time,

17  were you paying some of them more K-code minutes?

18  A.    Yes.

19  Q.    And did some of the people basically hold flat

20  on number of minutes, trading essentially 15 minutes of

21  break and five minutes of K-code for 20 minutes of

22  K-code?

23  A.    Yes.

24  Q.    And did some people pick up an extra minute?

25  A.    Yes, sir.

1  Q.    And some people who previously had zero minutes,

2  people who weren't grandfathered, did they pick up an

3  extra five minutes?

4  A.    Yes.

5  Q.    Because they went from 15 minutes of break and

6  they are trading that for 20 minutes of K-code?

7  A.    Twenty minutes of K-code, yes.

8  Q.    Now were there any time studies that were done

9  to justify this change?

10  A.    Yes.

11  Q.    In 2010?

12  A.    Oh, I'm sorry, no, no.

13  Q.    I am on the last bank box now.

14  A.    No, I apologize, no, sir, no.  No.  That

15  was -- no, we didn't --

16  Q.    So why did you do it without any time studies?

17  A.    Once again, we were looking for a way to

18  disincentivize (sic) or better use that paid time that

19  we could satisfy the concerns around pre and post shift

20  activity.

21  Q.    Okay.  Let me show you the exhibit Mr. Hanson

22  showed you.

23        I want to ask you about this sentence that I

24  have highlighted.

25        Well, first of all, do you see the sentence

1  that says, "These are very good documents"?

2  A.     Yes.

3  Q.     Did you understand that the author of this was

4  trying to make sure your position was consistent with

5  the law?

6  A.     Yes.

7  Q.     And read that sentence into the record.

8  A.     "These are very good documents but we've revised

9  them for strategic reasons and consistency with our

10  legal theories."  (Quoted as read.)

11  Q.     Okay.  And then it goes on to the part Mr.

12  Hanson was focussing on?

13  A.     Yes.

14  Q.     Now, I then highlighted a sentence later below,

15  it starts, "As we have discussed."  Could you read that

16  into the reported?

17  A.     "As we've discussed there may be a claim that

18  this period should be paid rather than unpaid."

19  (Quoted as read.)

20  Q.     Is that a reference to the 20-minute portion of

21  the 25 minute break?

22  A.     Yes, that's my understanding.

23  Q.     Okay.  When the sentence says, "there may be a

24  claim," who were you worried was going to make this

25  claim against you?

```
 1   A.     Plaintiffs' attorneys.

 2   Q.     Okay.  And, in fact, do we now see ourselves

 3   facing such a claim?

 4   A.     We do.

 5   Q.     Is that the claim Mr. Hanson is bringing?

 6   A.     Yes.

 7   Q.     Okay.  And was that claim a relatively late

 8   add-on to the claims in this case?

 9   A.     I believe so.

10   Q.     Okay.  And if we go also to the other memo that

11   he showed you, 251, this is the memo that you said you

12   had a hand in authoring for the plant manager to issue,

13   do you remember this?

14   A.     Yes.

15   Q.     And can we look at the sentence that says,

16   "While the company believes."  I think it is the third

17   sentence.

18          MR. MUELLER:  Martin, if you could just

19   highlight that.

20   A.     I found it.  Yeah.  "While the company believes

21   times associated with these activities is paid

22   appropriately, or may be di minimis and therefore

23   compensable, the company has decided to approach this

24   issue in a conservative manner."  (Quoted as read.)

25   BY MR. MUELLER:
```

```
1    Q.     Okay.  So I have two questions:  First of all,
2  is the basis for that sentence in part the rulings of
3  the courts in Reich and Alvarez?
4    A.     Yes.
5    Q.     And what did you mean when you had a hand in
6  writing this, what did you mean by in a conservative
7  manner?
8    A.     Once again, we believed we were taking the
9  conservative approach as opposed the more riskier
10 approach that we thought by making these changes that
11 we didn't have to, that we're not compelled to, that we
12 thought this was the conservative approach to trying to
13 thwart off further litigation.
14   Q.     What I am getting at when you say you are being
15 conservative, whose side does it benefit?  Is it
16 conservative in favor of the employees or the company?
17   A.     The employees, we believe.
18   Q.     Just a few last questions.
19          MR. MUELLER:  Let's go back to the chart,
20 Martin.
21 BY MR. MUELLER:
22   Q.     In making decisions about pay practices, what
23 consideration have you given Mr. Kimbro to how the team
24 members might react?
25   A.     We're concerned.  We're concerned with turnover
```

1  in team members and market in that area is very

2  competitive.  There is a lot of, by my standards, a lot

3  of packing facilities in that area and didn't want to

4  lose people.

5  Q.    So if your employees don't like your pay

6  practices, what can they do?

7  A.    They can leave.

8  Q.    Now, you received any feedback in the new work

9  day structure at the plant?

10  A.    Yes.

11  Q.    Or at any of the plants?

12  A.    Yes.

13  Q.    And what's the feedback?

14  A.    After you get through the transition period,

15  it's been well received.  People enjoy the additional

16  time.

17  Q.    Okay.  Mr. Kimbro, now that we've explained your

18  thought process behind how the company got to where it

19  is today, have we basically explained your thought

20  process about how we got from 1988 to today?

21  A.    I believe so.

22  Q.    And in making its decisions along the way, did

23  Tyson think that it was complying with the rulings of

24  this court in the Tenth Circuit and the Reich vs. IBP

25  case?

```
1    A.    Yes, sir.

2    Q.    Okay.  And in making its changes in '07 did

3    Tyson think it was complying or doing what it had to do

4    to comply with the Supreme Court's ruling in Alvarez?

5    A.    Yes, sir.

6    Q.    And in making its changes in 2010, did Tyson

7    think that it was still in compliance with the law?

8    A.    Yes, sir.

9    Q.    As you sit here today, what is your view of

10   whether Tyson's in compliance with federal Kansas law?

11   A.    I believe we're in compliance.

12         MR. MUELLER:  Thank you, sir.

13         THE COURT:  All right.  Mr. Hanson.

14                    REDIRECT EXAMINATION

15   BY MR. HANSON:

16   Q.    Thank you.  Mr. Kimbro.  Do you still have that

17   January 15th opinion letter in front of you?

18   A.    Yes.  One moment please.

19   Q.    Mr. Mueller take it back?

20   A.    Yeah.

21   Q.    I'll hand you mine.

22   A.    Okay.  Thank you.

23   Q.    Do you recognize that?

24   A.    Yes.

25   Q.    And Mr. Mueller suggested that a copy of this
```

1  letter wasn't in Tyson's own files, do you remember

2  that?

3  A.    Yes, sir.

4  Q.    And I'll tell you, as Mr. Mueller did, I printed

5  out a more readable copy for you to look at today, but

6  let me hand you what have I marked as Exhibit 6.

7  A.    Thank you.

8  Q.    And you see that this is just another version of

9  the same Department of Labor opinion letter?

10 A.    Yes, sir.

11        MR. HANSON:  We move for admission of Exhibit

12 6.

13        THE COURT:  Any objection?

14        MR. MUELLER:  Can we approach?

15        THE COURT:  Sure.

16        (The following sidebar conference was had

17        outside the presence of the jury :)

18        MR. MUELLER:  I think as long as with a caveat

19 that he say it didn't come from this witness's files

20 because it is a West Law printout, it was produced in

21 litigation, but it did not come from his files.

