1                IN THE UNITED STATES DISTRICT COURT
                      DISTRICT OF KANSAS
2


3

4   ADELINA GARCIA, et al, Individually
    and on behalf of others similarly
5   situated,

6           Plaintiffs,

7       vs.                          District Court
                                     Case Number
8                                    06-CV-2198-JTM
    TYSON FOODS, INC., and           Volume 8
9   TYSON FRESH MEATS, Inc.,

10          Defendants.

11

12
            DAILY COPY TRANSCRIPT OF PROCEEDINGS
13

14      On the 15th day of March, 2011 came on to be

15   heard in the JURY TRIAL in the above-entitled and

16   numbered cause before the HONORABLE J. THOMAS MARTEN,

17   Judge of the United States District Court for the

18   District of Kansas, Sitting in Kansas City.

19          Proceedings recorded by mechanical stenography.

20          Transcript produced by computer.

21

22

23

24

25

```
 1                      APPEARANCES

 2

 3  The Plaintiffs appeared by and through:
            Mr. George Hanson
 4          Mr. Eric Dirks
            Mr. Lee Anderson
 5          Stueve Siegel Hanson Woody, LLP
            330 West 47th Street, Suite250
 6          Kansas City, MO 64112

 7          Mr. Peter Antosh
            1401 Central Avenue
 8          Garden City, KS 67801

 9

10  The Defendants appeared by and through:
            Mr. Michael Mueller
10          Ms. Evangeline Paschal
            Hunton & Williams, LLP
11          1900 K Street, NW
            Washington, DC 20006
12

13          Mr. Craig O'Dear
            Mr. Robert Hoffman
14          Bryan Cave, LLP
            1200 Main Street, Suite 3500
15          Kansas City, MO 64105

16

17

18

19

20

21

22

23

24

25
```

3

```
 1                        INDEX

 2  Motion to Dismiss Pursuant to Rule 50        91
    Stipulated Facts                            214
 3  Instructions Conference                     265
    Reporter's Certificate                      291
 4
    WITNESSES FOR THE DEFENSE:
 5    MITCH YOUNG
            Direct Examination by Ms. Paschal    18
 6          Cross Examination by Mr. Hanson       64
            Redirect                             107
 7          Recross                              117

 8    ORLANDO KINNEY
            Direct Examination by Ms. Paschal   121
 9          Cross Examination by Mr. Hanson      157
            Redirect                            172
10
      VINCENT GARCIA
11          Direct Examination by Mr. Hoffman    187

12    JOSE GODINEZ
            Direct Examination by Mr. Hoffman    203
13          Cross Examination by Mr. Dirks       212

14    JEFFREY FERNANDEZ
            Direct Examination by Mr. Mueller    218
15          Cross Examination by Mr. Hanson      241
            Redirect                            248
16


17
    EXHIBITS                              ADMITTED
18
    1 Stipulation                            285
19  447 Manual                                83

20
    D-5013                                   287
21  D-5031 Policy                            129
    D-5025 Safety Policy                     134
22  D-5036 Policy                             81
    D-5039 Chart                             156
23


24


25
```

1          (Proceedings commence at 8:00 a.m. outside the

2          presence of the jury:)

3          THE COURT:  Well, I guess it wouldn't be a

4   morning if we didn't have a crisis.  Have a seat.

5          I have taken a look at the testimony, there's

6   no doubt in my mind but what it contradicts to some

7   extent Mr. Kimbro's testimony yesterday.  The question

8   is, why you didn't have it yesterday, Mr. Hanson, and

9   use it when he was here?

10          He's now been excused and there -- it's now

11   hearsay, is what the problem is.  So what do you have

12   to say?

13          MR. HANSON:  Sure.  After we cross-examined

14   Mr. Kimbro, I went back to my office, because I was

15   troubled with the testimony we had regarding the Chavez

16   case, I called the Chavez lawyers, never spoken to them

17   before, never talked to them before.  I asked, you have

18   a copy of the transcript in the Chavez case?  They did.

19   They sent it to me.

20          I had no knowledge of what he had testified to

21   before in Chavez.  I had an inkling from the Chavez

22   footnote that we saw, but I had no idea that Mr. Kimbro

23   would so dramatically deny seeing that letter, when it

24   was issued, deny lobbying for the letter, say that he

25   didn't get it until years later, and then reconfirm

1  that on cross from --

2          THE COURT:  Mr. Mueller.

3          MR. HANSON:  -- Mr. Mueller.  So that was

4  brought out far more than I ever would have

5  anticipated.  So I had no knowledge of that transcript

6  when I -- and Mr. Mueller asked me this question last

7  night when I made him aware of the issue and I

8  confirmed that, first time I saw it was last night

9  after 7:00 o'clock.

10          So at that time I sent it to Mr. Mueller, we

11  did have a discussion -- it was not a productive

12  discussion -- about how to handle it.

13          I think at the very least, if -- my thoughts

14  about it are, we should be able to publish it to the

15  jury.  If not, we should have the right to recall Mr.

16  Kimbro to address it.

17          The problem I see, Your Honor, is that Mr.

18  Kimbro sat on the stand yesterday and testified with

19  crystal clarity to everything that happened in the 1998

20  and before time frame when it suited the company.  But

21  when it got to a matter that helped us, and it was

22  clear, I brought out the materiality of it in my cross

23  examination, I asked him, Do you know that your saying

24  you don't remember that letter hurts my clients and

25  helps yours?  And he says, Yes, I do know that.  So

1  when there was an issue that helps his client he

2  completely contradicts his former sworn testimony.

3          Judge, I would never hold something like that

4  back.  I had no knowledge of it until last night.  But

5  it is a critical matter.

6          Our jury has the impression that this company,

7  you know, follows the law, always does the right thing.

8  Given, I think the absolute stark contradictory nature

9  of the former testimony, if Mr. Kimbro cannot be

10  recalled to confront it, we should get an adverse

11  inference instruction so the jury does know that there

12  has been prior inconsistent statements.

13          The jury would be free to disregard the

14  statements that were made favorable to the company,

15  and, frankly, I think as a sanction, their willfulness

16  defense should be stricken, that is what I think is the

17  appropriate --

18          THE COURT:  Well, willfulness is actually not

19  a defense, the burden is on you to have to prove it and

20  I'm not going to direct a verdict in your favor on that

21  point.

22          But, Mr. Mueller, what do you have to say?

23  And why did you reenforce yesterday with him when you

24  pointed out the date on the faxed document and so

25  forth, when you were actually involved and examined him

1   in the trial when he talked about when he had actually

2   received this?

3           MR. MUELLER:  Yes, Your Honor, may it please

4   the Court.  I have quite a bit to say about this, and

5   until you tell me to stop, I want to set the record

6   straight.

7           First of all, this should have been raised

8   five years ago.  Mr. Kimbro was deposed --

9           THE COURT:  I don't want to talk about five

10  years ago, Mr. Mueller, I want to talk about right now.

11          MR. MUELLER:  I --

12          THE COURT:  Yesterday, when Mr. Kimbro was on

13  the stand and you're driving home the point with

14  him -- and this is not to excuse the fact that the

15  plaintiffs didn't see this, but I want to find out what

16  happened yesterday.

17          MR. MUELLER:  Yes.

18          THE COURT:  And I don't need five years ago to

19  know that.

20          MR. MUELLER:  Your Honor, with all due

21  respect, I would like to tell you what happened.

22          THE COURT:  I want to hear what happened but

23  not five years ago, when it should have been raised.

24          MR. MUELLER:  But you just asked me, though,

25  why I did what I did.

```
 1            In his deposition, which Mr. Dirks took and
 2   Mr. Hanson sat next to, he said the exact same thing he
 3   said on the stand, which is he didn't get the letter
 4   until he was being prepared in the Jordan case.  The
 5   Jordan case was the deposition he thought was 2005 but
 6   I -- I had to impeach my client and prove it was 2004.
 7            Your Honor knows I didn't show him either
 8   version of the letter.  I --
 9            THE COURT:  You showed him a fax date.
10            MR. MUELLER:  No, but Mr. Hanson pulled up the
11   letter, and I was trying to, one, get his memory
12   refreshed when he thought it was 2005, I was bringing
13   the date earlier; and, second, I am bringing him back
14   to his deposition testimony, which they knew about.
15            So when Mr. Hanson says he didn't know about
16   this issue, it's just not accurate, Your Honor.  He
17   said in his deposition in this case, that's when he got
18   the letter.  That's the first point.
19            The second thing is, in the Chavez case, I
20   have gone back and looked at what happened.  He was not
21   deposed on it in the Chavez case, nobody showed him
22   that letter, honestly I don't remember the Chavez cross
23   that -- that they showed me.
24            THE COURT:  This was trial testimony.
25            MR. MUELLER:  I realize that.
```

1          THE COURT:  Yeah.

2          MR. MUELLER:  So I went back and checked the

3    history of this last night.

4          I'll tell you as an officer of the Court I

5    don't remember this entire line of questioning that is

6    in a trial eight years ago and Mr. Hanson's, you know,

7    if he can't remember what had in this case five years

8    ago, I don't remember what happened in that case.  And

9    so, but I did look at the transcript they sent you last

10   night.  You will notice that Mr. --

11         THE COURT:  I didn't see the transcript last

12   night, I saw it about 15 minutes ago.

13         MR. MUELLER:  Okay, I meant the transcript

14   that I received last night.

15         THE COURT:  Okay.

16         MR. MUELLER:  But apparently you have it now,

17   and you'll notice at one point Mr. Kimbro says he

18   assumes he got it when it came out.  There's a really

19   good explanation for that.  Neither the version that

20   Mr. Dirks showed the witness in his deposition in this

21   case, which was a printout from Lexis, or the version

22   Mr. Hanson showed him yesterday first, which was a

23   printout from West Law, was one that he had seen

24   previously.  The one that Mr. Hanson admitted came off

25   West Law, we had an agreement that I could point out to

1 the witness it was just printed out the night before so

2 he had never seen it, he's not a lawyer, he had not

3 seen the document.

4        And if you look at the <u>Chavez</u> trial

5 transcript, there, somebody must have given him one

6 that had the name on it.  And you can see how a witness

7 can remember something when he's got the real, full

8 copy.  Yesterday Mr. Hanson didn't examine off that

9 copy, he examined off two copies that had the name

10 removed.

11        And at one point, Mr. Kimbro, when I'm

12 essentially trying to rehabilitate, my own client

13 corrects me and says that he did get the letter

14 earlier.  I mean Mr. Hanson was able to effectively

15 make all his impeachment points.

16        At one point in the trial transcript

17 yesterday, Mr. Kimbro corrects me, when I'm trying to

18 see if he did get it after 2001, this is at Page 195 of

19 yesterday's trial transcript, I said:

20        Now, you said you saw this some years later,

21 am I right about that?

22        Answer:  Yes.

23        Question:  And in the intervening period

24 actually from January of 2001 to -- and he started to

25 cut me off, so I say, Go ahead.

1        He says, Can I make a correction?  And I said,

2   Sure.

3        He says, I -- actually what I recall seeing

4   was, uh, it -- it appears to be the same letter but it

5   was like, a, it said to the staff or something like

6   that.  It wasn't exactly this letter.

7        I said, Okay.

8        He said, I think the content was probably the

9   same but I don't think -- I don't remember it looking

10  like this.

11       So he is basically agreeing with Mr. Hanson.

12  Now, is the testimony muddled?  Yeah, it's all over the

13  place because he was now talking about three versions

14  of the letter:  The one Mr. Hanson sent him, showed

15  him; the second one Mr. Hanson showed him, which was a

16  completely different one from his deposition; and one

17  that nobody showed him that apparently somebody showed

18  him in the Chavez trial.  So nobody is intentionally

19  misleading anybody here.

20       I mean the guy said he didn't even remember

21  being at the Chavez trial.  And all things considered,

22  how many times this guy testifies the reason he didn't,

23  Your Honor, is he doesn't -- we don't call that the

24  Chavez trial, that is what Mr. Hanson called it.  We

25  call it Alvarez II and so the witness didn't know what

1  trial he was even talking about when Mr. Hanson is

2  trying to confront him with it.

3         And one last point.  Mr. Hanson came in here

4  prepared to impeach him on it.  As you may recall, he

5  pulled out the District Court's decision in Chavez with

6  the footnote to impeach the witness and he effectively

7  impeached the witness, he read it to the jury, he said

8  a federal judge already ruled that you got this letter

9  and you continued to lobby the DOL on it.  And the

10  witness agreed to that.

11         So, he's effectively impeached him with

12  something from the Chavez case, which he brought in to

13  court to impeach him with.

14         At this point -- by the way, Mr. Kimbro is

15  agreed to all his impeachment points.  He agreed he

16  continued to lobby the Department of Labor; he agreed

17  he got the letter at some point; he agreed it wouldn't

18  have mattered when he got the letter because he said he

19  wouldn't have followed it no matter what, and he said

20  that multiple times.

21         So he has given Mr. Hanson all of his

22  impeachment points and I think the confusion is simply,

23  he wasn't shown in this trial or in his deposition the

24  copy of the letter that was shown to him in the Chavez

25  trial and that is all I can say about it.  I mean,

1 there is no intentional falsehoods here, he got all his

2 points in and he should have been dealt with when it

3 came up in the deposition in this case.

4          THE COURT:  Mr. Hanson.

5          MR. HANSON:  Judge, it's not my responsibility

6 to ferret out any inconsistency beforehand.

7          They have made a clear point in this case that

8 they followed the Department of Labor, that they

9 followed the rules.  But the truth is, they'll just say

10 what they need to say at the moment.

11          And when I showed Mr. Kimbro the Chavez

12 footnote, it was something I learned the night before

13 in reading Chavez in preparation for the testimony.  I

14 had no idea that he had actually testified at that

15 trial to exactly the same letter and testified 180

16 degrees differently.

17          THE COURT:  Well, it is not 180 degrees

18 differently.

19          MR. HANSON:  Judge, it is.  I --

20          THE COURT:  Mr. Hanson, no, it's not.  I heard

21 his testimony and I read this.  It's not 180 degrees.

22 He said here, he got it later than what he said he got

23 it in his testimony, but that is a difference in time,

24 it's not 180 degrees.

25          So, I am going to call the jury back in here,

1  I'll think about this, but I am inclined just to leave

2  things as they are.

3          You know, the fact of the matter is that

4  whether you knew it or not, Mr. Hanson, it was your

5  responsibility to know it coming in here to try the

6  case and if I thought -- Mr. Hanson, just sit down,

7  we're about done with this for the moment.

8          The fact that he testified to a different time

9  frame in another proceeding is something that you could

10  have known ahead of time.  How he was going to testify,

11  he's been deposed over and over again, maybe not on

12  this point, it sounds as if he was, but the fact is, we

13  are on what is supposed to be the last day of evidence

14  in this case.

15          You all have done a fine job of laying your

16  cases out.  I am not going to instruct the jury on

17  that.  We have got the general instructions about

18  witness credibility, if they find that they have been

19  misleading or evasive they can use as much or as little

20  of the testimony as they want to.  I am not going to

21  satisfy your burden with respect to the willfulness in

22  this case.

23          I'll think about handling the testimony during

24  this first segment of trial this morning.  But this

25  strikes me as something that could have been discovered

1  some time over the numerous years that this case has

2  been pending.  I don't want the jury to be mislead.  I

3  am not sure that they are misled in terms of, as Mr.

4  Mueller points out, he was all over the place

5  yesterday, all he said was that he was sure he didn't

6  get that right after it came out.

7          Even the testimony that you're suggesting be

8  read to the jury here today doesn't say that he

9  received it immediately after it was issued.

10          MR. HANSON:  Respectfully, Judge, it does say

11  exactly that.  The question in the Chavez case was:

12          And did you get this January 15th, 2001 letter

13  sometime shortly after it was written?

14          And the answer is yes.

15          And do you recall reading this letter shortly

16  after it was issued?

17          I do.

18          And then when Mr. Mueller in the Chavez case

19  continues to question him about it, he says, Were you

20  happy with this letter?  No.

21          And did you continue to lobby the Department

22  of Labor?  Yes.

23          And did that result in the June 6th, 2002

24  opinion letter?  Yes.

25          And, Your Honor, I --

```
 1              THE COURT:  I'll think about this, Mr. Hanson.

 2              MR. HANSON:  I appreciate that, thank you.

 3              THE COURT:  All right.  Mr. O'Dear.

 4              MR. O'DEAR:  Your Honor, in close of the

 5  plaintiffs' case yesterday we made our oral motion for

 6  judgment as a matter of law, Rule 50 motion, I just

 7  want to --

 8              THE COURT:  We'll take that up at the next

 9  break.

10              MR. O'DEAR:  And we filed a brief, I just

11  wanted to --

12              THE COURT:  Thank you very much.

13              MR. O'DEAR:  -- put that on the record.

14              THE COURT:  Let's go ahead and get the jury in

15  here.

16              (The jury enters the courtroom.)

17              THE COURT:  Members of the jury, go ahead and

18  have a seat.  Once again, we had an issue this morning

19  that took a little more time than I had anticipated, so

20  I think we're ready to roll, though.

21              And, who will be the first witness for Tyson

22  this morning?

23              You'll recall several witnesses Tyson has

24  presented evidence already through.

25              Ms. Paschal.
```

1        MS. PASCHAL:  Defendants call Mitch Young.

2        THE COURT:  Is that microphone on?

3        MS. PASCHAL:  I don't think it is.

4        THE COURT:  Beautiful.

5        MS. PASCHAL:  It is now.

6        (Witness is sworn.)

7        MS. PASCHAL:  Ladies and gentlemen, you are

8   about to hear the testimony of Mitch Young, the Complex

9   Human Resources Director at the plant.  I expect that

10  through his testimony, Mr. Young will describe for us

11  some photos and videos taken at the plant earlier this

12  year that show what employees wear, what they wear in

13  the cafeteria, specifically, how they enter and leave

14  the plant, the hallways in the slaughter and processing

15  areas, and some examples of some employees wearing

16  their white uniform on the slaughter side to and from

17  work.

18        In addition, Mr. Young is going to explain to

19  us the attendance policy and elaborate on what Mr.

20  Karkiainen explained about the point system for being

21  late.  And I expect that he will explain the difference

22  between being late at the beginning of your shift with

23  the point system and being late back from break.

24                    MITCH YOUNG,

25  called as a witness on behalf of the Defendants, having

1  been first duly sworn, testified as follows:

2                      DIRECT EXAMINATION

3  BY MS. PASCHAL:

4  Q.     Mr. Young, good morning.

5  A.     Good morning.

6  Q.     I know Mr. O'Dear introduced you at the

7  beginning of the trial but could you just remind us

8  again, who you are and where you work?

9  A.     My name is Mitch Young, I'm the Complex Human

10 Resource Manager for the Finney County plant.

11 Q.     Mr. Young, where are you from originally?

12 A.     Vietnam.

13 Q.     And how long have you worked for Tyson Foods?

14 A.     I worked for Tyson 27 years.

15 Q.     Has this always been at the Finney County plant?

16 A.     Yes, ma'am.

17 Q.     When you first came to the Finney County plant,

18 what was your position?

19 A.     I start out as an hourly production worker on

20 pull tenders.

21 Q.     I'm sorry, did you say you were a tender puller?

22 A.     Yes, ma'am, tender puller.

23 Q.     Is that on the processing slide or slaughter

24 side?

25 A.     Processing side.

19

1    Q.    How long were you an hourly employee at the

2    plant?

3    A.    I was an hourly for a year.

4    Q.    And then what was your next position?

5    A.    Then I got promoted to the orientation trainer.

6    Q.    And as an orientation trainer was that also an

7    hourly position?

8    A.    Yes.

9    Q.    Did you work on the production floor as an

10   orientation trainer?

11   A.    As an orientation trainer I worked both in the

12   orientation, training the new hire with the policy, and

13   also go out to the production floor training them on

14   their jobs.

15   Q.    And after you were an orientation trainer, what

16   was your next position at the plant?

17   A.    Then I got promoted to a production supervisor.

18   Q.    What departments did you supervise when you were

19   a production supervisor?

20   A.    I supervised the tender line, the round lines,

21   the top lines, and the strip lines.

22   Q.    Are these lines on the processing floor?

23   A.    That's correct.

24   Q.    Now, after you were a production supervisor what

25   was your next position?

1  A.    Then I got promoted to the assistant human

2  resource manager.

3  Q.    And approximately when was that?

4  A.    That was four years after I be the trainer, so

5  1989.

6  Q.    And how long were you an assistant HR manager?

7  A.    For two years.

8  Q.    And then what was your next position?

9  A.    Then I got promoted to human resource manager.

10 Q.    And how long were you a human resources manager?

11 A.    For 13 years.

12 Q.    And then what was your next job?

13 A.    Then just this year I got promoted to

14 almost -- almost a year, to the Complex HR Manager.

15 Q.    And could you just briefly explain for us what

16 the difference is between a human resources manager and

17 your current position of complex human resources

18 manager?

19 A.    Yes.  Each shift of the floor, like the

20 production we have A-Shift that will have the HR

21 manager that would take care of A-Shift team members'

22 problem; and B-Shift I would have an HR manager taking

23 care of B-Shift production; and on the slaughter side,

24 since it is smaller, so we have one HR manager take

25 care of the slaughter, and I oversee all three human

1  resource manager.

2  Q.    How would you describe your job duties as the

3  complex human resources manager?

4  A.    My job is to implement the company rules and

5  policy at the plant level.  I make sure that all team

6  members are in compliance with trainings, annual

7  training requirement.  I also make -- in charge of the

8  human resource functions such as the company picnic,

9  the Christmas dinner, Thanksgiving, and so on.

10         I also want to make sure that all employees

11  attend the training and they being treated fairly,

12  equally, and consistently and basically if team member

13  has a issue at work, then they can come see me.

14  Q.    Mr. Young, are you familiar with both the

15  slaughter and processing floors at the plant?

16  A.    Yes, I do.

17  Q.    Do you ever go out on to those floors?

18  A.    Yes, I do.

19  Q.    Do you remember Tyson's corporate videographer

20  and photographer, a man named Mr. Jeff Peak, and I

21  coming to the plant in January of this year?

22  A.    Yes, I remember that.

23  Q.    And do you remember that Mr. Peak took some

24  video footage and photographic footage of the plant at

25  that time?

1   A.     Yes, he did and I was there with him.

2   Q.     Was I there with you, too?

3   A.     Yes, you were.

4   Q.     Did you tell anyone else at the plant that we

5   would be coming to do this?

6   A.     I told the operation manager and I told the

7   training coordinator.

8   Q.     And why did you tell the training coordinator?

9   A.     His name is Garrett Headrick.  The reason I told

10  him is so that he can help me coordinate the whole

11  program, in case I get tied up.

12  Q.     Did you tell any of the hourly employees that we

13  would be coming to the plant?

14  A.     No, ma'am.

15  Q.     Did you tell any of the supervisors that we

16  would be coming to the plant?

17  A.     No, ma'am.

18  Q.     Did you ask the plant to do anything differently

19  on the days that we were in the plant collecting video

20  footage and photographic footage?

21  A.     No, ma'am.

22  Q.     And if I told you that the dates we were there

23  were January 24th and 25th of 2010 (sic), would you

24  have any reason to disagree with me?

25  A.     No, ma'am.

1   Q.    Does that seem about right to you?

2   A.    Yes.

3   Q.    Date wise?

4   A.    That's correct.

5   Q.    Did you ask any one shown in the -- in the

6   photographs or videos that we took to pose for the

7   camera?

8   A.    No, ma'am.

9   Q.    Did you observe Mr. Peak or me telling anyone to

10  pose for the camera?

11  A.    No, ma'am.

12  Q.    Or to do anything differently while they were on

13  camera?

14  A.    No, ma'am.

15  Q.    Did you accompany us while we were in the

16  hallways and on the production floors while we were at

17  the plant?

18  A.    Yes, I did.

19  Q.    Have you had a chance to review the video and

20  photographic footage that we collected at the plant on

21  January 24th and 25th?

22  A.    Yes, I did.

23  Q.    Does it appear accurate to the best of your

24  knowledge?

25  A.    Yes.

1    Q.    Do you have any concerns with the video and

2  photographs that you were shown that were collected at

3  the plant on the 24th and 25th?

4    A.    Not at all.

5    Q.    Are they consistent with what you remember

6  observing at the plant on those days?

7    A.    Yes.

8    Q.    I'd like now to show you some of those photos

9  that we collected.

10          (Tape is played.)

11           MS. PASCHAL:  For Plaintiffs, this is

12  Defendants' 5168.

13  BY MS. PASCHAL:

14    Q.    Mr. Young, could you tell us what this picture

15  shows?

16    A.    This is the trim line in the processing floor.

17    Q.    What kind of shoes are those employees wearing?

18    A.    They're just wearing regular boot.

19    Q.    Are those shoes that they get from the company

20  or from some place else?

21    A.    No, it's from their own personal shoes.

22    Q.    Can they wear their shoes from home?

23    A.    Yes, certainly.

24    Q.    Do you see any team members in this picture

25  wearing plastic vinyl sleeves?

1   A.    No, ma'am.

2   Q.    And if an employee were to wear those plastic

3   vinyl sleeves would they normally wear them on the

4   inside or outside of their frock?

5   A.    On the inside of their frock.

6   Q.    I'm sorry?

7   A.    They would wear inside or outside of their

8   frocks.

9   Q.    Okay.  Do you see any that are wearing them

10  outside their frock?

11  A.    No, ma'am.

12  Q.    What is -- if they do wear them outside their

13  frock, what is the purpose of the vinyl sleeve?

14  A.    Just not to get dirty or get wet.

15  Q.    Do you see any team members in this picture

16  wearing a plastic apron?

17  A.    Um, no, ma'am.

18  Q.    Now I would like to show you D-5623.

19          MS. PASCHAL:  And if I could just get some

20  assistance, Martin, on how to rotate this, I'm a little

21  technologically challenged.

22          Thank you.

23  BY MR. PASCHAL:

24  Q.    Mr. Young, what does this photo show?

25  A.    This show the trim rail over in the kill floor.

1   Q.    What kind of shoes is this man wearing?

2   A.    He's wearing rubber boots.

3   Q.    And this white shirt and pants, is that also

4   known as the uniform?

5   A.    Yes, for the slaughter team member, that's their

6   uniform.

7   Q.    Is this man wearing any gloves?

8   A.    No, ma'am.

9   Q.    Is -- is that okay for him to not be wearing

10  gloves in that position?

11  A.    Sure.

12  Q.    This person next to him, what are these that

13  she's wearing on her hands?

14  A.    Those are rubber glove, the green rubber gloves.

15  She also have the sleeve.

16  Q.    Are you referring to this right here, this white

17  piece?

18  A.    Yes, the polar sleeve.

19  Q.    What kind of sleeve is that?

20  A.    It's a polar sleeve.

21  Q.    And this man in the foreground, is he wearing a

22  polar sleeve?

23  A.    That's -- yes, ma'am.

24  Q.    The man in the -- right here, oh, he is wearing

25  right there on one hand?

1   A.    Yes.

2   Q.    Is that what you are looking at?

3   A.    Yes.

4   Q.    And on his other hand is he wearing a polar

5   sleeve?

6   A.    No, ma'am.

7   Q.    Are either of these two individuals wearing any

8   mesh?

9   A.    No, they don't.

10  Q.    Are they wearing any sort of apron?

11  A.    No, they don't.

12  Q.    Where are we now?

13  A.    We're still on the kill floor and we're looking

14  at a spit saw operator.

15  Q.    This is Defendants' 5625.

16        What is this that this man has on his leg

17  right here?

18  A.    That's a shin guard.

19  Q.    How many shin guards is he wearing?

20  A.    He just have one on his left leg.

21  Q.    Is that unusual for this position?

22  A.    No, there's job that require two and this job

23  that you only need one.

24  Q.    Is this man wearing any sort of mesh apron?

25  A.    No, ma'am.

1   Q.      Is he wearing mesh sleeves?

2   A.      No, ma'am.

3   Q.      Is he wearing any sort of plastic apron?

4   A.      No, ma'am.

5   Q.      What is this that he has on his hands?

6   A.      Those are the regular cotton glove.

7   Q.      Does he have any sort of mesh glove on?

8   A.      No, ma'am.

9   Q.      What is this that he's wearing right here?

10  A.      That's the weight belt.

11  Q.      Is there anything wrong with this -- with what

12  this man is wearing?

13          In other words, is there something he is

14  supposed to be wearing that he's not?

15  A.      No, ma'am, the only thing you can see different

16  is the ear muff that he has on, the team member has the

17  option to wear the earplugs or the ear muff.

18  Q.      And am I pointing at the accurate place to show

19  the ear muffs?

20  A.      Yes.

21  Q.      Do those serve the same purpose as the earplugs?

22  A.      Yes.

23  Q.      Let's now go to D-5635.  Where are we now?

24  A.      With the processing cafeteria.

25  Q.      Do you know what time of day this picture was

29

1  taken?

2  A.     It should be in the morning at first break.

3  Q.     Is that first break the 25-minute break?

4  A.     That's correct.

5  Q.     What is this team member right here in the

6  jacket, what does she appear to be doing?

7  A.     Looks like what she is taking a break, eating

8  her breakfast, drinking her milk.

9  Q.     And this employee who is in the foreground, what

10  is he wearing?

11  A.     He wearing a double mesh sleeve and a mesh

12  apron.

13  Q.     Am I pointing to the correct place to show his

14  mesh sleeve?

15  A.     Yes, that's the mesh sleeve.

16  Q.     Am I pointing to the correct place to show his

17  mesh apron?

18  A.     That's correct.

19  Q.     What is that that he's carrying?

20  A.     His lunch bag.

21  Q.     If we look at this individual on the far left of

22  the screen, what does he appear to be wearing where I'm

23  pointing?

24  A.     That's the -- he has on the double mesh sleeve.

25  Q.     Now take a look at D-5636.  Where are we now?

1    A.    We still in the processing cafeteria.

2    Q.    And what time of day is it?

3    A.    Like I say, it's in the morning, the first

4  break.

5    Q.    And this man right here in the foreground, what

6  is he doing?

7    A.    He's having his breakfast, he's wearing the

8  double mesh sleeve, he's wearing the mesh apron.  He

9  also have his beard net down.

10    Q.    Is this his beard net right here where I'm

11  pointing?  (Indicating.)

12    A.    That's correct.

13    Q.    This man next to him, what is he wearing?

14    A.    He's also wearing the double mesh sleeve on.

15    Q.    And what are these orange things that are

16  dangling right here?

17    A.    Those are earplugs.

18    Q.    If we look at this man right here with the cup,

19  on the right-hand side, what is he wearing?

20    A.    Look like the plastic apron.

21    Q.    Is that plastic or does that look like plastic

22  to you or mesh?

23    A.    The way it looked like he have the plastic apron

24  underneath the mesh.

25    Q.    So he -- is he wearing one or two aprons in this

1  picture, do you think?

2  A.    I -- I will assume two.  Some of them wear the

3  plastic apron underneath the mesh so the clothes won't

4  get dark.

5  Q.    And what is this man right here wearing?

6  (Indicating.)

7  A.    He wear mesh apron.

8  Q.    Where are we now?

9  A.    We're still in the processing cafeteria and look

10  like it's employees having their first break for

11  breakfast.

12  Q.    If I didn't say this before I believe this is

13  564 --

14            MR. MUELLER:  37.

15            MS. PASCHAL:  37, excuse me.

16  BY MS. PASCHAL:

17  Q.    What is this man wearing?

18  A.    He has on the double mesh sleeve and as I told

19  you earlier, he also wear the mesh apron and under the

20  mesh apron he has the like the jeans apron.

21  Q.    Okay.

22  A.    Clothes apron underneath.  And he has a beard

23  net down.

24  Q.    What is this man wearing next to him?

25  A.    Double mesh sleeve.

1    Q.    Does he appear to have any apron on?

2    A.    I -- I cannot tell there.

3    Q.    Does he have any straps going around his neck?

4    A.    No, ma'am.

5    Q.    What is this individual here in the back

6 wearing?

7    A.    The double mesh sleeve.

8    Q.    Let's now go to D-5641.  Could you explain for

9 us what this lady is wearing?

10   A.    She is the lead person, you can tell by the

11 color of her helmet, she's a blue, she -- it's an

12 assistant hourly trainer, she help train the team

13 member.

14         She has on her double mesh sleeve and she have

15 on her mesh apron.

16   Q.    You said she was an assistant hourly trainer.

17 Is this an hourly position?

18   A.    Yes.

19   Q.    Does she actually work on the floor?

20   A.    Yes.

21   Q.    And just to be clear, are we still in the

22 processing cafeteria at this point?

23   A.    Yes, ma'am.

24   Q.    And what time of day are we at?

25   A.    I'd say early in the morning, the first break

1  usually about 8:30.

2  Q.    This lady next to her, what is she wearing on

3  her arms?

4  A.    She have both of her arms she have the polar

5  sleeve on and she also have her mesh apron on.

6  Q.    If I point to right here, is that the mesh

7  apron?

8  A.    That's correct.

9  Q.    This is D-5643.  Would you tell us what this

10 picture shows?

11 A.    This gentleman taking his first break.  He has

12 on the double mesh sleeve, he has beard net down and

13 behind him there's another gentleman that wearing the

14 double mesh sleeve.

15 Q.    Am I pointing to the individual that you are

16 referring to?

17 A.    Yes.

18 Q.    And what are these here on the table in front of

19 this man?

20 A.    That is a safety glasses.

21 Q.    Let's go to D-5647.  What is this man in the

22 center of the picture wearing?

23 A.    He has on the double mesh sleeve and also the

24 mesh apron and as you can see he had the jean apron or

25 the cloth apron underneath this mesh apron.  He had his

1  beard net down and he has a stop watch, he also wear

2  the safety glasses.

3  Q.    So those right there, are those the safety

4  glasses?

5  A.    Yes, ma'am.

6  Q.    You said he was wearing a stop watch.  Are team

7  members allowed to wear stop watches?

8  A.    Yes, they are.

9  Q.    And what can they use them for?

10  A.    To keep track of their time, when they go to

11  break or the time we get off work.

12  Q.    And how many sets of straps does he have going

13  around his neck?

14  A.    Two.

15  Q.    Where are we now?  This is D-5652.

16  A.    We are over in the slaughter cafeteria.

17  Q.    What time of day was this photo made?

18  A.    It's in the morning, roughly 8:00 something.

19  Q.    Is this during a break?

20  A.    That's correct.

21  Q.    Is it first or second break?

22  A.    First break.

23  Q.    What are these ladies doing?

24  A.    She's taking her break, eating her breakfast, I

25  guess.

1   Q.    What is this lady in the front of the picture

2   wearing on her arms?

3   A.    She has on both mesh -- or I'm sorry, the polar

4   sleeve.

5   Q.    And the lady next to her, what is she wearing on

6   her arms?

7   A.    She also have the polar sleeve on.

8   Q.    And if we look here in the background, what is

9   this individual wearing?

10  A.    Rubber boot.

11  Q.    Were any of these employees that we just looked

12  at in processing and slaughter wearing something in the

13  cafeteria that they weren't supposed to be wearing?

14  A.    No, it's perfectly what they wearing right

15  there, that's -- we have no issue with that.

16  Q.    How common is what we just looked at, is it

17  common on a daily basis to see these types of scenes

18  that we just looked at?

19  A.    Yes, ma'am.

20  Q.    Would you say that these pictures show usual

21  activity or unusual activity?

22  A.    It's the normal activity from team members.

23  Q.    Now I would like to show you some video that we

24  collected at the plant.

25          MR. MUELLER:  Exhibit number?

```
 1            MS. PASCHAL:  This is 5670.

 2            (Tape is played.)

 3  BY MS. PASCHAL:

 4  Q.    Could you tell us where we are, Mr. Young?

 5  A.    You see a team member just enter into the

 6  slaughter building.

 7  Q.    So is this the entrance to the slaughter area of

 8  the plant?

 9  A.    That's correct.

10            (Tape is played.)

11  BY MS. PASCHAL:

12  Q.    What is the team member wearing?

13  A.    Team member wear the white uniforms.

14  Q.    Is that a white shirt and pants?

15  A.    Yes.

16  Q.    Where are we now?

17  A.    We're in the hallway of the slaughter floor.

18            (Tape is played.)

19  BY MS. PASCHAL:

20  Q.    Where does she just turn?  Where is she going?

21  A.    She turned to the entrance to the kill floor and

22  woman's locker room.

23  Q.    What is this right here?  I know it's a little

24  blurry when we stop it but what is this fixture right

25  here?
```

1    A.    That is a time clock.

2    Q.    Is that the only time clock in slaughter?

3    A.    No, we have some other time clock at different

4  places.

