IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS


ADELINA GARCIA, ET. AL.,

        Plaintiffs,


        vs.                    Case No. 06-2198-JTM


TYSON FOODS, INC. ET. AL.,

        Defendants.


MEMORANDUM AND ORDER

Presently before the court are the following motions: plaintiffs' Post-Trial Motions to Alter

or Amend the Judgment Regarding Liquidated Damages, Interest, and the Final Class Definition

(Dkt. No. 1055); defendants' Motion for Remittitur to Receive Credit for "Sunshine Time" (Dkt. No.

1056); and defendants' Motion for Judgment as a Matter of Law (Dkt. No. 1058). As detailed below,

the court denies the defendants' Motions and grants the plaintiffs' Motion.


**I. Background**

This case has a lengthy procedural history spanning over six years, which needs a brief

review. Adelina Garcia and other past and present employees of defendants Tyson Foods, Inc. and

Tyson Fresh Meats, Inc., (collectively Tyson) filed a class action and collective action lawsuit on

May 15, 2006, alleging violations of the Fair Labor Standards Act (FLSA) and the Kansas Worker

Protection Act (KWPA) against Tyson at its Finney County and Emporia, Kansas plants. In

February 2007, Judge John W. Lungstrum denied defendants' Motion for Partial Summary Judgment. *See* Dkt. No. 599. Tyson filed a motion to amend the court's summary judgment order, which was denied, and Tyson appealed. On August 19, 2008, the Tenth Circuit dismissed Tyson's appeal. Thereafter, on February 12, 2009, this court granted plaintiffs' motion for class certification and conditional collective action certification. *See* Dkt. No. 741.

Both parties filed summary judgment motions, which the court granted in part and denied in part. *See* Dkt. No. 952. The case was then reassigned to the undersigned, and the case proceeded to trial. *See* Dkt. No. 964. On February 10, 2011, the court held a hearing on Tyson's Motion to Bifurcate (Dkt. No. 951), which the court granted.[1] The court held an *in limine* conference, granting and denying several of the parties' requests and taking some under advisement. The matter went to trial on March 2, 2011, and the jury returned a verdict on March 16. Specifically, the jury found that Tyson  failed to compensate plaintiffs for time spent during the continuous workday for pre-and post-shift activities; that Tyson willfully violated the FLSA; and that Tyson violated the KWPA. The jury awarded $166,345.00 for pre- and post-shift violations of the FLSA and awarded $366,666.00 for violations of the KWPA. The court denied Tyson's initial motion for a directed verdict on March 16, and entered judgment in favor of the plaintiffs on March 17. Dkt. No. 1046.

## II. Tyson's Motion for Judgment as a Matter of Law

### A. *Legal Standard*

Courts grant judgment as a matter of law under Fed. R. Civ. P. 50(b) only "cautiously and

---

[1] The court bifurcated the trial by plant, with Finney County being tried first. The parties also agreed to try the liquidated damages and statute of limitations (willfulness) issues to the court. But the willfulness issue was ultimately submitted to the jury.

sparingly." *Zuchel v. City & County of Denver*, 997 F.2d 730, 734 (10th Cir. 1993) (quotations omitted). Granting judgment as a matter of law is improper "'[u]nless the proof is all one way or so overwhelmingly preponderant in favor of the movant as to permit no other rational conclusion.'" *Crumpacker v. Kan. Dep't of Human Res.*, 474 F.3d 747, 751 (10th Cir. 2007) (quoting *Greene v. Safeway Stores, Inc.*, 98 F.3d 554, 557 (10th Cir. 1996)). When considering the motion, a court may not weigh the evidence, consider the credibility of the witnesses, or substitute its judgment for that of the jury. *Sims v. Great Am. Life Ins. Co.*, 469 F.3d 870, 891 (10th Cir. 2006). The court must view the record in the light most favorable to the nonmoving party, and affirm the verdict if it contains evidence upon which the jury could properly return a verdict for the nonmoving party. *See Bartee v. Michelin N. Am., Inc.*, 374 F.3d 906, 914 (10th Cir. 2004). The court, however, should enter judgment as a matter of law in favor of the moving party when "there is no legally sufficient evidentiary basis for a reasonable jury to find for the issue against that party." *Sims*, 469 F.3d at 891.

### B. Legal Conclusions

Tyson argues this court must grant its Motion for two reasons. First, that plaintiffs failed to submit adequate proof for purposes of the FLSA collective action and the Rule 23 class action. Second, Tyson contends plaintiffs did not prove it acted willfully under the FLSA. Tyson moves the court to grant it judgment as a matter of law on these issues or, in the alternative, to decertify the FLSA collective action and the Rule 23 class action. The court will analyze each argument in turn.

### 1. Collective and Class Action Viability

There are two separate standards for determining whether a court has properly certified a

collective action under the FLSA and a class action under Rule 23. "To maintain a collective action under the FLSA, plaintiffs must demonstrate that they are similarly situated." *Anderson v. Cagle's, Inc.*, 488 F.3d 945, 952 (11th Cir. 2007) (quotations omitted); *see also* 29 U.S.C. § 216(b) ("An action to recover the liability prescribed in either of the preceding sentences may be maintained against any employer (including a public agency) in any Federal or State court of competent jurisdiction by any one or more employees for and in behalf of himself or themselves and other employees similarly situated."). Plaintiffs need only show their positions are similar, not identical, to the positions held by the rest of the collective class members. *Grayson v. K-Mart Corp.*, 79 F.3d 1086, 1096 (11th Cir. 1996); *Chabrier v. Wilmington Fin., Inc.*, No. 06-4176, 2006 WL 3742774, at *3 (E.D. Pa. Dec. 13, 2006). Plaintiffs must, however, demonstrate a reasonable basis for their claim of class-wide treatment. *See Harper v. Lovett's Buffet, Inc.*, 185 F.R.D. 358, 362 (M.D. Ala. 1999).

The Tenth Circuit uses a two-step approach in determining whether plaintiffs are "similarly situated" under § 216(b). *See Thiessen v. General Elec. Capital Corp.*, 267 F.3d 1095, 1102-03 (10th Cir. 2001). Under *Thiessen*, the court makes an initial determination of "similarly situated" at the "notice stage" and another at the conclusion of discovery. *Id.* The standard at the conclusion of discovery is a stricter standard than that at the notice stage. *Id.* Because this case is at the post-trial motion stage, this court must evaluate whether the plaintiffs were similarly situated using the stricter standard. Under this standard, the court evaluates several factors including, (1) the disparate factual and employment settings of the individual plaintiffs, (2) the defenses available to defendants which appear to be individual to each plaintiff, and (3) fairness and procedural considerations. *Id.* at 1103; *see also Ruehl v. Viacom, Inc.*, 500 F.3d 375, 388 n.17 (3d Cir. 2007) ("A representative (but not

4

exhaustive or mandatory) list of relevant factors includes whether the plaintiffs are employed in the same corporate department, division and location; advanced similar claims of age discrimination; sought substantially the same form of relief; and had similar salaries and circumstances of employment."). The court must also consider whether the plaintiffs can show that the defendant has a common policy or plan in violation of the FLSA. *O'Brien v. Ed Donnelly Enters., Inc.*, No. 04-CV-00085, 2006 WL 3483956, at *3 (S.D. Ohio Nov. 30, 2006).

The requirements for class treatment under Fed. R. Civ. P. 23 are more stringent than those under 29 U.S.C. § 216(b). *See, e.g.,Vaughn v. Mortgage Source, L.L.C.*, No. 08-4737, 2010 WL 1528521, at *4 (E.D.N.Y. Apr. 14, 2010) (stating "courts have repeatedly stated that Section 216(b)'s 'similarly situated' requirement is considerably less stringent than the requirements for class certification under Rule 23."). The prerequisites for class certification include Fed. R. Civ. P. 23(a)'s requirements of numerosity, commonality, typicality, and adequacy of representation. In addition, Fed. R. Civ. P. 23(b)(3) requires predominance and superiority—that is, common questions must predominate over individual issues and class resolution must be superior to other methods of adjudication. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 613-15 (1997).