22        MR. HANSON:  Mr. Mueller clearly left the

23 impression that Tyson didn't produce it and that's

24 their basis.  I mean I don't know exactly whose files

25 it came out of but I have to make it clear that it came

1  from Tyson.

2          MR. MUELLER:  I'll object to that just that

3  the witness can identify this copy, he didn't show him.

4  I get to explore the witness's knowledge, it's been

5  pretty squarely put in issue.

6          THE COURT:  You can.  You can.  I'm going to

7  overrule the objection.

8  BY MR. HANSON:

9  Q.    All right.  Let me go ahead and put up on our

10 ELMO the document I've marked as Exhibit 6.

11         And you can see, Mr. Kimbro, that this is

12 another copy of the opinion letter, correct?

13 A.    Yes.

14 Q.    January 15th, 2001, correct?

15 A.    Yes, sir.

16 Q.    And you see that the DOL Administrator is

17 Michael Kerr, correct?

18 A.    Yes, sir.

19 Q.    And I just wanted to reference you to what we

20 call a Bates stamp.  Do you know what a Bates stamp is?

21 A.    No, sir.

22 Q.    In all the litigation you've been involved with

23 that phrase has never been used?

24 A.    I may have heard it, I'm not sure I could

25 explain what it is.

223

1  Q.    All right.  Let me see if I can give an

2  explanation and see if you can agree with that.

3  A.    Okay.

4  Q.    When documents are produced between parties in

5  the litigation, they identify it with a footer that

6  usually has a number associated with it, and for

7  reasons that I guess I don't know fully, it's called a

8  Bates stamp and that's what that means.  You understand

9  that?

10  A.    Yes, sir.

11  Q.    All right.  And do you know that Tyson produced

12  to us many documents in this litigation, correct?

13  A.    Yes, sir.

14  Q.    Let me show you the Bates stamp for what Tyson

15  gave us.  All right?  Do you see this reference number

16  TG-2398, do you see that?

17  A.    I do.

18  Q.    And you understand that that means that this

19  document came out of Tyson's files?

20  A.    I believe that would be the case, yes.

21  Q.    Okay.  It was produced to us in the litigation,

22  correct?

23  A.    Okay.

24  Q.    Yes?

25  A.    Yes.

224

```
1    Q.    Does that refresh your recollection?

2    A.    Of this letter?

3    Q.    Yeah, that you had a copy of this letter?

4    A.    It -- no.

5    Q.    Just want to make sure that the language is the

6  same.  Do you see the second to last paragraph right

7  here?

8    A.    Yes.

9    Q.    Where it references the meat packing companies

10 who have asked the Department if it would be

11 permissible to pay employees wages based on an average

12 amount of time, do you see that?

13   A.    Yes.

14   Q.    And that's one of the questions that you had

15 been asking the Department of Labor, correct?

16   A.    My memory is we were looking for guidance on

17 3(o).

18   Q.    Some of this letter does --

19   A.    Yes.

20   Q.    Does suggest a 3(o) topic, right?

21   A.    Yes.

22   Q.    But it's true that IBP -- and you were the VP of

23 HR at the time, correct?

24   A.    Yes.

25   Q.    You wanted to know whether you could continue
```

1  paying gang-time and K-code, correct?

2  A.    We assumed we could, because we had the court's

3  decision that allowed us to.

4  Q.    Well, you wanted to know what the Department of

5  Labor thought about that, too, correct?

6  A.    Well, I think we knew what they thought.

7  Q.    You -- before you even saw this letter you

8  already knew they -- they wouldn't let you pay an

9  average time?

10  A.    Well, I think they didn't want us to.

11  Q.    So there was never a question in your mind that

12  the Department of Labor would not accept gang-time plus

13  K-code?

14  A.    Well, to my mind, that's what they argued for in

15  the Reich decision.

16  Q.    Well, let's back up.

17        You remember that the so-called settlement

18  that you reached with the Department of Labor was

19  contingent upon a final decision from the Department

20  regarding its position on recordkeeping in the meat

21  industry?

22  A.    Yes, yes, I do.

23  Q.    All right.  And you knew that the department

24  ultimately decided, can't do gang-time and K-code,

25  correct?

1    A.    Yes.

2    Q.    And you knew that from this letter, is that

3  correct?

4    A.    As I said to you, I didn't see this letter

5  until -- to prepare -- preparing for a deposition

6  several years after the 2001 date.

7    Q.    All right.  And I don't want to go back into the

8  Chavez case, but you remember you testified in that

9  case, correct?

10   A.    Yes, sir.

11   Q.    And you remember as part of your testimony in

12 that case, you said you lobbied for this opinion

13 letter, correct?

14   A.    I -- I would -- I lobbied for an opinion letter

15 around 3(o) and how it was to be applied.

16   Q.    Okay.  And this letter talks about 3(o),

17 correct?

18   A.    Yes, it does.

19   Q.    Are you saying that you only read the first two

20 paragraphs but never got to the last one?

21   A.    I'm saying that -- no, I eventually read the

22 entire letter, yes.

23   Q.    But when you did finally read the letter that

24 you lobbied for, and you saw that the Department of

25 Labor's position on recordkeeping in the industry was

1  you have to keep actual time, you see it says that,

2  right?

3  A.     Yes, sir, I see it says that, yes, sir.

4  Q.     You ignored that DOL position, correct?

5  A.     Yes, we never changed our position at Finney

6  County.

7  Q.     All right.  Just so it is clear, when it suits

8  IBP and Tyson to follow the Department of Labor's

9  guidance, for example, when you reach a so-called

10 settlement, you -- you do; you give the Department of

11 Labor some deference, is that correct?

12 A.     We give the court the deference, yes.

13 Q.     Well, it's the Department of Labor whom you say

14 you settled with, correct?

15 A.     Yes.

16 Q.     The court has always instructed you to keep time

17 for each particular employee, correct?

18 A.     For each employee, yes, sir.

19 Q.     But you're saying you don't have to do that

20 because the Department of Labor lets you off the hook,

21 right, to a settlement?

22 A.     Yes, we're saying the court told us how to keep

23 track of the people that wore the personal protective

24 equipment that was unique.

25 Q.     The court has always said keep time for each

1  particular employee, correct?

2  A.    Yes, sir.

3  Q.    But you haven't done that, instead you have

4  followed what you call the Department of Labor's, you

5  know, permission to do four minutes, correct?

6  A.    I'm not sure.  Help me.

7  Q.    I'm helping.

8  A.    Okay.  Thank you.

9  Q.    I'll try.

10       When it suits your purpose to rely on the

11  Department of Labor, for example, the concept that they

12  allowed the four minute rule?

13  A.    That when we settled the Reich case --

14  Q.    Right?

15  A.    Okay.

16  Q.    You relied -- pardon me.  You rely on the

17  Department of Labor when you are relying on what you

18  call to be -- what you characterize as a settlement,

19  correct?

20  A.    Yes.

21  Q.    But when the Department of Labor tells you you

22  can't keep gang-time K-code, you have to keep actual

23  time?

24  A.    Mm-hmm.

25  Q.    You ignore it, correct?

229

1  A.    Yes, because this was their opinion.

2  Q.    When it suits your company's purpose, it will

3  follow the DOL, right?  And when it doesn't suit your

4  company's purpose, you ignore it, right?

5  A.    I think we believe we're right we do, and when

6  we believe they are wrong, we challenge it.