5    Q.    What is this employee now doing?

6    A.    She's swiping her card.

7    Q.    Would it also be fair to say she's clocking in?

8    A.    That's correct.

9    Q.    Is she ready to go on the floor at this point?

10   A.    She getting ready to.

11   Q.    But, in other words, is she wearing like her

12  hard hat and her hair net at this point?

13   A.    No, she just show up, she going to clock in and

14  she going to go to her locker and change.

15   Q.    So is she clocking in before she goes to the

16  locker room to change?

17   A.    That's correct.

18   Q.    She appears to be turning to her right.  Where

19  is she going?

20   A.    Right in front of this is the entrance to the

21  kill floor and where she's turning right now is the

22  women's locker room adjacent to the kill floor.

23   Q.    So where the doors appear to be opening, is that

24  the slaughter floor?

25   A.    Yes.

1   Q.    Is that the locker room that she just went into?

2   A.    That's correct.

3   Q.    I would like to show you D-5671.

4         (Tape is played.)

5  BY MS. PASCHAL:

6   Q.    Where are we, Mr. Young, in this video?

7   A.    We are in the hallways of the processing floor.

8   Q.    And about what time of day are we at?

9   A.    Looks like it's about 8:32, which is the first

10 break.

11        (Tape is played.)

12 BY MS. PASCHAL:

13  Q.    And I notice at this point that some individuals

14 have their frock on and some don't, in the hallway.

15 For those that don't have them on, where could they

16 have left their frocks?

17  A.    When -- when break time -- when breaks come, the

18 team member has the option to hang their frock at their

19 work station or they can wear their frock to the

20 hallways and right next to the cafeteria we have hooks

21 available, they can take their frocks and hang it

22 there.

23  Q.    Where is this employee entering?

24  A.    That's the entrance to the cafeteria.

25  Q.    And are there separate cafeterias for processing

1 | and slaughter?

2 | A.    That's correct.

3 |        (Tape is played.)

4 | BY MS. PASCHAL:

5 | Q.    What does this individual right here appear to

6 | be wearing in the cafeteria?

7 | A.    That's the mesh apron.

8 |        (Tape is played.)

9 | BY MS. PASCHAL:

10 | Q.    And what are these employees over here on the

11 | right-hand side, what are they doing?

12 | A.    They buying food in the cafeteria.

13 |        (Tape is played.)

14 | A.    This is where they pay for their foods and they

15 | go straight to the cafeteria.

16 | BY MS. PASCHAL:

17 | Q.    So what are these team members doing?

18 | A.    Having their breakfast.

19 | Q.    And I see a wall back here.  What is this wall?

20 | A.    Those are shelves that team members can put when

21 | they bring their food from home, they will place them

22 | in there.

23 | Q.    What are these team members right here appear to

24 | be wearing?

25 | A.    That gentleman, he has on the double mesh sleeve

1  and the other gentleman look like he has mesh apron on.

2  Q.    What about this man right here?

3  A.    He has the mesh sleeve and mesh apron on.

4  Q.    And then this man right here in the background,

5  what does he appear to be wearing?

6  A.    Double mesh sleeve.

7        (Tape is played.)

8  BY MS. PASCHAL:

9  Q.    Let's now take a look at D-5673.

10       (Tape is played.)

11 BY MS. PASCHAL:

12 Q.    Where are we right now?

13 A.    We are at the entrance of the production floor

14 on from the back and on the front is the cafeteria and

15 you can see the two time clocks that the team member

16 punch in and out.

17 Q.    Is this on the processing side or the slaughter

18 side?

19 A.    On processing side.

20 Q.    And you said in the back is the production

21 floor.  Would that be behind where the camera is?

22 A.    That's correct.

23 Q.    What is this lady doing right here?

24 A.    She is either punching in and out.

25 Q.    What time of day are we at?

1   A.     This is 1:55, close to 2:00 p.m.

2   Q.     And on this particular day, when did the B-Shift

3   in processing start, approximately?

4   A.     2:50.

5   Q.     And what did the A-Shift end on this particular

6   day?

7   A.     On that particular day A-Shift work short hours,

8   so they go home early usually they don't get out until

9   roughly 2:35 and can you see they punching out roughly

10  about 2 o'clock.

11  Q.     So this lady who just turned right, what is on

12  the right-hand side?

13  A.     She's an A-Shifter, she just punch out and head

14  out to the leaving the building.

15  Q.     Is the entrance to the building on the

16  right-hand side where the camera shows?

17  A.     That's correct.

18  Q.     Did she punch out before or after she changed

19  back into her street clothes?

20  A.     After.

21  Q.     Who are these individuals right here?

22  A.     They were just sitting there, getting ready for

23  their shift start.

24  Q.     What shift do they work on?

25  A.     B-Shift.

42

```
 1   Q.    And this individual right here, what does he
 2  appear to be wearing?
 3   A.    Rubber boot.
 4   Q.    Is it okay for him to have worn those from
 5  outside the plant?
 6   A.    Yes.
 7         (Tape is played.)
 8  BY MS. PASCHAL:
 9   Q.    Do you recognize this individual?
10   A.    Yeah, he's a B-Shift team member.
11   Q.    What is he doing?
12   A.    He is clocking in.
13   Q.    Has he done all of his donning at this point?
14   A.    Nope.
15   Q.    And, again, at what point does B-Shift start?
16   A.    B-Shift start, like I say, roughly 2:50.
17   Q.    So is it accurate to say that he's -- appears to
18  be clocking in roughly 50 minutes before the start of
19  shift?
20   A.    That's correct.
21   Q.    Which way is he headed?
22   A.    He's either go to the cafeteria or he can go
23  outside the building.
24   Q.    Are there any locker rooms to the right-hand
25  side of where we are?
```

1    A.    No, ma'am.

2    Q.    So would it be accurate to say that he does not

3    appear to be heading towards the locker rooms?

4    A.    That's correct.

5    Q.    Do you recognize this lady?

6    A.    Yes, she's the A-Shift member, she's clocking

7    out, ready to go home.

8    Q.    Has she already done her doffing for the day?

9    A.    Yes.

10    Q.    Who is this individual?

11    A.    He's also on A-Shift team member.  He's clocking

12    out.

13    Q.    And has he done his doffing for the day?

14    A.    That's correct.

15    Q.    And who is this individual?

16    A.    He's a B-Shift team member, he is coming in,

17    just clocking in.

18    Q.    And these three guys here, are these the same

19    ones that we saw at the beginning of the video?

20    A.    Yes, ma'am.

21    Q.    What who is this individual?

22    A.    He's an A-Shift team member.

23    Q.    What did he just do?

24    A.    I don't know, he went to the time clock and just

25    walk away.

44

1   Q.    Do you recognize this individual?

2   A.    Yeah, he's a B-Shifter coming into work.

3   Q.    Has he done his donning yet?

4   A.    No, I may want to point it out to you and the

5   jury, you can see this guy coming in with the white

6   bags, the laundry bags.

7   Q.    Yes.

8   A.    That's their equipment or uniform that they take

9   it home and they just bring it to work.

10  Q.    Okay.  And the time clocks, how many time clocks

11  have we seen in this video?

12  A.    One on this side, and there's one on the

13  opposite of it.

14  Q.    And this individual, do you recognize him?

15  These two men, actually?

16  A.    Yes.

17  Q.    What shift do they work on?

18  A.    The one on the left, he's a B-Shifter, he's just

19  coming to work, and the other gentleman is A-Shift,

20  he's going home.

21  Q.    And this individual right here, what is he

22  doing?

23  A.    He's clocking out.  I'm sorry, he's clocking in.

24  Q.    And what kind of footwear was he wearing?

25  A.    Rubber boot.

1    Q.    Is that required on processing or optional?

2    A.    It's optional.

3    Q.    I'd now like to show you D-5674.  Where are we

4    right now?

5    A.    That's the entrance door of the slaughter.

6          (Tape is played.)

7    BY MS. PASCHAL:

8    Q.    And at 2:12 p.m., about what point of the day

9    are we at?

10   A.    That's in the afternoon and it's right before

11   B-Shift start, they start roughly 2:50.

12   Q.    What is this individual wearing who is walking

13   down the hallway?

14   A.    She's wearing her white uniform.

15         (Tape is played.)

16   BY MS. PASCHAL:

17   Q.    Now this area over to the right, is that the way

18   to the production floor that we saw earlier?

19   A.    Yes, ma'am.

20   Q.    Are there locker rooms on the right-hand side?

21   A.    Well, on the right-hand side is the entrance go

22   to the -- the kill floor and the locker room but on --

23   so you see on the left there is another entrance to the

24   woman's locker room.  We do have two woman's locker

25   room over in the slaughter area.

1    Q.    So would it be fair to say that the locker rooms

2    are off to this side, and off to the right-hand side

3    for women?

4    A.    Yes.

5    Q.    Where is this woman heading?

6    A.    She's heading to -- toward the caf -- the

7    slaughter cafeteria.

8    Q.    Is that where she is entering right now?

9    A.    That's correct.

10        (Tape is played.)

11   BY MS. PASCHAL:

12    Q.    And do you see these individuals who are sitting

13   behind her?

14    A.    Yes, those are the B-Shifter, they just

15   visiting, sit there, talk to their friends.

16    Q.    And is that before they've started to get ready

17   for work?

18    A.    Yes, ma'am.

19    Q.    What is she doing now?

20    A.    Oh, she just put her lunch bag on the shelves.

21    Q.    And what is she doing now?

22    A.    She getting her card out ready to clock in.

23    Q.    So is this the other time clock in slaughter?

24    A.    That's correct.

25    Q.    What is she doing now?

1    A.    She just stop and visiting with her friend.

2    Q.    Is he an hourly employee as well?

3    A.    Yes.

4          (Tape is played.)

5  BY MS. PASCHAL:

6    Q.    Where is she going now?

7    A.    Apparently she's heading to the women's locker

8  room on the right side and right in front is the kill

9  floor.

10   Q.    Let's now look at D-5675.

11         (Tape is played.)

12  BY MS. PASCHAL:

13   Q.    And where are we again in this video?

14   A.    That's the entrance door to the slaughter side.

15   Q.    What is this woman appear to be wearing?

16   A.    She's wearing her white uniform.

17         (Tape is played.)

18  BY MS. PASCHAL:

19   Q.    What are those two individuals doing right there

20  in the right-hand side?

21   A.    They just sitting on the bench on the hallways.

22   Q.    Does it appear that this individual already has

23  his hard hat and his hair net and his whites on?

24   A.    Yes, ma'am.

25   Q.    Where is she now?

```
1    A.    She entering the slaughter cafeteria.

2    Q.    What is she doing now?

3    A.    She just swipe her card.

4    Q.    What is she doing right now?

5    A.    She's just takes some food out, put it on the

6  shelves and take her personal belonging with her.

7            (Tape is played.)

8  BY MS. PASCHAL:

9    Q.    What is this man doing right here?

10   A.    He -- I don't know whether he is clocking in or

11 out.

12   Q.    Is he dressed for work?

13   A.    No, he's not.

14   Q.    And where is she going right now?

15   A.    She just go into the woman's locker room.

16   Q.    Let's now look at D-5676.

17           (Tape is played.)

18 BY MS. PASCHAL:

19   Q.    Are we at the slaughter entrance again?

20   A.    That's correct.

21   Q.    What is this lady wearing?

22   A.    She wearing her white uniform.

23   Q.    Where is she going right now?

24   A.    She just entering the personnel office.

25   Q.    What can employees do at the personnel office?
```

1    If they stop by before or after shift?

2     A.     If they want to change their address, they want

3    to change their claim, they want to have any question

4    about insurance, about benefits or if they have any

5    issue, they come see the HR manager.

6     Q.     Let's now look at 5677.

7            (Tape is played.)

8    BY MS. PASCHAL:

9     Q.     What does this woman appear to be wearing

10   underneath her coat?

11    A.     White pants, uniform.

12           (Tape is played.)

13   BY MS. PASCHAL:

14    Q.     Now what is she doing?

15    A.     She's clocking in.

16    Q.     Where is she going now?

17    A.     To the woman's locker room.  I guess she change

18   her mind.

19    Q.     Is that another employee that she is talking to?

20    A.     Yes.

21    Q.     The locker room that she went into, is that a

22   different locker room for women than the one we saw the

23   previous two clips?

24    A.     That's correct.

25    Q.     This is D-5678.

```
 1              (Tape is played.)

 2   BY MS. PASCHAL:

 3   Q.     We again at the entrance to the slaughter area?

 4   A.     Yes, ma'am.

 5   Q.     And now what time are we up to on this

 6   timestamp?

 7   A.     2:35:07 p.m.

 8   Q.     What is this lady wearing?

 9   A.     She wearing her white uniforms.

10   Q.     What is she doing right now?

11   A.     She just clock in.

12              (Tape is played.)

13   BY MS. PASCHAL:

14   Q.     Where is she going right now?

15   A.     She went to the other women's locker room across

16   the hallway.

17   Q.     Let's now look at D-5679.

18              (Tape is played.)

19   BY MS. PASCHAL:

20   Q.     We again at the slaughter entrance?

21   A.     That's correct.

22   Q.     What is the timestamp now?

23   A.     2:56:56 p.m.

24   Q.     What does this man appear to be wearing?

25   A.     He has on his white and rubber boot.
```

1   Q.     Where did he just go?

2   A.     He went into the men's locker room.

3   Q.     Where are we right now?

4   A.     We are in the processing cafeteria.

5   Q.     What time of day is it?

6   A.     It's 8:33:29 a.m., which is right around the

7   first break.

8   Q.     Is --

9   A.     For A-Shift.

10  Q.     I'm sorry, this is D-5681.

11         When you said first break, is this the

12  25-minute break?

13  A.     That's correct.

14  Q.     What is this individual wearing?

15  A.     He has on a double mesh sleeve.

16  Q.     And what about this lady right here?  What is

17  she wearing?

18  A.     She have a mesh apron and the polar sleeve on.

19  Q.     And this man behind her?

20  A.     Mesh sleeve and mesh apron.

21  Q.     And what about the man across from him?

22  A.     Mesh sleeve.

23  Q.     What do these employees appear to be doing?

24  A.     They're having their breakfast at the first

25  break.

1    Q.     What is this man wearing?

2    A.     He has on a polar sleeve and a mesh apron.

3    Q.     Is this the polar sleeve right here on his arm?

4    A.     Yes, ma'am.

5    Q.     What about this man right here?

6    A.     He's having double mesh sleeve, his beard net,

7  his mesh apron and the jean apron underneath.

8    Q.     What about this man right here?

9    A.     Double mesh sleeve.

10   Q.     What about this man right here?

11   A.     He has his mesh apron and the polar sleeve and

12  the cotton gloves.

13   Q.     So are those his cotton gloves right there,

14  pinned to his apron?

15   A.     Yes, ma'am.

16   Q.     What about this man right here?  What is he

17  wearing?

18   A.     He has on the yellow plastic apron and mesh

19  sleeve.  I mean, I'm sorry, the mesh apron, plus the

20  polar sleeve.

21   Q.     And this lady right here, what does she appear

22  to be wearing on her arms?

23   A.     On her left arm is the polar sleeve.  On both

24  arms.

25   Q.     What are these right here that he has attached

1   to his apron?

2   A.      That's the cotton glove.

3           (Tape is played.)

4   BY MS. PASCHAL:

5   Q.      What is this man wearing right here?

6   A.      Polar sleeves.

7           (Tape is played.)

8   BY MS. PASCHAL:

9   Q.      What are these things here hanging around the

10  chins of these guys?

11  A.      The beard net.

12  Q.      What is this man wearing right here?

13  A.      He has on the double mesh sleeve and the mesh

14  apron.

15  Q.      Is that another stop watch?

16  A.      Yes.

17  Q.      What is this woman wearing right here?

18  A.      She have on her white frock, she has on her

19  plastic apron and plastic sleeve.

20  Q.      And is she in the cafeteria?

21  A.      Yes.

22  Q.      Is it okay for her to be wearing these items in

23  the cafeteria where she is standing?

24  A.      Yeah.

25  Q.      What is this man wearing right here?

1  A.    Double mesh sleeve.

2        (Tape is played.)

3  BY MS. PASCHAL:

4  Q.    Is that just the TV in the cafeteria?

5  A.    That's correct.

6  Q.    The last video I want to show you, Mr. Young, is

7  D-5683.

8        (Tape is played.)

9  BY MS. PASCHAL:

10  Q.    Where are we right now?

11  A.    That's the entrance of the processing side.

12  Q.    And about what time of day are we at?

13  A.    8:48 a.m.

14  Q.    And at 8:48 a.m., where are we in the production

15  day?

16  A.    That's toward the end of the first break.

17        (Tape is played.)

18  BY MS. PASCHAL:

19  Q.    Now as we are turning, where are we going?

20  A.    That's the processing cafeteria.

21  Q.    What is this person wearing?

22  A.    She has on her white frock.

23  Q.    And what about this person right here?

24  A.    The --

25  Q.    What is she wearing on her arms?

1   A.     Polar sleeve.

2   Q.     What is this man wearing?

3   A.     He's wearing his white frock and he have plastic

4   gloves on.

5   Q.     What about this woman right here?

6   A.     She's also wearing her white frock.

7   Q.     And I believe you said this is at the end of the

8   first break, is that --

9   A.     That's correct.

10  Q.     What about that person that just sat down, what

11  is she wearing?

12  A.     She is wearing a white frocks and plastic gloves

13  on.

14  Q.     We still in the cafeteria?

15  A.     Yes, ma'am.

16  Q.     What are these individuals doing right here?

17  A.     Looks like they sitting there ready to go back

18  from break.

19  Q.     And what is that man doing as he's walking?

20  A.     He's just putting on his gloves on.

21  Q.     Where were you right now?

22  A.     We're right at the first entrance to the

23  processing floor.

24  Q.     How many entrances are there to the processing

25  floor?

1   A.    There are three entrance to the processing

2  floor.

3   Q.    Are all three entrances off the main production

4  hallway?

5   A.    That's correct.

6   Q.    And what are we looking at right now?

7   A.    That's the time clock.

8   Q.    And is that the floor back there?

9   A.    Yes.

10   Q.    Now we're back in the cafeteria now?

11   A.    Yes.

12   Q.    Are there multiple entrances to the cafeteria?

13   A.    Yes, ma'am.

14   Q.    Is this the main hallway again?

15   A.    That's correct.

16   Q.    Is that the cafeteria again?

17   A.    Yes, ma'am.

18   Q.    That just another entrance?

19   A.    Yes.

20   Q.    What is this area right here?

21   A.    That's another entrance to the women's locker

22  room.

23   Q.    What are these right here on the right-hand

24  side?

25   A.    Those are metal hooks provided there for team

1   members to hang their frocks or equipment for their

2   convenience, and this is right in front of the

3   cafeteria entrance.

4   Q.      There are also hooks out on the floor for them

5   to hang their frocks if they so choose?

6   A.      That is correct.

7   Q.      We back in the production hallway again?

8   A.      Yes, ma'am.

9   Q.      Is that a time clock?

10  A.      That's correct.

11  Q.      Where are these employees going?

12  A.      They getting ready to go back to work and go

13  into the processing floor.

14  Q.      Is this the second entrance to the processing

15  floor?

16  A.      That's correct.

17  Q.      And those cups that this man has on his helmet,

18  what are those?

19  A.      Those are ear muff.

20  Q.      Are those the same that we saw on that slaughter

21  employee at the beginning of our examination?

22  A.      That's correct.

23  Q.      Can employees wear their muffs that way when

24  they're not on the production floor?

25  A.      Sure.

58

1  Q.    Now where are we now?

2  A.    This is the entrance to the men's locker room.

3  On the left is the man locker room, on the right is the

4  entrance to the women's locker room.

5         We approaching the end of the hallways and to

6  your left is the third entrance to the processing

7  floor.

8  Q.    What is this here on the right-hand side?

9  A.    That's the time clock.

10  Q.    I think that was the last video I had for you,

11  Mr. Young, thank you.

12         Mr. Young, from what we've seen in this video,

13  do the employees appear to be doing things the way they

14  normally do?

15  A.    Yes, I believe so.

16  Q.    Did anyone appear rushed to you on this video?

17  A.    No, ma'am.

18  Q.    Or it appear like they were hurrying?

19  A.    No, ma'am.

20  Q.    Mr. Young, we've had testimony here at trial

21  from three current Finney County employees, Ms. Garcia,

22  Mr. Burks, and Mr. Cano.  Is Tyson paying them for the

23  time that they spend in the courtroom in this case?

24         MR. HANSON:  Object, Your Honor, it's

25  relevance.

1                THE COURT:   Overruled.

2    A.    Yes, it's company policy when team member has to

3  be here they are paid for.

4  BY MS. PASCHAL:

5    Q.    Do you remember when several videographers

6  working for the plaintiffs' expert, Doctor Radwin, came

7  to the plant for three days in May of 2010?

8    A.    Yes.

9    Q.    Were you at the plant at that time?

10   A.    Yes, I was.

11   Q.    Were you in your current position at that time?

12   A.    Yes, ma'am.

13   Q.    Did you notice that the plant did anything

14  differently on those three days with respect to pre and

15  post shift and break activities?

16   A.    No, ma'am.

17   Q.    Are you aware of any employees or supervisors

18  being told to speed things up before or after shift?

19   A.    No, ma'am.

20   Q.    Are you aware of anything being like, for

21  example, gloves being distributed differently on those

22  days than the way they normally are?

23   A.    No, ma'am.

24   Q.    Are you aware of anyone in plant management

25  directing employees or supervisors to do anything

1  differently or to change practices on those three days

2  that the videographers were in the plant in May of

3  2010?

4  A.    No, ma'am.

5  Q.    When Mr. Karkiainen was here he testified about

6  the attendance policy that was used in Finney County

7  and showed us a document that is used on the point

8  system for attendance.  Is that policy also used if an

9  employee is late back from a break?

10  A.    No, the attendance policy is different.  It's as

11  far as late from break, that's a different issues.

12  Only when you late from the start then will be assessed

13  for attendance policy.

14  Q.    And when you say late from the start are you

15  referring to the start of the shift?

16  A.    That's correct.

17  Q.    So being late at the start of the shift is

18  governed by the attendance policy?

19  A.    That's correct.

20  Q.    Now, if you're late back from break for about a

21  minute, what is the normal practice with respect to

22  enforcement of any sort of attendance policy?

23  A.    Well, if a team member late from break for a

24  minute or two, the supervisor will talk to them and

25  remind them to be on time.

1    Q.    You've heard some testimony from some of the

2    plaintiffs that you only have three opportunities to be

3    late and then after that you're fired.  Is that an

4    accurate description of the plant's policies and

5    practices with respect to being late back from break?

6    A.    No, it's not.

7    Q.    Could you please explain for us what the plant's

8    practice is?

9    A.    If -- if you are late from break, you know, on a

10   with, you know, 10, 15 more minutes, then that's a long

11   time, then the supervisor will counsel them.

12   Q.    And when you say counsel, what does that entail?

13   A.    Just to talk to team member, let them know that,

14   Hey, you are late from break and I'm talking to you

15   right now, you know, you shouldn't be late from break.

16   Q.    If a person is repeatedly late back from break,

17   what could happen?

18   A.    Then it would go to a written warning.

19   Q.    And then is there another step after a written

20   warning?

21   A.    I'm -- I should say a written counseling.

22   Q.    What is a written counseling?

23   A.    A written counseling is a form of notification

24   documenting, letting the team member know that they was

25   late from break.

1    Q.     And if it continues to happen, is there a next

2    step?

3    A.     Then they will get a progressive -- progressive

4    disciplinary action, what would be a written warning,

5    and if you keep repeating violating the policy, then

6    you would be suspended for one day and then the next

7    step would be termination.

8    Q.     So you talked to us about being just talked to?

9    A.     Correct.

10   Q.     If you're late back a minute from break?

11   A.     Yes.

12   Q.     You've mentioned verbal counseling?

13   A.     Yes.

14   Q.     You've mentioned written counseling?

15   A.     Yes.

16   Q.     You've mentioned written warning?

17   A.     Yes.

18   Q.     You've mentioned I believe it was suspension was

19   next?

20   A.     Correct.

21   Q.     And then termination?

22   A.     Yes, ma'am.

23   Q.     So would it be accurate to say there are

24   actually several steps in that process?

25   A.     Yes, ma'am.

1   Q.    For documenting lateness back from break?

2   A.    Yes, ma'am.

3   Q.    As an HR manager do you have oversight of how

4   the practice of disciplining team members for being

5   back late from work is implemented?

6   A.    Yes, I do have team member come to me to appeal

7   their write-ups as far as attendance or late from

8   breaks.  If they don't feel it's -- the discipline is

9   issued for it, then they will appeal to me and if I can

10  see it their first time or if they just a few minutes

11  late, I'm going to void the write-ups.

12  Q.    And when you say void, do you mean -- is that

13  equivalent of taking it out of their file, in effect?

14  A.    It still show on their file they was disciplined

15  but the discipline doesn't count toward the steps.

16  Q.    Is that something that you have done?

17  A.    Uh --

18  Q.    As a human resources manager?

19  A.    On several times, ma'am.

20  Q.    So if there is -- if we heard testimony that

21  after three times being late, you're fired, would you

22  say that that is accurate or inaccurate statement of

23  the plant's policies and practice with respect to

24  attendance?

25  A.    That's not accurate.

```
1            MS. PASCHAL:  I have no further questions at

2  this time.  Thank you, Mr. Young.

3            THE WITNESS:  You're welcome.

4            THE COURT:  Mr. Hanson.

5            MR. HANSON:  Thank you.

6                      CROSS EXAMINATION

7  BY MR. HANSON:

8  Q.    I'm going to go low tech.

9  A.    Okay.

10 Q.    Mr. Young, we met about a month ago, didn't we?

11 A.    Yes, sir.

12 Q.    And you helped give me and my colleague a tour

13 of the facility in February, correct?

14 A.    Yes, sir.

15 Q.    You did not give a deposition in this case, did

16 you, Mr. Young?

17 A.    No, sir.

18 Q.    You've been at trial, I think since the

19 beginning, is that right?

20 A.    That's correct.

21 Q.    And participated as the company representative,

22 correct?

23 A.    Yes, sir.

24 Q.    And you heard Mr. Paul Karkiainen testify at

25 some length, correct?
```

65

1    A.    Yes, sir.

2    Q.    And you heard Mr. Karkiainen testify about the

3    policies and practices at Finney County, right?

4    A.    Yes, sir.

5    Q.    And you heard Mr. Karkiainen testify truthfully,

6    is that correct?

7    A.    Yes, sir.

8    Q.    So it's fair for the jury to rely upon the

9    lengthy testimony that Mr. Karkiainen gave, is that

10   correct?

11   A.    Yes, sir.

12   Q.    Well, that will save us I think quite a bit of

13   time.

14         You understand that Mr. Karkiainen was the

15   highest ranking manager in the facility during -- well,

16   basically all of the period in question in this case,

17   right?

18   A.    Yes, sir.

19   Q.    And he would certainly know the policies and

20   practices at the plant that he managed, wouldn't he?

21   A.    He should.

22   Q.    You mentioned paying for the testimony -- or not

23   paying for the testimony but paying for the time of

24   some of the witnesses in this case.  Do you remember

25   that?

1    A.    Yes, sir.

2    Q.    In fact, Ms. Garcia, do you know that she is

3 actually out on medical leave at the moment?

4    A.    That she's on a leave.

5    Q.    And on paid leave, correct?

6    A.    When you on a medical leave it's -- it's has to

7 do with the personal insurance on short term or long

8 terms.

9    Q.    But you understand that Tyson would be paying

10 Ms. Garcia whether she was at home or participating in

11 trial, right?

12    A.    If she would send us the paper, yes, she would

13 be paid for.

14    Q.    Okay.  And Mr. Cano and Mr. Burks are both

15 current employees, correct?

16    A.    Yes, sir.

17    Q.    And you're aware that Tyson actually issued them

18 subpoenas to come testify at trial, aren't you?

19    A.    I'm not aware of that.

20    Q.    Okay.  They issued a legal form that required

21 them to attend.  You understand that if Tyson requires

22 witnesses to come attend trial and leave work, they

23 would need to pay for that, right?

24    A.    Yes, sir.

25    Q.    So we saw some videos and photographs that you

1 observed being taken, is that correct?

2   A.    Yes, sir.

3   Q.    And I just need to get this clarified because

4 it's important.  I think Ms. Paschal asked you when

5 those videos were created, do you remember that?

6   A.    Yes, sir.

7   Q.    And you said they were in January of 2010?

8   A.    No, sir.

9   Q.    Well, I think, I was watching the testimony, I'm

10 sure this is a mistake --

11   A.    Yes.

12   Q.    -- and I just want to clarify it.  They were not

13 taken in January of 2010, were they?

14   A.    Right.

15   Q.    They were taken in January of 2011?

16   A.    Yes, sir.

17   Q.    And January of 2011 is just six weeks ago or so?

18   A.    Sure.

19   Q.    Okay.  You know that when I visited the facility

20 we were not permitted to take videotapes, right?

21   A.    I'm not aware of that, sir.

22   Q.    You didn't know that that's what we were told?

23   A.    No, sir.

24   Q.    It is true that the workers in this case are not

25 permitted to take photographs or videotape in the

1  facility, that much is true, correct?

2  A.    That's correct.

3  Q.    I want to go back then to the time period that

4  we're talking about in this case, which starts in May

5  of 2003, and then the payroll data that was given to us

6  by Tyson ends at the end of 2010, okay?

7  A.    Okay.

8  Q.    Do you have any videos to show the jury on

9  policies and practices in the plant from 2003?

10  A.    You talking about video, sir?

11  Q.    Yeah, just --

12  A.    No.

13  Q.    Just like the ones you just saw?  Or how about

14  in 2004?

15  A.    Not that I know of.

16  Q.    2005?

17  A.    Not that I know of, sir.

18  Q.    You have any videos to show the jury about

19  policies and practices during the period we're talking

20  about in the case?

21  A.    Not that I'm aware of, sir.

22  Q.    And even the videos that were taken just a

23  couple of weeks ago, you didn't videotape everyone

24  walking in to the facility, did you?

25  A.    Not every single one of them, no.

1  Q.    You had the videographer wait to find someone

2  that you wanted to tape and then and videoed that

3  person, correct?

4  A.    No, whatever the gentleman wanted to tape, they

5  do it, I don't say nothing to them.

6  Q.    You didn't direct it, correct?

7  A.    No.

8  Q.    That was done by Tyson's lawyers?

9  A.    Yes.

10  Q.    But what I am saying is, is you don't have hours

11  and hours of footage of everyone coming in to the plant

12  that you picked and -- pick and chose out of, right?

13  A.    That's right.

14  Q.    You -- you chose to video what you wanted the

15  jury to see, correct?

16  A.    I have nothing to do with that, sir.

17  Q.    Well, the videos that were shown to the jury

18  were selected, they weren't all of the videos taken,

19  correct?

20  A.    That's what they did that day, sir.

21  Q.    On the days in question, do we even know how

22  many people walked in to the facility?  Do you know

23  that?

24  A.    There's -- there's a lot of people come in.

25  Q.    A lot, I mean even thousands, wouldn't it be?

1   A.      If you count the whole plant, yes, sir.

2   Q.      All right.  Now, there were other people

3   involved in this litigation who were in the plant

4   taking videos, weren't there?

5   A.      Can you repeat that question?

6   Q.      Yeah.  In addition to what Tyson's lawyers did,

7   you know, a couple of weeks ago, during the class

8   period in the case there were people hired by the

9   lawyers in the facility taking videos, you're aware of

10  that?

11  A.      Yes, sir.

12  Q.      You're aware of the expert witnesses that were

13  hired in the case, right?

14  A.      Yes, sir.

15  Q.      You're aware that we had an expert witness?

16  A.      Yes, sir.

17  Q.      You saw him testify, right?

18  A.      Yes, sir.

19  Q.      And you know Tyson has an expert witness,

20  correct?

21  A.      Yes, sir.

22  Q.      And did you meet Doctor Adams?

23  A.      Yes, sir.

24  Q.      And you know he was in the plant taking videos,

25  too?

1   A.      Yes, sir.

2   Q.      You knew Doctor Adams was in the plant taking

3   videos as well?

4   A.      Yes, sir.

5   Q.      Did you -- in preparing for your testimony, did

6   you review any of the videos that Doctor Radwin took?

7   A.      No, sir.

8   Q.      Did you know that he took dozens of hours of

9   footage of people coming into the facility?

10  A.      I don't know that, sir.

11  Q.      And do you know that there is not a single

12  incident in those dozens of hours of someone coming to

13  work in their sanitary outer garments?

14          MS. PASCHAL:  Objection.

15          THE COURT:  Basis?

16          MS. PASCHAL:  Assumes facts not in evidence.

17          THE COURT:  Overruled.

18  A.      I never seen the video, so I cannot tell you,

19  sir.

20  BY MR. HANSON:

21  Q.      And then when Doctor Adams was taking videos,

22  did you ever review Tyson's expert videos to see what

23  people were wearing when they came into the plant?

24  A.      No, sir.

25  Q.      I'm sorry, did you review those?

```
 1   A.     Yes, sir.

 2   Q.     Did you see a single instance where people came

 3   into the -- into the plant wearing their sanitary outer

 4   garments?

 5   A.     You mean on the Tyson video?

 6   Q.     Let me be really clear.  I apologize if I'm not.

 7          The expert that Tyson hired for this case,

 8   Doctor Adams, do you know who that is?

 9   A.     Yes, sir.

10   Q.     Do you know that he took videos?

11   A.     Yes, sir.

12   Q.     And observed activities inside the plant,

13   correct?

14   A.     Yes, sir.

15   Q.     Did you review any of Doctor Adams's videos?

16   A.     Yes, sir.

17   Q.     Okay.  Did you see people in Doctor Adams's

18   videos coming in with their sanitary outer garments on?

19   A.     Yes, sir.

20   Q.     Have you shown those to the jury?

21   A.     Well, you can see it in the video.

22   Q.     Okay.  And I am not being clear.

23   A.     There's people that have the uniform on and

24   there's people that don't have it on.  You can see

25   that.
```

1  Q.    Right.  In late January, Tyson's lawyers and you

2  accompanied a videographer, right?

3  A.    That's correct, sir.

4  Q.    And that's not -- that's not Doctor Adams,

5  though, do you understand that?

6  A.    Right.

7  Q.    Okay.  I'm talking about Tyson's expert who was

8  in the facility months before who was taking video.  Do

9  you understand?

10  A.    Yes, sir.

11  Q.    Okay.  It's -- that's the person I am asking

12  about, Doctor Adams, when he was doing his study at the

13  plant.  Do you know if Doctor Adams used any one coming

14  into the plant wearing their sanitary outer garments?

15  A.    I don't know that, sir.

16  Q.    Okay.  So what you know is what happened just a

17  couple of weeks ago, correct?

18  A.    Yes, sir.

19  Q.    You're not aware of any videos that were taken

20  by either Tyson's expert or our expert in this case,

21  correct?

22  A.    That's correct, sir.

23  Q.    The employees in slaughter -- and let me

24  actually back up.

25          There's no question, is there, Mr. Young, that

1  as far as the frock goes, that the processing employees

2  wear, it's actually blocked from my view but it is the

3  an outer garment on the right peg board over, there do

4  you see that?

5   A.    Yes, I see that.

6   Q.    Okay.  There's no dispute that processing

7  employees cannot wear that into the plant, correct?

8   A.    That's correct.

9   Q.    All right.  And you also agree that the

10  processing side is three times larger than the

11  slaughter side, correct?

12   A.    Yes, sir.

13   Q.    So, the issue is this slaughter uniform.

14  Correct?

15   A.    Yes, sir.

16   Q.    And is it true that slaughter employees are

17  issued a single uniform?

18   A.    Yes, sir.

19   Q.    And they have to wear that uniform every day, is

20  that right?

21   A.    Yes, sir.

22   Q.    So if the company allows slaughter employees to

23  wear their uniform into the facility, if that's the

24  policy, you would agree with me that the slaughter

25  uniform has to be sanitary, right, when it comes in?