This court conditionally certified plaintiffs' FLSA collective action and Rule 23 class action on February 12, 2009. *See* Dkt. No. 741. Nevertheless, Fed. R. Civ. P. 23(c)(1)(C) permits the court to alter or amend class certification before final judgment. *See Briggs v. Anderson*, 796 F.2d 1009, 1017-19 (8th Cir. 1986); *Key v. Gillette Co.*, 782 F.2d 5, 6-7 (1st Cir. 1986). A decision to decertify after a trial on the merits must take into account the possible unfairness to the defendant. CHARLES ALAN WRIGHT, ARTHUR R. MILLER, & MARY KAY KANE, 7AA FEDERAL PRACTICE & PROCEDURE § 1785.4 (3d ed. 2005) ("If the class has lost on the merits, this result may be inappropriate when

the opponent has devoted the time and resources necessary to defend a class suit and now finds that only the named plaintiffs are bound and the same issues may have to be retried. Similarly, if the class prevailed, then decertification wrongly may deprive them of the fruits of their victory."). Because the class prevailed at trial here, the court must carefully weigh its decision to decertify as it may wrongly deprive plaintiffs of the fruits of their victory. *See id.*

2. The Plaintiffs Are Similarly Situated

*a. Tyson Had a Common Policy or Plan*

First, it is clear that Tyson had a common policy or plan of paying all class members on gang time and paying them K code. And the K code was based on average estimated amounts of time that it takes to don and doff the sanitary and safety equipment. Tyson does not dispute this. Rather Tyson contends the plaintiffs are not similarly situated because of their disparate employment settings.

*b. Employment Setting*

There are factual differences among the plaintiffs: they wore various combinations of sanitary and safety equipment; they spent varying amounts of time donning and doffing such items; they worked in different areas and departments at the plant with different specific duties; they used different knives or equipment; and they had different pre- and post-shift routines. But they also had important similarities: all plaintiffs worked at the Finney County, Kansas plant; all plaintiffs were required to don and doff some combination of sanitary and safety equipment; all plaintiffs were paid on gang time and were paid K code. The similarities between the plaintiffs outweigh the differences. Further, the similarly situated requirement does not require proof that each employee performed

identical jobs, or that each employee wore the same equipment. *See Tucker v. Labor Leasing, Inc.*, 872 F. Supp. 941, 947 (M.D. Fla. 1994). More importantly, Tyson had a company-wide policy of paying the plaintiffs on gang time and K code. *See Bouaphakeo v. Tyson Foods, Inc.*, 564 F. Supp.2d 870, 899 (N.D. Iowa 2008) (holding that the "tie that binds" all the plaintiffs was the gang time compensation system). While it is true that the employees vary to some degree in the equipment they are required to don and doff, the jury found that the plaintiffs spent at least some uncompensated time performing donning and doffing during the limitations period.

Tyson cites *Lugo v. Farmer's Pride, Inc.*, 737 F. Supp.2d 291 (E.D. Pa. 2010), in which the court granted a defendant's motion to decertify an FLSA collective action in a donning and doffing case. Tyson contends this court should grant its motion for judgment as a matter of law or decertify the class for the reasons stated in *Lugo*. The *Lugo* court decertified the class for many reasons:

> First, while plaintiffs bear some general similarities to one another, the evidence indicates that plaintiffs worked in different positions and departments and on different shifts at defendant's plant, and that these positions and departments varied not only as to the PPE required and worn, but also as to the schedules followed and the amount of time provided for donning-and-doffing activities before and after the shifts and meal periods. Furthermore, the time study prepared by plaintiffs' expert, Dr. Kenneth Mericle, indicated significant variation among workers regarding the amount of time necessary to perform these tasks.

*Id.* at 303-04. Although *Lugo* is a donning and doffing case, the plaintiffs did not identify a policy or plan that applied to the whole class, such as the gang time and K code payments here. The plaintiffs' principal argument in *Lugo* was not that the defendant's pay policy was unlawful as written, but that it was unlawfully applied. *Id.* at 304-05. The court found there was no evidence of a uniform policy to support the plaintiffs' claim that the defendant was not following its compensation system. *Id.* at 310 ("While plaintiffs have offered evidence suggesting defendant's compensation system may not have been followed as written at times, the Court finds this evidence

fails to demonstrate a single 'decision, policy or plan' on behalf of defendant to not compensate for donning and doffing activities."). The court also identified several inconsistencies in testimony, which undermined the credibility of the representative evidence as applicable to other class members. *Id.* at 310-11. Because the *Lugo* court did not involve a policy or plan similar to Tyson's gang time and K code, its application to this case is limited. The employment settings here weigh in favor of collective action treatment.

### c. Defenses Available

The second factor the court looks at is whether there are individual defenses that make collective action treatment improper. This factor clearly weighs in plaintiffs' favor. All the defenses presented to the court and to the jury have been adjudicated on a class-wide basis and are not individualized defenses. At summary judgement, the court considered whether the donning and doffing activities were integral and indispensable to the work performed by the plaintiffs, whether that time was *de minimis*, and whether liquidated damages and a three-year statute of limitations was appropriate for the class. The court denied summary judgment on these issues and the jury ultimately decided them (except liquidated damages), all on a class-wide basis. Thus, the court's treatment of the defenses in this case favors collective action treatment.

### d. Procedural and Fairness Considerations

Last, procedural and fairness considerations also weigh in plaintiffs' favor. The FLSA's collective action has an important remedial purpose: "(1) to lower costs to the plaintiffs through the pooling of resources; and (2) to limit the controversy to one proceeding which efficiently resolves

common issues of law and fact that arose from the same alleged activity." *Moss v. Crawford & Co.*, 201 F.R.D. 398, 410 (W.D. Pa. 2000) (citing *Hoffmann-La Roche, Inc. v. Sperling*, 493 U.S. 165, 170 (1989)). Throughout the six-year litigation history of this case, numerous Tyson employees have been able to recover unpaid wages that would likely not have been possible if each employee had filed individually. Further, this court has been able to efficiently adjudicate several common issues of law and fact throughout the course of this case. Accordingly, the procedural and fairness considerations weigh heavily against granting Tyson's Motion.

### e. Conclusion

All the *Thiessen* similarly-situated factors weigh in plaintiffs' favor. The plaintiffs have identified a common policy that applies to all plaintiffs and the factual similarities between the plaintiffs outweigh the differences. And there are no individual defenses that weigh against collective action treatment. Last, procedural and fairness grounds weigh in plaintiffs' favor. Accordingly, the court will not decertify the FLSA collective action.

### 3. Certification Under Rule 23 Was Appropriate

Tyson contends this court should decertify the Rule 23 class action because "there is no reason to assume that, because one employee reasonably required more than K Code time for compensable donning and doffing and walking activities, employees in different positions would take the same reasonable time to don/doff, much less that their walking times would be the same." Dkt. No. 1059, pgs. 7-8. To support its argument, Tyson cites the Eleventh Circuit's opinion in *Babineau v. Fed. Express Corp.* 576 F.3d 1183 (11th Cir. 2009). In *Babineau*, a putative class of

FedEx employees sued the company seeking pay for time worked prior to and after each shift and during break periods. *Id.* at 1185-86. Each employee had a scheduled start and finish time each day but, for a variety of reasons, many employees arrived early or left late. *Id.* at 1187-88. Additionally, not all employees worked during the break periods, and the company specifically prohibited employees from working during the rest breaks. *Id.* at 1188-89. The district court denied certification finding that there was no uniform way to determine how much time each employee worked before and after their shift or at the break periods because the testimony of several plaintiffs indicated each worked different amounts of time on any given day. *Id.* at 1191. The Eleventh Circuit affirmed the district court's denial of class certification. *Id.* at 1195.

By analogy, Tyson seeks to apply *Babineau* to this case. *Babineau*, however, is not as persuasive as Tyson would have it. First, the plaintiffs in *Babineau* did not identify a single policy or plan that applied to all plaintiffs, such as the gang time and K code here. And the court stated that even if the defendant did have a policy requiring employees to arrive early and stay late, the district court did not err in finding that this policy "would not predominate over individualized issues." *Id.* at 1193. Second, the Eleventh Circuit did not hold that class certification would never be appropriate in situations in which employees may have worked different amounts of time. The court merely held that the district court did not abuse its discretion in denying class certification—a much more narrow holding. *See id.* at 1195 (holding that "we find that the district court's denial of class certification was not an abuse of discretion"). In addition, the plaintiffs in *Babineau* were not required to perform certain functions before and after each shift such as donning and doffing, unlike the plaintiffs in this case. Thus, the dissimilarities to this case limit *Babineau's* persuasive value. *See Burch v. QWEST Comm's Int'l, Inc.*, 677 F. Supp.2d 1101, 1128 (D. Minn. 2009) (limiting *Babineau's* application

"[b]ecause the alleged uncompensated activity consists of almost identical actions by employees, regardless of geographic location or particular supervisors").