7  Q.    Okay.  So you get to choose when the Department

8  of Labor is right and wrong, right?  That's what you

9  are saying?

10  A.    I believe so.

11  Q.    So you get to selectively decide which part of

12  the Department's labor guidance you want to follow and

13  which part you just want to ignore, that's your choice,

14  that's what you say?

15  A.    I believe so.

16  Q.    Have to revisit for a moment the Reich

17  litigation.  And, Mr. Mueller, your lawyer, showed you

18  a document that had been filed by the Department of

19  Labor, do you remember that?

20  A.    Um, which one?

21  Q.    Well, there were a couple, but it was the one

22  that said, compliance with the -- there's a relatively

23  simple way to comply with the injunction, do you

24  remember that document?

25  A.    Yes, I do, yes.

1  Q.    I want to show you what we have marked as

2  Exhibit 7.

3  A.    Thank you.

4  Q.    And, Mr. Kimbro, let me represent to you that

5  this is a filing by the Department of Labor from March

6  of 2000 which was a filing after the last pleading Mr.

7  Mueller showed you.

8  A.    Okay.

9  Q.    Okay?  And can you turn with me to just

10 the -- the third page.

11 A.    I'm sorry, how could you tell this is 2000, I'm

12 just -- I was trying to find it on here.

13 Q.    That's a good question.  I can tell that it's

14 2000 by looking at the last page?

15 A.    Oh.

16 Q.    And by looking at what's called a Certificate of

17 Service.

18 A.    Okay.

19 Q.    And you'll see that it is dated 28th of March,

20 2000?

21 A.    I see it, yes, sir.

22 Q.    And you'll see that this was a document that was

23 submitted by Mr. Stabler?

24 A.    Yes.

25 Q.    And Ms. Schoeb, two of the Department of Labor

1  lawyers we've talked about?

2  A.     Yes, sir.

3  Q.     Let's see what the Department of Labor's last

4  word was on this issue, okay?

5  A.     Okay.

6  Q.     The Department of Labor states, "If IBP had been

7  generally interested in voluntary compliance, it could

8  have simply began recording and paying its employees

9  for their work time at any time beginning in 1988;

10 something that millions of other employers do every

11 day.  Instead, IBP chose to continue its practice of

12 requiring employees to perform these daily work

13 activities without compensation while it pursued its

14 litigation with the Secretary.

15          Finally, IBP contends that the Secretary has

16 agreed it is in current compliance with the FLSA,

17 relying upon the Secretary's dismissal of Herman II and

18 her letter of July 16, 1999."  (Quoted as read.)

19          Do you see that?

20 A.     I do.

21 Q.     Do you remember when Mr. Mueller put up on the

22 screen the stipulation of dismissal, correct?

23 A.     Yes.

24 Q.     And suggested that you were in current

25 compliance because the case Herman had been dismissed?

1   A.     Yes.

2   Q.     You understand that the Department of Labor is

3   responding to that exact position here?

4   A.     Help me with that.

5   Q.     Well, IBP contends that the Secretary has agreed

6   it is in current compliance with the FLSA.  That's what

7   you are trying to tell us here today, right?

8   A.     Yes.

9   Q.     Well, here's what the Department of Labor says:

10  "However, the language of that letter clearly states

11  that the Secretary is only agreeing to permit IBP to

12  use its current recordkeeping methodology until such

13  time as the Department makes its decision on the meat

14  packing industry's request for an accommodation with

15  regard to the recordkeeping requirements of the FLSA."

16  (Quoted as read.)

17         And you'll recall that that is the subject of

18  the January 15, 2001 opinion letter, right?

19  A.     Yes.

20  Q.     And then it says, "The letter does not state

21  that the Secretary agrees IBP's current recordkeeping

22  is in compliance."  (Quoted as read.)

23         Do you see that?

24  A.     I do.

25  Q.     Do you still think you have a deal with the

1  Department of Labor?

2  A.      I do.

3  Q.      You think the Department of Labor agreed that

4  you were in compliance?

5  A.      I've never heard from them again.

6  Q.      Well, the last thing you heard from them was,

7  You're not in compliance, right?  I mean there is

8  nothing after this, is there?

9  A.      No, nothing.

10  Q.      All right.  Nothing after this and you say that

11  the Department of Labor went away, correct?

12  A.      Yes.

13  Q.      In fact, they went on and started suing Tyson's

14  poultry plants, correct?

15  A.      Yes.

16  Q.      Isn't it true that if you wanted to, you could

17  have gone to the Department of Labor and engaged in

18  discussions about whether your current K-code gang-time

19  system was compliant, right?  I mean you had that

20  opportunity, too?

21  A.      Could have done that, yes.

22  Q.      You know the Department of Labor welcomes

23  employers to make inquiries about whether they're in

24  compliance, correct?

25  A.      I would assume so, I don't know that but, yes.

1    Q.    But you never did that, did you?

2    A.    No.

3    Q.    Mr. Mueller showed you a portion of the <u>Reich</u>

4  opinion from the federal court.  Do you recall that?

5    A.    Help me.

6    Q.    Well, you read a part of it, I just wanted to

7  read the other part.

8          Do you have the <u>Reich</u> opinion from October of

9  1994?  October 25, 1994.

10         Can I give you a hand?

11   A.    Please.

12   Q.    I'm probably more familiar with these documents.

13  It is this document here, <u>Reich v. IBP</u>?

14   A.    I just looked at that.  <u>Chavez</u>.  <u>Herman</u>.

15   Q.    Do you have the October '94?  Okay, well

16  I'll -- do you remember reading a portion of that with

17  Mr. Mueller?

18   A.    I believe I do.

19   Q.    Okay.

20   A.    It may have been on the screen.

21   Q.    It may have been on the screen.  Now you get a

22  sense of what lawyers get to do all day which is --

23         But let me -- let me identify a part of that

24  ruling that Mr. Mueller did not read regarding hard

25  hats, safety glasses, earplugs and safety shoes.

1        And the Court said, "The fact that such

2   equipment is well suited to many work environments does

3   not make it any less integral and indispensable to

4   these particular workers than the more specialized

5   gear."  (Quoted as read.)

6           Do you understand that?

7           The Court is telling you that the hard hat,

8   the earplugs, the boots, the safety goggles are still

9   integral and indispensable, do you see that?

10  A.    I hear -- yes.

11  Q.    All right.  So that was back in 1994, you

12  understood the Court was saying that that gear is

13  integral and indispensable?

14  A.    Yes, sir.

15  Q.    And you remember that the Supreme Court in

16  Alvarez held that any integral and indispensable and

17  donning and doffing or anything that is donning and

18  doffing of anything that is integral and indispensable,

19  begins the continuous work day, do you recall that?

20  A.    I do.

21  Q.    All right.  So if we have the Court saying hard

22  hats, earplugs, safety shoes, goggles are integral and

23  indispensable, from our Kansas Court and the Supreme

24  Court is telling you anything that's integral and

25  indispensable starts the continuous work day needs to

1  be paid, did Tyson ever put two and two together and

2  start paying for that?  That type of standard

3  equipment?

4  A.     No, sir.

5  Q.     And you understand that our case is not just

6  about hard hats, earplugs, safety goggles, sanitary

7  outer garments, correct?

8  A.     I don't know quite how to respond to that.

9  Q.     Okay.  Well, you know we're not limiting --

10  A.     I do not know the full scope of your case is

11  what I am saying.