1   A.    Yes, sir.

2   Q.    Which means it has to be laundered, correct?

3   A.    Yes, sir.

4   Q.    Every day, right?

5   A.    It should be.

6   Q.    And that would be required by the USDA?

7   A.    I don't think so.

8   Q.    Do you know if it would be required by company

9   policy at least?  To wear a clean uniform?

10  A.    Clean, yes.

11  Q.    Right.  But to be clean, it would have to be

12  laundered, right?

13  A.    Yes, sir.

14  Q.    I mean, they are working in a slaughter

15  facility, right?

16  A.    Yes, sir.

17  Q.    So they would have to take the uniform, they

18  would have to wear the dirty uniform home, correct?

19  A.    It's their choice.

20  Q.    Well, they can come in -- well, let me back up.

21         If they're wearing it -- if they have one

22  uniform and they're wearing it into the facility,

23  correct?

24  A.    Yes, sir, I'm not sure if they have one or two,

25  I'm not sure about that.

1  Q.    Well, you know they are issued one by the

2  company, correct?

3  A.    I'm not sure about that, sir.

4  Q.    Okay.  If they are issued one, they would have

5  to launder it every night, correct?

6  A.    If they issue one but like I say, I don't know

7  if they issue one or two.

8  Q.    Is the company -- well, who would know that?  If

9  they are given more than one uniform?

10  A.    The training department, they in charge of the

11  laundry.

12  Q.    And you have some responsibility for training,

13  too, right?

14  A.    Yes, sir.

15  Q.    Okay.  But we can rely on the policy documents

16  to tell us how many uniforms are issued in the plant,

17  right?

18  A.    Yes, sir.

19  Q.    And we can rely on the policy documents to help

20  us understand what the practices are in the plant,

21  correct?

22  A.    Yes, sir.

23  Q.    If it is true that they are issued a single set

24  of uniform, they have to launder it themselves in the

25  evening, correct?

```
 1   A.     Yes, sir.

 2   Q.     And they would do that at their own expense?

 3   A.     Yes, yes, sir.

 4   Q.     And do it on their own time, is that right?

 5   A.     Well, if they take it home they chose to do

 6   that, then, yes, sir.

 7   Q.     I just want to make sure, if people exercise the

 8   choice that you're describing it, is not Tyson

 9   reimburses them for, correct?

10   A.     That's correct.

11   Q.     It doesn't pay them for their time?

12   A.     That's correct, sir.

13   Q.     In all the videos that we saw, the ones that

14   were created again just a couple of weeks ago, just the

15   ones that your lawyer just played for you, okay?

16   A.     Yes, sir.

17   Q.     You'll agree with me that we saw some folks

18   coming in in the whites, correct?

19   A.     Yes, sir.

20   Q.     But you'll agree with me that we didn't see a

21   single video of someone coming into the plant wearing

22   the other gear on the board, for example, the hard hat,

23   gloves, earplugs, hair net, the other stuff up there.

24   Would you agree with me?

25   A.     I seen some rubber boot.
```

1    Q.    Well, we saw some rubber boots from somebody who

2  was sitting on a bench?

3  A.    No, coming into work.

4    Q.    A rubber boot?

5  A.    Yes, sir.

6    Q.    All right, a rubber boot?

7  A.    And helmet also.

8    Q.    Did you see that on the video?

9  A.    Yes, sir.

10   Q.    Okay.  Did you see anything else being worn into

11  the facility that is on that board?

12  A.    No, sir.

13   Q.    Would you agree with me, though, that the vast,

14  vast majority of people put this stuff on when they get

15  to the facility?  That's true, isn't it?

16  A.    Yes, sir.

17          MR. HANSON:  Can we pull up the slide that is

18  just that Anatomy of the Workday slide?

19  BY MR. HANSON:

20   Q.    Mr. Young, we have shown this a couple times

21  during the litigation.  Do you see this?

22  A.    Yes, sir.

23   Q.    You understand what this is, at this point in

24  the case?

25  A.    Yes, sir.

1    Q.    All right.  And just to refresh, the claims in

2  this case have to do with the time period that's

3  identified in red, do you see that?

4  A.    Yes, sir.

5    Q.    And that period of red starts when the workers

6  don their equipment and sanitary outer garments in the

7  locker room, do you see that?

8  A.    Yes, sir.

9    Q.    All right.  So the videos that we just saw for

10  the folks who were coming in, putting their lunch on

11  the shelf in the cafeteria, going to the locker room,

12  walking to the locker room, you understand that the

13  workers in this case are not claiming compensation for

14  any of that time, do you see that?

15  A.    Yes, sir.

16  Q.    Do you understand that the workers' claims in

17  this case start from when they begin the donning

18  process in the locker room, right?

19  A.    Yes, sir.

20  Q.    So nothing that we just saw in any of those

21  videos would be time that the workers in this case are

22  claiming they should be paid for.  You understand that?

23  A.    Yes, sir.

24  Q.    We also saw some videos that were from

25  the -- from a couple of weeks ago that show folks in

1  the cafeteria.  Do you remember that?

2  A.     Yes, sir.

3  Q.     One thing that you didn't show was workers who

4  were using the restroom facilities or going into the

5  restroom facilities over their breaks.  Right?

6  A.     I don't recall that, sir.

7  Q.     Okay.  But it is true that the company wants

8  workers to take their restroom breaks or the company

9  wants the production workers if they need to use the

10 restroom, to do so over a break.  That's true, isn't

11 it?

12 A.     That's the employee's option wherever they need

13 to use the restroom, sir, we will allow them to do so.

14 Q.     And there's been testimony about, you know,

15 you're not going to deny someone a restroom break if

16 it's really needed, even during the production,

17 correct?

18 A.     That's correct, sir.

19 Q.     But it is true that Tyson expects production

20 workers to not use production time for the restroom

21 breaks but to use break time to use the restroom, is

22 that true?

23 A.     I would say we prefer, but not expect.

24 Q.     Let me hand you what I have marked -- actually

25 what your lawyers have marked as Exhibit 5036.

1          So this is Defendant's Exhibit 5036.  You see,

2   Mr. Young, that this is a policy from Tyson, correct?

3   A.    Yes, sir.

4   Q.    Referencing restroom facilities, correct?

5   A.    Yes, sir.

6          MR. HANSON:  We'd move for admission of 5036.

7          MS. PASCHAL:  Your Honor, we object this is

8   beyond the scope of the direct examination.

9          THE COURT:  Overruled.  It will be admitted.

10  BY MR. HANSON:

11  Q.    Mr. Young, can you direct your attention to

12  5036.  The Restroom Facility Policy from Tyson, do you

13  see that?

14  A.    Yes, sir.

15  Q.    And I'm just going to call your attention to

16  Paragraph 3.  And the policy says, "Employees are

17  expected to use restroom facilities prior to shift, at

18  breaks and meal periods, and at the end of shift.  This

19  minimizes disruption of production during the shift due

20  to employee's absence from the line and avoids the

21  undue burden such temporary absence might place on

22  co-workers."  (Quoted as read.)

23          Do you see that?

24  A.    Yes, sir.

25  Q.    And you'll agree with me that that's an accurate

1  statement of Tyson's policy, correct?

2   A.    That's what it say on there, yes, sir.

3   Q.    And that's accurate?

4   A.    Yes, sir.

5   Q.    It's the company policy that they expect workers

6  to take their restroom breaks not during production

7  time but over rest and meal breaks or before and after

8  shift, right?

9   A.    I personally would prefer that for my team

10 members.

11  Q.    And -- and it's company policy, correct?

12  A.    Yes.

13  Q.    All right.  So, understanding that that's

14 company policy, when you saw the workers that you

15 characterized to be on break in the cafeteria, do you

16 remember that?

17  A.    Yes, sir.

18  Q.    You didn't show the donning and doffing activity

19 that occurs before and after they use the restroom,

20 right?

21  A.    That's right.

22  Q.    And this much you'll agree with me.  They can't

23 wear their equipment or sanitary garments into the

24 restroom, correct?

25  A.    That's correct, sir.

1   Q.    That stuff has got to come off?

2   A.    Yes, sir.

3   Q.    And it's got to be put back on, correct?

4   A.    Yes, sir.

5   Q.    You testified, Mr. Young, about your involvement

6   in training, is that correct?

7   A.    Yes, sir.

8   Q.    I'm going to hand you what I have marked as

9   Exhibit 447.  Do you see that this is a New Team Member

10  Orientation and Training Manual from Tyson?

11  A.    Yes, sir.

12  Q.    Okay.  It's a fairly lengthy document, we are

13  just going to take a look at one or two pages, but

14  you're familiar with this document, correct?

15  A.    Some of it, sir.

16  Q.    Do you understand that new team members at Tyson

17  are provided orientation and training, correct?

18  A.    Yes, sir.

19        MR. HANSON:  We move for admission of 447.

20        THE COURT:  Any objection?

21        MS. PASCHAL:  No objection.

22        THE COURT:  447's admitted.  Thank you.

23  BY MR. HANSON:

24  Q.    Okay.  And there's quite a bit of material

25  covered here, but just so the jury understands,

1   when -- when a new team member is hired, they have to

2   go through a period of orientation, right?

3   A.    Yes, sir.

4   Q.    And they have to be provided training on the

5   company's policies and practices, correct?

6   A.    Yes, sir.

7   Q.    And that training includes things like safety

8   training, correct?

9   A.    Yes, sir.

10  Q.    Includes such things as attendance, clocking in

11  and out, those kind of things?

12  A.    Yes, sir.

13  Q.    It also includes training on hygiene and the

14  need to keep sanitary conditions in the plant, correct?

15  A.    Yes, sir.

16  Q.    Can we -- do you have tabs on your?

17  A.    Yeah, there's two.

18  Q.    Great.  Would you just turn to the first one,

19  please.

20  A.    Yes, sir.

21  Q.    And the tab is for a training module, is that

22  right?

23  A.    Yes, sir.

24  Q.    And the training program is broken down into

25  different modules for different topics, is that right?

85

1   A.    Yes, sir.

2   Q.    Let me just put up here the page that we're

3   looking at.  And this is from the orientation training

4   program, correct?

5   A.    Yes, sir.

6   Q.    And this is module -- I don't even -- that is

7   Module 19, is that how the Roman numerals work out?

8   A.    That is what it looks like.

9   Q.    I should know from Super Bowl watching.  Okay,

10  so Module 19 is at least how I would understand it.

11          And this program is called GMP and Personal

12  Hygiene?

13  A.    Yes, sir.

14  Q.    And can you tell the jury what GMP stands for?

15  A.    Good Manufacturing Practice.

16  Q.    And, in fact, that is -- that is what this tells

17  us here, right, Good Manufacturing Practice, Employee

18  Sanitation and Personal Hygiene Policies?

19  A.    Yes, sir.

20  Q.    You see the -- the video that you show your new

21  hires is about adulterated product?

22  A.    I'm not so sure about this, sir.  I'm not sure

23  this is the training module for the Finney County plant

24  or from the different plant.

25  Q.    Okay.

```
 1   A.     I have not seen this.

 2   Q.     You understand that this is a training module

 3   for Tyson Foods, correct?

 4   A.     Yes, sir.

 5   Q.     Okay.

 6   A.     But not every plant have the same manuals.

 7   Q.     Well, let's just -- Finney County is trained on

 8   Good Manufacturing Practices and Personal Hygiene,

 9   aren't they?

10   A.     Yes, sir.

11   Q.     Let's just see if you think these are accurate.

12   A.     Right, but I'm not sure about the video and you

13   just mentioned that.

14   Q.     That's fair enough.  I don't have a copy of it

15   any way.

16   A.     Right.

17   Q.     So I can't show it.  I am actually more

18   interested in what the policy document says.

19   A.     Yes, sir.

20   Q.     You would agree that Tyson Foods, Inc. is

21   dedicated to the practice of producing the highest

22   quality product possible.  Correct?

23   A.     Yes, sir.

24   Q.     And that clean personnel with clean habits are

25   essential to sanitary production of meat products.
```

1  Correct?

2   A.    Yes, sir.

3   Q.    Clean hands, clean clothing, and good hygienic

4  practices reduce the likelihood of contaminating the

5  product, equipment, utensils, and packaging materials,

6  correct?

7   A.    That's correct.

8   Q.    And then skipping to the last sentence, In

9  addition, we must comply with the rules, regulations,

10  and practices demanded by the USDA regarding

11  sanitation, correct?

12   A.    That's correct.

13   Q.    You would certainly agree that is the policy at

14  Finney County, right?

15   A.    Yes, sir.

16   Q.    Turn to the next page.  So the explanation here

17  says, "Diseases transmitted through food products

18  frequently come from an infected handler.  A wide range

19  of communicable diseases and infections may be

20  transmitted by other food handlers to other team

21  members and consumers through contaminated food and

22  products and careless handling practices."

23        You warn your new hires in Finney County about

24  that, don't you?

25   A.    Yes, sir.

1  Q.    And there are a number of guidelines that must

2  be followed while working for Tyson Foods, do you see

3  that?

4  A.    Yes, sir.

5  Q.    And the one that I want to call your attention

6  to is number three.

7        Do you see it says frocks and equipment must

8  be removed before entering restrooms?

9  A.    Yes, sir.

10 Q.    And that's a true statement of company policy?

11 A.    Yes, sir.

12 Q.    Frocks or other external garments worn in edible

13 production areas are not allowed in restrooms, do you

14 agree that that's correct?

15 A.    Yes, sir.

16 Q.    And then, finally, team members cannot wear

17 frocks or white work clothing outside the plant.  Do

18 you agree that that is a statement of Tyson policy as

19 well, correct?

20 A.    Yes, sir.

21 Q.    And you see it says white frock -- it says

22 frocks or white work clothing, correct?

23 A.    Let me clarify this, sir.  That's what it say in

24 there, but in fact we do allow a team member to wear

25 the white clothing.

1   Q.    You're saying that what is stated in Tyson

2   policy is not enforced at Finney County, correct?

3   A.    Can you repeat that, please?

4   Q.    You're saying that the statement that is in

5   Tyson's new hire and orientation module regarding good

6   manufacturing practices and personal hygiene, you're

7   saying that at least as far as that last sentence goes,

8   team members cannot wear frocks or white work clothing

9   outside the plant, that in Finney County, that that

10  policy is not enforced, is that right?

11  A.    The white work clothing outside the plant, yes,

12  we do not enforce that, sir.

13  Q.    Okay.  The company does enforce the frocks part

14  of that sentence, correct?

15  A.    Yes, sir.

16  Q.    But you are saying that it doesn't -- it doesn't

17  enforce the week work clothing part of that?  Is that

18  correct?

19  A.    Yes, sir.

20  Q.    Can you show me any training module that says

21  you can wear your white uniform outside the plant?

22  A.    No, sir.  I don't think we have that.

23  Q.    If -- if the -- if employees are trained that

24  they cannot wear their frocks or white uniforms outside

25  the plant, and there's no policy that says that they

1  can, is it just that the couple of people who do wear

2  their white uniforms in to work are just permitted to

3  do it?  Is that -- is that how that works?

4  A.    No, it's their option, if they wish to wear

5  that, we don't have no problem with that.

6  Q.    But how do you communicate that option?  You've

7  said it is not in a policy, correct?

8  A.    That's right.

9  Q.    You can't show me any document that discusses

10  that option, correct?

11  A.    That's correct, sir.

12  Q.    You just don't enforce the policy as written, is

13  that correct?

14  A.    That's right, sir.

15       MR. HANSON:  That's all I have, thank you.

16       THE COURT:  All right.  Let's go ahead and

17  take our first break of the morning.  We'll be in

18  recess, members of the jury, until 10:10.  10:10.

19       I remind you, again, you're not to discuss

20  this case or any aspect of it among yourselves or with

21  anyone else and no independent investigation.

22       See you back here shortly.

23       (The jury leaves the courtroom.)

24       THE COURT:  And, counsel, while we're on

25  break, the one thing I want to take up is the motion

1  that we talked about this morning.  The other matter I

2  want to defer until the next break.

3          I have sent an e-mail out that some of you

4  probably have received here that you can -- you can

5  step down, thank you, Mr. Young.

6          All right.  Mr. O'Dear, Mr. Mueller, who's

7  going to argue?

8          MR. O'DEAR:  I will.  May it please the Court.

9  As I said, we filed -- Mr. Thum put together a brief

10  for us and obviously all of our points are laid out

11  there but I just want to emphasize some.  And the first

12  one I want to emphasize is what we believe is a,

13  really, a profound failure of proof on a class wide

14  basis.

15          It is the plaintiffs' burden to establish that

16  each of these people that testified, the class reps,

17  are similarly situated to all of the five or 7,000

18  class members.  And it is very well established in the

19  law that when you asserted claims require

20  individualized factual determinations, then basically

21  the class reps are not similarly situated and class

22  certification simply can't be sustained.

23          In fact, as I go through this, I want to add

24  an oral motion that we'll follow up with for

25  decertification of these classes, based on the evidence

 1  presented.

 2       These videos we have been watching just

 3  illustrated Mr. -- Mr. Hanson has said time and again

 4  this case is about the size of that red box on his

 5  demonstrative and what we see, and we have heard it all

 6  along, is that every one of these people, they are all

 7  wearing different things, they all dress differently at

 8  different times.  We had five class members testify,

 9  each of them said, I only know what my practices are

10  and were in my job, I don't know about anybody else and

11  I can't speak to anybody else.

12       You know, under Rule 23, their burden is to

13  present enough evidence to determine liability for

14  every single plaintiff in the class.  And the fact that

15  there is a common legal theory that covers everybody

16  does not make a case.

17       Rule 23 also is very clear that the class

18  certification is conditional and it can be altered at

19  any time before a decision on the merits based on the

20  evidence presented at Court.

21       So, you know, it comes down, the ultimate

22  issue here, is they have to prove for every one of

23  those squares on that demonstrative we've looked at,

24  every member of the class was not adequately

25  compensated for the compensable activities.  And that's

93

1  not a damage issue, that is what must be proven for

2  liability.  And what that means is, that every member

3  of a class, who we've heard all received four minutes

4  from 2003 forward, and up to seven minutes in 2007, and

5  20 to 22 minutes after April, 2010, they have to prove

6  that every single one of these individuals, their

7  donning and doffing compensable activities exceeded

8  those amounts of times paid.

9       And we simply do not have evidence of that.  I

10 don't think we even have evidence of the people that

11 testified.  But what we have heard is that employees

12 arrive and leave at different times.  They all perform

13 a wide range of pre and post shift activities,

14 depending on what's required, personal preferences,

15 everything else.  There is simply no systematic way, or

16 at least if there is it isn't been presented in this

17 case, to show across the board that a given class

18 member actually engaged in uncompensated pre and post

19 shift activity before or after their production time.

20      And, a better way to say it, I think, is that

21 there is no reason to assume, if we had evidence, that

22 one of the five who testified did engage in

23 acts -- let's say Robert Cano who has been doing the

24 same job for 14 years, he testified, he doesn't even

25 know how big the red box that he lives in every day, he

1 doesn't know how big it is. But, but let's say that he

2 had come in and said, Yeah, I do know how big my red

3 box is, and it's really eight minutes a day instead of

4 four, there is absolutely no reason to assume that

5 anybody else in this class has the same red box, lives

6 in the same red box. Because he himself admitted, I

7 just know about me, I don't know about anybody else.

8           We cited the Babineau decision out of the

9 Eleventh Circuit which is very similar to this class

10 treatment was ruled inappropriate, because there is no

11 systematic way, that was the case, again, involving a

12 gap between punch in time for Federal Express workers

13 versus when they actually start work for purposes of

14 compensation.

15           And the Courts said, Look, individualized

16 inquiries are necessary and that defeats class purpose

17 and we have that same gap time issue here.

18           You know, we have a whole issue and, there's a

19 whole body of case law we've cited on Page 9. We have

20 at least 5,000 class members, we think 7,000, they had

21 five people testify. And there is just case after case

22 that that simply that alone, is not enough.

23           And the people who did testify, they all said,

24 you know, some on a slaughter side, I think three, two

25 on the processing side, they all said we know about our

1  jobs, there are a lot more jobs even in our

2  departments, there are many more departments on the

3  slaughter and the processing side, many jobs within

4  those, we don't know about all of the requirements in

5  those jobs, we just know about our self.

6          And they basically said, we don't know

7  what -- how much time was spent by any of these people

8  on any of these other positions, post shift, pre shift

9  or the meal periods.

10          And then they bring in an expert, which in my

11  view simply exacerbates or highlights the serious

12  problem.  Basically they instructed him to start

13  tracking employees' times when they picked up the first

14  item, and stop their clock when they laid it down.  And

15  what did he see?  He saw all over the map, all over the

16  map, all sorts of pre shift, post shift, meal period

17  differences, variations, time, manner, place of

18  doffing.  Some people actually do it in the locker

19  room, some people do it walking to the position.  You

20  know, it shows all different variations.

21          We also cited the Lugo Farmer's Pride case

22  and, again, I mean it's right on, it's a donning and

23  doffing case, and Court granted their defense motion to

24  decertify after two days of evidence.

25          And showed that some plaintiffs, same here,

1   arrived significantly early or long before their shift

2   to don their PPE but the evidence said, Employer didn't

3   require them to show up and at that time, and that

4   all -- and didn't show that all workers needed that

5   much time.  It was all different.  And the evidence was

6   that the donning could be done in minutes and the

7   precise amount varied between department position.

8           And, you know, it -- the Court there just, I

9   mean this is a great quote.  "The evidence indicates

10  that there may be some hourly production workers who

11  have legitimate claims of under compensation for time

12  spent donning and doffing.  And some who may not.  The

13  evidence does not demonstrate, however, that the

14  question of under compensation can be answered in a

15  manner common to all plaintiffs.  If the present case

16  were tried collectively and a verdict were reached for

17  defendant, this result would be unfair to those

18  plaintiffs who may have been denied pay owed them for

19  donning and doffing.  Similarly, if a verdict were

20  reached for plaintiffs, this would be unfair to

21  defendant who would be deemed liable as to the certain

22  collective action -- as to the entire collective action

23  case when it may not have under compensated all

24  individual members of that class."  (Quoted as read.)

25          That, we assert, Your Honor, is exactly what

1  we're confronted with here and we think that it

2  warrants judgment as a matter of law and or

3  decertification of the FLSA collective action and the

4  Rule 23 class at this time.

5        Next point is simply the point that they have

6  not proven their donning and doffing of the standard

7  sanitary items is compensable under the Portal Act.

8  The main issue there, which I'll just touch on, is

9  the -- is the issue of whether they met their burden of

10 proof that the standard sanitary items, the hard hat,

11 earplugs, hair net, smock or whites, non mesh gloves

12 and boots, primarily benefit Tyson, the employer.

13       And of course we heard time and again, all

14 these witnesses have said, yes, I understand all that

15 clothing, equipment is for my benefit, and at best, the

16 best testimony we heard, is that it's a toss up, 50-50.

17 They lose the toss up.  And so, we think that that

18 count fails.

19       The donning before a meal period, Judge, we

20 really truly would urge Your Honor to give serious

21 consideration.  We don't think this should be any

22 instructions.

23       What we have here, quite simply, in the

24 pretrial order at Page 20, plaintiffs have said they

25 are not seeking compensation for the meal period

 1    itself.  They -- their claim prior to April, 2010 that

 2    they should get damages for the portion of the unpaid

 3    meal period that was spent doffing and donning.  That

 4    is what they are saying their claim is limited to, not

 5    the entire meal period.

 6          And Judge Lungstrum ruled very clearly, that

 7    the Court rejects plaintiffs' suggestion that any time

 8    spent during the meal period performed -- performing

 9    otherwise compensable work must be compensated, even

10    though the remainder of the meal period is unpaid.

11    And, Judge Lungstrum ruled very clearly, that is not

12    the law in this case and that means the only issue is

13    whether plaintiffs' time during the meal period, as a

14    whole, spent predominantly for the benefit of Tyson.

15          We just watched some end meal periods and

16    break periods and all the evidence has been consistent.

17    They leave their work station, they leave the

18    production floor, they take off their frocks, most of

19    them, not all, and they go have lunch, breakfast, sit

20    and visit.  There's simply no evidence to suggest that

21    these people are required to use their lunch break

22    predominantly for Tyson's benefit.

23          So that one, again, we strongly feel like

24    should not be in the instructions and sent to the jury

25    as well.

1    You know, on the -- I'm not going to belabor
2  the willfulness issue, which we have just been dealing
3  with.  The bottom line is this.  The -- on willfulness,
4  the litigation that pertains to this plant in this
5  case, said Tyson has to compensate for the unique
6  items, not the standard sanitary items.  It's what they
7  have done.

8    The four minutes has been well established.
9  The Government's supported it.  It's what they have
10 paid.  <u>Alvarez</u> came along, required additional walking
11 time.  They paid it.  And as we have been contending
12 throughout, we believe on the FLSA claim, what -- what
13 Tyson has done and the record is clear, is they have
14 done exactly what the prior litigation instructed them
15 to do.

16    On the Kansas Wage Act willfulness, there is a
17 complete lack of proof on that one.

18    There are no prior adjudications about the
19 applicability of Kansas law, there is no precedent,
20 they have never been challenged on the issue.  Nobody
21 made a claim against Tyson or the prior employer.  And
22 it's a much tougher standard.  There has to be evidence
23 not just of a reckless disregard of the law but an
24 intent to injure a -- a -- a conscious intent to
25 violate law to injure employees, there is just -- it is

1  a much tougher standard on the Kansas willfulness and

2  there is a complete lack of proof on that one.

3         So, that's another one that we feel very

4  strongly should -- should never see the light of day

5  with the jury.

6         And I think that hits the high points.

7         THE COURT:  Thank you.  Mr. Dirks.

8         MR. DIRKS:  Looks like we have four minutes

9  before the jury comes, so I'll make this quick.

10        The big issue that Mr. O'Dear raised, class

11  certification, he talked a lot about our five

12  witnesses.

13        What we didn't hear about is Tyson's policies,

14  Tyson's practices.  Tyson's policies and practices

15  speak to everyone.  All the evidence from Tyson's

16  policies and practices speak to everyone.

17  Their -- their documents, they show exactly what folks

18  are wearing.  They're all required to wear some

19  combination of this gear.  Everybody is paid under the

20  same gang-time policy.  The rules on class

21  certification do not require a class of clones but I

22  can't imagine a more similar class where all these

23  people are walking into the -- in through the same

24  doors, in to the locker rooms, on to the -- change into

25  some sort of gear, on to the floor, cutting meat on the

1  same central line.

2       The -- the allegations here are legal and

3  factual in nature.  We allege that they didn't comply

4  with the Reich injunction.  We allege that they don't

5  pay for all the amount of time, these are complex legal

6  issues that predominate.  Did Tyson's four minute

7  policy and gang-time compensate lawfully?  And that's

8  why these cases are routinely certified and tried.

9       I haven't had time to read their couple of

10 cases but I imagine they were cited in the initial

11 brief and by the way, there was a decertification

12 motion deadline in the Court's orders, which Tyson

13 chose not to -- chose not to brief.

14      It is not just our testifying plaintiffs who

15 have the burden to carry the water here, even though I

16 think they did it.

17      For example, Ms. Garcia testified she works in

18 several different departments that had dozens of people

19 on each department in each shift.  Tyson wants to make

20 each job look so -- so different, but they're not.

21 We're talking about people on the line cutting meat,

22 paid under the same policy.  But also in addition to

23 their testimony we had Doctor Radwin who applied what

24 he did and used scientific methods to show that those

25 numbers apply to the entire class.

1          But, again, most importantly it is Tyson's

2  policies and Tyson's own practices, Tyson's own

3  admissions.

4          To the integral and indispensable question I

5  think even if our witnesses said, Yeah, there's some

6  benefit to me, there's still a fact question, who's the

7  primary benefit.  Here's what we showed.  That it has

8  to be done for the job.  It has to be done to comply

9  with sanitation policies, it has to be done to comply

10 with Tyson's policies, to comply with USDA regulations,

11 to comply with the OSHA, to comply with third-party

12 customer requirements.

13         The point -- the point is, it's for the job.

14 They have got to do it so that Tyson can go make money

15 and isn't shut down.

16         One other thing on the -- I think Tyson

17 misunderstands our claim or at least has told the jury

18 this is all about the frocks, whites, hard hats,

19 earplugs, it's not.  It's not just about that.  That is

20 part of the case but it's also about did they properly

21 compensate for the compensation -- the items that they

22 agree are compensable, that is another issue here.  And

23 what we are saying is the four minute and seven minute

24 policies don't -- don't properly compensate for the

25 continuous workday.

1           The meal period, it's true that there are two

2    kinds of meal period claims.  We are claiming for the

3    entire meal period because we just don't -- we just

4    don't get a real meal, and then there is what is our

5    claim, which is we're not paid for a portion of that

6    unpaid time.  And the -- Tyson's argument is if you

7    have a 30-minute unpaid meal period, that you could

8    make folks work 14 minutes every day, every single day,

9    say you got to work for 14 of those 30 minutes and

10   that's just not compensable.

11          And the cases that Tyson cites are cases where

12   the plaintiffs are saying, we have got to do some work

13   on our own unpaid meal period but we want to be paid

14   for the entire thing.  We didn't do that.  That's not

15   what we are asking for.  We're taking a much more

16   conservative approach.

17          The fact of the matter is, what we are

18   alleging and what we have shown is these activities,

19   these same donning and doffing, walking, waiting

20   activities at lunch are integral and indispensable and

21   must be compensated under the law.

22          One -- another thing in Mr. O'Dear's argument

23   was they show the lunch period, what people do.  Well,

24   that is not entirely the case.  We didn't see that

25   folks are supposed to use the bathroom if they're going

1  to use that on their breaks, that is what is preferred

2  by Tyson and that they have got to take everything off

3  to go use the bathroom and then they have to put it

4  back on.  So that's just a part that we didn't see in

5  the videos today.

6           Willfulness, you know, what Tyson's position

7  was when we briefed this, we briefed it twice now is we

8  relied on what the DOL told us we could do with the

9  four minutes.  I think it was crystal clear yesterday

10 that that's not the case, that Tyson only relies on

11 what the DOL tells them to do when they want to.    I

12 think we have come forward with evidence that they

13 failed to comply with the Reich injunction, there has

14 been evidence that Tyson has done a risk benefit or

15 cost benefit analysis, that it doesn't comply with any

16 rules that it doesn't want to follow, including its own

17 rules.

18          On the Kansas side, it's clear that Kansas

19 requires Tyson to pay all wages due and that looks at

20 the Fair Labor Standards Act.  Mr. Kimbro testified and

21 so that's it.  But Mr. Kimbro testified that he is

22 aware and understands the State law required the same

23 things as FLSA and that's what Judge Lungstrum found in

24 his summary judgment ruling.

25          THE COURT:  Thank you.  Well, I am going to

take the motions under advisement. I want to read the brief and take a look at it.

But, you know, folks, the long and the short of this is, however many details you want to get into, as a friend of mine would say, this is not rocket surgery when you cut everything else away. It's a matter of whether these people are going to be in a position, and if there has been enough evidence presented for them to determine if in fact there is time that these folks are not being paid for that they ought to be paid for.

Everything else cut away, that's what it comes down to. And I certainly feel like -- and these are just some preliminary thoughts, there has been plenty of evidence presented from which they can determine whether or not it takes more time or less time to put this stuff on, all of the evidence that's come in with relation to, you know, timing that was done on these things, it's all there. It's a question of them ferreting it out or more to the point, you all laying it out in closing arguments for them to show them where it is. And what supports your positions.

As I say, I want to read the brief before I make a decision with respect to the motion for judgment on any of these points. And I will do that. But I'll

```
1   just tell you I am leaning toward giving the whole
2   thing to the jury and letting them make a good
3   decision.   And I haven't been disappointed with a jury
4   yet.   I have disagreed with some of them, you know, at
5   times but when you look at it, there are nine good
6   minds over there and they're not going to have missed
7   anything.
8           If you all want to rush out and use the
9   restroom, do it quickly, and we'll notify the -- yes,
10  Mr. Mueller.
11          MR. MUELLER:  Can I have permission during the
12  next session to talk to a witness or do I have to stay
13  in court?
14          THE COURT:  Oh, sure, absolutely, absolutely.
15          MR. MUELLER:  Thank you.
16          THE COURT:   For any of who you are here, as
17  long as you have got somebody representing your folks,
18  you can be in and out of the courtroom.  That's fine.
19          (Recess taken 10:15 a.m. until 10:20 a.m.  The
20          jury enters the courtroom.)
21          THE COURT:  All right.  Mr. Young?  Let's go
22  ahead and get him back up on the stand.
23          And, Ms. Paschal, as soon as he is here, you
24  may proceed.
25          MS. PASCHAL:  Thank you, Your Honor.
```

1          THE COURT:  Sure.  As they say, folks, there

2    is no rest for the wicked.

3          Mr. Young, if you would come back up and take

4    the stand again, please.

5          THE WITNESS:  Yes, Your Honor.

6          THE COURT:  And once he is settled in, Ms.

7    Paschal, you may proceed.

8                    REDIRECT EXAMINATION

9    BY MS. PASCHAL:

10   Q.    Mr. Young, I have just a few questions based on

11   what Mr. Hanson just asked you about.

12   A.    Yes, ma'am.

13   Q.    Mr. Hanson showed you a training module on good

14   manufacturing practices and hygiene, do you remember

15   that document?

16   A.    Yes, he showed me that.

17   Q.    Is it your testimony that you're not sure if

18   that particular module is used at Finney County?

19   A.    That's correct.

20   Q.    And when you say that's correct --

21   A.    I'm not sure that --

22   Q.    You're not sure?

23   A.    -- that this is maybe the Emporia module,

24   that --

25   Q.    And in other words, when you say Emporia, are

1  you referring to another plant?

2  A.    That's correct, ma'am.

3  Q.    Do you know for a fact if employees are told in

4  training not to wear whites outside the plant?

5  A.    No, I'm -- I don't know for sure.

6  Q.    I believe you testified earlier that a man named

7  Garrett Headrick was with us when we took our video and

8  photographs in January, is that correct?

9  A.    Yes, ma'am.

10  Q.    And to be clear, I know Mr. Hanson clarified

11  that but if I misspoke, I was referring to January of

12  2011 when we went to the plant.  Is that your

13  understanding of when we were there?

14  A.    Right.

15  Q.    And was Mr. Headrick with us at that time?

16  A.    Yes.

17  Q.    And I believe he said that Mr. Headrick is the

18  training coordinator?

19  A.    Yes.

20  Q.    Was he with us when we observed individuals

21  walking into the slaughter part of the plant

22  from -- from outside in their whites?

23  A.    Yes.

24  Q.    Did he appear concerned or surprised by what he

25  saw?

1  A.    No, ma'am.

2  Q.    Did he indicate in any way that this was

3  inconsistent with how employees are trained at the

4  plant?

5         MR. HANSON:  We would object to hearsay.  Mr.

6  Headrick is not here to testify.

7         THE COURT:  Sustained.

8  BY MS. PASCHAL:

9  Q.    Do you have any reason to believe that Mr.

10  Headrick was concerned or upset by what he saw?

11         MR. HANSON:  I think that is asking for the

12  same thing.

13         THE COURT:  Sustained.

14  BY MS. PASCHAL:

15  Q.    Slaughter employees who need to use the

16  restroom, I believe you testified that they take some

17  items off to do so.  Do they have to take off their

18  white uniform when they use the restroom?

19  A.    No, ma'am.

20  Q.    What about their rubber boots?

21  A.    No, ma'am.

22  Q.    And their hard hat?

23  A.    No, ma'am.

24  Q.    Their hair net?

25  A.    No, ma'am.

```
 1   Q.     Their earplugs?

 2   A.     No, ma'am.

 3   Q.     I want to show you the same exhibit Mr. Hanson

 4   showed you.  This is Defense 5036.

 5          THE COURT:  Thank you.

 6   BY MS. PASCHAL:

 7   Q.     Could you read what I just highlighted, Mr.

 8   Young?

 9   A.     "No one will be denied access to the restrooms

10   during production time."  (Quoted as read.)

11   Q.     Is that statement part of the plant's policy

12   regarding restroom usage?

13   A.     That's correct.

14   Q.     Is that statement the plant's policy regarding

15   restroom usage during production time?

16   A.     Yes, ma'am.

17   Q.     Like to show you one video from January 25th,

18   2011, I apologize, we will see if we can proceed

19   through.

20          MR. HANSON:  Your Honor, this is beyond the

21   scope of cross.  I think it exceeds it.

22          MS. PASCHAL:  May I respond?

23          THE COURT:  I don't know if it exceeds it or

24   not.  What is the point?

25          MS. PASCHAL:  It goes exactly to Mr. Hanson's
```

1  line of questioning about use of the restroom during

2  production time, versus during the break.