For substantially the same reasons that this court sustained the jury's verdict as to the collective action members, the court also finds that certification of the Rule 23 class was appropriate. First, the commonality requirement is met because the employees were paid on gang time and paid K code, notwithstanding the factual differences in safety and sanitary equipment worn by each employee. Second, plaintiffs have proved typicality because the plaintiffs' overall legal theory that Tyson's gang time and K code time is unlawful, or resulted in undercompensation, applies to all employees. Tyson does not challenge the adequacy or numerosity requirements.

The plaintiffs have also met the "predominance" and "superiority" components of Rule 23(b)(3). This Rule specifically lists four factors relevant to the court's determination of predominance and superiority:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
> (D) the likely difficulties in managing a class action.

FED. R. CIV. P. 23(b)(3)(A)-(D). First, the court does not believe that the individual plaintiffs have an interest in proceeding individually; in fact, they have made the decision not to do so. Individual suits would be costly and less likely to result in a significant remedy. The advantages of proceeding as a class are apparent—all class members have been able to adjudicate their claims in one trial. The second and third factors are largely irrelevant at this stage because the case has already been tried. And the fourth factor is also a nonissue because the court did not have difficulties managing this

class action. The plaintiffs have established predominance because they proved to the jury that they were not paid for all the work they performed under the gang time system and that the K code was insufficient to cover donning and doffing. To do so, they were required to prove that they performed work which was unpaid—the donning and doffing activities. Although, as noted previously, not all employees wear the same equipment or require the same amount of time to don and doff that equipment, these individual differences are not so significant that they predominate. Plaintiffs have also established superiority because the class action tried to the jury was superior to individual lawsuits filed by five thousand class members. It would have been more burdensome on the class members and the court to try these FLSA violations individually. *See Valentino v. Carter-Wallace*, 97 F.3d 1227, 1234 (9th Cir. 1996) ("Where classwide litigation of common issues will reduce litigation costs and promote greater efficiency, a class action may be superior to other methods of litigation."). Accordingly, the court will not decertify the Rule 23 class.

### 4. Representative Evidence

Next, Tyson argues that even if the plaintiffs are similarly situated, they failed to present sufficient representative testimony supporting the jury's finding that Tyson owed each plaintiff additional compensation. Specifically, Tyson complains the five testifying plaintiffs did not provide sufficient testimony to sustain their burden. The plaintiffs contend they presented sufficient class-wide proof and that there is no requirement that a certain amount or percentage of the class testify in order to recover. Further, they contend Dr. Radwin's time study stands in proxy for the thousands of plaintiffs who could have testified in court.

The use of representative evidence is well accepted for determining liability in FLSA cases.

*See Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680 (1946). The burden originally is on the employees to demonstrate with sufficient evidence that the employees have, in fact, performed work for which they were improperly compensated, and to produce sufficient evidence to show the amount and extent of that work "as a matter of just and reasonable inference." *Id.* at 687. As the Tenth Circuit stated in *Metzler v. IBP, Inc.*, "[w]hen the employer has failed to record compensable time and the employees have proved that they actually performed the work in question, the plaintiffs need only produce evidence sufficient to support a reasonable inference of the amount and extent of that work." 127 F.3d 959, 965 (10th Cir. 1997) (citing *Mt. Clemens*, 328 U.S. at 687); *see also Reich v. Southern New England Telecomms.*, 121 F.3d 58, 66-67 (2d Cir. 1997). "'The burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee[s'] evidence.'" *Metzler*, 127 F.3d at 965-66 (quoting *Mt. Clemens*, 328 U.S. at 687-88).

### a. Plaintiffs' Burden

The burden is on the plaintiffs to demonstrate with sufficient evidence that the employees have, in fact, performed work for which they were improperly compensated, and to produce sufficient evidence to show the amount and extent of that work, as a matter of just and reasonable inference. *Mt. Clemens*, 328 U.S. at 687. Employee testimony, documentary evidence, and expert testimony are appropriate methods of making a prima facie showing of a pattern or practice of unpaid time and wages. *See Castillo v. Givens*, 704 F.2d 181, 195 (5th Cir. 1983) (holding "plaintiffs met their burden of proof by demonstrating that they performed work and were not compensated . . ." where 13 plaintiffs testified regarding the hours they and members of their families worked and

13

plaintiffs' statistics expert testified and calculated a minimum and maximum number of hours each plaintiff worked), *overruled on other grounds by Mclaughlin v. Richland Shoe Co.*, 486 U.S. 128 (1988).

Tyson primarily contends the plaintiffs did not meet their burden because the testimony of five plaintiffs was insufficient. In support, Tyson cites several cases in which it contends testimony from more than five plaintiffs was required. *See, e.g.*, *Donovan v. Del-Loc Diner, Inc.*, 780 F.2d 1113, 1115-16 (4th Cir. 1985) (22 of 98 plaintiffs testified); *Donovan v. Burger King Corp.*, 672 F.2d 221, 225 (1st Cir. 1982) (6 employees testified out of 246); *McLaughlin v. DialAmerica Mktg., Inc.*, 716 F. Supp. 812, 825-26 (D.N.J. 1989) (43 of 393 testified). But these courts did not hold that a specific number of plaintiffs were required to testify. And Tyson concedes neither the FLSA nor Rule 23 require that a certain amount of plaintiffs in a collective or class action testify in order for the class to prevail at trial. Testimony from the plaintiffs is not the only type of representative evidence.

In addition to the employee testimony, the plaintiffs introduced Dr. Radwin's time study, in which he measured the reasonable amount of time that employees spend donning and doffing during various times of the day. The study was conducted by six videographers and Dr. Radwin's assistant Tom Yen in May 2010 over the course of three days. During those three days, the videographers sampled a number of employees to get a representative sample of different employees in different areas of the plant at different shifts and different departments. The videographers randomly selected certain employees at the beginning of each shift and began recording when the employee donned the first piece of equipment and stopped recording when the employee donned the last piece of equipment. Similarly, they recorded employees at the end of the shift from the time the employee

14

doffed the first piece of equipment until the employee doffed the last piece of equipment. They recorded donning and doffing at the meal period in the same manner. The time study also took into account the time spent by the sample employees in which they were not donning or doffing. For example, each time an employee went to the restroom while donning or doffing, or when an employee would sit and wait, the videographers measured that time, but subtracted it out of the total time. In all, Dr. Radwin and his colleagues videotaped 43 employees on the processing side, 26 preshift and 17 postshift. They also videotaped 24 slaughter employees, 13 preshift and 11 postshift. Based on these samples, Dr. Radwin averaged the pre- and post-shift times to calculate his estimate of times for the class. Dr. Radwin testified that his study was conducted within a confidence interval of 95—that is "if I did this study over and over again, 95 out of a hundred times I would expect to get an average between that interval." Dkt. No. 1018, pg. 145.

Dr. Radwin's time study bolsters the testimony of the five testifying plaintiffs and was used by the plaintiffs as a substitute for calling all or a substantial number of the plaintiffs to testify. As Dr. Radwin testified in response to a question of why he did not conduct a study of all the employees:

> Well, for one thing, it's not possible to follow everybody, there is just too many people to follow. And you don't need to. You can sample, and if you do it in a proper way, you can get a very good estimate within the boundaries of what we need to estimate to know how much time it takes.

Dkt. No. 1018, pg. 107. This court agrees. It was unnecessary for the time study to measure all employee plaintiffs' donning and doffing time. The representative sample presented, as testified to by Dr. Radwin, a sufficient evidentiary basis for the jury to decide the case. Therefore, this court will not upset that finding.

The plaintiffs also presented damages testimony from Dr. Baggett, their damages expert. Dr.

15

Baggett determined, from Tyson's records, the weeks that an employee was paid on gang time and paid K code. Then he took Dr. Radwin's averaged donning and doffing numbers, subtracted from that number the K code Tyson had already paid to each plaintiff, and calculated damages for each plaintiff.

The evidence submitted by the plaintiffs—five testifying witness and expert testimony from Dr. Radwin and Dr. Baggett—was sufficient to allow the jury to award damages for violations of the FLSA and the KWPA. While the testimony of the five plaintiffs alone likely would not have been sufficient to sustain the jury's verdict, when coupled with the evidence of the time study conducted by Dr. Radwin, and the damages figures calculated by Dr. Baggett, the evidence presented was sufficient to show the amount and extent of that work, as a matter of just and reasonable inference. Accordingly, the plaintiffs met their initial burden.