12  Q.     We are not limiting our case to what is called

13  those standards items, correct?

14  A.     Yes, sir, correct.

15  Q.     You understand that we are arguing under the

16  continuous work day the moment any one of those

17  required items is put on, the clock has to start,

18  correct?

19  A.     Yes, sir.

20  Q.     And can only be stopped for an unpaid meal

21  break, correct?

22  A.     Yes, sir.

23  Q.     And then it ends when the last of those items is

24  doffed, correct?

25  A.     Yes, sir.

1  Q.    You understand that's what the continuous work

2  day means, right?

3  A.    I do.

4  Q.    And you understand that Tyson has never paid for

5  the continuous work day using this gang-time and K-code

6  pay scale?

7  A.    Well, we believe we have using the K-code.

8  Q.    But you -- but you are paying an average amount

9  of time, correct?

10 A.    Yes, sir.

11 Q.    You're not paying a continuous amount of time,

12 correct?

13 A.    Well, we may not be paying an actual amount of

14 time but we're -- we think that there is enough time in

15 our K-code to cover that.

16 Q.    You agree you have never paid the actual time

17 worked, correct?

18 A.    Yes, sir.

19 Q.    Did I hear you talk about the AMI?

20 A.    Yes, I believe so.

21 Q.    Can you identify for was the AMI is?

22 A.    I believe it's a trade association.

23 Q.    Well, don't you know what it is?

24 A.    It's a trade association.

25 Q.    Do you know what AMI stands for?

1   A.   I thought -- I hazard a guess, I thought it

2   American Meat Institute.

3   Q.   Sir, were you -- were you a member of the

4   American Meat Institute?

5   A.   At what time?

6   Q.   Well --

7   A.   The corporation, the company you mean?

8   Q.   Well, I -- yeah, were you a member of

9   the -- you?

10   A.   Me?

11   Q.   You.

12   A.   No.

13   Q.   You never were a member of the AMI?

14   A.   Me?

15   Q.   I'm sorry --

16   A.   Are you asking for the corporation or me?

17   Q.   Okay.

18   A.   I'm confused.

19   Q.   I apologize.

20   A.   Thank you.

21   Q.   Was -- was IBP ever a member of the AMI?

22   A.   They were.

23   Q.   Okay.  And as IBP's representative, did you have

24   communications with the AMI?

25   A.   No.

1   Q.    You say no, but let me hand you what I have

2 marked as Exhibit 449.

3   A.    Okay.

4   Q.    Mr. Kimbro, do you see that this is a memo from

5 the AMI, the American Meat Institute?

6   A.    I'm sorry, was there a question?  I apologize.

7   Q.    Sorry, do you recognize this as a memo from the

8 AMI?

9   A.    Yes, yes, sir.

10   Q.    Okay.  And do you see that your name is on the

11 list of recipients?

12   A.    I see my name is misspelled on there, yes, sir.

13   Q.    It's misspelled, it puts an O -- sorry, a W at

14 the end, correct?

15   A.    Yes, it does.

16   Q.    But you're not going to suggest there is another

17 Ken Kimbro with a W?

18   A.    There may be but I'm assuming they are referring

19 to me.

20   Q.    Yeah, the one who worked for IBP?

21   A.    Yes, sir.

22   Q.    Back in December of 1998?

23   A.    Yes, sir.

24   Q.    Okay.  Can we correct the testimony now and

25 acknowledge that you did have communications with the

1  AMI?

2  A.     Well, yes, they -- they sent this, yes.

3  Q.     All right.

4  A.     I guess that's communications, yes.

5  Q.     And you recognize what this is, correct?

6  A.     Yes.

7         MR. HANSON:  Just move for admission of 449.

8         THE COURT:  Any objection?

9         MR. MUELLER:  I thought it was just offered

10 for impeachment, I object.

11        THE COURT:  What's the purpose?

12        MR. HANSON:  Well, it's going to show not only

13 to impeach their testimony that he never communicated

14 with the AMI but it's also going to show substantively

15 what he learned from the AMI regarding recordkeeping

16 practices.

17        MR. MUELLER:  It's not even proper

18 impeachment, my question was about 2001, not 1998.

19        MR. HANSON:  Well, I asked him if he had

20 communications with the AMI, he said no.  And he asked

21 at what time and I said any time.

22        THE COURT:  I'm going to overrule the

23 objection.

24 BY MR. HANSON:

25 Q.     Sir, let me show you what I have marked --

```
 1              THE COURT:  We'll admit, what is it?  449?
 2              MR. HANSON:  449.
 3  BY MR. HANSON:
 4  Q.    So Mr. Kimbro, this is a memo from December 1st,
 5  1998.  Do you see that?
 6  A.    I do.
 7  Q.    And the American Meat Institute is a trade
 8  organization, is that correct?
 9  A.    Yes.
10  Q.    Of which IBP was a member?
11  A.    Prior to 1998, yes.
12  Q.    Okay.
13  A.    We were not a member in 1998.
14  Q.    This is dated December 1st, 1998, correct?
15  A.    Yes.
16  Q.    Were you a member of the AMI at this time?
17  A.    No, sir.
18  Q.    But you're getting communications from the AMI?
19  A.    Yes, sir.
20  Q.    Okay.  And that -- that's really what I want to
21  inquire about.
22          You are receiving this memorandum, correct?
23  A.    Yes.
24  Q.    Ken Kimbro, IBP, that's you, correct?
25  A.    Yes.
```

1  Q.    This is from Mike Brown, Vice President

2  Legislative Affairs, correct?

3  A.    Yes.

4        THE COURT:  Just so I'm clear, was IBP a

5  member of the institute at that time?

6        THE WITNESS:  No, sir.

7        THE COURT:  Okay.

8        THE WITNESS:  AMI -- IBP was not a member in

9  1998.

10       THE COURT:  Thank you.

11  BY MR. HANSON:

12  Q.    But you were getting communications from the

13  AMI?

14  A.    Obviously.

15  Q.    Okay.

16  A.    Yes.

17  Q.    And you see Sheila Hagen, that is the general

18  counsel of IBP, correct?

19  A.    Yes.

20  Q.    I guess, now I'm just curious, why are you

21  getting communications from the AMI if you're not a

22  member?

23        MR. MUELLER:  Objection, foundation.

24        THE COURT:  Sustained.

25  BY MR. HANSON:

1    Q.    You don't deny receiving this memo, though?

2    A.    No.

3    Q.    Okay.  Let's just see what it says.  You see

4    that it says, "In addition, AMI has learned that DOL is

5    not inclined to accept a time averaging formula to

6    compensate workers."

7          Correct?

8    A.    Yes.

9    Q.    So at least as of December 1st of 1998 you were

10   aware that the Department of Labor was not inclined to

11   accept a time averaging formula, is that right?

12   A.    Yes.

13   Q.    And this predates the January 15th, 2001 opinion

14   letter that you lobbied for, correct?

15   A.    Yes.

16   Q.    You mentioned, sir, the delay in making back

17   payments to Finney County in 2007 when the K-code

18   policy was increased to seven minutes, correct?

19   A.    Yes.

20   Q.    And you recall, we established that you were

21   increasing the K-code minutes to account for the walk

22   time that the Supreme Court had said was compensable in

23   November of 2005?

24   A.    Yes, sir.

25   Q.    And you said that one of the reasons you delayed

1  paying in Finney County was to avoid the appearance

2  that a union organizing effort would get credit for

3  those payments, is that right?