3          THE COURT:  All right.  I am going to overrule

4  the objection.

5          (Tape is played.)

6  BY MS. PASCHAL:

7  Q.    Mr. Young, where are we looking in this video?

8  A.    It's the entrance to the locker room.

9  Q.    And just to be clear, this is Defendants' 5680.

10 And where is the entrance to the men's locker room from

11 where we're looking?

12 A.    Be to the left.

13 Q.    And what about to the women's locker room?

14 A.    Would be to the right.

15 Q.    Are we in the processing area or the slaughter

16 area?

17 A.    Processing area.

18 Q.    Where are the restrooms located in the

19 processing area?

20 A.    The restrooms?

21 Q.    Yes.

22 A.    That's right where we are looking at it, the

23 men's locker rooms on the left and then the woman's

24 locker room is on the right.  It's right across from

25 the hallway from the production floor.

1  Q.    Okay.  So the restrooms are inside the locker

2  rooms?

3  A.    Yes.

4  Q.    And according to this timestamp, 7:54 a.m.,

5  where are we in the production process?  In processing?

6  Is this during production time?

7  A.    Yes, that should be -- yeah, before -- the first

8  break is at 8:00, 8:30, so this is during production

9  time.

10  Q.    So about 36 minutes before the first break?

11  A.    Yes.

12  Q.    What did that woman just do?

13  A.    Well, it seemed like she just walking out from

14  the women's locker room and putting on her gloves.

15  Q.    And this is during production time?

16  A.    That's correct.

17  Q.    What about this man right here?  Where did he

18  just walk out of?

19  A.    From the man's locker room and the restroom is

20  inside.

21  Q.    What is he doing now?

22  A.    He's putting back on his equipment.  On his

23  personal protective equipment.

24  Q.    And this woman who just walked out?

25  A.    She just left the woman's locker room and

1  putting on her frock.

2   Q.    How likely is it that the employees who have

3  been in the locker room during production time did so

4  to use the restroom?

5   A.    Not really, because, in order to be in the

6  locker room you have to have permission from your

7  supervisor and most likely, when the team member needs

8  to use the restroom, they would go in the locker room.

9   Q.    So, in other words, if they are in the locker

10  room during production time, is it likely they are

11  using the restroom?

12  A.    Most likely, yes, ma'am.

13  Q.    Where is that man going who has his back to us?

14  A.    He's going back -- going to the locker room.

15  Q.    And see this man in front of us is still putting

16  on his clothing, is this during production time?

17  A.    Yes.  It is.

18  Q.    Is he on the clock while he's doing that?

19  A.    Yes.

20  Q.    Is he getting paid for that time?

21  A.    Sure, definitely.

22  Q.    These two men, where are they going?

23  A.    They go to their locker rooms.

24  Q.    What about this man who just came out?

25  A.    He just left the locker room.

1   Q.    What about this man right here?

2   A.    Um --

3   Q.    Take a minute to look and see what he is doing.

4   A.    He's just taking off his apron and arm guard.

5   Q.    Is he doing this during production time?

6   A.    That's correct.  We also have another set of

7   hooks inside.

8   Q.    Inside the locker room?

9   A.    Yes.  So they have an option to hang their

10  frocks and equipment here or they can do it inside.

11        (Tape is played.)

12  BY MS. PASCHAL:

13  Q.    In the interest of time I was just going to fast

14  forward, try to fast forward here.

15        I may need some kind of technical assistance

16  on fast forwarding.

17        Where is this woman just walking out of?

18  A.    The woman locker room.

19  Q.    Are we still during production time at this

20  point?

21  A.    That's correct.

22  Q.    And that woman?  She just, what did she just do?

23  A.    Well, she was leaving the women's locker room

24  and re -- come right back.

25  Q.    This man who just walked out?  Where did he walk

1    out of?

2    A.    The men's locker room and he drying his hands.

3    Q.    And how many women just left the locker room

4    there?

5    A.    One entering, and two left the woman's locker

6    room.

7    Q.    Do we have another man that just left the men's

8    locker room?

9    A.    Yes.

10    Q.    And what about right behind him?

11    A.    There's another gentleman just walked out.

12    Q.    And at this point are we a little under 30

13    minutes before the approximate break time?

14    A.    That's a true statement.

15    Q.    But this is during production time, is that

16    correct?

17    A.    Yes, ma'am.

18    Q.    Is everything that we've seen of the individuals

19    we've pointed out been on paid time?

20    A.    Yes.

21    Q.    Mr. Young, how likely is it that the individuals

22    that we just pointed out in this video were using the

23    restrooms during production time?

24    A.    It happened a lot.  We -- we do allow our team

25    members to go to the restroom, which is our normal

1  practice.

2  Q.    Do you think that this is typical of what

3  happens on the processing side of production during

4  production time?

5  A.    Yes, ma'am.

6  Q.    You have any reason to believe they're doing

7  anything other than going to the locker room to use the

8  restroom?

9  A.    Sometime they have some emergency if they have

10 to leave and they will go in and change.

11 Q.    But the individuals that we saw who were getting

12 back dressed after they left, is it likely that they

13 were using the restroom?

14 A.    Oh, yes.  Definitely, yes.

15 Q.    Thank you.

16       MS. PASCHAL:  No further questions at this

17 time.

18       THE COURT:  Mr. Hanson.

19       MR. HANSON:  Thank you.  Could you pull that

20 video back up, please?

21       Do you remember where you said, Let's forward

22 in the interest of time?  Can you go back to that spot,

23       MS. PASCHAL:  No, I don't.  And,

24 unfortunately, I can't -- somewhere before 8:02, I just

25 don't remember.

1    MR. HANSON:  When you said in the interest of

2  time, let's fast forward.

3    MS. PASCHAL:  I can't represent exactly where

4  that was.  It may have been around here.

5    MR. HANSON:  I think it is further.

6    MS. PASCHAL:  Did you write down the time?

7    MR. HANSON:  No, I didn't.

8                RECROSS EXAMINATION

9  BY MR. HANSON:

10  Q.    Let me see if the witness remembers.  Do you see

11  when we just fast forwarded the video when there were

12  four or five gentlemen coming in?

13  A.    Yes, sir.

14  Q.    You saw those guys coming in when your lawyer

15  said fast forward?

16  A.    Yes, sir.

17  Q.    They weren't on production time, were they?

18  A.    Some production time, yes, sir.

19  Q.    The gentlemen who were wearing their street

20  clothes walking by?

21  A.    You mean the group of the team members?  Yes.

22  Q.    Right.  You -- you're not going to suggest they

23  were on production time?

24  A.    On company time, yes, sir.

25  Q.    Well, let's just stop it here.  This guy, with

1  the white and green sleeves, shirt.  He is not on

2  production time now, he's not being paid, is he?

3  A.    Uh, I believe this guy's is on the company

4  times, yes, sir.

5  Q.    You think they're on break right now?

6  A.    They must be -- I'm assuming that these are

7  the -- the new hire, so they -- they -- they

8  are -- they are on the company times.

9  Q.    Well, that's just an assumption, isn't it?

10 A.    That was with the train -- the trainer, so you

11 can see the lead person in front of them.

12 Q.    Isn't it true?

13 A.    Did you notice before they come in, the -- the

14 HR trainer was with them and they -- they -- they do go

15 through to -- they take a break to go to the restroom.

16        (Tape is played.)

17 BY MR. HANSON:

18 Q.    All right.  There was a moment, though, and I

19 just, I don't know when Ms. Paschal asked to have the

20 tape fast forwarded exactly.

21        Mr. Young, you'd agree that you can't testify

22 specifically that everyone walking up and down this

23 hallway is necessarily on production time, right?  You

24 don't know that for a fact?

25 A.    You noticed that like that guy right there, he's

1   a trainer, so he takes his team member to the restroom.

2   Q.    You are videoing before the break time, correct?

3   A.    Yes, sir.

4   Q.    But you understand that Tyson has staggered

5   breaks, right?

6   A.    Yes, sir.

7   Q.    They -- people leave the line at slightly

8   different times, correct?

9   A.    Yes, sir.

10  Q.    But you'd agree with me that break time itself,

11  the hallway would be very crowded, correct?

12  A.    Yes, sir.

13  Q.    And you didn't choose to videotape how many

14  people are using the restroom during break time,

15  correct?

16  A.    It -- it didn't show here, yes, sir.

17  Q.    No, you didn't show the jury what that hallway

18  looks like over break time, right?

19  A.    Well, I -- it was not my idea to do the filming,

20  sir.

21  Q.    It was your lawyer's idea, right?

22  A.    Yes, sir.

23  Q.    Okay.  So we can't show the jury what that

24  hallway looks like over a break time in processing, can

25  we?

1   A.    Yes, that's right.

2   Q.    And how many people work on a shift in

3   processing all together?

4   A.    I believe around 900.

5   Q.    900 people on a single shift in processing,

6   correct?

7   A.    Yes, sir.

8   Q.    And they all go on break at roughly the same

9   time, correct?

10  A.    It's -- it's around 30 minutes staggering.

11  Q.    Right.  Staggered over a 30-minute period?

12  A.    Right.

13  Q.    But during that time we would have seen that

14  hallway filled with processing workers, wouldn't we?

15  A.    Yes, sir.

16        MR. HANSON:  That's all I have.  Thank you.

17        THE COURT:  Ms. Paschal, anything further?

18        BY MS. PASCHAL:  I don't, Your Honor, other

19  than to move into evidence the various photos and

20  videos that I showed Mr. Young.

21        THE COURT:  Mr. Hanson.

22        MR. HANSON:  We had understood they were being

23  used as demonstratives when they were presented to us,

24  so we would stand on that objection.

25        MR. MUELLER:  May I respond?

```
 1              THE COURT:  I don't think they need to be
 2   admitted.  I think they illustrated his testimony, so
 3   deny that.
 4              All right.  Anything further with this
 5   witness?
 6              MS. PASCHAL:  Not from defense, Your Honor.
 7              THE COURT:  All right.  You may step down, Mr.
 8   Young.
 9              THE WITNESS:  Thank you, Your Honor.
10              THE COURT:  Next witness, please.
11              MS. PASCHAL:  Defendants call Orlando Kinney.
12              And, Your Honor, we have a trial board exhibit
13   that we would like to use with Mr. Kinney.  May I go
14   ahead and set it up?
15              THE COURT:  Sure.
16              (Witness is sworn.)
17                       ORLANDO KINNEY,
18   called as a witness on behalf of the Defendants, having
19   been first duly sworn, testified as follows:
20                     DIRECT EXAMINATION
21   BY MS. PASCHAL:
22   Q.    Good morning, Mr. Kinney.
23   A.    Good morning.
24   Q.    Could you please introduce yourself to the jury.
25   A.    My name is Orlando Kinney.
```

1   Q.      Mr. Kinney, where do you currently work?

2   A.      I work for Tyson in Holcomb, Kansas.

3   Q.      When you say Holcomb, Kansas, is that also

4   called Finney County?

5   A.      Yes, Finney County plant.

6   Q.      How long have you worked at the Finney County

7   plant?

8   A.      Twenty-eight years now.

9   Q.      What is your current position?

10  A.      I am the Complex Safety Manager.

11  Q.      How long have you been the Complex Safety

12  Manager at Finney County?

13  A.      Over 15 years now.

14  Q.      And going back to the beginning of your career

15  at Finney County, could you tell us how you started at

16  the plant?

17  A.      I started out as an hourly team member, I

18  actually bone chucks, pulled paddles, the paddle bones

19  there for three years, three, four years.  Then I moved

20  up to lead man position where basically trained, help

21  train team members, as well as assisted manager of that

22  department.  Then I went to a supervisory position, was

23  there for about three to four years, and moved

24  ultimately to the safety department.

25  Q.      Were all these jobs before you went to the

1  safety department on the processing floor?

2  A.    Yes.

3  Q.    And when you were a supervisor, what departments

4  did you supervise?

5  A.    I ran the chuck table, arm table, also ran ribs

6  at one point, and then top table.

7  Q.    When you were an hourly employee, did you wear

8  the items at issue in this case, such as the frock, the

9  hard hat, the hair net?

10  A.    Yes, I did.

11  Q.    Did you wear any mesh items?

12  A.    Yes.

13  Q.    Did you wear those items when you were a

14  supervisor in the processing area?

15  A.    Not too much as a supervisor but as an hourly,

16  yes.

17  Q.    Could you briefly describe for us what your job

18  duties are as the safety manager at Finney County.

19  A.    Primarily OSHA compliance, as well as safety

20  awareness in the facility.

21  Q.    Who do you report to?

22  A.    I report to plant manager.

23  Q.    When you say safety awareness, how does the

24  plant promote safety awareness?

25  A.    Um, several different ways.  One, the main way

1  is through meetings.  We have different topics that we

2  put together a little training presentations and have

3  the managers present those to our hourly and monthly

4  meetings.

5  Q.    Do you ever attend those meetings?

6  A.    Some, I do, yes.

7  Q.    Would it be fair to characterize these as safety

8  meetings?

9  A.    Yes.

10  Q.    So how often would an hourly team member attend

11  a safety meeting?

12  A.    Monthly.  We have monthly meetings with our team

13  members.

14  Q.    Are these meetings paid?

15  A.    Yes.

16  Q.    What types of topics are discussed during the

17  safety meetings?

18  A.    Lock out, tack out, Haz Com, recover, PPE, those

19  type of thing.

20  Q.    When you say PPE, are you referring to personal

21  protective equipment?

22  A.    Yes, personal protective equipment.

23  Q.    And just briefly for the sake of clarity, when

24  you say lock out, tack out what are you referring to?

25  A.    Basically teaching or making everyone aware that

1   when you're working with a piece of equipment, how to

2   isolate it and make sure it doesn't start up.

3   Q.    Are hourly employees able to raise safety

4   concerns with the plant?

5   A.    Oh, yes.

6   Q.    How do they do that?

7   A.    There's several ways they can do that.  First,

8   they have a -- they can bring their concern to their

9   supervisor, if the supervisor is not in the area or not

10  available at that point in time, they can ask their

11  safety committee person, or their lead person that's in

12  that department.

13  Q.    When you say their safety committee person, does

14  every department have a safety committee member?

15  A.    Yes, they do.

16  Q.    How would an hourly employee know who the safety

17  committee member is for their department?

18  A.    Those team members wear purple helmets which

19  shows that they are on the safety committee.

20  Q.    And the safety committee members, are those

21  hourly employees?

22  A.    Yes, they are.

23  Q.    Mr. Kinney, we've heard some testimony about

24  Tyson's core values.  Are you familiar with the

25  company's core values?

```
 1    A.     Yes.

 2    Q.     How does safety fit in as a core value of the

 3    company?

 4    A.     One thing we want to do as a company is to make

 5    sure that we create a safe working environment for our

 6    team members and that's part of our core values.

 7    Q.     You mentioned earlier that part of your job

 8    responsibility was related to OSHA.  Could you explain

 9    for us what OSHA is?

10    A.     OSHA is the Occupational Safety and Health

11    Administration.  Basically OSHA is a part of the

12    Government that makes sure companies are doing the

13    things they need to do to take care of their people.

14    Q.     Is there also a law called OSHA?

15    A.     There is standards, yes.

16    Q.     Are you familiar with those standards?

17    A.     Yes.

18    Q.     And in your position, are you familiar with OSHA

19    laws and regulations as they pertain to the Finney

20    County plant?

21    A.     Yes.

22    Q.     What is your understanding of the purpose of

23    OSHA?

24    A.     OSHA's purpose is, like I said earlier, is to

25    make sure that your people, you're creating a safe
```

1   working environment and you're doing things to reduce

2   or eliminate hazards associated with jobs in your area

3   or in your company.

4   Q.    To your understanding -- to your understanding,

5   who is OSHA designed to protect?

6   A.    The people.

7   Q.    And by people, does that include employees?

8   A.    Employees, yes.

9   Q.    If you'll give me just one moment, I think I

10  have misplaced an exhibit.

11           Mr. Kinney, this is a slide that we saw during

12  opening statements in this case, entitled The Purpose

13  of the Occupational Safety and Health law, or OSHA.

14           Could you read to us the quote that's on that

15  slide?

16  A.    "To assure so far as possible every working man

17  and woman in the nation safe and health full working

18  conditions."  (Quoted as read.)

19  Q.    Is that your understanding of the purpose of

20  OSHA?

21  A.    Yes.

22  Q.    Does OSHA require the plant to use particular

23  items of PPE?

24  A.    It requires us to use equipment, or standards

25  that they tell you you need to provide equipment but

1  it's not specific to what equipment is, what

2  the -- what the piece of equipment should be.

3  Q.     So, for example, is there any regulation in an

4  OSHA that says if you bone chucks, you must wear a mesh

5  glove?

6  A.     No.

7  Q.     Is that the company's decision?

8  A.     Yes.

9  Q.     So what does the company determine with respect

10 to what PPE is required for a position?

11 A.     We do analysis, Job Safety Analysis of the job,

12 and we try to take a look at all the steps in and the

13 hazards associated with that stuff and we can't

14 engineer it out, we look at some other way of

15 protecting the team members and that's how safety

16 equipment comes into play.

17 Q.     What do you mean by engineering it out?

18 A.     Well, if we can do something to take a

19 particular part out of the job, by adding automation of

20 some sort then we'll do that.

21 Q.     And if that's not possible?

22 A.     Then equipment is the other answer.

23 Q.     And by equipment, are you referring to personal

24 protective equipment?

25 A.     Yes, PPE, personal protective equipment.

1   Q.    What would you say is the primary purpose of

2 personal protective equipment?

3   A.    To protect our team members.

4   Q.    I'd like to show you D-5031, if we could pull

5 that up.

6        Mr. Kinney, do you know what this document is?

7   A.    Yes.

8   Q.    What is it?

9   A.    Personal Protective Equipment Policy.

10   Q.    Is this an accurate statement of the Personal

11 Protective Equipment Policy at the Finney County plant?

12   A.    Yes.

13       MS. PASCHAL:  We move to admit D-5031?

14       MR. HANSON:  No objection.

15       THE COURT:  D-5031 is admitted.

16 BY MS. PASCHAL:

17   Q.    Could you please read aloud the first paragraph

18 of this policy?

19   A.    "It is important PPE is utilized where

20 appropriate to prevent injuries to Finney County team

21 members.  Using PPE where hazards are present is

22 company policy."  (Quoted as read.)

23   Q.    Is that an accurate statement of the purpose of

24 PPEs?

25   A.    Yes.

1   Q.   Could you please read aloud the second

2 paragraph.

3   A.   "Emergency controls are the preferred method to

4 control team members' exposure to physical and chemical

5 hazards, however when engineering controls are not

6 feasible, I think that is, personal proactive equipment

7 is our alternative method of protection."  (Quoted as

8 read.)

9   Q.   Is that an accurate statement?

10   A.   Yes.

11   Q.   And how does this relate to the plant's OSHA

12 obligations?

13   A.   If we can't -- here again, if we can't control

14 it by other methods, then we use safety equipment.

15   Q.   Could you please read aloud the last paragraph.

16   A.   "PPE is provided to team members if indicated by

17 their job requirements.  These items are furnished at

18 no charge.  Exceptions include equipment that is lost,

19 or purposely damaged."  (Quoted as read.)

20   Q.   Is that an accurate statement?

21   A.   Yes.

22   Q.   How does the plant indicate what PPE is required

23 for a particular job?

24   A.   Um, we use, like I said earlier, we'll use a

25 JSA, Job Safety Analysis, of the job, look at the

1   hazards and determine at that point what equipment

2   needs to be used in that job.

3   Q.    Does the JSA list the required PPE for a job?

4   A.    Yes.

5   Q.    Should every production job have a JSA?

6   A.    Yes.

7   Q.    Is the personal protective equipment the same

8   for every job in the production areas of the plant?

9   A.    No, no.

10  Q.    What does it depend on?

11  A.    Depends on the heavier skilled jobs usually have

12  more equipment versus the lighter skilled jobs.

13  Q.    So, a heavier skilled job would require more

14  PPE?

15  A.    Yes.

16  Q.    Versus a less skilled job which might require

17  less PPE?

18  A.    Yes.

19  Q.    What is your role in developing or revising Job

20  Safety Analysis?

21  A.    I work with the supervisors and in putting those

22  JSAs together, the Job Safety Analysis together.  We

23  look at it together.  They come up with ideas, I take a

24  look at it.  If I think we need to go a little deeper

25  then we will look a little bit further into it but it's

1  a group effort.

2  Q.    Are JSAs ever revised?

3  A.    Yes.

4  Q.    Do you ever take a piece of PPE off a Job Safety

5  Analysis for a job?

6  A.    Yes, we have -- if there's also if we do some

7  changes to the job where we have taken a step out or

8  process out that has hazard then we can look at that

9  and see if we can remove equipment.  In some cases we

10 have.

11 Q.    Are there any instances in which you change the

12 type of PPE that is required for a job?

13 A.    Yes.

14 Q.    Can you give us an example?

15 A.    For a long time ago we used to, when we bone

16 chucks, it's a heavier skilled job, we used to use

17 polar sleeves at that point.  But through studies and

18 some of the incidents that occurred during that time

19 frame, we knew that those weren't appropriate so we had

20 to go a little bit tougher in that area so we went to

21 mesh aprons or excuse me, mesh sleeves.

22 Q.    And do you have any examples of when a piece of

23 PPE was taken off for a particular job?

24 A.    Yes.  One job, we've had a couple of jobs over

25 in slaughter where we have changed the process a little

1  bit and decided that some of the motions or some of the

2  cuts that we made in the product were taken out so the

3  hazard was gone and we removed, like a shin guard.

4  Q.    And these instances are the JSAs revised?

5  A.    Yes.

6  Q.    Do you have ultimate sign off on the JSA?

7  A.    Yes.

8  Q.    Are safety topics covered in employee

9  orientation at the plant?

10  A.    Yes, they are.

11  Q.    What type of topics are covered?

12  A.    In orientation they talk about workplace safety,

13  they talk about PPE, personal protective equipment,

14  various things that go on in the plant, in the

15  facility.

16  Q.    How does an employee know what PPE is required

17  for his or her job?

18  A.    In orientation they cover all the PPE but when

19  they're picked up by their managers to go out to their

20  jobs, at that point they cover all the equipment that

21  pertains to the job they're going to be performing.

22  Q.    Does that process involve use of the Job Safety

23  Analysis?

24  A.    Yes.

25  Q.    Will the Job Safety Analysis be explained to the

134

1  team member?

2  A.     At that point, yes.

3  Q.     Who would do that?

4  A.     That supervisor, that manager.

5  Q.     Does the plant have annual safety training for

6  all employees?

7  A.     Yes, we do.

8  Q.     And I assume by annual, that that's once a year?

9  A.     Yes.

10 Q.     What types of topic are covered?

11 A.     We cover Haz Mat, we cover lock out tag out, we

12 cover PPE, confined space, those types of things.

13 Q.     I'd like to show you Defense Exhibit 5025.

14        Do you know what this document is?

15 A.     Yes.

16 Q.     What is it?

17 A.     Our safety policy.

18 Q.     Is this a safety policy for the Finney County

19 plant?

20 A.     Yes.

21 Q.     Are these topics covered with employees during

22 the orientation?

23 A.     Yes, it is.

24        MS. PASCHAL:  We move to admit Defense 5025.

25        MR. HANSON:  No objection.

1          THE COURT:  5025 is admitted.

2          MS. PASCHAL:  Could we highlight the first

3 paragraph, please.

4 BY MS. PASCHAL:

5 Q.    Mr. Kinney, could you read aloud for us that

6 first paragraph?

7 A.    Sure.  "Tyson Fresh Meat has dedicated itself to

8 the principals of providing the safest and most helpful

9 working environment for all employees.  The prevention

10 of accidents and elimination of personal injuries and

11 illness to you is one of our company's primary goal."

12 (Quoted as read.)

13 Q.    Is that an accurate statement of the plant's

14 policy with respect to safety?

15 A.    Yes.

16 Q.    Is it an accurate statement with respect to the

17 plant's goals of safety requirements?

18 A.    Yes.

19 Q.    Let's now go to the second paragraph.

20          Could you please read that paragraph aloud?

21 A.    "Safety operating procedures have been

22 established by Tyson Fresh Meat for both management and

23 hourly personnel to eliminate work-related accidents

24 and thus personal injuries to you.  It is the

25 responsibility of all Tyson Fresh Meats personnel to

1   adhere to the safety procedures in order to protect

2   themselves, fellow employees, and visitors from harm."

3   (Quoted as read.)

4   Q.     Are those accurate statements with respect to

5   plant policy?

6   A.     Yes.

7   Q.     Do the plant safety rules apply to supervisors,

8   as well as hourly employees?

9   A.     Yes, it does.

10   Q.     Can supervisors be disciplined for failing to

11   wear appropriate PPE?

12   A.     Yes, they can.

13   Q.     Or for not following safety procedures?

14   A.     That's true, yes.

15   Q.     Let's go to the second page of this document.

16          Mr. Kinney, what does this second page

17   describe?

18   A.     The steps or categories for discipline, safety

19   discipline.

20   Q.     Could you please read the first paragraph aloud?

21   A.     "Every Tyson Fresh Meat employee has been issued

22   the personal protective equipment and safety equipment

23   necessary to prevent him or her from incurring any

24   injury or illness while performing their job.  The

25   failure to wear the personal protective equipment has

1  been placed in three categories, life-threatening,

2  imminent danger, important, based on the importance of

3  the equipment to provide your safety -- your personal

4  safety.  The failure to wear your required protective

5  equipment will result in discipline action.

6  Disciplinary action based upon the category which

7  equipment has in place.  The category or the personal

8  protective equipment and their disciplinary levels for

9  failure to wear are as follows."  (Quoted as read.)

10  Q.    Is that an accurate statement of the general

11  organization of disciplinary rules for safety

12  violations?

13  A.    Yes.

14  Q.    As safety director, do you agree with the safety

15  that PPE is necessary to prevent an employee from

16  incurring any injury or illness while performing his or

17  her job?

18  A.    Yes.

19  Q.    Can you explain to us how these three categories

20  of safety violations listed on this page work?

21  A.    Life-threatening, obviously, it's just a

22  situation where someone could die, so it's pretty much

23  a two-step policy.  Suspension, written warning

24  suspension, and then termination.

25  Q.    And so, for example, the first one listed under

1  there is mesh apron.  What does that refer to?

2  A.    That's your mesh -- the protection that covers

3  your -- your torso, a lot of vital organs there, so it

4  is important that you wear that piece of equipment.

5  Q.    So under this first category, if you don't wear

6  an important item like a mesh apron, I believe you said

7  it was a two-step process?

8  A.    Yes.

9  Q.    And what does that mean?

10 A.    That means we'll bring you in, go over the

11 incident and issue a suspension and if it occurs again,

12 something along the same lines, then termination could

13 be the next step.

14 Q.    Do you see a failure to wear earplugs on this

15 list of life-threatening categories?

16 A.    No.

17 Q.    Do you see a failure to wear a hard hat on this

18 list?

19 A.    No.

20 Q.    Let's go to the second category.

21        What are the disciplinary steps for failure to

22 wear these types of equipment?

23 A.    That's a three-step; written warning,

24 suspension, termination.

25 Q.    I believe you said earlier that the more serious

1  violations was a two-step process?

2  A.    Yes.

3  Q.    And this is a three-step process?

4  A.    Yes.

5  Q.    Is that because these violations are considered

6  not as threatening?

7  A.    Yes.

8  Q.    And what is that additional step that's added in

9  category B?

10  A.    It is the written warning.

11  Q.    Let's go to the third category.  This category

12  is called Important.

13        How many action levels are there at this

14  category?

15  A.    There's four.

16  Q.    So this is two more than the first category that

17  we looked at?

18  A.    Yes.

19  Q.    And why is that?

20  A.    Because here again, severity is less.

21  Q.    And what's the extra level that's added in this

22  Category C?

23  A.    Verbal, there's a verbal warning that we give

24  those team members.

25  Q.    And by verbal warning, is that something the

1  supervisor says to the employee?

2   A.    Yes, they'll go up and say, Hey, you need to

3  make sure you wear your earplugs or whatever the case

4  may be.

5   Q.    Is that something that is necessarily

6  documented?

7   A.    Not necessarily, no.

8   Q.    So if an employee happens to forget to put their

9  earplugs in when they walk on to the floor, what is

10  likely to happen?

11   A.    At that point in time, the manager or whoever

12  sees that team member will encourage them to, Hey, you

13  need to make sure you wear this.

14   Q.    Let's go to the next page.  What is this page?

15   A.    This is the sign off that our team members sign

16  when they get done with the orientation.

17   Q.    And by signing this, what are they certifying?

18   A.    That they have -- they read and understand the

19  policies read through safety discipline.

20   Q.    Does the plant expect employees to have read the

21  safety policy and fill out this acknowledgment before

22  they start working?

23   A.    Yes.

24   Q.    What if a team member doesn't speak English?

25   A.    Then we have interpreters there to provide the

141

1  information to them.

2  Q.     Are there any PPE items that every production

3  member, team member wears?

4  A.     Yes.  Yes.

5  Q.     What are those?

6  A.     Hard hat, earplugs.

7  Q.     So for the other -- I'm sorry.

8  A.     I didn't say anything.

9  Q.     I just wasn't sure if there was anything else

10 that you wanted to add.

11        So we have hard hat and earplugs.  Would the

12 other items of PPE, does that depend by job?

13 A.     Yes.

14 Q.     What about a hair net?  Is that considered a PPE

15 item?

16 A.     Not really but it does, you know, there's some

17 importance to wearing it for safety reasons as well.

18 Q.     And what are those reasons?

19 A.     We have a lot of overhead conveyors and there is

20 ticket rollers and there is things that you can get

21 caught in so if have you got everything in a central

22 location, it can protect you from getting stuck or

23 getting caught in it.

24 Q.     And when you say getting caught in it, are you

25 referring to a team member's hair?

1   A.      Yes, yes.

2   Q.      Has that ever happened at the plant where some

3   loose hair has gotten caught in a conveyor?

4   A.      Oh, yes, it has, yes.

5   Q.      And in those instances, have those always been

6   women or have there been some men?

7   A.      There's been a woman and a few male or a man

8   that I remember in the last -- over the last few years,

9   yes.

10  Q.      We've heard some testimony from a plaintiff and

11  former employee named Jeronimo Vargas who worked in a

12  position called clear neck on the slaughter side.

13          Are you generally familiar with that position?

14  A.      Yes.

15  Q.      I'd like to show you a JSA for that position.

16  This is Plaintiffs' Exhibit 239, Page 2277 which is

17  previously admitted.

18          Do you recognize this as a JSA for the clear

19  neck position?

20  A.      Yes.

21  Q.      And could you explain to us what, according to

22  this JSA, is required with respect to PPE for this

23  position?

24  A.      Mesh apron, shin guard, mesh glove, polar glove,

25  arm guard, and polar sleeve.

1  Q.    Do you know the date of this Job Safety

2  Analysis?

3  A.    I'm not sure the date of this but it's an old

4  one.

5  Q.    Do you know if any of these items have been

6  removed for this position?

7  A.    I believe the shin guard has been removed from

8  that position.

9  Q.    There been any items that you are aware of that

10 have been added?

11 A.    No.

12 Q.    Mr. Vargas testified that he also wore vinyl

13 sleeves and a plastic apron when he worked in the clear

14 neck position.  Are vinyl sleeves considered PPE for

15 this position?

16 A.    No.

17 Q.    Is a plastic apron considered PPE for this

18 position?

19 A.    No.

20 Q.    And do either of those items appear on this JSA

21 for this position?

22 A.    No, they don't.

23 Q.    Like to show you what has been admitted as 5039,

24 Defense Exhibit 5039, which we have now blown up on a

25 trial board poster for ease of reading.

1        I'm not sure the best vantage point, it may be

2   easier, Mr. Kinney, if you can come down here with me.

3   A.    I can't see that, that's for sure.

4   Q.    I know he it is very small print.  Get it as

5   close as possible.

6            MS. PASCHAL:  Maybe if we can pull it up on

7   the screen as well?

8            THE COURT:  You can move wherever you need to

9   go.

10           MR. HANSON:  I just want to look at one thing

11  at the top corner.

12           THE COURT:  Sure.

13           MS. PASCHAL:  Can we go to Page 6 on that

14  exhibit?

15           Let's just go, if we can highlight the top

16  part of that.

17  BY MS. PASCHAL:

18  Q.    Mr. Kinney, we've seen this exhibit already a

19  couple of times with the plaintiffs' expert, Doctor

20  Radwin, and then also yesterday when the plaintiffs

21  moved it into evidence at the end of the day.  Do you

22  recognize what it is?

23  A.    Yes.

24  Q.    What is it?

25  A.    It's a safety equipment list.

1   Q.    Is this the safety equipment list for Finney

2   County?

3   A.    Yes, it is.

4   Q.    Does it say Finney County there at the top?

5   A.    Yes.

6   Q.    And when you say a safety equipment list, what

7   should this document tell us?

8   A.    It should tell us the safety equipment required

9   for particular jobs.

10  Q.    Now if we start here at the top, what does it

11  say there in that top category?

12  A.    Finney County Slaughter Kill Floor.

13  Q.    And underneath it, those jobs that are listed,

14  do you recognize those as slaughter jobs in Finney

15  County?

16  A.    Yes.

17  Q.    Now let's go across here, the columns that we

18  have listed at the top.  What do these columns at the

19  top represent?

20  A.    They represent the equipment for particular

21  jobs.

22  Q.    Is that required equipment for those jobs?

23  A.    Yes.

24  Q.    Now if we look here, it looks like slaughter

25  goes from right here where it says knocker, all the way

1  down, I think we may go on to the next page, but all

2  the way down to wash tripe, right above cooler area.

3        Is that an accurate understanding of slaughter

4  positions?

5  A.    Yes, it is.

6  Q.    If we go over across these categories, let's go

7  over to vinyl sleeves.  And then the top part of this

8  chart under vinyl sleeves, where is that indicated as a

9  required piece of equipment for a position?

10 A.    There's an X in that box then that means the

11 equipment is required.

12 Q.    Do you see that for any slaughter positions?

13 A.    Yes.

14 Q.    And you pointed where there's an X under that

15 column, if we go across that column, can you tell us

16 what position that is?

17 A.    Blow hocks.

18 Q.    Do you see vinyl sleeves indicated as required

19 for any other slaughter position?

20 A.    No.

21 Q.    What about the rubber apron?  Do you see the

22 rubber apron required for any slaughter position?

23 A.    No.

24 Q.    What about cotton gloves?  Do you see cotton

25 gloves required for any position?

1    A.    No.

2    Q.    Let's look at the plastic arm guard, right next

3  to it.  Do you see some positions where the plastic arm

4  guard is required?

5    A.    Yes.

6    Q.    Could you tell us what a couple of those

7  positions are, according to this chart?

8    A.    Stickers, tail ripper, first leggers.

9    Q.    Are there any examples, according to this chart,

10  where the arm guard is not required for a slaughter

11  position?

12    A.    Yes.

13    Q.    Could you give us a couple of examples?

14    A.    Shackler, knocker.

15    Q.    Let's go to where it says shin guards.  Can you

16  give us a couple of examples where shin guards are

17  required?

18    A.    Yes.

19    Q.    For a slaughter position?

20    A.    The shackler, belly ripper.

21    Q.    Can you give us some examples where the shin

22  guards are not required for a particular position?

23    A.    Sticker, and first hang off.

24    Q.    Looking at the slaughter positions that we have

25  listed here and the various equipment where we have Xs

1  or blanks, how consistent would you say it is across

2  the slaughter floor?  In other words, do slaughter

3  employees tend to wear all the same items or would you

4  say there's variety?

5  A.    Oh, there's variety.

6  Q.    So are there certain items on this list that

7  certain slaughter employees are required to wear?

8  A.    Yes.

9  Q.    But are there also certain items on this list

10 that other employees are not required to wear?