To be clear, Dr. Radwin's time study, and the numbers produced by Dr. Baggett are not completely without issues. The recorded times for each employee tested varied, that is, employee donning and doffing time was not uniform throughout the sample. And each employee's first act of donning and last act of doffing occurred at different times and at different locations in the plant. Tyson contends this "wide variation in individual outcomes" cannot possibly be representative of the class as a whole. But these differences do not undermine the representative value of the evidence. In fact, Tyson could not reasonably expect that the donning and doffing times or locations of donning and doffing would be the same for all employees. This is precisely why Dr. Radwin sought to determine "average times" and not the "actual time" it took every employee to don and doff their equipment. In order to meet their burden, the plaintiffs were required to present "evidence sufficient to show the amount and extent of that work, as a matter of just and reasonable inference."

16

*See Mt. Clemens*, 328 U.S. at 687. They have done so.

### b. Tyson's Rebuttal

Because the plaintiffs have shown that they performed unpaid work and provided evidence as to the amount of unpaid work, the burden shifts to Tyson to produce "evidence of the precise amount of work performed or evidence to negative the reasonableness of the inference to be drawn from the employee's evidence. If the employer fails to produce such evidence, the court may then award damages to the employee[s], even though the result be only approximate." *Mt. Clemens*, 328 U.S. at 687-88. "'The employer cannot be heard to complain that the damages lack the exactness and precision of measurement that would be possible had he kept records in accordance with the requirements of [29 U.S.C. § 211(c)].'" *Metzler*, 127 F.3d at 966 (quoting *Mt. Clemens*, 328 U.S. at 688).

Tyson has not produced evidence of the precise amount of work performed by the plaintiffs to negative the reasonableness of the jury's award. As noted above, the plaintiffs submitted evidence through representative testimony of five plaintiffs, Dr. Radwin's time study, and the testimony of their damages expert Dr. Baggett. This evidence was sufficient to show the amount and extent of the work performed. Tyson has failed to rebut the evidence by showing the precise amount of work performed. Because Tyson does not record the compensable time worked by its employees, it cannot complain that the damages lack precision. *See Metzler*, 127 F.3d at 966. Accordingly, the plaintiffs presented sufficient representative evidence to support the jury's verdict, and Tyson's Motion is denied.

17

### C. Willfulness

The FLSA adopts a two-year statute of limitations in actions for unpaid wages, unless the employer acted willfully, in which case the limitations period is three years. *See* 29 U.S.C. § 255(a) (2006). The employee has the burden of proving the employer acted willfully. *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 135 (1988). To show willfulness, the plaintiffs must prove "the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute." *Id.* at 133; *Smith v. Aztec Well Servicing Co.*, 462 F.3d 1274, 1283 (10th Cir. 2006); *Reich v. Monfort*, 144 F.3d 1329, 1334 (10th Cir. 1998). An employer's action is not willful when the employer acts reasonably or unreasonably, so long as it did not act recklessly. *Mclaughlin*, 486 U.S. at 135 n.13. Mere negligence is generally not enough to sustain a finding of willfulness. *Nelson v. Waste Management of Alameda County, Inc.*, 33 F. App'x 273, 274 (9th Cir. 2002). But "[f]or § 255's extension to obtain, an employer need not knowingly have violated the FLSA; rather, the three-year term can apply where an employer disregarded the very 'possibility' that it was violating the statute . . . although we will not presume that conduct was willful in the absence of evidence." *Alvarez*, 339 F.3d at 908-09 (citing *Cox v. Brookshire Grocery Co.*, 919 F.2d 354, 356 (5th Cir.1990)) (internal quotations omitted).

Here, the court submitted the willfulness issue to the jury, and the jury found that Tyson willfully violated the FLSA.[2] For the following reasons, the court finds that the plaintiffs established sufficient facts on the willfulness issue, and the court will not disturb the jury's verdict.

To fully understand the willfulness issue, this court must analyze what Tyson (formerly IBP) knew regarding its compliance with the FLSA. The United States Department of Labor began

---

[2]The jury also awarded the plaintiffs damages based on Tyson's violations of the KWPA. But the jury found that Tyson did not willfully violate the KWPA.

investigating a number of IBP's beef and pork processing plants in 1987. The DOL took the position that the time spent donning and doffing protective gear and clothing and walking to and from the workstation was compensable. Trial Transcript, Dkt. No. 1031, pg. 44-46. In 1988, the DOL filed a lawsuit known as *Reich v. IBP*, in the District of Kansas. The lawsuit covered a number of plants, including the one in Finney County. *Id.* at 140-42.  The trial was bifurcated between a liability phase and a damages phase. After a trial to the court in 1993, Judge Earl E. O'Connor found the following activities compensable: time spent walking from the knife room to the work station and back to the knife room; time spent waiting in the knife room; time spent donning personal protective gear unique to the production job of individual employees; time spent cleaning knives and unique personal protective gear. *Reich v. IBP, Inc.*, 820 F. Supp. 1315, 1322-27 (D. Kan. 1993). He also found these activities noncompensable: clothes changing time and walking time related to obtaining sanitary outer garments. *Id.* The Tenth Circuit affirmed the district court's findings. *Reich v. IBP, Inc.*, 38 F.3d 1123, 1127-28 (10th Cir. 1994). The case proceeded to its damages phase with a bench trial in July 1995. The district court found that the employees were entitled to compensation for the reasonable time necessary to complete the compensable activities. *Reich v. IBP, Inc.*, No. 88-2171, 1996 WL 137817, at *3-6 (D. Kan. Mar. 21, 1996) (holding that "fourteen minutes is the total average reasonable time involved for all compensable pre-shift and post-shift activities"). The court also permanently enjoined IBP from future violations of the FLSA. *Id.* at *8-9. Additionally, IBP was ordered "to record and compensate for time spent in compensable activities under its present working conditions," and to "implement recordkeeping practices sufficient to record the time spent by each employee in performing pre-shift and post shift activities found to be compensable under the act." *Id.* IBP appealed this decision, and the Tenth Circuit affirmed. *Metzler v. IBP, Inc.*, 127

F.3d 959, 966 (10th Cir. 1997).

After IBP's last appeal in 1997, it still disputed how much it was required to pay under *Reich*. As a result, in April 1998 the DOL filed another suit against IBP alleging it was wrongfully withholding compensation from workers. *See Herman v. IBP, Inc.*, No. 98-2163 (D. Kan. Apr. 10, 1998). In 1998, IBP began a time study of the pre- and post-shift activities as they related to unique, personal protective equipment that the *Reich* court found to be compensable. IBP determined that it took four minutes per day to perform such activities. The DOL sent an independent time-study expert, Dr. Fernandez, to conduct its own time study. The DOL came up with similar compensable time figures. IBP began paying four minutes per day for donning and doffing activities performed by employees in knife-wielding departments, which was called "K code" time in 1998. Eventually the DOL agreed that four minutes per day was sufficient to pay employees for back pay from October 1994 to 1999 even though four minutes was less than the amount of time the *Reich* court found that IBP owed. Thereafter, the DOL Solicitor's Office sent IBP a letter stating that "IBP may continue its current practice with respect to recording and compensating pre and post shift compensable activities until such time as the Department announces its position with respect to recordkeeping in the industry." Trial Transcript, Dkt. No. 1031, pg. 68-69. Tyson understood that the DOL was not giving its blessing to IBP's K code payment system, but was saying that it could use K code until the DOL announced its opinion on the matter. On July 16, 1999, the court dismissed *Herman v. IBP*, in accordance with a joint stipulation submitted by the parties.