4  A.    Yes, sir.

5  Q.    Do you think that avoiding giving credit to a

6  union organizing campaign is justification to avoid

7  paying wages that are due?

8  A.    Well, we subsequent -- subsequently we paid

9  those wages, we just delayed that payment.

10  Q.    But you think it was okay to delay the payment?

11  A.    Yes, sir.

12  Q.    And I think I heard you say that you understood

13  every state has its own law, correct?

14  A.    Yes.

15  Q.    But you understand that there is one federal law

16  that applies in all states, correct?

17  A.    Yes, sir.

18  Q.    And you understand that that's the Fair Labor

19  Standards Act correct?

20  A.    Yes.

21  Q.    Now you understand that Kansas has its own labor

22  law as well, right?

23  A.    Yes, sir.

24  Q.    The Kansas Wage Payment Act, correct?

25  A.    Yes, sir.

1  Q.    And you understand that the Kansas Wage Payment

2  Act requires payment of all wages due just like the

3  FLSA?

4  A.    Yes, sir.

5  Q.    All right, finally, this is Exhibit 203A, do you

6  remember discussing that with Mr. Mueller?

7  A.    Yes, sir.

8  Q.    And this was the internal discussion about

9  realigning the work day, correct?

10  A.    Yes, sir.

11  Q.    And I think you testified that the motivation

12  for restructuring the work day, adding more K-code, was

13  to disincentivize (sic) more lawsuits, correct?

14  A.    Yes, sir.

15  Q.    I had thought you had testified before, or at

16  least the document suggested that the motivation to

17  realign the work day was to do the right thing for your

18  team members, is that not correct?

19  A.    Well, that would be a part of it, yes.

20  Q.    So is it to do the right thing for your team

21  members?

22  A.    I think it'd be both.

23  Q.    Mr. Kimbro, you said that there was no legal

24  requirement to provide a break, do you remember that?

25  A.    Yes, sir.

1   Q.    Do you remember you said that when we were

2   discussing the decision to take the formerly paid break

3   and make it unpaid, correct?

4   A.    Yes, sir.

5   Q.    You do understand, though, that if a company

6   like Tyson provides a break, they do need to pay for

7   it, correct?

8          MR. MUELLER:  Objection, ultimate jury issue.

9          THE COURT:  Overruled.

10  A.    Please say -- ask again.

11  BY MR. HANSON:

12  Q.    Sure.  You already said there was no legal

13  requirement to provide the break itself, correct?

14  A.    Mm-hmm, I think I believe I said a 15-minute

15  paid break but I can't remember exactly.  Maybe I --

16  Q.    All right.

17  A.    -- am just remember that go way.

18  Q.    Okay.  Let's just clarify it.

19         Do you think there is a legal requirement for

20  a company to provide a break?

21  A.    I'm not sure.

22  Q.    Okay.

23  A.    I honestly don't know.

24  Q.    Fair enough.  Do you think that if a company

25  provides a break, it is under a legal obligation to pay

1  for it?

2          MR. MUELLER:  Same objection.

3          THE COURT:  Overruled.

4  A.     Once again, I don't know.

5  BY MR. HANSON:

6  Q.     Okay.  You don't know.

7          You -- you testified now a couple of times

8  that by realigning the work day you were trying to take

9  a conservative approach, right?

10  A.     Yes, sir.

11  Q.     And part of what we see in Exhibit 203 is a

12  decision to take a formerly paid break and move it over

13  to unpaid break, correct?

14  A.     Yes, sir.

15  Q.     Don't you think that the conservative approach

16  would have been to add 15 minutes of K-code and leave

17  the break paid?

18  A.     I think that would be a more conservative

19  approach, yes, sir.

20  Q.     And don't you think rather than paying gang-time

21  and some average amount of K-code that the more

22  conservative approach would be to pay your workers by a

23  time clock punch to punch?

24  A.     Sir, I don't know anyone in our industry that

25  does that.

1   Q.     Well you do that.

2   A.     Not -- not for production workers in our

3   processing floor.

4   Q.     Well, let's explore that because we have

5   testimony in this case that you pay production workers

6   in Omaha, Nebraska and in Vernon, Texas punch to punch.

7   Are you aware of that?

8   A.     One is a small bacon plant and the other is a

9   small ham plant.

10   Q.     You just said you don't know anyone in the

11   industry that does that?

12   A.     Yeah, red meat, slaughtering animals and

13   processing animals.

14   Q.     IBP, Tyson now does pay some of its production

15   workers punch to punch, right?

16   A.     Yes, we do.

17   Q.     All right.  And in the poultry side of the

18   business, which are production workers, correct?

19   A.     Yes.

20   Q.     You are moving towards a system of paying them

21   punch to punch as well, correct?

22   A.     We are moving that way, yes.

23   Q.     My question is, don't you think the more

24   conservative approach would be to go ahead and pay

25   production workers punch to punch?

1  A.     Yes, that would be a more conservative approach.

2  Q.     And finally, sir, wouldn't you agree that the

3  most conservative approach of all, would be for Tyson

4  to come into compliance finally and forever?

5          Would you agree that that would be the most

6  conservative approach?

7  A.     But I believe we are in compliance.

8  Q.     It would be the most conservative approach to be

9  fully compliant, right?

10  A.     I believe we are compliant.

11  Q.     And that would be the most conservative

12  approach, correct?

13  A.     I think I've answered.

14          MR. HANSON:  That's fine.

15          THE COURT:  All right Mr. Mueller.

16                  RECROSS EXAMINATION

17  BY MR. MUELLER:

18  Q.     Mr. Kimbro, just a few points.  Let me start

19  with, since Mr. Hanson has read from portions of the

20  Tenth Circuit decision, do you still have that up

21  there?

22  A.     I have no idea.

23  Q.     Well, I'll save the time.

24          Mr. Hanson, do you remember I established that

25  the Tenth Circuit said that the standard items are di

1  minimis and not work and then he read a portion saying

2  that they are integral and indispensable?

3  A.    Yes, sir.

4  Q.    Okay.  And I would like you to read the other

5  portion of the Tenth Circuit's opinion Mr. Hanson

6  didn't read about the sanitary outer garments.

7  A.    Starting -- the highlighted portion?

8  Q.    Yes, just to make it move faster.

9  A.    The time utilized donning, removing, picking up,

10 and I'm sorry -- and depositing for laundering sanitary

11 outer garments is essentially time used to change

12 clothes and thus is primarily an -- excuse me,

13 preliminary and primarily within the meaning of the

14 Portal Act.  Furthermore, although required, and of

15 some value to the employer, the outer garments are

16 primarily for the benefit of the employee and thus,

17 unlike the safety equipment, are not integral and

18 indispensable to IBP.

19 Q.    Okay.  And so that was the Tenth -- the

20 Appellate Court decision that affected the sanitary

21 items over there in your Finney County plant?

22 A.    Yes, sir.

23 Q.    Okay.  My second point.  You know that memo that

24 Mr. Hanson just showed you from AMI dated December 1 of

25 1998?

1   A.      Yes.

2   Q.      Even after that memo, in fact for years after

3   that memo, didn't the Department of Labor enter into

4   the stipulation dismissing the Herman case that I

5   showed you?