11 A.    Yes.

12 Q.    Now if we look on down towards the bottom of the

13 chart, I think we have to go to Page 8 on the computer,

14 and I see here there is some categories like material

15 handling, shipping, rendering, and hides.  And I'm

16 going to represent to you that those areas in the plant

17 are not at issue in this litigation.

18        So where I'd like to focus is on the

19 processing side down here, the bottom of this chart,

20 for the ease and sake of everyone I think it is

21 probably easier if we go back to the computer for the

22 bottom part of the chart.

23 A.    Can I sit down?

24 Q.    Yes, we are going to get back to the computer

25 monitor.

1   A.      Okay.

2   Q.      Sir, are we on Page 8 of 5039.

3          MS. PASCHAL:  If we could just show the whole

4   page at first.

5          And then if we could just bring forward the

6   bottom part of that chart.

7          And, actually, if we could extend it all the

8   way across, just so it is the bottom third going

9   vertically or horizontally, excuse me.

10         And then if we could enlarge that.  That's as

11  big as it gets.  Oh, no.

12         Well, maybe we should shorten it just a little

13  bit.

14         Okay.  That looks great.

15  BY MS. PASCHAL:

16  Q.      So just looking here on this portion of the

17  chart, is every box X'd off?

18  A.      No.

19  Q.      And would you say there's some variety among the

20  Xs that do appear through the different positions?

21  A.      Yes, there is.

22         MS. PASCHAL:  And, in fact, if we could just

23  extend it all the way across.

24  BY MS. PASCHAL:

25  Q.      Would you agree that there are several columns

1  that are not X'd out at all?

2  A.     Yes, that would be true.

3          MS. PASCHAL:  If we could go up to the top of

4  that chart.

5          And then across to the end where we have

6  columns for vinyl sleeves and rubber apron.

7          And then if we could just scroll down towards

8  the end of the chart where we have our processing jobs.

9          I think this is going to be a little hard to

10 see.

11 BY MS. PASCHAL:

12 Q.     But if you could follow with me, Mr. Kinney,

13 where we're scrolling, to tell me if you see any

14 positions in processing that require vinyl sleeves.

15 A.     No.

16          MS. PASCHAL:  And if we could go up to the top

17 again.

18          Do the same for rubber apron.  Column 27.

19 BY MS. PASCHAL:

20 Q.     See there are a few Xs there, but down in the

21 bottom part of the page, do you see any Xs for rubber

22 apron?

23 A.     No, not at the bottom part.

24 Q.     And if we go across from where those Xs are, for

25 the rubber apron.  If we could go back to where those

1  few Xs are just to show which jobs they correspond to.

2       Do you see where it is underneath the heading

3  "Hides"?

4  A.    Yes.

5  Q.    And is hides a separate area of this plant?

6  A.    Yes.

7  Q.    And as I represented to you earlier, that's not

8  at issue in this litigation.

9       So other than those positions in hides, did

10 you see any positions in processing on this page that

11 indicated a rubber apron was required?

12 A.    No, I did not.

13 Q.    Are special boots required for any position in

14 processing?

15 A.    No.

16 Q.    Can employees choose to wear special rubber

17 boots in processing if they want to?

18 A.    Yes, they can if they want to, yes.

19 Q.    Mr. Kinney, we heard some testimony the other

20 day from a man named Larry Burks who works at the

21 Finney County plant.  Are you familiar with Mr. Burks?

22 A.    Yes, I am.

23 Q.    Are you familiar with the fact that Mr. Burks

24 lost a finger while operating a saw on the processing

25 floor?

1   A.      Yes, unfortunately, yes.

2   Q.      Are mesh gloves required for saw operators?

3   A.      No, they are not.

4   Q.      What about polar gloves?

5   A.      No.

6   Q.      Why are they not required for that position?

7   A.      The mesh, if you were to get caught in a saw,

8   it's just going to hold you there and pull you in, so

9   the injury could be worse than what you receive.

10  Q.      And when you say worse, what could happen?

11  A.      In his situation, he lost a finger; it could

12  have been a hand.

13  Q.      Given that the plant has determined that a mesh

14  glove or polar glove could make the situation worse,

15  how does the plant try to minimize the risk to saw

16  operators?

17  A.      Through training.  We have saw safety classes

18  that we put all of our saw operators through before we

19  send them out to do a job on their own, there is

20  someone on one training with a lead person or with

21  another experienced saw operator and we also post a

22  sign by the saw operators that says, Do Not Disturb

23  because we really emphasize with those guys running

24  saws, eyes and mind on task, because you -- you have --

25  you really have to be focussed when you are performing

1  those jobs.

2  Q.    Does the risk to a saw operator increase if he

3  is distracted?

4  A.    Oh, sure, yes, it does.

5  Q.    And you indicated that there was training for

6  saw operators.  Is this different from the basic

7  training that all hourly employees receive on safety

8  topics?

9  A.    Yes, specifically put together for the saw

10 operators.

11 Q.    We've heard that employees on the kill floor and

12 processing side on the plant often use knives in their

13 jobs, is that true?

14 A.    Yes, they do.

15 Q.    Where do they keep their knives between shifts?

16 A.    In their lockers.

17 Q.    Who puts the edge on the knives?

18 A.    We have knife room operators that will put the

19 edge on the knives for the team members.

20 Q.    How does a team member exchange his knife so

21 that an edge can be put on it in the knife room?

22 A.    On the processing side we have a tub process

23 where each department has a tub, if you need a knife

24 sharpened, you put your knife in the tub, there's a

25 designated person that takes it out and brings it back.

1   Q.      Is that done during production time?

2   A.      Yes.

3   Q.      Given this exchange process on the production

4   floor that you just described, is there any reason for

5   an hourly employee to have to go to the knife room

6   before or after shift?

7   A.      No.  No.

8   Q.      Mr. Kinney, who mainly benefits from wearing a

9   hard hat?

10  A.      The team members.

11  Q.      What about earplugs?

12  A.      Team members.

13  Q.      What about rubber boots?

14  A.      The team members.

15  Q.      Safety glasses?

16  A.      Team members also.

17  Q.      And is it correct that not every position has to

18  wear safety glasses?

19  A.      That would be true.

20  Q.      Do you go on to the kill floor?

21  A.      Yes, I do.

22  Q.      Do you go into the processing floor?

23  A.      Yes, I do.

24  Q.      And when you worked on the processing floor, I

25  believe you testified you wore PPE?

1    A.    Yes, I did.

2    Q.    And when you go out on to the floors today, do

3 you have to wear a frock, a hard hat, a hair net, and

4 earplugs?

5    A.    Yes, I do.

6    Q.    About how long does it take you to put these

7 items on together?

8    A.    Seconds.  It's not long, it doesn't take long.

9    Q.    What about to take them off?

10   A.    About -- it's seconds.

11   Q.    When you were an hourly employee in processing

12 did you wear a mesh apron?

13   A.    Yes, I did.

14   Q.    About how long did it take you to put that apron

15 on?

16   A.    Few seconds.

17   Q.    About what about to take that off?

18   A.    It's the same.

19   Q.    Did you also wear mesh sleeves?

20   A.    Yes, I did.

21   Q.    How long did it take you to put those items on?

22   A.    Not very long; few seconds.

23   Q.    And to take them off?

24   A.    Same.

25   Q.    Did you have to wear a mesh glove?

1  A.     Yes, I did.

2  Q.     And about how long did it take you to put on the

3  mesh glove?

4  A.     Here again, seconds.

5  Q.     And to take it off?

6  A.     Not long at all.

7          MS. PASCHAL:  Thank you.  I have no more

8  questions at this time.

9          THE COURT:  Thank you.

10          Mr. Hanson?

11          MS. PASCHAL:  Excuse me, Your Honor, there is

12  one thing I forgot.

13          THE COURT:  Sure.

14          MS. PASCHAL:  I would like to move the chart

15  that we just used with Mr. Kinney, that is an excerpt

16  from Defendant's 5039 into evidence.

17          THE COURT:  5039 has been admitted already,

18  hasn't it?

19          MR. HANSON:  Yes.

20          MS. PASCHAL:  Yes this is just a separate

21  excerpt from it that is specific to Finney County.

22          MR. HANSON:  Well, we would object, it is a

23  demonstrative, we think the documents' already in

24  evidence.

25          THE COURT:  I am going to go ahead and admit

1  it, but I hope you can read it.

2          Thank you.  Mr. Hanson.

3          MR. HANSON:  Thank you.

4                  CROSS EXAMINATION

5  BY MR. HANSON:

6  Q.    Hi, Mr. Kinney, my name is George Hanson.  We

7  have not met, right?

8  A.    No, we have not.

9  Q.    You have not given testimony in this case before

10 today, is that correct?

11 A.    That's correct.

12 Q.    If an employee came into the production floor at

13 Finney County without a hard hat, what would happen?

14 A.    Um, first of all, I've never seen that happen

15 but he would be stopped at that point and -- he or she,

16 and we would send them to get their hard hat.

17 Q.    Same with earplugs, right?

18 A.    Yes.

19 Q.    Company absolutely requires that the hard hat,

20 earplugs, other safety equipment be worn on the

21 production floor?

22 A.    Yes.

23 Q.    It's not --

24 A.    Yes.

25 Q.    It's not a choice that the employees have?

1   Correct?

2   A.      Yes, they must wear it on the production floor.

3   Q.      And that is by company policy, right?

4   A.      Yes.

5   Q.      So even if an employee were to say, You know, I

6   have got a thick skull, I know you want me to wear this

7   for my benefit but I know what's best for me, you

8   wouldn't let that employee work, correct?

9   A.      We would not let him go to the floor without the

10  equipment on.

11  Q.      So it's not the employee's choice, right?

12  A.      That would be right.

13  Q.      You testified a little bit about OSHA and the

14  design to create a safe working environment, correct?

15  A.      That's correct.

16  Q.      And the requirement to provide safe working

17  conditions is a serious one for Tyson, correct?

18  A.      Correct.

19  Q.      With very serious consequences if Tyson does not

20  comply, correct?

21  A.      If Tyson doesn't comply?

22  Q.      If Tyson doesn't comply with OSHA, there are

23  serious consequences to Tyson?

24  A.      Yeah, there could be, yes.

25  Q.      OSHA could shut down the operation, couldn't

1  they?

2  A.    OSHA could come in and do an inspection.

3  Q.    And they could shut it down if they felt it was

4  unsafe?

5  A.    If the -- if the -- if they found things that

6  serious then, yes, it's possible.

7  Q.    I'm just saying they have the power, right?

8  A.    They have the power.

9  Q.    So you agree with me that it is strongly to

10  Tyson's benefit to comply with OSHA?

11  A.    It's strongly -- yes, and it's also important to

12  the team members to follow as well.

13  Q.    No one is arguing --

14  A.    Okay.

15  Q.    -- that keeping the team members safe isn't

16  important.  All right?

17  A.    Okay.

18  Q.    I just want to talk a little bit about what is

19  important to Tyson.

20        It's important to keep Tyson up and running,

21  right?

22  A.    Yes, it is.

23  Q.    It's important to keep it in operation, right?

24  A.    Yes, it is.

25  Q.    If Tyson was not in compliance with OSHA, you

1  couldn't run your business, right?

2   A.    That's true, yes.

3   Q.    So it really, really helps Tyson to comply with

4  OSHA, right?

5   A.    Yes, it does.

6   Q.    And in addition to just running the business,

7  there are penalties that are associated with violating

8  OSHA, are there not?

9   A.    There's possible citations and penalties, yes.

10  Q.    You're aware that any violation of OSHA could

11 result in a monetary penalty of up to $7,000, correct?

12  A.    That's correct.

13  Q.    And that if that violation is willful, it could

14 be up to $70,000 for a violation but not less than

15 50,000, you're aware of that?

16  A.    That's correct, yes.

17  Q.    So, again, it's really in Tyson's financial

18 interests to be in compliance with OSHA, right?

19  A.    Yes.

20         MR. HANSON:   Could I have you pull up 5068?

21 Is this the document?

22         This is not the one that you used?

23         Can you ask him to pull up the one that you

24 used, the one you talked about in the first, second,

25 third rule violations.

1  BY MR. HANSON:

2   Q.    Do you remember testifying about the first,

3  second, and third local violations for PPE?

4   A.    Yes.

5   Q.    And we saw that slide?

6   A.    Yes.

7   Q.    Okay.

8         MR. HANSON:  I'm just asking your counsel to

9  have that pulled back up.  I was not given a copy of

10  that page.

11         Okay.  I think this is it.

12  BY MR. HANSON:

13   Q.    All right.  This is the safety policy, correct?

14   A.    Yes.

15   Q.    Okay.

16         MR. HANSON:  Go to the next page, please.

17  Okay.  Could we blow up the Category A.

18  BY MR. HANSON:

19   Q.    Do you recall testifying about that?

20   A.    Yes.

21   Q.    All right.  And these would be personal

22  protective equipment required to be worn of the highest

23  category, correct?

24   A.    Yes.

25   Q.    Okay.  And I just wanted to be clear about this,

162

1  because your counsel asked you, you don't see hard hats

2  on this list, right?

3  A.     Right.  I see it now.

4  Q.     Okay.  And I saw it then, but I -- did you just

5  overlook it?

6  A.     Just overlooked it.

7  Q.     Was there a reason hard hats should not be on

8  this list?

9  A.     Um, in my opinion, it probably shouldn't be on

10 the list because we have never had an issue with

11 someone coming out without a hard hat.

12 Q.     Well, let's -- let's drill down to what this is.

13         This is the equipment that needs to be worn

14 because failure to wear it could kill you, right?

15 A.     No, failure to wear it could lead to discipline

16 up to discharge, that's what that is saying.

17 Q.     All right.  Do you disagree, though, that this

18 is a life or death possibility?

19 A.     It is under life-threatening category, yes, I

20 agree.

21 Q.     All right.  And I said kill you, I'll just use

22 these words.  It could threaten your life if you don't

23 wear it, correct?

24 A.     Correct.

25 Q.     And on that list is a mesh apron, right?

1  A.     Yes.

2  Q.     And you see the mesh apron up on our board over

3  there, correct?

4  A.     Yes.

5  Q.     But just down, under number six, you also see a

6  hard hat, don't you?

7  A.     Yes.

8  Q.     So we now know that hard hat is in the same

9  category as mesh apron, right?

10  A.     That's correct, yes.

11  Q.     Just going to put up on the ELMO a stipulation

12  that the parties have reached in this case.

13          One of the items that the parties agree is

14  compensable is a mesh apron, do you see that?

15  A.     Yes.

16  Q.     You understand that means the company has to pay

17  for the time it takes an employee to put it on, those

18  kinds of things, you understand that?

19  A.     Yes.

20  Q.     As well as these other items here, correct?

21  A.     Correct.

22  Q.     But it's true, Mr. Kinney, from a safety

23  perspective, from the importance to the company, a mesh

24  apron is no different than a hard hat, is it?

25  A.     Yes.

```
 1   Q.    My statement is true?

 2   A.    Yes.

 3   Q.    But you understand the company doesn't pay for

 4   hard hats?

 5   A.    I don't know that.

 6   Q.    Okay.  Ms. Paschal asked you about Mr. Vargas,

 7   one of our workers in this case.  Do you remember that?

 8   A.    Yes.

 9   Q.    And she showed you a clear neck JSA, correct?

10   A.    That's correct, yes.

11   Q.    You said it looked outdated, is that right?

12   A.    Yes.

13   Q.    Can you show the jury the current one?  Are you

14   in a position to do that?

15   A.    I don't have it, no.

16   Q.    Okay.  Do you know, were you shown it before you

17   were testifying today?

18   A.    No.  I am saying because the -- if I can

19   explain, they are done differently now and that was an

20   old -- that was in an old form versus our new forms.

21   Q.    JSAs are updated, correct?

22   A.    Yes, yes.

23   Q.    Okay.  Do you know what Mr. Vargas testified

24   that he was told to wear by his supervisor?

25   A.    I don't know what he testified.
```

1    Q.    And you don't know what Mr. Vargas's supervisor

2  told him he had to wear?

3    A.    No.

4    Q.    When he worked at Tyson?

5    A.    No, I do not know.

6    Q.    On the big board with the different jobs and the

7  different personal protective equipment, do you

8  remember looking at that?

9    A.    Yes, I do.

10   Q.    You understand that that is what the company, by

11 policy, requires, correct?

12   A.    That's correct.

13   Q.    You understand that that is not a list of what

14 everyone necessarily wears, correct?

15   A.    That's correct.

16   Q.    For example, we've seen a lot of video in this

17 case, especially in processing where people are wearing

18 lots of gloves.  Are you aware that that happens?

19   A.    Yes.

20   Q.    Sometimes a plastic glove and then a cotton

21 glove and then maybe even layers of gloves, you're

22 aware of that?

23   A.    Yes.

24   Q.    And then a mesh chain, mesh glove as well, for

25 the non-knife cutting hand?

1   A.    Yes.

2   Q.    You'd agree with me that as far as you're

3   concerned, as the safety manager, the only one of those

4   items that's required for safety, is the mesh glove,

5   correct?

6   A.    That's correct.

7   Q.    So an employee in processing could go out on the

8   processing floor with nothing but the mesh glove and as

9   far as you would be concerned, that's okay, right?

10  A.    Yes.

11  Q.    You would have met the requirements for minimal

12  safety for that position, correct?

13  A.    That's correct.

14  Q.    But you know what the working conditions are

15  like in the processing floor, don't you?

16  A.    Yes, I do.

17  Q.    You've been there?  Right?

18  A.    Yes.

19  Q.    It can be -- well, it is cold, isn't it?

20  A.    Yes, it is.

21  Q.    It's about 40, low 40 degrees?

22  A.    I'm not quite sure of the temperature but it's

23  cold.

24  Q.    Like working in a refrigerator, correct?

25  A.    Yeah, that's true.

1  Q.     And you wouldn't disagree that wearing something

2  other than a metal glove would be necessary for a

3  processing worker to do their job, right?

4  A.     If you choose to.

5  Q.     Well, I am just -- just common sense, if you

6  wore nothing but a metal glove in a refrigerated

7  environment, you would expect your hands to get cold,

8  right?

9  A.     There's a good chance, yes, your hands would get

10 cold.

11 Q.     All right.  A good chance.  And if your hands

12 got cold, it would be hard to manipulate the meat,

13 correct?

14 A.     Could be, yes.

15 Q.     And hard to manipulate a knife, correct?

16 A.     Could be, yes.

17 Q.     And would you agree that even if it's not

18 required by your list of personal protective equipment,

19 that wearing gloves and maybe layers of gloves to keep

20 your hands warm in a refrigerated environment, it does

21 contribute to safety, you'd agree with that?

22 A.     Yes.

23 Q.     And you'd agree that at the very least, it

24 contributes to the ability to efficiently do your job,

25 right?

1  A.     It's comfort.

2  Q.     Well, sure.  It's -- it feels better not to have

3  cold hands, right?

4  A.     True.

5  Q.     But if you're doing a job that really requires

6  grabbing items and working a knife around them, it's

7  good to have feeling in your fingers, too, correct?

8  A.     Sure, yes.

9  Q.     So you wouldn't disagree that wearing gloves and

10 even layers of gloves helps the employees do their

11 jobs?

12 A.     I can't disagree with that, no.

13 Q.     And that's true even though those items don't

14 appear on the big board, right?

15 A.     That's true, yes.

16 Q.     Those items are just a minimum equipment

17 required for safety reasons, correct?

18 A.     That's correct.

19 Q.     I just didn't want the jury to think that was

20 exhaustive because it's not, is it?

21 A.     No.

22 Q.     We talked a little bit about earplugs.  We

23 haven't talked about why the employees are required to

24 wear earplugs.

25         It's -- it's loud in the facility, isn't it?

1   A.      It can be loud, yes, yes.

2   Q.      All right.  And you know who Paul Karkiainen is?

3   A.      Yes, I know Paul, yes.

4   Q.      I asked him who would be able to tell me how

5   loud it is in the facility, and he mentioned you.

6   So -- so here we go?

7   A.      That would be true.

8   Q.      Do you know?

9   A.      Yeah, I do sound level testing.

10  Q.      Okay.

11  A.      We have a monitor that does that and, you know,

12  OSHA's requirement is 85 decibels if you're above that

13  and then things need to be done to reduce it to sound

14  levels and we've got areas that are over that -- that

15  number.

16  Q.      85 decibels would be the threshold for where

17  hearing protection is required?

18  A.      That's correct.

19  Q.      And you exceed 85 decibels in the processing

20  side?

21  A.      Yes, in some areas.

22  Q.      And in the slaughter side?

23  A.      Yes, in some areas we do.

24  Q.      Do you know what the highest decibel reading is

25  on the production line?

1   A.    We've had -- we have at least one area that's

2   above a hundred decibels.

3   Q.    Above a hundred decibels?

4   A.    (Nods head.)

5   Q.    I have a chart with different things like

6   jackhammers and airplanes but I'm not sure exactly

7   where they fit on the decibel level, but do you know

8   how much a hundred decibels would be?

9   A.    For?

10  Q.    What it would be compared to?

11  A.    No, I -- I really don't know.

12  Q.    But it's well above the minimum required

13  for -- well, OSHA's requirement to wear earplugs?

14  A.    Yes, it is above 85, yes.

15  Q.    Are you involved in workers' compensation

16  issues, Mr. Kinney?

17  A.    No, I don't deal with workers' compensation.

18  Q.    So that's -- you're the manager of safety but

19  workers' comp, what happens when folks are injured on

20  the job, that's handled by a separate department?

21  A.    That's handled by someone else, yes.

22  Q.    Your job is to keep folks from moving over to

23  the workers' comp side?

24  A.    Yes.

25  Q.    You do know that workers' compensation is a

1  significant expense to the company, though, right?

2  A.    Oh, yes, yes.

3  Q.    And you know that keeping workers safe helps

4  reduce expensive workers' compensation costs, right?

5  A.    Yes, that would be true.

6  Q.    And you also know that hiring new workers and

7  training new workers is expensive, correct?

8  A.    Yes.

9  Q.    The -- the number we heard from Mr. Karkiainen

10 is it costs about $8,000 to hire and train a new worker

11 before they're ready for the production floor.  Does

12 that sound about right?

13 A.    I don't know numbers, but I -- I'm not sure if

14 that's correct or not.

15 Q.    Well, at least as it involves avoiding workers'

16 compensation and replacing injured workers, you'd agree

17 that keeping workers safe really helps Tyson as well,

18 correct?

19 A.    It helps Tyson as well as that team member.

20 Q.    Okay.  No one argues that keeping a team member

21 safe isn't good for the team member.

22        But when we're looking at the company as a

23 whole, keeping workers safe is really helpful to avoid

24 significant costs, correct?

25 A.    Costs and injuries.

1          MR. HANSON:  That's all I have.  Thank you.

2          THE WITNESS:  Thank you.

3          THE COURT:  Ms. Paschal?

4                    REDIRECT EXAMINATION

5  BY MS. PASCHAL:

6  Q.    Mr. Kinney, I just have a couple questions for

7  you.  Have you ever put on a pair of cotton gloves at

8  the plant?

9  A.    Yes, I have.

10  Q.    How long did it take you?

11  A.    Seconds.

12  Q.    What about a hard hat?  How long does it take

13  you to put a hard hat on?

14  A.    A few seconds.

15          MS. PASCHAL:  That's all I have.  Thank you.

16          THE COURT:  Mr. Hanson, anything else?

17          MR. HANSON:  Nothing further.

18          THE COURT:  All right.  Sir, you can step

19  down.

20          May this witness be excused?

21          MS. PASCHAL:  Yes, Your Honor.

22          THE COURT:   Mr. Hanson?

23          MR. HANSON:  Of course, yes.

24          THE COURT:  And you are excused.  Thank you.

25          Folks, let's go ahead and take our second

1  break of the day.  We'll be on break until noon.

2  That's noon.

3         I remind you, again, you're not to discuss

4  this case or any aspect of it among yourselves or with

5  anyone else.  No independent investigation.

6         See you back in here shortly.

7         (The jury leaves the courtroom.)

8         THE COURT:  All right.  Folks, lets visit just

9  for a couple of minutes about this Kimbro issue.  As I

10 say, I sent an e-mail out to you a little earlier this

11 morning, you probably had a chance to see it.

12        I've read the case that Mr. Anderson pulled

13 off of West Law, which really doesn't address the kind

14 of situation we're talking about here, but the

15 quotation is accurate, there's no doubt about that.

16        I have proposed a couple of things.  Where are

17 we?  Mr. Mueller?

18        MR. MUELLER:  Your Honor, we're okay with the

19 stipulation if -- we would like to make a small counter

20 and let me tell you why.  One, I think it is important

21 that somehow the stipulation mention the version he saw

22 in the trial he was testifying about had a name on it,

23 and they can, we would like to point out that the two

24 here don't, but that's the first point, because it

25 goes, that would be our rehabilitation.

1          And the second one is we want to designate

2    deposition testimony which I think we have a right to

3    do any way, but there's a passage in his deposition in

4    this case at Line 62, 19 to of Page 64, 6 where Mr.

5    Dirks asked him whether he had seen that letter when it

6    first came out and then the witness said, No, it was

7    before his deposition in another case.

8          And that would be offered as a prior

9    consistent statement to rebut the implication of a

10   recent fabrication of testimony, so I think it clearly

11   comes in for that purpose.  And in fairness, because it

12   was their question, not mine.

13          THE COURT:  Mr. Hanson.

14          MR. HANSON:  I don't have a problem with the

15   first concept, I'm not sure entering a witness's own

16   prior consistent statement makes sense here.  He

17   testified on the stand exactly what he testified to in

18   the deposition, apparently.  We know now that it's not

19   true in context.

20          I'm not sure the fact that he has repeated,

21   you know, the same incorrect testimony before does much

22   of anything.  If that wants to be brought out I would

23   say let's bring him and have a quick examination,

24   otherwise, I think it is going to get -- I don't know

25   how to avoid potentially bringing him back.

1              THE COURT:  Well, I'm not sure I understand

2    what your issue is with this testimony because if your

3    claim is that he testified inconsistently years ago

4    with his testimony yesterday, and they're bringing in

5    more what you claim is incorrect testimony, you're

6    going to argue this, I think is what it comes down to,

7    and so you can read, as far as I am concerned, his

8    testimony not from here, which the jury has already

9    heard, but from Alvarez II or Chavez, you can read the

10   other designated deposition testimony, and then you can

11   all argue whatever you want to.

12            MR. HANSON:  That's fine.

13            MR. MUELLER:  Okay.

14            THE COURT:  I think that avoids bringing him

15   in and it gives the jury everything that each of you

16   want them to hear.

17            And my concern is just giving them the facts

18   so that they can make a determination.

19            MR. HANSON:  We agree with that.  Thank you,

20   Judge.

21            THE COURT:  Okay.

22            So you can read the Chavez testimony that you

23   have highlighted, you can read in response to that, and

24   should we just go ahead and do that right after the

25   break?

```
 1            MR. MUELLER:  Well --
 2            THE COURT:  Are you in a position to do that
 3  then?
 4            MR. HANSON:  Yes.  Can we -- can we
 5  just -- can you set it up maybe a little bit for us so
 6  it doesn't seem --
 7            THE COURT:  Sure, absolutely.
 8            MR. HANSON:  Okay.
 9            THE COURT:  And I will just tell the jury that
10  Mr. Kimbro, there was a matter that came up after he
11  left, we're dealing with it this way, rather than
12  requiring him to come back.
13            MR. MUELLER:  When you say the matter came up,
14  how would Your Honor explain it?
15            THE COURT:  I don't think I need to explain
16  anything at all.
17            MR. MUELLER:  Okay.
18            THE COURT:  Just to say a matter came up
19  involving Mr. Kimbro's testimony, we're dealing with it
20  this way rather than requiring him to come back.
21            MR. HANSON:  We'll introduce what we are going
22  to read, when it was taken.
23            THE COURT:  Exactly.
24            MR. HANSON:  Okay.
25            THE COURT:  All right.  Okay.  See you all
```

1  back here shortly.

2           (Recess was taken from 11:43 a.m. until 12:02

3           p.m.  Proceedings continue outside the

4           presence of the jury.)

5           THE COURT:  With respect to our charge

6  conference this afternoon, we can either do it right

7  after we finish here today, or we can do it around

8  2:30.  It's entirely up to you all.

9           MR. MUELLER:  I just, we have a sandwich in

10 the room but I'm not going to eat it until we rest, so

11 I just would like some time to eat a bite.

12          THE COURT:  Why don't you, we'll just take an

13 hour after we recess here for the day and send the jury

14 home, and then we'll get back together and take it up

15 at that point.

16          MR. MUELLER:  Okay.

17          MR. O'DEAR:  I have a question about closing.

18          THE COURT:  Sure.

19          MR. O'DEAR:  A couple things.  Any time limit?

20          THE COURT:  I'm not going to.  I'm going to

21 leave that to you guys.

22          MR. O'DEAR:  And we have this daily

23 transcript, of course.  Can we put it under the ELMO to

24 show --

25          THE COURT:  Sure.

1          MR. O'DEAR:  -- portions that we want to?

2          THE COURT:  Yeah, we sure can.

3          MR. HANSON:  And, Judge, unfortunately, Mr.

4    Dirks's grandfather passed away and he is going to need

5    to be down in Wichita for a funeral.

6          THE COURT:  Oh, Mr. Dirks, I am sorry to hear

7    that.

8          MR. HANSON:  We have alerted the other side,

9    obviously, we need to keep the thing on track.

10          We would just like to mention to the jury Mr.

11   Dirks's absence for a funeral, we won't go into the

12   details or anything like that.   I just think it is

13   important that the jury knows we are not -- our trial

14   team is not abandoning ship.

15          THE COURT:  Will you be gone tomorrow?

16          MR. DIRKS:  Yeah.

17          THE COURT:  Are you taking off tomorrow, Mr.

18   Dirks?

19          MR. DIRKS:  Yeah, I am leaving tonight, the

20   funeral is tomorrow so I just can't be here.

21          THE COURT:  I'm just so sorry to hear it.  You

22   know, no matter what age they are, it is never easy

23   with a grandparent.

24          So, I will allow the plaintiff, too, to break

25   up your closing tomorrow.  The rule I'm going to give

 1  you, though --

 2          (Jury enters the courtroom.)

 3          THE COURT:  -- is no more on the back end than

 4  the front end.  And I remind you that Judge Brown has

 5  always said no soul's saved after 15 minutes.

 6          Go ahead and have a seat, folks.

 7          And everyone can be seated.

 8          Members of the jury, there are a couple of

 9  things that I want to advise you about.  First of all,

10  Mr. Dirks, one of the lawyers for the plaintiff, has

11  experienced a death in his family, so he will not be

12  with us tomorrow, the funeral is tomorrow, and he will

13  be away and there -- and don't construe that to mean

14  any lack of interest or anything on his part,

15  obviously.  But any time that you lose somebody in your

16  family it's difficult, and I'm sure you can all

17  appreciate that.

18          Second thing is, there was a matter that came

19  up last evening after Mr. Kimbro was already excused,

20  which has been brought to my attention, and in visiting

21  with the parties, rather than bringing Mr. Kimbro back

22  to testify again, the parties have agreed that portions

23  of his testimony from the trial that took place several

24  years ago in a different district may be read to you

25  now, and Tyson will have the ability to read portions

1  of some of Mr. Kimbro's deposition testimony as well to

2  you, in order to give you a balanced view.

3          This relates to that opinion letter from the

4  Department of Labor that was -- the exact date escapes

5  me right now, but it seems like it was in the late '90s

6  or early 2000.

7          MR. HANSON:  January 15th, 2001.

8          THE COURT:  January 15th, 2001.  And he

9  testified about that yesterday.

10          With that, Mr. Hanson, I'll allow you to read

11  the portions of his testimony.

12          And then, Mr. Mueller, you may read the

13  portions of his testimony.

14          MR. HANSON:  Thank you, Your Honor.  These are

15  excerpts from a trial in the case, Chavez versus IBP,

16  from September 29, 2004, the examination is of Kenneth

17  Kimbro.  First, I'm going to be reading the questions

18  from plaintiffs' counsel, and later switch to questions

19  of Mr. Kimbro from the defense counsel.  And Mr.

20  Anderson will be reading the responses that Mr. Kimbro

21  gave.

22          THE COURT:  Before you begin, I -- one last

23  thing.

24          Mr. Kimbro was under oath on both of these

25  occasions and he was represented by counsel or at least

1   Tyson or IBP's counsel on occasion, on these occasions

2   as well.  And you are to judge this testimony the same

3   way you would any other testimony that any witness

4   would give if they were here testifying live.

5          Go right ahead.

6          MR. HANSON:  This is examination of

7   plaintiffs' counsel.

8          (Deposition testimony read as follows with the

9          questions read by Mr. Hanson and the answers

10         read by Mr. Anderson.)

11         Q.  Mr. Kimbro, you have in front of you

12  Plaintiffs' Exhibit Number 85?

13         A.  I believe so.

14         Q.  Okay.  And can you tell us what that is?

15         A.  It appears to be a letter from the U.S.

16  Department of Labor.

17         Q.  And when you testified here last time in

18  2000, you testified that you were waiting for an

19  opinion letter from the Department of Labor, is that

20  correct?

21         A.  Yes.

22         Q.  And would this have been the opinion

23  letter you were waiting for?

24         A.  I believe so.

25         Q.  And, in fact, you had personally lobbied

1   the Department of Labor with regard to this, getting

2   this opinion letter in the Spring of 1999, isn't that

3   correct?

4           A.   I believe so.

5           Q.   And, Mr. Kimbro, have you had a chance to

6   read this January 15th, 2001 letter?

7           A.   Yes.

8           Q.   Okay.  And you see on the second page,

9   there's a discussion of compensation for meal period

10  donning and doffing?

11          A.   I do.

12          Q.   And I'll just read it to you.  It should

13  also be noted that the meal period may not include any

14  time performing work and that time spent donning and

15  doffing of personal protective equipment, clothing, or

16  gear, before or after the meal period, is compensable.

17          Do you see that?

18          A.   I see that.

19          Q.   And, did you get this January 15th, 2001

20  letter sometime shortly after it was written?

21          A.   Yes.

22          Q.   It's addressed to J. Patrick Boyle, the

23  President and CEO of the American Meat Institute, did

24  you see that?

25          A.   I do.

1          Q.  And IBP is very active in the American

2    Meat Institute, isn't it?

3          A.  Well, no.

4          Q.  Were you actively involved with the

5    American Meat Institute with regard to lobbying about

6    opinion letters from the Department of Labor?

7          A.  Yes.

8          Q.  Okay.  And you do recall reading this

9    letter shortly after it was issued?

10         A.  I do.

11         Q.  Do you see where the letter says quote, It

12   should also be noted that the meal period may not

13   include any time performing work and that time spent

14   donning and doffing of personal protective equipment,

15   clothing, or gear before or after the meal period is

16   compensable?

17         A.  I see that.

18         Q.  And did you see that in January of 2001?

19         A.  I would assume so, I believe so.

20         Q.  And did you understand that the Department

21   of Labor was telling the meat packing industry to

22   compensate workers for meal period and donning and

23   doffing?

24         A.  I would understand that, for work, yes.

25         MR. HANSON:  And the next examination was

184

1   redirect by Tyson's counsel.

2         Mr. -- plaintiffs' counsel placed in front of

3   you Plaintiffs' Exhibit 85, which is Kerr's January 15,

4   2001 opinion letter.  Do you have that up there?

5         A.   I believe I do, it's the January 15th

6   letter to J. Patrick Boyle from Michael Kerr, yes.

7         Q.   And this is near the beginning of Mr.

8   Mark's examination, he asked you if that was the

9   opinion letter that you had been lobbying for, do you

10  recall that?

11        A.   Yes.

12        Q.   And you recall saying that it was?

13        A.   Yes.

14        Q.   Okay.  Were you happy with this letter?

15        A.   No.

16        Q.   Okay.  Did you continue to lobby the

17  Department of Labor?

18        A.   Yes.

19        Q.   And did that result in the June 16th, 2002

20  opinion letter?

21        A.   Yes.

22        MR. HANSON:  Thank you.

23        THE COURT:  Thank you very much.

24        All right.  Mr. Mueller.

25        MR. MUELLER:  This is from the deposition of

1 Mr. Kimbro taken in this case, two and a quarter years

2 later, on December 1th, 2006.