Tyson acquired IBP in 2001, and continued the practice of paying four minutes of K code. The DOL announced its position on recordkeeping in an opinion letter on January 15, 2001. In that opinion, the DOL stated that "in order to comply with the FLSA and its implementing regulation

20

. . . [a] company must record and pay for each employee's actual hours of work. Including compensable time spent putting on, taking off, cleaning his or her protective equipment, clothing or gear." Trial Transcript, Dkt. No. 1031, pg. 71-72. Tyson's Senior Vice President of Human Resources, Kenneth Kimbro, testified that Tyson knew that this was the DOL's position, and admitted that he personally lobbied the DOL for that opinion, albeit a part of the opinion relating to unions. Yet he also testified that he was not aware of the opinion letter until 2005 or 2006. Regardless, he agreed that Tyson did not comply with the opinion letter in 2001 or in 2005. On redirect, Mr. Kimbro testified as follows:

> Q. When it suits your company's purpose, it will follow the DOL, right? And when it doesn't suit your company's purpose, you ignore it, right?
> A. I think [when] we believe we're right we do, and when we believe they are wrong, we challenge it.
> Q. Okay. So you get to choose when the Department of Labor is right and wrong, right? That's what you are saying?
> A. I believe so.
> Q. So you get to selectively decide which part of the Department's labor guidance you want to follow and which part you just want to ignore, that's your choice, that's what you say?
> A. I believe so.

Trial Transcript, Dkt. No. 1031, pg. 229 (alterations added).

In 1998, employees at IBP's Pasco, Washington, plant filed suit to recover unpaid wages for donning and doffing related activities, including walking to and from workstations. The trial court found, among other things, that the time spent donning and doffing protective gear pre-and post-shift was work and required compensation under the FLSA. *Alvarez v. IBP, Inc.*, No. CT-98-5005, 2001 WL 34897841, at *13-14 (E.D. Wash. Sept. 14, 2001). It also found that time spent walking to and from the locker room and work station, time spent donning and doffing at the meal and rest break, and time devoted to waiting for, preparing, handling, replacing, and washing equipment was

21

compensable. *Id.* The Ninth Circuit agreed with the district court and held that "'donning and doffing' and 'waiting and walking' constitute compensable work activities except for the *de minimis* time associated with the donning and doffing of non-unique protective gear." *Alvarez v. IBP, Inc.*, 339 F.3d 894, 904 (9th Cir. 2003). Tyson appealed this decision to the Supreme Court. On November 8, 2005, the Court held that pre-shift walking time is compensable as part of the continuous workday if it occurs after the first principal activity of the day, and post-shift walking time is compensable if it occurs before the last principal activity of the day. After this ruling, Tyson conducted more time studies. Effective January 2007, Tyson authorized seven minutes of K code, which it began to pay in August 2007. Tyson also back paid its employees from January 2007. From the Supreme Court's decision in November 2005 to January 2007 Tyson knew that it was required to pay for compensable walking time at Finney County but it did not do so. According to Mr. Kimbro, the company was focused on determining how much more K code to add for walking time and to start paying that amount on a forward basis.

Tyson contends that the jury's verdict on willfulness cannot stand because Tyson has complied with the *Reich* injunction and with the Supreme Court's decision in *Alvarez*. Tyson contends that its interpretation of *Reich* did not mandate that it record and pay for actual time spent donning and doffing, rather it believes it can pay for the reasonable time spent doing those things, i.e., K code. The plaintiffs argue that Tyson has acted willfully by not recording and paying for actual time spent performing the donning and doffing activities. They argue that the *Reich* injunction required Tyson to record actual time and that the DOL explicitly informed Tyson that it needed to record and pay for actual time. And because Tyson has refused to pay actual time but instead has adopted the K code or "reasonable time" payments it has willfully violated the FLSA.

22

The plaintiffs have produced sufficient evidence that Tyson knew or showed reckless disregard that its pay practices were prohibited by statute. First, this court issued a permanent injunction against Tyson over 15 years ago restraining it from future violations of the FLSA. That injunction also required Tyson to record and to pay employees for time spent on compensable activities. In response, Tyson conducted time studies and began paying its employees in knife wielding departments four minutes per day for donning and doffing activities. Although less than the amount of time the court found Tyson owed, the DOL settled its lawsuit with Tyson. Yet, as the Ninth Circuit stated in *Alvarez*, "IBP's four-minute compliance plan, moreover, merely embodies an effort to overcome a settlement impasse," thus, the DOL did not approve Tyson's method of paying K code rather than actual time. *See* 339 F.3d at 908. In fact, on January 15, 2001, the DOL explicitly announced in an opinion letter that Tyson must record and pay for each employee's actual hours of work. Although Mr. Kimbro repeatedly denied knowing about the letter until 2005, Tyson did not change its pay practice in 2005. And the jury also had sufficient grounds for questioning the credibility of Mr. Kimbro's testimony on this matter, especially in light of his admission that Tyson follows DOL opinion statements when they are in Tyson's favor, but challenges the DOL or refuses to comply with DOL interpretations when they are not in Tyson's favor.

It is true that the courts and not the DOL are the final interpreters of the FLSA. The pertinent regulation provides that "[t]he ultimate decisions on interpretations of the act are made by the courts. The Administrator must determine in the first instance the positions he will take in the enforcement of the Act. The regulations in this part seek to inform the public of such positions. It should thus provide a 'practical guide for employers as to how the office representing the public interest in its enforcement will seek to apply it.'" 29 C.F.R. § 785.2 (quoting *Skidmore v. Swift*, 323 U.S. 134, 138

(1944)). But Tyson's admittedly cavalier attitude regarding the DOL's 2001 opinion letter is pertinent to the willfulness issue.

After *Alvarez*, Tyson again conducted time studies. At the conclusion of these studies, it determined it needed to add between one and three minutes of K code to each employee's pay per day. As a result, Tyson decided to increase its K code by three minutes in January 2007, but it did not make any back payments for time worked before January 2007. It is clear at this point that Tyson either knew or should have known that the K code minutes it added in response to *Alvarez* should have been paid to its employees before January 2007. Mr. Kimbro testified that Tyson was concerned with making the payments on a forward basis and did not consider paying before January 2007. The plaintiffs need not prove that Tyson knew it was in violation of the law, it is sufficient that Tyson "showed reckless disregard for the matter of whether its conduct was prohibited by the statute." *See McLaughlin*, 486 U.S. at 133. Tyson cannot avoid a finding of willfulness simply by hiding behind its admission that it was only thinking about compliance going forward. And from Mr. Kimbro's testimony alone the jury had sufficient evidence to conclude that Tyson knew or recklessly disregarded the possibility that it had not paid sufficient compensation to its employees under the FLSA during the limitations period.

As stated by another court "[t]hese defendants [Tyson and IBP], individually or collectively, have now been litigating this same issue for decades, reflecting what can only be described as a deeply-entrenched resistance to changing their compensation practices to comply with the requirements of the FLSA." *Jordan v. IBP, Inc., & Tyson Foods, Inc.*, 542 F. Supp.2d 790, 794 (M.D. Tenn. 2008) (alterations added); *see also* Trial Transcript, Dkt. No. 1031, pgs. 105-06. The jury in this case had ample evidence from which to agree with the sentiment expressed by the court

in *Jordan*. And, for the reasons stated above, the jury had a sufficient evidentiary basis for concluding that Tyson willfully violated the FLSA. Accordingly, Tyson's Motion for Judgment as a Matter of Law is denied.

### III. Tyson's Motion to Alter Judgment to Receive Credit for Sunshine Time

In this Motion, Tyson seeks a remittitur (a reduction) in damages for "sunshine time" paid to the plaintiffs. Sunshine time was a form of compensation paid to slaughter employees representing the difference between the amount of time scheduled for a shift and the amount of time in which it took to complete the work for the day. For example, if the shift was scheduled to last 7 hours and 56 minutes yet the employees finished the work in 7 hours and 40 minutes, the employees were paid for the entire scheduled shift. The parties agree that allowing an offset for sunshine time would reduce plaintiffs' damages by $67,507.

#### A. Legal Standard

Ordinarily a motion for remittitur is appropriate when the jury erred in awarding damages. *Arnold v. Riddell, Inc.*, 882 F. Supp. 979, 995 (D. Kan. 1995). Whether or not to grant a remittitur motion is within the sound discretion of the trial court. *Aerotech Res., Inc. v. Dodson Aviation, Inc.*, 191 F. Supp.2d 1209, 1223 (D. Kan. 2002). The court, however, may not substitute its judgment for that of the jury. *Goico v. Boeing Co.*, 358 F. Supp.2d 1028, 1030 (D. Kan. 2005). "'[A]bsent an award so excessive as to shock the judicial conscience and to raise an irresistible inference that passion, prejudice, corruption or other improper cause invaded the trial, the jury's determination of the damages is considered inviolate.'" *Id.* (quoting *Fitzgerald v. Mountain States tel. & Tel. Co.*, 68

F.3d 1257, 1266 (10th Cir. 1995) ((citing *Malandris v. Merrill Lynch, Pierce, Fenner, & Smith, Inc.*, 703 F.2d 1152, 1168 (10th Cir. 1981))). In this case, application and possible reduction of damages based on sunshine time was not submitted to the jury; both parties agreed the court would make this determination. Thus, the normal standards for remittitur do not apply.