6   A.      Yes.

7   Q.      Wasn't that the next year?

8   A.      Yes.

9   Q.      And didn't the Department of Labor agree in that

10  stipulation of dismissal that we showed you and the

11  jury that the practices implemented at IBP's facilities

12  had mooted the relief the department wanted?

13  A.      Yes.

14  Q.      Okay.  The next point.  I'm very glad that Mr.

15  Hanson showed you this version of this opinion letter

16  that came out of Tyson's files.  Do you think it came

17  out of your file?

18  A.      I don't believe so, no.

19  Q.      Okay.  I thought it was very interesting that

20  Mr. Hanson showed you the first page.  You remember he

21  showed you this number here, down at the bottom?

22  A.      Yes, I forgot end what that's called.

23  Q.      A Bates stamp.  But, he didn't show you the

24  second page.

25          Do you see where -- there is a fax telltale?

1   A.     Yes.

2   Q.     That says it was received January 29th, 2004?

3   A.     Okay.

4   Q.     It's about three years after the opinion letter?

5   A.     Yes.

6   Q.     Is that consistent with your position that you

7   didn't get it for years?

8   A.     Yes, sir.

9   Q.     Fourth point.  Mr. Hanson showed you the

10  Department of Labor's brief that he called the final

11  say in the litigation with IBP, do you remember that?

12  A.     Yes, sir.

13  Q.     Let's take a look at the first page which Mr.

14  Hanson didn't show you.

15         Can you read that into the record?

16  A.     "The only changed circumstance in the case at

17  bar is the IBP -- is that IBP currently is not in

18  violation of the overtime provisions of the FLSA."

19  (Quoted as read.)

20  Q.     Is that the last thing that the Department of

21  Labor ever said in a court about your operations on the

22  red meat side of the industry?

23  A.     Yes, sir.

24         MR. MUELLER:  Thank you.  No further

25  questions.

```
1              THE COURT:  Mr. Hanson?

2              MR. HANSON:  All done.  Thanks.

3              THE COURT:  All right.  Mr. Kimbro, you can

4  step down.

5              May this witness be released or excused?

6              MR. HANSON:  Yes, Your Honor.

7              MR. MUELLER:  Yes, sir.

8              THE COURT:  And you are excused.  Thank you so

9  much.

10             And the timing could not be more perfect, in

11 terms of breaking, unless you have got a short witness

12 that we could get on today, Mr. Hanson?

13             MR. HANSON:  Is it 1:30?

14             THE COURT:  Yes, it is.

15             MR. MUELLER:  How time flies.

16             THE COURT:  All right.

17             MR. HANSON:  I didn't set my watch yet.

18             THE COURT:  But we lost an hour over the

19 weekend, so that probably explains why we're here so

20 quickly.

21             MR. HANSON:  Sure.

22             All we have for our case is to read in a

23 couple stipulations, admit an interrogatory, and some

24 short deposition testimony.

25             I know we're trying to get the case submitted
```

1   by tomorrow, we would be happy to take a brief break

2   and do that, as a housekeeping matter, and then allow

3   maybe the defendants to pick up their case tomorrow or

4   we can wait, whatever the Court feels.

5           THE COURT:  Members of the jury, could you go

6   for another half hour or so today?

7           Does that create a problem for anybody?

8           All right.  Why don't we take a ten minute

9   break.  We'll pick back up at 1:40 and we'll finish up

10  the plaintiffs' case.

11          Members of the jury, one last thing before you

12  go, though.

13          We have had some witnesses out of order in

14  this case and I have allowed, for example, where the

15  plaintiffs have called certain witnesses that Tyson

16  would have called, I have allowed them to go ahead and

17  Tyson to do its examination of the witness at the same

18  time, so that we don't have to keep them on ice for

19  three or four days and then bring them back again.

20          So, when the plaintiff rests here, the

21  defendant already will have presented a good part of

22  its case during the course of the plaintiffs' case, and

23  I think there was some concern that you not think that,

24  well, Tyson's only calling one or two people to the

25  stand for its case, because a lot of their own people

1  have testified about Tyson matters over the course of
2  the plaintiffs' case.
3          And any party has a right to call any witness
4  to use anybody's exhibits during the course of their
5  case, and the parties have been very good about working
6  with each other in order to accommodate witnesses who
7  are coming into Kansas City and having to leave again,
8  and so that's why you're kind of getting this all at
9  once as opposed to so many of the plaintiffs'
10  witnesses, and then so many of the defendants', with a
11  very clear line of demarcation.
12          So I hope you understand that and appreciate
13  what the parties have done to try and help out moving
14  this case along with you.
15          So, again, with that, I'll give you another
16  couple of minutes, we'll be back at 1:42 and then
17  finish up.   Thank you.
18          (The jury leaves the courtroom.)
19          THE COURT:   All right.   Have a seat.   Mr.
20  Mueller, I hope that picks up what your concern was.
21          MR. MUELLER:   Thank you, yes.
22          MR. O'DEAR:   I was just getting ready to ask
23  you for that, so you read our mind.
24          MR. MUELLER:   Before our he first witness, we
25  have an evidentiary dispute.   We could either take it

1  up at the end of the day today, or if that's not

2  convenient for Your Honor, at 7:30 in the morning.  It

3  relates to our first witness.

4         THE COURT:  Okay.  And what is it?

5         MR. MUELLER:  You remember on February 25th,

6  they objected --

7         THE COURT:  I can hardly remember March the

8  4th at this point.

9         MR. MUELLER:  On February 25 -- we

10 filed -- they filed some motions in limine saying that

11 they objected to certain videos and photos we took in

12 our own plant and you said to both parties, grow up,

13 why don't you guys talk to each other, you know, and we

14 gave them all the information about who took them,

15 when, who was there, and then you said it was incumbent

16 on them to tell them why there was still any problem

17 with them.

18        Well, they haven't told us why there is a

19 problem but they still object and we have case law if

20 it matters, saying these kinds of day-in-the-life

21 photos always come in.

22        MR. HANSON:  And here is our objection and we

23 made it during the motions in limine but I think the

24 course of the trial has just put it to strong relief

25 why we take the position we do.

```
 1              After the close of discovery, many months
 2    after, I believe the witness they are going to call
 3    helped supervise some videographers to video people
 4    coming in and out of the plant this after our expert
 5    had been in to the plant, during the course of
 6    discovery, making videos, after their expert had been
 7    in the facility, making videos these were disclosed to
 8    us for the first time whenever we did our motions in
 9    limine, they were created well after the close of
10    discovery.
11              And they go to, and I'll just highlight it for
12    the Court, see who is here, but one of the issues in
13    the case, which is what can people wear from home and
14    what they can't and it is very clear that they went out
15    and singled out certain people to, I am going to guess,
16    demonstrate that people can wear certain things from
17    home.
18              And at this point, when, you know, they had
19    five years to gather such evidence and present it, and
20    because of Mr. Karkiainen's testimony about this very
21    issue, it's just very substantially prejudiced to have
22    this not produced in the course of discovery, not have
23    us have the ability to test it, and really go and send
24    our own videographer into rebut it, it is just late
25    evidence that we have seen to date in the trial we do
```

1  think it should be excluded.

2          THE COURT:  Well, I am going to let them use

3  it but whoever is testifying about it is going have to

4  have the information about when it was shot, the

5  purpose for it, and I think you can argue it all you

6  want to, Mr. Hanson, but I am going to allow it.