3          Questioning is by plaintiffs' counsel.

4          (Deposition testimony was read as follows,

5          with both questions and answers read by

6          Mr. Mueller:)

7          MR. MUELLER:  Plaintiffs' counsel.

8          Q.  Mr. Kimbro, I'm showing you what's been

9 marked as Exhibit 6.

10          Can I mention this was a version of the

11 letter, the second version that was marked yesterday in

12 court?

13          THE COURT:  Sure.

14          MR. MUELLER:  Answer, Okay.

15          QUESTION:  Which is a 2001 U.S. Department of

16 Labor Employment Standards Administration Wage and Hour

17 Division opinion letter.  Have you seen this opinion

18 letter before?

19          Answer by Mr. Kimbro:  Let me just take a

20 quick look at this, please.  Okay.

21          QUESTION:  Okay, I -- I'd like to direct your

22 attention to Page 2, the second to the last paragraph.

23 Where it begins, quote, Also a number of meat packing

24 companies quote quote dot dot dot end quote, if you

25 could just read that paragraph.

1          Mr. Kimbro:  Okay, okay.

2          QUESTION:  Did anything about that paragraph

3   of -- of this letter cause you to reconsider the four

4   minute policy?  Have you had -- have you seen this

5   letter?

6          Answer by Mr. Kimbro, I've seen this letter.

7          QUESTION:  When did you see the letter?

8          A.  During the course of this litigation.  Not

9   this litigation, I'm sorry, not this litigation as it

10  pertains to Finney County, I -- I want to tell you I

11  think it was the Jordan case is my memory.

12         QUESTION:  The Jordan case was the first time

13  you've seen this letter?

14         ANSWER:  I believe so, yes.

15         QUESTION:  And the Jordan case was the first

16  time that this letter had been called to your

17  attention?

18         ANSWER:  I'd heard about it before, the

19  opinion letter, as it pertained to 3(o).

20         QUESTION:  Okay.

21         ANSWER:  But I believe that the first time I

22  actually saw it would have been in preparation for

23  Jordan.

24         THE COURT:  All right.  Thank you very much.

25  Your next witness now.

1          MR. HOFFMAN:  The defendants call Vincent

2  Garcia.

3          THE COURT:  Thank you.

4          (Witness is sworn.)

5                    VINCENT GARCIA,

6  called as a witness on behalf of the Defendants, having

7  been first duly sworn, testified as follows:

8                  DIRECT EXAMINATION

9  BY MR. HOFFMAN:

10  Q.    Mr. Garcia, could you introduce yourself quickly

11  to the jury?

12  A.    My name is Vincent Garcia.

13  Q.    And where do you live, Mr. Garcia?

14  A.    Garden City, Kansas.

15  Q.    How long have you lived there?

16  A.    42 years; all my life.

17  Q.    Your whole life?

18        And how are you employed?

19  A.    I'm employed with Tyson facility over there in

20  production.

21  Q.    What -- what is your job at the facility?

22  A.    I'm a floating supervisor.  I oversee 25 line

23  supervisors there and I work with the team members

24  around that area to help out with the supervisors to

25  make sure the team members are taken care of.

1   Q.      You say a floating supervisor?

2   A.      Yes, yes, sir.

3   Q.      So, you said, I think I understood, you said 25

4   supervisors beneath you?

5   A.      Right.

6   Q.      And then how many employees, how many team

7   members reporting to those 25 supervisors that are

8   reporting to you?

9   A.      There about an average to each about 40, 40 team

10  members to each line, there's an average, give or take

11  somewhere around there.

12  Q.      So all totaled up, is it about half the

13  production floor?

14  A.      Excuse me, I don't --

15  Q.      All of those team members added together, is it

16  roughly half of the processing floor?

17  A.      Right.  Right.

18  Q.      And that's all on the processing side?

19  A.      Right.

20  Q.      Not slaughter of course?

21  A.      No just the processing side is all.

22  Q.      How long have you been in the floating

23  supervisor position?

24  A.      About two years now.

25  Q.      And before that, how were you employed?

1    A.    I was a regular line supervisor and before that

2    I was an hourly team member.

3    Q.    And what was the line that -- when you say you

4    were a regular line supervisor, what was the line that

5    you supervised?

6    A.    The rib line.

7    Q.    And when you were a hourly team member,

8    what -- what was your job?

9    A.    Before I got promoted I was an arm loader.

10   Q.    Okay.  And so that's a cutting position?

11   A.    Yes, it's a knife job, we -- you separate the

12   part of the rib, the chuck rib from the bone and you

13   have another bone, you take the shank meat off and you

14   put the bone in the bone belt and put the shank in an

15   overhead conveyor that will lead to the hamburger belt.

16   Q.    And how long did you hold that job?

17   A.    Oh --

18   Q.    In the arm position?

19   A.    About seven years, 6-1/2, seven years.

20   Q.    And I don't know if I got how long you were the

21   rib line supervisor?

22   A.    About six months.  No, about a year -- about a

23   year.

24   Q.    About a year?

25   A.    Yeah.

1  Q.    So all tolled, is that about ten years?

2  A.    Yeah.

3  Q.    With Tyson?

4  A.    Yeah.  Yes.

5  Q.    And in your current job as floating supervisor,

6  do you actually work on the processing floor?

7  A.    Yes, sir, I do.

8  Q.    So you spend your days out with the team

9  members, working?

10  A.    Yes, I do.

11  Q.    And do you wear personal protective equipment

12  while you're out there?

13  A.    Yes, I do.

14  Q.    What -- what items do you wear in your current

15  position?

16  A.    My hard hat, my hair net, my earplugs, and a

17  mesh apron, if I go in certain areas that I need to

18  wear.

19  Q.    Do you -- and do you wear gloves?

20  A.    Yes, I do.

21  Q.    I want to ask you about, we've talked a little

22  bit today about Job Safety Analysis and different Job

23  Safety Analysis for different jobs.  How are

24  employees -- are you aware of how employees are trained

25  for the positions that they're hired into?

1  A.     You're saying -- I'm not catching on how what

2  you're asking the question, could you --

3  Q.     Well, what I really wanted to get to is the Job

4  Safety Analysis, the JSA?

5  A.     Right.

6  Q.     Is it used in the training for employees?

7  A.     Yes, yes, for the -- for the new hires that come

8  in or somebody that bids to another job, we take them

9  and their -- the new hires are trained in orientation

10 and as they come out a supervisor will take them and

11 give them a JSA, which is Job Safety Analysis, and

12 explain to them the job safety of what kind -- what

13 equipment is needed for their job.

14        And a bid, when they bid would do the same

15 thing, we sit down and we do a JSA with them to let

16 them know that there could be some changes in

17 their -- in their equipment wearing.  So that way they

18 know the proper equipment that they are going to need

19 to wear for that job.

20 Q.     And when you were a supervisor, did you actually

21 give the JSA to the employee team member?

22 A.     Yes, we did.  We did -- we did that when we went

23 and picked up our team member from -- from the

24 orientation room, we sat down with them, we let them,

25 we talked to them about the JSA and our personal lives

1  and that we -- we sat down and we let them know, yes, I

2  did do that, sir.

3  Q.     I'll just cut right to the chase, but did -- did

4  you as a supervisor ever require team members to wear

5  equipment that is not listed on the JSA for the job

6  that they are perform something?

7  A.     No, that is their preference of what they want

8  to wear after the JSA.

9  Q.     And do some employees choose to wear more than

10  is required by Tyson?

11  A.     Yes, yes, they do, some -- some do, but

12  that -- on their preference, though.

13  Q.     Another issue we've talked about at different

14  points during this trial is the -- the swiping of time

15  cards or the punching in process.  And I want to show

16  you an exhibit real quick.

17           This is, should be on the screen in front of

18  you.  I have got -- that's the map of the processing

19  side of the plant, isn't it?

20  A.     Correct.

21  Q.     And this -- this time clock, and this time clock

22  (indicating) are they in a little hallway that is right

23  by the front door?

24  A.     Yes, it is.

25  Q.     So then I am indicating here, this is where team

1  members walk in and out of the -- of the plant?

2  A.    Yes, sir.

3  Q.    And where -- are these also time clocks down

4  here?

5  A.    Yes, sir, they are.

6  Q.    And is -- and this area is the locker room down

7  here?

8  A.    Yes, it is.

9  Q.    Now, do you observe sometimes team members

10  clocking in or swiping their cards?

11  A.    Yes, I do.

12  Q.    Where do most of the team members do that?

13  A.    Right there when they first walk in the door,

14  right as they're coming in to the plant.

15  Q.    Those first two clocks?

16  A.    The first two clocks, time clock.

17  Q.    Would you say those first two clocks get used a

18  lot more than the other three clocks?

19  A.    Yeah.

20  Q.    At the end of the hall?

21  A.    Yes, they do.

22  Q.    And where do employees typically swipe out when

23  they're leaving the plant?

24  A.    When they're leaving the plant they usually

25  swipe out about in the same area.

1  Q.    Do they do that typically before they walk out

2  the door or do they do it --

3  A.    Well, after -- after they're done they'll go to

4  the locker room, undress and do whatever they want to

5  do and then they'll -- as they're walking out they'll

6  swipe out.

7  Q.    What I am really trying to get at, is we had

8  some discussion about, and I'll show you, this is an

9  exhibit that the plaintiffs in this case have used to

10 describe to some extent what this case in their view is

11 about and what the anatomy of the workday is.

12          This would represent the time that the

13 worker -- this first line would be the time the worker

14 enters the plant and then the beginning of the red box

15 is when the worker, by their theory, begins donning

16 equipment and taking first actions towards proceeding

17 to work and then the end of the red period is when the

18 worker actually enters in the production area and

19 begins working.

20          Would it be typical that the worker would

21 clock in before or after the beginning of donning and

22 doffing?

23 A.    They clock every four -- they clock in right as

24 soon as they walk in the door.

25 Q.    Is that what you did when you were a line

1  worker?

2  A.     I did the same thing also.

3  Q.     There's been some discussion today about Tyson's

4  policy and procedures regarding bathroom breaks.  And

5  whether employees are required to take their break to

6  go to the restroom solely on the break time or if they

7  are allowed to go during production time.

8          Do -- help me.  First, do employees always

9  have to ask before they can go to the restroom?

10  A.     They ask but if they need to go and they don't

11  see us and they really have to go, they will go and

12  when we get there we'll ask them, you know, the other

13  team member, Where did they go?  Well, they had to go

14  to the bathroom and so, you know,

15  well -- we'll -- well, you know, they'll come back, you

16  know, they didn't always ask, sometimes they will ask

17  if we're in the area they will ask but sometimes we'll

18  be at the back of the table and if they have to go,

19  they'll go.

20  Q.     Have you ever denied a team member a restroom

21  break?

22  A.     No, never have denied a team member a restroom

23  break.  If they have to go to the bathroom they'll ask

24  us and I'll ask them or what -- I'll ask them I'll say,

25  can you hold it for a little bit 'til I get somebody to

1  take their place?  Take your place?  And if they say

2  they can't, and they have to go, then I'll jump in and

3  we'll let them go right at that time.

4       If they say they can hold it for a little bit

5  we'll find somebody to replace them and let them go to

6  the bathroom.

7  Q.   Another issue that's come up today, is we talked

8  about it some today, is the steps towards disciplining

9  team members who are either late arriving to work in

10 the morning or late returning from breaks.  And I

11 wanted to ask you about that.

12      What -- what is the typical, in practice, what

13 happens when a team member shows up, say, a minute or

14 two late from break?

15 A.   There is -- well, if they come back late, we'll

16 have verbal warnings, we'll talk to them and, you know,

17 we'll let them know that, Hey, it is very important

18 that you make it back from break on time, you know, we

19 understand there is going to be situations so we want

20 them to feel comfortable, so we talk to them at first.

21      But if it is an ongoing thing, then

22 we'll -- we'll give them a -- a counseling, to document

23 it, because it has been an ongoing thing with this same

24 team member, so we'll document it.  And even after that

25 we document it, they still have the same situation,

1   we'll still verbally try to work with the team member

2   and let them know, hey, you know, we -- we still are

3   having a situation, what can we do to help you fix it,

4   we need to get you here on time.

5   Q.     With all of the employees, all the team members

6   that -- that you have supervisory authority over, have

7   you ever terminated a team member for returning from

8   break or arriving in the morning or at the beginning of

9   the shift tardy?

10  A.     No, never.

11  Q.     The -- one of the things that has been at

12  different points in this case, an issue we've talked

13  about, is the rest break.  And you -- you know that

14  back in April of 2010, Tyson realigned the work day?

15  A.     Yes, sir.

16  Q.     And changed the timing of the breaks?

17  A.     Yes, sir.

18  Q.     And the -- and there's now a 25-minute rest

19  break?

20  A.     Yes, sir.

21  Q.     And in your -- are you able to observe team

22  members as they take that 25-minute rest break?

23  A.     Yes, I am.

24  Q.     And I guess the first question I've got for you

25  is have you gotten feedback from the team members about

1  that break?

2  A.    Yes, I have.

3  Q.    What's the feedback that you've received?

4        MR. ANDERSON:  Objection, hearsay.

5        THE COURT:  Sustained.

6  BY MR. HOFFMAN:

7  Q.    Have you -- do you -- have you formed an

8  impression about the reaction of team members?

9        MR. ANDERSON:  Objection, same objection.

10        THE WITNESS:  Yes, I have, I --

11        THE COURT:  Excuse me, you need to wait when

12  an objection is made --

13        THE WITNESS:  Sorry.

14        THE COURT:  -- before you answer.  That's

15  overruled.  He can talk about his own impression.

16  A.    Yes, I have -- I have observed them, they are

17  enjoying it more, they're having more relaxed time.

18  I -- I think they take it to it, and they really like

19  it.

20  BY MR. HOFFMAN:

21  Q.    The team members, do they typically take off all

22  of their, in the processing side of the facility, do

23  they typically take off all of their PPE during the

24  break?

25  A.    Some do, and some don't, you know, it's their

1  preference on -- on if they want to or they don't want

2  to.

3  Q.    For example, today we've seen video and

4  photographs in court of a few members taking a break

5  and sitting at the cafeteria tables wearing their hard

6  hats.  Did most people keep their hard hat on during

7  the break?

8  A.    Right.

9  Q.    And the hair net?

10  A.    Yes, sir.

11  Q.    And the mesh sleeves, we've seen those, in the

12  break room?

13  A.    Yes.

14  Q.    Is that typical?

15  A.    Yeah.  Yeah.

16  Q.    And sometimes the aprons under the mesh sleeves?

17  A.    Yes, sir.

18  Q.    And --

19  A.    They do.

20  Q.    And the mesh aprons?

21  A.    Yes, they wear -- that's their preference if

22  they want, if they want to take it off, they take it

23  off, on some --

24  Q.    Is it fair to say --

25  A.    If they want to wear it in there, they wear it,

1  if they don't want to wear it in there, they don't wear

2  it.

3  Q.    Fair to say that if they choose to don and doff

4  at the rest break, they can?

5  A.    Right.

6  Q.    But they aren't required to?

7  A.    No, they're not required to.

8  Q.    The -- of the -- of the 25-minute rest break, do

9  team members have most of that time --

10  A.    Oh, yeah they most --

11  Q.    -- to enjoy for themselves?

12  A.    Yes, sir.

13  Q.    And are they able to do things like eat and sit

14  down?

15  A.    Yes.

16  Q.    And smoke cigarettes if they're smokers?

17  A.    I've seen them call their wives, you know, I've

18  seen them sit there and go visit with other team

19  members outside, too, just socialize.

20  Q.    Can -- in practice, and as you see it, can a

21  frock be worn in the break room?

22  A.    Yes, sir, they can.

23  Q.    Do you sometimes see frocks in the break room?

24  A.    Yes, sir, I do.  In fact, I wear mine sometimes

25  in there.

1   Q.     You said you wear yours sometimes?

2   A.     Yeah, absolutely.

3   Q.     Back when you worked on the rib line, you

4   wore -- you wore a set of PPE, regularly?

5   A.     Yes, sir.

6   Q.     And of course you do now, too, it's just a

7   lighter set?

8   A.     Yes, sir.

9   Q.     The -- what did you wear when you worked on the

10  rib line?

11  A.     I wore my mesh apron, my hard hat, my earplugs,

12  my hair net, my mesh glove, mesh sleeves, and polar

13  glove.

14  Q.     Were you able to don all of that equipment

15  in -- well, how long did it take you to just put it on?

16  A.     All of it, 45 seconds to a minute, at the most,

17  a minute at the most.

18  Q.     And after you get practiced in putting it on and

19  you have adjustments on the apron, right?

20  A.     Yeah, you just slip it right on.  When you go

21  into orientation and they sit there and they adjust it,

22  they have all the equipment, they start putting it on

23  you, your hard hat, everything to make sure it's going

24  to fit you correctly.

25         So after you're done with that, everything

1  fits correctly, you just, you just put everything on,

2  gear up and go and you're out of there.

3  Q.    And it take you longer or about the same amount

4  of time to doff the equipment, to take it off?

5  A.    About the same amount of time.

6  Q.    So --

7  A.    About the same.

8  Q.    45 seconds to a minute to put it on?

9  A.    45, minute at the most.

10  Q.    About the same?

11  A.    Yeah, about the same to take it off.

12        MR. HOFFMAN:  Mr. Garcia, I have nothing

13  further at this time.

14        THE COURT:  All right.  Mr. Anderson.

15        MR. ANDERSON:  No questions, Your Honor.

16        THE COURT:  All right.  You may step down.

17  Thank you.

18        And may this witness be excused?

19        MR. HOFFMAN:  He may from the defendants'

20  perspective.

21        THE COURT:  And you are excused.

22        Your next witness, please.

23        MR. HOFFMAN:  We'll call Jose Godinez.

24        (Witness is sworn.)

25              JOSE GODINEZ,

 1  called as a witness on behalf of the Defendants, having

 2  been first duly sworn, testified as follows:

 3                    DIRECT EXAMINATION

 4  BY MR. HOFFMAN:

 5  Q.    Good afternoon, Mr. Godinez.

 6  A.    Good afternoon.

 7  Q.    Could you turn and introduce yourself to the

 8  jury?

 9  A.    Jose Godinez.

10  Q.    And, Mr. Godinez, where are you from?

11  A.    Finney County, Kansas, Garden City.

12  Q.    And how long have you lived there?

13  A.    All my life; 25 years.

14  Q.    And you -- are you currently employed at the

15  Finney County plant for Tyson?

16  A.    Yes, I am.

17  Q.    How long have you been employed?

18  A.    Eight years.

19  Q.    And what is your current position with Tyson?

20  A.    Production supervisor, slaughter division.

21  Q.    What does that job entail?

22  A.    Um, basically I'm -- I manage my employees and I

23  look out for safety, for their general safety.

24  Q.    How many employees do you manage or that report

25  to you?

1   A.     Fifty-two.

2   Q.     Is that a particular group of the slaughter

3   employees?

4   A.     Yes, in my department, 17B.

5   Q.     And what is -- I'm sorry, what department?

6   A.     In my department, 17B.

7   Q.     What -- what is the name of the department?

8   A.     It's 17B, just --

9   Q.     17B, I'm sorry.  And what -- does it have a name

10  other than a number?

11  A.     Just a second skinning line.

12  Q.     And how long have you been in that management

13  position?

14  A.     For seven years.

15  Q.     Before you became a supervisor, a production

16  supervisor, were you a line worker?

17  A.     Yes, I was, I was a regular employee.

18  Q.     And what -- what was your job as a team member?

19  A.     I was a low backer.

20  Q.     What does a low backer do?

21  A.     Basically what it is, is you use an air knife to

22  remove the hide from the four quarters and the area of

23  the back.

24  Q.     And what part of the -- that was of course in

25  the slaughter facility?

1    A.    Yes, it was.

2    Q.    And what part of the line was the low back

3  position, is it near the front of the line or middle?

4    A.    It's in the middle area.

5    Q.    Is that around the same area that you're the

6  production supervisor of?

7    A.    Yes, it is.

8    Q.    And do you, in your current position, wear

9  protective equipment?

10    A.    Yes, we do.

11    Q.    What -- what items of equipment do you wear?

12    A.    Do I wear personally?  Well, I wear a helmet,

13  earplugs, hair net, a mesh apron, mesh glove, polar

14  sleeves, polar gloves, and a rubber apron, rubber

15  boots.

16    Q.    Do you sometimes wear shin guards?

17    A.    Yes, I do.

18    Q.    And do you -- do you sometimes wear all of the

19  items of PPE that are designated for positions that you

20  supervise?

21    A.    Yes, I do most of the time I do wear all PPE

22  equipment.

23    Q.    And why is that?

24    A.    Basically I generally wear it because of

25  sometimes I have to be in different areas, sometimes I

1  have to perform different jobs, if I'm -- I have to

2  take a team member's place.

3  Q.    And why would you have to take a team member's

4  place?

5  A.    Um, sometimes they -- they ask to go to the

6  nurse, I -- if I don't have nobody to put there I jump

7  in myself or I find somebody or if they need to go to

8  the restroom, I personally get on the line and let them

9  go.

10 Q.    Do you have any role in training employees?

11 A.    Yes, I do.

12 Q.    Do you -- what I really want to ask about is the

13 use of the Job Safety Analysis, and whether or not you

14 use the Job Safety Analysis in your training of

15 employees?

16 A.    Yes, yes, I do.

17 Q.    What is the -- what are you -- what process do

18 you go through?

19 A.    First of all, we introduce ourselves, I

20 introduce myself, I get them familiarized with the

21 plant, with the safety procedures and then I introduce

22 them to their JSA, the Job Safety Analysis, and I go

23 through it with them and I let them know the -- the

24 hazards and that's basically it.

25 Q.    Do you talk to them about what items of

1  equipment are required for their position?

2  A.    Yes, yes, I do.

3  Q.    Do you talk to them about what items of

4  equipment are optional for their position?

5  A.    Yes.

6  Q.    And have you -- do you ever require of employees

7  that you supervise, that they wear items of equipment

8  that are not required items for the job that they

9  perform?

10  A.    No, I don't.

11  Q.    If they choose to wear other items, do you

12  object to them?

13  A.    No, it's their preference, whatever they feel

14  comfortable with.

15  Q.    And do -- do some of the employees that you

16  supervise, do they choose to wear items that aren't

17  required?

18  A.    Yes, yes, they do.

19  Q.    There's been a lot of discussion today and in

20  some other days in the trial, about wearing the white

21  uniform.  And do all of the employees in the slaughter

22  side of the facility, they wear the white uniform?

23  A.    Yes.

24  Q.    Do you wear a white uniform?

25  A.    No, I do not, I wear a tan and a khaki and a

1  brown pants uniform.

2  Q.    When you were -- when you worked on the line

3  back seven years ago in the slaughter side, did

4  you -- did you then wear a white uniform?

5  A.    Yes, I did.

6  Q.    And the questions I want to ask you about, are

7  you aware or have you ever observed employees wearing

8  the white uniform into the plant from their home?

9  A.    Yes, I have.

10  Q.    And when you see that, do you object to it or

11  protest?

12  A.    No, I don't, me myself as an employee, I wore my

13  white uniform home.

14  Q.    So when you worked on the line and wore a white

15  uniform, that was your practice?

16  A.    That was my practice.

17  Q.    You -- did you wear it both to work and home

18  from work?

19  A.    Yes, I did.

20  Q.    When -- at the end of the day, if you -- if you

21  chose to have it laundered at -- at the plant, could

22  you put it in the laundry facility there?

23  A.    Yes, I could.

24  Q.    And how many uniforms did you have?

25  A.    I had two, but if I needed more I was -- they

1  gave me more.

2  Q.    Did -- are you aware of other employees having

3  more than two uniforms?

4  A.    Yes.

5  Q.    Did anybody ever tell you when you were a line

6  worker that you weren't allowed to wear the white

7  uniform to work?

8  A.    No, I was never told.

9  Q.    And how do -- I guess how do employees become

10 aware that that's okay?  That just you see other people

11 doing it?

12 A.    Yeah, they see other people doing it and we have

13 no objection to that.

14 Q.    So, tell me the process.  You would wear your

15 uniform in, put your PPE on for the job, do the -- do

16 the job through the day and then at the end of the day

17 would you -- would you have brought clothes with you or

18 would you just wear the uniform home?

19 A.    No, I would just wear my second uniform that I

20 already had laundered already clean, I would put that

21 on and wear it home.

22 Q.    So you would wear your clean uniform home and

23 would you leave your dirty uniform there at the plant?

24 A.    Yes, to be laundered.

25 Q.    And then it would be clean and dry for you the

1  next day?

2  A.     Yes, sir.

3  Q.     Did you think that was a benefit to you that the

4  company provided laundry and clothing for you?

5  A.     Yeah, it was a major benefit for me.

6  Q.     Have you -- have you ever denied an employee

7  working under you a bathroom break?

8  A.     No, I haven't.

9  Q.     Is it Tyson's policy to allow employees bathroom

10 breaks whenever they request one?

11 A.     Yes, it is.

12 Q.     And is that the practice?

13 A.     Yes.

14 Q.     That you see on the floor?

15 A.     That is the practice, day-to-day practice.

16 Q.     And if they have to go on a bathroom break, do

17 you sometimes fill in for them yourself?

18 A.     Yes, um, I ask them, if they ask me, I need to

19 go to the bathroom, I ask them, can you wait 'til I

20 find somebody?  Or if they tell me it's an emergency, I

21 myself, personally jump in the line and I let them go.

22 Q.     The -- the equipment that you wear, would you

23 say that you wear as much or more PPE than anybody else

24 on the slaughter side of the plant?

25 A.     I wear a little more due to the -- the nature of

211

1   my job.

2   Q.   Because you're doing some times through the day

3   all of those maybe all of those 50 jobs?

4   A.   Yes, yes.

5   Q.   And are you able to put on your equipment

6   quickly?

7   A.   Yes, I am.

8   Q.   Would you say -- let me just ask it this way.

9        Do you think that putting it on and taking it

10  off, the two things together, is that -- does it take

11  you more or less than four minutes?

12  A.   It's less.

13  Q.   About how much time does it take you to put on

14  and take off all of your equipment?

15  A.   To put it on it doesn't take me very long,

16  less -- less than a minute.  To take it off it's even

17  faster.

18  Q.   And then to put all of the items fitted to you

19  personally?

20  A.   Yes, they are, they are adjusted to me myself.

21  Q.   And mostly throw on over your head or just slide

22  on and snap?

23  A.   Everything is basically just slide on over, just

24  put it on, slips on and that's it.

25  Q.   Are the snaps made to be quick and easy to put

1  on?

2  A.    Yes, they are.

3  Q.    And off?

4  A.    Yes, they are.

5  Q.    In your experience and observation, is four

6  minutes time for donning and doffing of the protective

7  equipment that you wore in your job a reasonable amount

8  of time, a reasonable estimate of the time that is

9  actually required to do that job?

10  A.    Yes, I feel it's very reasonable.

11        MR. HOFFMAN:  I have nothing further, Mr.

12  Godinez.

13        THE COURT:  Cross examination?

14        MR. DIRKS:  Yes.

15              CROSS EXAMINATION

16  BY MR. DIRKS:

17  Q.    Good afternoon, Mr. Godinez.

18  A.    Good afternoon.

19  Q.    Just a couple questions.  So you had mentioned

20  that you had two sets of whites, right?

21  A.    Yes, sir.

22  Q.    And so at the end of the day, you had -- this is

23  when back when you were working on the kill floor, is

24  that right?

25  A.    Yes, sir.

1   Q.    And would -- would your uniform get dirty while

2   you are working on the kill floor?

3   A.    Yes, it would.

4   Q.    And so then at the end of the day, you would

5   actually change out of the dirty uniform and obtain a

6   clean uniform and wear that home, right?

7   A.    Yes, I would.

8   Q.    Okay.  And you wouldn't want to wear the bloody

9   or dirty uniform on your drive home to home, would you?

10  A.    No, I wouldn't.

11  Q.    That wouldn't be -- that wouldn't really be

12  practical, would it?

13  A.    No.

14  Q.    And so then the next morning you would actually,

15  you'd have your white uniform that you wore home, clean

16  white uniform, you come into the facility and then you

17  would put on the rest of your PPE and other gear,

18  right?

19  A.    Yes, I would.

20         MR. DIRKS:  Nothing further.

21         MR. HOFFMAN:  I have no additional questions.

22         THE COURT:  All right.  Thank you.  You may

23  step down.

24         May this witness be excused?

25         MR. HOFFMAN:  He may from the defendants'

```
 1  view.
 2           MR. DIRKS:  Yes.
 3           THE COURT:  You may be excused.
 4           Your next witness please.
 5           MR. O'DEAR:  Your Honor, before we call our
 6  last witness we would like to read a few more
 7  stipulated facts to the jury, if we could do that.
 8           THE COURT:  Have you gone over those with the
 9  plaintiffs or let them know what they are?
10           MR. MUELLER:  Yes.
11           MR. O'DEAR:  Yeah.
12           THE COURT:  Okay.  That's fine, go ahead, Mr.
13  O'Dear.
14           MR. O'DEAR:  All right.  Stipulated Fact
15  Number 30.  The payroll data produced by Tyson to
16  plaintiffs' counsel in this litigation is believed to
17  be authentic and accurately represents the compensation
18  paid to workers at the Finney County facility during
19  the time period included in the data.
20           Stipulated Fact Number 37 from the pretrial
21  order.  The production time for which an employee is
22  paid may be less than the time between the swipe in and
23  swipe out, but the swipe in/swipe out does not measure
24  production time.
25           Stipulated Fact 41.  For at least some part of
```

1   the class period employees in the slaughter area at the

2   Finney County plant have been eligible to receive

3   "sunshine pay" meaning that if they complete

4   production, (i.e. kill and process) the required number

5   of head of cattle for the day in less than the posted

6   production time for the shift, they would be allowed to

7   leave after the last piece of product passes their work

8   station and are still paid for some or all of the

9   posted production time.

10         Stipulated Fact 42.  Production employees at

11  the Finney County facility were "guaranteed hours" of

12  paid time up to a certain number of hours per week for

13  a certain number of weeks per year that they reported

14  to work.

15         Stipulated Fact 44.  Some team members may

16  wear additional sanitary and protective clothing not

17  required by Tyson.

18         Stipulated Fact 46.  On the slaughter side,

19  the start time for each position on the chain is

20  predetermined, based upon when the first piece of

21  product is scheduled to arrive at a given work station.

22         And Stipulated Fact 47, the last one.  On the

23  processing side, team members have a set time to report

24  to their work station.  This time varies from one job

25  to another, but is generally when the first piece of

1   product reaches their work station.

2          Thank you.

3          THE COURT:  Thank you.  All right.  Your next

4   witness.

5          MR. MUELLER:  This will be our last witness.

6   Defendant calls Doctor Jeffrey Fernandez.

7          (Witness is affirmed.)

8          MR. MUELLER:  Your Honor, with this witness, I

9   would like to give -- I won't use my full two minutes,

10  but my summary.

11         THE COURT:  Sure.

12         MR. MUELLER:  Ladies and gentlemen, I believe

13  with this witness we will establish the following

14  facts.  Doctor Jeffrey Fernandez is an industrial

15  engineer with experience in time studies but he's not

16  affiliated with either side in this case.  We have

17  called him here today as a fact witness not as an

18  expert witness, like you heard earlier in the case,

19  offer some opinion testimony.

20         Doctor Fernandez is the person who led the

21  time study team for the United States Department of

22  Labor when the Department of Labor was attempting to

23  verify Monty Hahn's conclusion of four minutes for the

24  K-code in 1998, at the end of the Reich vs. IBP

25  litigation.

1            The Department of Labor and Doctor Fernandez

2    picked two plants from that lawsuit to be

3    representative of all the plants in the case, which

4    includes Finney County.

5            Doctor Fernandez received Monty Hahn's four

6    minute number and supporting spreadsheet that he

7    testified about, and that his industrial engineers had

8    measured for all the knife users at all eleven plants

9    in that case.

10           The Department of Labor then asked Doctor

11   Fernandez if he could verify IBP's four minute number

12   and the Department of Labor gave Doctor Fernandez free

13   leave to design a study of his own to do that.

14           He and his team then visited the Emporia and

15   Storm Lake plants, which were two of the eleven plants,

16   for one or two days each in November of 1998.  They

17   videotaped employees doing activities, they watched the

18   tapes, they analyzed them, they measured each activity

19   separately using the same elemental approach that you

20   heard Monty Hahn testify about, and then he made --

21   Doctor Fernandez made statistical calculations, he

22   wrote a report, gave it to the Department of Labor,

23   explained his conclusions.

24           And his conclusion was that IBP's four-minute

25   K-code number was quote verified and can be accepted as

1    true and representative.

2                    JEFFREY FERNANDEZ,

3    called as a witness on behalf of the Defendants, having

4    been first affirmed, testified as follows:

5                    DIRECT EXAMINATION

6    BY MR. MUELLER:

7    Q.    Good afternoon, Doctor Fernandez.

8    A.    Good afternoon.

9    Q.    Do you prefer to be called Doctor or Mister?

10   A.    Doctor is fine.

11   Q.    Okay.  Where do you presently live, sir?

12   A.    Fairfax, Virginia.

13   Q.    And what is your occupation?

14   A.    I'm an industrial engineer.

15   Q.    Do you do any teaching?

16   A.    Yes, I do.

17   Q.    Where?

18   A.    At Catholic University.

19   Q.    And do you do any consulting work?

20   A.    I do, I consult.

21   Q.    Can we agree you are not testifying here as an

22   expert witness for either side in this trial?

23   A.    Yes.

24   Q.    And do you understand you're testifying as a

25   fact witness about some events that happened in the

1  past?

2  A.    That happened 12, 13 years ago, yes.

3  Q.    Okay.  Are you currently employed or engaged in

4  any way now by Tyson Foods or Tyson Fresh Meats?

5  A.    No.

6  Q.    Okay.  And in the interest of disclosure, am I

7  correct that after you worked for the Department of

8  Labor, in 1998, did you do any work for Tyson Foods?

9  A.    Yes, I did.

10  Q.    Okay.  And were you a consultant in some

11  litigation after 1998?

12  A.    Yes, I was.

13  Q.    And did that end in the -- has that ended?

14  A.    It ended about two years ago.

15  Q.    So have you worked for Tyson at all in the last

16  two years?

17  A.    No, I have not.

18  Q.    And same with IBP, I mean it doesn't exist but

19  have you worked for IBP in any time recently?

20  A.    Well, IBP was bought by Tyson.

21  Q.    Okay.

22  A.    But for the last two years I have not.

23  Q.    I didn't know if you knew that.

24        In the -- do you have any expectation of

25  receiving anything from Tyson today other than

1  reimbursement for your ordinary travel expenses and

2  time?

3  A.    No.

4  Q.    Okay.  Is that a condition of your being willing

5  to come here?

6  A.    Yes.

7  Q.    Are you currently employed or engaged by

8  plaintiffs in this case?

9  A.    No.

10 Q.    Are you independent of both sides?

11 A.    Yes, I am.

12 Q.    Did you let me ask you some questions yesterday

13 by telephone?

14 A.    Yes.

15 Q.    And did you let me talk to you for a few minutes

16 in the witness room outside this morning?

17 A.    Yes.

18 Q.    And did you talk to Mr. Hanson and Mr. Anderson

19 on the phone last weekend?

20 A.    Just last weekend.

21 Q.    Okay.  So you talked to both sides?

22 A.    Yes, I have.

23 Q.    And did you come here at my request?

24 A.    Yes.

25 Q.    And let me just ask you some questions about

1  your credentials, I'm not trying to establish you're an

2  expert, I just want to know what background you had

3  before you did this work for the Department of Labor in

4  1998.

5        What's your educational background?  And don't

6  tell us anything after 1998.

7  A.    I have a bachelor's in mechanical engineer, a

8  master's and a PhD from Texas State University,

9  Lubbock, Texas in industrial engineering.  I was a

10 professor of industrial engineering at Wichita State

11 University in Wichita, Kansas, for 13 years.  And I am

12 a registered professional engineer and a certified

13 ergonomist.  I was a tenured full professor at Wichita

14 State University.

15 Q.    What department were you a professor in at

16 Wichita State?

17 A.    In the department of Industrial and

18 Manufacturing Engineering.

19 Q.    And what courses did you teach?

20 A.    I taught classes in ergonomics, bio mechanisms,

21 physiology, time and motion study, statistics, and a

22 few other classes.