### B. Analysis

Section 207(h) is the only provision in the FLSA that addresses offsets. *See* 29 U.S.C. § 207(h). This section provides:

> (h) Extra compensation creditable toward overtime compensation
> (1) Except as provided in paragraph (2), sums excluded from the regular rate pursuant to subsection (e) shall not be creditable toward wages required under section 6 or overtime compensation required under this section.
>
> (2) Extra compensation paid as described in paragraphs (5), (6), and (7) of subsection (e) of this section shall be creditable toward overtime compensation payable pursuant to this section.

*Id.* § 207(h)(1)-(2). According to paragraphs (h)(1) and (2), sums excluded from the regular rate of pay may not be used as offsets except the three exceptions found in subsection (e). The three types of compensation eligible for offsets in subsection (e) are: (5) regular time and a half overtime for hours worked in excess of 8 in one day or in excess of the maximum workweek applicable to the employee; (6) premium pay for days worked on weekends or holidays; and (7) premium pay provided under an employment contract or collective-bargaining agreement. *Id.* § 207(e)(5)-(7).[3]

---

[3]Section 207(e)(5)-(7) provides:
(5) extra compensation provided by a premium rate paid for certain hours worked by the employee in any day or workweek because such hours are hours worked in excess of eight in a day or in excess of the maximum workweek applicable to such employee under subsection (a) of this section or in excess of the employee's normal working hours or regular working hours, as the case may be;
(6) extra compensation provided by a premium rate paid for work by the employee on Saturdays, Sundays, holidays, or regular days of rest, or on the sixth or seventh day of the workweek, where such premium rate is not less than one and one-half times the rate established in good faith for like work

Both parties disagree as to the correct reading of the statute. According to Tyson, the statute does not apply to bar offsets for sunshine payments because it paid sunshine time as part of the regular rate, thus, falling outside the realm of subsection (h)(1). Because the statute does not specifically bar an offset for sunshine pay, Tyson contends it is available. Plaintiffs, on the other hand, read subsection (h)(2) as providing the only three instances in which compensation may be offset against wages not paid.

To be clear, the plain language of the statute does not explicitly support either party's position. Unlike Tyson contends, the statute does not provide that amounts included in the regular rate are eligible as an offset unless otherwise excluded. Likewise, contrary to plaintiffs' position, the statute does not provide that only in the three instances listed in subsection (e) may a defendant be eligible for an offset. Rather, the statute establishes the three instances in which payments excluded from the regular rate are nonetheless eligible for an offset.

This court must determine whether the sunshine pay here, indisputably paid as part of the regular rate, is eligible for an offset; a situation not addressed by § 207(h). The only court of appeals to have ruled on a similar issue held that § 207(h) did not apply. *See Singer v. City of Waco, Tex.*, 324 F.3d 813, 827 (5th Cir. 2003). In *Singer*, the court held amounts paid in excess of overtime compensation due under the FLSA were properly offset against plaintiffs' damages because the excess payments were part of the plaintiffs' regular rate of pay. *Id.* at 828. In reaching that

_____

performed in nonovertime hours on other days;

(7) extra compensation provided by a premium rate paid to the employee, in pursuance of an applicable employment contract or collective-bargaining agreement, for work outside of the hours established in good faith by the contract or agreement as the basic, normal, or regular workday (not exceeding eight hours) or workweek (not exceeding the maximum workweek applicable to such employee under subsection (a) of this section, where such premium rate is not less than one and one-half times the rate established in good faith by the contract or agreement for like work performed during such workday or workweek;

*Id.*

27

conclusion, the Fifth Circuit determined that § 207(h) "does not apply in this case [because] . . . [t]hat provision refers to payments that are *not included* in determining the regular rate of pay." *Id.* (emphasis in original). Tyson cites two other cases which have cited *Singer* and agreed with its holding that § 207(h) is inapplicable to situations in which an offset is sought for an amount included in the regular rate of pay. *See Monroe Firefighters Ass'n v. City of Monroe*, No. 06-CV-1092, 2009 WL 916272, at *11-12 (W.D. La. Mar. 31, 2009); *Solis v. Tyson Foods, Inc.*, No. 2:02-CV-1174-VEH (attached as Ex. B. to Dkt. No. 1057). In *Solis*, the defendants sought a jury instruction entitling it to an offset for extra compensation it alleged it paid at the meal period and rest breaks. Citing *Singer*, the court found the extra compensation was included as part of the regular rate, thus, § 207(h) did not apply. *See* Dkt. No. 1057, Ex. B. Pg. 5. Ultimately, the court refused to allow the offset instruction, but only because defendants failed to present any evidence as to the amount of over-compensation or the amount of over-compensated time.

Plaintiffs cite *Alvarez v. IBP, Inc.*, and a DOL regulation to support their position that the sunshine payments should not be used to offset their damages. *See Alvarez v. IBP, Inc.*, No. CT-98-5005, 2001 WL 34897841, at *24 (E.D. Wash. Sept. 14, 2001), *reversed on other grounds by Alvarez v. IBP, Inc.*, 339 F.3d 894 (9th Cir. 2003); 29 C.F.R. § 778.207. The *Alvarez* court briefly addressed the issue of sunshine payment offsets and concluded:

> IBP has sought to treat Sunshine payments as an offset. The Court finds that these Sunshine payments are in the nature of incentive pay, *i.e.*, a reward for working more efficiently and at greater speeds. In effect, IBP has been making these payments to slaughter division employees for their production floor performance during their work shift. Sunshine pay is not payment for off-the-clock work, nor is it the type of premium pay that could offset overtime pay obligations under U.S.C. § 207(h). Similarly, Sunshine pay is not compensation for MWA off-the-clock work and does not offset MWA damages.

2001 WL 34897841, at *24. While not dispositive, this case clearly supports plaintiffs' position.

28

The DOL regulation plaintiffs cite also provides support for their position:

> (a) Overtime premiums are those defined by the statute. The various types of contract premium rates which provide extra compensation qualifying as overtime premiums to be excluded from the regular rate (under section 7(e)(5), (6), and (7) and credited toward statutory overtime pay requirements (under section 7(h)) have been described in §§ 778.201 through 778.206. The plain wording of the statute makes it clear that extra compensation provided by premium rates other than those described cannot be treated as overtime premiums. Wherever such other premiums are paid, they must be included in the employee's regular rate before statutory overtime compensation is computed; no part of such premiums may be credited toward statutory overtime pay.
>
> (b) Nonovertime premiums. The Act requires the inclusion in the regular rate of such extra premiums as nightshift differentials (whether they take the form of a percent of the base rate or an addition of so many cents per hour) and premiums paid for hazardous, arduous or dirty work. It also requires inclusion of any extra compensation which is paid as an incentive for the rapid performance of work, and since any extra compensation in order to qualify as an overtime premium must be provided by a premium rate per hour, except in the special case of pieceworkers as discussed in § 778.418, lump sum premiums which are paid without regard to the number of hours worked are not overtime premiums and must be included in the regular rate. For example, where an employer pays 8 hours' pay for a particular job whether it is performed in 8 hours or in less time, the extra premium of 2 hours' pay received by an employee who completes the job in 6 hours must be included in his regular rate. Similarly, where an employer pays for 8 hours at premium rates for a job performed during the overtime hours whether it is completed in 8 hours or less, no part of the premium paid qualifies as overtime premium under sections 7(e)(5), (6), or (7).

29 C.F.R. § 778.207. Plaintiffs contend the language "extra compensation which is paid as an incentive for the rapid performance of work" refers to sunshine pay. Under the regulation, such pay is included in the regular rate. Plaintiffs then point to the portion of subsection (a) which provides "[t]he plain wording of the statute makes it clear that extra compensation provided by premium rates other than those described cannot be treated as overtime premiums. Wherever such other premiums are paid, they must be included in the employee's regular rate before statutory overtime compensation is computed; *no part of such premiums may be credited toward statutory overtime pay*." 29 C.F.R. § 778.207(a) (emphasis added). Plaintiffs argue the sunshine payments do not

qualify for an offset because it is extra compensation, other than that described in § 207(e)(5)-(7), which may not be credited toward statutory overtime pay. Although not cited by plaintiffs, another section of the regulations strengthens this interpretation. *See* 29 C.F.R. § 778.201(c). This section provides: "Section 7(h) [§ 207(h)] of the Act specifically states that the extra compensation provided by these three types of payments may be credited toward overtime compensation due under section 7(a) for work in excess of the applicable maximum hours standard. *No other types of remuneration for employment may be so credited.*" *Id.* (emphasis added).