7          MR. HANSON:  Okay.

8          THE COURT:  Okay.  Anything else before

9  tomorrow?

10          MR. MUELLER:  Well, when do you want to do the

11  charge conference?

12          THE COURT:  Tomorrow afternoon.

13          MR. MUELLER:  Okay.

14          THE COURT:  I haven't had a chance to look at

15  you guys' proposed set.  I appreciate you working and

16  getting them to us over the weekend, but with the

17  documents I didn't get a chance.

18          Ryan, I know, worked on a set of instructions

19  over the weekend and so, we're going to have to take

20  this afternoon to try and reconcile them and get them

21  out to you, so that we can have a meaningful conference

22  tomorrow.

23          MR. MUELLER:  Work off the second set, the

24  first one had a mistake.

25          THE COURT:  Okay.  Very good.  Yeah, Mr.

1  Dirks.

2        MR. DIRKS:  Then the only other thing we had

3  mentioned on Thursday we were going to put a CD

4  together ah DVD together of the admitted videos, that

5  is Exhibit 386.

6        THE COURT:  Okay.  Thank you so much.

7  Appreciate it.

8        All right.  See you back here in just a few

9  minutes.

10       (Recess is taken from 1:38 p.m. until

11       1:45 p.m.  Proceedings had outside the

12       presence of the jury:)

13       THE COURT:  Okay.  Let's bring them in.

14       (The jury enters the courtroom.)

15       THE COURT:  Go ahead and have a seat.

16       And, Mr. Hanson, as soon as everybody is

17  seated, you can push ahead.

18       MR. HANSON:  Thank you.

19       MR. MUELLER:  Your Honor, I'm sorry, we have

20  an issue and I didn't know this issue was coming up.

21       THE COURT:  Come on up.

22       (The following sidebar conference was had

23       outside presence of the jury.)

24       MR. MUELLER:  We were told that they were

25  going to read stipulations today and interrogatory

1  answers.  They are now trying to read deposition from a

2  witness they asked to be here, we offered to be here,

3  actually was here and they released him and so now

4  instead of the preference for live testimony they're

5  trying to read his deposition in and we can't cross

6  examine and we object.

7          MR. HANSON:  They can bring the witness if

8  they want, we have always said we were going to read a

9  very short deposition designations, we can do that

10 regardless of the witness's availability.  You have

11 already ruled on the objections.

12         THE COURT:  No, it can be used for that

13 purpose so if you need to have him here, Mike, you

14 know, if we need to smooth things out, we'll do it

15 but --

16         MR. HANSON:  It is very short.

17         THE COURT:  Okay.

18         (Sidebar concludes and the following

19         proceedings then continue in open court.)

20         MR. ANDERSON:  Would you call up Mr. Jepson's

21 photo?

22         During the course of the litigation, we took a

23 deposition of Mr. Lonnie Jepsen and we'll read short

24 portion or selections from that deposition.  And I'll

25 be playing the role of Mr. Jepsen in reading.

1          Page 8, Lines 7 and 8, I'm sorry, 5 to 8.

2          Next, Page 15, Line 19 to Page 16, Line 6.

3          Next is Page 40, Lines 7 through 13.

4          Next is Page 80, Line 19 through Page 81, Line

5  18.

6          Next, Page 125, Lines 10 through 20, and Page

7  126, Lines 5 through 16.

8          And next, in the course of the litigation, the

9  parties are allowed to ask each other questions and get

10  written responses to those questions.  So, we're

11  admitting by agreement Exhibit 401A, which is a portion

12  of the questions that we answered or asked Tyson during

13  the litigation and that they answered.

14          And I won't read all of the pages to you, but

15  just by way of illustrating what you'll have.

16  Available to you.

17          We asked the question, List each job duty, job

18  code, job title, job description, or job category of

19  Holcomb facility hourly workers from May, 2001 until

20  the present.

21          And Tyson's answer:  The following are the

22  chain production jobs.  And then several pages of what

23  those jobs are.

24          And another one of the questions that we

25  asked -- I guess I need more focus.  There it is.

1          For each job category, job code, and or job

2    title identified in answering Interrogatory Number 4,

3    identify the clothing, protective gear, safety gear,

4    sanitary outer garments and other uniform, gear or

5    equipment, whether unique, non unique or otherwise,

6    worn or utilized by workers in each job category.

7          And Tyson answered, and included also a table

8    that is very, very difficult to see, because the print

9    is quite small.

10         But, identifying the job title in the

11   left-hand column, and then the particular equipment

12   across the top and Xs marking which gear is required in

13   each job.  So that's an exhibit.  That you'll have.

14         And, finally, the parties entered a number of

15   facts, stipulations in the course of the litigation and

16   I'll read some of those.

17         Tyson has been engaged in interstate commerce

18   or in the production of goods for interstate commerce

19   throughout the relevant time period.  That was

20   Stipulation Number 2.

21         Stipulation Number 25.  In September, 2001,

22   Tyson acquired IBP through a stock purchase and merged

23   IBP into Tyson.  Tyson thereby acquired the rights and

24   assets of IBP and assumed the rights and obligations of

25   IBP.

1        Stipulation 26.  There were no significant

2   changes in the beef production side of the business

3   when Tyson took over from IBP.  The production facility

4   operations -- i.e., getting the cow from the stockyard

5   through the material handling department -- remained

6   unchanged.

7        Stipulation 9.  Plaintiffs are (A) those

8   current and former hourly production employees of the

9   Finney County facility who opted in to this case by

10  filing timely, consent to join forms pursuant to the

11  FLSA, for claims under the FLSA within the applicable

12  statute of limitations (the FLSA class); and (B) those

13  Rule 23 class members with claims under Kansas state

14  law within the applicable statute of limitations (the

15  Kansas state law class).

16       Stipulation 11.  Workers are required to be at

17  their work stations on the production floor at their

18  scheduled start time.

19       Stipulation 14.  Before nearly all workers are

20  permitted to work on the production floor each day,

21  they are required by Tyson to don certain sanitary and

22  personal protective clothing.  The types of required

23  sanitary and protective clothing for each production

24  job, at least as of July 20, 2007, is listed in Tyson's

25  answer to Interrogatory Number 5 of plaintiffs' second

1 set of interrogatories.

2          Which is what I showed you a moment ago.

3          Stipulation 15.  Among the items that must be

4 donned and doffed, a hard hat, a hair net, a beard net,

5 as necessary, and earplugs are required to be worn by

6 all production workers.  Additional items required are

7 listed on the JSA for each particular position.

8          Nearly all non clerical hourly -- this is

9 Stipulation 43.  Nearly all non clerical hourly

10 production team members are required to wear bump cap,

11 hard hat, earplugs, and hair net and or beard net.

12 Depending on the particular job, they may also be

13 required to wear steel toe boots or safety glasses.

14          Stipulation 45.  Sanitary items include such

15 items as frocks, hair nets, beard neither, cotton and

16 rubber gloves, rubber aprons, and rubber sleeves.

17          Stipulation 48.  The parties agree that the

18 following items are compensable:  Shin guards, mesh

19 aprons, legging aprons, belly guards, steel, scabbard,

20 knives, mesh gloves, polar gloves, polar sleeves,

21 plexiglass arm guards, mesh sleeves, double mesh

22 sleeves, and knocker vests.

23          Stipulation 23.  Tyson's policies regarding

24 what clothing must be worn by workers are established,

25 in part, to meet general directives set forth in USDA

1  and OSHA regulations.