23 Q.    And before you worked for the Department of

24 Labor, had you done any work for any other government

25 agencies?

1  A.    I worked for the Department of Justice, the

2  Department of Education, and IOSH, which is the

3  Department of Health and Human Services.

4  Q.    Did you do any work for OSHA?

5  A.    Yes, I had worked for OSHA before that.

6  Q.    And as of 1998, had you ever previously been

7  hired as an expert or a consultant for IBP or Tyson

8  Foods?

9        That is, before 1998, before you did the work

10 for the Department of Labor, did you ever work for us?

11 A.    Never.

12 Q.    Okay.  And so let me ask you, did there come a

13 time in 1998 when the Department of Labor reached out

14 to you to ask if you might be willing to do some work

15 for the Department of Labor?

16 A.    Yes.

17 Q.    Who called you?

18 A.    Mike Stabler.

19 Q.    Is he with the Department of Labor Solicitor's

20 Office in Kansas City?

21 A.    Is he a regional director of the office in

22 Kansas City, yes.

23 Q.    And we heard about some testimony about Mr.

24 Stabler yesterday.

25        Just generally speaking, what did Mr. Stabler

1  discuss with you?

2         And I'm not trying to establish the truth of

3  anything he said, I'm just trying to establish whether

4  or not he hired you and what he wanted to hire you to

5  do.

6  A.    He asked me whether I -- I was working on

7  another case for Mr. Stabler and some attorneys in that

8  office, it was against Tyson, and he asked me whether I

9  was interested in -- whether I was familiar with time

10  and motion study and I said I was teaching it at that

11  time and he asked me whether I would be interested in

12  working with them on a case against IBP.

13  Q.    And go ahead, I'm sorry.

14  A.    At that time, that was the extent of the

15  discussion and I said, yes and then he said we have to

16  get some paperwork completed and so on.

17  Q.    So after you did that paperwork, did you

18  eventually get hired by the Department of Labor on this

19  new project against IBP?

20  A.    Yes.

21  Q.    Okay.  And after you got hired or maybe as part

22  of the process of getting hired, what did they tell you

23  that they wanted you to do?

24  A.    Initially they told me they wanted me to attend

25  the meeting where the IBP engineers were going to

 1   present the results.  Based on the results they said

 2   that we will have to go ahead and review the results

 3   and then discuss what we needed to do, design a study.

 4   At that time, we did not know what the results, what

 5   they were going to present and what was going to

 6   happen.

 7   Q.    Okay.  Who was it telling you they wanted you

 8   to -- I don't know how you just put it.  What did you

 9   say about the numbers, do what with the numbers?

10   A.    Review the numbers, I think that's what I said.

11   Q.    And after you reviewed the numbers, did they ask

12   you to do anything else?

13   A.    We attended the meeting, the engineers, when I

14   say "we" a couple of lawyers from the Department of

15   Labor Solicitor's office and myself attended this

16   meeting where the IBP engineers presented their numbers

17   and we took those numbers, went back to the office and

18   then they asked me to look at those numbers, look at

19   those spreadsheets and then they sent me up to design a

20   study and I had to go back and then think about a study

21   and we just designed a study.

22   Q.    And how many plants, if you recall, were

23   involved in this study?

24   A.    I looked at two plants, there was a list of

25   plants, I was given a list of plants that -- that the

1  IBP engineers had reviewed.  I do not remember the

2  list, but there was a list.  Out of that list we

3  selected two.  One hog and one beef facility.

4  Q.    Do you know whether or not the plants were union

5  or nonunion plants?

6  A.    They were nonunion, I do remember that aspect.

7  Q.    Without the exact number, do you know whether it

8  involved all of IBP's nonunion plants?

9  A.    I do not know that.

10  Q.    Okay.  Now, you said you selected two plants.

11  How did that process go?  In terms of picking the

12  plants?

13  A.    We needed a plant that had kill and processing,

14  both aspects; we needed a plant where it was two

15  shifts, so we can get as much data as fast as possible;

16  and I was looking for a facility that was pretty close

17  to Wichita, Kansas.

18  Q.    And which plants did you end up selecting?

19  A.    We selected Emporia and we -- Emporia, Kansas,

20  and we selected Storm Lake, Iowa.

21  Q.    And was the Emporia, Kansas plant, was that a

22  beef plant?

23  A.    Yes, it is.  Was.

24  Q.    And I'm sorry?

25  A.    Yes, at that time it was a plant, I'm not sure

1  if it is a plant now.

2  Q.    Oh, okay.  And Storm Lake, what was that a hog

3  plant?

4  A.    That is a hog plant.

5  Q.    And did the Department of Labor have any input

6  into your selection?  I mean, did you pick them or how

7  did that work?

8  A.    I selected them, they okayed them, and basically

9  they asked me would this be representative and I said,

10  yes, I felt it was representative.

11  Q.    Okay.  And did they give you instructions on the

12  rigor or the process with which you had to do your

13  work?

14  A.    They were concerned about the repeatability and

15  they said quality -- quality assurance, quality control

16  was important and they made sure that the method I used

17  for video analysis involved two individuals and I was

18  careful about the numbers.

19  Q.    What do you mean two individuals?

20  A.    Two -- two people looking at the videotapes, so

21  just because one person looking at it coming up saying

22  this is how long it took, because I used videotapes, as

23  opposed to the IBP engineers that were using a stop

24  watch.

25  Q.    And when you saw the numbers that you said IBP's

1   engineers gave you on a spreadsheet, were there numbers

2   for each plant?

3   A.     There were numbers for each of those plants,

4   yes.

5   Q.     Was there an all-in average number for all of

6   the plants?

7   A.     There was an average number in there, in the

8   report, which I don't have in front of me and I don't

9   have in my possession, in my files.

10  Q.     You mean IBP's report?

11  A.     IBP's report, yes.

12  Q.     Okay.  We have already seen that.  What's

13  your -- what's your recollection of what the number was

14  they showed you that you were trying to verify?

15  A.     It was somewhere between 3.9 and 4, slightly

16  less than 4, but I don't know the number.

17  Q.     Okay.  So was that the number, whatever it is,

18  slightly less than four minutes you're trying to

19  verify?

20  A.     Yes.

21  Q.     Now did you end up going to those plants you

22  mentioned?  Emporia and Storm Lake?

23  A.     Yes, I did, I visited both -- both those plants,

24  yes.

25  Q.     And what then?  Did you go to one or both of

1  them first to look at it?

2  A.    We were using the -- we were using a video

3  camera, this is 13 years ago, where video cameras were

4  a little different technology wise, and so we would do

5  that.  The steam, if you use it in the steam you

6  wouldn't be able to see through it so the IBP's

7  engineer said we wouldn't be able to do it, so we went

8  to Emporia, just to check whether we could use those

9  cameras and at that time it was state of the art VHS

10 camera that was supposed to have this switch that would

11 help -- some times it did, sometimes it didn't -- with

12 steam was concerned, so we went initially just to check

13 it out and see whether we could use -- we could use

14 cameras there.

15 Q.    And when was -- what month was that?

16 A.    That was -- that was October, 1998.

17 Q.    And did the cameras work?

18 A.    Sometimes they did, sometimes it didn't, it

19 fogged up.

20 Q.    And when they fogged up, what did you do?

21 A.    Tried to clean up.

22 Q.    Okay.  And did you get enough data points?

23 A.    We weren't look -- at that time we were not

24 looking for data points.

25 Q.    Okay.

1   A.    At that point we were just looking whether we

2   could use it.

3   Q.    All right.  Let me just ask about your actual

4   study then.  When did you go to Emporia?

5   A.    Looking at my report, if I'm not mistaken, it

6   was the 12th of November and the 13th of November,

7   1998.

8   Q.    And did anyone go with you?

9   A.    I had some graduate students go with me.

10  Q.    And when did you go to Storm Lake?

11  A.    19th of November.

12  Q.    Of 1998?

13  A.    1998.

14  Q.    And generally speaking, what did you do while

15  you were in those plants?

16  A.    We videotaped employees donning, doffing, and

17  washing, or cleaning, as they call it.

18  Q.    And while you were in the plants, did you do

19  anything to determine if you got a big enough sample?

20  A.    IBP had their spreadsheets and they had the

21  samples for each of their numbers, what we were trying

22  to do is the instructions I got from the Department of

23  Labor is to ensure that my numbers were higher than

24  IBP's numbers, so every time we videotaped for a

25  session, we would go back either if it was Emporia then

1  we went back to Wichita we would look at the tapes and

2  see how many data points we had, instead of later on we

3  found that the duration but initially we just found out

4  how many data points.

5          When we were in Storm Lake, we'd go back to

6  the hotel room and check it so we made sure that we had

7  more than IBP's numbers.

8  Q.    And by numbers, do you mean sample sizes?

9  A.    Samples, the number of dates that that collected

10 the data, sample sizes, yes.

11 Q.    And did you get enough samples to your

12 satisfaction?

13 A.    We got more than IBP's numbers, yes.

14 Q.    And did you do any statistical analysis with

15 numbers?

16 A.    Initially after we got the numbers, we did the

17 video analysis when we went back to Wichita and after

18 that, yes, after we compiled the data we did

19 statistical analysis.

20 Q.    Did you prepare a report?

21 A.    Yes, I did.

22 Q.    And were you the author of the report?

23 A.    Yes.  Along with my graduate students who

24 supported me.

25 Q.    And did anyone at the Department of Labor tell

1  you what outcome to reach in terms of the specific

2  number that you should reach?

3  A.    No.

4  Q.    Was your conclusion independent?

5  A.    Yes.

6  Q.    I would like to show you something we've marked

7  as Exhibit 5012.

8        Take a look at it, thumb through it if you

9  need to look at each page.

10        I just want to ask you if it is a true and

11  correct copy of the report.

12  A.    Yes.

13  Q.    And --

14  A.    This is the report I wrote.

15  Q.    Okay.  And did you create that report as a

16  consultant retained by a government agency in order to

17  make fact findings?

18  A.    Yes.

19  Q.    Did you turn your report in to the Department of

20  Labor?

21  A.    Yes.

22  Q.    I would just like to put a copy of it on the

23  projector.

24        MR. MUELLER:  But, Your Honor, move for

25  admission of 5012.

1          MR. HANSON:  Can we approach on this very

2  quickly?

3          THE COURT:  Sure.

4          (The following sidebar conference was had

5          outside the presence of the jury:)

6          MR. HANSON:  This is the issue that we've been

7  building up to.  We understand that Doctor Fernandez's

8  testimony goes to the concept of willfulness, that

9  Tyson reasonably relied on a four minute study to

10  implement its K-code costs, although Mr. Mueller has

11  taken ostensible pains to say you're not an expert in

12  this case, the jury will never be able to understand

13  that this report is not an expert report for this case.

14          I think it is perfectly appropriate for the

15  witness to testify what he did, to lay the foundation

16  for a reliance defense, but I'm afraid that Mr.

17  Mueller's intentions are further than that.  They are

18  going to want the jury to rely substantively on his

19  report to show that in actuality, four minutes was

20  reasonable in Finney County, where he never visited.

21  At all.

22          THE COURT:  In 1998?

23          MR. HANSON:  In 1998.

24          MR. MUELLER:  Goes to weight, not -- it meets

25  every exception to the government fact finding

1  exception to hearsay rule.  It is being offered for two

2  purposes:    A probative measurement, which I concede

3  was not from Finney, but the Government thought was

4  representative of Finney; and to willfulness.

5          And it meets all of the evidentiary

6  requirements to come in.

7          THE COURT:  I am going to let him testify as

8  to stuff in the report but I'm not going to admit the

9  report any more than I would let an expert report when

10 the expert is on the stand testifying.

11         MR. MUELLER:  May I publish -- we talked about

12 this.

13         THE COURT:  You can publish parts of this --

14         MR. MUELLER:  That's all.

15         THE COURT:  -- as you are asking him and if

16 you are going to be using it more as a visual aid --

17         MR. MUELLER:  Yes.

18         THE COURT:  -- than as an exhibit admitted.

19         MR. HANSON:  It will not be admitted in to

20 evidence?

21         THE COURT:   That's correct.

22         (Side bar concludes and proceedings then

23         continue in open court:)

24 BY MR. MUELLER:

25 Q.    So, Doctor Fernandez, I have my own copy here.

1  Is that the front page of your report?

2  A.     Yes, it is.

3  Q.     And is that your name at the top?

4  A.     Yes, it is.

5  Q.     Who are all these other people?

6  A.     These are graduate students, these were graduate

7  students of mine.

8  Q.     Okay.  And what's the date on the report?

9  A.     December 14, 1998.

10  Q.     And who does it say you submitted it to?

11  A.     The Hour and Wage, U.S. Department of Labor.

12  Q.     Okay.  And on the second page, what is this?

13  A.     This is table of contents.

14  Q.     Okay.  Could you just tell us briefly, by

15  looking at the table of contents, what it is you did or

16  said in this report?

17  A.     Basically, I have an executive summary,

18  summarizes everything up front, the introduction, where

19  we went and so on, the method, how we collected our

20  data, the strategy, the classification, instructions to

21  my graduate students, how to collect the data, how we

22  did the video analysis, how we analyzed it, the

23  statistical methods we used, what were the limitations,

24  and then the statis -- the 4.1 is results and

25  discussions, basically this reports how we did the

1  statistical analysis.  And the results, the concluding

2  remarks, is point 5 and then the Appendices.

3          MR. MUELLER:  Your Honor, can I try and put

4  that poster to block the sunlight?  It's making it hard

5  to read the screen.

6          THE COURT:  Sure.  A low tech solution to a

7  high tech problem.

8          MR. MUELLER:  Always look for the cheap way

9  out.

10          MR. HANSON:  Just wave.

11          THE COURT:  Thank you.  If you would do that

12  or throw something in the air or something, Mr. Hanson.

13          MR. MUELLER:  This is like something out of

14  Stonehenge, you know, the sun comes through just when

15  you need -- don't need it.

16  BY MR. MUELLER:

17  Q.    Okay.  So, let me look at -- have you turn to

18  your Table 1.

19  A.    Yes, sir.

20  Q.    And what -- what does Table -- Table 1 tell us

21  you did?

22  A.    These are the various items that we first column

23  is we put on in pre shift, removed in post shift, and

24  then washed or cleaned in post shift.

25  Q.    Okay.  And did you also measure waiting to dip

1   and dipping equipment?

2   A.     Yes, I did.

3   Q.     And did you measure walking to the wash station

4   and waiting for the wash station post shift?

5   A.     Yes.

6   Q.     Okay.  And then also, sanitize -- well, gather

7   equipment, waiting to dip and dipping, did you measure

8   those post shift?

9   A.     Yes.

10  Q.     Okay.  Were these the same activities that Mr.

11  Hahn or the industrial engineers at IBP had also

12  measured?

13  A.     In general, yes.

14  Q.     Okay.  And did you measure each of these things

15  one by one?

16  A.     Yes.

17  Q.     Okay.  Is that called an elemental approach?

18  A.     The elemental approach is where you measure it

19  independently, a start point and an end point and

20  measure it.

21  Q.     And was the Department of Labor accepting of

22  that method?

23  A.     That's the method -- yes, they were.

24  Q.     Okay.  And then on Pages 5 to 6 it says, when

25  you did -- what does this tell us?

1   A.    This tells us where these activities occurred,

2   in the cafeteria, in the hallway, where -- where I

3   measured these.

4   Q.    Okay.  So go ahead.

5   A.    The pre-shift dipping was occurring at the dip

6   station, the post shift removal where these were at

7   these locations, the work station, at the wash stations

8   and the aisles and while walking.

9   Q.    Just a few more questions.  I want to look at

10  your executive summary.

11        If you want you can follow on Page 1, numbered

12  Page 1.

13        And can you tell us what your results were?

14  And in particular, I'm interested in a couple sentences

15  I highlighted, but you shouldn't feel restricted to

16  that.

17  A.    "Results indicated that the total time at

18  Emporia as we measured it was 4.42" -- excuse me, sir.

19  Do you want me to read --

20  Q.    Right.

21  A.    -- verbatim was what is on this?

22  Q.    You can read the highlighted sentence and then

23  tell us about.

24  A.    It results indicated that the total time at

25  Emporia was 4.140 minutes, IBP was 5.2207 minutes.  And

1   at Storm Lake was 3.6362 minutes, IBP equal to 3.3568

2   minutes.

3   Q.     And what does it mean IBP equal?  What were you

4   saying when you had one number that you reached

5   compared to another number in parenthesis?

6   A.     The 4.1 -- 4.140 number is what we calculated,

7   IBP had calculated at Emporia, 5.2207.

8   Q.     So Emporia was your number lower than IBP?

9   A.     Yes.

10  Q.     Okay.  By 1.1 minutes?

11  A.     By one point something minutes, yes.

12  Q.     Is that per day?

13  A.     That is per shift, yes.

14  Q.     Oh, per shift.  Okay.  And then at Storm Lake,

15  what does that mean in parenthesis?

16  A.     Our number was 3.6362 minutes and IBP had

17  calculated a number of 3.3568 minutes.

18  Q.     So you came up with something about 20 seconds

19  higher than IBP's number?  Per day?

20  A.     Was slightly higher, I have not calculated it.

21  Q.     But point, roughly .3 minutes higher?

22  A.     Yeah.

23  Q.     Is that 20 seconds?

24  A.     About 3.3 minutes higher, yes.

25  Q.     Well, at -- IBP's number was 3.3 minutes, right?

1  A.    Our number was -- IBP's number was lower than

2  ours by 3. -- by .3 minutes.

3  Q.    Okay.  20 seconds?  Is that what point three

4  times sixty, is about 18 seconds?

5  A.    Eighteen seconds, yes.

6  Q.    Okay.  Now, can you read the next sentence I

7  highlighted?

8  A.    "Based on these results, as can be concluded

9  that the IBP data (supplied to the U.S. Department of

10 Labor on October 2nd, 1998) has been verified and can

11 be accepted as true and representative."  (Quoted as

12 read.)

13 Q.    And then in your conclusion?  Do you have a

14 conclusion?

15 A.    Yes.

16 Q.    Can you just read into the record your

17 concluding remarks?

18 A.    "Based on the results of the study, it can be

19 concluded that IBP proposed time for pre-shift put on,

20 post shift removal, and post shift cleaning for the two

21 plants are not different from our calculated time and

22 the study verified IBP results in the two plants.

23 Based on the sample of these two plants, it is

24 recommended that the IBP data supplied to the U.S.

25 Department of Labor on October 2nd, 1998 can be

1   true -- can be accepted as true and representative.

2         IBP may want to consider monitoring and

3   regulating variable time activities on a regular basis

4   so as to efficiently manage worker related compensable

5   time."  (Quoted as read.)

6   Q.    And were you recommending their audits to happen

7   after this number was derived?

8   A.    Could you explain to me what you mean, sir?

9   Q.    What do you just mean by that last sentence?

10  A.    That variable times were the times were wait to

11  wash, wait to dip, what we were trying to tell them

12  there is, that they need to -- they need to monitor

13  that more closely and if they wanted to keep that

14  number down, they needed to take care of it.

15  Q.    And one last question.  You told me earlier that

16  the number, the all-in number you were trying to verify

17  was somewhere between 3.9 and 4.0 minutes a day.  When

18  you say the IBP data be accepted as true and

19  representative, is that the number you were referring

20  to?

21  A.    I was taking it -- I was thinking -- I mean I

22  was representative of all the facilities.

23  Q.    And was that number approximately four minutes?

24  A.    It was between 3.9 and 4, whatever that number

25  was, yes.

```
 1              MR. MUELLER:  Thank you, sir.
 2              THE COURT:  Thank you.  Cross examination?
 3                    CROSS EXAMINATION
 4  BY MR. HANSON:
 5  Q.    Good afternoon, sir.
 6  A.    Good afternoon.
 7  Q.    Just to clarify a little bit of background.
 8  You're not testifying today as an expert witness,
 9  right?
10  A.    That's right, sir.
11  Q.    You've been asked by Tyson to testify only as a
12  fact witness?
13  A.    Yes, sir.
14  Q.    You're not prepared today to offer any expert
15  testimony to our jury, correct?
16  A.    Yes.  That's right.
17  Q.    Do you even know what Tyson wants you testify at
18  this trial?
19  A.    They asked me to -- regarding this particular
20  document, that's all.
21  Q.    You have never been to the Finney County
22  facility at issue in this case, correct?
23  A.    I have not.
24  Q.    You've never done a time study at the Finney
25  County facility at issue in this case, is that right?
```

1  A.    I have not.

2  Q.    Your report was back in 1998, correct?

3  A.    Yes.

4  Q.    I'll represent to you that the time period for

5  our case begins in May of 2003 and continues on

6  forward.  You have done no time studies for that time

7  period in question, correct?

8  A.    No, I have not done any time studies.

9  Q.    All right.  Would you agree that if the jury

10 wants to consider a time study to help it decide how

11 long certain donning and doffing, walking activities

12 take in Finney County, from the time period 2003

13 onwards, they shouldn't rely on your report to decide

14 that, should they?

15 A.    I am just talking about this report.

16 Q.    Right.

17 A.    That's all I'm talking about at this point.

18 Q.    You are not trying to tell the jury how much

19 time it takes in Finney County to do anything, right?

20 A.    I am not saying it takes this amount of time in

21 Finney County.  If that's the -- the facility you are

22 talking about presently, I don't know what it is.

23 Q.    You don't know how much time it takes in Finney

24 County?

25 A.    No.

243

1  Q.    We can't use your report to help us understand
2  how much time it takes in Finney County, can we?
3  A.    No, I -- I wouldn't think so.
4  Q.    Okay.  In fact, wouldn't you agree that if the
5  jury wants to understand how much time donning and
6  doffing and walking activities take in Finney County,
7  they should rely on the expert witnesses who visited
8  Finney County?
9  A.    Yes.
10 Q.    They should rely on an expert witness who
11 actually did a time study in Finney County?
12 A.    Whoever did the time study or time analysis in
13 that particular facility, those would be the individual
14 who should come up with the number, yes.
15 Q.    Your study even back in 1998, it did not measure
16 the entire continuous workday, did it?
17 A.    Define for me, sir.
18 Q.    Let me put this this way, your time study did
19 not evaluate when a worker first retrieved an item from
20 the locker, donned their required garments and gear,
21 and walked to the production line.  You did not measure
22 that entire, um, amount of time, correct?
23 A.    That, no , I did not.
24 Q.    You looked at discreet activities, correct?
25 A.    Yes.

1   Q.    Were you allowed in the Emporia locker room?

2   A.    No.

3   Q.    So your time study did not observe workers

4   donning and doffing in the -- in the locker room,

5   correct?

6   A.    Correct.

7   Q.    Is that why a lot of your observations in your

8   report are referred to as a simulations?

9   A.    That was one of the reasons, that's not the only

10  reason.  The other reasons was the steam, other reason

11  was some of the items were not used very often, at all.

12  Q.    But when you -- when you say that your

13  observations are simulations, you're referring to the

14  fact that you weren't able to observe the workers kind

15  of doing it as they actually would be doing it in a

16  working day, while they were kind of in -- in the

17  normal working conditions, is that right?

18  A.    I did simulate data, and if you are asking me

19  what I mean by simulation, it's not the workers are

20  doing it but they're not doing it in an actual working

21  day.

22  Q.    Thank you.  Was there anything about the conduct

23  of your study that gave you concern in 1998 that the

24  company was trying to perhaps influence the results?

25  A.    As I mention in my report, there was one aspect

1 where the, when we were there, the supervisors were

2 directing employees to particular wash stations.

3 Q.    And explain that a little bit.

4        Was it that the -- the company managers were

5 kind of directing traffic, if you will, at the wash

6 stations?

7 A.    Yes.

8 Q.    Trying to get those workers to move a little bit

9 faster?

10 A.    Directing them, yes, that -- that was

11 decreasing, moving -- I wouldn't say moving faster but

12 the time was decreasing, because now there was less

13 wait time in some work stations and so on.

14 Q.    And did you get -- did you get the impression

15 that the company was trying to move the workers along

16 so the time elapsed for waiting at those wash stations

17 would be shorter?

18 A.    Yes, and that's one of the reasons, I mentioned

19 that as one of the biases and I had concern.

20 Q.    So had you been observing the employees in the

21 normal course of their activities without the

22 management influence, those time frames might have been

23 larger, correct?

24 A.    In fact, I did notice it but I had not got a

25 whole lot of data, that was in October, where we

1  noticed that management or supervisors were not

2  directing traffic.

3  Q.    But for this report, it is a fair statement that

4  at least for that aspect of it you did think there was

5  a potential bias by company management, correct?

6  A.    Yes.

7  Q.    It's true, Doctor Fernandez, that your study in

8  1998 is not representative of activities that have

9  occurred in Finney County from 1993 -- sorry, from 2003

10 onward, is that correct?

11 A.    I would not know if it's representative or not.

12 Q.    You couldn't tell the jury that it is?

13 A.    I -- I couldn't say yes or no.  I wouldn't know.

14 Q.    Well, you wouldn't want the jury to rely on your

15 report to decide the issues in this case, would you?

16 A.    As it relates to the amount of time it takes to

17 perform items?

18 Q.    Yes.

19 A.    It might be a different -- it might be different

20 group, of different list of activities.

21 Q.    Right.

22 A.    It could be a different group of employees, it

23 could be a variety.

24 Q.    We know it is a different group of employees

25 don't we?

1  A.    Yes, but I would like to do something

2  representative that represented all of the employees,

3  so, yes, our numbers would be different.

4  Q.    And, again, you would rather for purposes of

5  this case, that the testimony of experts who testified

6  in this case be relied upon, that's true?

7  A.    Yes.

8  Q.    And did I hear that you were -- your travel was

9  being reimbursed by Tyson in this case?

10  A.    Yes.

11  Q.    Okay.  What -- when you do testify as an expert

12  do you charge an hourly rate?

13  A.    Yes.

14  Q.    What is that hourly rate?

15  A.    460 an hour.

16  Q.    Okay.  And do you have an expectation that

17  you're going to be paid $460 an hour for your testimony

18  in this case?

19  A.    Yes.

20  Q.    Is that what Tyson has told you?

21  A.    That's what my billing rate is.

22  Q.    I'm sorry?

23  A.    That's my rate, I said that is what I was told I

24  would be paid, yes.

25  Q.    That is what you were told by Tyson?

```
 1   A.    Yes.

 2         MR. HANSON:  No further questions.

 3         THE COURT:  Thank you.   Mr. Mueller.

 4         MR. MUELLER:  Just two questions.

 5         MR. HANSON:  Judge, before the witness is

 6   excused we would like to approach on one final issue.

 7                 REDIRECT EXAMINATION

 8   BY MR. MUELLER:

 9   Q.    Doctor Fernandez, on my examination I asked you

10   about the phrase, true and representative.  Was the

11   purpose for which DOL hired you to come up with a

12   number that was true and representative of all the

13   plants on Monty Hahn's spreadsheet, the industrial

14   engineer from IBP?

15   A.    Could you repeat that, please?

16   Q.    Did --

17   A.    I'm sorry.

18   Q.    The Department of Labor, you said you got a

19   spreadsheet from IBP's industrial engineers?

20   A.    Yes, numerous spreadsheets, yes.

21   Q.    Right.  And wasn't the purpose of your study to

22   determine whether you could verify IBP's all-in number

23   for all the plants on that list?

24   A.    Yes.

25   Q.    Okay.  And then when you turned this report into
```

1  the Department of Labor, was IBP in an adversarial

2  posture to the Department of Labor?  That is to your

3  understanding, were they on different sides of the

4  lawsuit?

5  A.    Yes.

6  Q.    And did IBP -- I'm sorry, did the Department of

7  Labor accept your report?

8  A.    Yes.

9        MR. MUELLER:  Thank you.  No further

10 questions.

11       THE COURT:  Mr. Hanson?

12       MR. HANSON:  Can we approach just briefly,

13 Your Honor.

14       THE COURT:  Yes.

15       (The following sidebar conference was had

16       outside the presence of the jury:)

17       MR. HANSON:  Here's the concern that I have.

18 Mr. Mueller has published a lot of the report in front

19 of the jury.  I know it's not going to go into evidence

20 but I think it would be helpful to clarify to the jury

21 that the report itself is not evidence.

22       I am also concerned that this really sounded

23 like an attempt to get expert testimony in front of the

24 jury on issues that are fact based, not just to go to

25 willfulness and my concern is compounded by the fact

1  that this witness, although he was proffered as a fact

2  witness or an educated witness, is going to be paid his

3  expert rate for his testimony and my understanding has

4  always been it is okay to pay experts to testify, it's

5  not okay to pay fact witnesses.

6          We're in a little bit of a quandary there.

7          THE COURT:  We're in no quandary, go ahead,

8  Mr. Mueller.

9          MR. MUELLER:  We're in no quandary.

10          MR. HANSON:  We want a limiting instruction.

11          MR. MUELLER:  We're allowed to pay a witness

12  for their time, I didn't offer him as an expert

13  witness, I can't believe he is suggesting I did offer

14  him as a expert witness.  And, finally, I don't want a

15  limiting instruction because they showed the jury lots

16  of things throughout this trial and it didn't come into

17  evidence and there was no special explanation for them

18  either.  It is what it is?

19          MR. HANSON:  Well, we are in a little bit of a

20  different situation here.  Where I do think there is a

21  real potential for jury confusion about Doctor

22  Fernandez, we're calling him Doctor, he's been

23  offering --

24          THE COURT:  You call treating physicians

25  doctors, I mean it's just, you know --

1           MR. HANSON:  Well, I think --

2           THE COURT:  As a matter of fact, it's the only

3     appropriate thing to do; it's a proper respect for a

4     person's title.

5           MR. HANSON:  It is going to be hard I think

6     for the jury to distinguish between his testimony as a

7     fact witness and in light of what we have heard his

8     testimony is.

9           THE COURT:  He came in to testify as to why

10    Tyson took the position that it did.  You can tell the

11    jury that is what his testimony is being offered for,

12    not to establish the four minutes is the finding in

13    anyway, but rather, Tyson relied upon that, that it is

14    why you brought him in here and the rest of that, I'm

15    not concerned about what they saw up there.

16          They have seen a lot of stuff, as Mr. Mueller

17    has indicated.

18          MR. MUELLER:  And I would just request if

19    we're going to have a limiting instruction, that we be

20    allowed to discuss it outside the presence of the jury.

21          There were no new studies done until very

22    recently and from our perspective, it is at least a

23    probative of a time until --

24          THE COURT:  Mr. Mueller, you told me Fernandez

25    was not testifying as to the substantive aspects of

1 this case. That he was coming in here, being brought

2 in here to testify about the willfulness aspect, and

3 why Tyson did what it did. To let Tyson tell its

4 story.

5          Now if you are shifting gears and saying that

6 his four minutes is something that the jury should

7 consider in determining what's an appropriate period of

8 time for these people to don and doff, that's a whole

9 other situation.

10          MR. MUELLER: I don't believe I said that,

11 Your Honor, I'll look for the record or transcript, I

12 believe I told you I was offering that through Monty

13 Hahn only for willfulness and Mr. Kimbro for

14 willfulness but I am pretty sure I made a clear

15 distinction that I had two goals.

16          THE COURT: Then he did testify as an expert

17 witness about a plant that he never visited.

18          MR. MUELLER: Well, under Rule 701 -- I --

19          THE COURT: Go ahead.

20          MR. MUELLER: I was going to say, I didn't

21 offer him as an expert, he came up with the conclusions

22 for the Government and it's a fact finding report of

23 the Government.

24          THE COURT: You couldn't --

25          MR. MUELLER: And he says it applies to this

1  plant.

2      THE COURT:  I don't even let people offer

3  people as expert witnesses in cases, you come in and

4  you testify but if you're allowed to offer opinion

5  testimony, that moves it into the realm of an expert,

6  whatever tag you put on it.

7      Now -- how did we end up here?  Again?  I

8  thought Fernandez was coming into explain, from Tyson's

9  perspective, why it went with the K-code time, and that

10  there was a basis for it.  And not -- not that that is

11  something that the jury could consider in determining

12  whether this is a reasonable time or not.  Just to

13  explain Tyson's attitude.

14      MR. MUELLER:  I would like to look for the

15  transcript because I believe I explained clearly that

16  there was another purpose.  I said it was probative of

17  the number of minutes, that is the first have I heard

18  this argument.

19      THE COURT:  You can look it up if you want to,

20  Mr. Mueller, you may be right, but I'm telling you my

21  impression was that that's why he was here.  If he was

22  being brought in to testify about what's an appropriate

23  period of time, I would have stricken that, I would

24  have never allowed him to testify to that because he

25  has never been to the plant, it predates this period by

1 a number of years.

2      MR. O'DEAR:  Judge, we have -- I think the

3 point is, that we, IBP, came up with the four minutes.

4 Okay?  We're the ones that said we think that's what it

5 should be.

6      And it's the DOL simply relying on his report

7 saying, We agree.

8      THE COURT:  Then why can't I simply instruct

9 the jury about that and be done with it?  I mean that's

10 my point.

11      MR. MUELLER:  Well, my response to that, Your

12 Honor, is that Doctor Radwin can't take his number

13 back, and he can't take it forward, they're all just

14 probative.

15      MR. HANSON:  Here's the problem.  This is

16 exactly what I was worried about.  Now we have an

17 industrial engineer on the stand, who's testified to a

18 time study and now they want to use it as probative

19 evidence of the time period in question.

20      We don't have the underlying data, we have

21 never had a chance to test his theory, he has never

22 been through the Daubert process and I'm frustrated

23 that we are here, too.  I also was under the impression

24 it was for a limited purpose, but now --

25      MR. O'DEAR:  He said it didn't apply to the

```
 1  plant in Finney County.
 2          THE COURT:  Listen, you guys, you have another
 3  witness?
 4          MR. MUELLER:  No, we're just going --
 5          THE COURT:  Is there anyplace else we're
 6  moving?
 7          MR. MUELLER:  We aren't going to move in other
 8  witnesses.
 9          THE COURT:  Are we done with --
10          MR. MUELLER:  As far as I'm concerned.
11          THE COURT:  All right.
12          (Sidebar concludes and proceedings continue in
13          open court:)
14          THE COURT:  Doctor Fernandez, you can step
15  down.
16          We'll take this up after I let the jury go.
17          Apart from a few housekeeping matters, are
18  there -- and you can go ahead and step down.  Thank you
19  so much.
20          Are there any other matters that -- apart from
21  the housekeeping that Tyson plans to introduce at this
22  point, Mr. Mueller?
23          MR. MUELLER:  No, Your Honor, we will move in
24  some additional exhibits, we were done calling
25  witnesses, and then we'll rest.
```

```
 1            THE COURT:  All right.  So you're resting,

 2  apart from the housekeeping that we have talked about

 3  and your introduction of a few exhibits?

 4            MR. O'DEAR:  That's right.

 5            MR. MUELLER:  Yes.

 6            THE COURT:  All right.  Is the plaintiff going

 7  to have any rebuttal?

 8            MR. HANSON:  No rebuttal, Judge.

 9            THE COURT:  All right.  So we can go ahead and

10  excuse the jury then now?

11            All right.  Members of the jury, I am going to

12  excuse you for the day.  The evidence is now complete.

13  In terms of what's being presented to you.

14            You'll see a lot of it, I'm sure, recounted

15  during closing arguments tomorrow but what's going to

16  happen, first off tomorrow, is I am going to instruct

17  you, then you will hear from the plaintiff, you'll then

18  -- or from the plaintiffs' counsel, you'll hear from

19  defense counsel, and plaintiffs will have an

20  opportunity to get the last word because they have the

21  burden of proof.  So they can divide their argument

22  however they wish.

23            I remind you, again, and if we're fortunate

24  enough to get to a verdict tomorrow, it's the last time

25  I'll have to give this to you, but you are not to
```

1 discuss this case among yourselves or with anyone else

2 or to do any independent investigation.

3         Is it a problem for you all to be back here at

4 8 o'clock in the morning?

5         A lot of times if we're doing instructions and

6 closing we come at 9:00, but I would rather get off to

7 a quick start again in the morning, if that's all right

8 with all of you.

9         So, if you'll be back here just a few minutes

10 before 8:00, we'll start with instructions, and then go

11 right into closing.

12         Thank you so much.  Have a good afternoon and

13 evening.

14         (The jury leaves the courtroom.)