This court finds the sunshine payments at issue are incentive payments for rapid performance of work that must and are calculated as part of the regular rate. Because such payments are included in the regular rate and they do not fall under the exceptions listed subsection (e)(5)-(7), § 207(h) does not apply. This does not mean, however, that the payments are automatically creditable against plaintiffs' damages award simply because they are part of the regular rate and not covered by § 207(h). All three of the cases Tyson relies on for that proposition, *Singer*, *Monroe Firefighters*, and *Solis*, involved extra compensation not akin to the sunshine payments here. *Singer*, 324 F.3d at 826 (involving faulty overtime calculations resulting in overpayments in which firefighters worked 96 hours); *Monroe Firefighters*, 2009 WL 916272, at *10 (involving an extra lump sum payment for 6.5 hours at half the regular rate and longevity payments paid to firefighters after their 23rd year of employment); *Solis*, No. 2:02-CV-1174 (involving extra compensated minutes received at lunch and rest breaks).

The DOL's regulations are not binding on this issue. *See* 29 C.F.R. § 775.1 ("Advisory interpretations announced by the Administrator serve only to indicate the construction of the law which will guide the Administrator in the performance of his administrative duties . . . ."); 29 C.F.R.

§ 778.1 ("This Part 778 constitutes the official interpretation of the Department of Labor with respect to the meaning and application of the maximum hours and overtime pay requirements contained in section 7 of the Act. It is the purpose of this bulletin to make available in one place the interpretations of these provisions which will guide the Secretary of Labor and the Administrator in the performance of their duties under the Act unless and until they are otherwise directed by authoritative decisions of the courts or conclude, upon reexamination of an interpretation, that it is incorrect."); 29 C.F.R. § 785.2 ("The ultimate decisions on interpretations of the act are made by the courts."). But because 29 C.F.R. §§ 778.201 and 778.207 are interpretative regulations, this court should defer to them to the extent they have the power to persuade. *Fowler v. Incor*, 279 F. App'x 590, 598 (10th Cir. 2008) (citing *Skidmore v. Swift & Co.*, 323 U.S. 134, 138 (1944)).

Nothing in the FLSA expressly permits Tyson to offset the amount it paid in sunshine payments against plaintiffs' recovery. The regulations indicate such sunshine payments should not be offset against plaintiffs' damages. Because the payments are not the type Congress expressly authorized to be used for offset treatment, this court finds the regulations persuasive and holds Tyson's sunshine payments may not be offset against plaintiffs' damages. Therefore, Tyson's Motion is denied.

## IV. Plaintiffs' Motion to Alter or Amend Judgment

Plaintiffs move this court for (1) an award of liquidated damages, (2) an award of pre-judgment interest, (3) an award of post-judgment interest, and (4) clarification of the class definition. The court will address each request in turn.

### A. Liquidated Damages

31

An employer may avoid paying liquidated damages for violating the FLSA "if the employer shows to the satisfaction of the court that the act or omission giving rise to such action was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation of the Fair Labor Standards Act of 1938." 29 U.S.C. § 260 (2006). "'[L]iquidated damages are not a penalty exacted by the law, but rather compensation to the employee occasioned by the delay in receiving wages due caused by the employer's violation of the FLSA.'" *Jordan v. United States Postal Servs.*, 379 F.3d 1196, 1202 (10th Cir. 2004) (quoting *Herman v. RSR Sec. Servs. Ltd.*, 172 F.3d 132, 142 (2d Cir. 1999)). While the employer must prove subjective good faith, it must also prove that its actions were objectively reasonable. *Overly v. Black & Veatch Corp.*, No. 05-2161, 2006 WL 1517761, at *3 (D. Kan. May 25, 2006). If the employer meets that burden the court retains discretion whether to award liquidated damages. *Greene v. Safeway Stores, Inc.*, 210 F.3d 1237, 1245 (10th Cir. 2000). But the Tenth Circuit has adhered to a different rule when a jury has determined that the defendant willfully violated the FLSA. *Brinkman v. Dep't of Corrections of Kan.*, 21 F.3d 370, 372-73 (10th Cir. 1994). "The same willfulness standard for the statute of limitations issue applies to the liquidated damages issue." *Id* at 373. Thus, the court is prohibited from reaching a contrary result as to liquidated damages. *Id.* at 372-73 ("We have held that when fact issues central to a claim are decided by a jury upon evidence that would justify its conclusion, the Seventh Amendment right to a jury trial prohibits the district court from reaching a contrary conclusion.").

Here, recognizing *Brinkman's* holding, the parties have agreed this court must award liquidated damages in the full amount of the FLSA award, or $166,345.00. Tyson filed its motion for remittitur seeking to reduce the liquidated damages award to $153,638.00. However, as noted

above, the court denied defendants' Motion. And the court denied Tyson's Motion for Judgment as a Matter of Law on the willfulness issue. Therefore, the court grants plaintiffs' Motion and awards liquidated damages to plaintiffs in the amount of $166,345.00.

### B. Pre-Judgment Interest

The parties agree that the plaintiffs are entitled to pre-judgment interest on the KWPA claim. Further, the parties agree it is appropriate to apply a 10% per annum interest rate.[4] Plaintiffs calculated the interest by taking the KWPA award, $336,666, and dividing it by the number of months in the class period, which equals $3,699.63 per month. The 10% interest rate is then applied to the $3,699.63 resulting in a prejudgment interest of $116,538.23. Tyson sought to reduce this amount through its Remittitur Motion, but the court denied the Motion. Therefore, the court grants plaintiffs' Motion for pre-judgment interest and awards them $116,538.23.

### C. Post-Judgment Interest

In plaintiffs' initial brief (Dkt. No. 1055), plaintiffs sought post-judgment interest at ten percent per annum running from the date the court entered judgment. The parties have since conferred and agreed that 28 U.S.C. § 1961 governs the award of post-judgment interest. This statute provides, "[i]nterest shall be allowed on any money judgment in a civil case recovered in a district court. . . . Such interest shall be calculated from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of

---

[4] "At the discretion of the presiding officer, interest, as provided under K.S.A. 16-201, and amendments thereto, may be assessed on wage claims found to be due and owing from the date the wages were due as defined in K.S.A. 44-314, and amendments thereto." KAN. STAT. ANN. § 44-323(a). Kan. Stat. Ann. § 16-201 provides that the interest rate shall be ten percent per annum.

Governors of the Federal Reserve System, for the calendar week preceding the date of the judgment." This court entered judgment on March 17, 2011. The weekly average in the preceding week, as provided by the parties, was 0.252%. Thus, pursuant to § 1961, this court amends judgment to provide for post-judgment interest running from March 17, 2011, to the date of payment at the rate of 0.252%.

### D. Modification of Class Definition

Last, plaintiffs move the court to amend the final Rule 23 class definition to the following:

> All current and former hourly employees of Defendants who worked at the Finney County facility from May 15, 2003, to December 31, 2010, who were paid on a "Gang Time" basis and paid for their donning and doffing activities on an "average time" basis using K-code.

Dkt. No. 1055, pg. 3. Essentially, plaintiffs seek to remove any reference to the Emporia claims and employees because the trial was bifurcated, the Emporia trial yet to take place. They also seek to include only employees who were paid gang time and K code. Plaintiffs' request to amend the class definition to exclude Emporia class members is granted. The court bifurcated the trial in this matter and tried the Finney County facility first. Dkt. No. 976. All evidence at trial only pertained to the Finney County facility, and no facts were presented as to the Emporia facility. Tyson does not appear to dispute this modification but it does object to plaintiffs' attempt to modify the class to include only employees paid on gang time and paid K code.

Plaintiffs moved for class certification on October 15, 2008. Judge Lungstrum certified this case as a class and collective action on February 12, 2009, and defined the class as:

> All current and former hourly employees of Defendants who worked at the Holcomb or Emporia facilities from May 15, 2003 to the present and who performed off-the-clock activities during one or more workweeks, including but not limited to

> donning, doffing, washing and walking and who were paid on a "Gang Time" basis
> and/or paid for their donning and doffing activities on an "average time" basis during
> one or more of those workweeks.