2         Stipulation 17.  A worker may receive

3  progressive discipline, up to and including

4  termination, for failure to wear required safety items.

5         Stipulation 16.  After their shift, workers

6  deposit soiled laundry in the laundry room, or in carts

7  or gondolas, on their way out of the plant.  Workers

8  rinse and store certain PPE in their lockers, where

9  they retrieve it the next work day prior to production.

10        Stipulation 27.  Throughout the applicable

11 class period, Tyson has had a policy and practice

12 requiring workers to swipe an identification card each

13 day, before and after their shift.  The swipe generally

14 is used to register attendance.

15        Stipulation 19.  Tyson does not create or

16 maintain records of the actual time workers spend

17 performing pre and post shift activities.

18        Stipulation 18.  K-code is not the actual time

19 workers spend donning and doffing all of the items that

20 they wear.

21        Stipulation 49.  Pardon my handwritten notes,

22 I'll spare you those.

23        From the beginning of the limitations period

24 until January 28th, 2007 at Finney County, defendants

25 paid an additional four minutes per day, coded as

1  K-code time, to all employees in a department where

2  knives were used by at least one employee in the

3  department.

4           Starting -- and I'm going to jump over to

5  number 20 -- Stipulation 20, at the Finney County

6  facility, prior to January 28th, 2007, K-code time was

7  intended by Tyson to compensate certain production

8  employees for time spent conducting pre and post shift

9  donning and doffing of certain unique clothing and

10 equipment. These items included shin guards, mesh

11 aprons, legging aprons, belly guard, steel, scabbard,

12 knives, mesh gloves, polar gloves, polar sleeves,

13 plexiglass arm guards, nerve sleeves and double mesh

14 sleeves and knocker vests; post shift walking from the

15 production line to the wash stations; post shift

16 waiting at the wash stations and rinsing of clothing

17 and equipment; and pre and post shift waiting to

18 sanitize and sanitizing certain clothing and equipment

19 in dip tanks.

20          Turning back then to the second paragraph of

21 Stipulation 49.  Starting on the foregoing dates and

22 continuing through April 12, 2010, defendants paid a

23 daily K-code time that was job specific to any employee

24 in a knife-wielding position (i.e., who used knives)

25 these minutes ranged from four to seven minutes at

1  Finney County.  Employees who were not in

2  knife-wielding positions were paid zero K-code minutes

3  during this time period.

4          Stipulation 21.  At the Finney County

5  facility, from January 28, 2007 to present, K-code time

6  has been intended by Tyson to compensate certain

7  production employees for time spent conducting pre and

8  post shift donning and doffing of certain unique

9  clothing and equipment.  These items included shin

10 guards, mesh aprons, legging aprons, belly guards,

11 steel, scabbard, knives, mesh gloves, polar gloves,

12 polar sleeves, plexiglass arm guards, mesh sleeves, and

13 double mesh sleeves, and knocker vests; post shift

14 walking from the production line to the wash stations;

15 post shift waiting at the wash stations and rinsing of

16 clothing and equipment; pre and post shift waiting to

17 sanitize and sanitizing certain clothing and equipment

18 in dip tanks; pre-shift walking from the locker room to

19 the production floor; and, post shift walking from the

20 wash station to the locker room.

21         Stipulation 50.  Starting on or about April

22 12, 2010, all employees have been paid 20 to 22 minutes

23 a day of K-code time, which was effectuated by adding

24 16 minutes of K-code time to any job that previously

25 received four minutes and 15 minutes of K-code time to

1   any job that previously received five to seven minutes

2   of K-code time.

3           Five minutes of the K-code time is associated

4   with the rest break and five minutes of the K-code time

5   is associated with the meal break.  The remainder of

6   the K-code time is associated with pre and post shift

7   activities.

8           Stipulation 29.  There are no exemptions under

9   the FLSA that apply to the plaintiffs in this case.

10          And finally, stipulation 10.  FLSA opt-in

11  consent forms were filed for FLSA class members on the

12  dates reflected on the docket.  The date of filing

13  these consent forms, as reflected on the docket, is

14  true and accurate.  The parties have entered into

15  certain tolling agreements in this case that tolled the

16  statute of limitations for certain defined periods of

17  time.  The statute of limitations for claims asserted

18  under Rule 23 begin on May 15, 2003 for class members

19  in Finney County.

20          THE COURT:  Mr. Hanson, anything else?

21          MR. HANSON:  No.  We're just want to identify

22  that we're a little bit of housekeeping to put our

23  final pieces of evidence into the record, in that

24  manner, but we're done calling witnesses and the

25  plaintiffs rest.

```
 1            THE COURT:  All right.  Thank you very kindly.
 2            MR. HANSON:   Thank you.
 3            THE COURT:  Well, members of the jury, we'll
 4  go ahead and take our recess for the day, we'll pick up
 5  at 8:00 in the morning.  I remind you, again, you're
 6  not to discuss this case or any aspect of it among
 7  yourselves or with anyone else.  No independent
 8  investigation.
 9            We'll plan to get started at 8:00 and if we
10  have any issues to take up ahead of time, I expect
11  we'll have them done a little earlier than we did this
12  morning.  So thank you so much.  Be safe on the roads,
13  we'll see you in the morning.
14            (The jury leaves the courtroom.)
15            THE COURT:  All right.  Thanks, folks.
16  Anything?
17            MR. MUELLER:  We will be moving for a directed
18  verdict on Rule 50.
19            THE COURT:  Okay.
20            MR. MUELLER:  We have a written brief, we
21  would like to get today's transcript and fill in the
22  cites.
23            THE COURT:  Sure.
24            MR. MUELLER:  And then we'll file it.  It will
25  be late, maybe early in the morning, but as soon as we
```

1    can, and then one of us will be prepared to argue it,

2    if Your Honor wants argument.

3           THE COURT:  Well, thank you very kindly and it

4    may even be the first break before we get to it

5    tomorrow but I think by -- if you want to, you can make

6    the oral motion right now.  And you'll have preserved

7    your record.

8           MR. MUELLER:  We move for a directed verdict

9    under Rule 50, and we're prepared to articulate the

10   details and record cites tonight and tomorrow morning.

11          THE COURT:  That's fine, we'll take it up

12   tomorrow.

13          All right.  Anything else?

14          MR. HANSON:  Not for plaintiffs.

15          THE COURT:  All right.  See you all in the

16   morning.  Thank you so much.

17          (Proceedings recess for the day at 2:06 p.m.

18          and commence the following day, March 15,

19          2011.)

20

21

22

23

24

25

1                C E R T I F I C A T E

2          I, Jana L. Hoelscher, United States Court

3  Reporter in and for the District of Kansas, do hereby

4  certify:

5          That the above and foregoing proceedings were

6  taken by me at said time and place in stenotype;

7          That thereafter said proceedings were

8  transcribed under my discretion and supervision by

9  means of computer-aided transcription, and that the

10 above and foregoing constitutes a full, true and

11 correct transcript of requested proceedings;

12         That I am a disinterested person to the said

13 action.

14         IN WITNESS WHEREOF, I hereto set my hand on

15 this, the 14th day of March, 2011.

16

17                    s/ Jana L. Hoelscher
                      Jana L. Hoelscher, RPR, CRR, RMR
18                    United States Court Reporter

19

20

21

22

23

24

25