15         THE COURT:  Folks, go ahead and have a seat.

16         All right.  We're going to break here in just

17 a minute but I want to go back to this point.

18         There were enough motions in limine filed in

19 this case by both sides, that they all kind of run

20 together for me at this point.  But I will just tell

21 you that my clear impression, and it may not be borne

22 out by the precise words in the record, but my distinct

23 impression was that Doctor Fernandez was coming in to

24 testify so that Tyson could tell its story in its own

25 words, as to the K-code, the history of that, and not

1  as a witness with respect to the amount of time that it

2  actually takes employees to don and doff and walk, in

3  Finney County because he had never been to Finney

4  County.

5       He never observed anything there.  These were

6  limited to the Emporia and the Storm Lake, Iowa plants.

7  The latter being a hog facility, Emporia being a beef

8  facility.

9       And there has been a request by plaintiffs

10 that the jury receive a limiting instruction with

11 respect to Doctor Fernandez's testimony, and it being

12 limited to the issue of whether Tyson -- its actions

13 were willful or not and not as substantive evidence as

14 to the amount of time that it takes to don, doff, and

15 walk.

16      As I say, my impression has been from the

17 outset that Doctor Fernandez's testimony would be

18 limited to the willfulness issue because he offers

19 nothing -- nothing that is relevant to anything that

20 has happened in the Finney County case.

21      Now, Mr. Mueller indicates that he has not,

22 and nobody on the Tyson team has indicated that his

23 testimony would be limited to that, and you may be

24 right.  I mean, I am just telling you, that's the

25 impression that I had.  But, we need to get this sorted

1  out right now.  Because otherwise the jury, I think, is

2  going to improperly be considering Doctor Fernandez's

3  testimony as substantive evidence of the amount of time

4  that it takes to don, doff, and walk in Finney County.

5        And so, Mr. Mueller, the onus I think is on

6  you at this point to tell me why I should not instruct

7  the jury about his testimony in relation to the whole

8  issue of a plant where he has neither observed nor done

9  any kind of study that he literally has no knowledge

10 about, or was included in his report with respect to

11 this four minutes.

12        MR. MUELLER:  Yes, Your Honor.  And I'll be

13 very brief.

14        First of all, just so the Court understands

15 our candor, I filed a brief on this specific exhibit

16 and his testimony on the 13th, so two days ago.  That's

17 Docket 1028.  And we expressly said to Your Honor, the

18 report is both probative of the amount of time it

19 reasonably takes employees to perform the activities,

20 as well as IBP's, later Tyson's, good faith on relying

21 upon that number.

22        So I just want the Court to understand, and I

23 think some of my earlier statements are consistent with

24 this but it is certainly the most recent statement

25 about it.

1          My point is this:   We have witnesses who

2 worked for a certain period of time, like Mr. Jeronimo,

3 and left.  He's come in and testified to numbers, are

4 his numbers -- he's being offered as a class

5 representative.  Is he representative of everything the

6 last two years?

7          And we have it going the other way, too.  But

8 Doctor Radwin wasn't there at any time before May of

9 2010.  They're offering his number as representative of

10 the past.

11          We have no problem with a limiting instruction

12 saying he's not being offered as an expert, but it's

13 just a piece of evidence, like all other evidence.  He

14 says that the Department of Labor hired him to make

15 that number resolve the litigation for all eleven

16 plants.  And that they can give it whatever weight they

17 want.  He has made his point, that he wasn't in the

18 plant, we all heard that, but that goes to weight.

19          I mean it's just a probative piece of evidence

20 that each person who has testified in this trial has

21 this much information, and maybe Radwin has this much

22 information.  (Indicating.)  It all goes to weight

23 because nobody knows information at the front end of

24 the class and at the back end of the class, except some

25 people who have worked the whole period, and that's our

1   point.

2          THE COURT:  All right.  Mr. Hanson.

3          MR. HANSON:  They already have that evidence

4   through Monty Hahn, we heard it.  He was someone who

5   could say he had been in Finney County, he was with

6   Tyson, they can argue what they want about the time

7   studies.

8          This I think is just an end run around Rule 26

9   expert disclosures.  We have already indicated Doctor

10  Fernandez was never identified to us, certainly never

11  proffered as an expert, and to the extent that he is

12  going to do anything other than simply say, I did a

13  report in 1998 for the Department of Labor, and that it

14  goes to their, you know, sense of mindset about the

15  four minutes, anything in addition to that, is severely

16  prejudicial.

17         I mean I don't even think it is relevant.  I

18  don't even think it is probative of the issues in the

19  case.  Even if it had a little bit, it is grossly

20  outweighed by the prejudice and the misapprehension

21  that a doctor of industrial engineer is giving some

22  improviso to four minutes.

23         THE COURT:  Well, I am going to give a

24  limiting instruction to the jury tomorrow, telling them

25  that they may only consider the doctor's testimony as

1  it relates to the willfulness issue, and Tyson's

2  reliance upon his number in terms of the process that

3  have followed over the course of time.

4        I think to allow a person to testify

5  substantively about what is effectively a

6  reasonableness argument, the amount of time that it

7  takes to don and doff and walk in a plant that he has

8  never visited, where he has absolutely no information

9  at all about how things are handled out there would be

10 unfairly prejudicial to the plaintiffs in this case.

11        Obviously, Tyson is free to argue in its

12 closing that the doctor came up with this number, that

13 it was submitted to the Department of Labor, the

14 Department of Labor said this works for us at this

15 point, and that Tyson relied upon that, in the way that

16 it dealt with its employees.

17        But to argue that person found that four

18 minutes was a reasonable period of time for donning,

19 doffing, and walking in a plant that he never visited,

20 had no information about, I think goes over the line.

21        So, I am going to give a limiting instruction

22 tomorrow.

23        All right.  Now, we are going to get together

24 and do our charge conference, will 2:30 work all right

25 for everybody?  And if there are any other issues,

1    we'll take them up at that time.

2          MR. MUELLER:  Move exhibits in.

3          THE COURT:  Mr. Mueller, have you something

4    else you want to bring in now?

5          MR. MUELLER:  No, you want us to move the

6    exhibits in then?

7          THE COURT:  Why don't you go ahead and do that

8    now and then -- then at 2:30, we'll do our charge

9    conference.  What needs to come in.

10          MR. MUELLER:  We're going to renumber this big

11    chart 5039A, which you already admitted.  And then

12    moving in just a couple exhibits from Mr. Kimbro's

13    examination that they were all testified to and not

14    objected to, and that's Plaintiffs' Exhibit 1 but only

15    Exhibit 8, that was Exhibit 8 to his Declaration, so

16    Plaintiffs' Exhibit 1, Exhibit 8 of it, Plaintiffs'

17    Exhibit 7; Plaintiffs' Exhibit 331 which I think was

18    already admitted by stipulation, Defendants' 5013,

19    Defendants' 5200 and Defendants' 5201, all moving all

20    those in.

21          THE COURT:  Mr. Anderson.

22          MR. HANSON:  And I -- and Mr. Anderson.

23          MR. ANDERSON:  Sorry, I wasn't sure of the

24    mechanics of this yesterday, I understood the Court

25    might have been asking us to put in as an exhibit

1  pretrial stipulations that I read yesterday?  So, that

2  is Exhibit 450.

3          THE COURT:  All right.  I'm not going to send

4  the stipulations back, we have read those, have we not?

5          MR. ANDERSON:  Correct.

6          THE COURT:  To the jury?  So, we'll keep those

7  out.  But --

8          MR. HANSON:  And -- I just, I apologize,

9  Judge, I just need to see that those list of exhibits

10  that Mr. Mueller references, my understanding from

11  yesterday, when Mr. Mueller was -- okay, and --

12          THE COURT:  And I hope you will all say hello

13  to Judge Lungstrum who I know you are missing horribly

14  after three weeks.

15          JUDGE LUNGSTRUM:  I just couldn't tear myself

16  away.

17          MR. HANSON:  If I may, Judge, just take a look

18  at these.

19          THE COURT:  Sure, take a look at them, let us

20  know about those at the charge conference.  Anything

21  else before 2:30?

22          MR. MUELLER:  No, sir.

23          THE COURT:  We'll see you back here.

24          Did you all get the set of instructions that I

25  sent out to you last night?

1          MR. MUELLER:  Yes, sir.

2          THE COURT:  Okay.  Good.  Thanks so much.

3          (Recess was taken from 1:50 p.m. until

4          3:30 p.m.)

5          THE COURT:  For the record, Jana was really

6   concerned about being able to complete daily copy today

7   if we were going to have a lengthy conference here,

8   so...

9          We'll start through these again numerically.

10  My understanding is that there is no objection from

11  either party to Instruction Number 1, Number 2, Number

12  3, Number 4, Number 5, Number 6, Number 7, Number 8,

13  Number 9, Number 10, Number 11, Number 13, Number 14,

14  Number 19, Number 20, Number 32, Number 35, Number 36,

15  Number 37, and, finally, Page 46, which is the response

16  to request for transcript.

17          Is that accurate, Mr. Dirks, from the

18  plaintiffs?

19          MR. DIRKS:  Yes.

20          THE COURT:  And from the defendants, Mr.

21  Mueller?

22          MR. MUELLER:  Yes, Your Honor.

23          THE COURT:  Okay.  Let's start then,

24  Instruction Number 12, as modified, now reads:

25          Plaintiffs introduced into evidence certain

1  interrogatories, that is questions together with

2  answers signed and sworn -- probably should say sworn

3  to -- by the other party.  A party is bound by its

4  sworn answers.

5          Any objection to 12, as modified?

6          MR. DIRKS:  No.

7          MR. MUELLER:  No.

8          THE COURT:  All right.  Instruction Number 15

9  are the stipulations and I've asked the parties if you

10 would, to go through those, see what can be struck and

11 what stays, and please let us know tonight, just by

12 paragraph number, or any other changes that -- that you

13 wish to make with those.  And we'll take that up again

14 on the record tomorrow morning.  All right?

15         And that's Instruction Number 15, the

16 stipulations.  All right?

17         That acceptable to the plaintiff.

18         MR. DIRKS:  Yes.

19         THE COURT:  And defendant?

20         MR. MUELLER:  Yes.

21         THE COURT:  All right.  Instruction Number 16

22 was modified to read now:   The plaintiffs claim that

23 they represent 5,130 past and present hourly workers.

24         And we have struck from paragraph 3, at the

25 meal period.

1          So essentially will read, Plaintiff asserts

2   claims under Fair Labor Standards Act (FLSA) for unpaid

3   time during the continuous workday beginning and ending

4   with time spent donning and doffing protective clothing

5   and equipment and associated walking time before and

6   after each of their shifts, and at the rest break.  I

7   think that was the only change we made to that.

8          MR. HANSON:  Right.  And plaintiffs would just

9   object to the deletion of meal period.

10          MR. MUELLER:  I thought it was by agreement

11   when we discussed it.

12          THE COURT:  I did, too.  Any objection beyond

13   the one you just made, Mr. Dirks?

14          MR. DIRKS:  No, Your Honor.

15          THE COURT:  All right.  Mr. Mueller?

16          MR. MUELLER:  No, Your Honor.

17          THE COURT:  Instruction Number 17.  I have

18   struck the last clause of the first paragraph, so that

19   first sentence will -- or excuse me, the second

20   sentence will end, When required by law to do so,

21   period.

22          For time spent donning and doffing certain

23   gear and so forth, has been deleted.

24          The rest of the instruction stays as it is.

25          Any objection from the plaintiffs?

```
1              MR. DIRKS:  No objection.

2              THE COURT:  Defendant?

3              MR. MUELLER:  No objection.

4              THE COURT:  All right.  Instruction Number 18

5    is the one that I indicated I'm going to have to look

6    at again tonight.  And I will do that and send out our

7    thoughts to you with respect to that instruction.

8              MR. MUELLER:  Your Honor, as I recall, I

9    thought we were in agreement on the first paragraph

10   though and you were just going to look at the language

11   at the end, is that correct?

12             THE COURT:  That is correct.

13             MR. MUELLER:  Okay.

14             THE COURT:  About, does not vary from person

15   to person and so forth?

16        Okay.  Apart from just that last paragraph

17   that I just mentioned, were there any other objections

18   from the plaintiff?

19             MR. DIRKS:  Just the objection, the general

20   objection that we believe the issue of

21   representativeness is a legal issue and not an issue to

22   be given to the jury.

23             THE COURT:  All right.  Mr. Mueller, any other

24   objections?

25             MR. MUELLER:  I thought we worked out by
```

1  agreement that it would say, And others in the class,

2  and that was going to solve our objection.  I thought

3  we were all in agreement on that.

4        THE COURT:  Well, just a moment.  Looking at

5  the first paragraph, on behalf of themselves and the

6  class, we had changed and I think agreed to that.

7        Are you talking about at the very end?

8        MR. MUELLER:  No, I was talking about the

9  beginning, because I didn't hear you say it on the

10 record, so the only comment I was going to make is we

11 had agreed to change it to on behalf of themselves, and

12 I thought it was others in the class, but either way.

13       THE COURT:  Well --

14       MR. MUELLER:  And then we are just waiting for

15 you to rule on the last paragraph?

16       THE COURT:  I will change that to say, And

17 others in the class.  I think it just reads better.

18       And it's the last paragraph that I'll get back

19 to you all on.

20       Any other objections to that?

21       MR. DIRKS:  No.

22       THE COURT:  Beyond what is remaining open?

23       All right.  Instruction Number 21, change the

24 first sentence to read, Defendants must pay plaintiffs

25 for all time worked during the continuous workday, have

1 added to the first sentence of the second paragraph,

2 where it says, Excluding a bona fide meal period and a

3 non-compensable rest break period.

4           Any objections to that instruction as

5 modified?

6           MR. DIRKS:  Just -- just for the record,

7 plaintiffs object to the non-compensable rest break

8 language.

9           THE COURT:  All right.  That's overruled.

10           MR. MUELLER:  And we object to deleting the

11 word compensable.

12           THE COURT:  All right.  And that's overruled.

13           MR. MUELLER:  And we requested the insertion

14 of the language that we had proposed in our -- let me

15 find that.

16           We had proposed the following language:   That

17 being said, a di minimis activity, which I will explain

18 to you in a moment cannot start the continuous workday,

19 thus if you find that the donning, doffing, and washing

20 activities at issue are di minimis, those activities

21 cannot start or stop the continuous workday.

22           THE COURT:  All right.  I'm overruling that

23 objection.

24           Instruction Number 22.

25           MR. DIRKS:  Objection for the record that the

1   legal standard for integral and indispensable as set

2   out in Smith versus Aztec Well and in plaintiffs'

3   proposed jury instructions is the appropriate standard.

4          THE COURT:  All right.  Any objection from the

5   defendants?

6          MR. MUELLER:  We don't have an objection but

7   as I understand it you are adding -- well -- did you

8   add standard and sanitary items?

9          THE COURT:  No.

10          MR. MUELLER:  You did not.  Then we would

11   object, we would suggest that it should say donning and

12   doffing activities or donning and doffing all the

13   standard and sanitary items because those are the only

14   items at issue.

15          THE COURT:  I am going to overrule that

16   objection.

17          Instruction Number 23.

18          MR. DIRKS:  No objection.

19          MR. MUELLER:  No objection.

20          THE COURT:  All right.  Instruction Number 24

21   I had added, at the suggestion of the party, at least

22   one of the parties, in the last sentence, then the

23   walking time that follows pre-shift donning or precedes

24   post shift doffing is also compensable.

25          Any objection from plaintiffs?

272

```
1          MR. DIRKS:  For the record, plaintiffs object
2   that this instruction is under inclusive of the
3   continuous workday.
4          THE COURT:  All right.
5          MR. MUELLER:  No objection from defendant.
6          THE COURT:  All right.  The plaintiffs'
7   objection is overruled.
8          Instruction Number 25 goes back to this whole
9   meal period again and it is something that I need to
10  look at a little more closely.  At this point I just
11  need, as I say, to review it further.  So I am going to
12  ask you when we send it out to you tonight to please
13  send any objections that you have back.
14         Instruction Number 26.
15         MR. DIRKS:  Plaintiffs', for the record, do
16  have an objection that -- I don't even remember talking
17  about this one.
18         THE COURT:  You know, it may have been stuck
19  to the other page.
20         MR. DIRKS:  Plaintiff, just for the record,
21  the objection is that the fact question of whether the
22  break is 20 minutes is a fact question but that the
23  remainder of the issues is a strict legal issue.
24         THE COURT:  All right.  That's overruled.
25         MR. DIRKS:  And the rest break time cannot be
```

1  offset and the rest break time is part of the

2  continuous workday and not something that stops the

3  running of the continuous work day.

4       THE COURT:  All right.  Those are overruled.

5  Mr. Mueller?

6       MR. MUELLER:  No objection.

7       THE COURT:  Instruction -- excuse me,

8  Instruction Number 27.  Starting with the second

9  paragraph, it's been modified to read, Defendants claim

10 that reasonable time spent by plaintiffs within the

11 continuous workday including donning and doffing

12 activities and so forth, is the first change.

13      The third paragraph, whether determine -- when

14 determining whether time is di minimus, you must first

15 determine how much reasonable time is spent within the

16 continuous workday, including the donning and doffing

17 activities and walking time which Tyson did or does not

18 pay for.

19      Finally, the last sentence, You need not find

20 that all three factors favor a certain party, rather

21 you must consider the factors together when deciding

22 whether the activities in issue are di minimus.

23      With those changes, any objection from the

24 plaintiffs?

25      MR. HANSON:  For the record, plaintiffs have

1  an objection to the use of the terms reasonable, when

2  it is saying reasonable time in this instruction.

3        Also, in the second, one -- the third

4  paragraph, the size of the time in the aggregate,

5  plaintiffs would object that it should be the size of

6  the claim in the aggregate and that's it.

7        THE COURT:  All right.  Thank you.  Those are

8  overruled.

9        Mr. Mueller.

10       MR. MUELLER:  We just note for the record the

11 objection to the phrase within the continuous workday

12 including.

13       We would like the Court's original proposed

14 language which was spent each day on the donning and

15 doffing activities and walking time.

16       THE COURT:  All right.  Those are overruled as

17 well.

18       All right.  Instruction Number 28, and I am

19 going to look back at Instruction 16 on this, but I am

20 taking out the legality of gang-time is not at issue.

21 That leaves a question of whether at the meal period

22 comes in or stays out.

23       But, position of the plaintiff?

24       MR. DIRKS:  Other than the meal period issue,

25 no objection.

```
 1            THE COURT:  All right.  Mr. Mueller?
 2            MR. MUELLER:  Note our objection to the
 3    deletion of the last sentence.
 4            THE COURT:  Okay.  Instruction Number 29 has
 5    been modified now to where the last sentence reads:
 6    You must decide whether K-code minutes sufficiently
 7    compensated employees for activities that you find are
 8    compensable.
 9            Position of the plaintiffs?
10            MR. HANSON:  No objection.  We did -- well
11    actually --
12            THE COURT:  There is a typo also.
13            MR. DIRKS:  I'm sorry, sorry to do this on the
14    record.  The sentence before actually has similar
15    language about additional minutes, didn't know if
16    the -- if Tyson and Court would want to change that
17    additional to K-code as well.
18            THE COURT:  About Tyson paying employees
19    K-code beyond gang-time?
20            MR. DIRKS:  Exactly, right now it says, You
21    have also heard testimony that Tyson is paying
22    employees additional minutes beyond gang-time is
23    intended.
24            I didn't know if -- I don't feel strongly one
25    way or the other but I think that K-code is the same
```

1    there as it is in the next sentence.

2          THE COURT:  Mr. Mueller?

3          MR. MUELLER:  Well, I thought it was well done

4    the first time.  We were talking about additional

5    minutes to compensate for donning and doffing you must

6    decide whether these K-code minutes, I mean I thought

7    it was a pretty nice pair of sentences explaining each

8    other.

9          THE COURT:  I think I am going to give it the

10   way I have indicated that we revised it, where we just

11   substitute K-code before minutes and delete additional

12   in the last sentence.  We'll also correct the typo.

13         MR. MUELLER:  And then there is just be note

14   objection -- well, an issue for you to decide tonight

15   about the meal periods, that applies here, too.

16         THE COURT:  Right.  All right.  Instruction

17   Number 30, I intend to give it the way it is.

18         MR. DIRKS:  Objection from the plaintiffs that

19   the -- the first sentence about time clocks is -- is

20   misleading, it takes Tyson's requirements to keep

21   accurate time records out of context.

22         THE COURT:  All right.  Instruction

23   31 -- that's overruled, by the way.  31.

24         MR. DIRKS:  Sorry, I have misplaced 31.

25         THE COURT:  It's the one that says, If you

1  find the plaintiffs have proven their claims by a

2  preponderance of the evidence, and that Tyson has

3  failed to prove the activities in question are di

4  minimus, you must turn to the question of damages.

5          MR. DIRKS:  Mr. Anderson is telling me that we

6  did have an objection and --

7          THE COURT:  Well, while you are running that

8  down, Mr. Mueller, as I recall there were no defense

9  objections, is that correct?

10         MR. MUELLER:  That's correct, Your Honor.

11         THE COURT:  All right.  I didn't have anything

12 written on here so it just must have been a not a

13 language objection but --

14         MR. DIRKS:  There was no objection.

15         THE COURT:  All right.  Instruction 33.

16         MR. MUELLER:  Note -- well, I'll let the

17 plaintiffs go first.

18         MR. DIRKS:  No objection from plaintiffs.

19         MR. MUELLER:  Would like to note for the

20 record that we believe it should mention that KWPA

21 needs to be tied to a contract or agreement but we are

22 just noting that for appeal.

23         THE COURT:  All right.  And that's overruled.

24         Instruction Number 34.

25         MR. DIRKS:  No objection.

```
 1            MR. MUELLER:  No objection.

 2            THE COURT:  All right.

 3            MR. MUELLER:  Will you -- yeah, that's right.

 4            THE COURT:  It says prior litigation history

 5  as opposed to cases.  All right.

 6            MR. MUELLER:  And we request additional

 7  instructions or --

 8            THE COURT:  As long as you have proposed them

 9  already, your record is protected, but what are

10  you -- what do you want in?

11            MR. MUELLER:  The one that we haven't really

12  discussed today is our 407 remedial measures

13  instructions.  We believe they intend to argue, in fact

14  Doctor Baggett's alternative damage calculation is

15  predicated entirely on taking the new work day and

16  applying it retroactively and saying, see, they must

17  have thought when they made this change that it should

18  have been done earlier and was the correct number of

19  minutes and in our view it's a subsequent remedial

20  measure.

21            The testimony all says it was designed to

22  minimize future litigation, that's the core purpose of

23  Rule 407 and it may be admissible for other purposes

24  but it should not be admissible for liability and we

25  believe that is a very important concept that they need
```

1  to be instructed on.  That was our proposed

2  instruction -- I'll find it.  Proposed Instruction 16,

3  which was on Page 49 of the joint submission, Docket

4  1027.

5          THE COURT:  Mr. Dirks, any objection?

6          MR. DIRKS:  Yeah, the -- the April, 2010

7  change does not fall within the -- the scope of Rule

8  407.  Rule 407 is a -- a rule designed for safety

9  purposes, designed so that, for example, auto

10 manufacturers there is a public policy concept that

11 auto manufactures and other similar type companies

12 should go ahead and make a change that promotes safety

13 and that should not be held against them.

14          This is a -- this is a strict liability

15 statute, Rule 407 says it can't be used to prove

16 culpability, so for that reason as well, Rule 407

17 doesn't apply to this case.

18          THE COURT:  Mr. Mueller, anything else?

19          MR. MUELLER:  I would just note the rule is

20 not limited to products liability, it's to anything you

21 can be sued for.

22          THE COURT:  Well, I agree the subsequent

23 remedial measures don't apply in this context and so I

24 am not going to give that instruction.

25          Any other proposed instructions that you wish

1  to bring up at this point?

2       MR. MUELLER:  Your Honor, just because I like

3  to wear a belt with my suspenders -- it was my judge's

4  favorite phrase -- I'm just going to note for the

5  record that we have proposed an instruction on a work

6  instruction based on the Reich test and also an

7  alternative instruction on the KWPA so the work

8  instruction was in Roman V of our joint proposed

9  instructions, and our alternative KWPA instruction was

10 our Roman IV in the joint proposed instructions.

11      THE COURT:  All right.  And I don't intend to

12 give those proposed instructions but I think you're

13 covered in the record, Mr. Mueller, so that's a good

14 thing.

15      Anything else?

16      MR. MUELLER:  Yes, we have the Kimbro exhibits

17 which I gave to Mr. Hanson and he came back after lunch

18 and said we have a disagreement.  I, frankly am

19 surprised.  I thought we had agreement, he's right on

20 some of them, thought we had a agreement, he summoned

21 them out, but I pulled up our e-mail correspondence and

22 all we agreed to keep out was the court decisions,

23 which I'm not offering, he is just reading court

24 decisions broader than I am.

25      They got in the injunction, so I wanted to get

1   in the consent decree, I thought those were in pari

2   materia, which if he gets the injunction, which he

3   agreed to, I thought the stipulated dismissal would

4   also go in and that is -- where did they go?  They were

5   sitting up here.

6          THE COURT:  I see Mr. Hanson is rushing back

7   in.

8          MR. HANSON:  I hear we're arguing something.

9          THE COURT:  He heard his name mentioned.

10         MR. MUELLER:  What happened to these?

11         THE COURT:  It's a question about the Kimbro

12  exhibits.

13         MR. MUELLER:  Did you give them back to me?

14         MR. HANSON:  Yes.

15         THE COURT:  And Mr. Mueller was just saying

16  that the consent decree, and I can't remember what

17  else, it's a long day but -- that they were seeking to

18  get those in.

19         MR. MUELLER:  Right.  So I agree with Mr.

20  Hanson, I was going to offer Plaintiffs' 7 but

21  I'll -- in light of our agreement I will not offer

22  that.

23         I was going to offer -- and I do offer Exhibit

24  1, but only a portion of it, and that's the joint

25  stipulation for dismissal.  And when they offered the

1  consent decree, or the injunction in <u>Reich</u>, I offered

2  this as a response to it.

3          I didn't read this as pleadings and opinions.

4  I thought we were talking about briefs and, in fact, I

5  don't see it in the list of anything in our

6  correspondence between us, see, George, right here, I

7  can show it to you but I never agreed that this fell

8  within the definition of pleadings and opinions that we

9  could keep away from the jury.  And I really think this

10  is not harmful and it's our answer to their injunction.

11          MR. HANSON:  And just to respond to that, the

12  injunction was admitted by stipulation before the

13  trial.  So, it didn't come out through Kimbro, it was

14  pre-admitted.

15          The correspondence that Mike and I had and

16  I'll allow it, we may have understood it differently, I

17  thought was when we are getting into willfulness, we're

18  obviously going to be showing legal opinions, letters

19  back and forth from different people, pleadings in

20  cases to show state of mind, what Mr. Kimbro knew, when

21  he knew it, but all of those things are so frocked with

22  hearsay, my understanding was that we would use them,

23  publish them for demonstrative purposes, but they would

24  not be entered into evidence and I thought that would

25  be the system with the Court's admonition, that the

1  jury -- well, you're going to instruct the jury not to

2  consider other pleadings, other opinions, not to

3  mention don't do your own research, so it was my

4  thought that, well, you show that stuff and talk about

5  it, none of it comes in.

6      If, frankly if the Herman stipulation of

7  dismissal comes in, I think there are other pleadings

8  that have to come into balance it, and we get back into

9  the -- I mean our examination yesterday was a the bit

10 of a tit for tat both Mr. Mueller and myself, trying to

11 show a chronology, I am afraid if we open the door to

12 one piece of the chronology coming in, you have to put

13 all that stuff in and, just frankly, it's not

14 sufficiently relevant to be admitted as evidence.  We

15 have already made the points through examination.

16      THE COURT:  Mike, what do you want to get in?

17      MR. MUELLER:  Well, the only thing is I want a

18 stipulated dismissal which is more in the nature of a

19 contract, I mean it's an agreement.  And it's not a

20 -- it's not -- important to put its imprimatur on it

21 but -- so it is Plaintiffs' Exhibit 1 but only Exhibit

22 8 of Plaintiffs' Exhibit 1, so it is a one-page

23 document with a signature page, by both parties.

24      MR. HANSON:  Can I just mention why it is so

25 confusing.  This is Herman, it is Case Number 2163,

1   it's not even the <u>Reich</u> case and it was a dismissal of

2   the enforcement action, it wasn't even the dismissal of

3   the <u>Reich</u> case.

4          I just think putting this in to evidence and

5   then allowing specific argument about it, and its

6   meaning, is going to unduly confuse the jury.  I think

7   the jury has heard, you know, enough about the

8   chronology of the cases but to have them try to sort

9   out what a stipulation of this dismissal means as

10  evidence, I think would be improper.

11         THE COURT:  Mike, what else you looking for?

12         MR. MUELLER:  There were two letters I used

13  with the witness, 5200 and 5201, this is a letter from

14  Ms. Hagen to Mr. Stabler of DOL and then later a letter

15  from Mr. Stabler to Ms. Hagen, both offered on

16  willfulness.

17         We had no deal on these and I expressly said

18  in an e-mail I was offering these and the only response

19  I got back was not responding to that, and didn't

20  object to them and there was no objection made during

21  my discussion of them.  They're -- subject to Your

22  Honor's --obviously, review.  They're in.

23         MR. HANSON:  These are lengthy correspondence

24  from litigating parties at the time, setting forth Ms.

25  Hagen's view about the litigation, about the company's

1  position, again, entirely hearsay.

2       I remember when Mr. Mueller published them he

3  was very careful to only publish select parts of them.

4  There is a ton of stuff in there which is completely

5  irrelevant.  The only thing that matters is, what

6  effect did it have on the state of mind.  That point

7  has been made.  We do not need to get into all of the

8  correspondence and text or the back and forth between

9  the DOL and IBP at the time.  It's not evidence, and

10  frankly, it's just -- it's contains a ton of stuff

11  that's irrelevant, confusing, prejudicial, the point

12  has been made.

13       And my concern is, and I didn't bring the file

14  I had yesterday from my examination, but for

15  every -- everything that is Mr. Mueller wants to get

16  in, I have got a counter point that I would have to

17  offer into evidence to balance it.  And, frankly,

18  that's not what the jury should be spending its time

19  doing.

20       THE COURT:  Well, I'll tell you what.  You can

21  use those during your closing tomorrow and if you even

22  want to put the portions that you used with the witness

23  up on the screen during your closing, you can do that,

24  but I'm just not going to let these go back to the jury

25  room.

1          MR. MUELLER:  Okay.

2          THE COURT:  If there's stuff in there that

3   hasn't been testified about let's keep them focussed

4   where it ought to be.

5          In terms of the stipulation of dismissal,

6   Exhibit 1, I'll allow that in.  And you can explain

7   <u>Herman versus</u> whatever in relation to <u>Reich</u>.

8          I'll look at the letters tonight, if you want

9   me to, Mike.

10          MR. MUELLER:  How about if we redact them to,

11   these are just the two letters that say four minutes is

12   okay, four minutes okay, and that's all we care about?

13   And --

14          THE COURT:  Then go ahead and redact them and

15   I'll let that in, but I mean that is all that comes in.

16          And it eliminates all the stuff, George, that

17   you're worried about.  So...

18          MR. HANSON:  They're going to have to be

19   heavily redacted.

20          MR. MUELLER:  Oh, I agree, that's fine.

21          THE COURT:  Well, I mean I am assuming we are

22   going to end up with a paragraph or couple of sentences

23   from each of them but if there is still an issue

24   tomorrow, we'll talk about those.

25          MR. MUELLER:  The last one I don't think there

1  is objection over, that's 5013 which is the other memo

2  Mr. Kimbro issued when he implemented K-code.

3          MR. HANSON:  We don't object to that.

4          THE COURT:  Okay.  5013 is in then.

5          All right.  Anything else today?

6          MR. DIRKS:  Before you go, the verdict form.

7  We didn't file a proposed verdict -- well, I guess

8  actually we did.

9          THE COURT:  Well, you sent us one.

10          MR. DIRKS:  Yeah, okay, I just wanted to put

11  that in the record, but --

12          THE COURT:  Yeah.

13          MR. DIRKS:  Okay.

14          THE COURT:  Yeah, no we have got yours.  Your

15  verdict form.

16          And look at ours, shoot us your comments

17  tonight.  As I say, we will get out the instructions

18  that are still in dispute to all of you tonight so you

19  can be prepared in the morning to state your

20  objections, but we're not going to change what you get

21  tonight before they go to the jury tomorrow.

22          And, by the way, my practice is, and it may be

23  the practice in a lot of places, but we make a set of

24  instructions for every juror so they can read along

25  with us, and they he can take them back to the jury

1  room and that way they're not having to pass the

2  original set around.

3            MR. HANSON:  Okay.

4            THE COURT:  George.

5            MR. HANSON:  Did defense rest?  Did I -- I

6  didn't know if I heard those.

7            THE COURT:  Yes.

8            MR. MUELLER:  Well --

9            THE COURT:  Actually you said after

10  they -- after this housekeeping stuff.

11           MR. HANSON:  Okay.

12           MR. MUELLER:  We rest, and you already passed

13  rebuttal.

14           MR. HANSON:  No rebuttal, but I -- I am going

15  to make an oral motion for directed verdict on behalf

16  of plaintiffs, and I'm not going to argue it except to

17  say we believe that we have established the elements of

18  integral and indispensable as a matter of law; we

19  believe we've established the elements sufficient to

20  reject di minimus as a matter of law; we believe the

21  appropriate instructions to the jury at this point

22  would be on damages only.

23           And I would say, we've established willfulness

24  as a matter of law, too, although I'm not going to be

25  quite as saying that with quite the conviction.

1            But for the record, I would say that as well.

2            That's the motion, so we preserved our --

3            THE COURT:  Thank you, Mr. Hanson.  You sure

4    have.

5            And I assume that the defendants would simply

6    say --

7            MR. MUELLER:  Oppose.

8            THE COURT:  No.  Okay.

9            MR. MUELLER:  That's a sure certainty.

10           THE COURT:  It's under advisement.

11           Ladies and gentlemen, anything else that we

12   need to talk about before we come back in tomorrow

13   morning?

14           MR. HANSON:  Only clarification.  Did -- and I

15   think I heard Craig say this.

16           You are going to allow us to show the jury

17   excerpts from the transcript to date in the case?

18           THE COURT:  Yes.

19           MR. HANSON:  Just snippets?

20           THE COURT:  Exactly.

21           MR. HANSON:  Not just -- okay.

22           THE COURT:  Exactly.  Yeah, you absolutely can

23   do that.

24           MR. HANSON:  That's all we have, I think.

25           MR. MUELLER:  Oh, yeah.

1          MR. HANSON:  Did you say 8:00 or did you give

2   us 'til 9:00?

3          THE COURT:  8 o'clock, the jury wanted to be

4   here at 8:00.

5          MR. MUELLER:  We still on the record?

6          We renew our Rule 50 motion, because frankly

7   none of us can remember whether you have to do that, so

8   we renew.

9          THE COURT:  And as I recall, it's still under

10  advisement.  So...

11         MR. HANSON:  We renew anything that we would

12  be required to renew.

13         MR. MUELLER:  I renew your renewal.

14         THE COURT:  Thank you all so much.

15         MR. MUELLER:  Thank you.

16         THE COURT:  You all go home, don't even give

17  this case a thought until tomorrow morning.

18         (Proceedings recess for the day at 4:30 p.m.

19         and commence the following day, March 16,

20         2011.)

21

22

23

24

25

```
 1              C E R T I F I C A T E

 2         I, Jana L. Hoelscher, United States Court

 3  Reporter in and for the District of Kansas, do hereby

 4  certify:

 5           That the above and foregoing proceedings were

 6  taken by me at said time and place in stenotype;

 7           That thereafter said proceedings were

 8  transcribed under my discretion and supervision by

 9  means of computer-aided transcription, and that the

10  above and foregoing constitutes a full, true and

11  correct transcript of requested proceedings;

12           That I am a disinterested person to the said

13  action.

14           IN WITNESS WHEREOF, I hereto set my hand on

15  this, the 15th day of March, 2011.

16

17                    s/ Jana L. Hoelscher
                      Jana L. Hoelscher, RPR, CRR, RMR
18                    United States Court Reporter

19

20

21

22

23

24

25
```