Dkt. No. 741, pg. 7. This initial class covered all employees paid on gang time "and/or" paid K code for donning and doffing activities. As explained in plaintiffs' brief, all individuals who were paid K code were also paid on gang time. But not all individuals paid on gang time were paid K code. Asserting that only individuals paid both gang time and K code were tried to the jury, plaintiffs believe individuals paid only gang time should not have their potential claims adjudicated in this trial because they were not subject to the K code payments that were central to liability and damages in this case. Said another way, plaintiffs seek to remove the "or" in the original class certification definition and leave the "and." This and/or distinction amounts to approximately 2,057 employees reducing the original class size of 7,187.

Tyson objects to plaintiffs' requested modification for several reasons. First and foremost, it argues that the class as originally defined by Judge Lungstrum and as provided in the Pretrial Order was the class tried to the jury. And it would be unfair to allow plaintiffs to remove over 2,000 class members at this late date. Second, Tyson takes issue at the time period in which plaintiffs first sought to formally narrow the class definition, arguing this also should preclude a modification.

Fed. R. Civ. P. 23(c)(1)(A) grants the district court wide discretion in the initial certification of a class.[5] *See DG ex rel. Stricklin v. Devaughn*, 594 F.3d 1188, 1194 (10th Cir. 2010) ("Recognizing the considerable discretion the district court enjoys in this area, we defer to the district court's certification ruling if it applies the proper Rule 23 standard and its 'decision falls within the bounds of rationally available choices given the facts and law involved in the matter at

---

[5]Fed. R. Civ. P. 23(c)(1)(A) provides: "At an early practicable time after a person sues or is sued as a class representative, the court must determine by order whether to certify the action as a class action."

hand.'") (quoting *Vallario v. Vandehey*, 554 F.3d 1259, 1264 (10th Cir. 2009)). This discretion

continues throughout the course of the litigation as Fed. R. Civ. P. 23(c)(1)(C) provides that "[a]n

order that grants or denies class certification may be altered or amended before final judgment." *See*

*id.* at 1201. This broad discretion to modify or decertify a class extends after a trial on the merits in

a given case. *See Forehand v. Fla. State Hosp. at Chattahoochee*, 89 F.3d 1562, 1566-67 (11th Cir.

1996); *Stastny v. Southern Bell Tel. and Tel. Co.*, 628 F.2d 267, 275-76 (4th Cir. 1980); *see also*

7AA CHARLES ALAN WRIGHT, ARTHUR R. MILLER, & MARY KAY KANE, FEDERAL PRACTICE &

PROCEDURE § 1785.4 (3d ed. 2005) ("Courts have modified or decertified classes at the outset of

pretrial, the completion of discovery, after summary judgment in favor of plaintiff class's injunctive

claims, but before awarding damages, at the close of plaintiff class's case-in-chief, and at the

completion of the trial on the merits."). The Eleventh Circuit in *Perryman v. Johnson Products Co.,*

*Inc.*, facing a similar situation, held the district court did not abuse its discretion when it reduced the

size of the class prior to a decision on the merits but after trial. 698 F.2d 1138, 1148 (11th Cir.

1983). In finding so the court stated:

> The defendant has failed to cite any case in which a trial court was held to have
> abused its discretion by reducing the size of a class prior to a decision on the merits
> where all members of the recertified class were also members of the original class.
> The prejudice, if any, suffered by [defendant] as a result of the recertification of the
> plaintiff class was not severe enough to compel our interference with the trial court's
> duty to facilitate the fair and expeditious utilization of the class action mechanism.

*Id.* at 1147-48. Tyson cites two cases for the proposition that a court may not alter the class

definition after trial. *See Garrett v. City of Hamtramck*, 503 F.2d 1236, 1244 (6th Cir. 1974); *EEOC*

*v. Detroit Edison Co.*, 515 F.2d 301, 310 (6th Cir. 1975). Neither of these cases, however, provide

support for defendants' position. In *Garrett*, the Sixth Circuit held that the district court abused its

discretion by enlarging the class definition to include individuals not represented in the action. 503

36

F.2d at 1245-46. By enlarging the class size the court found defendants had been prejudiced because they had no opportunity to argue against including such individuals. *Id.* at 1246. Similarly, in *Detroit Edison Co.*, the court found the district court erred by enlarging the plaintiff class in its decision on the merits to include previously excluded persons and persons likely not represented by the class as defined before and during trial. 515 F.2d at 310-11.

Here, the plaintiffs do not seek to enlarge the class definition to persons not previously contemplated as members of the class. On the contrary, plaintiffs are seeking to narrow the class. As such, any persuasive authority the *Garrett* and *Detroit Edison Co.* cases may have is limited. Tyson has not and cannot provide authority showing a court may not narrow class definition after trial.

Given this broad discretion the court finds it appropriate to modify the plaintiffs' Rule 23 class to encompass only those employees who were paid on gang time and paid K code. Plaintiffs' damages expert, Dr. Baggett, based his damages methodology on employees who received both gang time and K code. While Dr. Baggett may have studied and calculated damages for all 7,187 class members, it is clear that plaintiffs only sought to prove damages for those paid both gang time and K code. This is further bolstered by plaintiffs' representative testimony.

It is true that the initial Class Certification Order and the Pretrial Order defined the class to include gang time "and/or" K-code employees. It is also true, as Tyson contends, that the Pretrial Order binds counsel to the issues of fact and law to be decided. *See R.L. Drilling Contractors, Inc. v. Schramm, Inc.*, 835 F.2d 1306, 1308 (10th Cir. 1987). Yet, as noted above, this court's discretion to modify the class definition under Fed. R. Civ. P. 23(c)(1)(C) is paramount and does not dissipate merely because the initial Class Certification Order and the Pretrial Order contained a slightly

37

different class. Tyson cannot show prejudice as a result of narrowing the class definition.

Last, Tyson contends this court should not alter the class because plaintiffs did not try to amend the class definition prior to trial or before the conclusion of trial. In fact, Tyson contends the first time they became aware of plaintiffs' intention was during opening statements. It is true plaintiffs did not seek to formally narrow the class definition prior to trial, but it is disingenuous of Tyson to assert they were totally unaware of the class definition plaintiffs intended to try. Tyson became aware of plaintiffs' methodology in figuring damages when Dr. Baggett finished his initial report in August 2010. Thereafter, Dr. Baggett was not able to complete his report until late February 2011, because Tyson provided him with the final data necessary around January 26, 2011. Additionally, defense counsel acknowledged in an email on February 28, 2011, that the "Rule 23 class contains 5,130 persons who are claiming non-zero damages." Dkt. No. 1065, Ex. C. Even more, once the issue of final class definition arose during trial, plaintiffs prepared to file a motion immediately. Before doing so, plaintiffs sent a copy of the proposed order to defense counsel in an effort to reach agreement. In response defense counsel requested plaintiffs delay filing the motion until they could consult with their client. In an act of professional courtesy, plaintiffs did not file the motion before trial had concluded. Thus, it is abundantly clear that although plaintiff did not move for formal amendment, Tyson knew the class plaintiffs sought to try before the trial and throughout it.

In sum, this court finds it has discretion to modify the class definition to reflect the class presented at trial. Further, the court finds Tyson will not be prejudiced by this decision. Therefore, the final Rule 23 class shall be defined as follows:

> All current and former hourly employees of Defendants who worked at the Finney
> County facility from May 15, 2003, to December 31, 2010, who were paid on a

38

"Gang Time" basis and paid for their donning and doffing activities on an "average time" basis using K-code.

The court grants plaintiffs' Motion to Modify the Class Definition.

IT IS ACCORDINGLY ORDERED this 21st day of August 2012, that plaintiffs' Post-Trial Motion to Alter or Amend the Judgment Regarding Liquidated Damages, Interest, and the Final Class Definition (Dkt. No. 1055) is granted.

IT IS FURTHER ORDERED that Tyson's Motion for Remittitur to Receive Credit for "Sunshine Time" (Dkt. No. 1056) is denied.

IT IS FURTHER ORDERED that Tyson's Motion for Judgment as a Matter of Law (Dkt. No. 1058) is denied.

s/J. Thomas Marten
J. THOMAS MARTEN, JUDGE